

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

BETANIA TORIBIO, Administratix
of the Estate of JOHN JOAQUIN
TORIBIO, Deceased; and BETANIA
TORIBIO, Individually

        Plaintiffs,

    v.

PINE HAVEN, LLC, d/b/a PINE
HAVEN CAMPGROUND and PINE HAVEN
CAMPING RESORT; and DIVERSIFIED
INVESTMENTS, INC. a/k/a
DIVERSIFIED INVESTMENTS, LLC
a/k/a DIVERSIFIED INVESTMENT
SERVICES LLC,

        Defendants / Third
        Party Plaintiffs,

    v.

HEATHER MILLER a/k/a HEATHER
DIOSCON; TIMOTHY MILLER;
ANTHONY DIOSCON; and MICHELLE
WHEELER,

        Third Party
        Defendants.

HONORABLE JOSEPH E. IRENAS

CIVIL ACTION NO. 12-4975
     (JEI/JS)

**OPINION**

**APPEARANCES:**

LAW OFFICE OF TERKOWITZ & HERMESMANN
By:  Patrick J. Hermesmann, Esq.
309 Fellowship Road
Suite 200
Mount Laurel, New Jersey 08540
    Counsel for Defendants / Third Party Plaintiffs Pine Haven,
    LLC & Diversified Investments, Inc.

BARNABA & MARCONI, LLP
By:  Gary S. McDonald, Esq.
315 Lowell Avenue
Trenton, New Jersey 08619
     Counsel for Third Party Defendants Timothy Miller, Heather
     Miller a/k/a Heather Dioscon, and Anthony Dioscon

**IRENAS**, Senior District Judge:

Plaintiff Betania Toribio brings this wrongful death suit on behalf of her son, decedent John Toribio, and in her individual capacity.  Following the filing of Betania Toribio's Complaint, Defendants Pine Haven, LLC, and Pine Haven Holdings, LLC,[1] filed an Answer and Third Party Complaint, alleging that Third Party Defendants Timothy Miller, Heather Miller,[2] Anthony Dioscon, and Michelle Wheeler shared liability in John Toribio's death, and the Defendants were therefore entitled to indemnification and contribution for any negligent acts of the Third Party Defendants.

Currently pending before the Court is the remaining Third Party Defendants' Motion for Summary Judgment,[3] which seeks judgment in their favor on the counts of negligence, breach of

---

[1] In their Answer and Third Party Complaint, Defendants / Third Party Plaintiffs indicate that the proper names for Defendants are: Pine Haven, LLC and Pine Haven Holdings, LLC, rather than the names used in the Caption to the Plaintiffs' original pleadings.  Throughout this Opinion, the Court will use the amended names for the Defendants / Third Party Plaintiffs, or refer to them collectively as "Pine Haven."

[2] As the result of a previous marriage, Heather Miller was once known as Heather Dioscon and is Anthony Dioscon's mother.  In view of her present marriage to Timothy Miller, the Court will refer to her as Heather Miller.

[3] The Court previously granted summary judgment in favor of Michelle Wheeler, terminating her as a party to the suit.  *See Toribio v. Pine Haven, LLC*, No. 12-cv-4975 (JEI/JS), 2014 WL 1959112 (D.N.J. May 15, 2014).

contract, and indemnification and contribution asserted against them.[4]  For the reasons explained herein, this motion will be granted.

## I.

The Court recounts only the facts necessary for deciding the Third Party Defendants' pending motion and construes any disputes in favor of the non-moving Third Party Plaintiffs.

The facts and events relevant to this lawsuit and the pending counterclaims begin before the tragic death of the decedent, fourteen year-old John Toribio ("Toribio" or "decedent"), on August 8, 2010.  Decedent and Third Party Defendant Anthony Dioscon ("Dioscon") first became close friends in 2007 or 2008 when they began middle school, where they attended a number of the same classes and played recreational basketball and football together.  (Anthony Dioscon Dep., Oct. 15, 2013, at 22:1-23:8)  Dioscon and the decedent were the same age, saw each other every day in school, and spent many weekends together with friends near decedent's home on Friendship Street. (Id. at 23:9-25)

In addition to spending time at the decedent's home, Dioscon and the decedent also spent time with Dioscon's parents,

---

[4] The Court exercises subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(a).

3

Third Party Defendants Heather Miller and Timothy Miller.  On at
least one occasion, the decedent and Dioscon swam together in
the Millers' above-ground pool.  (Id. at 33:10-21; Heather
Miller Dep., Oct. 29, 2013, at 26:3-12; Timothy Miller Dep.,
July 1, 2013, at 110:23-111:18)  The Millers shared a general,
"heightened concern" around the water because they had the pool,
and they were "hyper concerned about any drownings," and
sensitive to the potential danger surrounding the water.  (H.
Miller Dep. at 56:16-24)  As a result, there was always an adult
present when the decedent and Dioscon swam in the pool.  (T.
Miller Dep. at 110:23-111:18)

In view of the Millers' sensitivity, both the Millers and
Dioscon knew that the decedent could swim.  (Dioscon Dep. at
121:11-13; H. Miller Dep. at 38:14; T. Miller Dep. at 114:23-
116:4)  All three reached this conclusion even with the
knowledge that the decedent had a minor deformity on his right
hand.  (Dioscon Dep. at 121:11-13; H. Miller Dep. at 38:14; T.
Miller Dep. at 114:23-116:4)  Despite her knowledge of the
decedent's abilities, Heather Miller nonetheless confirmed the
decedent's swimming abilities with Betania Toribio, as well as
the decedent's sister Odalie Toribio, when the two of them
dropped off the decedent on Thursday, August 5, 2010.  (H.
Miller Dep. at 39:1-20)

4

After spending Thursday evening at the Millers' home, the
family and the decedent set off for Pine Haven Campground on
Friday, arriving around 8:00 p.m.  (Id. at 41:18-42:1)  On
Saturday, the group traveled to Sea Isle City to spend some time
on the beach and swim in the ocean.  Sometime before arriving in
Sea Isle City, Heather informed the decedent and Dioscon of the
"main rules" for the weekend: "they were not to go near any
water, they were not allowed to swim without me or my husband
present, and that Saturday night they had to be home by curfew
[at 10:00 p.m.], and it was Sunday night, too, it ended being
for the curfew."  (Id. at 42:2-12)  In total, the Millers issued
approximately twenty warnings to Dioscon and the decedent over
the course of Saturday and Sunday, reiterating that the
teenagers were not to swim without the Millers present.  (E.g.
Dioscon Dep. at 51:25)  While visiting Sea Isle City (and
complying with the Millers' warnings about swimming), Dioscon
and the decedent spent a few hours swimming in the ocean,
alternately swimming and throwing a football around while in the
water.  (H. Miller Dep. at 52:4-13; T. Miller Dep. at 114:23-
116:18, 118:21-120:6, 122:21-123:2; Dioscon Dep. at 71:8-18)

After swimming in the ocean on Saturday, the group returned
to Pine Haven and spent Sunday, August 8, at the campground.  At
lunchtime, Dioscon and the decedent changed into basketball
shorts, which they wore as swim trunks, underneath their cargo

5

shorts.   (Dioscon Dep. at 73:12-74:12)   As Dioscon recalled, the decedent made repeated requests on Saturday and Sunday — approximately four per day — to swim in the lake at Pine Haven. (Id. at 53:22-24)   Though it is unclear whether Heather or Timothy knew that the teenagers had changed, the record clearly reflects that when Dioscon mentioned to Heather that the teenagers were considering swimming after lunch, the Millers reminded them to call them if they were going to go into the water, or otherwise make sure someone else's parents were there to supervise.   (Id. at 74:19-21)

Later on Sunday afternoon, the decedent joined Dioscon and the Millers for dinner at the Millers' camper, and the family finished eating sometime between 5:00 p.m. and 6:00 p.m.   (T. Miller Dep. at 76:15)   After dinner, the teenagers headed off to the basketball court to meet up with other teenagers around their age, and Timothy took the Millers' young daughter to the playground near the lake.   (Id. at 77:10-78:7; Dioscon Dep. at 75:20-76:9)   When Timothy arrived at the lake, he found Dioscon, the decedent, and Michelle Wheeler nearby, searching for frogs along the banks of the water.   (T. Miller Dep. at 77:10-78:7) Before Timothy left the playground, Dioscon remembered Timothy again warning him and the decedent: "to be careful, and I think he told us, 'Don't go swimming in the lake either,' and then he left."   (Dioscon Dep. at 76:17-19)

6

Shortly after Timothy left, Wheeler asked if anyone wanted
to go swimming in the lake.  (Michelle Wheeler Dep., Nov. 25,
2013, at 23:9-13)  In spite of the recent warning, the decedent
urged Dioscon to get into the water with him and Wheeler.
(Dioscon Dep. at 76:21-77:5)  As Dioscon recalled, "[Toribio]
was just, like, kind of saying, 'Come on, let's -- come on, just
come with me' because, like, he, obviously, wanted to go
swimming with Michelle.  He wanted me to be there with him."
(Id. at 76:23-77:1)  Though this was the first time they had all
met, Dioscon eventually relented and entered the water to swim
with Wheeler and the decedent.  (Id. at 77:15, 91:13-25)

As this Court recounted in a previous motion for summary
judgment, after entering the water to swim but still near the
shore, the three teenagers began splashing water on one another.
(Id. at 107:1-14)  Following a few minutes of splashing, the
three began to swim out towards the middle of the lake, with
Dioscon and Wheeler talking together and swimming in front of
the decedent.  (Wheeler Dep. at 30:2-5)  Dioscon and Wheeler
swam together ahead of the decedent for approximately two
minutes before reaching almost the exact middle of the lake.
(Id.; Dioscon Dep. at 110:13-111:2)

Just as Wheeler and Dioscon reached the middle of the lake,
Wheeler turned 180 degrees to see the decedent flailing his arms
a few feet behind her, and both Dioscon and Wheeler heard the

decedent call out: "help." (Wheeler Dep. at 30:4-20; Dioscon Dep. at 106:10-21) As they both observed the decedent behind them "splashing around" and "flailing his arms up and down," Wheeler asked Dioscon if the decedent was alright. (Dioscon Dep. at 106:10-15; Wheeler Dep. at 30:4-10) Dioscon told Wheeler, "Yeah, I think so," and, as he watched the decedent, Dioscon believed that he "was in control of everything[, h]e looked like he was just out there messing around." (Dioscon Dep. at 106:16-21) Wheeler and Dioscon then turned back away from the decedent, swimming to the opposite side of the lake for approximately two more minutes without turning around until they reached the opposite shore. (Wheeler Dep. at 32:12-33:15; Dioscon Dep. at 113:13-15)

Upon arriving at the shore, Wheeler and Dioscon turned and looked back across the lake but failed to see the decedent in the water. (Wheeler Dep. at 33:17-20; Dioscon Dep. at 113:11-114:1) Wheeler asked Dioscon where the decedent had gone, and Dioscon responded that he thought he might have left the lake on his own. (Wheeler Dep. at 33:17-20; Dioscon Dep. at 113:13-22) Wheeler and Dioscon began walking the perimeter of the lake to see if they could find the decedent's belongings, believing that he would have picked them up if he had gotten out of the water while Wheeler and Dioscon swam across the lake without him. (Wheeler Dep. at 33:20-21; Dioscon Dep. at 113:22-114:1)

8

After walking back around the lake and arriving near where they first entered the water, Wheeler and Dioscon came across the decedent's clothing. (Dioscon Dep. at 113:25-114:1) After this discovery, they walked back to the basketball courts to ask if anyone had seen the decedent recently. (Wheeler Dep. 33:20-23; Dioscon Dep. at 113:25-114:1) When no one answered affirmatively, Wheeler and Dioscon recruited approximately eight to ten other teenagers to search for the decedent around the perimeter of the lake. (Wheeler Dep. at 37:12-38:6) The group spent nearly an hour searching for him with no success. (Id.)

Shortly before his 10:00 p.m. curfew, Dioscon returned to the camper. (H. Miller Dep. at 79:19-80:5; T. Miller Dep. at 80:24-81:8) Dioscon immediately reported to his mother that he could not find the decedent, and that he thought the decedent might have drowned. (H. Miller Dep. at 80:6-21) Following their brief exchange, Heather took her keys and got into her truck and drove down to the lake, stopping as close as she safely could to the water's edge, while Timothy remained in the camper with their daughter. (Id. at 81:6-13, 91:4-6) At the side of the lake, Heather turned her high beam headlights on facing the lake and asked Dioscon and Wheeler where they last saw the decedent. (Id. at 81:6-13) The teenagers again reported that they believed the decedent had drowned, and Heather started crying. (Id. at 82:8-10) Heather insisted that

9

Dioscon show her where he last saw the decedent in the water,
and after taking a few steps, fully clothed, into the water, she
stopped and called 911.  (Id. at 82:10-14)  Sometime after this
call, Heather then called the decedent's mother to report what
her belief that the decedent had drowned.  (Id. at 92:9-24)
Later that evening, the decedent's body was recovered from the
water.  (Id. at 96:24-97:3)

Plaintiff Betania Toribio, individually and as
administrator for the decedent's estate, brought this suit
seeking recovery for John's wrongful death by filing a Complaint
in this Court on August 8, 2012.  On January 30, 2013, Pine
Haven filed an Answer and Third Party Complaint.  In the Third
Party Complaint, Pine Haven contends that Third Party Defendants
Heather Miller, Timothy Miller, and Anthony Dioscon are liable
in decedent's drowning death, and that the Third Party
Defendants therefore owe indemnification and contribution to the
Defendants / Third Party Plaintiffs.  Following discovery, the
Millers and Dioscon moved for summary judgment in their favor on
May 6, 2014.  Following briefing of the issues and oral argument
on July 30, the motion is now ripe for decision.

## II.

"The court shall grant summary judgment if the movant shows
that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).   In deciding a motion for summary judgment, the court must construe all facts and inferences in the light most favorable to the nonmoving party.  *See Boyle v. Cnty. of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998).  The moving party bears the burden of establishing that no genuine issue of material fact remains.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The nonmoving party must present "more than a scintilla of evidence showing that there is a genuine issue for trial." *Woloszyn v. Cnty. of Lawrence*, 396 F.3d 314, 319 (3d Cir. 2005). A fact is material only if it will affect the outcome of a lawsuit under the applicable law, and a dispute of a material fact is genuine if the evidence is such that a reasonable fact finder could return a verdict for the nonmoving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 249, 252 (1986).  The court's role in deciding the merits of a summary judgment motion is to determine whether there is a genuine issue for trial, not to determine the credibility of the evidence or the truth of the matter.  *Id.* at 249.

## III.

Third Party Plaintiffs assert four claims against the remaining Third Party Defendants.  Count one contends that

Heather and Timothy Miller, and Anthony Dioscon, are joint tortfeasors under N.J.S.A. 2A:53A and N.J.S.A. 2A:15-5.  Count two asserts that any Pine Haven negligence is secondary or derivative to the Third Party Defendants' negligent acts, and Pine Haven is therefore entitled to indemnification.  Count three contends that Heather and Timothy Miller breached a contractual and tort duty of care resulting in John Toribio's death.  Count four charges that Anthony Dioscon was negligent in John Toribio's death.  The Court begins by addressing Anthony Dioscon's liability before addressing claims against Heather and Timothy Miller.

### A.

The essential elements of a negligence claim are: (1) a duty of care owed by the defendant to the plaintiff, (2) a breach of that duty, (3) injury to the plaintiff proximately caused by the breach, and (4) damages.  *Robinson v. Vivirito*, 217 N.J. 199, 208 (2014).  "The issues of whether a defendant owes a legal duty to another and the scope of that duty are generally questions of law for the court to decide."  *Id.* (citing *Carvalho v. Toll Bros. & Developers*, 143 N.J. 565, 572 (1996)).

As this Court reviewed in its previous Opinion concerning the liability of Third Party Defendant Michelle Wheeler, the

common law generally imposes "'no independent duty of rescue at all' and relieves a bystander from any obligation to provide affirmative aid or emergency assistance, even if the bystander has the ability to help." *Podias v. Mairs*, 394 N.J. Super. 338, 347 (App. Div. 2007) (quoting *Praet v. Borough of Sayreville*, 218 N.J. Super 218, 224 (App. Div. 1987)); *see also Toribio*, 2014 WL 1959112, at *3. However, certain relationships, whether rooted in a "contractual, relational or transactional" beginning, may give rise to the existence of a duty between two parties.[5] *Podias*, 394 N.J. Super. at 347-48 (quoting *Praet*, 218 N.J. at 224). As a matter of law, friendship — standing alone — is an insufficient basis for imposing a special relationship upon two parties. *See, e.g., Theobald v. Dolcimascola*, 299 N.J. Super. 299, 304-05 (App. Div. 1997).[6]

---

[5] Specific relationships, often referred to as special relationships, generally impose a duty of care and break from the general rule that there is no independent duty of rescue. *See, e.g., Del Tufo v. Township of Old Bridge*, 147 N.J. 90, 100 (1996) (holding law enforcement officers have a duty to provide emergency care to arrestee or inmate in their custody); *see also* RESTATEMENT (SECOND) OF TORTS § 314A (1965).

[6] In *Theobald*, a teenager was tragically killed when, in the presence of four of his friends, he lifted a loaded gun to his head and pulled the trigger until the weapon discharged. 299 N.J. Super. at 302. The record demonstrated that the decedent made several attempts to pull the trigger as his friends sat by and watched. *Id.* Nevertheless, New Jersey law did not impose a duty upon the bystanders to stop the decedent; as the Superior Court explained:

> While we may deplore their inaction, we, as did the trial judge, find no legal authority to impose liability. We note the ease with which defendants could have reached out and taken away the revolver when [the decedent] put it down between his two series of attempted firings, or the simple act of one of the five walking to the door and summoning [the decedent's] father, or even remonstrating with [the decedent]

13

As with Wheeler, there is no basis to conclude that Dioscon owed the decedent a duty of care to rescue the decedent while they swam together.  As Pine Haven essentially conceded at oral argument, the undisputed record demonstrates only that Wheeler suggested the group of teenagers should swim together, and that Dioscon and the decedent were close friends.  (Dioscon Dep. at 76:21-22, 22:21; Wheeler Dep. at 21:25)  As a matter of law, such friendship is insufficient to establish a special relationship, even where the danger is obvious and foreseeable, as it was with the friends who watched a teenager play Russian roulette with a loaded firearm in *Theobald*.[7]  These facts therefore fail to establish a sufficient basis to establish liability as a matter of law, and the Court will grant summary judgment in Dioscon's favor.

This grant of summary judgment also applies to counts one and two asserted against Dioscon.  Count one alleges that Dioscon is a joint tortfeasor under N.J.S.A. 2A:53A-1, but after

---

concerning his actions.  But such acts would have been no more or less than the simple preventatives given in the Restatement [§ 314] Illustration of a word or touch necessary to save a blind pedestrian.  Where there is no duty, there is no liability.

*Id.* at 305.

   [7] Whether Dioscon should have foreseen danger is perhaps debatable; Dioscon had no reason to question the decedent's swimming abilities in view of his repeated (and recent) observation of the decedent's swimming skills in Sea Isle City.  (Dioscon Dep. at 35:14-17)  On the other hand, Dioscon received numerous warnings from his parents, instructing him and the decedent not to swim alone.  (*Id.* at 51:25)  However, foreseeability of harm, standing alone, is insufficient to impose either a special relationship or, more broadly, a duty of care.

determining that Dioscon did not act in a tortious manner, Dioscon cannot be deemed a joint tortfeasor under this statute. Count one also alleges that Dioscon is subject to New Jersey's comparative negligence statute, N.J.S.A. 2A:15-5.2, but again, because Dioscon did not commit a tortious act, he is entitled to summary judgment on this count as well. Count two contends that Pine Haven's negligence, if any, was secondary or derivative to Discon's negligence and as a result, Pine Haven is entitled to indemnification from Dioscon. In light of the determination that Dioscon has not committed a tort, he is entitled to summary judgment in full. For similar reasons, Dioscon's counterclaims against Pine Haven are rendered moot, and will also be dismissed as such.

## B.

Though Pine Haven styles its crossclaims against Heather and Timothy Miller as three distinct claims (for contributory and comparative negligence, indemnification, and a negligence / contract theory of recovery), these claims effectively raise two issues. The first is whether Pine Haven may continue to pursue its theory of liability in contract, as pled in count three and implicated in count two's claim for indemnification. The second is whether Pine Haven may continue to pursue its theory of liability in tort for negligence, as pled in count three and

implicated in count one, where Pine Haven seeks contribution under principles of comparative negligence, and count two, where Pine Haven seeks contribution for indemnification.  The Court addresses each in turn.

### 1.

Pine Haven's third count asserts that Heather and Timothy Miller "entered into a seasonal contract to rent site 54A at Pine Haven Camping Resort for a time period that included the summer of 2010." (Crossclaim, Third Count ¶ 2)  Pine Haven contends that the Millers' failure to supervise the decedent, a child and their guest, breached the terms of the contract.  (Id. ¶¶ 6-11)  This claim is rooted in the Millers' acceptance of the Pine Haven Campground Rules and Regulations, and the assertion that the "[r]ules state that campers who bring guests are responsible for the behavior of their guests." (Pine Haven Campground Rules and Regulations, Third Pty. Pls. Ex. B; Crossclaim, Third Count ¶ 6)

Review of the contract between the Millers and Pine Haven does not reveal any basis for liability under a breach of contract claim.  A breach of contract claim under New Jersey law requires a plaintiff to establish: (1) the existence of a valid contract between the parties; (2) failure of the defendant to perform its obligations under the contract; and (3) a causal

relationship between the breach and the plaintiff's alleged

damages.  *Sheet Metal Workers Int'l Ass'n Local Union No. 27,*

*AFL-CIO v. E.P. Donnelly, Inc.*, 737 F.3d 879, 900 (3d Cir.

2013).  Nothing in Pine Haven's rules imposes liability on a

renter, the Millers, because of the decedent's alleged breach of

the campground's rules or regulations.  (<u>See</u> Pine Haven

Campground Rules and Regulations, Third Pty. Pls. Ex. B)  There

is therefore no basis to establish that the Millers failed to

perform that obligation under a breach of contract theory.

Moreover, Pine Haven cannot demonstrate that the Millers

violated any of the six specifically enumerated provisions

concerning the swimming pool and lake.  These rules include:

> **Swimming Pool / Lake:** Please abide by the
> following rules when using the pool or lake:
> - No lifeguards on duty at either the lake or
>   swimming pool; swim at your own risk.
> - An adult must accompany all children under the
>   age of 16 while at the pool.
> - Observe all signs posted.
> - No swimming or fishing is allowed after dark.
> - Proper attire is required.
> - No food or drink permitted in the enclosed
>   swim area.

(<u>Id.</u>)  Though the Millers failed to accompany Dioscon and the

decedent to the lake in the evening on August 8, this action is

not prohibited by Pine Haven's Rules, which only prohibit

unaccompanied children at the pool.  In addition, there is no

dispute that the Millers did not actually permit the boys to

swim after dark, as the undisputed record demonstrates that the boys were repeatedly warned not to swim alone. (See, e.g., Dioscon Dep. at 51:23-52:1)

None of the other enumerated rules apply to the Millers' undisputed behavior on the date of the decedent's drowning.[8] Because the record demonstrates that none of the Millers' actions violated Pine Haven's Rules and Regulations, the Court may grant summary judgment to the Millers on Pine Haven's breach of contract claim.

### 2.

Heather and Timothy Miller also seek summary judgment on Pine Haven's counterclaims for negligence. As described *supra*, the fundamental elements of a claim for negligence under New Jersey law include the following: (1) a duty of care owed by the defendant to the plaintiff, (2) a breach of that duty, (3) injury to the plaintiff proximately caused by the breach, and (4) damages. *Robinson*, 217 N.J. at 208. Whether a defendant

---

[8] Pine Haven provides photographs purporting to show that by swimming in the lake, Dioscon and the decedent failed to follow posted signs prohibiting swimming in the lake. (See Third Pty. Pls. Ex. C) The Millers contend that these photographs, stamped with a December 6, 2010 date, do not demonstrate that such signs appeared lakeside on August 8, 2010, when the decedent drowned. The Court need not resolve this dispute — whether the signs were posted and in view of Dioscon and the decedent does not bear on whether Heather and/or Timothy Miller failed to observe a posted sign, which would be necessary to demonstrate their failure to perform a contractual obligation and give rise to a breach of contract.

owes any legal duty to another, and the scope of that duty, is generally a question of law left to the court's determination. *Id.* (citing *Carvalho*, 143 N.J. at 572).

To review, foreseeability is a "critical but not dispositive factor" concerning the application of a duty of care. *Robinson*, 217 N.J. at 208. However, "[a]s a general rule, there is no duty to control the conduct of another, absent a special relationship or special circumstances among the parties." *Sacci v. Metaxas*, 355 N.J. Super. 499, 507 (App. Div. 2002) (citing *Lombardo v. Hoag*, 269 N.J. Super. 36, 48 (App. Div. 1993)).  The inquiry into whether a duty exists involves "a weighing of the relationship of the parties, the nature of the risk, and the public interest in the proposed solution." *City Check Cashing, Inc. v. Mfrs. Hanover Trust Co.*, 166 N.J. 49, 59 (2001) (quoting *Kelly v. Gwinell*, 96 N.J. 538, 544 (1984)).

Standing as the exception to the general "no duty" rule are some prominent special relationships — "namely, police-arrestee (*Del Tufo v. Township of Old Bridge*, 147 N.J. 90 (1996); *Hake v. Manchester Township*, 98 N.J. 302 (1985)) and physician-patient (*Olah v. Slobodian*, 119 N.J. 119 (1990))." *Theobald*, 299 N.J. Super. at 304-05.  These cases concern relationships where one party exercises a significant degree of control over the other's liberty (police-arrestee), or one party has potential knowledge of a concealed or inconspicuous condition resulting in harm

19

(physician-patient).[9]  However, as described *supra*, a friendship relationship, standing on its own, is insufficient to impose this relationship.  *Id.*

In view of the undisputed record, the circumstances of the Millers' relationship with the decedent are insufficient to constitute a special relationship.  While Betania Toribio may have let her son travel to Pine Haven with the Millers because she "know they are good person [sic] and they take care of the kids very nice," her statement does not demonstrate the necessary contours of a recognized special relationship.  (Betania Toribio Dep., July 15, 2013, at 89:9-11)

Rather, the Millers came to know the decedent through their son, Dioscon's classmate and best friend, beginning two to three years before the decedent's death in August 2010.  (See Dioscon Dep. at 31:7-22)  Heather Miller learned that the decedent would be coming along to Pine Haven with her son just shortly before the decedent's mother dropped him off at the Miller household on Thursday, August 5.  (H. Miller Dep. at 36:3-12)  Though Heather had the decedent obtain his mother's permission in order to join the Millers on their trip, the fourteen year-old decedent's

---

[9] Other circumstances, like legislative action to impose a fiduciary relationship, may also result in the imposition of a special relationship. *See, e.g.*, *City Check Cashing*, 166 N.J. at 59-62.  However, in the absence of such a legislative imposition or "unless the facts establish a special relationship between the parties created by agreement, undertaking or contact, that gives rise to a duty," relief under a theory of negligence would be unavailable to an aggrieved party.  *Id.* at 61.

choice to join Dioscon and the Millers over the weekend (even
with Betania Toribio's permission and expectation that the
decedent would be in the care of the Millers) did not give
Heather or Timothy Miller such a degree of control as to fall
within the ambit of a recognized special relationship. (See id.
at 36:13-23)  In view of this determination, the Court cannot
conclude that the Millers and the decedent entered into a
special relationship of legal significance.[10]

In the absence of a factual basis to impose any special
relationship between the Millers and the decedent, the Court
must apply the general "no duty" rule.[11]  As a result, the

---

[10] Pine Haven argues that its Rules and Regulations impose a duty of
care upon the Millers to act as the decedent's lifeguard because Pine Haven's
rules explained that no lifeguard was ever on duty at the lake. (See Pine
Haven Campground Rules and Regulations, Third Pty. Pls. Ex. B)  This argument
rests on the theory that a contractual relationship may give rise to a duty
if a party "undertakes 'gratuitously or for consideration, to render services
to another which he should recognize as necessary for the protection of the
other's person or things.'"  Pfenninger v. Hunterdon Cent. Reg'l High Sch.,
167 N.J. 230, 241 (2001) (quoting RESTATEMENT (SECOND) OF TORTS § 323 (1965)).
Pfenninger concerned the tragic death of a contractor who, due to issues with
a supplier, used a different type of building material than was specified in
his contract with the Hunterdon School Board.  Pfenninger, 167 N.J. at 238-
40.  There, the New Jersey Supreme Court determined that a duty of care was
rightfully imposed on the School Board because the Board knew that the
substituted building material required a dangerous installation process,
which a jury could have found led to the plaintiff's death.  Id. at 241.
Pine Haven's regulation is clearly distinguishable.  The regulation in
question, that individuals were to "swim at your own risk," is plainly not a
gratuitous covenant that the Millers undertook to act as a lifeguard for the
benefit of third parties like the decedent.  As such, application of this
contractual theory is inappropriate in the pending matter.

[11] Such a conclusion does not overlook or diminish the significance of
foreseeability in the determination of whether to impose a duty of care under
New Jersey law.  Indeed, Robinson makes clear that the foreseeability
analysis weighs heavily, and the relevant inquiry concerns "knowledge of the
risk to be apprehended."  Robinson, 217 N.J. at 208-09.  The undisputed
record here demonstrates that the Millers were highly sensitive to the risks
of teenagers swimming unattended and foresaw dangers like drowning,
particularly in light of the warnings they issued and their prior ownership

Millers are entitled to summary judgment on Pine Haven's claim of negligence, as well as summary judgment on Pine Haven's claims for indemnity and contribution.

## IV.

In light of the foregoing, the Court will grant the Third Party Defendants' motion for summary judgment.   In accordance with the determination that that the Third Party Defendants are not liable for any tortious acts, the Court will dismiss the Third Party Defendants' crossclaims seeking contribution under N.J.S.A. 2A:53A-3 as moot because none of the Third Party Defendants are tortfeasors eligible for recovery from a joint tortfeasor.   An appropriate Order accompanies this Opinion.

Date: 8/5/14

_____
JOSEPH E. IRENAS, S.U.S.D.J.

---

an above-ground pool.  (See, e.g., H. Miller Dep. at 55:22, 56:16-21; T. Miller Dep. at 79:20-80:5)  However, cases like *Robinson* and *Clohesy v. Food Circus Supermarkets, Inc.*, 149 N.J. 496 (1997), focus on the foreseeability analysis with negligence claims for premises liability.  In such cases, a landowner controls the land, giving rise to a relationship with someone who enters onto that land for purposes of the duty analysis.  In the Millers' case, the factual basis of their relationship with the decedent was no more than that of a fourteen year-old and his friend's parents — a basis that is not recognized as an exception to the general "no duty" rule discussed above.

22