```
 1

 2                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF NEW JERSEY
 3  _____
    BETANIA TORIBIO, Administratrix
 4  of the Estate of JOHN JOAQUIN
    TORIBIO, Deceased; and BETANIA
 5  TORIBIO, individually,
                Plaintiff               CIVIL ACTION
 6      v.                              NO. 12-4975 (JEI/JS)

 7  PINE HAVEN, LLC, d/b/a PINE HAVEN
    CAMPGROUND and PINE HAVEN CAMPING
 8  RESORT; and DIVERSIFIED INVESTMENTS,
    INC. a/k/a DIVERSIFIED INVESTMENTS,
 9  LLC a/k/a DIVERSIFIED INVESTMENT
    SERVICES LLC,
10              Defendants.
    _____
11                               UNITED STATES COURTHOUSE
                                 ONE JOHN F. GERRY PLAZA
12                               4TH AND COOPER STREETS
                                 CAMDEN, NEW JERSEY 08101
13                               MAY 5, 2015

14  B E F O R E:       THE HONORABLE JOSEPH E. IRENAS
                       UNITED STATES DISTRICT JUDGE
15
    A P P E A R A N C E S:
16
    MANIACI, CICCOTTA & SCHWEIZER
17       BY:  RENO JOHN CICCOTTA, ESQUIRE
            – and –
18  WESTMORELAND, VESPER, QUATTRONE & BEERS
         BY:  TOM VESPER, ESQUIRE
19            Counsel for Plaintiff

20  LAW OFFICES OF TERKOWITZ & HERMESMANN
         BY:  PATRICK J. HERMESMANN, ESQUIRE
21            Counsel for Defendant, Diversified Investments
              Pine Haven, LLC
22

23       Certified as true and correct as required by Title 28,
    U.S.C., Section 753.
24                       /S/ Karen Friedlander, CRR, RMR

25
```

1                    **W I T N E S S   I N D E X**

2

3     **WITNESS**                                                    **PAGE**

4     **MICHAEL TERRY JORDAN**                                        196

5     DIRECT EXAMINATION OF MICHAEL TERRY JORDAN BY MR.               197

6     VESPER:

7     CROSS EXAMINATION OF MICHAEL TERRY JORDAN BY MR                 284

8     HERMESMANN:

9     REDIRECT EXAMINATION OF MICHAEL TERRY JORDAN BY MR.             309

10    VESPER:

11    **CHARLES C. SCARPA**                                           326

12    DIRECT EXAMINATION OF CHARLES C. SCARPA BY MR.                  326

13    VESPER:

14    CROSS EXAMINATION OF CHARLES C. SCARPA BY MR.                   346

15    HERMESMANN:

16    REDIRECT EXAMINATION OF CHARLES C. SCARPA BY MR.                350

17    VESPER:

18    **RULE 104 HEARING – HOMER STAVES**                            356

19    DIRECT EXAMINATION OF HOMER STAVES BY MR. VESPER:               356

20

21

22

23

24

25

1                     **E X H I B I T   I N D E X**

2

3

4  **EXHIBIT NUMBER**                                    **PAGE**

5

6    DEFENDANT EXHIBIT D-40 WAS RECEIVED IN EVIDENCE      300

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**1**              (OPEN COURT; MAY 5, 2015; 8:45 a.m.)

**2**              MR. VESPER:  Your Honor, two things came to me this

**3**    morning besides this exhibit I had to pick up.

**4**              THE COURT:  Whatever you're going to say, say it in

**5**    60 seconds.

**6**              MR. VESPER:  Can the jury take notes during the

**7**    trial?

**8**              THE COURT:  Yes.

**9**              MR. VESPER:  May the jury ask questions during the

**10**   trial?

**11**              THE COURT:  I haven't provided for that.  I did not

**12**   ask that.

**13**              MR. VESPER:  Because in some, if there's no

**14**   objection, some of the witnesses, especially the experts, they

**15**   may want to --

**16**              THE COURT:  I'm not going to -- I have found it slows

**17**   down because then you have to -- I mean, them asking

**18**   questions.

**19**              MR. VESPER:  I said two questions.

**20**              THE COURT:  I'm ruling no.

**21**              MR. VESPER:  Oh.

**22**              THE COURT:  They can take notes.

**23**              MR. VESPER:  Thank you, Your Honor.

**24**              THE COURT:  They take notes in every case, but not in

**25**   openings.  They take notes during the testimony.

1      MR. VESPER:  Thank you, Your Honor.

2      THE DEPUTY CLERK:  All rise.

3      (JURY ENTERS; 8:47 a.m.)

4      THE COURT:  Good morning, everybody.

5      RESPONSE:  Good morning, Your Honor.

6      THE COURT:  Everyone be seated.  Juror No. 2., in

7  that first break, I'm going to make a couple of phone calls.

8      JUROR #2:  Thank you, sir.

9      THE COURT:  Swear in the jury.

10      THE DEPUTY CLERK:  The jury please rise.  Raise your

11  right hand.

12  (JURY having been first duly sworn)

13      THE COURT:  Okay.  You may be seated.  Now that you

14  have been sworn, I will give you some preliminary instructions

15  to guide you in your participation in the trial.  It will be

16  your duty to find from the evidence what the facts are.  You

17  and you alone are the judges of the facts.  You will have to

18  apply to those facts the laws the Court will give it to you.

19  You must follow that law whether you agree with it or not.

20      The evidence from which you will find the facts will

21  consist of the testimony of witnesses, documents, any

22  depositions or Answers to Interrogatories that may be read to

23  you and other -- and other things received into the record as

24  exhibits, and any fact the lawyers agree or stipulate to,

25  whether the Court may instruct you to find.

*United States District Court*
*Camden, New Jersey*

1       Statements, arguments and questions by lawyers are not

2   evidence.  If a lawyer asks a question on cross examination,

3   which incorporates a statement, which assumes certain facts to

4   be true, the question is not evidence of those facts if the

5   witness denies the truth of the statement in his or her

6   answer.  You may consider the facts incorporated into a

7   question only if the answer of the witness recognizes their

8   truth.  In short, questions are not evidence; answers are.

9       Let me give you an example of that.  On cross

10   examination a lawyer says, isn't it true that you were in

11   Dubuque, Iowa on July 4th, 2010?  Well, that is not evidence

12   because the lawyer says you were in Dubuque, Iowa on July 4th.

13   It's not evidence.  What's evidence is the answer, not the

14   lawyer's statement.

15       Now, during the course of the trial you should not talk

16   with any witnesses or with the parties or with any of the

17   lawyers in the case.  Please don't talk with them about any

18   subject at all.  In addition, during the course of the trial,

19   you should not talk about the trial with anyone else, not your

20   family, not your friends, not the people you work with.

21       By the way, many years ago, more than I care to think

22   about, my wife was on a jury in a very interesting case and my

23   wife is about 51 and about 105 pounds.  She came home and I

24   was a lawyer, I wanted to know what was going on in the jury.

25   So I started pounding her to tell me about the case and tell

1   me what was going on in the jury room and she shook her finger

2   at me like she has for 53 years, you know, I'm not telling you

3   anything.  The Judge told me not to discuss this case with

4   anybody, and not withstanding what I thought was my persuasive

5   being, she wouldn't tell me a darn thing.

6       So don't talk about the case with anybody.  And once

7   again, it's not -- there's a real reason for this.  If

8   somebody says something to you outside the court, you may say

9   to yourself, gee, that sounds pretty sensible, but if it was

10  said here in court and the lawyers were exposed to it and I

11  was supposed exposed to it, we might show you that it was not

12  so sensible.  The trouble is, if you hear something privately

13  at home from a family member, from a co-employee or from

14  anybody, from Google, we don't get to test it.  What makes the

15  trial fair is that we all hear the same evidence.

16      So, please -- and that also goes to discussing the case

17  among yourselves.  There's no way I can dump all the evidence

18  on you, you know, in one moment.  It's going to come in over

19  time, and what may seem to you as sensible at a given moment

20  may be if you waited and two days later, you heard some

21  contrary evidence, might not seem so sensible to you.  The

22  trouble is, human beings being what they are, if they take a

23  position, well, I believe this witness was a good witness,

24  it's hard to back off that position psychologically, if you've

25  taken a strong position in the past.

1      So please don't discuss the case among yourselves.  The

2   trial isn't going to be that long.  Wait until all the

3   evidence is in and then have at it.

4      Now, because you should not attempt to gather any

5   information on your own, that you think might be helpful, do

6   not engage in any outside reading on the case and do not in

7   any other way try to learn about the case outside what's said

8   in this courtroom.  No statement, ruling, remark or comment

9   that I may make during the course of the trial is intended to

10  indicate my opinion as to how you should decide the case or to

11  influence you in any way in your determination of the facts.

12  At times, I may ask questions of witnesses.  If I do so, it is

13  for the purpose of bringing out matters that I think should be

14  brought out and not in any way to indicate my opinion about

15  the facts or to indicate the weight I feel you should give to

16  the testimony of the witness.

17      I may also find it necessary -- I don't think often,

18  but I may find it necessary to admonish the lawyers, and if I

19  do, you should not show prejudice to either side because I

20  found it necessary to admonish one side or the other.

21      Let me point out what we call the well of the court.

22  That is where the lawyers are sitting.  That's a tough place

23  to be.  It really is a tough place to be where you have two

24  lawyers who are both dedicated to their client's interest, the

25  clients feel strongly and there's a lot of pressure in there.

1    So I want you to show some sympathy if I may, you know, if I

2    have to quiet things down a bit, because we have two very good

3    lawyers doing the best they can in what you will clearly

4    gather, I think, very early on, is a very tense kind of

5    situation and, and as I say, I spent, of course it was many

6    years ago, I spent more than my share of time in the well of

7    the court.  And no matter how many cases I tried, I always

8    found it a tough place to be, and they work hard in making

9    snap decisions and it's not an easy place to carry out your

10   trade.

11          Finally, let me clarify something you may wonder about

12   later.  During the course of the trial, I may have to

13   interrupt the proceedings to confer with the attorneys and the

14   parties about the rules of law that should apply here.

15   Sometimes we will talk at sidebar.  If I think I can do it in

16   a minute or two, we will just go to sidebar and do it.

17   Sometimes it looks to me like the issue might take longer to

18   resolve, rather than make you sit and cool your heels in the

19   jury box, I'll dismiss you for a few minutes so we can handle

20   the issue, and I assure you, I try to avoid such interruptions

21   as much as possible, but please be patient, because in many

22   cases, those conferences actually move the trial along, in a

23   sense, they help the trial go forward.

24          At times during the trial, a lawyer may make an

25   objection to a question asked by another lawyer or to an

1   answer by a witness.  You see that on TV, "I object, I

2   object."  This simply is kind of a shorthand way for a lawyer

3   to request that I make a decision on a particular rule of law.

4   It is the duty of a lawyer to object to evidence that he or

5   she believes may not properly be offered and you should not be

6   prejudiced in any way against a lawyer who makes objections

7   for the party in which represents.  Do not draw any conclusion

8   from such objections or from my rulings on the objections.

9   These only relate to legal questions that I must determine and

10  should not influence your thinking.

11       If I sustain an objection to a question, the witness

12  may not answer it.  Do not attempt to guess what the answer

13  might have been given -- might be have been given had I

14  allowed to question to go forward.  Similarly, if I tell you

15  not to consider a particular statement, you should put that

16  statement out of your mind and you may not refer to that

17  statement in your later deliberations.

18       There are two kinds of evidence, direct and

19  circumstantial.  Direct evidence is direct proof of a fact,

20  such as testimony of an eyewitness.  Circumstantial evidence

21  is proof of facts from which you may infer or conclude that

22  other facts exist.  I will give you further instructions on

23  these as well as other matters at the end of the case.  But

24  have in mind that you may consider both kinds of evidence.  It

25  will be up to you to decide which witnesses to believe, which

 1  witnesses not to believe, and how much of any witness's

 2  testimony to accept or reject.  I'll give you some more

 3  detailed guidelines for determining the credibility of

 4  witnesses at the end of the case.  But remember, that's a very

 5  important part of your job, is -- it's up to -- solely up to

 6  you, the jury, to decide again, whether you believe all of

 7  what a witness says, some of what a witness says or none of

 8  what a witness says.  That's your call and it's a very

 9  important role that you play.

10       If you want to take notes during the course of the

11  trial, you may do so.  We'll even provide pads and government

12  pens.  How many here -- raise your hand if you think the

13  government pen will work.  I don't see any hands go up.  We

14  will try to find a few working models for you and we will give

15  you a pad, a steno pad to write on.

16       However, it is difficult to take detailed notes and pay

17  attention to what the witnesses are saying at the same time.

18  If you do take notes, be sure that your taking of notes does

19  not interfere with your listening to and considering all of

20  the evidence.

21       Also, if you take notes, do not discuss them with

22  anyone, or with your fellow jurors before you begin your

23  deliberations.  Do not take the notes with you at the end of

24  the day.  Just leave them with Larry.  He will collect the

25  pads and stow them for you somewhere safe.  If choose not to

1  take notes, remember, it is your own individual responsibility

2  to listen carefully to the evidence.  You cannot give this

3  responsibility to someone who is taking notes.  We depend on

4  all judgment of the members of the jury.  You must all

5  remember the evidence in this case.  You will notice that we

6  have an official court reporter making a record of the trial.

7  Are we going to have daily copy?

8          THE COURT REPORTER:  I don't believe so.

9          THE COURT:  I'm waiting for you.

10          MR. VESPER:  I'm sorry, Your Honor.

11          THE COURT:  I was confirming, it's not going to be

12  daily copy.

13          MR. VESPER:  No, Your Honor.  Sorry.

14          THE COURT:  Okay.  So we won't have a transcript

15  available, like, on a moment's notice, even though, you know

16  she would be capable later on of producing a transcript from

17  her steno notes -- we're not going to be able at this point to

18  just hand you, you know, hand you a transcript to review the

19  testimony.

20          MR. VESPER:  There may be daily copy for next week,

21  for a certain witness.

22          THE COURT:  Well --

23          MR. VESPER:  I'll let the Court know.

24          THE COURT:  Yeah, if it turns out we have daily copy

25  for some witnesses, then it's possible that that might be

1  available for review, but at this point, apparently, the

2  parties don't know.

3      In civil cases, it's less common to have daily copy,

4  which we will prepare the transcript as we go along.  But in

5  criminal cases, which this is not, we frequently have daily

6  copy.  But this is not a criminal case.  It's a civil case.

7      Now, my next words, this is a civil case.  Plaintiff

8  has a burden of proving his case by what is called the

9  preponderance of the evidence.  That means the plaintiff has

10 to produce evidence that, considered in light of all the

11 facts, leads you to believe that what the plaintiff claims is

12 more likely true than not true.  To put it differently, if you

13 were to put the plaintiff's and defendant's evidence on

14 opposite sides of the scale -- you've seen justice only, the

15 scale of two sides -- the plaintiff would have to make the

16 scales tilt to his side, however slight the tilting was, it

17 would have to tilt on his side, which is another way of

18 saying, plaintiff has to prove by a preponderance of the

19 evidence, and that means that what he claims is more likely

20 true than not true.

21      Those of you who have sat on or heard about criminal

22 cases have heard about proof beyond a reasonable doubt.  I'm

23 sure you've heard of that, if nothing else, on television.

24 That -- that is a standard of proof which is required only in

25 criminal cases.  That requirement does not apply to a civil

**1** case and you should, therefore, put it out of your mind.

**2**       The trial will now begin.  First, each side may make an

**3** opening statement.  An opening statement is neither evidence

**4** nor argument.  It is an outline of what the party intends to

**5** prove offered to help you follow the evidence.  Next, the

**6** plaintiff will present its witnesses and the defendants may

**7** cross-examine them.  The defendant will then, when the

**8** plaintiff rests -- I mean, finishes presenting his case, the

**9** defendant will present their witnesses and plaintiff may

**10** cross-examine those witnesses.  After that, the attorneys will

**11** make their closing arguments to summarize and interpret the

**12** evidence with you and argue, in the good sense of that word,

**13** you know, why you should find their way.  When the closing

**14** arguments are done, you will retire to deliberate your

**15** verdict.

**16**       You noticed you don't have your note pads with you.  I

**17** normally don't like, in opening statements, note pads.  I will

**18** give you the note pads when we start hearing actual witnesses,

**19** which won't be too long.  So now I ask that you give the

**20** parties your close attention as I recognize them for purposes

**21** of making their opening statements, and for that purpose, I

**22** recognize Mr. Vesper to make his opening statement on behalf

**23** of the plaintiff.

**24**       MR. VESPER:  Thank you.  So when you were in 7th,

**25** 8th, 9th grade, do you remember anybody ever telling you, if

 1   you do something, do it right?  That was something I learned.

 2   And if you were in that age, 13, 14, 15 and somebody made a

 3   rule, but they didn't enforce it, after I while, I don't know

 4   about you, I didn't pay much attention to that rule.  This is

 5   a case about rules and I'm going to tell you what they are.

 6   Excuse me, Your Honor, excuse my back.

 7           THE COURT:  Okay.  You really need to be an engineer.

 8   That's high tech stuff.

 9           MR. VESPER:  Yeah.  If I could just get that legal

10   pad -- the artist pad.  I just want to highlight -- I

11   apologize, I don't want to get into your face here.

12           I could stand back here, but then.

13           THE COURT:  By the way, I allow counsel to move

14   around, I do.  That's both sides.  As long as you don't block

15   something, if you want to stand over there, you can move

16   around, both sides can move around.

17           MR. VESPER:  Now that the court reporter is moved, I

18   definitely want the Judge to see what's going on, as well as

19   my adversary.

20           THE COURT:  But I point out, defense counsel, you can

21   move if you want, that's fine.

22           MR. HERMESMANN:  Thank you, Your Honor.

23           MR. VESPER:  Do you have a black magic marker?  Thank

24   you.

25           So rules.  If you -- you don't have to have

1  surveillance cameras if you own a property.  I'm going to

2  describe this property in just a moment.  You don't have to

3  have lights.  There's no rule that says you have to have

4  surveillance cameras or any cameras and there's no rule -- or

5  I shouldn't say -- there's no statute or law that says you

6  have to have lights, let alone -- I mean sensor lights.  But

7  once you choose to put up surveillance cameras, they should

8  work, and once you choose to put up lights -- well, let's go

9  back to the cameras.  Once you choose to put up -- because

10 there's no law that you have to, but once you decide, I'm

11 going to put up surveillance cameras because for whatever

12 reason, usually it's because there's something dangerous.  So

13 if you decide to put up surveillance cameras, they should work

14 and shouldn't they be in, like, important -- like, you have to

15 prioritize where you're going to put them.  You just don't put

16 six surveillance cameras in one spot?  Also, no rule that says

17 you have to have lights.  No rule.  But once you put the

18 lights up, again, you should put them in a place that they're

19 going to have an effect, and they should work, okay?

20        So you see how that -- once you decide to do

21 something, do it right, and what this case is about, believe

22 it or not, and I'm going to explain this in just a moment, is

23 really about percentages, because that's -- we're not going to

24 -- hopefully, my adversary and I are going to argue with you.

25 We're going to try to reason with you at the end of this case,

1    but it's about percentages and money damages, because you

2    can't bring John back.

3         Now, you're the judges, as Judge Irenas said, and each

4    party in this case, our client, deceased, John, 14 years,

5    first time at this -- it's called a camping resort, first

6    time.  Also first time in the lake.  First time.

7         You have to judge John how?  By what standard?  Now,

8    I'm not going to tell you what the law is.  I'm not going to

9    tell you what, like, the law of when you undertake to perform

10   an activity.  His Honor is going to tell you that is the law

11   in New Jersey more elegantly and precisely than I could.

12        But let me just share with you the concept of you judge

13   people based on who they are and the circumstances they're in.

14   That's the shorthand of what the Judge is going to tell you

15   this at the end of the case.  So 14-year-old John Toribio

16   judgement has to be based on what would a reasonably prudent,

17   under the circumstances, hot Sunday evening in August, what

18   would that 14-year-old John Toribio have done that was

19   reasonable.

20        Now, "reasonable" means not the most cautious, not -- I

21   guess, the most negligent, okay?  That's what's reasonable.

22        Now, Pine Haven Camping Resort, it's called a camping

23   resort and you're going to hear testimony about why it's a

24   camping resort because the KOA has three kinds of categories.

25        THE COURT:  Excuse me.  Does that have a number on

1  it?

2          MR. VESPER:  Yes, this is an enlargement of what we

3  marked yesterday was P-1A.

4          THE COURT:  P-1A okay.

5          MR. VESPER:  This is probably going to have P-1B

6  because it's even larger.

7          THE COURT:  I want to identify it.

8          MR. VESPER:  Pardon?

9          THE COURT:  I want to identify it.

10          MR. VESPER:  Thank you, Your Honor.

11      So why is it called a camping resort and not a

12  campground?  There's camping facilities or lodgings where you

13  can just drive in and they have washroom facilities, and you

14  can stay overnight and they don't have a lot of other bells

15  and whistles.  So that's one category.

16      Then there's another category of they're called holiday

17  resort -- holiday camps.  A holiday camp is where you can

18  bring in your SUV -- excuse me, your RV, you bring it in

19  excuse and park there and it has a restaurant, places to eat

20  and a store, other amenities, and then there's the camping

21  resort.  The camping resort is a place where you can stay --

22  you don't have to take any day trips, you can just stay there

23  for weeks.  Why?  Because it's kind of like self-contained.

24  It has amenities, it has, besides places to eat and stores,

25  it's got lots of things for the family to do, activities and

1    places to go, things to do, on-site.  So this site, Pine

2    Haven, is down off of Route 9.  Here's Route 9.  And if you

3    keep going, you're in Cape May.  And if you went this way, you

4    would go towards Atlantic City, okay?  And over here is Sea

5    Isle and the Atlantic Ocean.

6           So 590 units.  This is not a mom and pop operation.

7    This is owned by Pine Haven, along with other camping spots.

8    It's owned by Diversified Investments, Inc.  Not a mop and pop

9    operation.  This 590 spots, is spread out over 85 acres.  Big.

10   And they have a guard house here with one guard that makes

11   sure that only members or those with passes to get in, get in.

12   You would think -- pretty good security.  Nobody -- and that

13   -- and that guard -- I think it's two or three shifts of not

14   called guards, the gate attendant, gate attendant, 24/7 at

15   that spot.  You're also going to hear that here's the man-made

16   swimming lake, man-made for people to swim, and it's got a

17   man-made beach and it's also got a man-made -- there's a --

18   did we mark this?

19          MR. CICCOTTA:  Yes.

20          MR. VESPER:  P-6.

21      I'm going to show you what's been marked as P-6.

22          THE COURT:  What's that marked?

23          MR. VESPER:  P-6, Your Honor.

24          I'm sorry, I didn't have time to get this thing

25   marked, but do you see that fountain?  There's a fountain of

 1   water that goes up like 30 feet in the air coming out of a

 2   whale that's sitting on top of a float so that -- you're not

 3   supposed to stand on it, but people do swim out and stand on

 4   that float, where the water is spraying up in the air, kind of

 5   high.

 6        This whale is over here, approximately in this man-made

 7   swim lake and it's left on, even though people aren't supposed

 8   to go in after dusk, because that's one of the rules of the

 9   Diversified Industries camping resort, that no one of any age,

10   whatsoever, is supposed to go into that -- into either the

11   swimming lake or the -- there's a pool here with a kiddie

12   pool, and that's why I had it blown up, so that you people on

13   the east side of this jury box can see this, because this is a

14   large courtroom.  This is where the pool area and the kiddie

15   pool are.  You can see like right -- it's right across from --

16   and again, I'll show you an actual aerial, so you will see the

17   -- this is not to scale, okay, but it pretty much approximates

18   what you're going to see on the -- you know the Google thing,

19   the Google Earth.  Did I do that?

20        There's a Google Earth that will put all this in

21   perspective.  So no one of any age, of any age, is supposed to

22   be in here or here -- in the water, here or here after the

23   stores close, because there's a store, which I'll point out,

24   it's called the -- yeah, the general store and office are

25   here, and so when the store closes, nobody in the water.

1    That's a rule.  How is it enforced?  No one, no one from this

2    campground was designated, not the gate attendant, and nobody

3    else was assigned, other than on Fridays and Saturdays, to

4    patrol and enforce that rule, because this happened on a

5    Sunday, in August.

6         Remember what I said?  If, if you're going to do

7    something, do it right.  The corporate entity, Diversified

8    Industries, Inc., they did have a patrol, a mobile patrol on a

9    golf cart.  A man drove around until two o'clock in the

10   morning.  It was four o'clock -- early -- to enforce the rule,

11   but he was only there Fridays and Saturdays.  Now, you're the

12   judges.  You're going to be asked to decide, was that

13   reasonable?  He only picked Fridays and Saturdays for the guy

14   in the mobile cart -- in the golf cart, the mobile patrol to

15   enforce your rule, because you don't want your guests to

16   drown.

17        So Diversified Industries, Inc., owns and operates this

18   large camping resort and they have to be judged by what a

19   reasonably corporate owner of a facility this size with the

20   amenities that it has would reasonably do.  Not the most

21   cautious, you know, 100 percent going -- 100, you know,

22   percent perfection for safety, and not the most unsafe, but

23   just reasonable, and 12-years-and-one-month-old John has to be

24   judged by what a reasonably prudent 14-year-old would have

25   done on a Sunday night.  I'm going to tell you about that

*United States District Court*
*Camden, New Jersey*

1    Sunday night.

2         Now, before I tell you about this Sunday night, let me

3    just explain another concept, because this may help you as you

4    hear the evidence.  How do you decide if somebody is -- and

5    this, we learn in law school, some of us learned.  This was

6    not one of my best courses, but some of us really learned

7    this.  Here's the concept.  What is a reasonable man, or

8    reasonable woman -- because you have to judge everybody by

9    that standard unless, of course, they are a 14-year-old, then

10   you have to say, what does a reasonable 14-year-old, okay?  Or

11   in this case, what is a reasonable corporate entity that owns

12   and operates a camping resort of this size.

13        Now, in order to determine whether the 14-year-old or

14   the corporate entity acted reasonably, reasonableness, and

15   what you do or don't do depends on risk.  Is it reasonable to

16   say that I have to wear a life preserver or that anybody in

17   here should wear a life preserver, because the river could

18   rise?  That's not much of a risk, right?  However, if we're in

19   a boat in the ocean, maybe even in the Delaware, should you

20   wear a life preserver?  Yeah.  Why?  Because you might fall

21   over.

22        So there's risk and then there's foreseeable risk,

23   right?  And that's another concept, but I'll just leave it at

24   -- there's not only risk that you can see, there's also what's

25   called foreseeable risk.  It's the risk that -- foreseeable

1    just means that a reasonable person, or in this case, a

2    corporation run by reasonable management, is going to foresee

3    a risk, all right?  And also, whether a reasonable 14-year-old

4    is going to foresee a risk.  And how do you judge whether they

5    are reasonable?  It's called care, commensurate -- I know I'm

6    going to misspell this, but I think it's commensurate, with

7    risk.  That's all it is.

8           So if you're going to judge the corporation or the

9    manager of the corporation or anybody, 14-year-old, anybody,

10   you're going to judge yourselves, sometimes.  You have to

11   decide, am I acting reasonably in light of -- are my actions

12   commensurate with the risk.  And again, risk has to be

13   something that you could reasonably foresee or actually see.

14   Okay?  So that's just to give you a heads up, my shorthand

15   version of what you should be looking for, whether there was

16   risk and whether the risk was foreseeable -- reasonably

17   foreseeable for the people in those circumstances, and whether

18   the care by those people was commensurate with the risk.

19          Let me tell you briefly what I believe the evidence is

20   going to show you about the care, or lack of care that was

21   shown by the defendant, Diversified Industries, Inc.,

22   Diversified Industries, Inc., had choices.  First of all, did

23   Diversified Industries, Inc., recognize that there's a risk?

24   Of course they did.  Why?  Because they posted signs.

25          Now, where they posted them, I don't know whether it

1  makes a difference, but I'll just tell you, at the time of

2  this incident the signs weren't visible to anybody on the

3  beach because you're going to hear testimony that the signs

4  were in the woods.  And for people approaching the swim lake,

5  were walking around this beach, is over here -- actually,

6  pretty much the beach runs around here.  But there's a nice

7  sand beach here at the southern side of the swim lake.  So

8  where should the signs have been if you're going to put up

9  signs?  It should be where people are going to see the signs,

10  where they are going to use the facility.  I believe there was

11  a sign near the pool saying, you know, don't swim after dusk,

12  or -- whatever the signs say, was here, but the sign for the

13  swimming lake was in the trees over here, not visible.

14        Again, do you need a sign to know there's water?  No.

15  There's water.  But did the corporate entity do anything else

16  besides put up a sign?  Wherever it was, whether it's in a

17  tree, a bush, like, what else would you do if you knew that

18  when people go into the water of any age after dusk, when

19  you've closed the place, they could get in trouble, for

20  whatever reason.  So are there -- and you're going to hear,

21  there's about ten choices they had of things that they could

22  do.  Do you want to put up a motion detector, something that

23  when you go past it, you know, it makes a sound or a light

24  comes on?  Do you want to have somebody patrol the area?  That

25  will be up for you to judge.

*United States District Court*
*Camden, New Jersey*

1    But Pine Haven Camping Resort had choices, and if they

2 had opted to exercise those reasonable choices, it's our

3 position, and it's for you to judge that nobody would have

4 been in the water that night.

5    Now, what -- oh, and also the care commensurate with

6 the risk, and if you don't make the right choices, what may

7 happen?  Is it foreseeable that somebody is going to drown

8 because you don't enforce the rules?  I believe the evidence

9 will show it is.

10    Now, what was the risk to the 14-year-old, by the way,

11 who was told, two dozen times, he was told by the Millers with

12 whom he was staying.  And perhaps let me go back and I should

13 have done this.

14    John Toribio went to Pine Haven with his best friend,

15 Anthony Dioscon and Anthony's parents, and you will meet them

16 Tim and Heather Miller -- Heather Dioscon Miller or Heather

17 Lee Dioscon Miller.  And they had rented for that year right

18 here, a camp spot, a site for their RV, right here.  They had

19 been there a few times before but not with John.  So John, I

20 believe it was Friday, goes along with his best friend from

21 8th grade, Anthony Dioscon, and they go down with the Millers

22 and their little daughter and they stay in the camper there,

23 and one day, I think they went to the beach in Sea Isle.  But

24 on this Sunday, this Sunday, they played some basketball, two

25 14-year-olds playing hoops, shooting baskets and then they had

1   dinner here at the RV and then after dinner they said, we're

2   going to go down to the basketball court, which the basketball

3   court is very close to the swim lake.  The basketball court is

4   over here.  Again, this is not to scale, it's kind of up this

5   way.  But let's see where the basketball courts are down here.

6   Okay.

7          So they walk down and they -- John has always wanted to

8   swim in this lake.  Why?  One person remembers he wanted to

9   swim to the whale, the spouting whale.  Why he went out in the

10  water that night, not as important about why the rule wasn't

11  enforced.  Not just that night, but any night, other than

12  Friday and Saturday in the summer, the height of the season.

13         So John and Anthony go to the basketball court on this

14  Sunday evening in August and they meet up with two 14-year-old

15  girls and one of the girls, who again you will meet, her name

16  is Heather, Heather says -- I'm sorry, Michelle.  Name is

17  Michelle Wheeler.  I apologize.  So they meet up with two

18  young ladies and teenagers, and I believe Michelle Wheeler was

19  also 14 years old and she says, let's go down to the lake, and

20  they do.  And by the way, one of the reasons that -- I believe

21  you're going to hear testimony from Anthony, one of the

22  reasons why they didn't stay at the basketball court is

23  because there was some underage drinking going on there.  They

24  didn't want any parts of that.  You're going to hear

25  testimony.  And you're also going to find out that there was

1   not a drop of any alcohol or controlled substance of any kind

2   in John.  So there was no drinking from these two teenagers --

3   or two teenage boys.

4        So they go from the basketball court, they go from

5   here, to here, to here.  Now, when they get to the beach here,

6   Mr. Miller comes with his young daughter who is maybe four or

7   five at the time and he sees them and he sees the two girls on

8   the -- I believe -- there's playground equipment on the beach

9   here, and just -- I apologize for going back, but again,

10   Diversified Investments, Incorporated decided that as an

11   amenity, one of its transactions, it would put playground

12   equipment, little pirate ship, swings, little merry-go -- that

13   little, you know, spin-around merry-go-round thing, and guess

14   where they put it?  Where kids are not supposed to go after

15   dusk.  They put it on the beach within, like, I don't want to

16   say from here to the wall, but very close to the water.  No

17   fence, open to anybody is the playground on the beach of the

18   man-made lake that nobody patrols, other than Fridays and

19   Saturdays.

20        So on this particular Sunday night girls are sitting I

21   think on the pirate ship, on the swings and Tim Miller sees

22   the boys are attracted to the girls and he tells them again,

23   don't go in the water, and he leaves to go back with his young

24   daughter, back to their trailer, and don't be late, because

25   they have a 10 o'clock curfew.  They're supposed to be back by

 1  10 o'clock.

 2       So Heather's walking -- or the boys are walking or

 3  there's three of them now, Anthony, John and I keep saying

 4  Heather -- Michelle.  Anthony, John and Michelle are walking

 5  in the water and Michelle says, let's swim, so she starts to

 6  swim across the lake, the man-made lake, and what do the boys

 7  do?  They swim after her.  John never came out.  You're going

 8  to hear testimony from Anthony that as you walk into the

 9  water, in this -- in this -- again, I'm estimating it was

10  somewhere either here or in the middle here where they started

11  out across the lake.  When you go in the water, the water

12  is --

13            MR. HERMESMANN:  Objection.  Objection, Your Honor.

14            THE COURT:  Yeah, what's the objection?

15            MR. HERMESMANN:  Can I be heard at sidebar?

16            THE COURT:  You think the fact that you contest his

17  version of the facts --

18            MR. HERMESMANN:  It's unsupportable, what I believe

19  he's about to say.

20            THE COURT:  Well, all right.  I'm going to let it --

21  go ahead, Mr. Vesper.  I'm overruling the objection.

22            MR. VESPER:  Thank you.

23       Anthony Dioscon has testified that when you walk in the

24  water, it's shallow and then there's a -- like a drop-off.

25  Now, how deep the drop-off is, I don't know.  How deep the

*United States District Court*
*Camden, New Jersey*

1   lake is, we will find that out sometime this morning, but once

2   you get out towards the middle of this lake, it's deep.  It's

3   over your head.  That's a fact, and it was somewhere out in

4   the deep part of the lake where Michelle and Anthony were

5   swimming that they heard -- they heard John and he said help

6   and he was splashing or waving or flapping his arms and

7   Michelle asked Anthony, is John okay, and Anthony, who had

8   been -- they had been friends throughout grade school, Anthony

9   thought that John was fooling around, playing, so Anthony and

10  Michelle kept swimming.

11          When they got to the other side, the other beach, they

12  looked and there was no John, so they started calling for John

13  and they walked around and they found where John -- John had

14  taken -- the boys had wanted to go swimming that night,

15  because they wore basketball shorts under their cargo pants,

16  so they had -- they were going to go swimming and Michelle was

17  wearing a bathing suit.  And so when they had taken the shirts

18  and cargo pants off and flip-flops or whatever, they left them

19  on -- the three of them had left their clothes somewhere

20  around here on the beach, and so when Heather and Anthony came

21  around to look for John, they saw his clothes were still

22  there.  And Anthony and I'm sure Michelle started to panic and

23  they went over and they got some other teenagers to help them

24  search.  And you could imagine, they were frantic calling out

25  for him.  And then finally somebody went and told Mr. and Mrs.

1  Miller and then there's there was a search and then John was

2  found, John's body.

3      Now, that's what happened.  Why it happened, it's our

4  position, that in this case there's responsibility and that

5  responsibility has to be laid on those that it should be laid

6  on.  You may find some responsibility on the part of the

7  14-year-old.  I would submit to you judges that you're going

8  to find a substantial amount of responsibility on the part of

9  the adults, the corporate management of Pine Haven Camping

10  Resort.  There's a concept called cause.  We had just

11  discussed the facts, we will call this 2010.  There's

12  something called causation or legal cause, proximate cause.

13  What is -- so the Judge is going to explain that to you.  A

14  cause, a cause.  A cause for any injury or death has to be a

15  substantial cause.  Can't just be something trivial, but you

16  can have two or more causes.  Not "the" cause.  It doesn't

17  have to be one cause for something to happen, and in this

18  case, I believe, the evidence will bear out that there are

19  several causes for this.  I believe most importantly is that

20  when you make a rule, you should enforce that rule, otherwise

21  nobody is going to pay attention to that rule.  Also, if you

22  have surveillance, you've decided that for the safety of your

23  guests, or business invitees, these people, however many of

24  them are there in the summer with their children, so if

25  there's 590 spots, there's more than 590 people there.

 1   Thousands of people, thousands of people are there.  So if

 2   thousands of people are there, including children, shouldn't

 3   you enforce your own rule?  Not just on Fridays and Saturdays,

 4   every night of the summer.  That's for you to judge.

 5        And that's why, that's why my colleague and I, Reno

 6   Ciccotta, who remembers the names much better than I do,

 7   that's why we have brought this lawsuit against Diversified

 8   Industries, Incorporated and their Pine Haven campground.

 9        Now, I'm going to very briefly do this.  The Judge

10   mentioned that the burden of proof is -- it's not a criminal

11   case, so I don't have to convince you by clear and convincing

12   or overwhelming beyond a reasonable doubt.  You know, you

13   could still have a doubt, which I don't think you will, when

14   you hear all the evidence, but we have to produce the evidence

15   that tips the scales in your hearts and minds, in your hearts

16   and minds, tips the scales in favor of our position.

17        The defense has the same burden.  If they're going to

18   allege, which we have, that -- that John, the 14-year-old, is

19   at fault, they have to meet that burden.  They have to tip the

20   scales in your hearts and minds, also, that John did something

21   unreasonable for a 14-year-old in the summer at a summer camp

22   where I believe you will find, where the rules are not

23   enforced.

24        So the -- the cause or causes of this drowning have to

25   be decided by you.

 1          And the defense -- why are we are here?  Because the

 2    defense has two liability experts that you will hear, and one

 3    is an engineer.  I don't know what experience this engineer

 4    has in running, inspecting or whatever, a camping resort of

 5    this size, but the engineer is going to say everything was

 6    done as it should have been done.  All the rules were

 7    followed.  The signs were posted.  What other rules are there?

 8    Well, there's the New Jersey statute that says you have to

 9    post a sign.  Doesn't say what the sign should say, but is

10    there any other rule?  Not that I know of, according to the

11    engineer.  That's -- so the engineer is going to talk to you

12    about signage, not necessarily about the operation, like what

13    about the operation.

14          THE COURT:  Mr. Vesper your opening is supposed to

15    say what you're going to prove, not the other side is --

16          MR. VESPER:  All right.  Let me not dwell on what the

17    experts are going to say.  But suffice it to say, there will

18    be two experts that the defense will produce.

19          MR. HERMESMANN:  Objection, Your Honor.

20          MR. VESPER:  All right.  There may be, there may be

21    expert testimony that the campground did nothing wrong.  I

22    would ask you to weigh that evidence against all of the

23    evidence and what a reasonably prudent operation of this size

24    should have done.

25          Also, there may or may not be -- well, I know what

1  we're going to prove as far as damages.  What are damages?

2  Actually it's not just loss, it's losses.  In a wrongful death

3  case in New Jersey, His Honor is going to explain to you what

4  the law is, but I just want you to see where the facts fit,

5  because this is, I'm sure you understand, a very serious case.

6         The law in New Jersey, which is very serious, has been

7  the same law for 300 years.  Whether it should be changed or

8  not, we won't debate that at this time.  But here is what the

9  law in New Jersey says:  There's no grief or sorrow in New

10 Jersey, so -- and we wouldn't -- because we're not allowed,

11 we're not allowed to ask you to make any judgment based on

12 sympathy, bias, prejudice or anything like that.

13        In -- but in some states when a family member dies,

14 then the survivors are allowed grief and sorrow.  There is no

15 grief or sorrow, nothing like that.  And there will be no

16 attempt to elicit any kind of sympathy or grief or sorrow

17 elements in the case, because it's not allowed.  What are

18 allowed are these two things for loss.  There's something

19 called survivorship.

20        Now, what does survivorship mean?  Some states have it.

21 Most states do.  In New Jersey, if someone -- if someone has

22 any conscious pain before they die, then their estate has a

23 right to ask for that to be evaluated the defendant by -- so

24 I'm not going to dwell on that.

25        But there's going to be, I believe -- no, there's going

1    to be testimony from -- from a forensic pathologist that I

2    will call, Dr. Donald Jason and he will explain to you how

3    long it took for this young boy to become unconscious.

4         Then there's something called wrongful death.  And you

5    would think all this is together, but survivorship is

6    different because this is for -- this is for John, and then

7    there's what's called wrongful death, or the -- these are like

8    noneconomic, so I'm not allowed to suggest to you any numbers

9    whatsoever.  I believe the Judge will allow my partner and I,

10   perhaps, to use a suggested formula that might help you, but

11   that's for later.

12        This is non- -- this is not something I can tell you,

13   well, this is how much it's worth, in my opinion, or in our

14   opinion.  But wrongful death damages, again, because New

15   Jersey has this 300-year-old law has to be evaluated.

16        Now, how is it evaluated?  It's pure economics.  That's

17   what the statute says, because it's based on old English law

18   that when there was a death, there was a loss of economics to

19   the family.

20        Now, there's a forensic economist that we will call and

21   you will hear how our forensic economist, professor, he's also

22   a pH.D doctor, Frank Tinari evaluated the economic value, not

23   the money, but evaluated -- not the income, because the estate

24   of John does -- is not entitled to anything that John would

25   have earned, right?  It's based -- it's going to get a lot

 1   clearer when the Judge explains it, I'm sure, but I'm trying

 2   to give you an overview here of -- the evidence is going to

 3   show that under our New Jersey law an economist is allowed,

 4   for purposes of assisting you, because you have an ultimate

 5   decision.  You can ignore the economist and come up with your

 6   own evaluation, okay?  I mean, you do that with any expert.

 7   You hear an expert and the expert says, well, I think this and

 8   you can say, I don't agree with that.  It's up -- that's the

 9   power that you have to decide facts.

10        So in this case, Professor Tinari has analyzed three

11   elements of loss and they are -- there's services.  So the

12   kinds of things that growing up John would have done for his

13   mom, and you'll hear about some of the things that he had

14   already, you know, established a pretty good record within the

15   family of having -- doing things with the computer -- he was

16   the go-to guy and you will hear other things that he did for

17   the family, and particularly for his mom, Betty.  And then the

18   economist is allowed to project that as he got older -- bless

19   you -- as he got older and as his mom got older, there would

20   be different requirements, and John may have gotten married,

21   and that's factored in, and he may not -- probably would not

22   have lived with his mother.  So all those things are factored

23   into the future life of Betty, of his mother, not the future

24   life of John, but of Betty and the kinds of things that John

25   would do for Betty are part -- the things he would do, all

1  right, that's something that you, as judges, have to put an

2  economic value on.

3        Secondly, is companionship.  Now, you could see where

4  if the husband loses a wife or a wife loses a husband, that

5  companionship -- that's a life-long companion.  Not that John

6  was going to be with his mom for the rest of her life, but he

7  was going to spend some time being with her, and that can be

8  estimated, again, up to you to decide whether or not Professor

9  Tinari did it reasonably, did a reasonable evaluation to help

10  you.

11        And then the third -- the third economic element of

12  wrongful death damages is something called advice and counsel.

13        Now, I have a cousin, he gives me lots of advice.  Is

14  it worth anything?  I don't think so.  On the other hand, I

15  have partners who give me advice and it's very valuable.  My

16  wife gives me advice.  Sometimes I take it.  And it's very

17  valuable.

18        So you have to decide is the advice and counsel that

19  John had already advised and counseled his mom about,

20  something that he would have continued for the rest of his

21  mom's life, which I believe with this family, I believe you

22  will come to the conclusion that he would have given ongoing

23  advice and counsel, and solace.  And sometimes we just need

24  somebody to talk to, to cry on, to share our happiness, right?

25        Now, there's a -- there's a factor here of and I need

1   to explain this just briefly, is the -- there's an on-call.

2   What's called an on-call value.  What does that mean?  All

3   right.  I don't need a show of hands, but do any of you have a

4   car that has that OnStar thing when you get in trouble, you

5   press?  No.

6        So there are on-call services.  Maybe the best example

7   is the police, the fire department in your communities.

8   They're on call, aren't they?  You call the police and you

9   need help, they're going to be there in less than two minutes.

10  Same thing with fire department, they're on call.  You may pay

11  for that in your taxes.

12       So in this case, in addition to the actual time that

13  John would spend with his mom, there's also a value for being

14  accessible 24 hours.  I mean, some people have a 24/7 service.

15  They're on call.  And a lot of times when we get to do the

16  research that we need things done, we pay a service, whether

17  it's Westlaw or LexisNexis we pay for a service that's on call

18  24/7.  24/7 we can access and do legal research 24/7, but you

19  have to pay.

20       So there's an on-call value for the advice and counsel

21  and even the companionship that you would share with somebody

22  in the middle of the night.  Oh, my God it's the middle of the

23  night, I needed to call somebody and that person is on call.

24       So we're going to ask you again in the case to evaluate

25  what is a just result for liability, who of the two parties or

1  to what percentage these two parties are responsible and for

2  your evaluation of fair and just result, no more than that,

3  but no less than that either.

4       The Judge already told you this several times, but I

5  want to -- it bears repeating when the Judge has said, this is

6  not a criminal case.  We're not here to punish anybody.  We're

7  not here to punish the manager, whose name is Michael Jordan,

8  who you're going to hear testify this morning.  Nobody is

9  going to be punished.  Nobody is going to lose their license.

10 This is not a criminal proceeding --

11      (Phone ringing)

12      MR. VESPER:  I had this on for no good reason.  My

13 fault.

14      You need to understand this about your role as the

15 judges, why when you walk in and out, we stand.  Do you know

16 why that is?  Because you're the judges of the fact, a very,

17 very important function in this case.  And because -- and I

18 know you'll give the same attention to Mr. -- Patrick

19 Hermesmann that you gave to me and I thank you very much and I

20 hope to at the end of this case be able to show you what we've

21 proven why you should render a judgment in this case.  Thank

22 you very much.

23      THE COURT:  Okay.  Thank you, Mr. Vesper.  Mr.

24 Hermesmann, I'm going to take about a 10-minute break, just to

25 get you --

**1**         MR. HERMESMANN:  Thank you.

**2**         THE COURT:  Get your things organized.

**3**         MR. HERMESMANN:  Thank you.

**4**         THE COURT:  So I'm going to come back about 10 after

**5** 1 -- 10 after 10, okay?

**6**         MR. HERMESMANN:  Thank you, Your Honor.  All rise

**7** while the jury leaves.

**8**         (JURY EXITS; 9:58 a.m.)

**9**         (RECESS TAKEN; 9:58 a.m.)

**10**        THE DEPUTY CLERK:  All rise.

**11**        (JURY ENTERS; 10:13 a.m.)

**12**        THE COURT:  Good morning, everyone.  Please be

**13** seated.

**14**        Mr. Gotta, I spoke to the general counsel, he's going

**15** to get later to me today.

**16**        JUROR #2:  Thank you.

**17**        THE COURT:  Okay.  I'll now recognize Mr. Hermesmann

**18** to give the opening statement for the defense.

**19**        MR. HERMESMANN:  Thank you, Your Honor.  May it

**20** please the Court, Counsel.

**21**        Good morning, ladies and gentlemen.  As I mentioned

**22** yesterday, my name is Patrick Hermesmann.  I represent Pine

**23** Haven campground in this action, and then seated to my left

**24** and he will be here throughout the trial is Terry Jordan, who

**25** is the general manager of Pine Haven.

1          I certainly concur with Mr. Vesper that this is a

2     serious matter.  Let me start by just telling you a little bit

3     about the Pine Haven campground.  You've heard some from

4     Mr. Vesper and I'll try not to be too repetitive.  Pine Haven

5     is an 85-acre campground located down in Cape May County in

6     between Cape May and Ocean City right on Route 9.  It has some

7     permanent facilities, cabins, that somebody could go down and

8     rent for a period of time, but for the most part, it has sites

9     and these sites are leased out to individuals who bring their

10    own camper, whether it be a trailer, mobile home, RV, they

11    bring it down to Pine Haven.  Pine Haven is open not

12    year-round, it's a seasonal campground, opens in April and it

13    closes in October.

14         As mentioned, it has a gate check, so when you come

15    through, somebody greets you to make sure that you're supposed

16    to -- you're supposed to be there.  And it's not something

17    that you can come in and out of without going through --

18    without going through the guard.

19         It also has various -- various items on the campground

20    that are meant to be utilized by the people who lease the

21    facilities there.  You've obviously heard about the lake.

22    There's actually two lakes.  There's a swimming lake and

23    there's a fishing lake.  You have heard a little bit about the

24    pool.  There's playgrounds, there's a basketball court,

25    there's a recreation center, there's a little -- a putt putt,

1    there's a little putt putt golf course, nine holes.  I think I

2    said there's a basketball court.  It has four-and-a-half miles

3    of roads throughout, and you saw the diagram presented

4    earlier.  It has four-and-a-half miles of roads throughout the

5    campground, and again, those who come down, typically, not all

6    of them, but typically, will bring down their own camper.

7    They might leave it there year-round, but it's only open,

8    again, from April to October.

9         And that's a general -- a general description of the

10   campground and their clientele.  It's a family-oriented --

11   it's a family-oriented campground, and it's run, again, by

12   Mr. Jordan.

13        Let me move into what happened and then I'll talk a

14   little bit more about some facts that we're going to present

15   to you and certain facts are going to be absolutely undisputed

16   in this matter.  To look at what happened, though, you can't

17   start on August 8th, 2010, when this accident occurred.  If

18   you want to know what happened, you really have to go back a

19   little bit.  You have to go back to the beginning of that

20   season, 2010.  You heard some names and I'll try to be as

21   clear as possible and make this as simple as possible for you.

22        You heard the names Tim Miller and Heather Miller.  Tim

23   Miller, back in April of 2010, again, we're talking three

24   months or so, four months or so, four months or so before this

25   incident, Tim Miller met with Terry Jordan and he was looking

1   at a place to put his own camper and to take his then fiancé,

2   now his wife and their family down during the summer months.

3        The Millers are from Philadelphia, and both Tim and

4   Heather made an assessment that this is -- this is the type of

5   place where we would like to take our family and, as you might

6   expect, in a business such as this, they entered into an

7   agreement to pay a certain amount of money to be able to bring

8   their camper there and utilize the campground throughout the

9   season.  As part of -- as part of that meeting, and as part of

10  the later agreement to become -- or to have access to the

11  campground, Mr. Jordan went over the rules and regulations

12  that apply to this particular campground, and you're going to

13  hear it from Mr. Jordan and presumably, you're going to hear

14  it also from Tim Miller.

15       Those rules and regulations were clear when they met.

16  Particularly, the rules and regulations talked about parental

17  responsibility, and it made clear to the Millers and anybody

18  else who brought their children to Pine Haven campground that

19  the responsibility to monitor and watch the children rested

20  with the parents, and that Pine Haven did not have personnel

21  in place to do that particular task.

22       The rules and regulations, which we'll hear more about,

23  read in part:  Please provide proper supervision for your

24  children while in the park.  All children must be under direct

25  adult supervision.  Children under 16 years must have adult

1  supervision while in the pool area or lake area.  Parents will

2  be held responsible for the actions of minor children.  Minors

3  must be on their site and under direct adult supervision by

4  10 p.m.

5      Mr. and Mrs. Miller were aware of this when they signed

6  the contract, but not only were they aware of it when they

7  signed the contract, they then spent most of the summer of

8  2010 during the weekends going down to Pine Haven, and again,

9  you'll hear from Mr. Miller, who will tell you, you know, he

10  knew, he knew there was nobody watching those kids down at the

11  lake other than him and -- him and Mrs. Miller.  He knew that.

12      As you move forward to the weekend of August 8th, 2010,

13  the facts are going to show that the Millers, their son, in

14  this case, it was Mr. Miller's stepson, Anthony Dioscon, which

15  is Heather's natural son, was friends with the decedent in

16  this case, John Toribio.  They went to school together in

17  Philadelphia.  They were friends, and Anthony wanted John to

18  come down to the campground and John wanted to come down to

19  the campground, and it was agreed that John would come down

20  and spend the weekend with the Miller/Dioscon family at the

21  campground, and they came a few days before this incident

22  occurred.

23      And as I mentioned to you, and I think Mr. Vesper also

24  mentioned, the incident occurs on a Sunday night.  So what

25  occurred on this particular Sunday night, the boys -- the boys

1   after eating and spending the day here and there, worked their

2   way down to the lake and they meet another 14-year-old girl

3   who you're going to hear from, a Michelle Wheeler.  They'd

4   never laid eyes on Michelle Wheeler before this particular

5   evening.  They didn't know -- they didn't know one another.

6   But kids being kids, they encounter each other.

7         They're over by the lake and Mr. Miller with the

8   youngest -- with his youngest child is also there.  And

9   Mr. Miller, while it is still light out, indicates that he's

10  going back to the camper.  That's what he tells them.  Boys,

11  I'm going back to the camper.  Words to that effect.  And oh,

12  by the way, don't go in the lake, do not go in the lake.

13        This wasn't the first time that the boys had been told

14  not to go in the lake, but Heather Miller, Anthony's mother,

15  we expect you will hear testimony from her that she told these

16  boys 20 times over the course of this weekend, don't go in the

17  lake, do not go in the lake.  Mr. Miller leaves.

18        After Mr. Miller leaves, Michelle Wheeler says to the

19  boys, you guys want to go swimming?  As Mr. Vesper said during

20  his opening statement, these boys were going swimming, they

21  were going swimming.  They dropped their cargo pants, had

22  basketball shorts underneath, shirts off, shoes off, and they

23  all go into the water.  They head into the water, and at some

24  point, decide to swim across the lake.

25        I give this to you just as a pictorial, so you get a

1    little idea of the lake, and you will hear some testimony

2    later regarding the size to put it into context, and just to

3    orient you, on the backside is Route 9, up here, and you'll

4    hear testimony about the basketball courts which are about 75

5    yards away from the lake off here, where the boys had been.

6         They go into the lake and it's uncontested that Anthony

7    and Michelle get ahead of John Toribio, not a huge distance,

8    but a little bit ahead of John Toribio, and at some point, he

9    does start splashing around.  Michelle makes inquiry to John,

10   is he okay?  In essence, the response is, he's probably --

11   he's just joking around, he kind of does that type of thing.

12   They then proceed.

13        Now, just so we're clear, and you'll hear testimony

14   about where they entered and where they were exiting, but it

15   wasn't -- they weren't going the length, they weren't going

16   here, they were actually cutting a pretty -- a short angle, as

17   far as where -- a short angle as to where they were swimming.

18   And you'll hear testimony.  It wasn't -- it wasn't as if they

19   were swimming some super long distance when all of this

20   occurred, so they then finish across the lake and as

21   Mr. Vesper has pointed out, John, of course, did not make it

22   across the lake.

23        I had mentioned earlier that I was going to talk about

24   some facts that are frankly just not disputed in this case.

25   One is that a lake, such as this one, it may come as no

1  surprise to you, but it's regulated in New Jersey.  There's a

2  regulation that says what Pine Haven has to do relative to

3  this lake, relative to signage and safety for the lake.

4        The facts are also going to show that those

5  regulations, that they have -- they have nothing that for a

6  second requires lighting.  They have nothing for a second that

7  requires patrolling.  There's nothing that requires fencing.

8  There's nothing that requires lifeguards.  All of the things

9  that are asserted by the plaintiff that should have been done,

10  they're not required in New Jersey under -- under the

11  regulation that governs this particular lake.

12        More important, less than three weeks before, less than

13  three weeks before this incident occurred, the Cape May County

14  Department of Health came out to the lake and conducted their

15  inspection to ensure that Pine Haven campground was in

16  compliance with the regulations that governed the lake.  And

17  there's one of two boxes that get checked, unsatisfactory or

18  satisfactory, and they were marked satisfactory.

19        You heard earlier about signage and they can put

20  whatever they want up on the sign.  Well, you're going to hear

21  that that's not accurate.  They're required, they're required

22  by law to put signs that has certain language on it.  And, in

23  fact, they buy those signs, they don't make them themselves,

24  they don't go to Staples, they buy those signs from the state,

25  and when the inspector from the county health commission comes

 1    out, they make sure that the signage is in -- one, in proper

 2    place, and, two, has the proper language.

 3         And in this case --

 4         THE COURT:  What's the number of that exhibit,

 5    please?

 6         MR. HERMESMANN:  Your Honor, I did not mark it.

 7         THE COURT:  Okay.  All right.  Go ahead.

 8         MR. HERMESMANN:  The signage you're looking at, that

 9    you all can read for yourself, is located in two spots.  The

10    two entry points to the lake.  It's located -- it's located

11    down on this end, down on this end, because we've got other

12    activities over here, and there's a road that runs alongside

13    this tree line to the right.  So that road runs perpendicular

14    to Route 9, as I mentioned, Route 9 running this way, road

15    running this way, there's signage there, because those are

16    considered the two entry points to the lake.

17         The second sign, again, there's two of them posted at

18    the lake, and you're going to hear from Charlie Scarpa who is

19    the maintenance manager at Pine Haven.  He will tell you that

20    he personally placed these signs and he will tell you where he

21    placed them and he will tell you about the inspection that

22    Cape May County Health Department conducted relative to the

23    signage and the lake, a mere three weeks beforehand.  And the

24    signs, while certainly complaint with the regulations that

25    covered this particular lake was really more repetition than

1    anything.

2         The evidence will show that everybody knew there were

3    no lifeguards at this particular lake.  Everybody knew it.

4    The boys knew there were no lifeguards at the lake.  The boys

5    had been told not to go into the lake.  Again, these are all

6    undisputed facts, ladies and gentlemen.

7         Another point that will be undisputed is that this

8    particular body of water by itself had nothing to do with this

9    incident.  When I say the body of water had nothing to do with

10   it, what I mean is he didn't catch his foot on something that

11   was at the bottom of the lake that the campground should have

12   known about, there wasn't some crazy tide that the campground

13   knew about.  There was nothing particular to this body of

14   water that in any way contributed to this incident.

15        You heard during opening about a whale.  You're going

16   to hear from Michelle Wheeler who is the one out in front

17   swimming, were you going to the whale?  No.  Any discussion

18   about going to the whale?  No.  The whale, ladies and

19   gentlemen, it's in the lake, yeah, it regurgitates and pumps

20   in fresh water during the summer months.  It's got nothing to

21   do with this particular incident, absolutely -- absolutely

22   zero.

23        The other thing you're going to hear, which is

24   absolutely uncontested in this case, is that at no point did

25   Pine Haven ever give the impression to the Millers or to

1    anybody else that their children were in the care and custody

2    of Pine Haven.  This was not a day camp where you dropped your

3    children off and picked them up a week later.  Not a camp

4    where you picked them up at the end of the day.  This is a

5    camp where you, the parents, are with them throughout the day,

6    throughout the night and at all times.  It's not a camp, it's

7    a family camp, it's a family camp, but it's not like a Boy

8    Scout camp or a Girl Scout camp or some other camp that you

9    would entrust your children to.  It's not that type of

10   campground.  And that's going to be disputed by nobody in this

11   case.

12        You're going to hear from some other witnesses.  The

13   defense in this case, we don't have to -- we don't have to

14   prove anything.  We don't have a burden, we don't have a

15   burden of proving that we are not negligent.  That burden

16   rests -- that burden rests with the plaintiff.  We can choose

17   who to call, who not to call.  If we don't want to call

18   anybody, that's -- that's okay, too.  That's what the rules

19   are.  That's what the rules are for a case such as this.

20        You've heard from Mr. Vesper that you're going to hear

21   from the Millers.  You're also going to hear, he indicated,

22   from Mr. Anthony Dioscon, who, I believe is now 19 years old.

23   You will hear from Michelle Wheeler, 19 years old.  You're

24   certainly going to hear from the people -- you're going to

25   hear from the people who run Pine Haven, Mr. Jordan, in

1   particular, his role as general manager, how he runs the camp,

2   his interaction with the Millers, the culture he has of the

3   camp relative to the rules and regulations, and again, you'll

4   hear from Mr. Scarpa regarding his roles relative to signage,

5   his roles relative to inspection.

6        It's our belief that after you hear that, you'll return

7   a verdict that indicates that the defendant Pine Haven was not

8   at fault.

9        You heard some earlier comment about reasonableness.

10  Mr. Vesper was right, this is a case about reasonableness,

11  right?  You need to look.  You need to look at Pine Haven's

12  behavior, you need to look at Anthony Dioscon's behavior, you

13  need to look at everybody's behavior, John Toribio's behavior,

14  and apply the reasonableness and common sense approach.

15       While we don't think you should ever even get to

16  damages in this case, I'm compelled to make sure I'm doing my

17  job that I do address it to some degree.  There's two aspects,

18  two aspects of damages in this case.  You can't make a

19  decision, you cannot, based upon sympathy, based upon emotion,

20  based upon the fact that you feel sorry, you feel sorry.  We

21  don't need to impanel a jury to say we feel sorry for a family

22  that's lost somebody in this fashion.  We don't need a jury

23  for that.  We can unanimously concede that's the case.

24       In this case, you get to look at two things.  You get

25  to look at what's called conscious pain and suffering, that's

1   under the Survivor's Act.  You're going to look at conscious

2   pain and suffering, if you get to damages.  Again, I don't

3   think you will, but if you do, and then you get to look at the

4   economic claim that's going to be asserted by the plaintiff

5   through counsel and through their forensic economist, and I

6   just ask, ladies and gentlemen, that when you hear the

7   testimony relative to economic damages, listen to the

8   assumptions, listen to the assumptions, and ask yourself, if

9   the things that they are assuming will occur make sense.  Do

10  those assumptions make sense, because they're going to get you

11  to a number over here, whatever it might be, based upon what I

12  believe will be faulty assumptions.

13       So zero in on those assumptions and wait until you hear

14  the testimony, and the judge has already said this, and if

15  not, he will say it again, wait until you hear all the

16  testimony.  You know, wait until you hear it all, because some

17  of the assumptions made initially by their economist or some

18  of the facts presented to you, when you analyze them, when you

19  look at them and apply your collective common sense, they

20  might not stand up to the light of day.

21       Another issue I must return to, albeit briefly, is this

22  issue regarding lighting, which the plaintiff asserts a lot of

23  this case was about lighting.  Ladies and gentlemen, they

24  entered -- they entered the lake at 8:15 p.m., 8:15 p.m. on

25  August 8th, and you will hear from Anthony Dioscon, it was

 1   light out.  You're going to hear when nautical twilight is,

 2   you will hear when dusk is.  When these boys went into this

 3   lake, it was light out.  So you need to keep that fact in mind

 4   when you're listening to arguments about they should have had

 5   lighting.

 6        Because, ladies and gentlemen, the facts will show,

 7   one, none was required, it's not reasonable, and two, it's

 8   irrelevant, it's irrelevant because this boy drowned when it

 9   was still light out.  Nonetheless, it's the plaintiff's

10   position that lighting had something to do with this case,

11   just like it's the plaintiff's position that the whale had

12   something to do with this case, even though we know from

13   Michelle Wheeler, they weren't going to the whale.

14        I appreciate your patience.  I'm not going to get the

15   chance to speak to you in this fashion again until the end of

16   the case, however long that might take, so I will be back to

17   you then which I suspect will be sometime next week.  Again, I

18   appreciate your patience, your common sense application and

19   again, the reasonableness test.  That's absolutely the

20   standard we need to look at, and I believe when you hear

21   everything, listen to all the evidence, you'll conclude that

22   Pine Haven absolutely acted reasonable in how they operated

23   their park and particularly how they operated this lake.

24   Thank you, ladies and gentlemen.

25        THE COURT:  Okay.  Thank you, sir.  I think I'll take

1   like another ten-minute break or 15-minute break.

2           MR. VESPER:  At your pleasure, Your Honor.

3           THE COURT:  I will let you get organized.

4           MR. VESPER:  I'm organized, I'm ready to go.

5           THE COURT:  Okay.  We will be back at 5 of 11, 5 of

6   11.  All rise when the jury leaves.

7           (JURY EXITS; 10:41 a.m.)

8           THE COURT:  Please be seated for a minute.  Counsel

9   had argued to discuss the issue of whether it was charged

10  5.20(e) or 5.20(f).  I've read some of that early now and in

11  broad sweep, the (f), to me, is where there's some physical

12  defect of the property, either an extrinsic substance on the

13  floor, will make a simple slip and fall analysis a crack

14  somewhere, you know, something that's physical about the

15  property.  One of the comments in the notes to 520(f) is, as

16  to injury to invitees caused by activities or operations

17  negligently conducted on the premise, see charge 5.20(e).  And

18  that's what we will really have here.  We have a question of

19  whether they are conducting their business.  They did not use

20  due care and did not, you know, properly run the operation.

21          So I'll let you argue it again.  I'm not making this a

22  final, but my -- I am leaning now to 5.20(e).  And by the way,

23  I thought both of your openings were consistent with that.  So

24  it wasn't that I was hearing something from one side that was

25  kind of at odds.  You know, like, for instance, there's an

1  undertow, there's a snag that your foot was caught on a

2  branch.  I mean, there's all kinds of things that can happen

3  in a lake that might be physical, hidden, hidden dangers and

4  there's all kind of issues with business invitees about hidden

5  hazards, even specifically the lake, but I don't see that

6  here.  Nobody has suggested that there was any impediment in

7  the lake, that there was anything kept a good swimmer from

8  swimming across the lake or swimming anywhere else in the

9  lake.

10       There is clearly an issue as to whether reasonable

11  operations of that facility, as they said here, well, caused

12  by activities or operations negligently conducted, that may be

13  an issue.  And I say, that was consistent with both your

14  openings, actually.  So I didn't see a conflict in the

15  openings, but I thought I'd mention that because Mr.

16  Hermesmann had actually raised it with me a few times.

17       Now, it will come a time when we do the charge

18  conference, we will get another, in a sense, everybody will

19  get another shot at, you know, arguing the point all over

20  again.  I'm not making this as a, you know, rule of law of the

21  case or anything, but -- and I don't really expect I'm going

22  to get any testimony that's really at odds with that, but I

23  thought I'd just tell you that now, if that's okay.  And I'll

24  see you about five of 11.

25       MR. VESPER:  Could I ask one other question?

**1**          THE COURT:  Sure.

**2**          MR. VESPER:  This has nothing to do with what you

**3** just said, Your Honor, but unless you want to comment on --

**4**          MR. HERMESMANN:  No, I concur that it's 520(e) case.

**5** That was my position all along.  I have another matter also

**6** with Mr. Vesper.

**7**          THE COURT:  Go ahead.

**8**          MR. VESPER:  So my question is, I am allowed, as I

**9** have been in the past to use the time unit rule in summation.

**10**          THE COURT:  What rule?

**11**          MR. VESPER:  The time unit rule for the conscious

**12** pain and suffering.  I can ask the jury to --

**13**          THE COURT:  There is -- New Jersey law, quite

**14** candidly, is -- it's my understanding it's a little iffy

**15** there.

**16**          MR. VESPER:  No it's not.  With respect --

**17**          THE COURT:  The answer is I'm not going -- I don't

**18** have it with me -- cases today.

**19**          MR. VESPER:  I have to give notice, but here's what

**20** I'm doing.  I didn't put it in my co-counsel.

**21**          THE COURT:  Have your co-counsel -- one of your

**22** lawyers just write me a two-page case and --

**23**          MR. VESPER:  Sure.  I have to give notice to my

**24** adversary.

**25**          THE COURT:  And tell me what the measure is going to

**1**  be.

**2**          MR. VESPER:  Will do.

**3**          THE COURT:  And let me make a judgment.

**4**          MR. VESPER:  Right.

**5**          THE COURT:  You know, I hate to blow off with not

**6**  having read the cases.

**7**          MR. VESPER:  No, you can tell me to sit down any

**8**  time.

**9**          THE COURT:  If I had read the cases yesterday, maybe

**10**  I would have been in a better position.  But as you know, this

**11**  is a diversity case, and we don't get that many of these, so.

**12**       Okay.  Mr. Hermesmann, you had something.

**13**       MR. HERMESMANN:  Yes, just a few comments regarding

**14**  plaintiffs opening which I wanted to put on the record, Your

**15**  Honor.  One, the indication that this is a camping resort,

**16**  which has been talked about and the distinction.  My objection

**17**  is that we don't know yet if Mr. Staves is going to be allowed

**18**  to testify and that's the only individual, I believe, that's

**19**  going to bring out that testimony.

**20**          MR. VESPER:  If -- and I'll answer that, if you want.

**21**  If --

**22**          THE COURT:  We're going to have a hearing, I hope,

**23**  about 2:30 today.

**24**          MR. VESPER:  We will, but let me respond right now --

**25**  no.  Let me not.

1          THE COURT:  You know something, I think this

2   distinction between a campground and a resort, at least as to

3   this point, this point, is right over the jurors' head.  I

4   don't think any of the jurors are figuring out what's the

5   difference between a campground and a camp resort.  That just

6   isn't happening.  Now --

7          MR. HERMESMANN:  It's --

8          THE COURT:  -- I understand, if Staves testifies, it

9   may highlight that distinction, and I understand that.  But

10  right now they haven't heard Staves, they don't even know who

11  he is.

12         MR. HERMESMANN:  Well, they heard an opening about

13  the distinction when we don't know if the witness is going to

14  offer something to support that is allowed to testify.  That's

15  the objection.

16         THE COURT:  See your objection is on the record.  I'm

17  telling you my ruling is that that just went right over the

18  jurors' head.  I just don't believe it was somehow prejudicial

19  that he called it a resort when really it was only a

20  campground.  I mean, if Staves testifies, if he's allowed to

21  testify and he makes a lot of that issue, then that's a

22  different story, but not -- not up to now.

23         MR. HERMESMANN:  Then -- I'm sorry, Your Honor.

24         THE COURT:  I'm not going to do anything -- at this

25  point, I'm not going to do anything corrective.  I'm not going

**1**  to give a corrective charge to the jury.

**2**       MR. HERMESMANN:  The next is the comment that they

**3**  are judged by a corporate owner.  They're not judged by a

**4**  corporate owner.  They're held at the same standard as anybody

**5**  who owns and runs a campground.

**6**       THE COURT:  Let me make a comment on that.

**7**       MR. VESPER:  I totally disagree with that.

**8**       THE COURT:  Hold it.  I'm going to make a comment and

**9**  I don't want an argument on it.  Trying to develop sympathy

**10**  because you have a big bag corporation owns the facility, is,

**11**  to me, not proper argument.  The -- and Mr. Vesper was getting

**12**  close to the line in emphasizing after the sixth or seventh

**13**  time he mentioned it, it was like, enough, they know it's a

**14**  corporation already.  But once again, I didn't have the sense

**15**  that it went over the line and I didn't have sense that

**16**  somehow or other at least at this point, there's any prejudice

**17**  to the jury.

**18**      That's -- so on that -- at this stage, I don't know

**19**  what he's going to do for the rest of the trial, he has a

**20**  tendency to be unpredictable, but the -- I'm not going to give

**21**  a corrective.  That's really the issue, whether I'm going to

**22**  give a corrective charge right now.  I'm not going to.  I

**23**  don't think he crossed the line that would require that.  At

**24**  this stage.  Okay.  Anything else?

**25**      MR. HERMESMANN:  Yes, Your Honor.  Comment about

1    tipping the scales in your hearts and minds.

2            THE COURT:  Say again?

3            MR. HERMESMANN:  There was a comment about tipping

4    the scales in your hearts and minds, which, again, to the

5    emotional aspect, which is also tied in with a comment

6    regarding John Toribio and the solace that he would provide to

7    his mother, I think is different than the companionship and it

8    again goes to an emotional claim, which is not permissible

9    under the Wrongful Death Act.

10           THE COURT:  Well, I'm going to make the same ruling.

11   I mean, I think he was getting close to the line, but I don't

12   think that this case is going to influence the jury.  But if

13   it keeps up and we do have an appeal to the emotional, let's

14   call it, the -- sort of the emotional trauma that a parent has

15   who loses a child, which is not a compensable element, I'll

16   take steps and if I -- if I think that line is crossed, you're

17   going to find my steps to be very forceful, let me put it that

18   way, and -- but I don't disagree with your point.

19   Companionship is not the same as the emotional, you know, kind

20   of toll that loss of a child takes and -- so we're not in

21   disagreement.

22           MR. HERMESMANN:  I've got a couple more, Your Honor.

23           THE COURT:  Go ahead.

24           MR. HERMESMANN:  The next one.

25           THE COURT:  Mr. Vesper, did you make all these

1   mistakes?

2          MR. VESPER:  I --

3          THE COURT:  He's not stopping.

4          MR. VESPER:  I did so much over the jury's head that

5   at this point, why did I even -- why did I even try, but --

6          THE COURT:  You said it, not me.  Okay.  Go ahead.

7          MR. HERMESMANN:  The next one, and my concern is I

8   don't think it should happen again in closing argument also,

9   and this one goes to what some states do, what some states

10  don't do relative to damages, what the old English law is.

11  Doesn't matter if he's a hundred percent accurate, that's not

12  for him to say to this particular jury how different states

13  measure damages in a wrongful death.

14         THE COURT:  Well, 300 years ago is 1715.  I'm not

15  sure we were having too many death cases or even statutes

16  dealing with that in 1715.  I think we were still East Jersey

17  and West Jersey then.  I don't even know if we had --

18         MR. VESPER:  We adopted Lord Campbell's act.

19         THE COURT:  What?

20         MR. VESPER:  We adopted Lord Campbell's act sometime.

21         THE COURT:  Yeah.  I think it was a little later.  I

22  own a home on David Brearly Court.  Do you know who David

23  Brearly was?

24         MR. VESPER:  No, Your Honor --

25         THE COURT:  First district judge in the State of New

*United States District Court*
*Camden, New Jersey*

1    Jersey, but that was 1790.

2         MR. VESPER:  The reason, by the way, I mentioned that

3    in my opening is a lot of times jurors have told me.  Now

4    again, they wouldn't tell defense counsel this, but they want

5    to know what we want.  They want to know the number.  I simply

6    did that to tell them in my own way that I'm not allowed to

7    tell them what I want.  Now, I'll refrain -- I didn't tell

8    them what I could do in other states.  I'm just telling them

9    here, I can't tell them what I want.

10        THE COURT:  Basically, he's giving you a word to the

11   wise.  Just don't provoke me.

12        MR. VESPER:  Is that improper for me to explain to

13   him why I can't -- I can't suggest a number that's improper.

14        MR. HERMESMANN:  Judge, that's not when was said.

15   The comment I'm concerned about is that he said some states

16   have this, some states don't, which leads, in its worst case

17   scenario, to jury nullification thinking, gee, if we were

18   trying this case in Ohio, perhaps we could give the Toribios

19   money for emotional distress.

20        THE COURT:  What some states have or don't have --

21        MR. HERMESMANN:  Is irrelevant.

22        THE COURT:  -- and the fine points of the law in

23   death cases is in great variation around the country.  Let's

24   stay away from that.

25        MR. VESPER:  Very well.


*United States District Court*
*Camden, New Jersey*

1        THE COURT:  I'm not going to give any -- I'm not

2  giving any corrective instruction to the jury.

3        MR. VESPER:  Thank you, Your Honor.  I don't think --

4  at this point, I don't think Mr. Vesper has prejudiced the

5  jury so...

6        MR. HERMESMANN:  And the last point that I have,

7  Judge, for the record, is again, and I think you did correct

8  it, to some degree, when Mr. Vesper is talking about our

9  experts, who we're going to call, we have no burden to call

10  anyone.

11        THE COURT:  My point there was a very basic one, was

12  that in an opening, unlike a closing, where you can very much

13  comment to other side's case.  Did?  You better.  But in an

14  opening, you're supposed to lay out what you're -- what you

15  intend to prove.

16        MR. HERMESMANN:  Understood.

17        THE COURT:  And to a certain degree, you can mention

18  what the other side might put up, but I thought he was getting

19  close to going a little too far on that.  To me, that was

20  beginning to get to argument about the other side's case.  But

21  I stepped in very briefly and he didn't -- once again, I don't

22  think he crossed the line.

23        MR. HERMESMANN:  That's all I have, Judge.  Thank

24  you.

25        THE COURT:  Okay.  Well, we will go five more

1    minutes.  We will to go 11.

2             MR. VESPER:  Thank you, Your Honor.

3             THE DEPUTY CLERK:  All rise.

4             (RECESS TAKEN; 10:55 a.m.)

5             THE DEPUTY CLERK:  All rise.

6             (JURY ENTERS; 11:06 a.m.)

7             THE COURT:  Everyone please be seated.  Mr. Gotta,

8    heard back, you're okay.  You will deduct what you get paid

9    here, you will keep that, but they will pay you the full

10   difference.

11            JUROR #2:  Thank you, sir.

12            THE COURT:  I got a call back.

13            JUROR #2:  Appreciate it.

14            THE COURT:  Okay.  I now recognize Mr. Vesper to

15   begin putting in his case.

16            MR. VESPER:  I'd like to call Mr. Michael Jordan --

17   Michael Terry Jordan, please.

18            THE COURT:  Good morning, sir.  Please step up.

19   (**MICHAEL TERRY JORDAN**, having been duly sworn as a witness,

20   testified as follows:)

21            THE DEPUTY CLERK:  Please state and spell your full

22   name for the record.

23            THE WITNESS:  Michael Terry Jordan.  Need me to

24   spell?

25            THE DEPUTY CLERK:  Yes, spell it.

*United States District Court*
*Camden, New Jersey*

JORDAN – DIRECT – VESPER

1            THE WITNESS:  M-I-C-H-A-E-L  T-E-R-R-Y  J-O-R-D-A-N.

2            MR. VESPER:  Thank you, Your Honor.

3    (DIRECT EXAMINATION OF MICHAEL TERRY JORDAN BY MR. VESPER:)

4    Q.   Good morning, Mr. Jordan.

5    A.   Good morning.

6    Q.   We met -- I think it was a couple days before Christmas a

7    couple years ago, right?

8    A.   23rd of December, yes, sir.

9    Q.   And on that occasion, you were in the deposition under

10   oath, like we are today, speaking on behalf of Diversified

11   Industries -- Diversified Investments, is it, Inc.?

12   A.   Correct.

13   Q.   Right.  You are the designated spokesperson?

14   A.   I'm the general manager of Pine Haven Camping Resort.

15   Q.   You were designated as the spokesperson for that

16   deposition, though, weren't you?

17   A.   I do not know.

18            MR. HERMESMANN:  Your Honor, I have an objection.

19            THE COURT:  That's irrelevant.  The answer is --

20            MR. VESPER:  Okay.

21            THE COURT:  -- he testified.  And he is the manager

22   of the facility.

23            MR. VESPER:  Well, it's one step further, with all

24   due respect.

25   BY MR. VESPER:

*United States District Court*
*Camden, New Jersey*

JORDAN – DIRECT – VESPER

1  Q.   Are you here speaking --

2        THE COURT:  No, I'm not going to permit testimony on

3  what a 30 witness, 30(b) --

4        MR. VESPER:  30(b)(6).

5        THE COURT:  30(b)(6).

6        MR. HERMESMANN:  We specifically designated him as

7  not being so.

8        THE COURT:  It doesn't make any difference.  It is an

9  irrelevant issue.  Question.

10       MR. VESPER:  All right.

11 BY MR. VESPER:

12 Q.   Now, you heard what your attorney said in the opening,

13 didn't you?

14 A.   I did.

15 Q.   And you agree -- what your attorney said about this

16 campground not being one that's entrusted --

17       THE COURT:  Before he objects, I'm sustaining the

18 objection.  He's not here to comment on the opening or

19 interpret what's --

20       MR. VESPER:  Let me rephrase the question.

21       THE COURT:  He's here to elicit factual information.

22 BY MR. VESPER:

23 Q.   Was your campground advertised or not advertised as being

24 entrusted with children?  Yes or no.

25 A.   No.

JORDAN – DIRECT – VESPER

1  Q.   No.  So if I show you -- has this been marked -- let me

2  show you the copy.  The original will be marked.

3       You've seen your brochures, haven't you?

4  A.   I have, but that one's one before my time.

5  Q.   Okay.  Is there anything different between the one before

6  your time and the one now?

7  A.   I don't know.

8  Q.   All right.  Then, let me show you the one before your

9  time.  Also, have you seen your website?

10 A.   I have.

11 Q.   And was that there before your time?

12 A.   No, sir.

13 Q.   Okay.  So your website hasn't changed from -- just so the

14 jury knows, before your time, you arrived at -- on-site at

15 Pine Haven in Cape May when?

16 A.   January of 2010.

17 Q.   And you were the general manager as of January 2010?

18 A.   January -- yes, sir.

19 Q.   Okay.  So roughly eight months before this drowning,

20 correct?

21 A.   Yes, sir.  Yes, sir.

22 Q.   Now, before January 2010, you had been at other

23 Diversified Investments, Inc.'s camps, weren't you?

24 A.   One.  Yes, sir.

25 Q.   Yeah, what was that?

JORDAN – DIRECT – VESPER

1  A.   That was Neshonoc in Wisconsin.

2        MR. HERMESMANN:  Can I see the exhibit before you

3  show it to the witness?

4        MR. VESPER:  Sure, it's the manual that was marked --

5  premarked P-3.

6        MR. HERMESMANN:  I'd like to see that.

7        MR. VESPER:  It's not the manual, it's the brochure.

8        THE COURT:  Can I see the -- do you have a copy for

9  me?

10        MR. VESPER:  I'd like to show you the original.

11        THE COURT:  Well, either way, can I see it?

12        MR. VESPER:  Oh, it's marked down here, P-3.  May I

13  show it to the Court?

14        THE COURT:  P-3?

15        MR. VESPER:  P-3, yes, Your Honor.

16        THE COURT:  All right.  Let me see it.  P-3.

17        MR. VESPER:  Thank you.

18        MR. HERMESMANN:  I just have an objection to

19  relevance, Your Honor.

20        THE COURT:  Well, if the grounds for the objection is

21  it was before 2010, if there's testimony, you know, I think he

22  can show it.  I don't think it's necessarily irrelevant.  I

23  don't know what part of it he wants to question about, but...

24        MR. VESPER:  Thank you, Your Honor.

25  BY MR. VESPER:

JORDAN - DIRECT - VESPER

1  Q.  Let me show you the brochure and, again, you don't know

2  whether it's changed over the years, and whether it was in

3  effect in 2010, do you?

4  A.  I don't remember this brochure, but does not mean it

5  wasn't there.  I don't remember it.

6  Q.  All right.  And do you have, at least on your website --

7  you see on the front of the brochure, there's the little --

8  there's two chipmunks on either side of the sign?

9  A.  Yes, sir.

10 Q.  So why are the chipmunks on either side of the sign?

11 A.  I don't understand the question.

12        THE COURT:  The answer is you don't know.  Come on --

13        THE WITNESS:  I don't know.

14        THE COURT:  -- Mr. Vesper, let's get to this case.

15 BY MR. VESPER:

16 Q.  Is that brochure geared to bring children to the park

17 with their parents?

18 A.  Children don't come to the park, parents come to the

19 park.

20 Q.  That wasn't my question.  You do expect that parents will

21 bring children to your park, don't you?

22 A.  Yes, sir.

23 Q.  And are you telling us -- tell us --

24        THE COURT:  Ask a question.

25        MR. VESPER:  I am.

JORDAN - DIRECT - VESPER

1          THE COURT:  He said -- this is direct examination.

2    The witness has not shown himself to be recalcitrant.  Ask

3    proper questions.

4    BY MR. VESPER:

5    Q.  Did you or did you not tell people that were paying you

6    money --

7          THE COURT:  The answer to that is yes, he either did

8    or he didn't.  Ask a proper question.

9          MR. VESPER:  I thought that was a proper question.

10          THE COURT:  Well, you said, did you or did you not.

11    The answer to that question is always yes, you did one or the

12    other.

13          MR. VESPER:  It's either yes or no.

14          THE COURT:  No, it's not.  If you said did you or

15    didn't you, the answer is always yes.

16          MR. VESPER:  Certainly don't want to argue with the

17    Court.

18    BY MR. VESPER:

19    Q.  Did you tell people that were paying you money to stay at

20    your park that they had to supervise their children wherever

21    their children went?

22    A.  No.

23    Q.  Do you understand my question?

24    A.  Well, no, not really.  In the agreement --

25    Q.  What about the question don't you understand?

*United States District Court*
*Camden, New Jersey*

JORDAN — DIRECT — VESPER

1   A.   I did not specifically tell every individual that came

2   into the campground, they had to stay with their child

3   everywhere they went.  However --

4   Q.   Then you did understand the question?

5   A.   Yes, I did.

6   Q.   All right.  And understanding that question as it was

7   asked and you just answered, did you tell the Millers --

8   remember Mr. and Mrs. Miller?

9   A.   Yes, I do.

10   Q.   Okay.  Did you tell -- was it Mr. Miller or Mrs. Miller

11   that you talked to about their lease of their site?

12   A.   Mr. Miller.

13   Q.   All right.  Did you tell, and can you specifically

14   remember telling Mr. Miller that he had to supervise his

15   children or any underaged guests that he brought to your park

16   wherever they want?

17   A.   Wherever they went?

18   Q.   Yes.

19          THE COURT:  By the way, supervise doesn't mean you're

20   actually with them.  You can supervise children and not be

21   with them every minute.

22          THE WITNESS:  Yes, I did tell them.

23          THE COURT:  Every parent supervises children, they

24   don't stay every second with their children, even the little

25   ones.

JORDAN – DIRECT – VESPER

1          MR. VESPER:  I accept your definition.

2          THE WITNESS:  Well, then, yes, I did.

3    BY MR. VESPER:

4    Q.   Yeah, supervise them doesn't mean that a parent has to be

5    with the child every minute of the day, does it?

6    A.   No, sir, I guess it doesn't.

7    Q.   So you did not tell Mr. Miller that he had to accompany

8    his children, underaged or any underaged guests, wherever they

9    went in the park, did you?

10   A.   No, sir.

11   Q.   You know the difference -- do you know about the KOA?

12   A.   I do.

13   Q.   And you know the difference in the grades of camps and

14   campgrounds versus camping resorts, do you know the three

15   categories?

16   A.   I've never heard of that before in my life.

17   Q.   Never, ever?

18   A.   No, not until Mr. Hermesmann had mentioned it to me.

19   Q.   Really.  So you've been in the business how many years?

20   A.   I've been in the camping industry since 2008.

21   Q.   2008.  And you don't know about the KOA's rating of

22   campgrounds as destination or journey campgrounds versus

23   holiday campgrounds or resort campgrounds?

24   A.   That would be specific to KOA campgrounds.  That has

25   nothing to do with my campground.

JORDAN – DIRECT – VESPER

1  Q.   Well, his -- I'm asking a question.  Do you know what the

2  KOA categories are?

3  A.   No, I do not.

4  Q.   People that go camping, though, a lot, I guess they would

5  know the KOA?

6          MR. HERMESMANN:  Objection.

7          THE COURT:  Sustained, sustained.

8          MR. VESPER:  I withdraw.

9  BY MR. VESPER:

10  Q.   So let me understand this.  You didn't name the Pine

11  Haven's Camping Resort a camping resort, did you?

12  A.   We did change the name during my tenure, yes, sir.

13  Q.   Oh, okay.  Now, if you changed -- what was it before?

14  A.   Campground.

15  Q.   And who owned it before?

16  A.   Before Pine Haven?

17  Q.   Yeah.  Here's what I'm asking, and I don't mean to

18  confuse you.  Before you changed the name of Pine Haven

19  campground to the Pine Haven Camping Resort, who owned the

20  Pine Haven campground?

21  A.   Diversified.

22  Q.   Okay.  And then Diversified changed the name to a camping

23  resort as opposed to a campground?

24  A.   No.  I changed the name as the general manager.

25  Q.   All right.  So as the general manager, why did you do

JORDAN – DIRECT – VESPER

1   that?

2   A.   Because everybody else was.

3   Q.   What do you mean everybody else was?

4   A.   All the other campgrounds in the area.  That was -- it

5   was like going from -- places used to be called motels and now

6   they're called hotels.  It was just the change in the way you

7   designated the campground.  It had nothing to do with anything

8   that changed.  It was just we -- it sounded better, looked

9   better in writing.

10  Q.   Right.  It sounded better, it was more attractive to

11  people to come to a camping resort than a campground?

12  A.   Yes, sir.

13  Q.   Okay.  Now, it was mentioned that -- and you agree that

14  Cape May County only three weeks beforehand had come to your

15  park and done an inspection.

16  A.   Correct.

17  Q.   Tell the jury, they -- did they or did they not inspect

18  your operations?

19        THE COURT:  Did they or did they not, the answer is

20  yes, they either did or they didn't.

21        MR. VESPER:  I'm sorry.  Then I'll withdraw the

22  question.

23        THE COURT:  The answer is yes to that question, no

24  matter what happens.  Ask a question that can give an answer.

25        MR. VESPER:  I'm going to ask an open-ended question

1   here.

2   BY MR. VESPER:

3   Q.   Mr. Jordan, as far as you know, did Cape May County, when

4   they came to inspect your property, did they inspect how you

5   operated it?

6   A.   No, sir.

7   Q.   They didn't, did they?

8   A.   No, sir.

9   Q.   Tell the jury what they did inspect.  They did not

10  inspect your operation, we know that.

11  A.   They inspected our compliance to the regulations required

12  by the Cape May County Health Department, State of New Jersey.

13  Q.   Yeah, but you have to tell us because there was an issue

14  here, what -- what did you comply with?  Did you comply with

15  how many lights there would be or how many things like that,

16  or what did you comply with?

17  A.   Everything that was required by the State of New Jersey

18  is an extensive list.  I don't have -- if you would like to

19  bring up a copy of the report, I could read it to you.

20  Q.   Yeah.  I'll ask for that list, but right now, here and

21  now, did they check the water quality of the lake?

22  A.   They do not, no, sir.

23  Q.   Oh.  So they don't check whether the water is polluted or

24  not?

25  A.   The Cape May County Health Department does not.

JORDAN – DIRECT – VESPER

1   Q.   Okay.  What are we talking about right now, the three

2   weeks before the drowning --

3   A.   Right.

4   Q.   -- there was an inspection by --

5   A.   Cape May County Health Department.

6   Q.   All right.  So we're talking about the same thing.

7   A.   Right.

8   Q.   The Cape May County Health Department came and with

9   respect to the lake, okay, they didn't check how you operated

10  the lake, did they?

11  A.   I'm confused.

12        THE COURT:  Yeah, I'm confused, too.

13  BY MR. VESPER:

14  Q.   Okay.  The way you operate the -- the lake, by way of how

15  often you patrol it, how often you rake the sand, did they

16  look at that operation?

17  A.   None of that is required by the Cape May County Health

18  Department, so, no, they did not.

19  Q.   Okay.  That's what I need to know.  They didn't inspect

20  because that's not what is required.

21  A.   Correct.

22        THE COURT:  They --

23  BY MR. VESPER:

24  Q.   With respect to the lake --

25        THE COURT:  Did they inspect signage at the lake?

JORDAN – DIRECT – VESPER

1           THE WITNESS:  Yes, sir, they did.

2  BY MR. VESPER:

3  Q.   All right.  Besides the signage, what else did the Cape

4  May County Health Department look at, in terms of the

5  operation of your swimming lake, besides the sign?

6  A.   We have to have proper signage, we have to have the right

7  safety equipment available.  They check for that, which we had

8  all that, and that's pretty much it for the lake.

9  Q.   Okay.  And what's the -- so you had two signs that was

10  required, correct?

11  A.   Correct.

12  Q.   And does the -- does the Cape May County -- yeah --

13  Department of Health, do they require how many signs?

14  A.   No, sir, not that I'm aware of.

15  Q.   All right.  That's a matter of your discretion?

16  A.   I believe.

17  Q.   Well, who else?

18  A.   Yes, yes, it is.

19  Q.   Who else is responsible --

20  A.   Yes, sir.

21  Q.   So you take responsibility for how many signs, correct?

22  A.   We had two.  Two at the lake.

23  Q.   There's a minimum requirement by the Cape May County

24  Health Department?

25  A.   Again, I would need to see the requirements to tell you

JORDAN – DIRECT – VESPER

1   that.  I get inspected by numerous agencies in New Jersey and

2   I do not know the requirements of all of them in my head.

3   That's why I have the forms.

4   Q.  All right.

5   A.  If you'll give me that, I can tell you what they

6   inspected for.

7   Q.  I'm not trying to complicate your life, I'm trying to

8   focus in on the swimming lake.

9       Focusing on the swimming lake, we know that Cape May

10  County came and inspected the signs at the lake, but they

11  didn't require any specific number; is that correct?

12  A.  Best of my knowledge, correct.

13  Q.  All right.  And they did specify the language?

14  A.  They did.

15  Q.  Okay.

16  A.  It's in a report.

17  Q.  Right.  Did they specify -- this is now the Cape May

18  County Health Department.  Did they specify where the signs

19  should be placed?

20  A.  No, sir.

21  Q.  Right.  But as the manager, you want to put the sign

22  somewhere where people are going -- that you want to keep out

23  of the lake to see the signs, correct?

24  A.  The entrance to the lake, correct.

25  Q.  All right.  So you said the entrance of the lake?

JORDAN – DIRECT – VESPER

1  A.   It is.  To the two areas we get -- entrance areas, yes.

2  Q.   Oh, entrance, I'm sorry.

3       So with respect to -- this is -- we need the sticker

4  here, on -- this is -- I'm showing you, Mr. Jordan --

5           THE COURT:  It's P-1A.

6           MR. VESPER:  P-1 -- this is actually P-1B.

7           THE COURT:  A.

8           MR. VESPER:  Yes, the small one is A, the bigger one

9  is B.  This is P-1B.  I'm sorry, Your Honor.

10          THE COURT:  You told me A when you told me the first

11 time.  All right.

12          MR. VESPER:  Yeah, that was the --

13          THE COURT:  P-1B.

14 BY MR. VESPER:

15 Q.   The magic marker.  Sorry about that.

16      Do you want to place -- here's Pine Haven swim lake,

17 and just put a small if you would, a small box.

18 A.   Approximation?

19 Q.   Yeah, approximation.

20 A.   Again, this is not to scale.

21 Q.   Understood.

22 A.   Because these playgrounds not nearly that close to the

23 lake, neither is the arcade, but we had a sign right down

24 here, people would come in this way.

25 Q.   Okay.

JORDAN – DIRECT – VESPER

1   A.   And we had one right up along the road, because this is

2   raised up somewhat here, right in here, because people park

3   their golf carts there and they enter the lake from that side.

4   Q.   Terrible marker.  Just putting a make-shift cross.

5        So if someone is at the playground, which again, this

6   is not to scale.

7   A.   Correct.

8   Q.   But if somebody is at the playground, can they see either

9   of those two signs?

10  A.   Yes, they can.

11  Q.   Which one can they see?

12  A.   The one to the left.

13  Q.   Okay.  Because the one to the left is aimed -- is turned

14  in their direction?

15  A.   It's faced almost like this to the lake.  You can see

16  that sign from anywhere on that lake, unless you're standing

17  besides the sign itself.

18  Q.   Okay.  Well, if the -- if they're at the playground and

19  they're looking at the sign, you're saying the sign is angled

20  in such a way that over here at the playground, they can see

21  the sign?

22  A.   Correct.

23  Q.   All right.  And then what about people coming in this

24  direction?  They can also see the sign?

25  A.   Not from the arcade, no, sir.

JORDAN – DIRECT – VESPER

1  Q.  Okay.

2  A.  They would be to the back of it.

3  Q.  All right.  Now you mentioned you were inspected by many

4  different agencies besides the County of Cape May, the State

5  of New Jersey -- yes?

6  A.  Yes.

7  Q.  And what other agencies?

8  A.  The DEP, the township inspectors, have electrical

9  inspectors, building inspectors, numerous inspectors.

10  Q.  Of which township?

11  A.  I'm sorry?

12  Q.  Which township?

13  A.  Dennis Township.

14  Q.  Dennis?  Besides the township and the state and the

15  county and the feds, anybody else?

16  A.  I don't think I have any federal inspectors.  Oh, yes, I

17  do, Department of Justice because of safety equipment.  I

18  believe that's it.

19  Q.  Now, do any of those agencies that you named, do any of

20  them inspect the operation of your campground, the actual

21  operation?

22  A.  They inspect what's pertinent to their departments, yes.

23  Q.  I asked -- how about the swimming lake?  Anything to do

24  with the swimming lake and whether you fence it or surveil it

25  or sign it?

JORDAN – DIRECT – VESPER

1   A.   No, no.

2         THE COURT:  Well, signage, State of New Jersey.

3         THE WITNESS:  Signage, yes, I'm sorry.

4         THE COURT:  Signage, they do.

5   BY MR. VESPER:

6   Q.   And I want to qualify that.  I'm not trying to mislead

7   anybody.

8         Other than the signs that you're required by the State

9   of New Jersey to post --

10  A.   Right.

11  Q.   -- other than that, there's no requirement by any of

12  these agencies that you just named about how to operate a

13  swimming lake, is there?

14  A.   Their only other requirement is every week, our water

15  samples are tested from pools, lakes and from the drinking

16  water and submitted to an outside agency.

17  Q.   Okay.  And who requires --

18  A.   Okay, and that's -- you know, I'm not sure who requires

19  it.  All I know is it gets filed with the state or the county.

20  Q.   So the water has to be pure?

21  A.   It does.

22  Q.   Yes.  Now, you would agree, there's no requirement that

23  you have surveillance, is there?

24  A.   No, sir.

25  Q.   All right.  No county, state, municipal, federal, any

*United States District Court*
*Camden, New Jersey*

JORDAN – DIRECT – VESPER

1   other kind of government entity requires you to have any

2   patrol of the lake -- of the swimming lake; isn't that

3   correct?

4   A.   Correct.

5   Q.   All right.  But somebody on behalf of Pine Haven Camping

6   Resort decided to have a roving mobile patrol, didn't they?

7   A.   On Friday and Saturday nights, and on Friday, Saturday,

8   Sunday nights on holidays for four hours, correct.

9   Q.   The answer is yes?

10  A.   Yes.

11  Q.   And that person that decided to have a roving mobile

12  patrol -- which would include the swimming lake, right?

13  A.   They did not go around the lake, no.  They would drive by

14  it on the road.

15  Q.   Yeah.  And aren't they supposed to make sure that nobody

16  is swimming in the lake after dusk?

17  A.   Correct.  They could do that from the road with a

18  flashlight, correct.

19  Q.   Yeah.  So part of the duties of the roving patrol is to

20  make sure there's no rowdyism, to make sure there's no

21  underaged drinking?

22  A.   If we catch them, yes.

23  Q.   Well, sure, you don't want underaged drinking?

24  A.   No, I don't.

25          THE COURT:  Come on.

JORDAN – DIRECT – VESPER

1  BY MR. VESPER:

2  Q.   And also to make sure nobody is swimming in the lake?

3  A.   Correct.

4  Q.   Okay.  So who decided that -- and by the way, when you

5  say it's only on Fridays and Saturdays, it's Fridays and

6  Saturdays and what else?

7  A.   Three nights on holidays, holiday weekends.

8  Q.   Right, and when are they, the holiday weekends?

9  A.   Memorial Day, July Fourth and Labor Day.

10  Q.   So on those weekends, it's Friday, Saturday and --

11  A.   Sunday usually.  A third night.

12  Q.   Yeah, whatever the third night.  Okay.

13      So who decided that those nights, Friday, Saturday and

14  then the holiday weekends, three nights of the holiday

15  weekend, would be -- would be patrolled as opposed to the --

16  do you know how the -- let me back up.

17      Do you know how many days and nights there are from

18  Memorial Day to Labor Day?

19  A.   No, I don't.  I'd have to look at a calendar.

20  Q.   Right.  Would you agree it's probably somewhere around 99

21  or a hundred?

22  A.   Approximately, yes, sir.

23  Q.   That's how many days?

24  A.   Correct.

25  Q.   So in 2010, if I tell you that in 2010, there were --

JORDAN - DIRECT - VESPER

1    yeah, actually 99 days and 14 weekends.

2         If I tell you that, you have no reason to disagree with

3    that?

4    A.   I don't know any different, right.

5    Q.   All right.  And I will get a calendar and we will count.

6         But for now, if there's -- if there's 99 days, your --

7    you, the manager, are patrolling out of that 99 days, roughly,

8    one-third or 30 some -- 28 days, correct?

9    A.   I'll take your word for it.

10   Q.   You're patrolling, however it adds up, a certain number

11   of days out of a possible 99 or a hundred days and nights?

12        THE COURT:  But it's not 24 hours.

13        THE WITNESS:  No, sir.

14        THE COURT:  It's certain hours.

15        THE WITNESS:  It's four hours a night, almost three

16   nights or two nights respectively.

17        THE COURT:  And with dusk, four hours after dusk?

18        THE WITNESS:  No, sir, from 10 p.m. to 2 a.m.

19   BY MR. VESPER:

20   Q.   All right, and why is it 10 p.m. to 2 a.m.?

21   A.   Because that's when people are the noisiest and you try

22   to quiet them down for the night.

23   Q.   So you decided those four hours, correct?

24   A.   I didn't decide it.  That was in place when I got there.

25   Q.   Oh, okay.  Do you know who decided on that?

*United States District Court*
*Camden, New Jersey*

JORDAN - DIRECT - VESPER

1  A.   It was in the rules and regulations and I felt it was

2  appropriate and it was -- it fulfilled the need that we had at

3  the time.

4  Q.   So it was somebody from Diversified Investments that made

5  that decision?

6  A.   I don't know the answer to that.

7  Q.   Well, it was already in place at the -- what was called

8  the campground that was owned by Diversified, wasn't it?

9  A.   Yes, but they bought it from someone else, so I don't

10  know if it was in place before they bought it or not.

11  Q.   How long did Diversified own the property from the time

12  they bought it from somebody else?

13  A.   I don't know.  I can give you an approximate date.

14  Q.   Yes.

15  A.   I don't know what year they bought it.  I think they

16  bought it in 2000.  That's a guess.

17  Q.   So they had it for ten years?

18  A.   I believe.

19  Q.   Okay.  So let's say for ten years, somebody at

20  Diversified went along with the program of having Fridays and

21  Saturdays and then three days on the summer -- two summer

22  holidays, to have a roving patrol at a given set of hours?

23  A.   Correct.

24       THE COURT:  10 a.m. to 2 p.m.

25       THE WITNESS:  10 p.m. to 2 a.m.

JORDAN – DIRECT – VESPER

1          THE COURT:  10 p.m. to 2 a.m.

2          THE WITNESS:  Yes, sir.

3          MR. VESPER:  All right.  I have that trouble, too.

4   BY MR. VESPER:

5   Q.   But here's the point.  Did you have the authority to

6   change the hours?

7   A.   Yes, sir.

8   Q.   All right.  And you also had the authority to add hours,

9   didn't you?

10  A.   Well, I had a budget I had to stick with, but, yes, sir,

11  I did.

12  Q.   Right.  And it was -- it was your -- on your authority,

13  you not only could have changed the hours or added hours, you

14  had the authority to add days, too, didn't you?

15  A.   Yes, sir.

16  Q.   Now, tell the jury, how much did it cost for -- it was

17  one mobile guy on a golf cart for four hours?

18  A.   Approximation, about 40 or 50 dollars per shift.

19  Q.   Okay.  And it's only one shift every night, correct?

20  A.   Correct, yes, sir.

21  Q.   So -- so he's getting $10 an hour?

22  A.   Right at that, yes, sir.

23  Q.   So $10 an hour for those nights, and you don't have to do

24  the math right now, but was it within your budget to add more

25  hours if you wanted to have them to patrol from -- let's say,

JORDAN - DIRECT - VESPER

1  what time does the -- does the general store close?

2  A.   In 2010, I believe on a Sunday night, we closed at 7.

3  Q.   All right.  And at 7 o'clock when the -- and the general

4  store is, so just so everybody can see.

5  A.   I can see.

6  Q.   This is the general store, correct?

7  A.   Yes, sir.

8  Q.   All right.  And when the general store closes, the arcade

9  closes, correct?

10  A.   Yes, sir.

11  Q.   And that's -- in August of 2010, that would have been at

12  7 o'clock?

13  A.   Yes, sir.

14  Q.   And when those two facilities close, the swimming pool

15  closes, the kiddie pool and the swimming pool, don't they?

16  A.   Correct.

17  Q.   And in addition to the swimming pool and the kiddie pool,

18  it's really -- it's like a wading pool?

19  A.   It is, yes, sir.

20  Q.   So the -- in addition to the swimming pool and the wading

21  pool, the swimming lake has to close, too, doesn't it?

22  A.   People are not allowed in there after that, correct.

23  Q.   It's closed, isn't it?

24  A.   Correct.

25  Q.   It's not closed like physically up, but nobody is allowed

JORDAN - DIRECT - VESPER

1  of any age in that swimming lake, correct?

2  A.   After dark, you're not allowed in there if you're

3  under --

4  Q.   That's not what I just asked.  I'm sorry to interrupt.

5       You just told this jury at 7 o'clock, at 7 o'clock at

6  night on Sunday, nobody was allowed in that lake, were they?

7  A.   Not according to the signage.

8  Q.   Not according to you, your rules and your signage; isn't

9  that correct?

10  A.   I believe the rules say after dark, you're not allowed in

11  the lake.

12  Q.   You know, I want a straight answer to this.

13  A.   Well, that's what I believe.

14  Q.   You just told me that at 7 o'clock, everything closes

15  down, including the pool, the wading pool and the lake.  Isn't

16  that true?  Is it true?

17  A.   You're confusing me here.  According to the signage --

18  Q.   I'm sorry.

19       THE COURT:  Let him answer.

20       THE WITNESS:  If you have an adult --

21       MR. VESPER:  How can he answer if he --

22       THE COURT:  Let him answer.  Go ahead.

23       THE WITNESS:  According to the signage, if you have

24  an adult -- and I believe our agreement, if you have an adult,

25  you can be in the lake till dark, but you have to be out by

JORDAN – DIRECT – VESPER

1   dark.  We lock the pools because there's a gate there.  We

2   lock the arcade, because there's a locked door there.  And

3   there's no one inside the campground.  There's somebody at the

4   guard booth, but nobody inside the campground.

5   BY MR. VESPER:

6   Q.   Now, do you remember my question, which you said was

7   confusing?

8   A.   There's been a few of them.  I'm not sure which one.

9   Q.   Yeah.  Because you just answered a couple questions.  But

10  let me ask you a straight question.

11       At 7 o'clock on Sunday, August 8th, 2010, that swimming

12  lake was closed, wasn't it?

13       THE COURT:  He already answered that and his answer

14  was no.  So long as they came with an adult.  He already

15  answered that squarely.

16  BY MR. VESPER:

17  Q.   Is that what you're saying?

18  A.   That's what it --

19  Q.   So if they came with an adult, they could swim?

20  A.   According to the state law, correct.

21       THE COURT:  Before dark.

22       MR. VESPER:  Okay.

23       THE COURT:  I mean, he gives an answer, you just

24  ignore it and ask another question.

25       MR. VESPER:  No.

JORDAN – DIRECT – VESPER

1   BY MR. VESPER:

2   Q.   So if they -- if an underaged swimmer comes to the

3   swimming lake after 7 o'clock and before -- it's dusk, isn't

4   it?

5   A.   Yeah, dark.  In the agreement it says dark.  Yes.  Dusk,

6   dark.

7   Q.   Dusk, dark.  You testified in your deposition that the

8   rule was at dusk.  Do you remember?

9   A.   Right.  I believe I do, yes, sir.

10  Q.   So dusk or dark, whichever comes first, no one, of any

11  age is supposed to be in the lake?

12  A.   Correct.

13  Q.   Okay.  And on this Sunday, after the -- after the store

14  closed and the arcade closed, at 7 o'clock, no one is supposed

15  to be in the lake between 7 and dusk or dark?

16       THE COURT:  You're misstating his testimony and I

17  won't allow it.  You are misstating his testimony.

18       MR. VESPER:  I didn't even finish the question.

19       THE COURT:  Well, you said after 7 o'clock, no one

20  was allowed.  That's not -- he's already said three or four

21  times --

22       MR. VESPER:  I haven't finished.

23       THE COURT:  -- that people were allowed.

24  BY MR. VESPER:

25  Q.   No child without an adult is allowed in the lake between

JORDAN – DIRECT – VESPER

1  7 on Sunday and dusk or dark.  Do I have that right?

2  A.   No child without an adult is ever allowed in that lake,

3  period.

4  Q.   Yeah.  But on that evening, a child, between 7 and 8 with

5  an adult could have gone to the lake?

6       THE COURT:  Not between 7 and 8, between 7 and dusk.

7  BY MR. VESPER:

8  Q.   Dusk or dark, yes?

9  A.   With an adult, yes.

10  Q.   Okay.  Now, if you know -- in 2010, you had between 20

11  and 30 employees.

12  A.   That sounds correct.

13  Q.   And starting with the chain of command, you're the

14  general manager, correct?

15  A.   Yes, sir.

16  Q.   And then under your command, there's the chief of

17  maintenance, Mr. Scarpa is --

18  A.   Correct.

19  Q.   -- here -- well, he was here.

20  A.   Correct.

21  Q.   And then -- then there's -- of course, there's the

22  maintenance people that work with Mr. Scarpa in the

23  maintenance department, correct?

24  A.   Yes, sir.

25  Q.   And there's the -- what do you call them, the gate keeper

JORDAN – DIRECT – VESPER

1  or gate attendant?

2  A.   Gate staff, correct.

3  Q.   Gate staff.  And by the way, in the gate staff people,

4  you would include the mobile patrollers, don't you?

5  A.   The rover, yes, sir.

6  Q.   What do you call them?

7  A.   A rover.

8  Q.   The rover.  Okay.  So there's the gate staff and the

9  mobile rover people, and then you have the people that work at

10  the store and the arcade and the housekeeping.

11  A.   Yes.

12  Q.   So remember me asking you all those different categories?

13  A.   Right.

14  Q.   And of all those different categories of people, the 20

15  or 30 people in 2010, you remember telling me, no one was

16  specifically designated to enforce the rule of no child

17  unattended going to the lake, was there?

18  A.   Correct.  I did not have a lifeguard.

19  Q.   That's not what I asked.  See, we know and I'll

20  stipulate, okay?  There's no life guard at the swim lake.  We

21  know that.

22  A.   Right.

23  Q.   I'm talking about somebody that goes around to enforce

24  your rule.  It is your rule that no -- you, meaning Pine

25  Haven, no child goes into that swim lake without an adult at

JORDAN – DIRECT – VESPER

1  any time, correct?

2  A.   Correct.

3  Q.   All right.  So I asked you, when you were deposed two or

4  three days before Christmas last year or 2013, are there any

5  one of the 20 or 30 employees that were working for you in

6  2010 that was designated to enforce that rule?

7  A.   Any one?  No, sir.

8       THE COURT:  But were there several people have

9  responsibilities for that purpose?

10      THE WITNESS:  Any employee I have would -- if they

11 saw a child in that lake, they would make them leave.

12      THE COURT:  And did you advise parents about that?

13      THE WITNESS:  Oh, yes.  We would take them back to

14 the site --

15      THE COURT:  So you had somebody whose job it was to

16 do that?

17      THE WITNESS:  Anyone.  The culture of safety in my

18 park is paramount, and I would not, anyone would be told,

19 housekeepers, maintenance people, anyone, if they see a kid in

20 that lake, they tell them to get out, and they report it to

21 the parents.

22      THE COURT:  But you had nobody whose full time job it

23 was --

24      THE WITNESS:  No, sir.

25      THE COURT:  -- to prevent children from going to the

JORDAN – DIRECT – VESPER

1    lake unattended.

2              THE WITNESS:  I did not, no, sir.

3              MR. VESPER:  Were you finished, Judge?

4              THE COURT:  Yep.

5    BY MR. VESPER:

6    Q.   So what you just told the Judge was, there's a culture in

7    your park of everyone, all 20 or 30 of your employees, if they

8    see the rule about no child unattended in the swim lake at any

9    time of the day, they are to enforce the rule.  Is that what

10   -- your testimony is under oath.

11   A.   Yes.

12   Q.   Yes?

13   A.   Yes, they are supposed to.

14   Q.   Now, whose -- I know they are supposed to, and they're

15   told that, aren't they, like your culture --

16   A.   Yes.

17   Q.   -- is one that is passed down orally, I take it, or is it

18   in writing?

19   A.   It is.  No, it's orally.

20   Q.   Orally, okay.  So there's oral culture or tradition that

21   you pass down to these 20 or 30 employees of -- did they work

22   for Pine Haven company or is there -- did they work for

23   Diversified Investments, Inc.?

24   A.   Pine Haven.

25   Q.   They what?

JORDAN - DIRECT - VESPER

1 A.   I believe it's Pine Haven.  Their checks come from -- I'm

2 not sure what their checks say, because I don't see their

3 checks.

4 Q.   All right.  All of your employees are told orally that

5 they're responsible to enforce that rule of no swimming by a

6 minor unless accompanied by adult, correct?

7 A.   Correct.

8 Q.   Now, that would include -- that would include, is that

9 Mr. Scarpa there?

10 A.   It is.

11 Q.   And Mr. Scarpa is second in command.

12 A.   Yes, sir.

13 Q.   He didn't know that.

14 A.   Yes, he did.  He's asked many people to leave that lake.

15 Q.   Really?

16 A.   I'm sure he has.

17 Q.   Okay.  So if he testified that he didn't know that he

18 was --

19          THE COURT:  No, no.  Don't argue with him as to what

20 he testified to.  You question him, he can do it.

21          MR. VESPER:  Yes.

22 BY MR. VESPER:

23 Q.   You're saying under oath to this jury, that Mr. Scarpa

24 knew that he was to enforce that rule?

25 A.   I would have thought so.  I guess.  Yes, I would think

JORDAN – DIRECT – VESPER

1   so.

2   Q.   Yes.  Okay.  Just so long as we get a definite yes on

3   that.

4   A.   Yes.

5   Q.   Okay.  And how deep is the lake at its -- swim lake as

6   deep -- is it still the same depth today as it was back in

7   2010?

8   A.   I believe so.

9   Q.   Okay.  So what's its deepest depth?

10  A.   You know, I don't know.

11  Q.   Well, it's over six foot.

12  A.   I do know the police report said that they -- it was 15

13  feet deep.

14  Q.   How much?

15  A.   The police report -- excuse me, my allergies are

16  bothering me.  The police report said it was 15 feet.

17  Q.   Do you want some water?

18  A.   No, I'm good, thank you.

19  Q.   You sure?

20  A.   Yeah.

21  Q.   All right.  And do you know what -- was that in the

22  middle of the lake, somewhere?

23  A.   It was where they recovered John.

24  Q.   And approximately where was that?

25  A.   About the middle of the lake, about 35 yards offshore.

JORDAN - DIRECT - VESPER

1   Q.   And this lake is how -- how big across -- I'm talking

2   like from north, south?

3   A.   I would guess about 50 yards.

4   Q.   How much?

5   A.   About 50 yards.

6   Q.   50 yards across?

7        THE COURT:  About half of a football field.

8   BY MR. VESPER:

9   Q.   Yeah, it's half a football field to cross and how big is

10  it lengthwise?

11  A.   Twice as long, about a hundred yards, and again,

12  approximation.

13  Q.   Okay.  So the swim lake itself is just about

14  approximately the size of a football field?

15  A.   My guess would be, yes, sir.

16  Q.   All right.  And the whale in the -- it's not exactly in

17  the middle of the lake, it's kind of over towards the eastern

18  side of the lake?

19  A.   Yes, sir.

20  Q.   So the whale was there before you arrived?

21  A.   Yes, sir.

22  Q.   And do you know whether it was somebody from Diversified

23  Industries, Inc., that put that in there?

24  A.   I don't know.

25  Q.   But certainly, it was there when you arrived, and

JORDAN - DIRECT - VESPER

1  Diversified was there calling it the Pine Haven campground for

2  ten years before you arrived, correct?

3  A.  Yes.  Yes, sir.

4  Q.  So when you inherited this lake, this -- yeah, this lake

5  whale, same lake whale that's there now?

6  A.  Correct.

7  Q.  And it spouts water up in the air?

8  A.  It puts fresh water into the lake, correct.

9  Q.  First, the water goes up into the air and then it comes

10  down, correct?

11  A.  Yes, sir.

12  Q.  All right.  And the reason for the whale is --

13         THE COURT:  Excuse me.  Where is the source of the

14  water that it spouts from?

15         THE WITNESS:  There's a hose connected to the bottom

16  of the whale that runs underneath the water through the sand,

17  up to a well, W-E-L-L.

18         THE COURT:  So it's not taking lake water --

19         THE WITNESS:  No.

20         THE COURT:  -- putting it through the spout and

21  circulating, it's taking water from another source --

22         THE WITNESS:  Correct.

23         THE COURT:  -- goes to the spout but then into the

24  lake?

25         THE WITNESS:  Correct.  In the summer, the lake

*United States District Court*
*Camden, New Jersey*

JORDAN – DIRECT – VESPER

1  evaporates and it loses a lot of the level, so you have to

2  keep adding water, and it oxygenates the water.

3  BY MR. VESPER:

4  Q.  So you just said to the Judge that the sun evaporates the

5  water?

6  A.  It does.

7  Q.  Well, no, I believe you, I'm not arguing with you.

8      What about at night, does the moon evaporate the water?

9      THE COURT:  Oh, come on.  Evaporation occurs all the

10  time.  The rate may change by the light, but even in the dead

11  of night, there's evaporation.

12      MR. VESPER:  Sure, there is.

13      THE COURT:  So come on.

14  BY MR. VESPER:

15  Q.  So do you need to run the whale at night?

16  A.  I do.

17  Q.  Because of that evaporation factor?

18  A.  Correct.  You lose the water level.

19  Q.  Okay.

20  A.  And it cleans the water somewhat, adds fresh water to it.

21  Q.  I'm sure it does.

22      So if you turn the whale off for four hours, six hours,

23  that would really cause harm to the lake?

24  A.  I don't know the answer to that.

25  Q.  So P-6 shows the whale?

JORDAN – DIRECT – VESPER

1   A.   Yes.

2   Q.   And the reason for the whale is not to attract anybody,

3   it's a tool, as you called it.

4   A.   Correct.

5   Q.   It's not to attract anybody?

6   A.   No, sir.

7   Q.   All right.  So this non-attraction, that is there solely

8   for the purpose of making sure that the water doesn't

9   evaporate at night or during the day and purifies the water,

10  too, correct?

11  A.   It puts fresh water in, which helps it, yes.

12  Q.   Yes, it helps it.  Certainly it helps the health of the

13  lake.  I'm not disagreeing here.  It helps the health of the

14  lake.  It keeps the lake water fresh.

15  A.   Fresher, yes, sir.

16  Q.   Now, the same object, if the whale is not there to

17  attract them, the same objective of freshening the water and

18  keeping the water level high, that could be accomplished

19  without the whale, couldn't it?

20  A.   Yes.

21  Q.   You guess?

22  A.   Yes, it could.

23  Q.   Yes, okay.  And you, as the manager, you could have

24  removed the whale, couldn't you?

25  A.   Yes, sir.

JORDAN - DIRECT - VESPER

1   Q.   And also, as the manager, if you found out that it would

2   do no harm to the water quality or the water level of the

3   lake, you could have also turned off the whale at night,

4   couldn't you?

5   A.   Well, theoretically, with those if's, yes, sir.

6   Q.   With those if's.  I did give you two if's.

7        You would agree, as general manager, that the two most

8   serious foreseeable risks of death to any of your campers are

9   the lake and the pool, aren't they?

10  A.   From my experience?

11  Q.   Yeah.

12  A.   I've never had a death from any of those in any of the

13  hotels or properties that I've managed.

14  Q.   Except this one.

15  A.   I'm sorry?  Until this time.

16  Q.   I'm asking you foreseeable risk.  You don't want your

17  guests injured or killed in a drowning accident?

18       THE COURT:  Of course he doesn't want his guests

19  injured or killed.  Come on, get useful information from him.

20       MR. VESPER:  I want to make sure he understands.

21       THE COURT:  He's not going to answer he wants his

22  guests to be killed or maimed.  Come on.

23  BY MR. VESPER:

24  Q.   Let me ask you about risk.  Besides the lake and the

25  pool, what other operations of the Pine Haven Camping Resort

JORDAN - DIRECT - VESPER

1   are there that present a foreseeable risk of serious injury or

2   death?  What other places?

3   A.   The playgrounds have more issues of injury because of the

4   kids when they fall and things like that.

5   Q.   Death?

6   A.   I've never had a death, no.

7   Q.   So serious injury, though?

8   A.   Broken arms, things like that, kids can have.

9   Q.   Yeah.  And besides -- so besides the pool, the swim lake,

10  the playgrounds, where else?  Is there a foreseeable risk of

11  your -- of your guests and business invitees, their guests

12  getting seriously injured or killed?  Where else?

13  A.   You know, it's -- I have three -- four-and-a-half miles

14  of roads in that park.  I have kids on skateboards and

15  bicycles.  I mean, there's numerous ways that people can get

16  injured if they're not careful.

17  Q.   Those are -- give me the operations of your campground.

18  You do operate the pool and you do maintain and operate the

19  playgrounds, correct?

20  A.   Yes, sir.

21  Q.   And you do maintain and operate the swim lake, correct?

22  A.   Correct.

23  Q.   So for places, I just want the places, that you maintain

24  and operate on the Pine Haven's campground, what other places

25  are there that have a foreseeable risk of serious injury or

United States District Court
Camden, New Jersey

JORDAN – DIRECT – VESPER

1  death?  Besides what we've already discussed?

2  A.   I can't -- none of them I guess.

3       THE COURT:  Who maintains the roads?

4       THE WITNESS:  We do, we do.

5       THE COURT:  Didn't you just testify that people

6  skateboard --

7       THE WITNESS:  Mm-hmm, yes.

8       THE COURT:  -- and do other things on -- and those

9  are your roads.

10       THE WITNESS:  They are our roads but people fall, the

11  kids fall, things like that.  I haven't had any serious

12  injuries on any of the roads, but, I mean, I have a lot of

13  things in the park.  It's a large park.

14  BY MR. VESPER:

15  Q.   Yeah, I understand that.  As far as -- if you don't

16  maintain the road, if you don't maintain the road -- listen to

17  my question.

18  A.   Okay.

19  Q.   If you don't maintain the road, somebody could be

20  seriously injured or killed?

21  A.   Yes.

22  Q.   Okay.  Now, other than what we've just talked about now

23  and the Judge asked about the roads, that's good, so you have

24  the swim lake, the pool, the playgrounds, the roads, are there

25  any other foreseeable places that people could get injured or

JORDAN - DIRECT - VESPER

1   killed, that you operate and -- at the park?

2   A.   Not that -- no, I don't believe so.

3   Q.   Okay.  So now those four -- let's talk about that.

4   A.   I'm really kind of confused with this.  I mean, I have

5   people in there that are cooking with grills, you know, and

6   fire, campfires.

7   Q.   You're not operating that.

8   A.   Well, I know.

9   Q.   You're really missing my question.

10  A.   Okay, well, then, I just want to make sure I clarify.

11  Q.   Somebody could come and set off a rocket?

12  A.   Exactly.

13  Q.   Right.  I'm asking you -- I'm going to ask you again, so

14  there's no doubt that I tried to confuse you here.

15       Of the things and the places and the attractions that

16  Pine Haven operates and maintains --

17  A.   Right.

18  Q.   -- other than the swim lake, the swimming pool, wading

19  pool, the playground and the roads, are there any other such

20  facilities in camp -- in Pine Haven Camping Resort that you

21  maintain and operate that have a foreseeable risk of

22  serious injury or death?

23       THE COURT:  Foreseeable to whom?

24       MR. VESPER:  A foreseeable risk.

25       THE COURT:  Foreseeable to whom?  Foreseeable to him?

JORDAN - DIRECT - VESPER

1          MR. VESPER:  Yes, that's what I've been asking.

2          THE COURT:  He's testified he never had a swimming

3    accident at any place.

4          THE WITNESS:  No, I didn't.

5          THE COURT:  He's not aware of any.  You just --

6          THE WITNESS:  I mean, I have horseshoe places, I have

7    a basketball court, I have volleyball, I have bocce or bocci

8    ball, you know, I have an arcade that has a pool table in it.

9    I mean, I have all these things --

10   BY MR. VESPER:

11   Q.   Right.

12   A.   -- that -- I guess if somebody picked a ball up and hit

13   him in the head with it, maybe it would be, you know, but

14   that's -- I don't foresee that happening, but it could.

15   Q.   Here's what I'm asking you.  The foreseeable risk of

16   somebody drowning, you had as manager, because that's why you

17   have those signs up; isn't that true?

18   A.   Definitely.

19   Q.   Right.  So we definitely have you, the manager of this

20   camping resort having in your mind, your mind, that there is a

21   foreseeable risk of serious injury or death at the swimming

22   lake and the pool.  Do you have that?

23   A.   I do.

24   Q.   Now, let's talk about reasonable.  Do you have a

25   reasonably foreseeable risk of somebody getting killed at the

JORDAN - DIRECT - VESPER

1  playground?

2  A.  No.

3  Q.  Do you have a reasonably foreseeable risk of somebody

4  getting killed -- what was the other place?

5       THE COURT:  Roads.

6  BY MR. VESPER:

7  Q.  On the roads?

8  A.  No, sir.

9  Q.  No.  So really, what we've narrowed it down for your

10  foreseeability, the manager of the -- so you, as manager do,

11  in your mind have a foreseeable risk of serious -- of death

12  happening to your business invitees at the swimming lake,

13  correct?

14  A.  If rules and regulations are not followed, yes, sir.

15  Q.  Yes.  And to enforce those rules and regulations, as

16  you've just added, you have -- you've assigned no one to

17  enforce the rule; isn't that correct?

18  A.  Are you asking me if I have one specific person?

19  Q.  Did you assign one specific person?

20  A.  No, sir.

21  Q.  But --

22       THE COURT:  We've been through all of this.  This is

23  completely repetitive.

24       MR. VESPER:  All right.

25  BY MR. VESPER:

JORDAN - DIRECT - VESPER

1  Q.   Now, to -- with the foreseeable risk of death at the

2  swimming pool, what did you do to prevent death by drowning at

3  the swimming pool?

4  A.   The same --

5  Q.   Besides put up a sign?

6  A.   We have signage and at night, we lock the gate that's `

7  by the state.

8  Q.   Okay.  Did you do anything else?

9  A.   Well, I had the safety equipment present.  I'm in

10  compliance with all the regulations.

11       THE COURT:  Did you instruct your employees to remove

12  any minors unaccompanied by adults?

13       THE WITNESS:  Yes, I did.  It's the same thing.  I've

14  had employees come up --

15       THE COURT:  I mean, you keep asking the same question

16  four times.

17       MR. VESPER:  This is different.

18       THE COURT:  No.

19       MR. VESPER:  Yes, it is.

20       THE COURT:  You're plowing up the same field trying

21  to make a little minor change in the question.

22       MR. VESPER:  I'm asking, if Your Honor please, for

23  the right to cross-examine a witness.

24       THE COURT:  No, he has -- you don't have an absolute

25  right to cross-examine him.

*United States District Court*
*Camden, New Jersey*

JORDAN – DIRECT – VESPER

1            MR. VESPER:  I have a --

2            THE COURT:  No, you do not.  The rules leave control

3    of me.  He has not been --

4            MR. VESPER:  You have control, you certainly --

5            THE COURT:  He has not been evasive.  He's tried to

6    answer every question.

7            MR. VESPER:  All right.  Let me proceed, then, and I

8    apologize to the Court and to the jury if I'm going over new

9    ground -- over old ground.  I'm asking about what was done to

10   prevent -- to prevent death at the pool.  I did not ask that

11   question before.  So we didn't talk about defense --

12           THE COURT:  At the pool as opposed to the swimming

13   lake?

14           MR. VESPER:  Yes, Your Honor.

15           THE COURT:  All right, go ahead.

16   BY MR. VESPER:

17   Q.   I asked you then, insofar as these foreseeable risks of

18   death at the pool, what you've done to prevent them, is you

19   have safety equipment?

20   A.   Safety equipment.  We have signage, we have all of the

21   risk equipment, the ring, the hook.

22   Q.   The safety equipment.

23   A.   Yes.  We lock -- we have a gate, there's a fence required

24   by the state, lock it at night, however, you know --

25   Q.   Right.

JORDAN – DIRECT – VESPER

1    A.   It's part of what's required.

2    Q.   Okay.

3    A.   And I'm not sure what else you're asking me for.  If I

4    see somebody over there that's underaged, yes, we ask them to

5    leave.  If I see a guest that has a bottle in there or

6    something like that, we ask them to take that out.

7    Q.   Right.  You enforce the oral custom of your -- or

8    culture.

9    A.   The rules and regulations.  We patrol it constantly when

10   it's open.

11   Q.   Yeah, all right.  So in addition to what you just told

12   us, what else do you have there?

13   A.   Where?

14   Q.   We're talking about the pool.  Do you understand that?

15   Do you understand we've just been talking about the pool?

16   A.   I do understand that, yes, sir.

17   Q.   All right.  So at the pool we've just been talking about,

18   what other safety features do you have there to keep people

19   from foreseeably drowning?

20   A.   I have a first aid kit.

21   Q.   Okay.

22   A.   I'm not -- I'm really not sure what he's asking me here.

23   Q.   You're not required to have a surveillance camera, are

24   you?

25   A.   I am not.

JORDAN - DIRECT - VESPER

1  Q.   What's there?

2  A.   The camera.

3  Q.   At the pool?

4  A.   That's what you're asking -- a camera.

5  Q.   Well, of course.

6  A.   It's a camera that doesn't work.  It was there before I

7  got there.  That has been there for years and years.

8  Q.   Okay.

9       MR. VESPER:  Could we -- I'm going to take a -- ask

10 the Court for a short -- let me -- may we approach the bench,

11 please.

12      THE COURT:  Yep.

13      (SIDEBAR AS FOLLOWS:)

14      MR. VESPER:  Respectfully, respectfully, I want to

15 say two things.  Your Honor has interrupted my questioning, I

16 think, unfairly.  Your Honor characterized this witness almost

17 as being forthright.  If this is not an evasive -- he is

18 diverting, he is evasive and I want to be allowed to

19 cross-examine him.

20      THE COURT:  I'm not giving you the right to

21 cross-examine.  I'll let you ask some leading questions, I'm

22 not going to strictly enforce it.

23      MR. VESPER:  Did you hear him?

24      THE COURT:  I did hear him.  He's not being evasive.

25 I'm not saying he's telling the truth.  That's a different

1  story, but he's not being evasive.  You've asked stuff that's

2  not even in dispute.  Everything that he said is not there.

3          MR. VESPER:  What I've asked is in dispute.

4          THE COURT:  No.  What is in dispute?

5          MR. VESPER:  Do you hear what he just said?

6          THE COURT:  What is in dispute?  Give me a fact

7  that's in dispute.

8          MR. VESPER:  Here's what's in dispute.  They're

9  operating in a negligent manner.

10          THE COURT:  No, no, no.  That's -- what factual

11  dispute is there?

12          MR. VESPER:  That they didn't protect the lake.

13  They're saying they did by following the state regulations.

14          THE COURT:  No, what they did, they did.  You can

15  argue, you can --

16          MR. VESPER:  What they shouldn't have done -- excuse

17  me.  Can't I argue --

18          THE COURT:  Not to him.  You can't argue with him at

19  all.

20          MR. HERMESMANN:  It's for close --

21          MR. VESPER:  I mean questioning.  Can't I question

22  him -- well, I intend to question him about what he did at the

23  pool, which he didn't do at the lake which, by the way, he

24  didn't answer in a forthright way.

25          THE COURT:  No, no.  You're making this up.

JORDAN - DIRECT - VESPER

1          MR. VESPER:  I'm not making anything up.

2          THE COURT:  I'll let the Circuit look at the record.

3     Your questions are convoluted, they're repetitive, same

4     questions asked three or four times sometimes with just a

5     slight factual change.  The facts are -- we know there's no

6     lifeguards, we know there's no patrols in either the lake -- I

7     don't think there's any even at the pool.  There's no --

8          MR. VESPER:  There are patrols, but they're only on

9     certain nights.

10          THE COURT:  But he said that.  There's no dispute

11     about that.  He said it's from 10 to 2 on two nights.

12          MR. VESPER:  Right.

13          THE COURT:  And one, two weekends, I think it was

14     three nights.  But basically, he's agreed to that.

15          MR. VESPER:  He hasn't agreed to -- about the

16     surveillance.

17          THE COURT:  You're trying to argue negligence.

18          MR. VESPER:  Yes.

19          THE COURT:  No, not with him.

20          MR. VESPER:  All right.  Okay.

21          THE COURT:  Not with him.  You can argue what the

22     facts are on the ground.

23          MR. VESPER:  Okay.

24          THE COURT:  There is no dispute.  Simple matter is,

25     you haven't really brought out any dispute, not one.

JORDAN – DIRECT – VESPER

1          MR. VESPER:  Well, all right.  I won't belabor this

2    at this time.

3          THE COURT:  Your point is as to the dispute whether

4    there was negligence or reasonably to do that.  That you may

5    argue at some appropriate time, not with this witness.  He's

6    an a lawyer.  He's not designed to decide whether somebody is

7    negligent or not negligent.  He's never seen a drowning.  This

8    is the first incident at this resort he knows of.  So be it.

9    But the facts on the ground are agreed upon, there's no

10   lifeguard, there's no patrols, except that very limited.

11         MR. VESPER:  Right.

12         THE COURT:  There's no patrols.  That's a fact.

13   There comes time you want to make an argument at closing you

14   can argue it.

15         MR. VESPER:  And another fact, there's a surveillance

16   camera at the pool.  Now, he tried --

17         THE COURT:  No, he didn't try anything.  He told you

18   it was broken.

19         MR. HERMESMANN:  He told you the truth, Tom.  He told

20   you the same thing.

21         MR. VESPER:  When I first asked him, what safety

22   devices they have --

23         THE COURT:  It's not a safety device if it's not

24   working.

25         MR. VESPER:  Okay.

JORDAN – DIRECT – VESPER

1          THE COURT:  You asked him if there was a camera --

2          MR. VESPER:  You're jumping to a conclusion.  That's

3   not true.

4          THE COURT:  What's not true?

5          MR. VESPER:  It was there as a deterrent.  It was

6   there as a deterrent.  You're not letting me develop that.

7          THE COURT:  Ask, was that there as a deterrent.  You

8   can ask him that question.

9          MR. VESPER:  Okay.

10         THE COURT:  But he told you it wasn't working, which

11   is quite a concession.

12         MR. VESPER:  No, you're not getting it.  Okay.

13         THE COURT:  You know something, I'm going to say it,

14   I shouldn't.  You don't believe in your case as much as you

15   should and because you don't believe in it, you're trying to

16   push the envelope.

17         MR. VESPER:  I'm not pushing the envelope.  I'm

18   trying to establish a basic fact.

19         THE COURT:  The facts -- he'll give you all the

20   facts.

21         MR. VESPER:  All right, if I may --

22         THE COURT:  He's not going to argue negligence with

23   you, he's not going to argue what's reasonable.

24         MR. VESPER:  All right.

25         THE COURT:  Even not what's foreseeable.  That's a

JORDAN – DIRECT – VESPER

1    very complicated subject.  He's not a lawyer.  He runs parks.

2    And so far, I haven't seen one thing that he has said,

3    factually, that anybody has any dispute over.

4              MR. VESPER:  Okay.  Thank you, Your Honor.

5              (END OF SIDEBAR.)

6    BY MR. VESPER:

7    Q.   In addition to the safety procedures that were in place

8    at the pool that we've already talked about, I'm asking you

9    now about the surveillance camera at the pool.  There was a

10   camera at the pool when you took over as general manager,

11   correct?

12   A.   I believe so, yes, sir.

13   Q.   Okay.  And when you took over as general manager, as far

14   as you know, it had been at the pool for ten -- at least ten

15   years, as far as you know?

16   A.   Well, it was there before I got there.

17   Q.   Okay.

18   A.   And I don't know if it worked or not.

19   Q.   We're getting to that.  Now, in fact, the camera at the

20   pool, it's aimed at -- it's aimed in a southerly direction

21   towards the pool, correct?

22   A.   If I remember correctly, it's in a tree or right on the

23   top of this -- and it's pointed back this way.

24   Q.   Like at a set -- thank you for clarifying.

25              So I'm writing, there's a camera in a tree and it's

JORDAN - DIRECT - VESPER

1  aimed in the direction where I just drew the arrow?

2  A.  Yes, sir.

3  Q.  On P-1B, and as you found out, when you took over, that

4  surveillance camera is inoperable, isn't it?  It doesn't work?

5  A.  As far as I know, it doesn't work.  We had no monitor for

6  it.  There was nothing -- I don't know.

7  Q.  Right.  But it was kept there by you.  It's still there?

8  A.  I didn't have any reason to pull it down.

9  Q.  Right.  And you kept the inoperable camera aimed in the

10  direction that it is towards the pool as a deterrent, didn't

11  you?

12  A.  I didn't keep it there as a deterrent.  I think that's

13  the reason the people put it in was as a deterrent.

14  Q.  All right.  Let's agree then that the reason that

15  somebody put in a surveillance camera that doesn't work was to

16  deter what?  It was the deterrence for what?

17  A.  I would guess for people sneaking into the pool.

18  Q.  Right.

19        THE COURT:  I mean, at a time they shouldn't be in

20  the pool.

21        THE WITNESS:  Exactly.

22        MR. VESPER:  Yeah.  Thank you, Your Honor, for that

23  clarification.

24  BY MR. VESPER:

25  Q.  Now, in addition to the surveillance camera that's --

JORDAN - DIRECT - VESPER

1 that doesn't work, being aimed at the pool, are there any

2 surveillance cameras around the swim lake?

3 A.   Around the swim lake?  No, sir.

4 Q.   There are five other cameras, though, aren't there?

5 A.   There's cameras in the front booth and there's two in the

6 -- I believe two in the arcade and two in the general store.

7 Q.   Okay.  When you say there's -- so there's two

8 surveillance cameras in the gate, at the gate house?

9 A.   One, one at the gate house.

10 Q.   Sorry.  So there's one surveillance camera in the gate

11 house aimed where?

12 A.   At the gate.

13 Q.   Out towards Route 9?

14 A.   Towards the front entrance gate, correct.

15 Q.   Okay.  And that does work?

16 A.   Yes, sir.

17 Q.   Okay.

18 A.   We installed them.

19 Q.   Let me back up.

20        THE COURT:  "We," meaning after you got there?

21        THE WITNESS:  Correct, yes, sir.

22 BY MR. VESPER:

23 Q.   When you came to the -- to the Pine Haven's Camping

24 Resort in January of 2010, what surveillance cameras were

25 there, besides the one we've already talked about at the pool?

*United States District Court*
*Camden, New Jersey*

JORDAN – DIRECT – VESPER

1   A.   In January?

2   Q.   Yes.

3   A.   None that I know of.

4   Q.   Except that one?

5   A.   The one at the pool, yes.  I don't count that because it

6   doesn't work.

7   Q.   I know you don't count it because it doesn't work, but

8   even though it doesn't work, you left it there for a reason?

9          THE COURT:  Look, he's answered that question.  Stop

10   arguing with him.

11          MR. VESPER:  I will, Your Honor.

12   BY MR. VESPER:

13   Q.   So you added five more cameras?

14   A.   Correct.

15   Q.   How much did they cost?

16   A.   I don't know.  I would guess about $5,000.

17          THE COURT:  Altogether.

18          THE WITNESS:  I would guess, yes, sir.

19   BY MR. VESPER:

20   Q.   Yeah, $5,000 altogether.

21          And you decided where they would be positioned,

22   correct?

23   A.   Charlie and I did, yes, sir.

24   Q.   Who is Charlie?

25   A.   Scarpa.

JORDAN - DIRECT - VESPER

1  Q.  Oh, the chief of maintenance?

2  A.  Correct.

3  Q.  And so Charlie and you decided on -- Charlie and you

4  decided on the best places to put surveillance cameras for

5  safety reasons?

6  A.  No, sir.

7  Q.  For what reasons?

8  A.  Vandalism.

9  Q.  Okay.  So the new cameras that were added, five of them,

10 one at the front gate and two at the general store?

11 A.  I believe it's two at the -- I believe, and then I think

12 it's two at the arcade.

13 Q.  Okay.  Total of five?

14 A.  I believe, yes, sir.

15 Q.  And the only reason for those five cameras is for

16 vandalism?

17 A.  Correct.

18 Q.  So the five cameras that you placed, nothing whatsoever

19 to do with the safety of your guests?

20 A.  No, sir.

21 Q.  All right.  If you wanted to, you could have bought

22 another five cameras for $5,000, couldn't you?

23 A.  Yes, sir.

24 Q.  That was within the budget?

25 A.  No, sir, but I could have bought them, yes, sir.

JORDAN - DIRECT - VESPER

1  Q.   You could have bought them and got reimbursed?

2  A.   Yes.

3  Q.   And you could have bought them and then positioned them

4  wherever you want, correct?

5  A.   Correct.

6  Q.   Wherever there was a foreseeable risk of death?

7  A.   Not those cameras.  Those cameras are not infrared.  They

8  were very inexpensive, but yes, you could.  If you're asking

9  me if I could have put them there, yes, sir.

10  Q.   Yes.  You also --

11        THE COURT:  But more significantly, you could have

12  put them around the lake.

13        THE WITNESS:  Yes, sir.

14        THE COURT:  At various -- five different points

15  around the lake.

16        THE WITNESS:  I could have, yes.

17        THE COURT:  You could have put cameras that were

18  operable.

19        THE WITNESS:  That were operable, yes, sir.  These

20  are cheap ones.

21        THE COURT:  Whatever it was, you could have done it.

22  That was his question, you could have done it.

23        MR. VESPER:  Yes, that was my question, thank you,

24  Your Honor.

25        THE COURT:  And you could have dispersed them around

JORDAN – DIRECT – VESPER

1  the lake.

2          THE WITNESS:  Yes, sir.

3          MR. VESPER:  We keep losing the black magic marker.

4      I apologize, Your Honor, for not being prepared.

5          THE COURT:  Are you looking for something?

6          MR. CICCOTTA:  A marker.

7          THE COURT:  Oh, a marker.

8          MR. VESPER:  Got it.

9  BY MR. VESPER:

10  Q.  All right.  I want to go factually and ask you what you,

11  as management, did for the safety of anybody –– of any age

12  using the swimming lake, okay?  Do you understand where I'm

13  going?  Factually, what you did.  I'm going to ask you these

14  questions.

15          MR. HERMESMANN:  I'm just going to object.

16  BY MR. VESPER:

17  Q.  When I say "you,"  factually I'm going ––

18          MR. HERMESMANN:  Your Honor, I have an objection as

19  to asked and answered.

20          THE COURT:  You're going over what's been gone over

21  four times.  I'm going to let him do it once more if he does

22  it forthright.

23          MR. VESPER:  Thank you, Your Honor.

24          THE WITNESS:  You're asking me what rules and

25  regulations were in place to help with the safety of the lake

JORDAN – DIRECT – VESPER

1   like we just talked about, right?

2   BY MR. VESPER:

3   Q.  No, no.  We know the rules --

4        THE COURT:  No, but that's -- you just can't poo-poo

5   that.

6        MR. VESPER:  Oh, I don't want to go over the rules,

7   no, no, no.

8        THE COURT:  No, no.  The rules and regulations here

9   are saying is one of the things they did for the safety.

10       MR. VESPER:  Okay.  The rules and regulations.

11       THE COURT:  You can't just ignore that.

12       MR. VESPER:  I will not ignore it.

13  BY MR. VESPER:

14  Q.  There were rules and regulations that were given to every

15  one of the guests -- of the members of the -- and people that

16  came to and leased from the camp, correct?

17  A.  Yes, sir.

18  Q.  Okay.  In addition to the rules, you also had a guard?

19  A.  I had a gate attendant.

20  Q.  Yeah.  Let's call him the gate --

21       THE COURT:  I'm sorry, gate attendant has to do with

22  the lake?

23       THE WITNESS:  No, not with the lake.

24       THE COURT:  His questions have --

25  BY MR. VESPER:

JORDAN – DIRECT – VESPER

1  Q.   That's for safety?

2  A.   No, no, that's not for safety.

3  Q.   No?  Okay.  Oh, you didn't have the guard for the lake,

4  but you did have a roving mobile patrol the two days of the

5  weekend and on those holidays?

6  A.   Correct, but not specifically for the lake.

7  Q.   No, but one of their duties was for the lake, correct?

8  A.   To ride by, correct.

9          THE COURT:  And that was from 10 a.m. to –– 10 p.m.

10  to 2 a.m.?

11          THE WITNESS:  Yes, sir.

12          THE COURT:  Four hours.

13          THE WITNESS:  Yes, sir.

14          THE COURT:  On those two days.

15  BY MR. VESPER:

16  Q.   So you had the rules, you had the mobile patrol.

17          As far as the pool was concerned, you did have a fence

18  around the pool, correct?

19  A.   Correct.

20  Q.   And that was locked after everything closed down?

21          THE COURT:  You were asking him about the lake.  Why

22  are you going back to the pool?

23          MR. VESPER:  I'm trying to lay a foundation for the

24  fence, Your Honor.  There was no ––

25          THE COURT:  Ask a question.  You don't need to lay a

JORDAN – DIRECT – VESPER

1    foundation.  The jury has heard it ten times now that there's

2    a fence around the pool.  Come on.

3    BY MR. VESPER:

4    Q.   Is there a fence around the lake?

5    A.   No, sir.

6         THE COURT:  Well, that's not a safety --

7    BY MR. VESPER:

8    Q.   There's no fence.

9    A.   No, sir.

10   Q.   There's -- there was a deterrent -- dummy camera, can we

11   call it a dummy camera?

12   A.   Not for the lake.

13   Q.   No, for the pool?

14   A.   You were talking about the lake, I thought.

15        MR. HERMESMANN:  Your Honor --

16   BY MR. VESPER:

17   Q.   Let's talk about --

18        THE COURT:  First of all, you say we're going to make

19   a list of what the safety things were, and then you're now

20   going to start putting on the list things that are not safety.

21        MR. VESPER:  I'm rushing and I'm getting frustrated,

22   and I apologize, but let me rephrase the question.

23        THE COURT:  We have -- look, the facts are not in

24   dispute here.  Everybody, everybody agrees to what the facts

25   of the grounds were.

1          MR. VESPER:  All right.  May I just proceed?

2          THE COURT:  This is not the time for closing

3   argument.

4          MR. VESPER:  I'm not closing, I'm trying to get the

5   facts out in writing.

6          THE COURT:  What fact?  Ask him a fact.  We've been

7   through these facts 20 times.  Everybody agrees to them.

8   There's no dispute on them.

9   BY MR. VESPER:

10  Q.   The water safety of the park includes the pool and the

11  swim lake, water safety?

12         THE COURT:  You're now changing the list to water

13  safety?

14         MR. VESPER:  Yes, so I can ask my questions, if I

15  may.

16  BY MR. VESPER:

17  Q.   Water safety.  You have that in general?

18  A.   Excluding drinking water?

19  Q.   Yeah, excluding drinking water, because for this

20  reason --

21  A.   I want to make sure I'm correct here.

22  Q.   For this reason.  Yeah, for this reason, you've testified

23  that the only foreseeable risk to you of a -- of a death is at

24  the pool or at the lake, agreed?

25  A.   Yes.

JORDAN - DIRECT - VESPER

1   Q.   So what I want to do now is talk about what was done by

2   way of water safety at both the pool and the lake.

3          THE COURT:  The accident didn't happen in the pool.

4          MR. VESPER:  I know that, but the rules and

5   regulations, Your Honor, apply to both the pool and the lake.

6          THE COURT:  So you have rules and regulations.

7          MR. VESPER:  Right.  The rules and regulations --

8          THE COURT:  I'm asking.  You had the roving for just

9   a limited number of hours, you had the roving patrol.

10         THE WITNESS:  Yes, sir.

11         THE COURT:  Okay.  You did not have a lifeguard?

12         THE WITNESS:  No, sir.

13         THE COURT:  You did not have a fence?

14         THE WITNESS:  Not on the lake.

15         THE COURT:  That's what I'm talking about, around the

16   lake.  You did not have a fence.  You did not have any kind of

17   sensors that sense when people --

18         THE WITNESS:  No, sir.

19         THE COURT:  -- would come.  You didn't have a

20   mechanism where some message would blast out if the sensor

21   like, Stay out of the pool; Stay out of the lake?

22         THE WITNESS:  No, sir.

23         THE COURT:  You didn't have that, right?

24         THE WITNESS:  No, sir.

25         THE COURT:  You had the signage at two locations

JORDAN - DIRECT - VESPER

1    around the lake?

2           THE WITNESS:  Correct.

3           THE COURT:  And you had nothing else?

4           THE WITNESS:  That's correct.

5           THE COURT:  All right.  There's your --

6           MR. VESPER:  Your Honor, and I appreciate --

7           THE COURT:  There's no dispute as to the facts on the

8    ground and I don't know why you're beating this to death.

9    BY MR. VESPER:

10   Q.  Did the mobile patrol on the weekends and on the holiday

11   three-day weekends, did they show a presence by way of wearing

12   a uniform?

13   A.  A T-shirt with Pine Haven on it.

14   Q.  So there was that in addition to their just driving

15   around, they had a presence that they were representing

16   somebody on behalf of Pine Haven, correct?

17   A.  Correct.

18   Q.  Now, Diversified Industries, Inc., owns other campsites

19   and camping resorts, don't they?

20   A.  Yes.

21          THE COURT:  In New Jersey or elsewhere?

22          THE WITNESS:  In Pennsylvania.

23          THE COURT:  Pennsylvania.

24          THE WITNESS:  And Texas.

25   BY MR. VESPER:

JORDAN - DIRECT - VESPER

1  Q.   There's two or three sites in Pennsylvania at Gettysburg,

2  aren't there?

3  A.   Two.

4  Q.   And if you know, at one site -- do you know the Little --

5  what's it called, not Little Big Horn, but the Little Round

6  Top, right?  The Little Round Top site?

7  A.   I know of it.

8  Q.   Have you been there?

9  A.   I've been to the office there.

10 Q.   And do you know the manager?

11 A.   I do.

12 Q.   And do you know that the manager -- by the way, is the

13 Little Big Horn -- and this is owned by the same company,

14 Diversified, right?  So the Little Big Horn that's run by the

15 manager that you know, how many sites does it have?

16 A.   I don't know.

17 Q.   Well, it's got a lot less than you do, don't they?  It's

18 got less than Pine Haven?

19 A.   It's smaller, yes, sir.

20 Q.   Yes.  Pine Haven's got how many?

21 A.   625, currently.

22 Q.   Currently.  And in 2010, did you have 625?

23 A.   Few less, I believe.  I don't remember the number.

24 Q.   Well, 600, to be -- rounded?

25 A.   Around there would be good, yes, sir.

JORDAN - DIRECT - VESPER

1   Q.   And the Little Big Top has got less than half, don't

2   they?

3   A.   I don't know.

4   Q.   Can you approximate to the jury?

5   A.   I don't know how many numbers, how many sites they have.

6   Q.   All right.  The manager at Little Big Horn -- they have a

7   pool?

8   A.   I believe he does, yes, sir.

9   Q.   And the manager -- do you know whether the manager and

10  any of his designees patrol throughout the day and night,

11  around the clock?

12          THE COURT:  Before you go, do they have a lake and a

13  pool or just a pool?

14          THE WITNESS:  I don't know.

15          MR. VESPER:  This will be marked.  What's the next

16  number?

17          MR. HERMESMANN:  Your Honor, I'm going to want to be

18  heard at sidebar for this exhibit.

19          THE COURT:  First of all, show it to him.

20          MR. VESPER:  Yes.

21      (SIDEBAR AS FOLLOWS:)

22          THE COURT:  I mean, I don't know, we have a death

23  case, nobody has made a binder of exhibits for me.  The first

24  case I've tried in years, where I didn't have a binder of

25  exhibits handed to me at the beginning of the case.

*United States District Court*
*Camden, New Jersey*

JORDAN - DIRECT - VESPER

1           First of all, is this premarked, was this -- in the

2     final pretrial.

3               MR. VESPER:  No.

4               THE COURT:  Why not?

5               MR. VESPER:  I just found it.

6               MR. HERMESMANN:  Judge, I've never heard of Little

7     Round Top until five minutes ago.

8               MR. VESPER:  It's on the --

9               THE COURT:  No.

10              MR. HERMESMANN:  I've never heard of it.  It's never

11    been disclosed in discovery and it's part of plaintiff's case

12    in chief and --

13              THE COURT:  I mean, believe me, if this has been

14    brought out in discovery, I think it's relevant, what the

15    safety steps are taken in another related site, so I don't

16    question -- you know, you got to let me finish.

17              MR. VESPER:  But you need the factual background.

18              THE COURT:  No, you got to let me finish.

19              MR. VESPER:  Yes, sir.

20              THE COURT:  It's -- it's no secret that the

21    Diversified, whatever it is, had more than one site.  If you

22    want to make reference to what their safety was at other

23    sites, believe it or not, I think that's relevant or could be

24    relevant.  I don't dispute that.  But to pop up with it five

25    minutes --

1          MR. VESPER:  Now, may I just state --

2          THE COURT:  Yeah.

3          MR. VESPER:  -- what happened.  I went on their

4     website.  I -- and it's on -- when I say "their," I went on

5     Pine Haven's website.  On Pine Haven's website, I never

6     noticed it before.  I just found out, and Mr. Staves went

7     there yesterday to get that for me.  What I noticed was --

8          THE COURT:  So you have an expert go the day the

9     trial starts, to get something?

10         MR. VESPER:  Just to get this, to get this -- wait.

11    Here's what happened.  I find out on their -- on their

12    website, they reference this campground, they reference Pine

13    Haven.

14         THE COURT:  They just put it on yesterday.

15         MR. VESPER:  Yes.

16         THE COURT:  Was it there a week ago, two weeks ago,

17    six weeks ago, ten years ago?

18         MR. VESPER:  Ten years.  It was probably there ten

19    years ago.  But they list this campsite as one of their

20    campsites.

21         THE COURT:  Mr. Vesper, safety precautions taken at

22    sites owned by Diversified might well be relevant, I don't --

23    it's classic.  Excuse me, I don't even think I'm stretching

24    the law on that one, I think that's --

25         MR. VESPER:  But I can't use this?

*United States District Court*
*Camden, New Jersey*

JORDAN – DIRECT – VESPER

1          THE COURT:  Well, here's what I'm going to do.  I'm

2   going to mark this and I'm going to let you question him as to

3   what --

4          MR. HERMESMANN:  Judge --

5          THE COURT:  If he knows anything about this.

6          MR. HERMESMANN:  Judge, I've got an ongoing objection

7   and if we're bringing up a campsite that their expert knows

8   about and here we are I'm hearing about it on the day of

9   trial, nobody should be able to talk about it because I'm not

10  able to --

11         THE COURT:  No, the fact that the expert went

12  yesterday to get this, to me, is another nail in the coffin of

13  that expert, but the -- he raises to new hiatus the concept of

14  a shoddy job.

15         MR. VESPER:  I asked him to go, Judge.

16         THE COURT:  But if he, who is a general manager of

17  one of the three or four, whatever number they own, has

18  knowledge of what they do here, I'm going to allow it.

19         MR. HERMESMANN:  Well, Judge, I request a 104 hearing

20  outside of the presence of the jury, rather than taint the

21  jury to hear about a campsite I haven't heard about.

22         THE COURT:  Okay.  To grant that, send the jury out.

23  Do it right now.

24         MR. VESPER:  Your Honor, the jury.

25         THE COURT:  Yes.

RULE 104 HEARING — JORDAN

1          (END OF SIDEBAR.)

2          THE COURT:  Larry, we're going to send the jury out

3   for a few minutes.

4          THE DEPUTY CLERK:  All rise.

5          (JURY EXITS; 12:24 p.m.)

6          THE COURT:  Okay, you can be seated, please.  Are you

7   familiar with the Round Top?

8          THE WITNESS:  I've been there once.

9          THE COURT:  When was that?

10          THE WITNESS:  It was either last year or the year

11   before.  I had been there for like ten minutes.

12          THE COURT:  What caused you to go there?

13          THE WITNESS:  To say hi to the manager.

14          THE COURT:  You said you were there ten years

15   earlier?

16          THE WITNESS:  No, not there, no, sir.

17          THE COURT:  Okay.  Well, when you got there,

18   presumably, you went through the gate, I assume there's a

19   gate.

20          THE WITNESS:  Well it was wintertime, so --

21          THE COURT:  The place was closed when you went there?

22          THE WITNESS:  He's got some annuals that people stay

23   year-round, so he works year-round.

24          THE COURT:  Okay.

25          THE WITNESS:  And I don't remember a gate.

*United States District Court*
*Camden, New Jersey*

RULE 104 HEARING – JORDAN

**1**          THE COURT:  Okay.  So you went in and did you meet

**2**  the manager?

**3**          THE WITNESS:  I did, Brent.

**4**          THE COURT:  They have a pool, at least this brochure

**5**  I got, that apparently, their punitive expert went out and got

**6**  it --

**7**          THE WITNESS:  Okay.

**8**          THE COURT:  -- yesterday.  It shows a pool.  I don't

**9**  see a lake on here, but I do see a pool.  Did you -- when you

**10**  talked with this guy, did you talk about the pool in any way,

**11**  shape or form?

**12**          THE WITNESS:  No, sir.

**13**          THE COURT:  Did you mention it?  Did you --

**14**          THE WITNESS:  No.  I wouldn't have any reason to.

**15**          THE COURT:  Did you discuss any safety measures that

**16**  were done?

**17**          THE WITNESS:  No, sir.

**18**          THE COURT:  Do you know what kind of safety measures

**19**  the gentleman, your --

**20**          THE WITNESS:  Brent?

**21**          THE COURT:  Your parallel guy at this place?

**22**          THE WITNESS:  I do not.  I don't know what the State

**23**  of Pennsylvania requires.  I have no idea what he does.

**24**          THE COURT:  No, no, that's not the question I asked.

**25**  The question is, do you know what he does to make that pool

*United States District Court*
*Camden, New Jersey*

1   safe?

2          THE WITNESS:  No, sir.

3          THE COURT:  Did you see the pool?

4          THE WITNESS:  No, sir.

5          THE COURT:  I mean, when you were there, did --

6          THE WITNESS:  I don't remember seeing it.

7          THE COURT:  You don't remember laying eyeballs on it?

8          THE WITNESS:  It would have been closed and covered,

9   so I probably wouldn't have noticed it.

10         THE COURT:  Okay.  Any questions you want to ask him,

11  either side?

12         MR. VESPER:  No, Your Honor.

13         MR. HERMESMANN:  I have no questions.

14         THE COURT:  What is it that -- what are we going to

15  get from this witness?

16         MR. VESPER:  He doesn't know that the -- and I would

17  represent to the Court that the manager does live on-site.

18  You don't know that?

19         THE WITNESS:  Yes, I do know that.

20         THE COURT:  I think he even said that.

21         MR. VESPER:  Well, then, that fact you do know.  And

22  do you know whether the manager on-site patrols himself?

23         THE WITNESS:  I don't know that.

24         MR. VESPER:  All right.  And you don't know whether

25  he has people with him that go around throughout the day or

1 night?

2        THE WITNESS:  I know nothing about the way he

3 operates.

4        MR. VESPER:  But you do know he lives on-site.

5        THE WITNESS:  I do.

6        MR. VESPER:  Well, the fact is, this other operation

7 by Diversified, does patrol that top --

8        THE COURT:  Well, you know, if you had -- look, it's

9 not that this is some secret point.  It's been known for years

10 that Diversified has other operations.  It's certainly is not

11 a subtle point in discovery to find out what companion -- I

12 call it companion -- related companies are doing for safety.

13 I even told you, you know, if they had a situation where they

14 were patrolling far more extensively than they were, I think

15 that might -- might be relevant.

16        MR. VESPER:  Right.

17        THE COURT:  But you can't come up after a pretrial

18 that's a hundred pages long, this document isn't even

19 mentioned, the other site, in his expert report, he talks

20 about his being head of KOA.  This is not a KOA operation, I

21 don't believe.

22        THE WITNESS:  No, sir.

23        THE COURT:  It's got nothing to do with KOA.  He

24 never mentions it, he doesn't make a point, well, I've looked

25 at the four other units that Diversified -- Diversified owns.

*United States District Court*
*Camden, New Jersey*

**1**          THE WITNESS:  Yes, sir.

**2**          THE COURT:  And I find that in three of them, they

**3** are patrolling, and, you know, the lights going on and noise

**4** blaring and sensor motions, but at this place here in New

**5** Jersey, they have none of that.  Well, I think that would be

**6** very interesting testimony.  But you can't come up with that

**7** the day after the trial starts.

**8**          MR. VESPER:  All right.  May I ask a different line

**9** of questions, since the jury is out?

**10**          THE COURT:  I'm letting you ask him anything -- this

**11** is a 104 hearing.  Anything that you think --

**12**          MR. VESPER:  Thank you.

**13**          THE COURT:  -- may bear on his admissibility, go ask

**14** him.

**15**          MR. VESPER:  All right.

**16** BY MR. VESPER:

**17** Q.   You testified at your deposition, when I asked you if

**18** after the drowning, any changes were made.

**19**          Do you remember your testimony?

**20** A.   I do remember, yes.

**21** Q.   Yeah, and you said no changes were made?

**22** A.   None, yes, sir.

**23** Q.   Right.

**24** A.   To the lake.  You asked me to the lake?

**25** Q.   Yeah.  Any changes made for the safety of people, your

RULE 104 HEARING – JORDAN

1   operation --

2           THE COURT:  That wouldn't be admissible anyhow.

3           THE WITNESS:  Not that I remember, no, sir.

4   BY MR. VESPER:

5   Q.   You said there were no changes made.

6   A.   Okay.

7   Q.   At the present time, your maintenance people are

8   patrolling every day and at night during the season, aren't

9   they?

10  A.   No, they're not doing anything different than we did in

11  2010, my maintenance department.  If they need to be out and

12  out, they're out.  They're not out as -- looking and trying to

13  catch people doing things.  The maintenance department also

14  leaves when the store closes.

15          THE COURT:  You mean he leaves the premises?

16          THE WITNESS:  Yes.

17          THE COURT:  The entire site.

18          THE WITNESS:  The maintenance department is in golf

19  carts though, so if they have anywhere to go, they go out,

20  they go ride around, they look for leaves to pick up, they

21  look for trees, you know, work that needs to be done, things

22  like that.  I don't just have them sitting in the maintenance

23  shop doing nothing.

24  BY MR. VESPER:

25  Q.   So let me correct this.  Your maintenance people don't

1  patrol at any time?

2  A.   Yes, they do.

3  Q.   Okay.  Your maintenance people patrol on Fridays and --

4        THE COURT:  He's used the word "patrol."  They don't

5  patrol specifically the lake.  They're not going around the

6  lake to make sure that nobody is in it.

7        THE WITNESS:  Correct.  Never.  They are patrolling

8  for maintenance work.  They're looking for things that need to

9  be done.

10  BY MR. VESPER:

11  Q.   And they're not tasked -- well, they have this culture of

12  looking to enforce the rule, though, as they're driving

13  around.  Yes?

14  A.   That is my goal, yes, sir.

15  Q.   All right.  So your maintenance people who are driving

16  around for maintenance but also to enforce the rules about the

17  swim lake, are they driving around now every night?

18  A.   No, they're only there until the store closes.

19  Q.   Okay.

20        THE COURT:  At 7 o'clock.

21  BY MR. VESPER:

22  Q.   And that's at 7 o'clock.

23  A.   Or at 5.  Right now it closes at 5, once the season

24  starts.

25  Q.   The season hasn't started.  So when the season starts,

RULE 104 HEARING – JORDAN

1   are there now security people that patrol more than just

2   Friday and Saturday nights?

3   A.   No, sir.

4          THE COURT:  Now, you just changed the -- that's the

5   kind of subtle changes.  You said security people, he's been

6   talking about maintenance people.

7          MR. VESPER:  Right.  I'm not talking about

8   maintenance people.  I'm not trying to subtly change it.

9          THE COURT:  He hasn't even said there are any

10  security people.

11  BY MR. VESPER:

12  Q.   Don't you still have -- don't you have the Friday,

13  Saturday and special weekend mobile patrol?

14  A.   I will, yes, sir.

15  Q.   Yeah, when the season starts.

16  A.   Starting Memorial Day.

17  Q.   And do those -- and those are called the mobile patrol?

18  A.   Rover.

19  Q.   The rovers.  Do the rovers rove more than they did in

20  2010?

21  A.   No, sir, not that I know of.  I mean, I haven't changed

22  anything, if that's -- if I specifically tasked them to do

23  anything different, no, sir.

24          MR. HERMESMANN:  Judge, there's no indication --

25          THE COURT:  Wait a minute, let him finish.  Go ahead.

RULE 104 HEARING - JORDAN

1          MR. VESPER:  No, I'm finished.  I'm finished.

2          THE COURT:  Okay.  You can ask questions.

3          MR. HERMESMANN:  I don't have questions, Judge, I

4    just want to move along.  I mean, the Little Round Top --

5    again, I didn't hear about it until literally 15 minutes ago

6    for the first time.  There should be no reference to it.  The

7    jury has already been tainted, relative to hearing about at

8    least the implication that there's another site out there that

9    they're doing something different.

10          THE COURT:  I'm not going to allow any questions of

11   Little Round Top.  I'm not going to allow this exhibit, and I

12   must say, in a case as serious as this, a death case, to be

13   looking at -- it's one thing if they had a thousand camps, but

14   they only have, what, four owned by --

15          THE WITNESS:  Five now.

16          THE COURT:  Five owned by Diversified.  It's not like

17   there's a huge universe out there, and it seems to me that --

18   it wouldn't take a whole lot of discovery to find out what

19   kind of, A, do they have swim lakes, do they have swimming

20   pools, what kind of water do they have, and what kind of

21   safety do they do.

22          And you can't decide you're going to look into that the

23   day after the case.  And literally, I'm shocked by that.

24          So you can continue with the witness, but I'm --

25          MR. HERMESMANN:  Well, I just have one other point

*United States District Court*
*Camden, New Jersey*

1   unrelated to Little Round Top.  Any questions regarding

2   subsequent remedial measures should not be admissible and

3   should not even be asked.

4          MR. VESPER:  I'm not.  I'm not.

5          THE COURT:  There's a rule of evidence on that.

6          MR. VESPER:  Right, I'm not going to ask it.

7          MR. HERMESMANN:  I believe it's 412.

8          THE COURT:  You know that in 1966, I tried a case,

9   when the very famous civil rights lawyers, plaintiff's lawyer,

10  she came out and the first question she was asked, the

11  plaintiff was asked, by -- cross examination was, didn't the

12  defendant come out and repair the damage?  I jump up and

13  yell -- I'm a one-year lawyer -- screaming.  Judge Ackerman

14  marches the jury out, lectures her, says don't ask that

15  question, it's improper.  I had moved on it before.

16         She comes out again, first question out of her mouth,

17  didn't the defendant repair the damage right after the

18  accident?  So it happens three times, goes out, comes in, so

19  now the day is over, I'm back in my office, I'm a one-year

20  associate, and Judge Ackerman, later a federal Judge for many

21  years here, calls me and says, she's driving me crazy.  She's

22  a judge, what can I do?  I said I don't patrol what she does.

23  She's a famous lawyer, she does what she does.  I want to

24  settle the case.  Judge -- I want to call your adjuster.

25         I said, Judge, do whatever you want, I don't tell you

1   what to do.  He said, come in at 8 o'clock in the morning, I'm

2   going to call Clancy, that's his name actually.  He gets on

3   the phone with Clancy, the carrier, and says, you have 900

4   cases before me, I want you to settle this one, and guess

5   what?  It was settled in ten minutes.

6          But the bottom line of all of that is, you can't ask

7   whether there's been any changes made in the method of

8   operation, safety.

9          MR. HERMESMANN:  Judge, can we take three minutes to

10   run to the men's room, head call?

11          THE COURT:  All right.  Go ahead.

12          MR. HERMESMANN:  Thank you.

13          THE COURT:  Anybody who wants to, we will take three

14   or four minutes.  I'm not even going to go off the bench.

15          THE WITNESS:  Me, too.

16          THE COURT:  Sure.  If you want to go, sure.  Oh, but

17   do not -- do not talk to --

18          MR. HERMESMANN:  I won't talk to him, Judge.

19          THE COURT:  Yeah, do not talk to him.

20          THE WITNESS:  To my attorney.

21          THE COURT:  Do not talk to your attorney.

22          (RECESS TAKEN; 12:35 p.m.)

23          THE DEPUTY CLERK:  All rise.

24          (JURY ENTERS; 12:42 p.m.)

25          THE COURT:  Okay.  Everybody, please be seated.

JORDAN – DIRECT – VESPER

1        Mr. Vesper, you can continue.

2           MR. VESPER:  Thank you, Your Honor.

3   BY MR. VESPER:

4   Q.  Mr. Jordan, in 2010, did any employee of Pine Haven live

5   on-site?

6   A.  No, sir -- well, yes, yes, I did.  I had a store employee

7   that lived on-site in the back.

8   Q.  When you say "in the back," where?

9   A.  In the very back of the campground.  She had a trailer

10  back there.

11  Q.  And she worked for --

12  A.  In the store.

13  Q.  But there was nobody from management or maintenance that

14  lived on-site?

15  A.  No, sir.

16  Q.  And on Sunday, August 8th, at around the time of the

17  drowning, around 8 o'clock, the only employee on duty for Pine

18  Haven was the guard at the gate?

19  A.  The gate attendant, yes, sir.

20  Q.  I'm sorry, the gate attendant.  We've been -- the gate

21  attendant.  All right.

22          Now, two more questions -- in the line of the question.

23  In the United States -- I guess, in the United States and

24  Canada, do you know, there's -- there's private-owned

25  campgrounds and camp resorts and then there's government

*United States District Court*
*Camden, New Jersey*

1  campgrounds and camp resorts.  Are you familiar with that?

2  A.    National Park Service camps, campgrounds?

3  Q.    Yes.

4  A.    Correct.

5  Q.    If you added up all the government camps and the

6  privately-owned camps, do you know roughly how many there are?

7  A.    No, sir.

8  Q.    I mean, it's -- if I told you --

9           THE COURT:  No, no, no, no.  You're not testifying.

10          MR. VESPER:  No, I'm not.

11 BY MR. VESPER:

12 Q.    Do you know if it's more or less than 10,000?

13 A.    I don't know.

14 Q.    Okay.  So just in the United States alone, do you know

15 how many private campgrounds there are?

16 A.    No, sir.

17 Q.    All right.  Again, you wouldn't be able to estimate

18 whether it was 5,000 or 50,000, you just don't know?

19 A.    I do not.

20 Q.    So you -- if you don't know how many campsites there are,

21 do you know whether or not the majority of the campsites --

22          MR. HERMESMANN:  Objection.

23          THE COURT:  I haven't heard the question yet.  Finish

24 the question.

25 BY MR. VESPER:

JORDAN - DIRECT - VESPER

1   Q.   Don't answer the question.  So here's the question:  Do

2   you know if the majority of the privately-owned campsites, not

3   the government-owned, but the majority of the privately-owned

4   campsites do or do not have round the clock surveillance after

5   closing hour surveillance, so stop --

6           THE COURT:  Hold it.  Surveillance is a pretty broad

7   term.

8           MR. VESPER:  I'll rephrase it.

9           THE COURT:  All right.

10          MR. VESPER:  Okay.  Let me rephrase it.

11  BY MR. VESPER:

12  Q.   You're -- the rover?

13  A.   Yes, sir.

14  Q.   The employee that rides around on the golf cart to

15  enforce the rules of the park --

16          THE COURT:  From 10 to 2.

17          MR. VESPER:  Yes.

18          THE COURT:  Only twice a week.

19          MR. VESPER:  Yes.

20  BY MR. VESPER:

21  Q.   They -- in Pine Haven, we know that it's a limited period

22  of time and a limited number of days.  Do you know whether or

23  not the majority of the privately-owned campgrounds, camp

24  holiday grounds or camp resorts, all of them, privately-owned,

25  have a rover to enforce its rules and regulations for safety

JORDAN – DIRECT – VESPER

1   for every night of the week?  Do you know?

2          MR. HERMESMANN:  Objection.

3          THE COURT:  Do you know?

4          THE WITNESS:  Do I know or do you want a professional

5   opinion?

6          THE COURT:  No, I don't want a professional opinion.

7   Do you know?

8          THE WITNESS:  No, sir, I do not.

9          THE COURT:  Okay.  Next question.

10         MR. VESPER:  All right.

11  BY MR. VESPER:

12  Q.  And do you know, same number -- whatever the number is of

13  privately-owned campgrounds or camping resorts, if they employ

14  surveillance cameras, whether or not they put surveillance

15  cameras over every swimming area?  Do you know?

16  A.  I do not.

17  Q.  And do you know if somebody, in however many camping

18  grounds, camping resorts there are in the United States, once

19  they do utilize a surveillance camera, whether they actually

20  monitor it, you know, like look --

21         MR. HERMESMANN:  Objection, Your Honor.

22         THE COURT:  He answered he doesn't know.

23  BY MR. VESPER:

24  Q.  You don't know?

25  A.  I don't know.

*United States District Court*
*Camden, New Jersey*

JORDAN - DIRECT - VESPER

1        THE COURT:  How would he possibly know?

2        MR. VESPER:  He might have read it, Your Honor.  I

3   mean, he's in the business.  How would he know?  How would I

4   know the law?

5        THE COURT:  These campgrounds vary so markedly.  Some

6   have artificial lakes and probably the majority do not have

7   artificial lakes.

8        MR. VESPER:  That's why they are categorized.  If I

9   may?

10        THE COURT:  You can't testify.

11        MR. VESPER:  All right.  If I may?  Let me question.

12   BY MR. VESPER:

13   Q.  So, Mr. Jordan --

14        THE COURT:  If this is going to be an argumentative

15   question, I'm not going to allow it.

16        MR. VESPER:  No, it's not.

17        THE COURT:  Sounds like that's where it's heading.

18        MR. VESPER:  I was going to ask him about the

19   surveillance cameras.

20   BY MR. VESPER:

21   Q.  Did you consult, other than with Mr. Scarpa, did you

22   consult with any -- anybody, any kind of safety expert or

23   somebody in -- or involved with surveillance cameras, did you

24   consult with anybody, other than Mr. Scarpa, about where to

25   place your surveillance cameras that you placed when you took

1  over?

2  A.  No, sir.

3  Q.  And for -- this is a different question.  Probably the

4  second line of questions, so with respect to supervision that

5  you expect as the general manager, the adult parental

6  supervision, correct, that you -- I mean, you expect that when

7  an adult brings, or a parent brings a child onto the Pine

8  Haven Camping Resort, that they --

9       THE COURT:  A minor child.

10      MR. VESPER:  Yeah, a minor.

11 BY MR. VESPER:

12 Q.  That they're going to supervise them, correct?

13 A.  I do.

14 Q.  And just so we all understand, and you, as the general

15 manager, you believe that supervision by the -- by the parent

16 is all the time wherever they go; isn't that true?

17      THE COURT:  That's a confusing question.  Does the

18 question mean that the parent is with the child 24/7?  Is that

19 what you're asking?

20 BY MR. VESPER:

21 Q.  Here's what I'm asking.  If a camper tells a child under

22 his control not to go swimming, and the child agrees to that,

23 is that adequate supervision?  Do you know what your answer

24 was?

25 A.  I don't remember, but I would think it would be no.

1  Q.   It was no.  Yeah, you're consistent.  You don't believe

2  that a parent telling a child not to go in the water is enough

3  supervision, correct?

4  A.   Correct.

5  Q.   Because in your --

6        THE COURT:  No, no, no.  He's answered the question.

7        MR. VESPER:  Right, I'm asking the next question.

8  BY MR. VESPER:

9  Q.   So what you believe --

10       THE COURT:  You want to make an argument.

11       MR. VESPER:  No, I want to ask him a question.

12       THE COURT:  What's the next question?  What's the

13 next factual question?

14 BY MR. VESPER:

15 Q.   The parents have to -- the next question that was asked

16 of you that day was:  So parents have to follow them, the

17 children around to make sure they don't go swimming?  That's

18 what parental supervision is required.

19       Do you remember you said, yes, and then the question

20 was:  No matter what?  And you said, no matter what.

21       Do you still believe that?

22 A.   I believe they're responsible.

23 Q.   So parents have to follow them -- I'm reading now from

24 Page 159.  Do you want to see your question?

25 A.   No, I believe it.

JORDAN - CROSS - HERMESMANN

1  Q.   All right.   Thank you for believing me.

2       This is on Page 159, Line 17:  So parents have to

3  follow them, the children, around to make sure they don't go

4  swimming?

5       And your answer was:  Parents are responsible.

6       And the question was:  No matter what?

7       Your answer was:  No matter what.

8  A.   And you're asking me what I believe today?

9       THE COURT:  Stop.  He's asking you if you said that

10 and you did say that.

11      THE WITNESS:  I did say that, yes.

12      MR. VESPER:  No further questions.

13      THE COURT:  Okay.  Mr. Hermesmann?

14      MR. HERMESMANN:  Thank you, Your Honor.

15      THE COURT:  By the way, I don't want questions on

16 cross, I want direct questions, even though this is

17 technically cross examination.

18      MR. HERMESMANN:  It is my intent to ask him direct

19 questions only.

20      THE COURT:  I want direct questions.

21      MR. HERMESMANN:  That is my intent.

22 (CROSS EXAMINATION OF MICHAEL TERRY JORDAN BY MR HERMESMANN:)

23 Q.   Mr. Jordan, if you would, just try to project to me.

24 A.   Yes, sir.

25 Q.   If I can hear you, I'm sure they can hear you.

*United States District Court*
*Camden, New Jersey*

JORDAN - CROSS - HERMESMANN

1          Let me start with your background in the hospitality

2     industry.  Tell us a little bit about your background in the

3     hospitality industry.

4     A.   Started, really, in construction work and then

5     transferred into the maintenance department for a Holiday Inn

6     Hotel back in the early '80s, and wanted to be a general

7     manager and went to food and beverage for about 15 years.

8     Opened up a -- as a general manager, my first hotel was a

9     Hampton Inn in South Florida, the 200 Hampton Inn, and then I

10    managed for a small company for ten years, I ran five small

11    properties and then a full service Hilton Hotel at the airport

12    in Cincinnati, a 385-room hotel, I was general manager there

13    for a few years.

14         Then with Marriott for a little while, and then I ran a

15    guest ranch right before I came to work for Diversified in

16    Texas.  My wife and I managed a lodge in south Texas on the

17    shore.

18    Q.   And then, I think you testified earlier, you worked for

19    another Diversified property --

20    A.   I did.

21    Q.   -- before Pine Haven?

22    A.   I was hired -- excuse me for interrupting.  I was hired

23    in Texas and we were transferred to Wisconsin.  I spent two

24    years at a -- I think it was a 325-site park, with an 800-acre

25    lake and two swimming pools, and a lot of -- same type of

JORDAN – CROSS – HERMESMANN

1   structure amenity-wise, and I was the GM there for two years

2   and then I transferred here in January of 2010.

3   Q.   Between the hotels, the ranch, and the other Diversified

4   property, any of them have either lakes or pools?

5   A.   I had a pool at the -- well, all the hotels had pools,

6   all of them.  I think the Hilton had two.  The ranch in Texas

7   had a -- we had a small lake.  We had a couple pools and we

8   also had an ocean.  It was right on the ocean, and then we had

9   -- Neshonoc had two swimming pools and a lake and then here we

10   have two pools and a lake now.

11   Q.   I'm going to ask you some questions about Pine Haven and

12   we're going to use the exhibit that you were referring to

13   earlier.

14   A.   Okay.

15   Q.   Can you all see?  Can you see it?

16   A.   I can see it, yeah.

17   Q.   This exhibit, what is it?

18   A.   This is a map of our camping resort.

19   Q.   And is it to scale?

20   A.   No, sir, it's not.

21   Q.   Can you give some examples, at least around the lake in

22   question, as to what's not to scale?

23   A.   The entranceway is quite a bit father up than you look

24   there.  You can't see the lake from the entrance at all.  The

25   store, right here, it says office store, is a little bit more

JORDAN – CROSS – HERMESMANN

1   this way and the lake is down.  There's a nice beach all the

2   way around the lake, it's down.  The arcade is over to the

3   left a little bit and possibly back, and it's a longer

4   building.  The playground right there that you see to the left

5   of the lake --

6   Q.  Where -- if you want to come down instead of having to

7   reach like that, why don't you do that?

8   A.  All this is way back here.  The maintenance shed is right

9   here.  This right here is really right here, so you drive in

10  this way and then you have the lake.  Piney's Palace is pretty

11  much right in the middle of the lake, and this all comes down

12  this way.

13       This playground is more like right in here.  You can

14  see the lake from it and you can access the lake from it, but

15  this playground is for small kids, it has a little bouncy

16  thing it has and some swing sets and monkey bars, things like

17  that.  The game room runs up here pretty much like where the

18  arcade is there.

19  Q.  How about -- is there -- are there trees in and around

20  the lake in any particular area?

21  A.  There are.  Behind the lake itself, there are -- again,

22  this is over here, so this is wooded back here.  So again, the

23  sign in question that Mr. Vesper was asking me about, you have

24  one right here, that faced this way, and then you also have

25  some sporadic trees along the edge of the road that run up

JORDAN – CROSS – HERMESMANN

1    here.  But around the lake itself, it's not wooded.

2        MR. HERMESMANN:  Judge, I'm going to have to retrieve

3    my blowup of the lake.  I think it's up over here.  Thank you.

4    Let's take a look.

5        THE COURT:  Which is this?  Can I see it?

6        MR. HERMESMANN:  I'm sorry.

7        THE COURT:  Has it been marked before?

8        MR. HERMESMANN:  I think he designated it as D-1, I

9    think, Your Honor.

10       THE COURT:  D-1?

11       MR. HERMESMANN:  Wasn't it?

12       THE COURT:  Okay.

13   BY MR. HERMESMANN:

14   Q.   Just if you could, orient the jury to the lake vis-a-vis

15   the blowup there.

16   A.   Okay.  This is the backside of the lake, where you see

17   those trees is right along here.  This right here, there's a

18   road right there, that you could -- as you can see, you can

19   see the white post right there, those trees are on the other

20   side of the road.  The building right here, the activity

21   center, is right in this area but back on the other side of

22   the road.  The store --

23       MR. VESPER:  I'm sorry, where?  What's on the other

24   side of the trees?  I didn't see it.

25       THE WITNESS:  The other side of the road.  Piney's

JORDAN – CROSS – HERMESMANN

1  Palace.

2          MR. VESPER:  Thank you very much.

3          THE WITNESS:  This is the west end of the lake.

4  BY MR. HERMESMANN:

5  Q.  Show us where the west end is there.

6  A.  This end here.

7  Q.  So that's where you just pointed to equates to where,

8  approximately?

9  A.  Right about here.

10  Q.  Okay.

11  A.  The arcade -- excuse me, the office is back over here.

12  This office building here is up the beach and across the road

13  and it sits about right here.  So if you're looking out the

14  office, you can see a little bit of the lake but not the

15  entire lake.

16          MR. VESPER:  Thank you.

17  BY MR. HERMESMANN:

18  Q.  You can get back there.

19      What's the total acreage at Pine Haven?

20  A.  85, 85 acres.

21  Q.  85 acres.  And the diagram shows various road network.

22  What's the total mileage?

23  A.  Four-and-a-half, four-and-three-quarters miles.

24  Q.  And how do people typically get in and around the

25  campground once they're there?

JORDAN - CROSS - HERMESMANN

1   A.   Once they're there, most of them have golf carts and they

2   ride around in golf carts and bicycles, things like that.  But

3   mainly golf carts.

4   Q.   And I take it on feet also?

5   A.   Yeah, a lot of walking, yes, sir.

6   Q.   And what type of activities do you offer?

7   A.   Well, we have an activity center where we -- one of the

8   main focuses of Pine Haven, it's a very family-oriented park

9   and so we gear the activities for the children.  Well, we have

10  activities during the season, almost every day, and then out

11  of season on the weekends, and it's geared towards anywhere

12  from 4 up to 10 to 12 year old children in the activity

13  building, and then we'll have -- we have cardboard boat races,

14  you know, where you build cardboard boats, father and son

15  things.

16       We have activities where we will bring in a magician.

17  We bring in pony rides and we do -- we give them complimentary

18  pony rides to the kids that want to ride.  We have western

19  weekends, it's a theme park where monthly -- excuse me,

20  weekly, every weekend is a different thing.

21       We'll have a Disney weekend and a western weekend,

22  Hollywood weekend, and it's really -- it's a nice place for

23  the family and the kids.  That's one of the reasons that I

24  have the guests stay so long there, is because we focus on

25  that and we try to make it different.

JORDAN - CROSS - HERMESMANN

 1          Since we're all seasonal, which means that the people

 2   stay there year after year, we have to be very creative, so

 3   every year we have to come up with different activities which

 4   sets us kind of apart from the other competition, because, you

 5   know, we watch these kids grow up, you know, the ones that I

 6   was there five years ago, now some of them getting ready to

 7   graduate high school, and they get away from the cities, they

 8   get out and they sit around the fire, you know, it's a -- we

 9   try to promote a very family wholesome environment, and we do

10   a pretty good job of it, I think.

11   Q.   You mentioned that the campground is seasonal.  What do

12   you mean by that?

13   A.   Everybody there is a permanent -- their trailer stays

14   there the whole summer.  We call it the poor man's beach

15   house, because three-and-a-half miles away, you know, a place

16   is $2,000 a week.  You can stay in the campground there for 3

17   of 4,000 for the whole summer.

18          They put their campground there -- I mean, their camper

19   and the activities are all included.  The amenities are

20   included.  They are three-and-a-half miles from the beach.

21   They are centrally located down at the shore area, which most

22   people --

23          THE COURT:  Is there electric and water hookup?

24          THE WITNESS:  Everything, water, sewer, septic,

25   electric.

JORDAN – CROSS – HERMESMANN

1              THE COURT:  At each pad?

2              THE WITNESS:  Yes, sir.  And the -- and cable.

3         The -- great location.  It's right pretty much in

4    between Wildwood and Ocean City and Cape May and Atlantic

5    City, in the busiest area.  I don't know if people from Jersey

6    know it, but that's the busiest area in the country, as far as

7    beaches go.

8    BY MR. HERMESMANN:

9    Q.   You had mentioned that they bring their own trailer

10   there.  How does that work?

11   A.   They pull it in or they buy it and have it delivered and

12   it's set up on a site.  It's usually blocked up with

13   cinderblock, and some people put skirting on it.  They will

14   add decks and put outdoor gazebos, you know, they turn it into

15   their little place at the shore.  It's amazing what they do

16   with it.

17   Q.   In the approximate 600 sites, how many are people that

18   come down and actually rent or lease those sites for a season?

19   A.   I have 577 seasonal sites and I have 53 cabin rents, so

20   577 want to rent them for the season.  The cabin rentals are

21   the transients that rent them, you know, minimum two nights.

22   Q.   The cabin rentals are owned by Pine Haven?

23   A.   Correct.

24   Q.   And everything else, people enter into a lease to bring

25   either RV or trailer, whatever it might be, to locate it there

JORDAN – CROSS – HERMESMANN

1   at the site?

2   A.   Yes, sir.

3          THE COURT:  It's really a license, rather than a

4   lease, isn't it?

5          THE WITNESS:  It is, it is.  It's a seasonal

6   agreement.

7          THE COURT:  You would call it a license to use it

8   rather than a technical real estate lease.

9          THE WITNESS:  It's not a contract, exactly.

10  BY MR. HERMESMANN:

11  Q.   When does the season begin?

12  A.   We open the first weekend in April and we close the

13  middle weekend in October.

14  Q.   And what is your role with Pine Haven?

15  A.   I'm the general manager.  I'm responsible for everything.

16  I'm responsible for people's safety, I'm responsible for their

17  enjoyment and their experience, you know, for my staff, for

18  the revenues, for the profits, I mean everything.  That's what

19  I am there and what I do a lot is I'm out -- I'm constantly

20  out because I -- the reason I do this --

21          MR. VESPER:  Can we just object and -- none of this

22  seems related to my questions.  Isn't the cross supposed to be

23  related?

24          THE COURT:  The truth of the matter is, this witness

25  should have taken 20 minutes both direct and cross.

*United States District Court*
*Camden, New Jersey*

JORDAN – CROSS – HERMESMANN

1          MR. VESPER:  Yes.

2          THE COURT:  Because there's no dispute as to what

3    he's saying.

4          MR. VESPER:  I don't disagree about the direct.  The

5    direct should have been shorter, but -- is this relevant?

6          THE COURT:  I don't know.  I'm going to allow it.  Go

7    ahead.

8          MR. VESPER:  Very well.

9          THE WITNESS:  The reason that my wife and I do this

10   is because we --

11         MR. VESPER:  Again, let me object.  Why is the reason

12   for he and his wife -- is that --

13         THE COURT:  Yeah, I'm going to sustain that

14   objection.

15         MR. VESPER:  Thank you.

16         MR. HERMESMANN:  That's fine.

17         THE COURT:  All right.  Next -- next question.

18   BY MR. HERMESMANN:

19   Q.   The staff that's in place during the season, how many

20   individuals does that consist of and what roles?

21   A.   I have approximately -- this year, it's increased a

22   little bit.  It will be up to 31 in 2010.  It was 20 to 30,

23   I'm not sure of the exact amount -- number of people.  I have

24   people that are in the retail end of it, the store side, I

25   have people in housekeeping for the cabin rentals and also for

JORDAN - CROSS - HERMESMANN

1   public area cleaning.  I have maintenance staff and I have

2   gate attendants and the activity staff.

3           THE COURT:  And you also have the rovers.

4           THE WITNESS:  Well, the rovers are the gate

5   attendant, yes, sir.  I'm sorry, and the rovers and the

6   activity staff.

7   BY MR. HERMESMANN:

8   Q.  And you testified on direct examination that the

9   campground is regulated; is that correct?

10  A.  It is, yes, sir.

11  Q.  And do you know by whom it's regulated by?

12  A.  Well, again, I get inspected by the Department of

13  Environmental Protection in New Jersey.  I get inspected by

14  the Cape May County Health Department.  The Dennis Township

15  inspects our electrical bonding certificates and makes sure

16  that we are in compliance with any improvements or things that

17  we do to the park, as far as building permits, things like

18  that, and then we are in compliance with the DOG regulation --

19  or DOJ, excuse me, regulation about the chair lifts for the

20  swimming pool.

21          MR. HERMESMANN:  Your Honor, may I approach the

22  witness?

23          THE COURT:  Yes.

24          MR. HERMESMANN:  Your Honor, would you like a copy of

25  this exhibit?

*United States District Court*
*Camden, New Jersey*

JORDAN – CROSS – HERMESMANN

1          THE COURT:  Yes, I would.

2          MR. HERMESMANN:  It's D-40.

3          THE COURT:  Was this marked prior to the --

4          MR. VESPER:  We have no objection.

5          THE COURT:  You have no objection?

6          MR. VESPER:  No.

7          THE COURT:  Okay.  Go ahead.  Did you say D-40?  Is

8   that what you said?

9          MR. HERMESMANN:  I did.  Your Honor, let me -- Your

10  Honor.

11          THE COURT:  Go ahead.

12  BY MR. HERMESMANN:

13  Q.   Mr. Jordan, let me show you what we have marked as D-40.

14       Do you recognize that document?

15  A.   Yes, sir.

16  Q.   What is it?

17  A.   It's the inspection certificate from Cape May County

18  Health Department from July 21st of '10.

19  Q.   Which would have been about three weeks or so before this

20  incident occurred?

21  A.   Yes, sir.

22  Q.   And what were they inspecting?

23  A.   This one is for the lake.

24  Q.   And specifically as to the lake, did they go through a

25  checklist as to what was required to pass the sanitary code

JORDAN - CROSS - HERMESMANN

1  inspection?

2  A.   Well, they have everything checked down here, yes, in

3  compliance, as far as emergency equipment, the beaches

4  provided -- we had a rope on the beach, I forgot about that

5  one.  We have a long rope that we have to have on the beach in

6  case of emergencies.  But all the equipment was in place and

7  the signage was in effect.  Everything was in compliance.

8  Q.   At the top of that document, did they mark it

9  satisfactory or not satisfactory?

10  A.   Satisfactory.

11        MR. HERMESMANN:  Your Honor, I would move D-40 into

12  evidence, please.

13        MR. VESPER:  I'm going to object to its relevance,

14  but it's been talked about.

15        THE COURT:  I'm sorry.  You object to it being

16  admitted?

17        MR. VESPER:  Yes.  It has no probative value.  Can we

18  be heard later?

19        THE COURT:  Well, let me say this.  You raised it.

20        MR. VESPER:  This?

21        THE COURT:  You brought it up.

22        MR. VESPER:  Right.

23        THE COURT:  I mean, he didn't -- he's not just

24  popping this on you right away.

25        MR. VESPER:  No, he's not.

JORDAN – CROSS – HERMESMANN

1        THE COURT:  You raised the issue of this inspection.

2        MR. VESPER:  Then it has nothing to do with the

3   operation of the lake.  It's irrelevant.  We stipulated to --

4   this has just got a bunch of things checked off.  What's its

5   prospective value?  Nothing, because it doesn't deal with

6   safety.  It doesn't deal with operation.

7        THE COURT:  I'm not going to admit it now.

8        MR. VESPER:  Thank you.

9        THE COURT:  I may revisit the issue.

10        MR. HERMESMANN:  Could I respond, Your Honor?

11        THE COURT:  What?

12        MR. HERMESMANN:  May I respond?

13        THE COURT:  Now, look, normally, defendant is not

14   supposed to move into evidence until it's his case, so there

15   will come a point where you can move this in and give me the

16   argument, but not let's waste time on that now.

17        I mean, I've had a witness that should have taken

18   20 minutes and the day is almost over.

19        MR. HERMESMANN:  Your Honor, I've had him for about

20   ten minutes.

21        THE COURT:  I know.  So let's go on.

22        MR. HERMESMANN:  Plaintiff has had him for two hours.

23        THE COURT:  I know, let's go on.  He had him more

24   than two hours.  Let's go.

25   BY MR. HERMESMANN:

JORDAN − CROSS − HERMESMANN

1  Q.   Did this inspection deal with safety at the lake?

2  A.   It does.

3  Q.   And did this inspection deal with the required signage at

4  the lake?

5  A.   It does.

6  Q.   And if you look down on the inspection report, does it

7  have in quotes the signage that's required?

8  A.   It does.

9  Q.   And does safety and signage at the lake, as you see it,

10  relate to the operation --

11         MR. VESPER:  That's an opinion, I object.

12         THE COURT:  Look, it's much less of an opinion than

13  you were asking him.

14         MR. VESPER:  You're going to allow him to testify

15  whether this applies to operation?  Your Honor?

16         THE COURT:  Answer the question.

17       I'm overruling your objection.  Answer the question.

18         MR. VESPER:  Very well.

19         THE WITNESS:  It's paramount to operation.  If I

20  don't comply to this, we don't operate.

21         THE COURT:  Okay.  Based on that, I didn't realize

22  that was in here.  I'm going to admit this into evidence now

23  so I don't have to deal with it later.

24         MR. VESPER:  Thank you, Your Honor.

25         THE COURT:  Okay.  D-40 in evidence.

*United States District Court*
*Camden, New Jersey*

JORDAN – CROSS – HERMESMANN

1    (DEFENDANT EXHIBIT D-40 WAS RECEIVED IN EVIDENCE)

2            THE COURT:  Okay.  Let's go.  Come on.

3    BY MR. HERMESMANN:

4    Q.  Were there signs in place at the lake?

5    A.  Yes, sir.

6            MR. HERMESMANN:  Judge, I apologize.  I thought these

7    had been marked specifically by the clerk.

8            THE COURT:  What is that?

9            MR. HERMESMANN:  It's a blowup.

10           THE COURT:  It's D-39.

11           MR. VESPER:  No objection.

12           THE COURT:  Right?  It's D-39.

13           MR. HERMESMANN:  Right.

14           THE COURT:  It's already been marked, not in

15   evidence, but it's been marked.

16       D-39, I have it on my list here.  Okay.

17           MR. HERMESMANN:  The confusion was the other one did

18   not get a sticker.  So that's No Lifeguard on Duty.  This is a

19   different sign.  41?

20           THE COURT:  Is this D-41?  Is this also a photo of

21   signage?

22           MR. HERMESMANN:  It is, Your Honor.

23           THE COURT:  All right.  What's the question?

24   BY MR. HERMESMANN:

25   Q.  Mr. Jordan, do you recognize what's depicted in D-49 that

1 is place in front of you?

2 A.   Yes, sir.

3 Q.   What is it?

4 A.   It's one of the signs required by law that we have at the

5 camp —— at the lake.

6 Q.   And were there signs exactly like that one in place on

7 August 8th, 2010?

8 A.   Yes, sir.

9 Q.   And where were they located?

10 A.   As I previously indicated, right on the backside of the

11 lake, kind of facing where people walk in, mainly the younger

12 people, and then one up by the road on the —— another entrance

13 area where people like to park the golf carts and then walk

14 down to the lake.

15 Q.   The language that is on that sign, did you personally

16 choose that language?

17 A.   No, sir.

18 Q.   Where did that language come from?

19 A.   Well, it's on the —— I believe it's on the Cape May

20 County health inspection, what you have to say, but we buy

21 those signs from an authorized and certified pool vendor that

22 takes care of our pools, as far as chemicals and supplying us

23 with everything that is required.

24 Q.   Let me show you Defendant's Exhibit 39.

25       Do you recognize that?

JORDAN — CROSS — HERMESMANN

1  A.  I do.

2  Q.  And what is that?

3  A.  No lifeguard sign.

4  Q.  And is that sign -- was that sign also present on

5  August 8th, 2010, at the lake in question?

6  A.  It was, yes, sir.

7  Q.  And how many were there?

8  A.  I believe there were two.

9  Q.  And where were they posted?

10  A.  In the same places.  They are side by side.

11  Q.  And the language on that -- that particular sign, did you

12  make up that language?

13  A.  No, sir, we bought that from the same vendor.

14  Q.  I'd like to take you back until -- April of 2010 --

15  strike that.  Make that May of 2010.

16      Do you know Tim Miller?

17  A.  I do, yes, sir.

18  Q.  And do you know Heather Miller?

19  A.  I do, yes, sir.

20  Q.  And how is it you first met Tim Miller?

21  A.  I believe he came to the campground looking for a site is

22  the first time I met him.

23  Q.  And at some point in time, did he agree to obtain a site

24  at Pine Haven?

25  A.  He did.  He had purchased a new trailer, if I remember

*United States District Court*
*Camden, New Jersey*

JORDAN – CROSS – HERMESMANN

1  correctly, and he picked a site, a nice site out on the back

2  side of the campground.

3  Q.   And did you talk to him on the phone or did you just meet

4  him in person or don't you recall?

5  A.   I don't remember the initial conversation, but when we

6  sell the sites, it's always face to face because we have to

7  review the agreements with the payment structures as well as

8  the rules and regulations, and I have to have him execute it

9  so I can file it with our corporate office.

10        THE COURT:  Does he have a three-day revocation

11  period after he signs it?

12        THE WITNESS:  No, sir.

13        THE COURT:  He doesn't?

14        THE WITNESS:  He does not.

15  BY MR. HERMESMANN:

16  Q.   And you said you had to review the rules and regulations?

17  A.   Yes.

18  Q.   Are those rules and regulations that you are referring to

19  in writing?

20  A.   They are.

21  Q.   Let me show you what we've marked Exhibit 17.

22        THE COURT:  D --

23        MR. HERMESMANN:  D-17.

24  BY MR. HERMESMANN:

25  Q.   Do you recognize that document?

JORDAN – CROSS – HERMESMANN

1   A.   Yes, sir.  It looks like a copy of the rules and

2   regulations.

3   Q.   And do you recognize this as being a document that you

4   pulled from Mr. Miller's file at Pine Haven?

5   A.   I believe I did, yes, sir.

6   Q.   And what were the dates that this particular agreement

7   covered?  Look in your top left-hand corner of Page 1.

8   A.   The top left corner?

9   Q.   Seasonal contract runs?

10   A.   Oh, I'm sorry.  It was for October 1st, 2009 until

11   September 30th, 2010.

12   Q.   And was it, in fact, if you look at Page 3, was it signed

13   by Mr. Miller?

14   A.   I believe that's his signature.

15   Q.   And when was it signed?

16   A.   May 23rd, 2010.

17   Q.   Did you personally discuss with him the rules and

18   regulations of the campground?

19   A.   I believe I did, normally with children, I do, I -- not

20   all the rules and regulations, but the pools and the lakes,

21   things like that, I do go over specifically.

22        I did not need read them to him if that's what you're

23   asking me.

24   Q.   But you discuss them with him?

25   A.   I do.

JORDAN – CROSS – HERMESMANN

1  Q.   Draw your attention to Page 1, right-hand side.

2  A.   Yes, sir.

3  Q.   About a little more than three-fourths of the way down,

4  parental responsibility.

5  A.   Yes, sir.

6  Q.   Can you read that into the record, please?

7  A.   I can.  Parental responsibility.  Please provide proper

8  supervision for your children while in the park.  All children

9  must be under direct adult supervision.  Children under 16

10 years must have adult supervision while in the pool area or

11 lake area.  Parents will be held responsible for the actions

12 of minor children.  Minors must be on their site and under

13 direct adult supervision by 10 p.m.

14 Q.   Turn to the last page.

15 A.   Yes, sir.

16 Q.   Do you see where it says swimming pool/lake?

17 A.   I do.

18 Q.   Does it indicate that there's no lifeguards on duty?

19 A.   It does, yes, sir.

20 Q.   And does it indicate that you must observe all posted

21 signs?

22 A.   It does, yes, sir.

23 Q.   And does it indicate no swimming after dark?

24 A.   It does, yes, sir.

25 Q.   These particular rules and regulations, particularly as

JORDAN − CROSS − HERMESMANN

1   it applies to the lake, do you ensure that they are enforced?

2   A.   I do my very best to ensure that they are enforced, yes.

3   Q.   And how do you that?

4   A.   Again, it's important that my staff help me with it.

5   It's a large property.  We constantly monitor what's going on

6   there.  I emphasize the −− how important it is that we take

7   care of the kids in the park.  The adults, you know, adults do

8   what they do, but the kids, sometimes you have to be extra

9   careful with, so we monitor that a lot.  Without the rules and

10  regulations, I would not be able to operate that park, you

11  know, and the responsible parents that instill the importance

12  of following them, I don't have any problems with, you know,

13  they go home when they're supposed to, they do what they're

14  supposed to do.

15          MR. VESPER:  I'm going to object to whether he think

16  parents are following the rules.  This has to do with this

17  case.  The parents are not defendants.  I object to this, Your

18  Honor.

19          THE COURT:  I'm going to sustain the objection.

20          MR. HERMESMANN:  Can I be heard as to −−

21          THE COURT:  All right.  You can be heard.

22          MR. HERMESMANN:  Can I approach?

23          THE COURT:  No, I'm sustaining the objection.  Go to

24  the next question.  The witness −− this is a 20-minute witness

25  has taken the whole day, and by the way, you may have to get

JORDAN - CROSS - HERMESMANN

1  ready to start working on Fridays.  I'm not going to put up

2  with this anymore.  Next question.

3  BY MR. HERMESMANN:

4  Q.  On your direct examination, you were questioned about

5  patrols, and I believe you indicated that there was a

6  one-person patrol that would go from 10 o'clock at night until

7  2 in the morning on Friday and Saturday evenings; is that

8  correct?

9  A.  Yes, sir.

10  Q.  And as to lighting at the pool -- strike that.

11       As to lighting at the lake, did you ever consider

12  putting lights on the lake?

13  A.  We did not.

14  Q.  Why not?

15  A.  We did not.  In my experience in operations I've managed,

16  when you illuminate an area, is an open invitation to come and

17  use it, and it would counter -- contradict the rules and

18  regulations I have saying that you can't go in there after

19  dark so -- because then it's not dark, and so we didn't.  I

20  never thought of it.  I've never illuminated any lake that

21  I've managed.

22  Q.  And there were some questions about the pool.  That does

23  not have a lifeguard either; is that correct?

24  A.  That's correct.

25  Q.  The hotels that you've worked in over the years, they all

JORDAN – CROSS – HERMESMANN

1 had lifeguards?

2 A.   No, sir.

3 Q.   Have they all had surveillance cameras that somebody was

4 watching the camera during all hours?

5 A.   No, sir.

6 Q.   Have any of them had that?

7 A.   Not that I remember, no, sir.

8 Q.   Did you or your staff ever take any action that, in your

9 mind, was meant to convey to people who were at the park that

10 their children were in the care and custody of Pine Haven as

11 opposed to the parents?

12       MR. VESPER:  I'm going to object.  How does he know

13 what's in their mind?

14       THE COURT:  What did you say?

15       MR. VESPER:  He's asking this witness what's in

16 somebody else's mind.

17       MR. HERMESMANN:  That's not what I asked him.

18       THE COURT:  Repeat the question.

19 BY MR. HERMESMANN:

20 Q.   The question was, did you ever convey anything, anything

21 to the people at Pine Haven that you believe would lead them

22 to believe that they -- their children were in the care and

23 custody of Pine Haven?

24       MR. VESPER:  Didn't that kind of say would lead them

25 to believe what you would believe?

JORDAN – REDIRECT – VESPER

1          THE COURT:  Well, let's limit that question, first of

2   all, to verbal.  Whether he did verbally or in writing convey

3   to people, customers or campers that their children would be

4   in their custody, Pine Haven's custody.

5   BY MR. HERMESMANN:

6   Q.   Do you understand the question, sir?

7   A.   I do.

8   Q.   Please answer.

9   A.   No, sir, never.

10          MR. HERMESMANN:  Your Honor, if I could just go

11   through my notes, I'm probably done.

12          That's all the questions I have here with this witness.

13   Thank you.

14          MR. VESPER:  Just very quickly.

15   (REDIRECT EXAMINATION OF MICHAEL TERRY JORDAN BY MR. VESPER:)

16   Q.   The places where you worked, the three or four places

17   before Pine Haven, Mr. Jordan, you don't know whether those

18   places that didn't have the surveillance cameras, the

19   surveillance monitors actually being watched, you don't know

20   whether that represents the majority rule in the United

21   States, do you?

22   A.   No, I do not.

23   Q.   No, you don't.  You don't know if the majority of the

24   places in the United States that put up, let's say, dummy

25   cameras for deterrence, whether they put them up over their

*United States District Court*
*Camden, New Jersey*

JORDAN - REDIRECT - VESPER

1   lakes, do you?

2   A.   No, I don't.

3   Q.   All right.  Now, let's talk about this -- where's the

4   great contract that talks about supervision?  Where's that

5   phrase that you read into the record?  Ah.  Now, read to the

6   ladies and gentleman again -- where's that parental

7   responsibility there?  Ah.  One -- there's two terms here.

8            THE COURT:  Now, you've got to stop testifying.

9            MR. VESPER:  All right.  I won't write this --

10            THE COURT:  You have got to stop testifying.  Let him

11   testify.

12            MR. VESPER:  You're right.  I'm not going to write

13   anything out anymore today.

14            THE COURT:  Well, quit writing it out, don't do it

15   orally.  Don't testify.

16            MR. VESPER:  He already testified.  I'm repeating his

17   testimony.  I know you're in a rush, Your Honor, but this is

18   cross.  May I cross-examine?

19            THE COURT:  What's the next question?

20   BY MR. VESPER:

21   Q.   You testified that parental responsibility, proper

22   supervision is used here.  Proper supervision.  Children under

23   16 must have adult supervision while in the pool area,

24   correct?

25   A.   Correct.

**1**        MR. HERMESMANN:  Objection, Your Honor, he's not

**2**   reading the whole thing.

**3**        THE COURT:  What?

**4**        MR. HERMESMANN:  It says pool area or lake area is

**5**   what it says.

**6**        MR. VESPER:  I'm sorry, I meant any water area, okay?

**7**        THE COURT:  Oh, come on.  You can't -- that's not a

**8**   casual error.

**9**        MR. VESPER:  If you knew the next question, you

**10**  wouldn't have said that.  And you've been interrupting me,

**11**  Your Honor, all morning.  That's why it's taken two-and-a-half

**12**  hours.  May I proceed to cross-examine?

**13**       THE COURT:  Ask a question.

**14**  BY MR. VESPER:

**15**  Q.   You testified that adult supervision was to be provided

**16**  pool area or lake area, correct?  Correct?

**17**  A.   Yes.

**18**  Q.   Now, why is it that in the same paragraph, the next

**19**  sentence, it doesn't use adult supervision, it's direct, it

**20**  says direct adult supervision.

**21**       Do you see a difference there between direct adult

**22**  supervision and just adult supervision?  Do you?

**23**       THE COURT:  Don't holler at him.

**24**       MR. VESPER:  I'm --

**25**       THE COURT:  Don't holler at him.

JORDAN - REDIRECT - VESPER

1          MR. VESPER:  I apologize.  I should not raise my

2     voice.

3     BY MR. VESPER:

4     Q.  Do you see a difference?

5     A.  I do not.

6     Q.  Okay.  You did not draft the language?

7     A.  I did not.

8     Q.  Let me suggest something to you.

9          THE COURT:  No.  Ask a question.  Don't suggest

10    something.

11         MR. VESPER:  All right.

12    BY MR. VESPER:

13    Q.  Let me question you.  If you're directly supervising

14    somebody, you're right over their shoulder.

15         MR. HERMESMANN:  Your Honor, this is not a question.

16         THE COURT:  No, ask a question.

17         MR. VESPER:  Okay.

18    BY MR. VESPER:

19    Q.  Do you think that direct supervision means you're closer

20    to the person than just supervising him, or there's no

21    difference at all?

22    A.  I don't know.

23    Q.  All right.  That's a fair answer.

24         There's 577 leased or licensed sites, correct?

25    A.  Seasonal sites, yes, sir.

JORDAN - REDIRECT - VESPER

1  Q.  I'm sorry, seasonal.  And these cost how much?  In 2010

2  dollars?

3  A.  I don't remember.

4  Q.  Well, remember, Mr. Miller paid you, what, 4,000?

5  A.  I don't remember.

6         MR. HERMESMANN:  Can I have objection to this line of

7  questioning, Your Honor?

8  BY MR. VESPER:

9  Q.  There's going to be testimony from Mr. Miller that he

10  paid you $4,000.

11         THE COURT:  Well, he already gave testimony.

12         MR. VESPER:  Yeah.

13  BY MR. VESPER:

14  Q.  Does that sound about right?  You're the general manager.

15  A.  Does what sound right?  I didn't hear a number, I'm

16  sorry.

17         MR. HERMESMANN:  Continuing objection, Your Honor, as

18  to the relevance.

19  BY MR. VESPER:

20  Q.  $4,000.

21         MR. VESPER:  He raised it in his direct -- or in his

22  cross.

23         THE COURT:  Answer the question.

24  BY MR. VESPER:

25  Q.  Could you?

JORDAN – REDIRECT – VESPER

1  A.   Yes, it sounds approximate, yes.

2  Q.   Okay.  So you, being the general -- and how about the

3  rental cabins, there's 53 of those, how much do they cost?

4  A.   Then?

5  Q.   Yeah.

6  A.   I don't remember.

7  Q.   Approximately?

8  A.   I don't remember.  I truly don't.  Anywhere from, I

9  guess, from a hundred to 150 a night.

10  Q.   Okay.  That's all I'm asking you.

11  A.   Okay.  Well, then 100 to 150 a night for the cabins.

12       MR. HERMESMANN:  Your Honor, ongoing objection.

13       MR. VESPER:  It was -- these questions were asked.

14       THE COURT:  Come on.  Just ask your next question.

15  I'm overruling that.  Next question.

16  BY MR. VESPER:

17  Q.   Didn't know.  So the gross in one year from your 577

18  leased and your 53 cabin rentals, how much?

19  A.   That would be a number to ask the corporate office.

20  Q.   You said you knew the profits when you just testified,

21  you said, I'm the general manager.  When you were asked, you

22  said, I'm the general manager, I know the profits.

23       THE COURT:  You're arguing with him now.

24       MR. VESPER:  I'm sorry.

25       THE COURT:  What good is that going to do?

*United States District Court*
*Camden, New Jersey*

JORDAN – REDIRECT – VESPER

```
 1            MR. VESPER:  Nothing.

 2  BY MR. VESPER:

 3  Q.   Do you know the profits that you manage?

 4  A.   You're at profits or gross?

 5            MR. HERMESMANN:  Your Honor, what is the relevance?

 6  It's a business.  They're allowed to bring in money.

 7            MR. VESPER:  They are, but he asked him questions

 8  about money.  I'm now asking the person that should know.

 9            THE COURT:  He's answered, there's 577 units, you

10  said roughly $4,000.

11            THE WITNESS:  Back then, yes, sir, probably.

12            THE COURT:  Do you charge separately for electricity

13  and water --

14            THE WITNESS:  We do, we do.

15            THE COURT:  -- and cable.  So that's added onto that.

16            THE WITNESS:  Yes.

17            THE COURT:  And then the cabins are 100 to 150 a

18  night.

19            THE WITNESS:  Right, but there were only 18 of them

20  in 2010, so there were less, so...

21            THE COURT:  Okay.  Were all 577 units rented?

22            THE WITNESS:  No, they weren't, not even close.

23            THE COURT:  How many were rented?

24            THE WITNESS:  Probably about 500 of them.

25            THE COURT:  So you had about 500, all right.  You,
```

*United States District Court*
*Camden, New Jersey*

JORDAN – REDIRECT – VESPER

1 you know...

2 BY MR. VESPER:

3 Q. Can you give us a rough --

4 THE COURT: He doesn't have to give you a rough

5 thing. You've got -- you know, he says there's 500. He's

6 told you roughly what the amount of money is.

7 MR. VESPER: Can I ask the question?

8 THE COURT: No. You have the answer already.

9 MR. VESPER: As to the profit, he didn't answer.

10 THE COURT: The profit, what relevance possibly could

11 the profit have?

12 MR. VESPER: It goes to the bottom line.

13 THE COURT: Do you know what the profit is, the

14 company's profit?

15 THE WITNESS: When I get the final spreadsheet, there

16 is no profit, but that's because it's corporation, and they

17 have -- I don't know what they -- how they work, so, you know,

18 I don't see all the -- I know when I do a budget, I'm supposed

19 to budget out at about a 35 percent expense ratio to the NOI,

20 so my control --

21 THE COURT: NOI is net operating income.

22 THE WITNESS: Yes. So my controlling part of it is

23 at about 65 to 35.

24 THE COURT: So that you allocate 35 percent of the

25 net operating income --

JORDAN – REDIRECT – VESPER

1            THE WITNESS:  For expenses.

2            THE COURT:  –– to expenses.

3            THE WITNESS:  Controllable expenses, yes, sir.

4            THE COURT:  But, obviously, net profit has to do with

5    deprecation ––

6            THE WITNESS:  A lot of it.

7            THE COURT:  Carry forward less carry back,

8    consolidation of corporate ––

9            THE WITNESS:  Property taxes are on the label.

10            THE COURT:  Property tax.  I mean, you can't –– and

11    also, it's –– because there's a consolidation rule, where you

12    have more than one site, so you don't necessarily get profit

13    just for one site.

14            THE WITNESS:  I don't, no, sir.

15            THE COURT:  All right.  Come on.

16    BY MR. VESPER:

17    Q.   And following up with the Judge's question, your site

18    goes into the other Diversified sites?

19    A.   I don't know how that works.

20            MR. HERMESMANN:  Your Honor, what is the relevance of

21    any of this?

22            THE COURT:  That is enough, enough of this.  Go to

23    another area.

24            MR. VESPER:  Can I ask him about his budget, please?

25            THE COURT:  He told you it was 35 percent of his net

JORDAN - REDIRECT - VESPER

**1** operating income.

**2**        MR. VESPER:  35 percent of $20 is -- can I ask him

**3** what the budget was?

**4**        MR. HERMESMANN:  Same objection.

**5** BY MR. VESPER:

**6** Q.  Isn't it relevant to know -- let me ask you this way:

**7** Can you set or recommend the budget for what you spend for

**8** lighting, fencing, signage and the rovers?  Can you set the

**9** budget?

**10** A.  If I'm in front of my computer with the history, yes.

**11** Q.  Yeah.  So it's your discretion how much money is assigned

**12** to those line items?

**13** A.  No.

**14** Q.  No?

**15** A.  It's not.  I submit the budget, then they cut it, or they

**16** do whatever they need to do, they evaluate it.

**17** Q.  But you can submit it and then if they want, they can cut

**18** it?

**19** A.  They can, yes, sir.

**20** Q.  And you never submitted a budget for a rover -- for more

**21** than what you testified to, did you?

**22** A.  I already said that, yes, sir.  I did not.

**23** Q.  I'm asking you about the budget.  I'm asking if you

**24** budgeted --

**25** A.  I did not.

JORDAN – REDIRECT – VESPER

**1**  Q.   That's a whole different question.

**2**         MR. HERMESMANN:  He's continually argumentative with

**3**  the witness.  The witness is not argumentative with counsel.

**4**         THE COURT:  And he's argumentative with me, let alone

**5**  with the witness.

**6**         THE WITNESS:  No, sir, I did not.

**7**  BY MR. VESPER:

**8**  Q.   I'll ask the question again.  Did you budget for any more

**9**  time for your rovers?

**10**  A.   No, sir.

**11**  Q.   Did you budget for any more surveillance cameras for your

**12**  camp resort?

**13**  A.   No, sir.

**14**  Q.   Did you budget for any more sensor lights?

**15**  A.   No, sir.

**16**  Q.   Now, you talked about what -- in your opinion, the lights

**17**  at the -- if you put lights up by the pool or the lake, it's

**18**  going to attract people to go into the pool.

**19**         Do you remember you said that?

**20**  A.   I did, yes, sir.

**21**  Q.   Now, what lights are there -- tell the jury, what kind of

**22**  lights are there by the arcade?

**23**  A.   You mean outside?

**24**  Q.   Yeah.

**25**  A.   There's front porch lights.

JORDAN – REDIRECT – VESPER

1  Q.  They're sensor lights, aren't they?

2  A.  They are now, yes, sir.

3  Q.  Yeah.  Tell them what sensor lights do.

4  A.  They come on at dark.

5  Q.  And are there motion lights, also?

6  A.  You know, I think there are, yes, sir.

7  Q.  Yeah.  Tell --

8        THE COURT:  At the arcade.

9        THE WITNESS:  At the arcade, yes, sir.

10  BY MR. VESPER:

11  Q.  Okay.  So you forgot about the motion lights?

12  A.  I didn't pay much attention to it.  Again, Mr. Scarpa

13  installs those type of things and --

14  Q.  May have slipped your mind?

15  A.  I didn't mislead you intentionally, if that's what you're

16  asking.

17  Q.  Just tell the jury, what do the motion lights do?

18  A.  When you walk by them, they come on, if it's dark.

19  Q.  Yeah, but if they -- again, if somebody is going to break

20  into the arcade, or let's just say somebody thinks the arcade

21  is open, when they walk close and the motion -- and the motion

22  lights go on, that's really there for deterrence, isn't it?

23  A.  Well, the door is locked.  They can't get in.

24  Q.  That's not what I asked you.

25        THE COURT:  That's his answer.  Ask your next

*United States District Court*
*Camden, New Jersey*

JORDAN – REDIRECT – VESPER

1  question.

2  BY MR. VESPER:

3  Q.  Do the motion lights have any kind of deterrent effect,

4  in your opinion, as the general manager?

5  A.  That's not the reason I installed them, no.

6  Q.  Okay.  So your answer to my question would be they -- as

7  far as you know, have no deterrent value at all, the motion

8  lights?

9  A.  No, sir, not in that instance.

10  Q.  All right.

11       Oh, yeah.  Final question about the photo.  This photo

12  of the lake --

13       THE COURT:  Which photo?

14       MR. VESPER:  I think it's D.  Was it D-1, the

15  photograph?  D something.  It's D.  I'll find it.

16       THE COURT:  D-1 is the photo of the lake.

17       MR. VESPER:  Yes, it is.

18  BY MR. VESPER:

19  Q.  Now, this photo of the lake, when was this taken?

20  A.  I have no idea.

21  Q.  It's to show what, the lake?

22  A.  Yeah, the lake.

23  Q.  And is there anything that's real close to this that

24  would be an attraction for kids?

25  A.  Define "real close."  How close?

JORDAN – REDIRECT – VESPER

1  Q.  Like outside of one of the borders here.

2  A.  Well, the arcade is probably 20 yards, 30 yards away from

3  it.

4  Q.  Closer than the arcade.  What's on the beach?

5  A.  On the beach.

6  Q.  Yeah.

7  A.  The playground?

8  Q.  Yeah.

9  A.  It's farther away than the arcade.

10  Q.  You think the arcade is closer?

11  A.  I do, because the back end of it.

12  Q.  Oh, okay.

13  A.  In my opinion, it is.

14  Q.  All right.  So when you were showing the ladies and

15  gentleman of the jury this photo, where is the arcade?

16  A.  Over here.

17  Q.  Yeah.  You're saying the arcade is over here?

18  A.  Mm-hmm.

19  Q.  And the playground is over here, isn't it?

20  A.  No, the playground is more -- starts kind of right here.

21  Q.  Right here?

22  A.  The arcade, and it goes right around -- runs right along

23  by the road, so people can park their golf carts and watch

24  their little kids while they are playing.

25  Q.  You're saying the arcade -- the playground with the

JORDAN – REDIRECT – VESPER

1  swings and the pirate ship, that's right here?

2  A.   Well, no, the pirate ship is gone, but the playground is

3  back up by the road.

4  Q.   In 2010, there was a pirate ship.

5  A.   It was over here somewhere, over here in the corner,

6  right there.

7  Q.   Ah.  Maybe we're talking about two different playgrounds.

8       Let me show you what I've marked as P-5.

9       MR. HERMESMANN:  Can I see this?

10      MR. VESPER:  Yes.

11  BY MR. VESPER:

12  Q.   P-5 is from your brochure.  When I say "your," Pine

13  Haven's brochure, okay?

14      Now, P-5, and I wish I could --

15      THE COURT:  P-5?

16      MR. VESPER:  P-5, yes, Your Honor.

17      THE COURT:  And what is it?  It's a brochure?

18      MR. VESPER:  It's a page of the brochure, it's Page 1

19  of 1, amenities.

20      THE COURT:  Okay.  Go ahead, ask your question.

21      MR. VESPER:  Thank you, Your Honor.

22      THE WITNESS:  Is that this?

23  BY MR. VESPER:

24  Q.   Yes, it is.

25  A.   Okay.

JORDAN - REDIRECT - VESPER

1  Q.   Thank you for -- that's a color --

2  A.   I think that right there is the pirate ship, I think.

3  Q.   So let me just see P-3 because -- thank you very much,

4  you found a much better picture.

5       This is P-3, which is the color --

6       THE COURT:  I'm sorry, you said P-5.  How did we get

7  to P-3?

8       MR. VESPER:  I'll tell you how.  The witness helped

9  me by finding a better photo.

10      THE COURT:  P-3?

11      MR. VESPER:  Yes, Your Honor.

12      THE COURT:  What is P-3?

13      MR. VESPER:  P-3 is the front flap of the brochure

14  for Pine Haven, which has a beautiful photo, color photo.

15      THE COURT:  Okay.  Brochure for Pine Haven.

16      MR. VESPER:  Right.

17      THE COURT:  P-3.  All right.  Go ahead.

18      MR. VESPER:  Thank you.

19  BY MR. VESPER:

20  Q.   So now on P-3, what you were showing the jury before

21  about the playground, was not where the playground was in

22  2010?

23  A.   Yes, it is.

24  Q.   All right.  So in 2010 --

25  A.   I don't think we moved the playground.  It was back up

JORDAN – REDIRECT – VESPER

1  here.  You see how far away it is from the lake.  The road is

2  right here.  That's almost to the road.

3  Q.   It's almost to the road, and how many steps to the lake?

4  A.   I don't know.  You would have to -- I mean, that's a

5  photograph, it's not giving you the dimensions correctly.

6  Q.   No, it's not.  It's not exact perspective, but this shows

7  that on the white --

8        THE COURT:  No, no, no, no.  You're testifying.  Ask

9  him a question.

10  BY MR. VESPER:

11  Q.   Does this show that the playground is on the white sand

12  beach that surrounds the lake?

13  A.   Yes, I've always said that, yes.

14        MR. VESPER:  Okay.  Thank you very much.

15        THE WITNESS:  You're welcome.

16        MR. HERMESMANN:  I'd just like to see P-3 before --

17        MR. VESPER:  It's the colored version of P-1 here, P

18  whatever.

19        MR. HERMESMANN:  I have no further questions, Your

20  Honor, thank you.

21        THE COURT:  What did you say?

22        MR. HERMESMANN:  I have no further questions, Your

23  Honor, thank you.

24        THE COURT:  Okay.  You may step down, thank you.

25        THE WITNESS:  Thank you.

SCARPA – DIRECT – VESPER

1          THE COURT:  Who is your next witness?

2          MR. VESPER:  Pardon, Your Honor?

3          THE COURT:  Who is your next witness?

4          MR. VESPER:  Mr. Scarpa.

5          THE COURT:  Get him up here.

6          THE DEPUTY CLERK:  Good afternoon, sir.  Please step

7  up.  Please raise your right hand.

8  (**CHARLES C. SCARPA,** having been duly sworn as a witness,

9  testified as follows:)

10          THE DEPUTY CLERK:  Please state and spell your full

11  name for the record.

12  A.   Charles C. Scarpa.  C-H-A-R-L-E-S, C, middle name

13  Carmine, Scarpa, S-C-A-R-P-A.

14          THE COURT:  First name again?  I'm sorry, sir.

15          THE WITNESS:  My first name is Charles.

16          THE COURT:  Scarpa.

17          THE WITNESS:  Yes, sir.

18          THE COURT:  All right.

19  (DIRECT EXAMINATION OF CHARLES C. SCARPA BY MR. VESPER:)

20  Q.   Good afternoon, Mr. Scarpa.  We met, I don't know whether

21  it was a year ago?

22  A.   A year ago.

23  Q.   So I'm hopefully just going to ask you a few questions

24  about what you do and some lights.

25  A.   Okay.

SCARPA – DIRECT – VESPER

1  Q.  Like I did last time, okay?

2  A.  Yes.

3  Q.  What you do is you're the chief of maintenance?

4  A.  That's correct.

5  Q.  And as far as the lake is concerned, you're not

6  responsible for the safety of people in the lake, you're

7  responsible for the signs?

8  A.  I am.

9  Q.  Okay.  I'm not misstating that you're not responsible for

10  anything else other than the placement, the maintenance of --

11  you want to make sure that the signs are where they should be?

12  A.  No.

13  Q.  No?

14  A.  That's not correct.

15  Q.  What else are you responsible for?

16  A.  There are to make sure that the trash is picked up,

17  things like that, debris, branches.

18  Q.  Around the lake?

19  A.  Around the lake.

20  Q.  Okay.  I'm not trying to say you don't do any other work.

21  I know there's lots of other -- there's lots of other jobs

22  that you do.  In terms of the safety of people in the swim

23  lake, the one thing that you do is that you maintain the

24  signs?

25  A.  That's correct.

SCARPA – DIRECT – VESPER

1   Q.   And the signs, if you're told to put up, for instance, if
2   the general manager tells you to put up 15 signs, you will put
3   up 15 signs?
4   A.   I will.
5   Q.   Because you have no veto power, do you?
6   A.   I guess -- no, I mean --
7   Q.   I mean, if he says put up 15 signs, you're not going to
8   say, I'm not going to 15 signs?
9   A.   I'm going to say I don't know why you want to put up 15
10  signs, but I'll put up 15 signs.
11  Q.   Do you know if there is a required number of signs by
12  state or county or federal law, any law?
13  A.   No.
14  Q.   All right.  So basically, when it comes to the signs, you
15  take your orders from the general manager?
16  A.   I do.
17  Q.   Okay.  And what's on the signs, again, if he gives you a
18  sign that has more or less language, you're going to put the
19  sign up?
20  A.   I am.
21  Q.   You don't write the words on the sign?
22  A.   No, I don't.
23  Q.   Okay.  Now, I think we can do this fairly quickly.  Do
24  you recall talking with or discussing with Mr. Jordan, the
25  general manager, the placement of surveillance videos when

*United States District Court*
*Camden, New Jersey*

SCARPA – DIRECT – VESPER

1   Mr. --

2           THE COURT:  Cameras, you mean?

3           MR. VESPER:  Pardon me?

4           THE COURT:  Surveillance cameras?

5           MR. VESPER:  Cameras, yes.

6   BY MR. VESPER:

7   Q.   Do you remember that?

8   A.   When we discussed them, what, to install?

9   Q.   Yeah.

10  A.   Yes.

11  Q.   And in terms of -- were you working for Pine Haven before

12  Mr. Jordan arrived?

13  A.   Shortly.

14  Q.   So you weren't there for like ten years before?

15  A.   No.

16  Q.   When you say "shortly," like a year before?

17  A.   No, maybe six months.

18  Q.   Okay.  So when you arrived, there was -- was the dummy

19  camera there at the pool?

20  A.   Yes, it's always been there, as long as I've known, since

21  I've been there.

22  Q.   Which is okay.  I'm just asking you when you arrived, the

23  dummy camera -- I'm calling it a dummy camera because as far

24  as you know, it never worked.

25  A.   No.

SCARPA – DIRECT – VESPER

1  Q.  Okay.  And then when Mr. Jordan arrived, he had a

2  discussion with you about putting in more surveillance

3  cameras, or did he tell you what to do?

4  A.  No, we had discussions about it.

5  Q.  Pardon?

6  A.  We had discussions about it.

7  Q.  You did -- okay.  And was part of your consideration that

8  you should put them in priority areas?

9  A.  The areas that we were having issues with.

10 Q.  Okay.  And so did you select the areas or it was kind of

11 like a joint discussion?

12 A.  Joint discussion.

13 Q.  And so the areas where you discussed placing more

14 surveillance, or -- yeah, video cameras, were where?

15 A.  Well, we had put them in the game room and put them at

16 the office and put them at the front gate.

17 Q.  Okay.  Game room, office, front date.

18 A.  That's correct.

19 Q.  Didn't you have any discussions about the pool?

20 A.  No.

21 Q.  All right.  And you had no discussions about -- you

22 didn't even consider putting them at the lake?

23 A.  No.

24 Q.  And you didn't have any discussions with any -- with any

25 other persons or experts or people like that about --

SCARPA – DIRECT – VESPER

1  A.   No.

2  Q.   -- where to put them.

3        All right.  So just so the jury knows, there's a --

4  which I think I already -- I drew one camera here, which I'm

5  going to make a little bit bigger, so that that could be --

6  can you see that?  No?  I didn't see what you wrote.  Can

7  everybody see?  Okay.  So this is the dummy camera right here.

8  Can you see this all right?

9  A.   Yes, I can see.

10  Q.   So this is the dummy camera, then there were one or two

11  cameras put at the office?

12  A.   At the -- what we call the general store.

13  Q.   The general store.  Yeah, I'm just reading.  Is there an

14  office in the general store?

15  A.   Yeah, there's a small office in the general store.

16  Q.   But you refer to it as the general store?

17  A.   General store, that's correct.

18  Q.   Okay.  So at the general store, there's one camera, I

19  think you told me it's aimed this way?  Or which way?  Which

20  way?  Here's Route 9?

21  A.   I got you.  We have one camera facing out towards the

22  basketball courts which would be over in this way.

23  Q.   Okay.

24  A.   Where the kids like to hang out.

25  Q.   Is it aimed at the courts?

SCARPA – DIRECT – VESPER

1   A.   It's in that area, yeah.   Then there's another camera is

2   faced out towards the parking lot in the front, yeah, right

3   there.

4   Q.   Now, there's no cameras on the inside?

5   A.   Inside the store?

6   Q.   Yeah.

7   A.   No.

8         THE COURT:   There's no cameras at the pool and

9   there's no cameras at the lake, right?

10        THE WITNESS:   That's correct.

11        THE COURT:   I'm going to give you 60 seconds to

12   get -- finish up where the cameras are.

13        MR. VESPER:   Very well.

14   BY MR. VESPER:

15   Q.   There's a total of six cameras, right?

16        THE COURT:   Five.

17   A.   There's cameras --

18        MR. VESPER:   Total of six if you count the dummy.

19        THE COURT:   He's been testifying about the five new

20   ones he bought.   You've had endless testimony about the dummy

21   already.

22        MR. VESPER:   All right, let's do the new cameras.

23   BY MR. VESPER:

24   Q.   We did two.   Where are the other three?

25   A.   You have them in the game room.

SCARPA – DIRECT – VESPER

1  Q.  In -- that are --

2  A.  In the game room.  Inside the game room.

3  Q.  Inside.  And they are pointing this way?

4  A.  They are pointing all different directions inside the

5  game room.  They are not facing outside.

6       THE COURT:  The cameras can swivel, I assume, to

7  change direction?

8       THE WITNESS:  They can.

9  BY MR. VESPER:

10  Q.  Well, let me just follow up on that.  Are these cameras

11  remotely controlled?

12  A.  No.

13  Q.  So they can be moved and positioned?

14  A.  That's correct.

15  Q.  Manually?

16  A.  Manually.

17  Q.  Manually, okay.  And then the other camera?

18  A.  The other one is at the gatehouse.

19  Q.  The gatehouse which is?

20  A.  Out front, which is facing Route 9.

21  Q.  And so the camera at the gatehouse is roughly, if I put

22  the gatehouse here, it's not this big, the camera is pointing

23  out toward Route 9?

24  A.  That's correct.

25  Q.  Now, the cameras that are aimed -- let me just do these

SCARPA – DIRECT – VESPER

1  two.  General store.  One camera is aimed towards the road --

2  not the playground.  Do you see this camera here?  It's not

3  aimed towards the playground or the lake?

4  A.  Yeah, you can see the playground.

5  Q.  Can they see the lake?

6  A.  Only a portion, only a portion of it.

7  Q.  And why, why was this camera towards pointed towards --

8  A.  Towards what, the playground?

9  Q.  The playground.

10 A.  In that area?

11 Q.  Yes.

12 A.  Because of vandalism.

13 Q.  In the playground?

14 A.  That's correct.

15 Q.  And this is the playground that's how far is -- in 2010,

16 how far was this playground with the pirate ship from the

17 lake?

18 A.  It's always been in the same location.  I can't -- I

19 don't know.  Maybe, if I'm standing at the -- when I was

20 standing at the pirate ship, maybe the lake is at the base of

21 the lake, maybe 30 yards.

22 Q.  Okay.  And the -- this camera here on this general store

23 can see that pirate --

24 A.  No.

25 Q.  Oh, it can't.

SCARPA – DIRECT – VESPER

1   A.   No.

2   Q.   It can see part of the lake.

3   A.   It could -- yes, it can see part of the lake, not that

4   pirate ship.

5   Q.   But it was pointed toward --

6   A.   Let me explain it to you, what it could see, so that

7   way --

8        THE COURT:  This is amateur.

9   A.   Yes, this camera here, here is the lake.

10  Q.   Yeah.

11  A.   This camera here.

12  Q.   Right.

13  A.   Sees the swing set.

14  Q.   Right.

15  A.   Sees this building.

16  Q.   The arcade --

17  A.   And sees a portion of this lake right here.

18  Q.   All right.  I'm going to draw a broken line.  That's what

19  the camera sees.

20  A.   That's correct.

21  Q.   And the reason why you and Mr. Jordan decided to put the

22  camera there was to prevent vandalism in this area?

23  A.   That's right.

24  Q.   Now, this camera is pointed and I assume that the view of

25  this camera at the southern end of the store, it's going to

SCARPA – DIRECT – VESPER

1  see all of the basketball court?

2  A.   See all of the basketball court.

3  Q.   And that's because you want to prevent vandalism there?

4  A.   Vandalism and underaged drinking.

5  Q.   Okay.  And what about -- did we cover -- okay.  So the

6  arcade cameras are pointing inward because what?

7  A.   They're inside because of vandalism.

8  Q.   Inside?

9  A.   Inside.

10  Q.   But you don't want them outside?

11  A.   Because I already have a camera facing the outside.

12  Q.   So you've covered the area.  You've covered the outside

13  and the inside?

14  A.   Yes.

15  Q.   All right.  And again, no consideration was given to

16  covering any part of the lake, was there?

17       THE COURT:  Now, that's been answered 30 times today.

18  We don't need a 31st time on that point.

19       MR. VESPER:  Very well, okay.

20  BY MR. VESPER:

21  Q.   The sensor lights.  There are motion lights and also

22  lights that come on, I guess, there's movement lights and then

23  there's lights from light.  There's light that?

24  A.   They are dusk to dawns and there are motion lights.

25  Q.   Right.  So as I understand it, there's 40 dusk till dawn

SCARPA – DIRECT – VESPER

1  lights.  Do I have that right?

2  A.   What do you mean, there's 40?

3  Q.   I think that's what you testified to, there's 40

4  different locations for the dusk --

5  A.   I might -- I might have in my testimony, but I don't

6  remember exact number that I said.

7  Q.   It's approximate.  Could we say --

8  A.   Yeah.  Throughout the park, you mean?

9  Q.   Yeah.

10  A.   Throughout the whole entire park?

11  Q.   Yes.

12  A.   Yes.

13  Q.   Okay.  So if there's 40 such -- and they come on at dusk

14  and they go off at dawn?

15  A.   Yes.

16  Q.   All right.  Are there any of these dusk to dawn lights

17  anywhere in the area of the pool or the -- or the lake?

18  A.   Piney's.

19  Q.   Piney's?

20  A.   Piney's Palace has them.  Dusk to dawn.  That's the

21  midway.

22  Q.   Okay.  Piney's Palace has the dusk to dawn lights.  But

23  what about?

24        MR. HERMESMANN:  Your Honor, could I be heard at

25  sidebar?

1          THE COURT:  All right, why not.  Everyone is

2    determined to take 20 minutes of testimony and make it four

3    hours.

4          (SIDEBAR AS FOLLOWS:)

5          THE COURT:  All right.  Give me your sad song.

6          MR. HERMESMANN:  Well, I don't know if it's a sad

7    song or not, but the objection is that these dusk to dawn

8    lights he's talking about present tense.  He's not talking

9    about how the park was as of August 8, 2010.

10         THE COURT:  So you cross-examine it.

11         MR. HERMESMANN:  Judge, it's a subsequent remedial

12   measure that shouldn't come into evidence.  That's the

13   objection.  That's the objection.

14         MR. VESPER:  If it was subsequent, I apologize.  I

15   thought it was done -- I thought it was done at the time.

16         THE COURT:  Why was it -- remedial measure.  What was

17   it remediating?

18         MR. HERMESMANN:  They are putting in lights.

19         THE COURT:  That wasn't remediating anything.  It

20   wasn't there in 2010.

21         MR. HERMESMANN:  It wasn't.

22         THE COURT:  And that's what matters.  I don't think

23   it's remediation and it's not relevant.

24         MR. CICCOTTA:   It's not the lake.

25         THE COURT:  What?

SCARPA – DIRECT – VESPER

1          MR. HERMESMANN:  It wasn't at the lake.

2          THE COURT:  I'm agreeing.

3          MR. HERMESMANN:  It a subsequent action.

4          MR. VESPER:  He's agreeing with me.

5          THE COURT:  I'm agreeing with me.  I don't know --

6          MR. HERMESMANN:  It's a subsequent action.

7          THE COURT:  All I know, it's not a remedial measure

8    at all.  But more to the point --

9          MR. HERMESMANN:  If it's not --

10          THE COURT:  -- it's subsequent to the state of facts

11   that existed on August 8th 2010.

12          MR. HERMESMANN:  That's it.

13          MR. VESPER:  I'll rephrase it.

14          THE COURT:  So go ahead.

15          (END OF SIDEBAR.)

16   BY MR. VESPER:

17   Q.  Mr. Scarpa, I don't want to know anything that was done

18   after August 8th of 2010.

19          Were the 40 or approximate 40 dusk to dawn lights in

20   place before the drowning?

21   A.  Yes.

22   Q.  Okay.

23   A.  They've been there.

24   Q.  All right.  So if they've been there, then -- all right.

25   I already asked you when.

SCARPA – DIRECT – VESPER

1          Now, different kind of light.  There's a sensor light,

2    movement –– what do you call it?

3    A.    Motion.

4    Q.    There's a motion sensor light that comes on when

5    something comes –– and you tell me when to stop?

6          THE COURT:  Let's make it simple.  When I go out to

7    my garage, there's a light above the garage door that senses

8    that I'm there because of movement, the light goes on.

9          MR. VESPER:  That's it.

10         THE COURT:  And then when I leave, drive my car away,

11   after I'm gone, it goes off.

12         MR. VESPER:  Right.  I just want to know, is the

13   range for the sensor lights that are at Pine Haven –– and

14   those sensor lights at Pine Haven were in place before the

15   drowning.

16   A.    Yeah, but –– yeah, way before that.

17   Q.    So did the sensors lights activate –– when I'm this

18   close?

19   A.    Yeah, they should.  I can't tell you, I'm not sure.

20   Q.    So the furthest distance ––

21   A.    The further they are, they wouldn't, no.

22   Q.    Would they –– but certainly, as far as from here to ––

23   A.    I would say yes.

24   Q.    And that's about the distance, approximately, of the jury

25   –– the front of the jury box.  And this –– could you just show

*United States District Court*
*Camden, New Jersey*

SCARPA – DIRECT – VESPER

1  us real quickly, this is it, as far as I'm concerned, where

2  are the sensor -- where were the sensor lights placed in -- in

3  place in 2010?

4  A.   Are you asking me the closest place to the lake is where

5  you're asking?

6  Q.   Yeah.

7  A.   That's what you're asking?

8  Q.   Yeah.

9  A.   It would be the front of the arcade building, right hand

10  top corner, the arcade, up.

11  Q.   Here?

12  A.   Nope.  Come to me.  Right there.

13  Q.   Oh, here?

14  A.   Yep.

15  Q.   So there's -- use a different marker.  So there's a -- a

16  sensor light here?

17  A.   Yep.

18  Q.   And why was it put there?

19  A.   Well, because people go in in front of that door.

20  Q.   You want to catch them?

21  A.   Catch them?

22  Q.   Well, if somebody goes near the door and this place is

23  locked?

24  A.   You go around that building, the light is going to come

25  on.

SCARPA – DIRECT – VESPER

1   Q.   Yeah, it's going to come on not to invite them to come

2   in.  It's going to go on to reveal their existence.

3   A.   Oh, I don't know what it's going to do.  It comes on.

4   It's on, somebody sees somebody there.

5   Q.   Yeah.  So it comes on, it doesn't come on, as far as you

6   know, these motion sensor lights, to invite people into the

7   arcade, it comes on to either scare them away or make somebody

8   know --

9   A.   That somebody's is there.

10  Q.   -- that somebody is there, yeah.

11       So besides the arcade, where else would the sensors

12  lights that are closest to the pool area?

13  A.   Well, that's it because the rest are all dusk to dawns.

14  When it gets dark, they come on.

15  Q.   I thought there was four.  Aren't there four sensor

16  lights?  There were 40 -- I thought you testified in your

17  deposition, there were 40 dusk to dawns and 40 sensor lights.

18  Where would the other three be?  In the general store area, in

19  the pool area?   I think I might be able to refresh your

20  memory.  Let me suggest that when we did -- because we did a

21  chart, it was a smaller chart.  Do you remember we did a

22  smaller chart?

23  A.   I remember a chart.  I just don't remember...

24  Q.   Yeah, there were sensor lights by the -- I think by the

25  pool?

SCARPA – DIRECT – VESPER

1   A.   There might have been.

2   Q.   Is this Scarpa 2?

3   A.   There might have been, but now they are dusk to dawns.

4   That's probably why I'm getting confused.  They might have

5   been, but now they are dusk to dawns.

6   Q.   Okay.

7   A.   They are not motion.  They stay on all the time.

8   Q.   So in 2010, your recollection, being refreshed now, is

9   that there were probably two motion lights around the pool

10   somewhere that have now been replaced?

11   A.   Yeah, your motion lights, my motion lights, my motion

12   lights would have been on the office, which would have been on

13   the left, on the -- on the left side and the right side of the

14   office, right here exactly, basketball court, and then where

15   the --

16   Q.   Here?

17   A.   Yes, that's correct.

18   Q.   This corner?

19   A.   Yep.  So it would light up that area.

20   Q.   If somebody came in within --

21   A.   That's correct.  And then the opposite area.

22   Q.   There?

23   A.   Exactly.  That would light up that area, the parking lot.

24   Q.   Right, if somebody got anywhere near this building --

25   A.   That's correct.

SCARPA – DIRECT – VESPER

1  Q.   -- that's gonna -- the lights are going to go off, but --

2  but the light at this corner of the general store, it's not

3  going to go off if somebody goes in the lake?

4  A.   No.

5  Q.   And do you remember where -- well, that's three.

6  A.   Yeah, that's three and then you got four, you got the

7  arcade, which had three there?

8  Q.   Yeah.

9  A.   And then I believe there would have been a back one on

10  the arcade building.

11  Q.   Oh, a back one?

12  A.   No.  Come forward.  Towards the lake.

13         THE COURT:  One more minute on lights.

14         MR. VESPER:  I don't need another minute.  Thank you,

15  Mr. Scarpa.

16         Wait, wait, I do have one other question.

17  BY MR. VESPER:

18  Q.   There was testimony about a culture of safety.  Were you

19  here when --

20  A.   I was here when I heard it.

21  Q.   Pardon?

22  A.   I heard it.

23  Q.   Okay.  And when -- when I asked you about whether, as far

24  as enforcing the rules and as far as you know, are you?

25         THE COURT:  What are you asking?  Are you reading a

SCARPA – DIRECT – VESPER

1  deposition?

2          MR. VESPER:  I'm reading Mr. Scarpa's deposition.

3          THE COURT:  When you read a deposition, Mr. Vesper,

4  you identify the date the deposition was taken, the page that

5  it was on, the line that it was on.

6          MR. VESPER:  I was rushing.  Sorry.

7          March 25th.

8          THE COURT:  You've done this before.

9          MR. VESPER:  Pardon?

10          THE COURT:  You've used depositions before at trials.

11          MR. VESPER:  Yes, I have.

12  BY MR. VESPER:

13  Q.   March 25th, 2014, Page 39.  When you were asked about

14  whether or not you enforced the rules, do you remember what

15  you said?

16  A.   Yes.

17  Q.   What?

18  A.   I said I do.

19  Q.   You are instructed to --

20  A.   No, I'm not instructed to.  You asked me if I did.

21  Q.   The question was:  Things like no drinking alcohol and

22  signs, you're required to have them signs, yes?

23          And then your answer was, so far as enforcing the rules

24  as far as Signagel goes, that's what I know as far as that

25  goes.

SCARPA — CROSS — HERMESMANN

**1**      You're responsible for signs?

**2**      Your answer was yes.  And I -- here, on Page 38, Line

**3**  17:  So part of your job -- your understanding is right up

**4**  until today, that is not part of your responsibility to

**5**  enforce the don't-swim-in-the-lake-after-it-gets-dark rule.

**6**      There was an objection and your answer was, my

**7**  responsibility is not to enforce that rule, but we do.  Your

**8**  responsibility is not to do that.

**9**          THE COURT:  No, no.  He agrees that he gave that

**10**  answer.  Okay.

**11**          MR. VESPER:  No further questions.

**12**  (CROSS EXAMINATION OF CHARLES C. SCARPA BY MR. HERMESMANN:)

**13**  Q.  Mr. Scarpa, I'm going to take you to that same bit of

**14**  testimony and perhaps a little slower.

**15**      You were being questioned at that time during your

**16**  deposition by Mr. Vesper about swimming in the lake after

**17**  dark.

**18**  A.  Okay.

**19**  Q.  Do you recall that?

**20**      I'm going to read this to you.  Mr. Vesper says to you

**21**  on Page 38, Line 12:  You understand I'm not picking on you.

**22**  I just want to know, is that one of your tasks or is that not

**23**  your job?

**24**      Answer:  That is not a written task.  That is not a

**25**  written rule for me to enforce that rule.

*United States District Court*
*Camden, New Jersey*

1          Okay.  So as part of your job, your understanding is

2     right up until today, that it is not part of your

3     responsibilities to enforce that

4     don't-swim-in-the-lake-after-it-gets-dark-rule.

5          An objection.

6          And you answered:  My responsibility is not to enforce

7     that rule, but we do, that's correct?

8          Did I read that correctly.

9     A.   Yes, you did.

10    Q.   And was that accurate when you offered that testimony

11    back on March 25th, 2014?

12    A.   Yes.

13    Q.   And is it accurate today?

14    A.   Yes, it is.

15    Q.   You were asked some questions about surveillance cameras.

16    A.   Yes.

17    Q.   The surveillance cameras, do any of them have anybody

18    watching a monitor while the camera is operating?

19    A.   Absolutely not.

20    Q.   And how is anything from that surveillance camera saved?

21    A.   It's saved on a -- it's automatically saved on the

22    camera.  So whatever happens within the first 30 days, in the

23    30 days, in say 30 days of recording, it will be there.  If

24    you wait 30 days after that, you know, it's not there no more.

25          So the only way that you're going to find out if

SCARPA – CROSS – HERMESMANN

1  something is on that camera is if something took place.

2  Q.   Let me show you what's been marked as Defendant Exhibit

3  41.  Do you recognize that sign?

4  A.   I do.

5  Q.   Do you recognize the placement of the sign?

6  A.   I do.

7  Q.   How many signs exactly like that, back on December -- I'm

8  sorry, August 8th, 2010 were there at Pine Haven?

9  A.   There's -- of those signs there?

10  Q.   Correct.

11  A.   Three.

12  Q.   And there are other signs that are also there that

13  address people near the lake?

14  A.   No.  This is -- yes, there is, there's another sign.

15  Q.   Which has alluded me again.  The language for those

16  signs, where did that language come from?

17  A.   I don't know where that language comes from.

18  Q.   Did you make up the language?

19  A.   No.

20  Q.   Did Mr. Jordan make up the language?

21  A.   No.

22  Q.   And how about the signs, where did they come from?

23  A.   They come from a certified pool dealer.

24  Q.   Okay.  And who purchased those signs?

25  A.   Pine Haven purchased the signs.  I, myself, purchased

SCARPA – CROSS – HERMESMANN

1   that sign.  I purchased that sign through the pool company

2   because that's the sign that we're required to have.

3           THE COURT:  How many signs were there around the

4   lake?

5           THE WITNESS:  There's total signage of this

6   particular sign, there's two --

7           THE COURT:  Well, there are two different signs.

8           THE WITNESS:  That's four.

9           THE COURT:  There's four that are around the swim

10  lake.

11          THE WITNESS:  That's correct.

12          THE COURT:  Okay.  Go ahead.

13  BY MR. HERMESMANN:

14  Q.   Is the other a no-swimming sign?

15  A.   Yeah, it's a no-swimming sign.

16          THE COURT:  Shouldn't have taken us to two o'clock to

17  get that answer.

18          (Off the record.)

19          THE COURT REPORTER:  I'm sorry, I didn't get your

20  answer.

21          THE WITNESS:  My answer as far as what, for what

22  question?

23          THE COURT:  That there was four signs.

24          THE WITNESS:  There was four signs.  There was two.

25          THE COURT:  I thought there was two, all the

SCARPA – REDIRECT – VESPER

**1**  testimony I was listening to.

**2**        MR. HERMESMANN:  That's all I have for you, Mr.

**3**  Scarpa.  Thank you.

**4**        MR. VESPER:  We may as well try to visualize this.

**5**  (REDIRECT EXAMINATION OF CHARLES C. SCARPA BY MR. VESPER:)

**6**  Q.  The four signs you were talking about around the lake, I

**7**  thought there was two, also.  So where I put these two

**8**  crosses --

**9**  A.  Yes.

**10**  Q.  Were there two signs there, a sign at each of those

**11**  approximate locations?

**12**  A.  Two signs at each location.

**13**  Q.  And the sign that you're talking about --

**14**  A.  One of those and one of the lifeguard not on duty.

**15**  Q.  Okay.  I want to get to the other two signs -- let me do

**16**  that now.  So there's another two -- a set of this sign and

**17**  the no lifeguard.  Where else are they?

**18**  A.  In the two locations that you have there.

**19**  Q.  Oh, I see what you're saying.  So there's two signs at

**20**  each of the X's?

**21**  A.  That's correct.

**22**  Q.  Okay.  My mistake.  I misunderstood.  I'm putting two X's

**23**  so I don't make that mistake again.  Now, with respect to this

**24**  sign --

**25**  A.  Yes.

*United States District Court*
*Camden, New Jersey*

SCARPA – REDIRECT – VESPER

1   Q.  -- persons -- this pool, or swimming area, this is at the

2   lake.

3   A.  Yes.

4   Q.  Shall be closed when the owner or manager is not on the

5   premises.  It doesn't say anything about the dusk or dark.

6   When -- when does a person know that's reading that sign when

7   the owner or manager is not on the presence -- on the

8   premises.  Like a flag that goes up or something?

9   A.  No.

10  Q.  So I'm just --

11          THE COURT:  He doesn't know.

12  A.  I don't know.

13          THE COURT:  Don't -- he wouldn't know.  Somebody

14  looking at the sign, 14-year-old looking at the sign wouldn't

15  know whether a manager was there or not.

16          MR. VESPER:  Okay.

17          THE COURT:  Okay.

18  BY MR. VESPER:

19  Q.  Oh, so the video from the five video surveillance cameras

20  that do operate, the video is saved for 30 days?

21  A.  It overrides in 30 days.

22  Q.  Yeah.

23          THE COURT:  Everything is overwriting, so it's always

24  30 days, but it's the last 30 days.

25          THE WITNESS:  That's correct.

*United States District Court*
*Camden, New Jersey*

SCARPA – REDIRECT – VESPER

1    BY MR. VESPER:

2    Q.   Right.  And who reviews the video to see if there's been

3    any –– 'cause here's what I understand ––

4           THE COURT:  Does anybody review the video?

5           THE WITNESS:  No one reviews the video unless there's

6    something that comes up, that something happens.

7    BY MR. VESPER:

8    Q.   Okay.  If something comes up, could it be you?

9    A.   It could be myself, it could be Mr. Jordan, it could be

10   the state police.

11   Q.   Okay.  And after this incident, after the drowning, did

12   you review any of the videos?

13   A.   No.  There's no video.

14   Q.   I just asking then ––

15          THE COURT:  Okay.  The answer is no.  Next question.

16   BY MR. VESPER:

17   Q.   Do you know if Mr. Jordan reviewed any of the ––

18   A.   No, I don't know if he did or didn't.

19   Q.   You don't know?

20   A.   No.

21          MR. VESPER:  No further questions.  Thank you.

22          THE COURT:  Is there camera that would have been

23   pointed at the location where the drowning took place?

24          THE WITNESS:  No.

25          THE COURT:  Okay.

*United States District Court*
*Camden, New Jersey*

SCARPA - REDIRECT - VESPER

1          MR. VESPER:  Just to follow up on the judge's

2     question, if I may.

3     BY MR. VESPER:

4     Q.   There is a camera pointed towards the basketball courts,

5     isn't there?

6     A.   To the basketball courts?  Yes.

7          MR. VESPER:  Thank you.

8          MR. HERMESMANN:  No further questions, Your Honor.

9          THE COURT:  Okay.  You may step down.  We are ending

10    for the day.  Ladies and gentlemen, we will see you tomorrow

11    when, let me hear?

12         THE JURY:  8:30.

13         THE COURT:  8:30.

14         And, please, don't discuss the case among yourselves,

15    do not discuss the case with your family, friends or loved

16    ones.  Stay off electronic media.  Don't go into a library,

17    don't talk to your co-employees or friends or relatives about

18    the case.  You'll get everything and probably get it three or

19    four times, that you need from the -- from the witness stand.

20    I thank you for your patience.  I look forward to seeing you

21    tomorrow.

22         THE DEPUTY CLERK:  All rise.

23         (JURY EXITS; 2:08 p.m.)

24         THE COURT:  Okay.  See you.  I want to see counsel in

25    my chambers.

1          MR. VESPER:  I thought we were going to hear from.

2          THE COURT:  At 2:30 we're going the hear from.

3          MR. VESPER:  Oh, at 2:30.

4          THE COURT:  We're going hear from --

5          MR. VESPER:  Mr. Staves.

6          THE COURT:  Yeah.

7          MR. VESPER:  Thank you.

8          THE COURT:  But I want to see not related to that.

9          MR. VESPER:  Unrelated.

10         THE COURT:  I want to see you both in chambers.

11         (RECESS TAKEN; 2:09 p.m.)

12         THE DEPUTY CLERK:  All rise.

13         (OPEN COURT; 2:45 p.m.)

14         THE COURT:  Good afternoon, everybody.

15         RESPONSE:  Good afternoon, Your Honor.

16         THE COURT:  Everyone, please be seated.

17     Okay.  I received a motion, what we would call now a

18 *Daubert* motion to preclude the testimony of Homer A. Staves.

19 I'm going to hold a hearing on that and put him on the stand,

20 swear him in.  Don't spend more than five minutes on his

21 qualifications, because qualifications are not the issue in

22 this case.  Just pick those qualifications that you think are

23 key and then tell me what you think -- you elicit from him his

24 opinion.

25     Remember, though, he's obviously been thinking about

*United States District Court*
*Camden, New Jersey*

1  the case, because he popped up with a document that he got

2  yesterday after the trial started, which is not what an expert

3  should be doing things.

4           MR. VESPER:  I asked him to do that.

5           THE COURT:  Doesn't make any difference.  He

6  shouldn't have been doing that.

7           MR. VESPER:  He can't override me.  I pay him.

8           THE COURT:  Yes, he can override you.  But the -- so

9  you asked him.  I'm going to have some questions to ask him

10 and let's get started.

11          MR. VESPER:  Yes, thank you.  Homer.  I only intend

12 to proffer him for two issues.  Two issues, not the

13 conclusion, that Your Honor had pointed out.

14          THE COURT:  That's the conclusion he reached.

15          MR. VESPER:  There's two issues that only and only

16 these two issues I believe he's qualified to address and --

17          THE COURT:  The issue is not whether he's qualified.

18 The issue is whether he's done the work.

19          MR. VESPER:  Yes.

20          THE COURT:  And the background.

21          MR. VESPER:  Yes.

22          THE COURT:  To justify.

23          MR. VESPER:  Yes.

24          THE COURT:  His opinion.

25          MR. VESPER:  Yes, agreed.  I'll rephrase that.

STAVES – DIRECT – VESPER

**1**          THE DEPUTY CLERK:  Please raise your right hand.

**2**    (**HOMER STAVES**, having been duly sworn as a witness, testified

**3**    as follows:)

**4**          THE DEPUTY CLERK:  Please state and spell your full

**5**    name for the record Homer Staves.  H-O-M-E-R  S-T-A-V as in

**6**    Victor, E-S.

**7**          THE COURT:  Okay.  Go ahead.

**8**    (DIRECT EXAMINATION OF HOMER STAVES BY MR. VESPER:)

**9**    Q.   Mr. Staves, you're currently the president of what, when

**10**   it comes to camping?

**11**   A.   I'm president of Staves Consulting, Inc., I'm president

**12**   of -- which is a consulting company that does campground

**13**   consulting all over the world.  I'm president of Buffalo

**14**   Bob's, Inc., which is a holding company for a large campground

**15**   outside of Glacier Park.

**16**          THE COURT:  Outside of where?

**17**          THE WITNESS:  Glacier National Park, and I'm let's go

**18**   president of the KOA Owners' Association.

**19**   BY MR. VESPER:

**20**   Q.   All right.

**21**   A.   Which is an association of all the KOA franchisees.

**22**          THE COURT:  How many of them are there?

**23**          THE WITNESS:  500.

**24**   BY MR. VESPER:

**25**   Q.   And in terms of knowing the industry, there are how many

*United States District Court*
*Camden, New Jersey*

STAVES – DIRECT – VESPER

1   campgrounds total, including federal, and private, in North

2   America?

3   A.   I can give you a best estimate.

4   Q.   Yes.

5   A.   If there's a lot of variables -- as the honorable Judge

6   said earlier, campgrounds are so different, there's a lot of

7   different niches.  But probably the next best choice is

8   there's one directory of campgrounds produced by a company

9   called Trailer Life.

10   Q.   Right.

11   A.   Or the Good Sam Club and they produce a directory listing

12   every campground in North America that's opened to the public.

13   Q.   Right, how many?

14   A.   There are 19 -- their 2015 issue that just come out list

15   15,000 campgrounds.

16   Q.   All right.

17          THE COURT:  Nongovernment.

18          THE WITNESS:  No, 15,000 open to the public.

19          MR. VESPER:  Total.

20          THE COURT:  So that includes the government.

21          THE WITNESS:  That includes the government.

22   BY MR. VESPER:

23   Q.   So the Judge is anticipating my next question.

24   A.   Me, too.

25   Q.   Go ahead.

STAVES – DIRECT – VESPER

1   A.   So in that -- out of that 15,000, kind of the accepted

2   norm and nobody knows for sure, but there's about an equal

3   number of private campgrounds and government campgrounds.

4   Q.   All right.

5   A.   That includes the federal government, the state

6   governments, the counties.  So there's approximately five to

7   6,000 private campgrounds in the United States, take Canada

8   out of it.

9   Q.   That's a fair estimate, then, correct?

10  A.   Yes.  I mean that's kind of what the industry goes by.

11  Q.   Right.  But just so the Judge knows, as a consultant,

12  have you been to more than 50 percent of the total that --

13  remember the 14,000 number, in North America?

14  A.   Let me kind of answer it a little different.

15  Q.   Go ahead?

16  A.   A few seconds more, Judge, is I actually went to work for

17  KOA in 1967 and worked for KOA for 25 years --

18  Q.   Right.

19  A.   -- visiting campgrounds all over North America, as well

20  as Europe.

21  Q.   Right.

22  A.   And my job early on was building the company-owned

23  campgrounds.  So to do feasibility studies, you always look at

24  the competition.

25  Q.   Right.

STAVES – DIRECT – VESPER

1   A.   So for 25 years I was looking at campgrounds not only

2   KOAs but non-KOAs.

3   Q.   Right.

4   A.   In 2000 I retired from KOA, opened up the Staves

5   Consulting company and during -- since then, I've done almost

6   500 feasibility studies for people that are looking to build

7   new campgrounds.

8   Q.   500 a year or 500 total?

9   A.   500 total in 15 years.

10   Q.   Okay?

11   A.   Now, every time I do a feasibility study I visit all the

12   competing campgrounds in the general area as part of the

13   feasibility study and that runs about 10 campgrounds per

14   study.  So in the last 15 years I've visited approximately

15   5,000 open-to-the-public campgrounds in North America.

16   Q.   In the total -- you've been in the business for 50 years?

17   A.   Right.

18   Q.   Right?

19        THE COURT:  You're not getting anywhere with me.  I'm

20   telling you right now, you're running in place.

21        MR. VESPER:  I want to get the majority.

22   BY MR. VESPER:

23   Q.   All right.  Have you been to more than 50 percent of the

24   privately owned?

25   A.   Yes.

*United States District Court*
*Camden, New Jersey*

STAVES – DIRECT – VESPER

1  Q.   Okay.  And so can you speak to what the majority of the

2  privately-owned campgrounds do as the standard of their

3  operation?

4  A.   Yes.  They -- the -- probably the strongest point is that

5  virtually every campground in North America is different and

6  that's why I have a job as a consultant because everybody

7  needs a hand on how to design it or what's happening.

8  Q.   Okay.

9  A.   And so every time I visit these campgrounds I'm looking

10  at how they do things, best practices.

11  Q.   Okay.  You used the word "best practices" in your report?

12  A.   Correct.

13  Q.   Now, best practices, you have to explain this to the

14  Judge.  Is there a written standard by any organization

15  anywhere on how a campground should operate a pool?

16  A.   There --

17  Q.   Safely.

18  A.   The only national standard that's written for campgrounds

19  is the ANSI code that since has migrated into an NFPA,

20  national fire protection A11.9.

21         THE COURT:  It doesn't give a standard for operating

22  been --

23         THE WITNESS:  No.

24         THE COURT:  -- particularly a private lake.

25         THE WITNESS:  It's a construction document only.

*United States District Court*
*Camden, New Jersey*

STAVES – DIRECT – VESPER

1  BY MR. VESPER:

2  Q.   Right.

3  A.   But my point is, I served on that committee since 1970

4  that writes that code and we've had proposals made to put

5  operating things in.

6  Q.   Operating things, like how to operate safely?

7  A.   How to operate safely.

8  Q.   Yeah.

9  A.   I mean, the committee is designed for safety.

10  Q.   And it's always the committee has backed off of that,

11  including any of that, for that same reason, that --

12         THE COURT:   Still running in place.

13         THE WITNESS:   -- that every campground is different.

14  BY MR. VESPER:

15  Q.   Right.  So here's my point.  In terms of pointing to some

16  written standard about the two, the two issues that I would

17  offer you to testify to, there are no written standards as to

18  what a -- what the majority of campgrounds in United States,

19  not Canada, just the United States, what the majority of the

20  campgrounds do by way of patrolling, once they decide to use a

21  patrol?

22         THE COURT:   Now, are we talking about a pool, an

23  inground pool?

24         MR. VESPER:   Any body of water where people are

25  invited to swim.

*United States District Court*
*Camden, New Jersey*

STAVES - DIRECT - VESPER

1        THE COURT:  No.  Come on.  Stop it.  An inground pool

2   is going to be secured other than by a patrol running around

3   it, which is 50 feet in either direction.  That's a -- that's

4   not how you're going to control the pool.  You're going to

5   control it with a fence, with maybe some kind of lighting, a

6   locked door, but you're not going to have some guy on a golf

7   cart running around in little circles.

8        THE WITNESS:  Yes and no.

9        THE COURT:  Well.

10       THE WITNESS:  I concur with you, Judge, that good

11  commercial pool, you've got a fence, you've got lights on it,

12  but you've also got kids trying to climb the fence and stuff.

13       THE COURT:  But --

14       THE WITNESS:  The majority of the campgrounds in the

15  United States utilize paid staff from probably about 6 in the

16  morning until 2 or 3 the next morning.  There's always staff

17  on the campground walking the property, seeing what people are

18  doing, whether it's checking -- in our case we have paddle

19  boat pond.  We check that regularly, all evening and night.

20  Swimming pool, paddle boat pond, petting zoo, so that our

21  staff is constantly monitoring everything.

22       THE COURT:  Which center is this?

23       THE WITNESS:  This is the campground that I own in

24  Western Montana.

25       THE COURT:  Montana?  Did you mention it in your

*United States District Court*
*Camden, New Jersey*

STAVES – DIRECT – VESPER

1    report?

2         THE WITNESS:  I had it in my resumé that I had sent

3    to counsel earlier, but that did not get included.

4         THE COURT:  How many of these 5,000 or 6,000 private

5    organizations have what I would call natural, either a real

6    truly natural lake or pond or a man-made one that is designed

7    to look like a natural.

8         THE WITNESS:  Less than 20 percent.  Yeah.  Water is

9    always an attraction.  So many campgrounds --

10        THE COURT:  You think the rules are the same for both

11   of them?

12        THE WITNESS:  For a swimming pool and a -- no.  They

13   are built differently.  They are different entities.

14        THE COURT:  Okay.  Now, you gave an opinion --

15        MR. VESPER:  You were going to say "but."

16        THE COURT:  You gave an opinion that if Friday and

17   Saturday practice of having their patrol had been carried out

18   all week long, the accident wouldn't have happened.

19        THE WITNESS:  Right.

20        THE COURT:  You don't really mean that.

21        THE WITNESS:  I do.

22        THE COURT:  Well, the accident occurred at 10 after

23   8.

24        THE WITNESS:  Yep.

25        THE COURT:  The patrols were going from 10 o'clock --

*United States District Court*
*Camden, New Jersey*

STAVES – DIRECT – VESPER

1   the patrols –– we've had endless testimony on that, the

2   patrols were going from 10 o'clock in the evening to two in

3   the morning.  So even if they had extended that seven days a

4   week, it wouldn't have stopped this drowning.

5            THE WITNESS:  Well, my point, when I say "extended,"

6   Judge, not just by days, but also by hours.

7            THE COURT:  Well, you didn't say.  But all right.

8            THE WITNESS:  At the time of the drowning there was

9   one employee out at the welcome center, at the guard gate

10  and ––

11           THE COURT:  Well, child went in.  What did he do that

12  he shouldn't have done?  He didn't have an adult with him.

13           THE WITNESS:  Right.

14           THE COURT:  Because as long as its light out, you're

15  allowed to go in so long as you have an adult with you.  It's

16  not forbidden.

17           THE WITNESS:  Well, it is because the sign says

18  unless the manager is on property and the manager wasn't on

19  property.  The entire staff was gone.

20           THE COURT:  It does say –– but you understand ––

21  let's assume, I don't know whether the manager was on.  I mean

22  I don't know that anything in your report tells me that.  But

23  I read –– I read the depositions and the girl who went with,

24  she said it was light out.  It was still light.  So lights

25  wouldn't have done anything.  It's only 75 yards across.  It's

STAVES - DIRECT - VESPER

1   a five-minute swim.

2           MR. VESPER:  Lighting, if I could just interrupt.

3           THE COURT:  No, no, you can't.

4           THE WITNESS:  We're having a good conversation here.

5   The -- lighting, Your Honor, is, to me is very important as a

6   deterrent not necessarily that those kids could not see.  I

7   don't argue that at all.

8           THE COURT:  Doesn't it attract the kids having the

9   lights?

10          THE WITNESS:  No.  If they were used to lights coming

11  on every night at that lake, they would have found another

12  dark place to get together.  The kids were looking for a dark

13  quiet place where no adults could see them.

14          THE COURT:  How do you know what they were looking

15  for.

16          THE WITNESS:  Because I work with kids all the time.

17          THE COURT:  So you're an expert now on how kids --

18          THE WITNESS:  In a campground.

19          MR. VESPER:  If Your Honor please.  Your Honor is

20  taking the approach that this witness is going to give an

21  opinion about kids.  He's not.

22          THE COURT:  Tell me, what is his opinion?

23          MR. VESPER:  I'll tell you.  It is not what Your

24  Honor has been focused on, which is the last paragraph.  His

25  point is going to be that when you have a swimming -- when you

STAVES - DIRECT - VESPER

1    have a water attraction, as they do -- this is on page -- by

2    the way, I'm going on Page 2, where he refers to the majority

3    or best practices.  He's giving -- and there's nothing in

4    writing, okay?  So this all thing is an argument --

5            THE COURT:  Best practices is what?

6            MR. VESPER:  The best practices in the industry, he

7    knows them.  He knows the best practices and Your Honor's

8    point was --

9            THE COURT:  So I take it on faith.  He's seen

10   hundreds and hundreds of --

11           MR. VESPER:  Let me finish.  If he's only seen, he's

12   only seen a sampling, he's only seen a sampling, he's not

13   qualified to say what the majority would do.  But I asked

14   their own general manager, do you know, do you know, what the

15   majority of places do?

16           THE COURT:  He doesn't.

17           MR. VESPER:  No, he doesn't, but he does.  And by you

18   denying him the ability to say that to this jury --

19           THE COURT:  If they all had private lakes, I guess,

20   but they don't all.  He said 20 percent of them have private

21   lakes.

22           MR. VESPER:  If Your Honor, please.  Of that 20

23   percent -- here's what you're doing.  You're making up your

24   mind in advance.  But here's the thing.  This jury, none of

25   them, none of them have ever owned or operated anything with

STAVES – DIRECT – VESPER

**1**   close to 300, let alone 600 units.

**2**        THE COURT:  They don't need an expert –– that's a

**3**   fair issue.  I mean, it's a fair issue, the number of

**4**   children.

**5**        MR. VESPER:  So here's the point.

**6**        THE COURT:  That's not expertise.

**7**        MR. VESPER:  He knows, he knows –– if I could just

**8**   finish this thought.  He knows that to operate a facility,

**9**   whether it's half this size, a mom and pop operation, and he's

**10**  agreeing with me, whether it's a mom and pop operation or a

**11**  big corporation, once you have a guard, you have to have ––

**12**  which you're not required to, you have to have the guard

**13**  continue every single night of your full season.  That's what

**14**  the majority do.

**15**       Now, let's say, like you said, there's only 20 percent

**16**  of the five, 6,000 that have man-made lakes, okay?  But of

**17**  that 20 percent, which is what, a thousand?  No.

**18**       THE COURT:  Yeah, it's almost.

**19**       MR. VESPER:  Let's say ––

**20**       THE COURT:  1200.

**21**  BY MR. VESPER:

**22**  Q.  Have you been to more than 50 percent of that thousand?

**23**  A.  I'd think so, but I never count how many have lakes

**24**  because water is very common in campgrounds.

**25**       MR. VESPER:  Right.

STAVES – DIRECT – VESPER

 1          THE COURT:  But pools are almost universal, inground

 2    pools.

 3          THE WITNESS:  Not universal.  But the first pools

 4    were actually put in the campgrounds in 1970.

 5          THE COURT:  But a lot of them that don't have lakes

 6    do have pools.

 7          THE WITNESS:  A lot do, but I mean, it's not

 8    universal.

 9          MR. VESPER:  Here's what he's saying.

10          THE COURT:  No, no, don't you tell me what he's

11    saying.

12          MR. VESPER:  I'm just trying to summarize it because

13    I know somewhere there's a white rabbit with a watch and he's

14    saying, relate, relate.  I know I'm going to see him.  He's

15    going to pop up.  All I'm trying to do is summarize and

16    represent to the Court, let me represent to the Court, he's

17    not -- I'm not offering him to give an opinion as to whether

18    or not any of these measures would have in all probability

19    prevented the drowning.

20          What I am asking him is, what do the majority of the

21    campgrounds in America do for lighting of water -- water, by

22    the way, which -- any kind of water that constitutes a risk of

23    drowning, what do they do once they do start surveilling.

24          THE COURT:  His first opinion is that the majority of

25    people that have private lakes have patrols that go around

STAVES - DIRECT - VESPER

 1   them?

 2          THE WITNESS:  They patrol the entire campground.

 3          THE COURT:  Okay.  And what's the other opinion?

 4          THE WITNESS:  The other opinion --

 5          MR. VESPER:  The other -- I'm sorry.

 6          THE COURT:  You said there were two.

 7          MR. VESPER:  Yes.

 8          THE COURT:  What's the other one?

 9          MR. VESPER:  I forgot.

10          THE WITNESS:  The other opinion is that lighting is a

11   deterrent to kids coming into various places.

12          MR. VESPER:  There's actually three.  That was not

13   what I was thinking.

14          THE WITNESS:  Okay.

15          MR. VESPER:  I was thinking once you have -- well,

16   here's the other one.  Once you decide to put up surveillance

17   cameras, which you don't have to do, you forgot, too, the

18   surveillance cameras should be placed where?

19          THE WITNESS:  Wherever there's going to be a problem.

20          MR. VESPER:  And is drowning --

21          THE COURT:  You say majority of the private lakes

22   have surveillance cameras?

23          THE WITNESS:  No, I did not.  I have --

24          THE COURT:  That might be the least credible thing

25   you could possibly say.

*United States District Court*
*Camden, New Jersey*

STAVES – DIRECT – VESPER

 1          MR. VESPER:  No, that's not the question.

 2          THE WITNESS:  My personal opinion, Your Honor, is I

 3  do not like surveillance cameras.

 4          THE COURT:  We heard it from him.

 5          MR. VESPER:  No.  I'm trying my case.  You're trying

 6  your case.  Here's what I'm trying to ask.  Forget what the

 7  Judge just said.  You can't forget it.

 8          THE COURT:  I didn't say anything.  He said it.

 9          MR. VESPER:  You asked the question about whether the

10  majority do.  They don't.  The majority don't.  But here's the

11  proper question, I think.  Respectfully, I say this.  Here's

12  the question.

13  BY MR. VESPER:

14  Q.   When the campsite does do it, which the majority don't,

15  that portion of the universe of campsites, once they do it,

16  don't they put surveillance over the water hazards?

17  A.   They put them everywhere there's a possibility of an

18  accident.

19          MR. VESPER:  That's it.  Now, how -- does the jury

20  know that?  You didn't -- with all respect, did you know that?

21  I don't think so, because you -- Judge, a jury doesn't know

22  that.  That's why an expert is needed in a case of this -- I

23  think --

24          THE COURT:  His one opinion that he wants to give

25  that matters is that in a large -- he admits, there's no

STAVES – DIRECT – VESPER

1  standards, there's no laws, there's no anything, ut he says

2  the best practices, if that's the right -- that the majority

3  of the 20 percent that have lakes do have a patrol around

4  them.

5           MR. VESPER:  Right.

6           THE COURT:  That's what he says.  He says they don't

7  have cameras, they don't have surveillance cameras, but they

8  do have patrols.  And I don't know, maybe he's going to say

9  they have lights, I don't know whether that -- if that's the

10 case.

11          THE WITNESS:  And in my deposition, I pointed out

12 that the Trailer Life Directory --

13          MR. VESPER:  Not in his deposition.  He meant his

14 report.

15          THE WITNESS:  I mean my report.  That scores every

16 campground in the United States --

17          THE COURT:  Your report -- well --

18          THE WITNESS:  Well, let me finish my --

19          THE COURT:  Yeah.

20          THE WITNESS:  Trailer Life gives extra points on the

21 score of any campground.

22          THE COURT:  Who?

23          THE WITNESS:  Railer Life, the directory.

24          THE COURT:  Yeah.

25          THE WITNESS:  They rate every campground.

*United States District Court*
*Camden, New Jersey*

STAVES - DIRECT - VESPER

1          THE COURT:  What was the rating on this campground?

2          THE WITNESS:  They were not rated because they were

3    not -- they're a permanent seasonal type residence open to the

4    public.

5          THE COURT:  And what's the relevance if you're not

6    the type to be rated, what difference does it make whether --

7          THE WITNESS:  Because it's still a campground open to

8    people.

9          THE COURT:  But they may have gotten the extra point,

10   who knows.

11         THE WITNESS:  Well, but my point is that Trailer Life

12   gives an extra point for lighting all of the activities.  I'm

13   not the only one who said that.

14         THE COURT:  I read that sentence and that sentence

15   was more ambiguous than you make it for the extra one point.

16         All right.  So the opinion -- you're going to elicit

17   from him that a majority of the 20 percent of the camps that

18   have sort of natural or man-made natural lakes, above and

19   beyond a swimming pool, would have roving patrols around the

20   lake --

21         THE WITNESS:  Staff, staff that do that.

22         THE COURT:  He would have to say what hours he thinks

23   they are, and lighting.

24         THE WITNESS:  Yeah.

25         THE COURT:  Okay.  And now what else other than that

STAVES – DIRECT – VESPER

1   do you want to elicit?

2          MR. VESPER:  I thought -- and also he just testified

3   that once the -- once that 20 percent, the majority of the 20

4   percent put up surveillance cameras, they're going to put

5   surveillance cameras in areas such as those that represent --

6          THE COURT:  He testified that he doesn't like

7   surveillance cameras --

8          MR. VESPER:  I know that.

9          THE COURT:  -- and that majority don't use them.

10          MR. VESPER:  No -- oh, yes, he did say that.

11          THE COURT:  Both of those things he said.

12          MR. VESPER:  But that's the wrong question.  Here's

13   the right question.  It's not the majority -- believe me, this

14   is serious.  I don't act like it sometimes, but this is

15   serious.  If the majority of republicans favor one, one

16   person, so the minority favor -- let's just use a name --

17   Nixon, of those people that, you know, favored Nixon, were

18   they, you know --

19          THE COURT:  Come on.

20          MR. VESPER:  You know, we're using 20 percent is

21   this, of the --

22          THE COURT:  You're not going to put a witness that

23   say he doesn't like surveillance lights and majority don't use

24   it but these people should have done it.

25          MR. VESPER:  No.

*United States District Court*
*Camden, New Jersey*

STAVES – DIRECT – VESPER

1          THE COURT:  It's not going to happen.

2          MR. VESPER:  That's not what he's going to say.

3          THE COURT:  It's not going to happen.

4          MR. VESPER:  That's not what he's going to say.

5          THE COURT:  What are you going to say?

6          MR. VESPER:  These people didn't have to do it, but

7   once they did it, the majority of those that do put up

8   surveillance, they put it near the water hazards.  That's what

9   he's going to say.  You're taking it and distorting it.

10   You're distorting it.

11          THE COURT:  I'm distorting it when he says I don't

12   approve of it --

13          MR. VESPER:  That's right.

14          THE COURT:  -- and it's not done by majority of

15   people.

16          MR. VESPER:  Of all -- yeah, but you're taking the

17   whole.  You're saying.

18          THE COURT:  I don't want to argue with you.

19          MR. VESPER:  You don't get it?

20          THE COURT:  No, I don't get it.  I guess I'm just a

21   dummy.

22          MR. VESPER:  You're not.  You're just saying the

23   majority don't do it, but those that do choose to do it --

24          THE COURT:  I'm not going to let him testify to that.

25          MR. VESPER:  All right.

STAVES – DIRECT – VESPER

**1**        THE COURT:  I'm going to consider letting him testify

**2**   as to the -- that a majority have patrols, although he has to

**3**   be clear as to when those patrols are.  However --

**4**        MR. HERMESMANN:  Judge, can I --

**5**        THE COURT:  Just a minute, let me finish.

**6**        Starting no later than 3:30, if Karen is alive and

**7**   well, you're going to take his deposition.

**8**        MR. HERMESMANN:  Judge, I don't want to take his

**9**   deposition because we're in the middle of this trial and

**10**  whatever I get from the deposition might require me two weeks

**11**  of work to counter what he has to say.  So me taking his

**12**  deposition, does nothing for me.  It just says, okay, we

**13**  checked the block, I took his deposition, I know what he's

**14**  going to say but it doesn't help me counter what I could

**15**  obtain in that deposition, and this is not the time for it.

**16**  Discovery on this case closed six, nine, 12, however long ago

**17**  it was.

**18**        THE COURT:  Discovery was botched.  This report was

**19**  botched.

**20**        MR. HERMESMANN:  But I didn't --

**21**        THE COURT:  I'm trying to salvage it.  The report was

**22**  terrible.  I mean, there's no question, the report for an

**23**  expert's report was horrendous and --

**24**        MR. VESPER:  Counsel still could have taken a

**25**  deposition a year ago.

STAVES – DIRECT – VESPER

1        MR. HERMESMANN:  I'm not required --

2        THE COURT:  No, but he doesn't --

3        MR. VESPER:  You're not.  I'm not only suggesting.

4        THE COURT:  You give a conclusion here.  The

5   conclusion is, and I'm going to read it, it is my opinion,

6   based upon what is reasonably probable, that if the Pine Haven

7   campground had utilized the police to patrol the park on

8   Sunday evening after dusk -- that alone is a question -- as

9   they did on Friday and Saturday.  Well, they didn't do it,

10   they did it later than that, they started at 10.  And,

11   thereby, enforced their own written rules regarding use of the

12   swimming pool/lake by campers and guests, and they say the

13   accident wouldn't have happened.

14        The expert -- look, I put steel fence with barbed wire

15   around the lake.  I don't need an expert to tell me that would

16   keep out swimmers.  If I put some guys with guns to shoot at

17   anybody that comes in the lake, that would do it.  If I had

18   have lights that blared an ugly message, that would probably

19   do it.  I mean, I could think of all kinds of ways to keep

20   people from swimming.  But you don't need an expert to tell me

21   that.

22        THE WITNESS:  Okay.  But I think the strongest point,

23   Your Honor, is the fact that majority of the campgrounds in

24   the United States use a lot more employees to patrol the

25   entire campground from dusk to dawn to -- into the night.

STAVES - DIRECT - VESPER

1          THE COURT:  It's got to be more specific than that.

2    That's why I want the deposition.  I just want an even --

3          THE WITNESS:  Like in our particular case, which is

4    typical --

5          THE COURT:  I mean, there may be people who generally

6    are on ground, they are driving around, you know, a 50-acre

7    site.  That's different than having the patrol around the

8    lake, and quite candidly, I don't know how you know that.  I'm

9    very skeptical, based --

10          THE WITNESS:  I'm just saying --

11          THE COURT:  You're saying, well, I visited lots of

12    them, about 20 percent, and a majority.  I offer somebody a

13    chance to take a deposition without even ruling yet on what

14    I'm going to do.

15          MR. HERMESMANN:  Judge, here else is the problem, is

16    that do I want to spend two or three hours -- I've got two

17    other experts I've got to cross tomorrow.  I shouldn't be put

18    in this position while I'm preparing this case for trial right

19    in the middle of it and I need to take their expert's

20    deposition when you look at his conclusion and what are

21    supposed to be his opinions when they're clearly barred by

22    *Daubert*.  This is a sole report he has written.  I am not

23    required nor should have taken his deposition based upon this

24    report.  This report in and of itself is insufficient to allow

25    him to come in and testify before a court.

STAVES – DIRECT – VESPER

**1**          THE COURT:  Why should I let him change his opinion

**2** now?  Why should I let him give a new opinion that he didn't

**3** give before?

**4**          MR. VESPER:  I beg you to focus on what I asked him.

**5** What I asked him --

**6**          THE COURT:  No, no.  He wrote a report.

**7**          MR. VESPER:  It's not the last --

**8**          THE COURT:  He didn't say 20 percent had natural

**9** lakes.

**10**          MR. VESPER:  He said the majority.  He said the --

**11**          THE COURT:  No, no, no.  20 percent had this kind of

**12** configuration is what he said.

**13**          MR. VESPER:  Here's what you're missing, please,

**14** Judge.  I am not asking him the last paragraph.  I told you

**15** that in chambers, that if you take things out of context and

**16** say he's not going to testify because that last paragraph is

**17** unsupported, I'm not disagreeing.

**18**          THE COURT:  But his opinion --

**19**          MR. VESPER:  That's not his opinion.  Here's his

**20** opinion and they've had it now for over a year.  He said the

**21** majority.

**22**          THE COURT:  Where?

**23**          MR. VESPER:  He said.  Ou have your opinion in front

**24** of you?

**25**          THE COURT:  Yeah.

*United States District Court*
*Camden, New Jersey*

1          MR. VESPER:  All right.  Today -- this is on Page 2.

2          MR. HERMESMANN:  Where?

3          MR. VESPER:  Pine Haven swimming lake has a major

4   attraction.

5          THE COURT:  Okay.  I got that at the top.

6          MR. VESPER:  He says the majority of private sector

7   campgrounds have a swimming pool or to a lesser degree they

8   have small pools.  Then it goes on to say -- where did I -- I

9   underlined where it said majority.

10         THE COURT:  Well, swimming pools, that's different.

11  I agree that a large number of swimming pools, but probably --

12  my guess is the majority of privately owned probably do have

13  swimming pools, but that's not what we're talking about here.

14         MR. VESPER:  No, no, I understand that.  He talks at

15  the bottom, Pine Haven rules of operation, the rules must be

16  enforced.  They didn't enforce them, patrolling the park --

17  okay.  Then, see where it says the lighting choices?  This

18  comes right after.

19         THE COURT:  Tell me where you --

20         MR. VESPER:  Pine Haven lighting choices.  Neither

21  the State of New Jersey nor the NFPA code --

22         THE COURT:  Okay, I got it.

23         MR. VESPER:  Right.  And then it says most RV parks

24  in the United States provide lighting throughout the park

25  during the night with full-time fixtures.  He's talking about

STAVES - DIRECT - VESPER

1  most or I said majority.  Then further down in that same

2  paragraph, although there's no -- it says, quote, although

3  there's no specific law requiring a specific level of lighting

4  in the common areas, the majority --

5           THE COURT:  Where?

6           MR. VESPER:  It says, the major directory --

7           THE COURT:  I got it.

8           MR. VESPER:  -- for RV parks in North America

9  inspects almost all parks on an annual basis and they provide

10  extra points where parks provide well-lit.  And then two major

11  directories he talks about.

12           THE COURT:  But they don't -- they're not talking

13  about specifically lakes.  Even this park has lights all over

14  the park.  There's lights all over this park.

15           THE WITNESS:  There is.

16           THE COURT:  Yeah, this is not a question they don't

17  have lighting.  They do have lighting.  We've had testimony

18  about that.

19           MR. VESPER:  Where was the best practices?

20           THE COURT:  His point is lighting that's very

21  specific to the entry place on the lake.

22           MR. VESPER:  Where do you say "best practices,"

23  Homer?  I can't find it and I'm rushing.  I know you make

24  reference.  It's your word, "best practices."

25           THE WITNESS:  Right.  I forget where I referred to it

STAVES – DIRECT – VESPER

**1**   as best practices, but that's kind of standard in the industry

**2**   where you have no specific hard written code.

**3**       MR. VESPER:  Yeah.

**4**       THE WITNESS:  That you would rely on best practices

**5**   that majority of the people are doing, and that becomes kind

**6**   of the guidance for new parks or new people.

**7**       MR. VESPER:  But the best practices are based on what

**8**   -- again, the majority do.

**9**       THE WITNESS:  The majority do.

**10**      MR. VESPER:  Where is -- am I going crazy?  I can't

**11**  find it.

**12**      THE COURT:  I don't want to sit here now and do this.

**13**      THE WITNESS:  I mean, I think --

**14**      THE COURT:  I'm --

**15**      MR. VESPER:  You pointed it out.  You said best

**16**  practices.

**17**      THE COURT:  Mr. Vesper, I'm going to only allow you

**18**  -- I'm going to allow him to testify.

**19**      MR. HERMESMANN:  Judge --

**20**      THE COURT:  My only guess is that he's just pulling

**21**  this out of thin air, but that 20 percent have artificial

**22**  lakes and that a majority of those have patrol, not generally

**23**  around the place, but around the lake itself, to keep people

**24**  from getting into the lake.

**25**      THE WITNESS:  Those are your words, not mine.  I said

STAVES – DIRECT – VESPER

**1** they patrol the entire campground.

**2**             MR. VESPER:  Yeah, including the lake.

**3**             MR. HERMESMANN:  Judge --

**4**             THE COURT:  Well, you have an 80-acre, 85-acre --

**5**             THE WITNESS:  I've got a 2,000-acre park in Houston.

**6**             THE COURT:  If somebody is patrolling the whole park.

**7**             THE WITNESS:  Yep.

**8**             THE COURT:  Well, that weakens the opinion, quite

**9** candidly.

**10**             MR. HERMESMANN:  Judge, it's not an opinion that he's

**11** voiced in this report.  You've said, you think he's pulling it

**12** out of thin air.  There's no *Daubert* compliance, and

**13** nonetheless, you're going to let him testify?

**14**             THE COURT:  There's a stinger.  I'm going to let the

**15** jury decide the case.  If the jury decides in favor of the

**16** plaintiff, the plaintiff runs a big risk that I'm going to

**17** just pull the verdict, I'm going to set it aside.  I have to

**18** tell you, you have vast experience, but this report is a

**19** travesty and it's, I'm smart, I've seen lots and lots of

**20** campgrounds, hundreds and thousands of them, and I know what

**21** percentages who have lakes and just trust me, they should have

**22** had a patrol.  Not around the whole grounds.  Is that your

**23** testimony, your opinion, they should have had one that covered

**24** the whole 85 acres?

**25**             THE WITNESS:  Yeah, we do it all the time.

*United States District Court*
*Camden, New Jersey*

STAVES – DIRECT – VESPER

1          THE COURT:  But 85 acres in a golf cart, the person

2    can be far distance from --

3          THE WITNESS:  It's a deterrent that people know that

4    they're coming through.  I mean, this isn't that you're trying

5    to stop a criminal.  You're trying to stop kids from doing

6    things they shouldn't be doing.

7          MR. VESPER:  And you're becoming an expert, Judge.

8    Like you're -- I can see that you have doubt in your eyes.

9    This is best practice.  See where you said as a best practice

10   in the RV park industry?  He made reference to it in the top

11   paragraph of Page -- I knew I saw it, I wasn't going crazy.

12   It was Page 3.

13         THE COURT:  I'm going to let him give that opinion,

14   but if you try to expand it.

15         MR. VESPER:  I won't.

16         MR. HERMESMANN:  What opinion is going to be

17   permitted, Judge?  Because I gotta tell you, I'm flabbergasted

18   that he's going to be able to testify.

19         MR. VESPER:  It's the rover.  It's the rover.  Am I

20   correct?

21         THE COURT:  You're flabbergasted.  I'm trying to keep

22   this case from turning into a nightmare and I'm going to let

23   the jury decide it, but quite candidly, I think there's going

24   to be a big chance if they come out for the plaintiff, I'm

25   going to set it aside, based on his testimony.  Because his

STAVES – DIRECT – VESPER

1   testimony is just a travesty and there's no other way I can

2   describe it.

3        The witness doesn't get on the stand and, well, I've

4   seen 5,000 parks, I know that 500 of them have -- which 500?

5   Which lakes?  What kind of lakes?  How big are the parks?  He

6   parks about a park that may be 2,000 acres.  Well, somebody

7   patrolling a whole park, it's like Fairton prison has a guy

8   outside the wall who goes around the wall in a jeep with a

9   gun --

10        THE WITNESS:  It's a deterrent.

11        THE COURT:  -- and while they did it, my friend John

12   Powers managed to escape.

13        THE WITNESS:  Yep.

14        THE COURT:  And --

15        THE WITNESS:  But we're not dealing with criminals.

16        THE COURT:  No.  Worse.  Teenagers.

17        THE WITNESS:  But you were one, once.

18        THE COURT:  Oh, of course I was.

19        MR. HERMESMANN:  Judge, I'm still not certain as to

20   what's going to be permitted testimony and I haven't had the

21   opportunity to at all --

22        THE COURT:  I was going to give you the chance to

23   depose him.

24        MR. HERMESMANN:  Judge, an expert --

25        THE COURT:  All right, you turn it down, fine.

STAVES – DIRECT – VESPER

 1          MR. HERMESMANN:  But it's a three to four-hour

 2     deposition.

 3          THE COURT:  You turn it down, fine.

 4          MR. HERMESMANN:  I am turning it down.

 5          THE COURT:  Okay.  I'm not forcing you to take a

 6     deposition.

 7          MR. VESPER:  The opinion is limited to the rover.  Is

 8     that your ruling?

 9          THE COURT:  And he said something about lights.

10          THE WITNESS:  Yeah.

11          THE COURT:  All right.  I'll let him, he will do his

12     cross.

13          MR. VESPER:  So be it.

14          THE COURT:  As I say the jury --

15          THE WITNESS:  But I won't be saying anything that's

16     on that last photograph.

17          THE COURT:  What?

18          THE WITNESS:  I said I won't say whatever is on that

19     last paragraph.

20          THE COURT:  No.  The notion --

21          MR. HERMESMANN:  Judge --

22          THE COURT:  I don't need an expert to tell me what

23     kind of restrictions might limit the chance of -- you know, as

24     I say, you could have all, I could think of ten different

25     things that would probably work.

STAVES – DIRECT – VESPER

**1**          THE WITNESS:  Sure.

**2**          THE COURT:  You know, including, I might add, a fence

**3** with barbed wire on it.

**4**          THE WITNESS:  Berlin wall.

**5**          THE COURT:  Yeah or a Berlin wall.

**6**          THE WITNESS:  Yeah, okay.

**7**          MR. HERMESMANN:  Judge, am I to understand, then,

**8** that the witness will be --

**9**          THE COURT:  This case should have been settled.

**10** You're both pig headed.  This is what I'm doing, all right?

**11**          MR. HERMESMANN:  Judge, I want to make sure.

**12**          THE COURT:  I'm giving you a chance to depose him,

**13** you refuse.  Okay.  It's okay with me.

**14**          MR. HERMESMANN:  Judge, I'm going to get my point on

**15** the record.  I mean, I didn't produce this witness, the

**16** plaintiff did.  I didn't write the report.  I raised an

**17** appropriate objection to him.  So --

**18**          THE COURT:  And I'm ruling favorably --

**19**          MR. HERMESMANN:  No, you're not.

**20**          THE COURT:  -- on almost all of your objections.

**21**          MR. HERMESMANN:  Judge, you just allowed him -- he

**22** got two points in his report.  You just said he could testify

**23** to both of them.

**24**          MR. VESPER:  And not the conclusion.

**25**          THE COURT:  Not the conclusion that it would have

STAVES – DIRECT – VESPER

 1  stopped anything.  And if you can't think of cross

 2  examination --

 3          MR. HERMESMANN:  Judge, I'm not worried about my

 4  cross examination.

 5          THE COURT:  No, I didn't think you would be.

 6          MR. HERMESMANN:  That's not the issue.

 7          THE COURT:  And I agree with you.

 8          MR. HERMESMANN:  I just want to make sure that we're

 9  clear that the Court's permitting him to testify beyond four

10  corners of his report.

11          THE COURT:  Look, it won't do him any good because if

12  he gets a verdict, the Circuit is going to set it aside.

13          MR. VESPER:  Can I take exception?  You can't say

14  he's testifying beyond the four corners.  It's directly on

15  Page 2 and 3.

16          THE COURT:  No, it's not.  This report is a travesty

17  and you refuse --

18          MR. VESPER:  You keep saying that.

19          THE COURT:  And you refuse to admit it.

20          MR. VESPER:  I refuse to admit that your

21  interpretation of the last paragraph is his entire report.

22  You can't say --

23          THE COURT:  That's what he says is my opinion.

24  That's my opinion.

25          MR. VESPER:  It's on the last page.

STAVES – DIRECT – VESPER

 1          THE COURT:  It's the conclusion, "my opinion."

 2          MR. VESPER:  I know, it's the conclusion.  So if he

 3  had some opinions that led up to the final opinion, you've

 4  allowed him.

 5          THE COURT:  Show me where he said that 20 percent of

 6  the private things have lakes that are similar to this one.

 7          MR. VESPER:  He said --

 8          THE COURT:  Where is that?  Where is that?

 9          MR. VESPER:  He didn't give a percentage.  It's not a

10  percentage that's in there.

11          THE COURT:  Okay.  Where does it say that those that

12  do have private lakes, that a majority of them have patrols

13  that go -- well, he has no opinion, by any stretch of the

14  imagination, they go around the lake.  He might -- you might

15  stretch it to say he has opinions they go around the property

16  itself.

17          THE WITNESS:  I just answered the questions you asked

18  me, Judge.

19          THE COURT:  Not that I asked you.

20          THE WITNESS:  Yes, you did.  You just asked me.

21          MR. VESPER:  He doesn't say those exact words, but he

22  references the majority of the best practices.

23      Now, if a doctor gave an opinion and on the first page,

24  he talked about a patient's symptoms, and then on the last

25  page, he gave some weird prognosis, if you strike the

STAVES - DIRECT - VESPER

**1** prognosis, you still got to leave the diagnosis.

**2**          THE COURT:  Look, he's --

**3**          MR. HERMESMANN:  Judge --

**4**          THE COURT:  -- he's trying to -- instead of -- it's

**5** not like he said, here are 10 campgrounds that are similar to

**6** this one, in some way, after 5,000, I've examined each of the

**7** 10, this is what they do in best practices.  He doesn't do

**8** that.  He says, hey, I'm a big deal, I've been here 25 years,

**9** I've seen 10,000 things, I think 20 percent have this and I

**10** think that majority of those have some kind of roving patrol,

**11** not necessarily around the lake, but around the premises.

**12** That's not an expert opinion.  That doesn't even get close to

**13** passing *Daubert*, all right?  But I'm going to let you do it.

**14**          MR. VESPER:  Thank you.

**15**          THE COURT:  Because you guys are making your own bed

**16** and you're lying in it and you want to carry this litigation

**17** on for the next ten years, be my guest.

**18**          And I've offered him a chance to take a deposition now

**19** for a couple of hours.  He doesn't want to do it.  I'm not

**20** going to force him to do it.

**21**          And I'm limiting your opinion to those two opinions,

**22** that there's a majority have lakes similar, although, for the

**23** life of me, how he comes up with that number, I don't know,

**24** but he has 20 percent have natural lakes in addition to

**25** inground pools and that of those, a majority of those have

STAVES - DIRECT - VESPER

1    some kind of roving patrol, not necessarily around the lake,

2    but around the whole property and that a majority have

3    lighting of some kind, some kind of lighting around the pool

4    area -- the lake area.  It's going to be his opinion, all

5    right?

6            MR. VESPER:  Thank you, Your Honor.

7            THE COURT:  As I say, I am -- you know, I've written

8    many opinions on *Daubert*, including for the Circuit, as well

9    as for the District.  I'm followed fairly widely around the

10   country.  And when I say this is a travesty, I mean it's a

11   travesty, the way it was presented.  But I'm going to let

12   those two opinions, I'm going to let him cross-examine, and I

13   reserve the right after I hear the whole case, if I think that

14   that has polluted the case or shouldn't have been allowed,

15   I'll just strike the verdict.  If it -- I mean, a plaintiff's

16   verdict, I'll strike it.

17           A defense verdict, it won't make a difference.  Okay?

18   Whether that's the right thing or the wrong thing, I don't

19   know.  A case that's this serious, quite candidly, hasn't been

20   treated with the seriousness it should have been treated with.

21   When you start asking for millions of dollars of money, you

22   know -- I tried the antitrust case one accountant charged

23   $2,750,000 for his opinion.  How much did you charge for

24   yours?

25           THE WITNESS:  4,000.

STAVES - DIRECT - VESPER

 1          THE COURT:  Hey, a broken down orthopedist who got a

 2  D.O. charges 10 to come to court for a day.  And -- so he

 3  charged $4,000.  Okay.  That's the way we're going to go.

 4          MR. VESPER:  Thank you very much, Your Honor.

 5          THE COURT:  We will start at 8:30 tomorrow.  Is he

 6  the first witness?

 7          MR. VESPER:  Yes, Your Honor.

 8          MR. HERMESMANN:  Can I have a representation --

 9          THE COURT:  But I'm going tell you, if you stray even

10  an inch from what I did, I will come -- you know what Tennyson

11  said:  The Assyrian came down like the wolf from the fold and

12  his cohorts were gleaming in purple and gold.

13          And I'm going to come down --

14          MR. VESPER:  No, you won't.

15          THE COURT:  -- like Tennyson's cohorts.

16          MR. HERMESMANN:  I'll be here at 0800.

17          THE COURT:  Yeah, and we'll get time and I want him

18  -- he will be on the stand and whatever happens.  And again, I

19  want the record clear, I've offered a deposition and counsel,

20  which is his right, has -- has turned it down.  So...

21          MR. HERMESMANN:  It's probably already on the record,

22  but it's now 3:25 and I have other experts to prepare for and

23  other witnesses to prepare for.

24          THE COURT:  Well, you won't have your witnesses

25  tomorrow.

*United States District Court*
*Camden, New Jersey*

STAVES – DIRECT – VESPER

1          MR. VESPER:  I have cross examination of their

2    witnesses.

3          THE COURT:  Oh, of their witnesses.

4          MR. VESPER:  We have for tomorrow, just so the Court

5    knows and my adversary --

6          THE COURT:  You have Tinari tomorrow?

7          MR. VESPER:  No.

8          THE COURT:  Who do you have as your other witness?

9          MR. VESPER:  That was the original plan, but here's

10   the plan.  Everything backed up.

11        The plan tomorrow is to get Mr. Staves on.

12         THE COURT:  He's first, then what's next.

13         MR. VESPER:  Right.  Then comes.

14         MR. CICCOTTA:  Timothy Miller, Anthony Miller,

15   Anthony Dioscon.

16         THE COURT:  The two Millers -- three Millers.

17         MR. CICCOTTA:  Including the boy.

18         MR. VESPER:  Including the boy and then is --

19         MR. CICCOTTA:  Michelle.

20         MR. VESPER:  Michelle.  I keep calling her Heather.

21         THE COURT:  Michelle Wheeler.

22         MR. VESPER:  Wheeler, and that should fill the day.

23   So there's no -- other than Mr. Staves, there's no expert for

24   tomorrow.  We probably will have will have on -- tomorrow is

25   Wednesday.

STAVES – DIRECT – VESPER

1          So on Thursday, we're going to have Professor Tinari.

2    And Dr. Jason is in trial, so he's not available Thursday.

3    He's available Monday.

4          THE COURT:  Doctor who?

5          MR. VESPER:  Dr. Jason, the forensic pathologist.

6          THE COURT:  Oh, pathologist.  Medical man.

7          MR. VESPER:  Medical man, yes, sir.

8          THE COURT:  Okay.

9          MR. VESPER:  So that's the lineup for now.

10         THE COURT:  Okay.

11         MR. VESPER:  I don't even know if our client is going

12   to be able to testify.

13         THE COURT:  Just remember the tombstone in Alabama.

14         MR. VESPER:  I don't know the tombstone in Alabama.

15         THE COURT:  Here lies the body of John Jay who died

16   maintaining the right of way.  He was right, dead right, as he

17   sped along, but he's just as dead as if he were wrong.

18         MR. VESPER:  That's a good one.

19         THE COURT:  So it's right next to the tombstone that

20   has a bull on it because he sired 9,000 calves.  But that's

21   the -- that's the -- that's the next tombstone next to that

22   one.

23         MR. VESPER:  I don't want to be one of those

24   tombstones.

25         THE COURT:  Okay.

STAVES – DIRECT – VESPER

1        MR. CICCOTTA:  Thank you, Your Honor.

2        MR. VESPER:  Thank you, Your Honor.

3        THE COURT:  Okay, see you tomorrow.

4        (3:28 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$10** [2] - 219:21, 219:23
**$2,000** [1] - 291:16
**$2,750,000** [1] - 390:23
**$20** [1] - 318:2
**$4,000** [4] - 313:10, 313:20, 315:10, 391:3
**$5,000** [3] - 251:16, 251:20, 252:22

## '

**'10** [1] - 296:18
**'80s** [1] - 285:6

## /

**/S** [1] - 134:24

## 0

**0800** [1] - 391:16
**08101** [1] - 134:12

## 1

**1** [5] - 172:5, 304:7, 305:1, 323:18, 323:19
**10** [26] - 160:25, 161:1, 172:4, 172:5, 176:4, 217:18, 217:20, 218:24, 218:25, 219:1, 245:11, 256:9, 279:16, 290:12, 305:13, 307:6, 359:13, 363:22, 363:25, 364:2, 376:10, 389:5, 389:7, 391:2
**10,000** [2] - 278:12, 389:9
**10-minute** [1] - 171:24
**100** [4] - 154:21, 314:11, 315:17
**104** [3] - 135:18, 265:19, 270:11
**105** [1] - 139:23
**10:13** [1] - 172:11
**10:41** [1] - 186:7
**10:55** [1] - 196:4
**11** [4] - 186:5, 186:6,

187:24, 196:1
**11:06** [1] - 196:6
**12** [3] - 290:12, 346:21, 375:16
**12-4975** [1] - 134:6
**12-years-and-one-month-old** [1] - 154:23
**1200** [1] - 367:20
**12:24** [1] - 266:5
**12:35** [1] - 276:22
**12:42** [1] - 276:24
**13** [1] - 148:2
**14** [4] - 148:2, 150:4, 159:19, 217:1
**14,000** [1] - 358:13
**14-year-old** [15] - 150:15, 150:18, 154:24, 155:9, 155:10, 155:13, 156:3, 156:9, 158:10, 159:14, 163:7, 164:18, 164:21, 177:2, 351:14
**14-year-olds** [1] - 158:25
**15** [13] - 148:2, 229:12, 229:16, 274:5, 285:7, 328:2, 328:3, 328:7, 328:8, 328:9, 328:10, 359:9, 359:14
**15,000** [3] - 357:15, 357:18, 358:1
**15-minute** [1] - 186:1
**150** [3] - 314:9, 314:11, 315:17
**159** [2] - 283:24, 284:2
**16** [3] - 175:25, 305:9, 310:23
**17** [3] - 284:2, 303:21, 346:3
**1715** [2] - 193:14, 193:16
**1790** [1] - 194:1
**18** [1] - 315:19
**19** [3] - 182:22, 182:23, 357:14
**196** [1] - 135:4
**1966** [1] - 275:8
**1967** [1] - 358:17
**197** [1] - 135:5
**1970** [2] - 361:3, 368:4
**1st** [1] - 304:10

## 2

**2** [19] - 138:6, 138:8,

172:16, 196:11, 196:13, 217:18, 217:20, 218:24, 218:25, 219:1, 245:11, 256:10, 279:16, 307:7, 343:2, 362:16, 366:2, 379:1, 387:15
**2,000** [1] - 384:6
**2,000-acre** [1] - 382:5
**20** [29] - 177:16, 224:10, 225:14, 226:5, 227:7, 227:21, 258:7, 293:25, 294:22, 298:18, 322:2, 338:2, 363:8, 366:20, 366:22, 367:15, 367:17, 371:3, 372:17, 373:3, 373:20, 377:12, 378:8, 378:11, 381:21, 388:5, 389:9, 389:24
**20-minute** [1] - 306:24
**200** [1] - 285:9
**2000** [2] - 218:16, 359:4
**2008** [2] - 204:20, 204:21
**2009** [1] - 304:10
**2010** [47] - 139:11, 163:11, 174:17, 174:20, 174:23, 176:8, 176:12, 199:16, 199:17, 199:22, 200:21, 201:3, 216:25, 220:2, 220:11, 222:11, 224:10, 225:15, 226:6, 229:7, 250:24, 261:22, 271:11, 273:20, 277:4, 286:2, 294:22, 301:7, 302:5, 302:14, 302:15, 304:11, 304:16, 313:1, 315:20, 323:4, 324:22, 324:24, 334:15, 338:9, 338:20, 339:11, 339:18, 341:3, 343:8, 348:8
**2013** [1] - 226:4
**2014** [2] - 345:13, 347:11
**2015** [2] - 134:13, 137:1, 357:14
**21st** [1] - 296:18

**23rd** [2] - 197:8, 304:16
**24** [2] - 170:14, 217:12
**24/7** [6] - 152:14, 170:14, 170:18, 282:18
**25** [3] - 358:17, 359:1, 389:8
**25th** [3] - 345:7, 345:13, 347:11
**28** [2] - 134:23, 217:8
**284** [1] - 135:7
**2:08** [1] - 353:23
**2:09** [1] - 354:11
**2:30** [3] - 189:23, 354:2, 354:3
**2:45** [1] - 354:13

## 3

**3** [5] - 291:16, 304:12, 362:16, 383:12, 387:15
**30** [20] - 153:1, 198:3, 217:8, 224:11, 225:15, 226:5, 227:7, 227:21, 294:22, 322:2, 334:21, 336:17, 347:22, 347:23, 347:24, 351:20, 351:21, 351:24
**30/b** [1] - 198:3
**30(b)(6)** [2] - 198:4, 198:5
**300** [4] - 136:6, 166:7, 193:14, 367:1
**300-year-old** [1] - 167:15
**309** [1] - 135:9
**30th** [1] - 304:11
**31** [1] - 294:22
**31st** [1] - 336:18
**325-site** [1] - 285:24
**326** [2] - 135:11, 135:12
**346** [1] - 135:14
**35** [6] - 229:25, 316:19, 316:23, 316:24, 317:25, 318:2
**350** [1] - 135:16
**356** [2] - 135:18, 135:19
**38** [2] - 346:2, 346:21
**385-room** [1] - 285:12
**39** [2] - 301:24, 345:13
**3:25** [1] - 391:22
**3:28** [1] - 394:4

**3:30** [1] - 375:6

## 4

**4** [1] - 290:12
**4,000** [3] - 291:17, 313:4, 390:25
**40** [10] - 219:18, 336:25, 337:2, 337:3, 337:13, 339:19, 342:16, 342:17
**41** [2] - 300:19, 348:3
**412** [1] - 275:7
**4TH** [1] - 134:12
**4th** [2] - 139:11, 139:12

## 5

**5** [6] - 134:13, 137:1, 186:5, 272:23
**5,000** [5] - 278:18, 359:15, 363:4, 384:4, 389:6
**5.20(e** [1] - 186:10
**5.20(e)** [2] - 186:17, 186:22
**5.20(f)** [1] - 186:10
**50** [9] - 219:18, 230:3, 230:5, 230:6, 358:12, 359:16, 359:23, 362:3, 367:22
**50,000** [1] - 278:18
**50-acre** [1] - 377:6
**500** [10] - 315:24, 315:25, 316:5, 356:23, 359:6, 359:8, 359:9, 384:4
**51** [1] - 139:23
**520(e** [1] - 188:4
**520(f** [1] - 186:15
**53** [4] - 140:2, 292:19, 314:3, 314:18
**577** [6] - 292:19, 292:20, 312:24, 314:17, 315:9, 315:21
**590** [4] - 152:6, 152:9, 163:25

## 6

**6** [1] - 362:15
**6,000** [3] - 358:7, 363:4, 367:16
**60** [2] - 137:5, 332:11

**600** [3] - 261:24, 292:17, 367:1
**625** [2] - 261:21, 261:22
**65** [1] - 316:23

## 7

**7** [17] - 220:2, 220:3, 220:12, 221:5, 221:14, 222:11, 223:3, 223:14, 223:15, 223:19, 224:1, 224:4, 224:6, 272:20, 272:22
**75** [2] - 178:4, 364:25
**753** [1] - 134:23
**7th** [1] - 147:24

## 8

**8** [6] - 224:4, 224:6, 276:1, 277:17, 338:9, 363:23
**80-acre** [1] - 382:4
**800-acre** [1] - 285:24
**85** [6] - 152:9, 289:20, 289:21, 382:24, 383:1
**85-acre** [2] - 173:5, 382:4
**8:15** [2] - 184:24
**8:30** [3] - 353:12, 353:13, 391:5
**8:45** [1] - 137:1
**8:47** [1] - 138:3
**8th** [12] - 147:25, 158:21, 174:17, 176:12, 184:25, 222:11, 277:16, 301:7, 302:5, 339:11, 339:18, 348:8

## 9

**9** [10] - 152:2, 173:6, 178:3, 180:14, 250:13, 331:20, 333:20, 333:23
**9,000** [1] - 393:20
**900** [1] - 276:3
**99** [5] - 216:20, 217:1, 217:6, 217:7, 217:11
**9:58** [2] - 172:8, 172:9
**9th** [1] - 147:25

## A

**a.m** [15] - 137:1, 138:3, 172:8, 172:9, 172:11, 186:7, 196:4, 196:6, 217:18, 217:20, 218:24, 218:25, 219:1, 256:9, 256:10
**a/k/a** [2] - 134:8, 134:9
**A11.9** [1] - 360:20
**ability** [1] - 366:18
**able** [10] - 145:17, 171:20, 175:7, 265:9, 265:10, 278:17, 306:10, 342:19, 383:18, 393:12
**absolute** [1] - 240:24
**absolutely** [7] - 174:15, 181:21, 181:24, 185:19, 185:22, 347:19
**accept** [2] - 144:2, 204:1
**accepted** [1] - 358:1
**access** [3] - 170:18, 175:10, 287:14
**accessible** [1] - 170:14
**accident** [9] - 174:17, 234:17, 238:3, 259:3, 275:18, 363:18, 363:22, 370:18, 376:13
**accompanied** [1] - 228:6
**accompany** [1] - 204:7
**accomplished** [1] - 233:18
**according** [6] - 165:10, 221:7, 221:8, 221:17, 221:23, 222:20
**accountant** [1] - 390:22
**accurate** [4] - 179:21, 193:11, 347:10, 347:13
**Ackerman** [2] - 275:13, 275:20
**acreage** [1] - 289:19
**acres** [6] - 152:9, 289:20, 289:21, 382:24, 383:1, 384:6
**act** [3] - 193:18, 193:20, 373:14
**Act** [2] - 184:1, 192:9

**acted** [2] - 155:14, 185:22
**acting** [1] - 156:11
**ACTION** [1] - 134:5
**action** [4] - 172:23, 308:8, 339:3, 339:6
**actions** [3] - 156:11, 176:2, 305:11
**activate** [1] - 340:17
**activities** [11] - 151:25, 180:12, 186:16, 187:12, 290:6, 290:9, 290:10, 290:16, 291:3, 291:19, 372:12
**activity** [6] - 150:10, 288:20, 290:7, 290:12, 295:2, 295:6
**actual** [4] - 147:18, 153:16, 170:12, 213:20
**add** [5] - 219:8, 219:14, 219:24, 292:14, 386:2
**added** [6] - 219:13, 239:16, 251:13, 252:9, 278:5, 315:15
**adding** [1] - 232:2
**addition** [10] - 139:18, 170:12, 220:17, 220:20, 242:11, 248:7, 249:25, 255:18, 260:14, 389:24
**address** [3] - 183:17, 348:13, 355:16
**adds** [2] - 217:10, 232:20
**adequate** [1] - 282:23
**adjuster** [1] - 275:24
**Administratrix** [1] - 134:3
**admissibility** [1] - 270:13
**admissible** [2] - 271:2, 275:2
**admit** [4] - 298:7, 299:22, 387:19, 387:20
**admits** [1] - 370:25
**admitted** [1] - 297:16
**admonish** [2] - 141:18, 141:20
**adopted** [2] - 193:18, 193:20
**adult** [27] - 175:25, 176:3, 221:20, 221:24, 222:14, 222:19, 223:25,

224:2, 224:5, 224:9, 225:25, 228:6, 282:5, 282:7, 305:9, 305:10, 305:13, 310:23, 311:15, 311:19, 311:20, 311:21, 311:22, 364:12, 364:15
**adults** [5] - 163:9, 240:12, 306:7, 365:13
**advance** [1] - 366:24
**adversary** [4] - 148:19, 149:24, 188:24, 392:5
**advertised** [2] - 198:23
**advice** [7] - 169:12, 169:13, 169:15, 169:16, 169:18, 169:23, 170:20
**advise** [1] - 226:12
**advised** [1] - 169:19
**aerial** [1] - 153:16
**afternoon** [4] - 326:6, 326:20, 354:14, 354:15
**age** [8] - 148:2, 153:9, 153:21, 157:18, 221:1, 223:11, 254:11
**agencies** [5] - 210:1, 213:4, 213:7, 213:19, 214:12
**agency** [1] - 214:16
**ago** [19] - 139:21, 142:6, 193:14, 197:7, 263:7, 264:16, 264:17, 264:19, 274:5, 291:6, 326:21, 326:22, 375:16, 375:25
**agree** [12] - 138:19, 138:24, 168:8, 198:15, 206:13, 214:22, 216:20, 234:7, 249:14, 302:23, 379:11, 387:7
**agreed** [6] - 176:19, 245:14, 245:15, 246:9, 258:24, 355:25
**agreeing** [4] - 339:2, 339:4, 339:5, 367:10
**agreement** [7] - 175:7, 175:10, 202:24, 221:24, 223:5, 293:6, 304:6

**agreements** [1] - 303:7
**agrees** [4] - 257:24, 258:7, 282:22, 346:9
**ahead** [21] - 161:21, 178:7, 178:8, 180:7, 188:7, 192:23, 193:6, 221:2, 241:15, 273:25, 276:11, 294:7, 296:7, 296:11, 323:20, 324:17, 339:14, 349:12, 356:7, 357:25, 358:15
**aid** [1] - 242:20
**aimed** [12] - 212:13, 248:20, 249:1, 249:9, 250:1, 250:11, 331:19, 331:25, 333:25, 334:1, 334:3
**air** [6] - 153:1, 153:4, 231:7, 231:9, 381:21, 382:12
**airport** [1] - 285:11
**Alabama** [2] - 393:13, 393:14
**albeit** [1] - 184:21
**alcohol** [2] - 160:1, 345:21
**alive** [1] - 375:6
**allege** [1] - 164:18
**allergies** [1] - 229:15
**allocate** [1] - 316:24
**allow** [12] - 148:13, 167:9, 223:17, 265:18, 274:10, 274:11, 281:15, 294:6, 299:14, 377:24, 381:17, 381:18
**allowed** [29] - 143:14, 166:10, 166:11, 166:14, 166:17, 166:18, 167:8, 168:3, 168:18, 188:8, 189:17, 190:14, 190:20, 194:6, 220:22, 220:25, 221:2, 221:6, 221:10, 223:20, 223:23, 223:25, 224:2, 243:18, 315:6, 364:15, 386:21, 388:4, 390:14
**alluded** [1] - 348:15
**almost** [12] - 212:15, 217:15, 243:16,

290:10, 298:18, 325:2, 325:3, 359:5, 367:18, 368:1, 380:9, 386:20

**alone** [6] - 138:17, 149:6, 278:14, 319:4, 367:1, 376:8

**alongside** [1] - 180:12

**altogether** [2] - 251:17, 251:20

**amateur** [1] - 335:8

**amazing** [1] - 292:15

**ambiguous** [1] - 372:15

**amenities** [5] - 151:20, 151:24, 154:20, 291:19, 323:19

**amenity** [2] - 160:11, 286:1

**amenity-wise** [1] - 286:1

**America** [8] - 357:2, 357:12, 358:13, 358:19, 359:15, 360:5, 368:21, 380:8

**amount** [4] - 163:8, 175:7, 294:23, 316:6

**analysis** [1] - 186:13

**analyze** [1] - 184:18

**analyzed** [1] - 168:10

**AND** [1] - 134:12

**angle** [2] - 178:16, 178:17

**angled** [1] - 212:19

**annual** [1] - 380:9

**annuals** [1] - 266:22

**ANSI** [1] - 360:19

**Answer** [1] - 346:24

**answer** [50] - 139:6, 139:7, 139:13, 143:1, 143:12, 188:17, 189:20, 197:19, 201:12, 202:7, 202:11, 202:15, 206:19, 206:23, 206:24, 215:9, 218:6, 221:12, 221:19, 221:21, 221:22, 222:13, 222:23, 232:24, 234:21, 241:6, 244:24, 279:1, 282:23, 284:5, 284:7, 299:16, 299:17, 309:8, 312:23, 313:23, 316:8, 316:9, 320:25, 321:6, 345:23,

346:2, 346:6, 346:10, 349:17, 349:20, 349:21, 352:15, 358:14

**answered** [12] - 203:7, 222:9, 222:13, 222:15, 251:9, 254:19, 280:22, 283:6, 315:9, 336:17, 347:6, 388:17

**Answers** [1] - 138:22

**answers** [1] - 139:8

**Anthony** [23] - 158:15, 158:21, 159:13, 159:21, 161:3, 161:4, 161:8, 161:23, 162:4, 162:7, 162:8, 162:9, 162:20, 162:22, 176:14, 176:17, 178:6, 182:22, 183:12, 184:25, 392:14, 392:15

**Anthony's** [2] - 158:15, 177:14

**anticipating** [1] - 357:23

**antitrust** [1] - 390:22

**anyhow** [1] - 271:2

**apart** [1] - 291:4

**apologize** [9] - 148:11, 159:17, 160:9, 241:8, 254:4, 257:22, 300:6, 312:1, 338:14

**appeal** [1] - 192:13

**application** [1] - 185:18

**applies** [2] - 299:15, 306:1

**apply** [7] - 138:18, 142:14, 146:25, 175:12, 183:14, 184:19, 259:5

**appreciate** [4] - 185:14, 185:18, 196:13, 260:6

**approach** [5] - 183:14, 243:10, 295:21, 306:22, 365:20

**approaching** [1] - 157:4

**appropriate** [3] - 218:2, 246:5, 386:17

**approve** [1] - 374:12

**approximate** [7] - 218:13, 262:4, 292:17, 314:1, 337:7, 339:19,

350:11

**approximates** [1] - 153:17

**approximation** [4] - 211:18, 211:19, 219:18, 230:12

**April** [5] - 173:12, 174:8, 174:23, 293:12, 302:14

**arcade** [33] - 211:23, 212:25, 220:8, 222:2, 223:14, 225:10, 238:8, 250:6, 252:12, 287:2, 287:18, 289:11, 319:22, 320:8, 320:9, 320:20, 322:2, 322:4, 322:9, 322:10, 322:15, 322:17, 322:22, 322:25, 335:16, 336:6, 341:9, 341:10, 342:7, 342:11, 344:7, 344:10

**area** [38] - 153:14, 157:24, 176:1, 206:4, 280:15, 287:20, 288:21, 291:21, 292:5, 292:6, 295:1, 301:13, 305:10, 305:11, 307:16, 310:23, 311:4, 311:6, 311:16, 317:23, 332:1, 334:10, 335:22, 336:12, 337:17, 342:12, 342:18, 342:19, 343:19, 343:21, 343:23, 351:1, 359:12, 390:4

**areas** [8] - 211:1, 330:8, 330:9, 330:10, 330:13, 373:5, 380:4

**argue** [4] - 147:12, 149:24, 186:21, 202:16, 228:19, 244:15, 244:17, 244:18, 245:17, 245:21, 246:5, 246:14, 247:22, 247:23, 365:7, 374:18

**argued** [1] - 186:9

**arguing** [4] - 187:19, 232:7, 251:10, 314:23

**argument** [10] - 147:4, 191:9, 191:11, 193:8, 195:20, 246:13, 258:3, 283:10, 298:16, 366:4

**argumentative** [4] - 281:14, 319:2, 319:3, 319:4

**arguments** [4] - 139:1, 147:11, 147:14, 185:4

**arms** [2] - 162:6, 235:8

**arrived** [8] - 199:14, 230:20, 230:25, 231:2, 329:12, 329:18, 329:22, 330:1

**arrow** [1] - 249:1

**artificial** [3] - 281:6, 281:7, 381:21

**artist** [1] - 148:10

**AS** [3] - 243:13, 262:21, 338:4

**aside** [3] - 382:17, 383:25, 387:12

**aspect** [1] - 192:5

**aspects** [2] - 183:17, 183:18

**asserted** [2] - 179:9, 184:4

**asserts** [1] - 184:22

**assessment** [1] - 175:4

**assign** [1] - 239:19

**assigned** [3] - 154:3, 239:16, 318:11

**assisting** [1] - 168:4

**associate** [1] - 275:20

**Association** [1] - 356:18

**association** [1] - 356:21

**assume** [4] - 266:18, 333:6, 335:24, 364:21

**assumes** [1] - 139:3

**assuming** [1] - 184:9

**assumptions** [6] - 184:8, 184:10, 184:12, 184:13, 184:17

**assure** [1] - 142:20

**Assyrian** [1] - 391:11

**Atlantic** [3] - 152:4, 152:5, 292:4

**attempt** [3] - 141:4, 143:12, 166:16

**attendant** [10] -

152:14, 154:2, 225:1, 255:19, 255:21, 277:19, 277:20, 277:21, 295:5

**attendants** [1] - 295:2

**attention** [7] - 144:17, 147:20, 148:4, 163:21, 171:18, 305:1, 320:12

**attorney** [4] - 198:12, 198:15, 276:20, 276:21

**attorneys** [2] - 142:13, 147:10

**attract** [5] - 233:2, 233:5, 233:17, 319:18, 365:8

**attracted** [1] - 160:22

**attraction** [5] - 233:7, 321:24, 363:9, 366:1, 379:4

**attractions** [1] - 237:15

**attractive** [1] - 206:10

**August** [15] - 150:17, 154:5, 159:14, 174:17, 176:12, 184:25, 220:11, 222:11, 277:16, 301:7, 302:5, 338:9, 339:11, 339:18, 348:8

**authority** [4] - 219:5, 219:8, 219:12, 219:14

**authorized** [1] - 301:21

**automatically** [1] - 347:21

**available** [5] - 145:15, 146:1, 209:7, 393:2, 393:3

**avoid** [1] - 142:20

**aware** [4] - 176:5, 176:6, 209:14, 238:5

---

**B**

**backed** [2] - 361:10, 392:10

**background** [4] - 263:17, 285:1, 285:2, 355:20

**backside** [3] - 178:3, 288:16, 301:10

**bag** [1] - 191:10

**ball** [2] - 238:8, 238:12

**barbed** [2] - 376:14,

386:3

**barred** [1] - 377:21

**bars** [1] - 287:16

**base** [1] - 334:20

**based** [15] - 150:13, 150:16, 166:11, 167:17, 167:25, 183:19, 183:20, 184:11, 299:21, 376:6, 377:9, 377:23, 381:7, 383:25

**basic** [2] - 195:11, 247:18

**basis** [1] - 380:9

**basketball** [20] - 158:24, 159:2, 159:3, 159:5, 159:13, 159:22, 160:4, 162:15, 173:24, 174:2, 177:22, 178:4, 238:7, 331:22, 336:1, 336:2, 343:14, 353:4, 353:6

**baskets** [1] - 158:25

**bathing** [1] - 162:17

**beach** [21] - 152:17, 157:3, 157:5, 157:6, 157:7, 158:23, 160:5, 160:8, 160:15, 160:17, 162:11, 162:20, 287:1, 289:12, 291:14, 291:20, 297:4, 297:5, 322:4, 322:5, 325:12

**beaches** [2] - 292:7, 297:3

**bear** [2] - 163:18, 270:13

**bears** [1] - 171:5

**beating** [1] - 260:8

**beautiful** [1] - 324:14

**become** [2] - 167:3, 175:10

**becomes** [1] - 381:5

**becoming** [1] - 383:7

**bed** [1] - 389:15

**BEERS** [1] - 134:18

**beforehand** [2] - 180:23, 206:14

**beg** [1] - 378:4

**begin** [4] - 144:22, 147:2, 196:15, 293:11

**beginning** [3] - 174:19, 195:20, 262:25

**behalf** [4] - 147:22,

197:10, 215:5, 260:16

**behavior** [4] - 183:12, 183:13

**behind** [1] - 287:21

**beings** [1] - 140:22

**belabor** [1] - 246:1

**belief** [1] - 183:6

**believes** [1] - 143:5

**bells** [1] - 151:14

**bench** [2] - 243:10, 276:14

**Berlin** [2] - 386:4, 386:5

**best** [29] - 142:3, 155:6, 158:14, 158:20, 170:6, 210:12, 252:4, 306:2, 357:3, 357:7, 360:10, 360:11, 360:13, 366:3, 366:5, 366:6, 366:7, 371:2, 380:19, 380:22, 380:24, 381:1, 381:4, 381:7, 381:15, 383:9, 388:22, 389:7

**BETANIA** [2] - 134:3, 134:4

**better** [8] - 164:6, 189:10, 195:13, 206:8, 206:9, 206:10, 324:4, 324:9

**Betty** [4] - 168:17, 168:23, 168:24, 168:25

**between** [13] - 173:6, 190:2, 190:5, 199:5, 223:15, 223:25, 224:4, 224:6, 224:10, 286:3, 292:4, 311:21

**beverage** [1] - 285:7

**beyond** [5] - 146:22, 164:12, 372:19, 387:9, 387:14

**bias** [1] - 166:12

**bicycles** [2] - 235:15, 290:2

**big** [10] - 152:9, 191:10, 230:1, 230:9, 333:22, 367:11, 382:16, 383:24, 384:5, 389:8

**Big** [5] - 261:5, 261:13, 261:14, 262:1, 262:6

**bigger** [2] - 211:8, 331:5

**binder** [2] - 262:23,

262:24

**bit** [14] - 142:2, 173:2, 173:23, 174:14, 174:19, 178:8, 285:2, 286:23, 286:25, 287:3, 289:14, 294:22, 331:5, 346:13

**black** [2] - 148:23, 254:3

**blared** [1] - 376:18

**blaring** [1] - 270:4

**blast** [1] - 259:20

**bless** [1] - 168:18

**block** [2] - 148:14, 375:13

**blocked** [1] - 292:12

**blow** [1] - 189:5

**blown** [1] - 153:12

**blowup** [3] - 288:3, 288:15, 300:9

**boat** [4] - 155:19, 290:13, 362:19, 362:20

**boats** [1] - 290:14

**Bob's** [1] - 356:14

**bocce** [1] - 238:7

**bocci** [1] - 238:7

**body** [6] - 163:2, 181:8, 181:9, 181:13, 361:24, 393:15

**bonding** [1] - 295:15

**booth** [2] - 222:4, 250:5

**borders** [1] - 322:1

**botched** [2] - 375:18, 375:19

**bothering** [1] - 229:16

**bottle** [1] - 242:5

**bottom** [5] - 181:11, 231:15, 276:6, 316:12, 379:15

**bought** [11] - 218:9, 218:10, 218:12, 218:15, 218:16, 252:21, 252:25, 253:1, 253:3, 302:13, 332:20

**bouncy** [1] - 287:15

**box** [4] - 142:19, 153:13, 211:17, 340:25

**boxes** [1] - 179:17

**boy** [4] - 167:3, 185:8, 392:17, 392:18

**Boy** [1] - 182:7

**boys** [16] - 160:3, 160:22, 161:2, 161:6, 162:14,

176:25, 177:10, 177:13, 177:16, 177:19, 177:20, 178:5, 181:4, 185:2

**branch** [1] - 187:2

**branches** [1] - 327:17

**break** [5] - 138:7, 171:24, 186:1, 320:19

**Brearly** [2] - 193:22, 193:23

**Brent** [1] - 267:3

**brent** [1] - 267:2

**briefly** [5] - 156:19, 164:9, 170:1, 184:21, 195:21

**bring** [16] - 150:2, 151:18, 173:9, 173:11, 174:6, 175:7, 189:19, 201:16, 201:21, 207:19, 290:16, 290:17, 292:9, 292:24, 315:6

**bringing** [2] - 141:13, 265:7

**brings** [2] - 282:7

**broad** [2] - 186:11, 279:6

**brochure** [12] - 200:7, 201:1, 201:4, 201:7, 201:16, 267:4, 323:12, 323:13, 323:17, 323:18, 324:13, 324:15

**brochures** [1] - 199:3

**broken** [4] - 235:8, 246:18, 335:18, 391:1

**brought** [7] - 141:14, 164:7, 175:18, 203:15, 245:25, 263:14, 297:21

**budget** [15] - 219:10, 219:24, 252:24, 316:18, 316:19, 317:24, 318:3, 318:7, 318:9, 318:15, 318:20, 318:23, 319:8, 319:11, 319:14

**budgeted** [1] - 318:24

**Buffalo** [1] - 356:13

**build** [2] - 290:14, 359:6

**building** [12] - 213:9, 287:4, 288:20, 289:12, 290:13, 295:17, 335:15, 341:9, 341:24,

343:24, 344:10, 358:22

**built** [1] - 363:13

**bull** [1] - 393:20

**bunch** [1] - 298:4

**burden** [9] - 146:8, 164:10, 164:17, 164:19, 182:14, 182:15, 182:16, 195:9

**bush** [1] - 157:17

**busiest** [2] - 292:5, 292:6

**business** [10] - 163:23, 175:6, 186:19, 187:4, 204:19, 235:11, 239:12, 281:3, 315:6, 359:16

**but..** [1] - 200:23

**buy** [4] - 179:23, 179:24, 292:11, 301:20

**BY** [148] - 134:17, 134:18, 134:20, 135:5, 135:7, 135:9, 135:12, 135:14, 135:16, 135:19, 197:3, 197:25, 198:11, 198:22, 200:25, 201:15, 202:4, 202:18, 204:3, 205:9, 207:2, 208:13, 208:23, 209:2, 211:14, 214:5, 216:1, 217:19, 219:4, 222:5, 222:16, 223:1, 223:24, 224:7, 227:5, 228:22, 230:8, 232:3, 232:14, 234:23, 236:14, 238:10, 239:6, 239:25, 241:16, 248:6, 249:24, 250:22, 251:12, 251:19, 254:9, 254:16, 255:2, 255:13, 255:25, 256:15, 257:3, 257:7, 257:16, 258:9, 258:16, 260:9, 260:25, 270:16, 271:4, 271:24, 272:10, 272:21, 273:11, 277:3, 278:11, 278:25, 279:11, 279:20, 280:11,

280:23, 281:12,
281:20, 282:11,
282:20, 283:8,
283:14, 284:22,
288:13, 289:4,
289:17, 292:8,
293:10, 294:18,
295:7, 296:12,
298:25, 300:3,
300:24, 303:15,
303:24, 307:3,
308:19, 309:5,
309:15, 310:20,
311:14, 312:3,
312:12, 312:18,
313:8, 313:13,
313:19, 313:24,
314:16, 315:2,
316:2, 317:16,
318:5, 319:7,
320:10, 321:2,
321:18, 323:11,
323:23, 324:19,
325:10, 326:19,
329:6, 332:14,
332:23, 333:9,
336:20, 339:16,
344:17, 345:12,
346:12, 349:13,
350:5, 351:18,
352:1, 352:7,
352:16, 353:3,
356:8, 356:19,
356:24, 357:22,
359:22, 361:1,
361:14, 367:21,
370:13

## C

cabin [5] - 292:19,
292:20, 292:22,
294:25, 314:18
cabins [4] - 173:7,
314:3, 314:11,
315:17
cable [2] - 292:2,
315:15
calendar [2] - 216:19,
217:5
calves [1] - 393:20
CAMDEN [1] - 134:12
camera [48] - 242:23,
243:2, 243:4, 243:6,
246:16, 247:1,
248:9, 248:10,
248:19, 248:25,
249:4, 249:9,
249:15, 249:25,
250:10, 257:10,

257:11, 280:19,
308:4, 329:19,
329:23, 331:4,
331:7, 331:10,
331:18, 331:21,
332:1, 333:17,
333:21, 333:22,
334:1, 334:2, 334:7,
334:22, 335:9,
335:11, 335:19,
335:22, 335:24,
335:25, 336:11,
347:18, 347:20,
347:22, 348:1,
352:22, 353:4
cameras [60] - 149:1,
149:4, 149:7, 149:9,
149:11, 149:13,
149:16, 150:2,
250:4, 250:5, 250:8,
250:24, 251:13,
252:4, 252:9,
252:15, 252:18,
252:22, 253:7,
253:17, 280:14,
280:15, 281:19,
281:23, 281:25,
308:3, 309:18,
309:25, 319:11,
329:2, 329:4, 329:5,
330:3, 330:14,
331:11, 332:4,
332:8, 332:9,
332:12, 332:15,
332:17, 332:22,
333:6, 333:10,
333:25, 336:6,
347:15, 347:17,
351:19, 369:17,
369:18, 369:22,
370:3, 371:7, 373:4,
373:5, 373:7
camp [23] - 151:17,
158:18, 164:21,
182:2, 182:3, 182:5,
182:6, 182:7, 182:8,
183:1, 183:3, 190:5,
237:20, 255:16,
277:25, 278:1,
279:23, 279:24,
301:5, 319:12
Campbell's [2] -
193:18, 193:20
camper [9] - 158:22,
173:10, 174:6,
175:1, 175:8,
177:10, 177:11,
282:21, 291:18
campers [3] - 234:8,
309:3, 376:12

campfires [1] - 237:6
CAMPGROUND [1] -
134:7
campground [72] -
151:12, 154:2,
164:8, 165:21,
172:23, 173:3,
173:5, 173:12,
173:19, 174:5,
174:10, 174:11,
175:8, 175:11,
175:12, 175:18,
176:18, 176:19,
176:21, 179:15,
181:11, 181:12,
182:10, 190:2,
190:5, 190:20,
191:5, 198:16,
198:23, 203:2,
204:25, 205:14,
205:19, 205:20,
205:23, 206:7,
206:11, 213:20,
218:8, 222:3, 222:4,
231:1, 235:17,
235:24, 264:12,
277:9, 289:25,
291:11, 291:16,
291:18, 295:9,
302:21, 303:2,
304:18, 356:12,
356:14, 357:12,
360:5, 360:15,
361:13, 362:17,
362:23, 365:18,
369:2, 371:16,
371:21, 371:25,
372:1, 372:7, 376:7,
376:25, 382:1
campgrounds [42] -
204:14, 204:22,
204:23, 204:24,
206:4, 277:25,
278:1, 278:2,
278:15, 279:23,
280:13, 281:5,
357:1, 357:6, 357:8,
357:15, 358:3,
358:7, 358:19,
358:23, 359:1,
359:7, 359:12,
359:13, 359:15,
360:2, 360:9,
360:18, 361:18,
361:20, 362:14,
363:9, 367:24,
368:4, 368:21,
376:23, 379:7,
382:20, 389:5
CAMPING [1] - 134:7

camping [26] - 150:5,
150:22, 150:24,
151:11, 151:12,
151:20, 151:21,
152:7, 153:9,
154:18, 155:12,
165:4, 189:15,
204:14, 204:20,
205:4, 205:11,
205:22, 206:11,
238:20, 260:19,
280:13, 280:17,
280:18, 286:18,
356:10
Camping [11] -
150:22, 158:1,
163:9, 197:14,
205:11, 205:19,
215:5, 234:25,
237:20, 250:23,
282:8
camps [8] - 151:17,
199:23, 204:13,
274:13, 278:2,
278:5, 278:6, 372:17
campsite [4] - 264:19,
265:7, 265:21,
370:14
campsites [7] -
260:18, 264:20,
278:20, 278:21,
279:2, 279:4, 370:15
Canada [3] - 277:24,
358:7, 361:19
candidly [6] - 188:14,
377:8, 382:9,
383:23, 390:19
cannot [2] - 145:2,
183:19
capable [1] - 145:16
Cape [23] - 152:3,
173:5, 173:6,
179:13, 180:22,
199:15, 206:14,
207:3, 207:12,
207:25, 208:5,
208:8, 208:17,
209:3, 209:12,
209:23, 210:9,
210:17, 213:4,
292:4, 295:14,
296:17, 301:19
car [2] - 170:4, 340:10
cardboard [2] -
290:13, 290:14
care [12] - 139:21,
156:5, 156:18,
156:20, 158:5,
182:1, 186:20,
301:22, 306:7,

308:10, 308:22
careful [2] - 235:16,
306:9
carefully [1] - 145:2
cargo [3] - 162:15,
162:18, 177:21
Carmine [1] - 326:13
carried [1] - 363:17
carrier [1] - 276:3
carry [4] - 142:9,
317:7, 389:16
cart [7] - 154:9,
154:14, 219:17,
279:14, 362:7, 383:1
carts [7] - 212:3,
271:19, 290:1,
290:2, 290:3,
301:13, 322:23
case [101] - 137:24,
139:17, 139:22,
139:25, 140:3,
140:6, 140:16,
141:1, 141:6, 141:7,
141:10, 143:23,
144:4, 145:5, 146:6,
146:7, 146:8, 147:1,
147:8, 148:5,
149:21, 149:25,
150:4, 150:15,
155:11, 156:1,
163:4, 163:18,
164:11, 166:3,
166:5, 166:17,
168:10, 170:12,
170:24, 171:6,
171:17, 171:20,
171:21, 176:14,
176:16, 178:24,
180:3, 181:24,
182:11, 182:13,
182:19, 183:10,
183:16, 183:18,
183:23, 183:24,
184:23, 185:10,
185:12, 185:16,
187:21, 188:4,
188:22, 189:11,
192:12, 194:16,
194:18, 195:13,
195:20, 196:15,
201:14, 247:14,
262:23, 262:24,
262:25, 263:11,
274:12, 274:23,
275:8, 275:24,
297:6, 298:14,
306:17, 353:14,
353:15, 353:18,
354:22, 355:1,
362:18, 370:5,

370:6, 370:22, 371:10, 375:16, 377:3, 377:18, 382:15, 383:22, 386:9, 390:13, 390:14, 390:19, 390:22

**cases** [12] - 142:7, 142:22, 146:3, 146:5, 146:22, 146:25, 188:18, 189:6, 189:9, 193:15, 194:23, 276:4

**casual** [1] - 311:8

**catch** [5] - 181:10, 215:22, 271:13, 341:20, 341:21

**categories** [5] - 150:24, 204:15, 205:2, 225:12, 225:14

**categorized** [1] - 281:8

**category** [2] - 151:15, 151:16

**caught** [1] - 187:1

**causation** [1] - 163:12

**caused** [3] - 186:16, 187:11, 266:12

**causes** [3] - 163:16, 163:19, 164:24

**cautious** [2] - 150:20, 154:21

**center** [5] - 173:25, 288:21, 290:7, 362:22, 364:9

**centrally** [1] - 291:21

**certain** [10] - 139:3, 145:21, 174:15, 175:7, 179:22, 195:17, 217:10, 217:14, 245:9, 384:19

**certainly** [9] - 173:1, 180:24, 182:24, 202:16, 230:25, 233:12, 241:4, 269:10, 340:22

**certificate** [1] - 296:17

**certificates** [1] - 295:15

**certified** [2] - 301:21, 348:23

**Certified** [1] - 134:23

**chain** [1] - 224:13

**chair** [1] - 295:19

**chambers** [3] - 353:25, 354:10, 378:15

**chance** [7] - 185:15, 377:13, 383:24, 384:22, 385:23, 386:12, 389:18

**change** [9] - 205:12, 206:6, 219:6, 232:10, 240:21, 245:5, 273:8, 333:7, 378:1

**changed** [11] - 166:7, 199:13, 201:2, 205:13, 205:18, 205:22, 205:24, 206:8, 219:13, 273:4, 273:21

**changes** [6] - 270:18, 270:21, 270:25, 271:5, 273:5, 276:7

**changing** [1] - 258:12

**characterized** [1] - 243:16

**charge** [6] - 186:17, 187:17, 191:1, 191:22, 315:12, 390:23

**charged** [3] - 186:9, 390:22, 391:3

**charges** [1] - 391:2

**Charles** [2] - 326:12, 326:15

**CHARLES** [9] - 135:11, 135:12, 135:14, 135:16, 326:8, 326:12, 326:19, 346:12, 350:5

**Charlie** [5] - 180:18, 251:23, 251:24, 252:3

**chart** [4] - 342:21, 342:22, 342:23

**cheap** [1] - 253:20

**check** [6] - 173:14, 207:21, 207:23, 208:9, 209:7, 362:19

**checked** [4] - 179:17, 297:2, 298:4, 375:13

**checking** [1] - 362:18

**checklist** [1] - 296:25

**checks** [3] - 228:1, 228:2, 228:3

**chemicals** [1] - 301:22

**chief** [4] - 224:16, 252:1, 263:12, 327:3

**child** [19] - 177:8, 192:15, 192:20, 203:2, 204:5, 223:25, 224:2, 224:4, 225:16, 225:25, 226:11,

227:8, 282:7, 282:9, 282:18, 282:21, 282:22, 283:2, 364:11

**children** [37] - 163:24, 164:2, 175:18, 175:19, 175:24, 175:25, 176:2, 182:1, 182:3, 182:9, 198:24, 201:16, 201:18, 201:21, 202:20, 202:21, 203:15, 203:20, 203:23, 203:24, 204:8, 226:25, 283:17, 284:3, 290:9, 290:12, 304:19, 305:8, 305:9, 305:12, 308:10, 308:22, 309:3, 310:22, 367:4

**chipmunks** [2] - 201:8, 201:10

**choice** [1] - 357:7

**choices** [7] - 156:22, 157:21, 158:1, 158:2, 158:6, 379:17, 379:20

**choose** [7] - 144:25, 149:7, 149:8, 149:9, 182:16, 301:16, 374:23

**Christmas** [2] - 197:6, 226:4

**CICCOTTA** [9] - 134:16, 134:17, 152:19, 254:6, 338:24, 392:14, 392:17, 392:19, 394:1

**Ciccotta** [1] - 164:6

**Cincinnati** [1] - 285:12

**cinderblock** [1] - 292:13

**circles** [1] - 362:7

**Circuit** [3] - 245:2, 387:12, 390:8

**circulating** [1] - 231:21

**circumstances** [3] - 150:13, 150:17, 156:17

**circumstantial** [2] - 143:19, 143:20

**cities** [1] - 291:7

**City** [4] - 152:4, 173:6, 292:4, 292:5

**civil** [5] - 146:3, 146:6, 146:7, 146:25, 275:9

**CIVIL** [1] - 134:5

**claim** [2] - 184:4, 192:8

**claims** [2] - 146:11, 146:19

**Clancy** [2] - 276:2, 276:3

**clarification** [1] - 249:23

**clarify** [2] - 142:11, 237:10

**clarifying** [1] - 248:24

**classic** [1] - 264:23

**cleaning** [1] - 295:11

**cleans** [1] - 232:20

**clear** [8] - 164:11, 174:21, 175:15, 175:17, 178:13, 375:3, 387:9, 391:19

**clearer** [1] - 168:1

**clearly** [3] - 142:3, 187:10, 377:21

**CLERK** [15] - 138:2, 138:10, 172:10, 196:3, 196:5, 196:21, 196:25, 266:4, 276:23, 326:6, 326:10, 353:22, 354:12, 356:1, 356:4

**clerk** [1] - 300:7

**client** [2] - 150:4, 393:11

**client's** [1] - 141:24

**clientele** [1] - 174:10

**clients** [1] - 141:25

**climb** [1] - 362:12

**clock** [2] - 262:11, 279:4

**close** [21] - 147:20, 153:23, 159:3, 160:16, 191:12, 192:11, 195:19, 211:22, 220:1, 220:14, 220:21, 244:20, 293:12, 315:22, 320:21, 321:23, 321:25, 340:18, 367:1, 389:12

**closed** [12] - 157:19, 220:2, 220:23, 220:25, 222:12, 223:14, 256:20, 266:21, 268:8, 351:4, 375:16

**closer** [3] - 312:19, 322:4, 322:10

**closes** [5] - 153:25, 173:13, 220:8, 220:9, 220:15,

221:14, 271:14, 272:18, 272:23

**closest** [2] - 341:4, 342:12

**closing** [8] - 147:11, 147:13, 193:8, 195:12, 246:13, 258:2, 258:4, 279:5

**clothes** [2] - 162:19, 162:21

**Club** [1] - 357:11

**co** [4] - 140:13, 188:20, 188:21, 353:17

**co-counsel** [2] - 188:20, 188:21

**co-employee** [1] - 140:13

**co-employees** [1] - 353:17

**code** [5] - 296:25, 360:19, 361:4, 379:21, 381:2

**coffin** [1] - 265:12

**cohorts** [2] - 391:12, 391:15

**colleague** [1] - 164:5

**collect** [1] - 144:24

**collective** [1] - 184:19

**color** [3] - 324:1, 324:5, 324:14

**colored** [1] - 325:17

**coming** [5] - 151:3, 212:23, 365:10, 369:11, 383:4

**command** [3] - 224:13, 224:16, 228:11

**commensurate** [5] - 156:5, 156:6, 156:12, 156:18, 158:5

**comment** [12] - 141:8, 183:9, 188:3, 191:2, 191:6, 191:8, 191:25, 192:3, 192:5, 194:15, 195:13, 198:18

**comments** [2] - 186:15, 189:13

**commercial** [1] - 362:11

**commission** [1] - 179:25

**committee** [3] - 361:3, 361:9, 361:10

**common** [6] - 146:3, 183:14, 184:19, 185:18, 367:24, 380:4

communities [1] - 170:7

companies [1] - 269:12

companion [3] - 169:5, 269:11, 269:12

companionship [5] - 169:3, 169:5, 170:21, 192:7, 192:19

company [9] - 227:22, 261:13, 285:10, 349:1, 356:12, 356:14, 357:8, 358:22, 359:5

company's [1] - 316:14

company-owned [1] - 358:22

compelled [1] - 183:16

compensable [1] - 192:15

competing [1] - 359:12

competition [2] - 291:4, 358:24

complaint [1] - 180:24

completely [1] - 239:23

compliance [8] - 179:16, 207:11, 240:10, 295:16, 295:18, 297:3, 297:7, 382:12

complicate [1] - 210:7

complicated [1] - 248:1

complimentary [1] - 290:17

comply [4] - 207:14, 207:16, 299:20

computer [2] - 168:15, 318:10

concede [1] - 183:23

concept [6] - 150:12, 155:3, 155:7, 155:23, 163:10, 265:13

concern [1] - 193:7

concerned [4] - 194:15, 256:17, 327:5, 341:1

concession [1] - 247:11

conclude [2] - 143:21, 185:21

conclusion [12] - 143:7, 169:22,

247:2, 355:13, 355:14, 376:4, 376:5, 377:20, 386:24, 386:25, 388:1, 388:2

concur [3] - 173:1, 188:4, 362:10

conducted [4] - 179:14, 180:22, 186:17, 187:12

conducting [1] - 186:19

confer [1] - 142:13

conference [1] - 187:18

conferences [1] - 142:22

configuration [1] - 378:12

confirming [1] - 145:11

conflict [1] - 187:14

confuse [2] - 205:18, 237:14

confused [4] - 208:11, 208:12, 237:4, 343:4

confusing [3] - 221:17, 222:7, 282:17

confusion [1] - 300:17

connected [1] - 231:15

conscious [4] - 166:22, 183:25, 184:1, 188:11

consider [6] - 139:6, 143:15, 143:24, 307:11, 330:22, 375:1

consideration [2] - 330:7, 336:15

considered [2] - 146:10, 180:16

considering [1] - 144:19

consist [2] - 138:21, 294:20

consistent [3] - 186:23, 187:13, 283:1

consolidation [2] - 317:8, 317:11

constantly [3] - 242:9, 293:19, 306:5, 362:21

constitutes [1] - 368:22

construction [2] - 285:4, 360:25

consult [3] - 281:21,

281:22, 281:24

consultant [2] - 358:11, 360:6

Consulting [2] - 356:11, 359:5

consulting [2] - 356:12, 356:13

contained [1] - 151:23

contest [1] - 161:16

context [2] - 178:2, 378:15

continually [1] - 319:2

continue [3] - 274:24, 277:1, 367:13

continued [1] - 169:20

continuing [1] - 313:17

contract [5] - 176:6, 176:7, 293:9, 304:9, 310:4

contradict [1] - 307:17

contrary [1] - 140:21

contributed [1] - 181:14

control [6] - 241:2, 241:4, 282:22, 316:20, 362:4, 362:5

controllable [1] - 317:3

controlled [2] - 160:1, 333:11

controlling [1] - 316:22

conversation [2] - 303:5, 365:4

convey [3] - 308:9, 308:20, 309:2

convince [1] - 164:11

convincing [1] - 164:11

convoluted [1] - 245:3

cooking [1] - 237:5

cool [1] - 142:18

COOPER [1] - 134:12

copy [11] - 145:7, 145:12, 145:20, 145:24, 146:3, 146:6, 199:2, 200:8, 207:19, 295:24, 304:1

corner [6] - 304:7, 304:8, 323:5, 341:10, 343:18, 344:2

corners [2] - 387:10, 387:14

corporate [11] - 154:7, 154:19, 155:11, 155:14, 157:15, 163:9, 191:3, 191:4,

303:9, 314:19, 317:8

corporation [7] - 156:2, 156:8, 156:9, 191:10, 191:14, 316:16, 367:11

correct [120] - 134:23, 195:7, 197:12, 199:20, 206:16, 208:21, 209:10, 209:11, 209:21, 210:11, 210:12, 210:23, 210:24, 212:7, 212:22, 215:3, 215:4, 215:8, 215:17, 215:18, 216:3, 216:24, 217:8, 217:23, 218:23, 219:19, 219:20, 220:6, 220:9, 220:16, 220:22, 220:24, 221:1, 221:9, 222:20, 223:12, 224:12, 224:14, 224:18, 224:20, 224:23, 225:2, 225:18, 226:1, 226:2, 228:6, 228:7, 231:2, 231:6, 231:8, 231:10, 231:22, 231:25, 232:18, 233:4, 233:10, 235:19, 235:21, 235:22, 239:13, 239:17, 248:11, 248:21, 250:14, 250:21, 251:14, 251:22, 252:2, 252:17, 253:4, 253:5, 255:16, 256:6, 256:7, 256:8, 256:18, 256:19, 258:21, 260:2, 260:4, 260:16, 260:17, 271:25, 272:7, 278:4, 282:6, 282:12, 283:3, 283:4, 292:23, 295:9, 307:8, 307:23, 307:24, 310:24, 310:25, 311:16, 312:24, 327:4, 327:14, 327:25, 330:18, 331:17, 332:10, 333:14, 333:24, 334:14, 335:20, 343:17, 343:21, 343:25, 347:7, 348:10, 349:11, 350:21, 351:25,

358:9, 360:12, 383:20

corrective [5] - 190:25, 191:1, 191:21, 191:22, 195:2

correctly [4] - 248:22, 303:1, 325:5, 347:8

cost [4] - 219:16, 251:15, 313:1, 314:3

counsel [17] - 148:13, 148:20, 169:12, 169:18, 169:23, 170:20, 172:14, 184:5, 186:8, 188:20, 188:21, 194:4, 319:3, 353:24, 363:3, 375:24, 391:19

Counsel [3] - 134:19, 134:21, 172:20

counseled [1] - 169:19

count [5] - 217:5, 251:5, 251:7, 332:18, 367:23

counter [3] - 307:17, 375:11, 375:14

counties [1] - 358:6

country [3] - 194:23, 292:6, 390:10

county [5] - 179:25, 213:15, 214:19, 214:25, 328:12

County [19] - 173:5, 179:13, 180:22, 206:14, 207:3, 207:12, 207:25, 208:5, 208:8, 208:17, 209:4, 209:12, 209:23, 210:10, 210:18, 213:4, 295:14, 296:17, 301:20

couple [7] - 138:7, 192:22, 197:6, 197:7, 222:9, 286:7, 389:19

course [15] - 139:15, 139:18, 141:9, 142:5, 142:12, 144:10, 155:9, 156:24, 174:1, 177:16, 178:21, 224:21, 234:18, 243:5, 384:18

courses [1] - 155:6

court [20] - 140:8, 140:10, 141:21, 142:7, 145:6,

148:17, 159:2,
159:3, 159:13,
159:22, 160:4,
173:24, 174:2,
238:7, 336:1, 336:2,
343:14, 377:25,
391:2

**Court** [13] - 138:18,
138:25, 145:23,
172:20, 193:22,
200:13, 202:17,
241:8, 243:10,
268:17, 368:16,
392:4

**COURT** [662] - 134:2,
137:1, 137:4, 137:8,
137:11, 137:16,
137:20, 137:22,
137:24, 138:4,
138:6, 138:9,
138:13, 145:8,
145:9, 145:11,
145:14, 145:22,
145:24, 148:7,
148:13, 148:20,
150:25, 151:4,
151:7, 151:9,
152:22, 161:14,
161:16, 161:20,
165:14, 171:23,
172:2, 172:4,
172:12, 172:17,
180:4, 180:7,
185:25, 186:3,
186:5, 186:8, 188:1,
188:7, 188:10,
188:13, 188:17,
188:21, 188:25,
189:3, 189:5, 189:9,
189:22, 190:1,
190:8, 190:16,
190:24, 191:6,
191:8, 192:2,
192:10, 192:23,
192:25, 193:3,
193:6, 193:14,
193:19, 193:21,
193:25, 194:10,
194:20, 194:22,
195:1, 195:11,
195:17, 195:25,
196:7, 196:12,
196:14, 196:18,
197:19, 197:21,
198:2, 198:5, 198:8,
198:17, 198:21,
200:8, 200:11,
200:14, 200:16,
200:20, 201:12,
201:14, 201:24,
202:1, 202:7,

202:10, 202:14,
203:19, 203:23,
205:7, 206:19,
206:23, 208:12,
208:22, 208:25,
211:5, 211:7,
211:10, 211:13,
214:2, 214:4,
215:25, 217:12,
217:14, 217:17,
218:24, 219:1,
221:19, 221:22,
222:13, 222:21,
222:23, 223:16,
223:19, 223:23,
224:6, 226:8,
226:12, 226:15,
226:22, 226:25,
227:4, 228:19,
230:7, 231:13,
231:18, 231:20,
231:23, 232:9,
232:13, 234:18,
234:21, 236:3,
236:5, 236:8,
237:23, 237:25,
238:2, 238:5, 239:5,
239:22, 240:11,
240:15, 240:18,
240:20, 240:24,
241:2, 241:5,
241:12, 241:15,
243:12, 243:20,
243:24, 244:4,
244:6, 244:10,
244:14, 244:18,
244:25, 245:2,
245:10, 245:13,
245:17, 245:19,
245:21, 245:24,
246:3, 246:12,
246:17, 246:23,
247:1, 247:4, 247:7,
247:10, 247:13,
247:19, 247:22,
247:25, 249:19,
250:20, 251:9,
251:17, 253:11,
253:14, 253:17,
253:21, 253:25,
254:5, 254:7,
254:20, 255:4,
255:8, 255:11,
255:21, 255:24,
256:9, 256:12,
256:14, 256:21,
256:25, 257:6,
257:18, 257:23,
258:2, 258:6,
258:12, 259:3,
259:6, 259:8,

259:11, 259:13,
259:15, 259:19,
259:23, 259:25,
260:3, 260:5, 260:7,
260:21, 260:23,
262:12, 262:19,
262:22, 263:4,
263:9, 263:13,
263:18, 263:20,
264:2, 264:8,
264:14, 264:16,
264:21, 265:1,
265:5, 265:11,
265:16, 265:22,
265:25, 266:2,
266:6, 266:9,
266:12, 266:14,
266:17, 266:21,
266:24, 267:1,
267:4, 267:8,
267:13, 267:15,
267:18, 267:21,
267:24, 268:3,
268:5, 268:7,
268:10, 268:14,
268:20, 269:8,
269:17, 269:23,
270:2, 270:10,
270:13, 271:2,
271:15, 271:17,
272:4, 272:20,
273:4, 273:9,
273:25, 274:2,
274:10, 274:16,
275:5, 275:8,
276:11, 276:13,
276:16, 276:19,
276:21, 276:25,
278:9, 278:23,
279:6, 279:9,
279:16, 279:18,
280:3, 280:6, 280:9,
280:22, 281:1,
281:5, 281:10,
281:14, 281:17,
282:9, 282:17,
283:6, 283:10,
283:12, 284:9,
284:13, 284:15,
284:20, 288:5,
288:7, 288:10,
288:12, 291:23,
292:1, 293:3, 293:7,
293:24, 294:2,
294:6, 294:13,
294:17, 295:3,
295:23, 296:1,
296:3, 296:5, 296:7,
296:11, 297:15,
297:19, 297:21,
297:23, 298:1,

298:7, 298:9,
298:11, 298:13,
298:21, 298:23,
299:12, 299:16,
299:21, 299:25,
300:2, 300:8,
300:10, 300:12,
300:14, 300:20,
300:23, 303:10,
303:13, 303:22,
306:19, 306:21,
306:23, 308:14,
308:18, 309:1,
310:8, 310:10,
310:14, 310:19,
311:3, 311:7,
311:13, 311:23,
311:25, 312:9,
312:16, 313:11,
313:23, 314:14,
314:23, 314:25,
315:9, 315:12,
315:15, 315:17,
315:21, 315:23,
315:25, 316:4,
316:8, 316:10,
316:13, 316:21,
316:24, 317:2,
317:4, 317:7,
317:10, 317:15,
317:22, 317:25,
319:4, 320:8,
320:25, 321:13,
321:16, 323:15,
323:17, 323:20,
324:6, 324:10,
324:12, 324:15,
324:17, 325:8,
325:21, 325:24,
326:1, 326:3, 326:5,
326:14, 326:16,
326:18, 329:2,
329:4, 332:8,
332:11, 332:16,
332:19, 333:6,
335:8, 336:17,
338:1, 338:5,
338:10, 338:16,
338:19, 338:22,
338:25, 339:2,
339:5, 339:7,
339:10, 339:14,
340:6, 340:10,
344:13, 344:25,
345:3, 345:8,
345:10, 346:9,
349:3, 349:7, 349:9,
349:12, 349:16,
349:19, 349:23,
349:25, 351:11,
351:13, 351:17,

351:23, 352:4,
352:15, 352:22,
352:25, 353:9,
353:13, 353:24,
354:2, 354:4, 354:6,
354:8, 354:10,
354:13, 354:14,
354:16, 355:5,
355:8, 355:14,
355:17, 355:20,
355:22, 355:24,
356:7, 356:16,
356:22, 357:17,
357:20, 359:19,
360:21, 360:24,
361:12, 361:22,
362:1, 362:9,
362:13, 362:22,
362:25, 363:4,
363:10, 363:14,
363:16, 363:20,
363:22, 363:25,
364:7, 364:11,
364:14, 364:20,
365:3, 365:8,
365:14, 365:17,
365:22, 366:5,
366:9, 366:16,
366:19, 367:2,
367:6, 367:18,
367:20, 368:1,
368:5, 368:10,
368:24, 369:3,
369:6, 369:8,
369:21, 369:24,
370:4, 370:8,
370:24, 371:6,
371:17, 371:19,
371:22, 371:24,
372:1, 372:5, 372:9,
372:14, 372:22,
372:25, 373:6,
373:9, 373:11,
373:19, 373:22,
374:1, 374:3, 374:5,
374:11, 374:14,
374:18, 374:20,
374:24, 375:1,
375:5, 375:18,
375:21, 376:2,
376:4, 377:1, 377:5,
377:11, 378:1,
378:6, 378:8,
378:11, 378:18,
378:22, 378:25,
379:5, 379:10,
379:19, 379:22,
380:5, 380:7,
380:12, 380:16,
380:20, 381:12,
381:14, 381:17,

381:20, 382:4,
382:6, 382:8,
382:14, 383:1,
383:13, 383:21,
384:11, 384:14,
384:16, 384:18,
384:22, 384:25,
385:3, 385:5, 385:9,
385:11, 385:14,
385:17, 385:20,
385:22, 386:2,
386:5, 386:9,
386:12, 386:18,
386:20, 386:25,
387:5, 387:7,
387:11, 387:16,
387:19, 387:23,
388:1, 388:5, 388:8,
388:11, 388:19,
389:2, 389:4,
389:15, 390:7,
391:1, 391:5, 391:9,
391:15, 391:17,
391:24, 392:3,
392:6, 392:8,
392:12, 392:16,
392:21, 393:4,
393:6, 393:8,
393:10, 393:13,
393:15, 393:19,
393:25, 394:3
**Court's** [1] - 387:9
**COURTHOUSE** [1] -
134:11
**courtroom** [2] - 141:8,
153:14
**courts** [6] - 159:5,
178:4, 331:22,
331:25, 353:4, 353:6
**cousin** [1] - 169:13
**cover** [1] - 336:5
**covered** [6] - 180:25,
268:8, 304:7,
336:12, 382:23
**covering** [1] - 336:16
**crack** [1] - 186:13
**crazy** [4] - 181:12,
275:21, 381:10,
383:11
**creative** [1] - 291:2
**credibility** [1] - 144:3
**credible** [1] - 369:24
**criminal** [8] - 146:5,
146:6, 146:21,
146:25, 164:10,
171:6, 171:10, 383:5
**criminals** [1] - 384:15
**cross** [26] - 139:2,
139:9, 147:7,
147:10, 212:4,

230:9, 240:23,
240:25, 243:19,
243:21, 275:11,
284:16, 284:17,
293:22, 293:25,
310:18, 311:12,
313:22, 338:10,
377:17, 385:12,
387:1, 387:4,
390:12, 392:1
**CROSS** [4] - 135:7,
135:14, 284:22,
346:12
**cross-examine** [10] -
147:7, 147:10,
240:23, 240:25,
243:19, 243:21,
310:18, 311:12,
338:10, 390:12
**crossed** [3] - 191:23,
192:16, 195:22
**crosses** [1] - 350:8
**CRR** [1] - 134:24
**cry** [1] - 169:24
**culture** [8] - 183:2,
226:17, 227:6,
227:15, 227:20,
242:8, 272:11,
344:18
**curfew** [1] - 160:25
**custody** [5] - 182:1,
308:10, 308:23,
309:4
**custom** [1] - 242:7
**customers** [1] - 309:3
**cut** [2] - 318:15,
318:17
**cutting** [1] - 178:16

## D

**D-1** [4] - 288:8,
288:10, 321:14,
321:16
**D-17** [1] - 303:23
**D-39** [3] - 300:10,
300:12, 300:16
**D-40** [7] - 136:6,
296:2, 296:7,
296:13, 297:11,
299:25, 300:1
**D-41** [1] - 300:20
**D-49** [1] - 300:25
**D.O** [1] - 391:2
**d/b/a** [1] - 134:7
**daily** [6] - 145:7,
145:12, 145:20,
145:24, 146:3, 146:5
**damage** [2] - 275:12,

275:17
**damages** [11] - 150:1,
166:1, 167:14,
169:12, 183:16,
183:18, 184:2,
184:7, 193:10,
193:13
**dangerous** [1] -
149:12
**dangers** [1] - 187:3
**dark** [25] - 221:2,
221:10, 221:25,
222:1, 222:21,
223:5, 223:6, 223:7,
223:10, 223:15,
224:1, 224:8,
305:23, 307:19,
320:4, 320:18,
342:14, 346:5,
346:17, 347:4,
351:5, 365:12
**darn** [1] - 140:5
**date** [3] - 218:13,
330:17, 345:4
**dates** [1] - 304:6
**Daubert** [5] - 354:18,
377:22, 382:12,
389:13, 390:8
**daughter** [3] - 158:22,
160:6, 160:24
**David** [2] - 193:22
**dawn** [8] - 336:25,
337:14, 337:16,
337:20, 337:22,
338:7, 339:19,
376:25
**dawns** [5] - 336:24,
342:13, 342:17,
343:3, 343:5
**days** [27] - 140:20,
176:21, 196:6,
216:17, 216:23,
217:1, 217:6, 217:7,
217:8, 217:11,
218:21, 219:14,
226:4, 256:4,
256:14, 279:22,
347:22, 347:23,
347:24, 351:20,
351:21, 351:24,
364:3, 364:6
**dead** [3] - 232:10,
393:16, 393:17
**deal** [6] - 298:5, 298:6,
299:1, 299:3,
299:23, 389:8
**dealer** [1] - 348:23
**dealing** [2] - 193:16,
384:15
**death** [28] - 163:14,

166:2, 167:4, 167:7,
167:14, 167:18,
169:12, 193:13,
193:15, 194:23,
234:8, 234:12,
235:2, 235:5, 235:6,
236:1, 237:22,
238:21, 239:11,
240:1, 240:2,
241:10, 241:18,
253:6, 258:23,
260:8, 262:22,
274:12
**Death** [1] - 192:9
**debate** [1] - 166:8
**debris** [1] - 327:17
**Deceased** [1] - 134:4
**deceased** [1] - 150:4
**decedent** [1] - 176:15
**December** [2] - 197:8,
348:7
**decide** [20] - 141:10,
143:25, 144:6,
149:10, 149:13,
149:20, 154:12,
155:4, 156:11,
168:9, 169:8,
169:18, 177:24,
217:24, 246:6,
274:22, 361:20,
369:16, 382:15,
383:23
**decided** [13] - 160:10,
163:22, 164:25,
215:6, 215:11,
216:4, 216:13,
217:23, 217:25,
251:21, 252:3,
252:4, 335:21
**decides** [1] - 382:15
**decision** [4] - 143:3,
168:5, 183:19, 218:5
**decisions** [1] - 142:9
**decks** [1] - 292:14
**dedicated** [1] - 141:24
**deduct** [1] - 196:8
**deep** [7] - 161:25,
162:2, 162:4, 229:5,
229:6, 229:13
**deepest** [1] - 229:9
**defect** [1] - 186:12
**Defendant** [2] -
134:21, 348:2
**defendant** [8] - 147:7,
147:9, 156:21,
166:23, 183:7,
275:12, 275:17,
298:13
**DEFENDANT** [2] -
136:6, 300:1

**Defendant's** [1] -
301:24
**defendant's** [1] -
146:13
**Defendants** [1] -
134:10
**defendants** [2] -
147:6, 306:17
**defense** [10] - 148:20,
164:17, 165:1,
165:2, 165:18,
172:18, 182:13,
194:4, 241:11,
390:17
**define** [1] - 321:25
**definite** [1] - 229:2
**definitely** [3] - 148:18,
238:18, 238:19
**definition** [1] - 204:1
**degree** [4] - 183:17,
195:8, 195:17, 379:7
**Delaware** [1] - 155:19
**deliberate** [1] - 147:14
**deliberations** [2] -
143:17, 144:23
**delivered** [1] - 292:11
**denies** [1] - 139:5
**Dennis** [3] - 213:13,
213:14, 295:14
**denying** [1] - 366:18
**DEP** [1] - 213:8
**Department** [15] -
179:14, 180:22,
207:12, 207:25,
208:5, 208:8,
208:18, 209:4,
209:13, 209:24,
210:18, 213:17,
295:12, 295:14,
296:18
**department** [7] -
170:7, 170:10,
224:23, 271:11,
271:13, 271:18,
285:5
**departments** [1] -
213:22
**depicted** [1] - 300:25
**depose** [2] - 384:23,
386:12
**deposed** [1] - 226:3
**deposition** [27] -
197:9, 197:16,
223:7, 270:17,
342:17, 345:1,
345:2, 345:3, 345:4,
346:16, 371:11,
371:13, 375:7,
375:9, 375:10,
375:12, 375:13,

375:15, 375:25, 377:2, 377:13, 377:20, 377:23, 385:2, 385:6, 389:18, 391:19
**depositions** [3] - 138:22, 345:10, 364:23
**deprecation** [1] - 317:5
**depth** [2] - 229:6, 229:9
**DEPUTY** [15] - 138:2, 138:10, 172:10, 196:3, 196:5, 196:21, 196:25, 266:4, 276:23, 326:6, 326:10, 353:22, 354:12, 356:1, 356:4
**describe** [2] - 149:2, 384:2
**description** [1] - 174:9
**design** [1] - 360:7
**designated** [8] - 154:2, 197:13, 197:15, 198:6, 206:7, 225:16, 226:6, 288:8
**designed** [3] - 246:6, 361:9, 363:6
**designees** [1] - 262:10
**destination** [1] - 204:22
**detailed** [2] - 144:3, 144:16
**detector** [1] - 157:22
**deter** [1] - 249:16
**determination** [1] - 141:11
**determine** [2] - 143:9, 155:13
**determined** [1] - 338:2
**determining** [1] - 144:3
**deterrence** [3] - 249:16, 309:25, 320:22
**deterrent** [13] - 247:5, 247:6, 247:7, 249:10, 249:12, 249:13, 257:10, 321:3, 321:7, 365:6, 369:11, 383:3, 384:10
**develop** [2] - 191:9, 247:6
**device** [1] - 246:23
**devices** [1] - 246:22
**diagnosis** [1] - 389:1
**diagram** [2] - 174:3, 289:21
**die** [1] - 166:22
**died** [1] - 393:15
**dies** [1] - 166:13
**difference** [12] - 157:1, 190:5, 196:10, 198:8, 204:11, 204:13, 311:21, 312:4, 312:21, 355:5, 372:6, 390:17
**different** [38] - 167:6, 168:20, 190:22, 192:7, 193:12, 199:5, 213:4, 217:4, 225:12, 225:14, 240:17, 243:25, 253:14, 270:8, 271:10, 273:23, 274:9, 282:3, 290:20, 290:25, 291:3, 300:19, 319:1, 323:7, 333:4, 337:4, 340:1, 341:15, 349:7, 357:6, 357:7, 358:14, 360:5, 361:13, 363:13, 377:7, 379:10, 385:24
**differently** [2] - 146:12, 363:13
**difficult** [1] - 144:16
**dimensions** [1] - 325:5
**dinner** [2] - 159:1
**Dioscon** [9] - 158:15, 158:16, 158:17, 158:21, 161:23, 176:14, 182:22, 184:25, 392:15
**Dioscon's** [1] - 183:12
**DIRECT** [6] - 135:5, 135:12, 135:19, 197:3, 326:19, 356:8
**direct** [21] - 143:18, 143:19, 175:24, 176:3, 202:1, 284:16, 284:18, 284:20, 293:25, 294:4, 294:5, 295:8, 305:9, 305:13, 307:4, 311:19, 311:20, 311:21, 312:19, 313:21
**direction** [7] - 212:14, 212:24, 248:20, 249:1, 249:10, 333:7, 362:3
**directions** [1] - 333:4
**directly** [2] - 312:13, 387:14
**directories** [1] - 380:11
**directory** [4] - 357:8, 357:11, 371:23, 380:6
**Directory** [1] - 371:12
**disagree** [4] - 191:7, 192:18, 217:2, 294:4
**disagreeing** [2] - 233:13, 378:17
**disagreement** [1] - 192:21
**disclosed** [1] - 263:11
**discovery** [6] - 263:11, 263:14, 269:11, 274:18, 375:16, 375:18
**discretion** [2] - 209:15, 318:11
**discuss** [9] - 140:3, 141:1, 144:21, 186:9, 267:15, 304:17, 304:24, 353:14, 353:15
**discussed** [4] - 163:11, 236:1, 329:8, 330:13
**discussing** [2] - 140:16, 328:24
**discussion** [4] - 181:17, 330:2, 330:11, 330:12
**discussions** [5] - 330:4, 330:6, 330:19, 330:21, 330:24
**dismiss** [1] - 142:19
**Disney** [1] - 290:21
**dispersed** [1] - 253:25
**dispute** [17] - 244:2, 244:3, 244:4, 244:6, 244:7, 244:8, 244:11, 245:10, 245:24, 245:25, 246:3, 248:3, 257:24, 258:8, 260:7, 263:24, 294:2
**disputed** [2] - 178:24, 182:10
**distance** [5] - 178:7, 178:19, 340:20, 340:24, 383:2
**distinction** [4] - 189:16, 190:2, 190:9, 190:13
**distorting** [3] - 374:9, 374:10, 374:11
**distress** [1] - 194:19
**District** [1] - 390:9
**district** [1] - 193:25
**DISTRICT** [3] - 134:2, 134:2, 134:14
**Diversified** [33] - 134:21, 152:8, 153:9, 154:7, 154:17, 156:21, 156:22, 156:23, 160:10, 164:7, 197:10, 197:11, 199:23, 205:22, 218:4, 218:8, 218:11, 218:20, 227:23, 230:22, 231:1, 260:18, 261:14, 263:21, 264:22, 269:7, 269:10, 269:25, 274:16, 285:15, 285:19, 317:18
**diversified** [2] - 205:21, 286:3
**DIVERSIFIED** [3] - 134:8, 134:8, 134:9
**diversity** [1] - 189:11
**diverting** [1] - 243:18
**doctor** [3] - 167:22, 388:23, 393:4
**document** [7] - 269:18, 296:14, 297:8, 303:25, 304:3, 355:1, 360:25
**documents** [1] - 138:21
**DOG** [1] - 295:18
**DOJ** [1] - 295:19
**dollars** [3] - 219:18, 313:2, 390:21
**don't-swim-in-the-lake-after-it-gets-dark** [1] - 346:5
**don't-swim-in-the-lake-after-it-gets-dark-rule** [1] - 347:4
**Donald** [1] - 167:2
**done** [31] - 147:14, 150:18, 154:25, 158:13, 165:6, 165:24, 168:12, 170:16, 179:9, 206:15, 241:9, 241:18, 244:16, 253:21, 253:22, 259:1, 267:16, 271:21, 272:9, 309:11, 338:15, 339:17, 345:8, 355:18, 359:5, 364:12, 364:25, 373:24, 374:14
**door** [6] - 222:2, 320:23, 340:7, 341:19, 341:22, 362:6
**doubt** [5] - 146:22, 164:12, 164:13, 237:14, 383:8
**down** [53] - 137:17, 142:2, 152:2, 158:21, 159:2, 159:5, 159:7, 159:19, 173:5, 173:7, 173:11, 174:5, 174:6, 175:2, 176:8, 176:10, 176:18, 176:19, 177:2, 180:11, 189:7, 200:12, 211:23, 217:22, 221:15, 227:17, 227:21, 231:10, 239:9, 249:8, 256:20, 287:1, 287:2, 287:6, 287:11, 291:21, 292:18, 297:2, 299:6, 301:14, 305:3, 325:24, 353:9, 380:1, 384:25, 385:3, 385:4, 391:1, 391:11, 391:13, 391:20
**dozen** [1] - 158:11
**Dr** [3] - 167:2, 393:2, 393:5
**draft** [1] - 312:6
**draw** [3] - 143:7, 305:1, 335:18
**drew** [2] - 249:1, 331:4
**drinking** [9] - 159:23, 160:2, 214:15, 215:21, 215:23, 258:18, 258:19, 336:4, 345:21
**drive** [4] - 151:13, 215:13, 287:9, 340:10
**driving** [6] - 260:14, 272:12, 272:15, 272:17, 275:21, 377:6
**drop** [3] - 160:1, 161:24, 161:25
**drop-off** [2] - 161:24, 161:25
**dropped** [2] - 177:21,

182:2

**drove** [1] - 154:9
**drown** [2] - 154:16, 158:7
**drowned** [1] - 185:8
**drowning** [19] - 164:24, 199:19, 208:2, 234:17, 238:16, 240:2, 242:19, 246:7, 270:18, 277:17, 339:20, 340:15, 352:11, 352:23, 364:4, 364:8, 368:19, 368:23, 369:20
**Dubuque** [2] - 139:11, 139:12
**due** [2] - 186:20, 197:24
**duly** [4] - 138:12, 196:19, 326:8, 356:2
**dummy** [11] - 257:10, 257:11, 309:24, 329:18, 329:23, 331:7, 331:10, 332:18, 332:20, 374:21
**dump** [1] - 140:17
**during** [23] - 137:6, 137:9, 137:25, 139:15, 139:18, 141:9, 142:12, 142:24, 144:10, 175:2, 176:8, 177:19, 181:15, 181:20, 205:12, 233:9, 271:8, 290:10, 294:19, 308:4, 346:15, 359:5, 379:25
**dusk** [33] - 153:8, 157:11, 157:18, 160:15, 185:2, 215:16, 217:17, 223:3, 223:5, 223:7, 223:8, 223:10, 223:15, 224:1, 224:6, 224:8, 336:24, 336:25, 337:4, 337:13, 337:16, 337:20, 337:22, 338:7, 339:19, 342:13, 342:17, 343:3, 343:5, 351:5, 376:8, 376:25
**duties** [2] - 215:19, 256:7
**Duty** [1] - 300:18

**duty** [5] - 138:16, 143:4, 277:17, 305:18, 350:14
**dwell** [2] - 165:16, 166:24

---

# E

**E-S** [1] - 356:6
**early** [5] - 142:4, 154:10, 186:10, 285:6, 358:22
**earned** [1] - 167:25
**Earth** [2] - 153:19, 153:20
**East** [1] - 193:16
**east** [1] - 153:13
**eastern** [1] - 230:17
**easy** [1] - 142:9
**eat** [2] - 151:19, 151:24
**eating** [1] - 177:1
**economic** [5] - 167:22, 169:2, 169:11, 184:4, 184:7
**economics** [2] - 167:16, 167:18
**economist** [7] - 167:20, 167:21, 168:3, 168:5, 168:18, 184:5, 184:17
**edge** [1] - 287:25
**effect** [5] - 149:19, 177:11, 201:3, 297:7, 321:3
**eight** [1] - 199:19
**either** [21] - 141:19, 153:10, 161:10, 171:3, 186:12, 200:11, 201:8, 201:10, 202:7, 202:13, 206:20, 212:8, 245:6, 266:10, 268:11, 286:4, 292:25, 307:23, 342:7, 362:3, 363:5
**electric** [2] - 291:23, 291:25
**electrical** [2] - 213:8, 295:15
**electricity** [1] - 315:12
**electronic** [1] - 353:16
**elegantly** [1] - 150:11
**element** [2] - 169:11, 192:15
**elements** [2] - 166:17, 168:11

**elicit** [5] - 166:16, 198:21, 354:23, 372:16, 373:1
**elsewhere** [1] - 260:21
**emergencies** [1] - 297:6
**emergency** [1] - 297:3
**emotion** [1] - 183:19
**emotional** [6] - 192:5, 192:8, 192:13, 192:14, 192:19, 194:19
**emphasize** [1] - 306:6
**emphasizing** [1] - 191:12
**employ** [1] - 280:13
**employee** [7] - 140:13, 226:10, 277:4, 277:6, 277:17, 279:14, 364:9
**employees** [9] - 224:11, 226:5, 227:7, 227:21, 228:4, 240:11, 240:14, 353:17, 376:24
**encounter** [1] - 177:6
**END** [3] - 248:5, 266:1, 339:15
**end** [16] - 143:23, 144:4, 144:23, 149:25, 150:15, 171:20, 180:11, 182:4, 185:15, 289:3, 289:5, 289:6, 294:24, 322:11, 335:25
**ended** [1] - 206:25
**ending** [1] - 353:9
**endless** [2] - 332:20, 364:1
**enforce** [27] - 148:3, 154:4, 154:10, 154:15, 158:8, 163:20, 164:3, 225:16, 225:23, 226:6, 227:9, 228:5, 228:24, 239:15, 239:17, 242:7, 243:22, 272:12, 272:16, 279:15, 279:25, 346:5, 346:7, 346:25, 347:3, 347:6, 379:16
**enforced** [8] - 154:1, 159:11, 164:23, 306:1, 306:2, 345:14, 376:11,

379:16
**enforcing** [2] - 344:24, 345:23
**engage** [1] - 141:6
**engineer** [6] - 148:7, 165:3, 165:5, 165:11
**English** [2] - 167:17, 193:10
**enjoyment** [1] - 293:17
**enlargement** [1] - 151:2
**ensure** [3] - 179:15, 306:1, 306:2
**enter** [2] - 212:3, 292:24
**entered** [4] - 175:6, 178:14, 184:24
**ENTERS** [4] - 138:3, 172:11, 196:6, 276:24
**entire** [8] - 271:17, 289:15, 337:10, 364:19, 369:2, 376:25, 382:1, 387:21
**entities** [1] - 363:13
**entitled** [1] - 167:24
**entity** [5] - 154:7, 155:11, 155:14, 157:15, 215:1
**entrance** [7] - 210:24, 210:25, 211:1, 211:2, 250:14, 286:24, 301:12
**entranceway** [1] - 286:23
**entrust** [1] - 182:9
**entrusted** [2] - 198:16, 198:24
**entry** [3] - 180:10, 180:16, 380:21
**envelope** [2] - 247:16, 247:17
**environment** [1] - 291:9
**Environmental** [1] - 295:13
**equal** [1] - 358:2
**equates** [1] - 289:7
**equipment** [11] - 160:8, 160:12, 209:7, 213:17, 240:9, 241:19, 241:20, 241:21, 241:22, 297:3, 297:6
**error** [1] - 311:8
**escape** [1] - 384:12
**especially** [1] - 137:14
**ESQUIRE** [3] - 134:17,

134:18, 134:20
**essence** [1] - 178:10
**establish** [1] - 247:18
**established** [1] - 168:14
**Estate** [1] - 134:4
**estate** [3] - 166:22, 167:23, 293:8
**estimate** [3] - 278:17, 357:3, 358:9
**estimated** [1] - 169:8
**estimating** [1] - 161:9
**Europe** [1] - 358:20
**evaluate** [2] - 170:24, 318:16
**evaluated** [5] - 166:23, 167:15, 167:16, 167:22, 167:23
**evaluation** [3] - 168:6, 169:9, 171:2
**evaporate** [2] - 232:8, 233:9
**evaporates** [2] - 232:1, 232:4
**evaporation** [3] - 232:9, 232:11, 232:17
**evasive** [5] - 241:5, 243:17, 243:18, 243:24, 244:1
**evening** [7] - 150:17, 159:14, 177:5, 224:4, 362:19, 364:2, 376:8
**evenings** [1] - 307:7
**everywhere** [2] - 203:3, 370:17
**EVIDENCE** [2] - 136:6, 300:1
**evidence** [45] - 138:16, 138:20, 139:2, 139:4, 139:8, 139:11, 139:13, 140:15, 140:17, 140:21, 141:3, 143:4, 143:18, 143:19, 143:20, 143:24, 144:20, 145:2, 145:5, 146:9, 146:10, 146:13, 146:19, 147:3, 147:5, 147:12, 155:4, 156:19, 158:8, 163:18, 164:14, 165:22, 165:23, 168:2, 181:2, 185:21, 275:5, 297:12, 298:14, 299:22,

299:25, 300:15,
338:12
exact [4] - 294:23,
325:6, 337:6, 388:21
exactly [8] - 230:16,
237:12, 249:21,
293:9, 301:6,
343:14, 343:23,
348:7
examination [10] -
139:2, 139:10,
202:1, 275:11,
284:17, 295:8,
307:4, 387:2, 387:4,
392:1
EXAMINATION [14] -
135:5, 135:7, 135:9,
135:12, 135:14,
135:16, 135:19,
197:3, 284:22,
309:15, 326:19,
346:12, 350:5, 356:8
examine [12] - 147:7,
147:10, 240:23,
240:25, 243:19,
243:21, 310:18,
311:12, 338:10,
390:12
examined [1] - 389:6
example [2] - 139:9,
170:6
examples [1] - 286:21
except [3] - 234:14,
246:10, 251:4
exception [1] - 387:13
excluding [2] -
258:18, 258:19
excuse [13] - 148:6,
150:25, 151:18,
151:19, 229:15,
231:13, 244:16,
264:23, 285:22,
289:11, 290:19,
295:19
execute [1] - 303:8
exercise [1] - 158:2
EXHIBIT [3] - 136:4,
136:6, 300:1
Exhibit [3] - 301:24,
303:21, 348:2
exhibit [8] - 137:3,
180:4, 200:2,
262:18, 274:11,
286:12, 286:17,
295:25
exhibits [3] - 138:24,
262:23, 262:25
exist [1] - 143:22
existed [1] - 339:11
existence [1] - 342:2

exiting [1] - 178:14
EXITS [4] - 172:8,
186:7, 266:5, 353:23
expand [1] - 383:14
expect [6] - 175:6,
177:15, 187:21,
201:20, 282:5, 282:6
expense [1] - 316:19
expenses [3] - 317:1,
317:2, 317:3
experience [5] -
165:3, 234:10,
293:17, 307:15,
382:18
expert [23] - 165:21,
168:6, 168:7, 264:8,
265:7, 265:11,
265:13, 267:5,
269:19, 281:22,
355:2, 365:17,
367:2, 370:22,
376:14, 376:15,
376:20, 383:7,
384:24, 385:22,
389:12, 392:23
expert's [2] - 375:23,
377:19
expertise [1] - 367:6
experts [8] - 137:14,
165:2, 165:17,
165:18, 195:9,
330:25, 377:17,
391:22
explain [9] - 149:22,
155:3, 163:13,
166:3, 167:2, 170:1,
194:12, 335:6,
360:13
explains [1] - 168:1
exposed [2] - 140:10,
140:11
extended [2] - 364:3,
364:5
extensive [1] - 207:18
extensively [1] -
269:14
extra [6] - 306:8,
371:20, 372:9,
372:12, 372:15,
380:10
extrinsic [1] - 186:12
eyeballs [1] - 268:7
eyes [2] - 177:4, 383:8
eyewitness [1] -
143:20

---

F

face [3] - 148:11,

303:6
faced [3] - 212:15,
287:24, 332:2
facilities [6] - 151:12,
151:13, 173:7,
173:21, 220:14,
237:20
facility [6] - 154:19,
157:10, 187:11,
191:10, 197:22,
367:8
facing [5] - 301:11,
331:21, 333:5,
333:20, 336:11
fact [20] - 138:24,
143:19, 161:16,
162:3, 171:16,
179:23, 183:20,
185:3, 244:6,
246:12, 246:15,
247:18, 248:19,
258:6, 265:11,
268:21, 269:6,
304:12, 376:23
factor [2] - 169:25,
237:20
factored [2] - 168:21,
168:22
facts [35] - 138:16,
138:17, 138:18,
138:20, 139:3,
139:4, 139:6,
141:11, 141:15,
143:21, 143:22,
146:11, 161:17,
163:11, 166:4,
168:9, 174:14,
174:15, 176:13,
178:24, 179:4,
181:6, 184:18,
185:6, 245:5,
245:22, 246:9,
247:19, 247:20,
257:23, 257:24,
258:5, 258:7, 260:7,
339:10
factual [5] - 198:21,
244:10, 245:5,
263:17, 283:13
factually [4] - 248:3,
254:10, 254:13,
254:17
fair [6] - 140:15,
171:2, 312:23,
358:9, 367:3
fairly [2] - 328:23,
390:9
Fairton [1] - 384:7
faith [1] - 366:9
fall [5] - 155:20,

186:13, 235:4,
236:10, 236:11
familiar [2] - 266:7,
278:1
family [20] - 139:20,
140:13, 151:25,
166:13, 167:19,
168:15, 168:17,
169:21, 174:10,
174:11, 175:2,
175:5, 176:20,
182:7, 183:21,
290:8, 290:23,
291:9, 353:15
family-oriented [3] -
174:10, 174:11,
290:8
famous [2] - 275:9,
275:23
far [31] - 166:1,
178:17, 195:19,
207:3, 236:15,
248:2, 248:13,
248:15, 249:5,
256:17, 269:14,
292:6, 295:17,
297:3, 301:22,
321:7, 325:1, 327:5,
329:23, 334:15,
334:16, 340:22,
341:1, 342:5,
344:23, 344:24,
345:23, 345:24,
349:21, 383:2
fashion [2] - 183:22,
185:15
father [2] - 286:23,
290:14
fault [3] - 164:19,
171:13, 183:8
faulty [1] - 184:12
favor [4] - 164:16,
373:15, 373:16,
382:15
favorably [1] - 386:18
favored [1] - 373:17
feasibility [4] -
358:23, 359:6,
359:11, 359:13
features [1] - 242:18
federal [6] - 213:16,
214:25, 275:20,
328:12, 357:1, 358:5
feds [1] - 213:15
feet [5] - 153:1,
229:13, 229:16,
290:4, 362:3
fellow [1] - 144:22
felt [1] - 218:1
fence [15] - 160:17,

213:24, 241:23,
256:17, 256:24,
257:2, 257:4, 257:8,
259:13, 259:16,
362:5, 362:11,
362:12, 376:14,
386:2
fencing [2] - 179:7,
318:8
few [12] - 142:19,
144:14, 158:19,
176:21, 187:16,
189:13, 222:8,
261:23, 266:3,
285:13, 326:23,
358:16
fiancé [1] - 175:1
field [4] - 230:7, 230:9,
230:14, 240:20
figuring [1] - 190:4
file [2] - 303:9, 304:4
filed [1] - 214:19
fill [1] - 392:22
final [5] - 186:22,
263:2, 316:15,
321:11, 388:3
finally [2] - 142:11,
162:25
fine [5] - 148:21,
194:22, 294:16,
384:25, 385:3
finger [1] - 140:1
finish [11] - 178:20,
223:18, 263:16,
263:18, 273:25,
278:23, 332:12,
366:11, 367:8,
371:18, 375:5
finished [4] - 223:22,
227:3, 274:1
finishes [1] - 147:8
fire [5] - 170:7,
170:10, 237:6,
291:8, 360:20
first [36] - 138:7,
138:12, 147:2,
150:5, 150:6,
156:22, 177:13,
193:25, 211:10,
223:10, 231:9,
242:20, 246:8,
246:21, 257:18,
262:19, 262:23,
263:1, 274:6,
275:10, 275:16,
285:8, 293:12,
302:20, 302:22,
309:1, 326:14,
326:15, 347:22,
368:3, 368:24,

388:23, 391:6,
392:12
**fishing** [1] - 173:23
**fit** [1] - 166:4
**Five** [1] - 274:16
**five** [23] - 160:7,
187:24, 195:25,
250:4, 251:13,
252:9, 252:13,
252:15, 252:18,
252:22, 253:14,
263:7, 263:24,
274:15, 285:10,
291:6, 332:16,
332:19, 351:19,
354:20, 358:6,
365:1, 367:16
**five-minute** [1] - 365:1
**fixtures** [1] - 379:25
**flabbergasted** [2] -
383:17, 383:21
**flag** [1] - 351:8
**flap** [1] - 324:13
**flapping** [1] - 162:6
**flashlight** [1] - 215:18
**flip** [1] - 162:18
**flip-flops** [1] - 162:18
**float** [2] - 153:2, 153:4
**floor** [1] - 186:13
**flops** [1] - 162:18
**Florida** [1] - 285:9
**focus** [3] - 210:8,
290:24, 378:4
**focused** [1] - 365:24
**focuses** [1] - 290:8
**focusing** [1] - 210:9
**fold** [1] - 391:11
**follow** [7] - 138:19,
147:5, 283:16,
283:23, 284:3,
333:10, 353:1
**followed** [3] - 165:7,
239:14, 390:9
**following** [4] - 244:13,
306:12, 306:16,
317:17
**follows** [3] - 196:20,
326:9, 356:3
**FOLLOWS** [3] -
243:13, 262:21,
338:4
**food** [1] - 285:7
**fooling** [1] - 162:9
**foot** [3] - 181:10,
187:1, 229:11
**football** [3] - 230:7,
230:9, 230:14
**FOR** [1] - 134:2
**forbidden** [1] - 364:16
**force** [1] - 389:20

**forceful** [1] - 192:17
**forcing** [1] - 385:5
**forensic** [5] - 167:1,
167:20, 167:21,
184:5, 393:5
**foresee** [4] - 156:2,
156:4, 156:13,
238:14
**foreseeability** [1] -
239:10
**foreseeable** [27] -
155:22, 155:25,
156:16, 156:17,
158:7, 234:8,
234:16, 235:1,
235:10, 235:25,
236:25, 237:21,
237:23, 237:24,
237:25, 238:15,
238:21, 238:25,
239:3, 239:11,
240:1, 241:17,
247:25, 253:6,
258:23
**foreseeably** [1] -
242:19
**forget** [3] - 370:6,
370:7, 380:25
**forgot** [4] - 297:4,
320:11, 369:9,
369:17
**form** [1] - 267:11
**forms** [1] - 210:3
**formula** [1] - 167:10
**forthright** [3] - 243:17,
244:24, 254:22
**forward** [6] - 142:23,
143:14, 176:12,
317:7, 344:12,
353:20
**foundation** [2] -
256:23, 257:1
**fountain** [2] - 152:25
**four** [39] - 154:10,
160:6, 174:2, 174:4,
174:24, 215:8,
217:15, 217:17,
217:23, 219:17,
223:20, 232:22,
235:13, 237:3,
240:16, 245:4,
254:21, 256:12,
265:17, 269:25,
274:14, 276:14,
289:23, 309:16,
338:2, 342:15,
344:6, 349:8, 349:9,
349:23, 349:24,
350:6, 353:19,
385:1, 387:9, 387:14

**four-and-a-half** [4] -
174:2, 174:4,
235:13, 289:23
**four-and-three-
quarters** [1] - 289:23
**four-hour** [1] - 385:1
**Fourth** [1] - 216:9
**fourths** [1] - 305:3
**franchisees** [1] -
356:21
**Frank** [1] - 167:22
**frankly** [1] - 178:24
**frantic** [1] - 162:24
**frequently** [1] - 146:5
**fresh** [5] - 181:20,
231:8, 232:20,
233:11, 233:14
**freshening** [1] -
233:17
**fresher** [1] - 233:15
**Friday** [5] - 158:20,
159:12, 215:7,
216:10, 216:13,
273:2, 273:12,
307:7, 363:16, 376:9
**Fridays** [10] - 154:3,
154:11, 154:13,
160:18, 164:3,
216:5, 218:20,
272:3, 307:1
**Friedlander** [1] -
134:24
**friend** [3] - 158:14,
158:20, 384:11
**friends** [6] - 139:20,
162:8, 176:15,
176:17, 353:15,
353:17
**front** [17] - 181:16,
201:7, 250:5,
250:14, 252:10,
301:1, 318:10,
319:25, 324:13,
330:16, 330:17,
332:2, 333:20,
340:25, 341:9,
341:19, 378:23
**frustrated** [1] - 257:21
**fulfilled** [1] - 218:2
**full** [8] - 196:9, 196:21,
226:22, 285:11,
326:10, 356:4,
367:13, 379:25
**full-time** [1] - 379:25
**function** [1] - 171:17
**furthest** [1] - 340:20
**future** [2] - 168:23

## G

**game** [7] - 287:17,
330:15, 330:17,
332:25, 333:2, 333:5
**garage** [2] - 340:7
**gate** [34] - 152:14,
154:2, 173:14,
222:1, 224:25,
225:1, 225:2, 225:3,
225:8, 240:6,
241:23, 250:8,
250:9, 250:10,
250:12, 250:14,
252:10, 255:19,
255:20, 255:21,
266:18, 266:19,
266:25, 277:18,
277:19, 277:20,
295:2, 295:4,
330:16, 364:9
**gatehouse** [4] -
333:18, 333:19,
333:21, 333:22
**gather** [2] - 141:4,
142:4
**gazebos** [1] - 292:14
**gear** [1] - 290:9
**geared** [2] - 201:16,
290:11
**gee** [2] - 140:9, 194:17
**general** [49] - 153:24,
172:14, 172:25,
174:9, 183:1,
197:14, 199:17,
205:24, 205:25,
220:1, 220:3, 220:6,
220:8, 224:14,
234:7, 248:10,
248:13, 250:6,
252:10, 258:17,
265:16, 282:5,
282:14, 285:6,
285:8, 285:12,
293:15, 313:14,
314:2, 314:21,
314:22, 321:4,
328:2, 328:15,
328:25, 331:12,
331:13, 331:14,
331:15, 331:16,
331:17, 331:18,
334:1, 334:22,
342:18, 344:2,
359:12, 366:14
**generally** [2] - 377:5,
381:22
**gentleman** [3] -
267:19, 310:6,

322:15
**gentlemen** [8] -
172:21, 181:6,
181:19, 184:6,
184:23, 185:6,
185:24, 353:10
**GERRY** [1] - 134:11
**Gettysburg** [1] - 261:1
**Girl** [1] - 182:8
**girl** [2] - 177:2, 364:23
**girls** [5] - 159:15,
160:7, 160:20,
160:22
**given** [7] - 140:19,
143:13, 169:22,
218:22, 255:14,
336:15
**Glacier** [2] - 356:15,
356:17
**gleaming** [1] - 391:12
**GM** [1] - 286:1
**go-to** [1] - 168:16
**goal** [1] - 272:14
**God** [1] - 170:22
**gold** [1] - 391:12
**golf** [14] - 154:9,
154:14, 174:1,
212:3, 219:17,
271:18, 279:14,
290:1, 290:2, 290:3,
301:13, 322:23,
362:6, 383:1
**gonna** [1] - 344:1
**Google** [4] - 140:14,
153:18, 153:19,
153:20
**Gotta** [1] - 196:7
**gotta** [2] - 172:14,
383:17
**governed** [1] - 179:16
**government** [10] -
144:11, 144:13,
215:1, 277:25,
278:5, 279:3,
357:20, 357:21,
358:3, 358:5
**government-owned**
[1] - 279:3
**governments** [1] -
358:6
**governs** [1] - 179:11
**grade** [3] - 147:25,
158:21, 162:8
**grades** [1] - 204:13
**graduate** [1] - 291:7
**grant** [1] - 265:22
**great** [3] - 194:23,
292:3, 310:4
**greets** [1] - 173:15
**grief** [4] - 166:9,

166:14, 166:15, 166:16

**grills** [1] - 237:5

**gross** [2] - 314:17, 315:4

**ground** [6] - 241:9, 245:22, 246:9, 260:8, 377:6

**grounds** [5] - 200:20, 257:25, 279:24, 280:18, 382:22

**grow** [1] - 291:5

**growing** [1] - 168:12

**guard** [12] - 152:10, 152:13, 173:18, 222:4, 225:20, 255:18, 256:3, 277:18, 364:9, 367:11, 367:12

**guards** [1] - 152:14

**guess** [24] - 143:12, 150:21, 160:13, 204:6, 205:4, 218:16, 228:25, 230:3, 230:15, 233:21, 236:2, 238:12, 249:17, 251:16, 251:18, 276:4, 277:23, 314:9, 328:6, 336:22, 366:19, 374:20, 379:12, 381:20

**guest** [3] - 242:5, 285:15, 389:17

**guests** [13] - 154:15, 163:23, 203:15, 204:8, 234:17, 234:18, 234:22, 235:11, 252:19, 255:15, 290:24, 376:12

**guidance** [1] - 381:6

**guide** [1] - 138:15

**guidelines** [1] - 144:3

**gun** [1] - 384:9

**guns** [1] - 376:16

**guy** [7] - 154:13, 168:16, 219:17, 267:10, 267:21, 362:6, 384:7

**guys** [3] - 177:19, 376:16, 389:15

## H

**half** [11] - 174:2, 174:4, 230:7, 230:9, 235:13, 262:1,

289:23, 291:15, 291:20, 311:11, 367:9

**Hampton** [2] - 285:9

**hand** [11] - 138:11, 144:12, 145:18, 169:14, 304:7, 305:1, 326:7, 341:9, 356:1, 360:7

**handed** [1] - 262:25

**handle** [1] - 142:19

**hands** [2] - 144:13, 170:3

**hang** [1] - 331:24

**happiness** [1] - 169:24

**hard** [3] - 140:24, 142:8, 381:2

**harm** [2] - 232:23, 234:2

**hate** [1] - 189:5

**Haven** [72] - 134:21, 150:22, 152:2, 152:7, 158:1, 158:14, 163:9, 164:8, 172:23, 172:25, 173:3, 173:4, 173:11, 175:18, 175:20, 176:8, 179:2, 179:15, 180:19, 181:25, 182:2, 182:25, 183:7, 185:22, 197:14, 199:15, 205:16, 205:18, 205:19, 205:20, 211:16, 215:5, 225:25, 227:22, 227:24, 228:1, 231:1, 234:25, 237:16, 237:20, 260:13, 260:16, 261:18, 264:13, 277:4, 277:18, 279:21, 282:8, 285:21, 286:11, 289:19, 290:8, 292:22, 293:14, 302:24, 304:4, 308:10, 308:21, 308:23, 309:17, 324:14, 324:15, 329:11, 340:13, 340:14, 348:8, 348:25, 376:6, 379:3, 379:15, 379:20

**HAVEN** [3] - 134:7, 134:7

**Haven's** [9] - 183:11,

205:11, 235:24, 250:23, 261:20, 264:5, 309:4, 323:13

**hazards** [3] - 187:5, 370:16, 374:8

**head** [9] - 162:3, 177:23, 190:3, 190:18, 193:4, 210:2, 238:13, 269:20, 276:10

**headed** [1] - 386:10

**heading** [1] - 281:17

**heads** [1] - 156:14

**health** [4] - 179:25, 233:12, 233:13, 301:20

**Health** [13] - 179:14, 180:22, 207:12, 207:25, 208:5, 208:8, 208:17, 209:4, 209:13, 209:24, 210:18, 295:14, 296:18

**hear** [60] - 140:12, 140:15, 150:23, 152:15, 155:4, 157:3, 157:20, 159:21, 159:24, 161:8, 164:14, 165:2, 167:21, 168:7, 168:13, 168:16, 171:8, 175:13, 175:22, 176:9, 177:3, 177:15, 178:1, 178:4, 178:13, 178:18, 179:20, 180:18, 181:16, 181:23, 182:12, 182:20, 182:21, 182:23, 182:24, 182:25, 183:4, 183:6, 184:6, 184:13, 184:15, 184:16, 184:25, 185:1, 185:2, 185:20, 243:23, 243:24, 244:5, 265:21, 274:5, 284:25, 313:15, 353:11, 354:1, 354:2, 354:4, 390:13

**heard** [34] - 140:20, 146:21, 146:22, 146:23, 161:15, 162:5, 173:3, 173:21, 173:23, 174:20, 174:22, 179:19, 181:15, 182:20, 183:9,

190:10, 190:12, 196:8, 198:12, 204:16, 257:1, 262:18, 263:6, 263:10, 265:21, 278:23, 297:18, 306:20, 306:21, 337:24, 344:20, 344:22, 370:4

**HEARING** [1] - 135:18

**hearing** [8] - 147:18, 186:24, 189:22, 265:8, 265:19, 270:11, 274:7, 354:19

**hearts** [5] - 164:15, 164:20, 192:1, 192:4

**Heather** [12] - 158:16, 159:16, 161:4, 162:20, 174:22, 175:4, 177:14, 302:18, 392:20

**Heather's** [2] - 161:2, 176:15

**heels** [1] - 142:18

**height** [1] - 159:12

**held** [3] - 176:2, 191:4, 305:11

**help** [11] - 142:23, 147:5, 155:3, 162:5, 162:23, 167:10, 169:9, 170:9, 254:25, 306:4, 375:14

**helped** [1] - 324:8

**helpful** [1] - 141:5

**helps** [4] - 233:11, 233:12, 233:13

**Hermesmann** [8] - 171:19, 171:24, 172:17, 172:22, 187:16, 189:12, 204:18, 284:13

**HERMESMANN** [158] - 134:20, 134:20, 135:8, 135:15, 148:22, 161:13, 161:15, 161:18, 165:19, 172:1, 172:3, 172:6, 172:19, 180:6, 180:8, 188:4, 189:13, 190:7, 190:12, 190:23, 191:2, 191:25, 192:3, 192:22, 192:24, 193:7, 194:14, 194:21, 195:6, 195:16, 195:23, 197:18,

198:6, 200:2, 200:6, 200:18, 205:6, 244:20, 246:19, 254:15, 254:18, 257:15, 262:17, 263:6, 263:10, 265:4, 265:6, 265:19, 268:13, 273:24, 274:3, 274:25, 275:7, 276:9, 276:12, 276:18, 278:22, 280:2, 280:21, 284:14, 284:18, 284:21, 284:22, 288:2, 288:6, 288:8, 288:11, 288:13, 289:4, 289:17, 292:8, 293:10, 294:16, 294:18, 295:7, 295:21, 295:24, 296:2, 296:9, 296:12, 297:11, 298:10, 298:12, 298:19, 298:22, 298:25, 300:3, 300:6, 300:9, 300:13, 300:17, 300:22, 300:24, 303:15, 303:23, 303:24, 306:20, 306:22, 307:3, 308:17, 308:19, 309:5, 309:10, 311:1, 311:4, 312:15, 313:6, 313:17, 314:12, 315:5, 317:20, 318:4, 319:2, 323:9, 325:16, 325:19, 325:22, 337:24, 338:6, 338:11, 338:18, 338:21, 339:1, 339:3, 339:6, 339:9, 339:12, 346:12, 349:13, 350:2, 353:8, 375:4, 375:8, 375:20, 376:1, 377:15, 379:2, 381:19, 382:3, 382:10, 383:16, 384:19, 384:24, 385:1, 385:4, 385:21, 386:7, 386:11, 386:14, 386:19, 386:21, 387:3, 387:6, 387:8, 389:3, 391:8, 391:16, 391:21

**hi** [1] - 266:13

**hiatus** [1] - 265:13
**hidden** [3] - 187:3, 187:4
**high** [4] - 148:8, 153:5, 233:18, 291:7
**highlight** [2] - 148:10, 190:9
**Hilton** [2] - 285:11, 286:6
**himself** [2] - 202:2, 268:22
**hired** [2] - 285:22
**history** [1] - 318:10
**hit** [1] - 238:12
**hmm** [2] - 236:7, 322:18
**hold** [3] - 191:8, 279:6, 354:19
**holding** [1] - 356:14
**holes** [1] - 174:1
**holiday** [10] - 151:16, 151:17, 204:23, 216:7, 216:8, 216:14, 260:10, 279:24
**Holiday** [1] - 285:5
**holidays** [4] - 215:8, 216:7, 218:22, 256:5
**holler** [2] - 311:23, 311:25
**Hollywood** [1] - 290:22
**home** [5] - 139:23, 140:13, 173:10, 193:22, 306:13
**Homer** [4] - 354:18, 355:11, 356:5, 380:23
**HOMER** [5] - 135:18, 135:19, 356:2, 356:5, 356:8
**Honor** [98] - 137:2, 137:23, 138:1, 138:5, 145:10, 145:13, 148:6, 148:22, 150:10, 151:10, 152:23, 161:13, 165:19, 166:3, 172:6, 172:19, 180:6, 186:2, 188:3, 189:15, 190:23, 191:25, 192:22, 193:24, 195:3, 196:2, 197:2, 197:18, 200:15, 200:19, 200:24, 211:9, 240:22, 241:14, 243:15, 243:16, 248:4,

249:22, 251:11, 253:24, 254:4, 254:18, 254:23, 256:24, 257:15, 259:5, 260:6, 262:17, 265:24, 268:12, 277:2, 280:21, 281:2, 284:14, 288:9, 295:21, 295:24, 296:9, 296:10, 297:11, 298:10, 298:19, 299:15, 299:24, 300:22, 306:18, 309:10, 310:17, 311:1, 311:11, 312:15, 313:7, 313:17, 314:12, 315:5, 317:20, 323:16, 323:21, 324:11, 325:20, 325:23, 326:2, 337:24, 353:8, 354:15, 355:13, 365:5, 365:19, 365:24, 366:22, 370:2, 376:23, 390:6, 391:4, 391:7, 394:1, 394:2
**Honor's** [1] - 366:7
**HONORABLE** [1] - 134:14
**honorable** [1] - 357:5
**hook** [1] - 241:21
**hookup** [1] - 291:23
**hoops** [1] - 158:25
**hope** [2] - 171:20, 189:22
**hopefully** [2] - 149:24, 326:23
**Horn** [4] - 261:5, 261:13, 261:14, 262:6
**horrendous** [1] - 375:23
**horseshoe** [1] - 238:6
**hose** [1] - 231:15
**hospitality** [2] - 285:1, 285:3
**hot** [1] - 150:17
**Hotel** [2] - 285:6, 285:11
**hotel** [2] - 285:8, 285:12
**hotels** [5] - 206:6, 234:13, 286:3, 286:5, 307:25
**hour** [4] - 219:21, 219:23, 279:5, 385:1

**hours** [27] - 170:14, 215:8, 217:12, 217:14, 217:15, 217:17, 217:23, 218:22, 219:6, 219:8, 219:13, 219:17, 219:25, 232:22, 256:12, 259:9, 298:22, 298:24, 308:4, 311:12, 338:3, 364:6, 372:22, 377:16, 389:19
**house** [5] - 152:10, 250:8, 250:9, 250:11, 291:15
**housekeepers** [1] - 226:19
**housekeeping** [2] - 225:10, 294:25
**Houston** [1] - 382:5
**huge** [2] - 178:7, 274:17
**human** [1] - 140:22
**hundred** [6] - 193:11, 216:21, 217:11, 230:11, 269:18, 314:9
**hundreds** [3] - 366:10, 382:20
**husband** [2] - 169:4

---

# I

**idea** [3] - 178:1, 267:23, 321:20
**identify** [3] - 151:7, 151:9, 345:4
**if's** [3] - 234:5, 234:6
**iffy** [1] - 188:14
**ignore** [4] - 168:5, 222:24, 255:11, 255:12
**illuminate** [1] - 307:16
**illuminated** [1] - 307:20
**imagination** [1] - 388:14
**imagine** [1] - 162:24
**impanel** [1] - 183:21
**impediment** [1] - 187:6
**implication** [1] - 274:8
**importance** [1] - 306:11
**important** [9] - 144:5, 144:9, 149:14, 159:10, 171:17, 179:12, 306:4,

306:6, 365:5
**importantly** [1] - 163:19
**impression** [1] - 181:25
**improper** [3] - 194:12, 194:13, 275:15
**improvements** [1] - 295:16
**IN** [2] - 136:6, 300:1
**Inc** [12] - 152:8, 154:8, 154:17, 156:21, 156:22, 156:23, 197:11, 227:23, 230:23, 260:18, 356:11, 356:14
**INC** [1] - 134:8
**Inc.'s** [1] - 199:23
**inch** [1] - 391:10
**incident** [11] - 157:2, 174:25, 176:21, 176:24, 179:13, 181:9, 181:14, 181:21, 246:8, 296:20, 352:11
**include** [4] - 215:12, 225:4, 228:8
**included** [3] - 291:19, 291:20, 363:3
**includes** [4] - 258:10, 357:20, 357:21, 358:5
**including** [9] - 164:2, 221:15, 357:1, 361:11, 382:2, 386:2, 390:8, 392:17, 392:18
**income** [4] - 167:23, 316:21, 316:25, 318:1
**incorporated** [1] - 139:6
**Incorporated** [2] - 160:10, 164:8
**incorporates** [1] - 139:3
**increased** [1] - 294:21
**indicate** [4] - 141:10, 141:14, 141:15, 305:18, 305:20, 305:23
**indicated** [3] - 182:21, 301:10, 307:5
**indicates** [2] - 177:9, 183:7
**indication** [2] - 189:15, 273:24
**individual** [3] - 145:1, 189:18, 203:1
**individually** [1] -

134:5
**individuals** [2] - 173:9, 294:20
**Industries** [10] - 153:9, 154:8, 154:17, 156:21, 156:22, 156:23, 164:8, 197:11, 230:23, 260:18
**industry** [8] - 204:20, 285:2, 285:3, 356:25, 358:10, 366:6, 381:1, 383:10
**inexpensive** [1] - 253:8
**infer** [1] - 143:21
**influence** [3] - 141:11, 143:10, 192:12
**information** [3] - 141:5, 198:21, 234:19
**infrared** [1] - 253:7
**inground** [4] - 361:23, 362:1, 368:1, 389:25
**inherited** [1] - 231:4
**initial** [1] - 303:5
**injured** [6] - 234:17, 234:19, 235:12, 235:16, 236:20, 236:25
**injuries** [1] - 236:12
**injury** [8] - 163:14, 186:16, 235:1, 235:3, 235:7, 235:25, 237:22, 238:21
**Inn** [3] - 285:5, 285:9
**inoperable** [2] - 249:4, 249:9
**inquiry** [1] - 178:9
**inside** [11] - 222:3, 222:4, 332:4, 332:5, 333:2, 333:3, 333:4, 336:7, 336:8, 336:9, 336:13
**insofar** [1] - 241:17
**inspect** [9] - 206:17, 207:4, 207:9, 207:10, 208:19, 208:25, 213:20, 213:22
**inspected** [7] - 207:11, 210:1, 210:6, 210:10, 213:3, 295:12, 295:13
**inspecting** [2] - 165:4, 296:22
**inspection** [12] - 179:15, 180:21,

183:5, 206:15, 208:4, 296:17, 297:1, 298:1, 299:1, 299:3, 299:6, 301:20
**inspector** [1] - 179:25
**inspectors** [5] - 213:8, 213:9, 213:16
**inspects** [2] - 295:15, 380:9
**install** [1] - 329:8
**installed** [2] - 250:18, 321:5
**installs** [1] - 320:13
**instance** [3] - 186:25, 321:9, 328:1
**instead** [2] - 287:6, 389:4
**instill** [1] - 306:11
**instruct** [2] - 138:25, 240:11
**instructed** [2] - 345:19, 345:20
**instruction** [1] - 195:2
**instructions** [2] - 138:14, 143:22
**insufficient** [1] - 377:24
**intend** [3] - 195:15, 244:22, 355:11
**intended** [1] - 141:9
**intends** [1] - 147:4
**intent** [2] - 284:18, 284:21
**intentionally** [1] - 320:15
**interaction** [1] - 183:2
**interest** [1] - 141:24
**interesting** [2] - 139:22, 270:6
**interfere** [1] - 144:19
**interpret** [2] - 147:11, 198:19
**interpretation** [1] - 387:21
**Interrogatories** [1] - 138:22
**interrupt** [3] - 142:13, 221:4, 365:2
**interrupted** [1] - 243:15
**interrupting** [2] - 285:22, 311:10
**interruptions** [1] - 142:20
**INVESTMENT** [1] - 134:9
**Investments** [7] - 134:21, 152:8, 160:10, 197:11, 199:23, 218:4,

227:23
**INVESTMENTS** [2] - 134:8, 134:8
**invitation** [1] - 307:16
**invite** [2] - 342:1, 342:6
**invited** [1] - 361:25
**invitees** [5] - 163:23, 186:16, 187:4, 235:11, 239:12
**involved** [1] - 281:23
**inward** [1] - 336:6
**Iowa** [2] - 139:11, 139:12
**Irenas** [1] - 150:3
**IRENAS** [1] - 134:14
**irrelevant** [7] - 185:8, 194:21, 197:19, 198:9, 200:22, 298:3
**Isle** [2] - 152:5, 158:23
**issue** [20] - 142:17, 142:20, 184:21, 184:22, 186:9, 187:10, 187:13, 190:21, 191:21, 198:9, 207:13, 298:1, 298:9, 354:21, 355:17, 355:18, 357:14, 367:3, 387:6
**issues** [8] - 187:4, 235:3, 330:9, 355:12, 355:15, 355:16, 361:16
**items** [2] - 173:19, 318:12
**itself** [8] - 181:8, 212:17, 230:13, 287:21, 288:1, 377:24, 381:23, 388:16

**J**

**J-O-R-D-A-N** [1] - 197:1
**January** [7] - 199:16, 199:17, 199:18, 199:22, 250:24, 251:1, 286:2
**Jason** [3] - 167:2, 393:2, 393:5
**Jay** [1] - 393:15
**jeep** [1] - 384:8
**JEI/JS** [1] - 134:6
**Jersey** [26] - 150:11, 165:8, 166:3, 166:6, 166:9, 166:10, 166:21, 167:15,

168:3, 179:1, 179:10, 188:13, 193:16, 193:17, 194:1, 207:12, 207:17, 210:1, 213:5, 214:2, 214:9, 260:21, 270:5, 292:5, 295:13, 379:21
**JERSEY** [2] - 134:2, 134:12
**JOAQUIN** [1] - 134:4
**job** [11] - 144:5, 183:17, 226:15, 226:22, 265:14, 291:10, 346:3, 346:23, 347:1, 358:22, 360:6
**jobs** [1] - 327:21
**John** [49] - 150:2, 150:4, 150:7, 150:15, 150:18, 154:23, 158:14, 158:19, 159:7, 159:13, 160:2, 161:3, 161:4, 161:7, 162:5, 162:7, 162:9, 162:12, 162:13, 162:21, 163:1, 164:18, 164:20, 167:6, 167:24, 168:12, 168:20, 168:24, 169:5, 169:19, 170:13, 176:16, 176:17, 176:18, 176:19, 178:7, 178:8, 178:9, 178:21, 183:13, 192:6, 229:23, 384:11, 393:15
**JOHN** [3] - 134:4, 134:11, 134:17
**John's** [1] - 163:2
**joint** [2] - 330:11, 330:12
**joking** [1] - 178:11
**JORDAN** [8] - 135:4, 135:5, 135:7, 135:9, 196:19, 197:3, 284:22, 309:15
**Jordan** [26] - 171:7, 172:24, 174:12, 174:25, 175:11, 175:13, 182:25, 196:16, 196:17, 196:23, 197:4, 207:3, 211:4, 277:4, 281:13, 284:23, 296:13, 300:25, 309:17, 328:24,

329:12, 330:1, 335:21, 348:20, 352:9, 352:17
**JOSEPH** [1] - 134:14
**journey** [1] - 204:22
**judge** [13] - 150:7, 150:12, 155:8, 156:4, 156:8, 156:10, 157:25, 158:3, 164:4, 184:14, 193:25, 263:6, 275:22
**JUDGE** [1] - 134:14
**Judge** [61] - 140:3, 148:18, 150:3, 150:14, 163:13, 164:9, 167:9, 168:1, 171:4, 171:5, 194:14, 195:7, 195:23, 227:3, 227:6, 232:4, 236:23, 265:4, 265:6, 265:15, 265:19, 273:24, 274:3, 275:13, 275:20, 275:24, 275:25, 276:9, 276:18, 288:2, 300:6, 338:11, 357:5, 357:23, 358:11, 358:16, 360:14, 362:10, 364:6, 370:7, 370:21, 375:4, 375:8, 377:15, 378:14, 381:19, 382:3, 382:10, 383:7, 383:17, 384:19, 384:24, 385:21, 386:7, 386:11, 386:14, 386:21, 387:3, 388:18, 389:3
**judge's** [1] - 353:1
**Judge's** [1] - 317:17
**judged** [4] - 154:18, 154:24, 191:3
**judgement** [1] - 150:16
**judges** [7] - 138:17, 150:3, 154:12, 163:7, 169:1, 171:15, 171:16
**judgment** [4] - 145:4, 166:11, 171:21, 189:3
**July** [4] - 139:11, 139:12, 216:9, 296:18
**jump** [1] - 275:12

**jumping** [1] - 247:2
**juror** [1] - 138:6
**JUROR** [4] - 138:8, 172:16, 196:11, 196:13
**jurors** [3] - 144:22, 190:4, 194:3
**jurors'** [2] - 190:3, 190:18
**jury** [56] - 137:6, 137:9, 138:9, 138:10, 139:22, 139:24, 140:1, 142:19, 144:6, 145:4, 153:13, 172:7, 183:21, 183:22, 186:6, 188:12, 191:1, 191:17, 192:12, 193:12, 194:17, 195:2, 195:5, 199:14, 206:17, 207:9, 219:16, 221:5, 228:23, 241:8, 257:1, 262:4, 265:20, 265:21, 265:22, 265:24, 266:2, 270:9, 274:7, 275:14, 288:14, 319:21, 320:17, 322:15, 324:20, 331:3, 340:24, 340:25, 366:18, 366:24, 370:19, 370:21, 382:15, 383:23, 385:14
**JURY** [10] - 138:3, 138:12, 172:8, 172:11, 186:7, 196:6, 266:5, 276:24, 353:12, 353:23
**jury's** [1] - 193:4
**justice** [1] - 146:14
**Justice** [1] - 213:17
**justify** [1] - 355:22

**K**

**Karen** [2] - 134:24, 375:6
**keep** [16] - 152:3, 161:3, 185:3, 196:9, 210:22, 232:2, 240:15, 242:18, 249:12, 254:3, 376:16, 376:19, 381:23, 383:21, 387:18, 392:20
**keeper** [1] - 224:25

**keeping** [1] - 233:18
**keeps** [2] - 192:13, 233:14
**kept** [4] - 162:10, 187:7, 249:7, 249:9
**key** [1] - 354:23
**kid** [1] - 226:19
**kiddie** [4] - 153:11, 153:14, 220:15, 220:17
**kids** [26] - 160:14, 176:10, 177:6, 235:4, 235:8, 235:14, 236:11, 287:15, 290:18, 290:23, 291:5, 306:7, 306:8, 321:24, 322:24, 331:24, 362:12, 365:6, 365:8, 365:12, 365:16, 365:17, 365:21, 369:11, 383:5
**killed** [8] - 234:17, 234:19, 234:22, 235:12, 236:20, 237:1, 238:25, 239:4
**kind** [43] - 142:4, 143:2, 151:23, 153:4, 159:4, 160:1, 166:16, 178:11, 186:25, 187:4, 192:19, 215:1, 230:17, 237:4, 259:16, 267:18, 273:5, 274:19, 274:20, 281:22, 291:4, 301:11, 308:24, 319:21, 321:3, 322:20, 330:10, 340:1, 358:1, 358:10, 358:14, 362:5, 368:22, 378:11, 381:1, 381:5, 384:5, 385:23, 389:10, 390:1, 390:3
**kinds** [7] - 143:18, 143:24, 150:24, 168:12, 168:24, 187:2, 376:19
**kit** [1] - 242:20
**know..** [1] - 316:1
**knowing** [1] - 356:25
**knowledge** [2] - 210:12, 265:18
**known** [3] - 181:12, 269:9, 329:20
**knows** [14] - 199:14, 246:8, 265:5, 265:7,

331:3, 358:2, 358:11, 366:7, 367:7, 367:8, 372:10, 392:5
**KOA** [13] - 150:24, 204:11, 204:24, 205:2, 205:5, 269:20, 269:23, 356:18, 356:21, 358:17, 359:4
**KOA's** [1] - 204:21
**KOAs** [2] - 359:2

# L

**label** [1] - 317:9
**Labor** [2] - 216:9, 216:18
**lack** [1] - 156:20
**ladies** [11] - 159:18, 172:21, 181:6, 181:18, 184:6, 184:23, 185:6, 185:24, 310:6, 322:14, 353:10
**laid** [3] - 163:5, 177:4
**lake** [268] - 150:6, 152:16, 153:7, 153:11, 157:4, 157:7, 157:13, 159:3, 159:8, 159:19, 160:18, 161:6, 161:11, 162:1, 162:2, 162:4, 173:21, 173:22, 173:23, 176:1, 176:11, 177:2, 177:7, 177:12, 177:14, 177:17, 177:24, 178:1, 178:5, 178:6, 178:20, 178:22, 178:25, 179:3, 179:11, 179:14, 179:16, 180:10, 180:16, 180:18, 180:23, 180:25, 181:3, 181:4, 181:5, 181:11, 181:19, 184:24, 185:3, 185:23, 187:3, 187:5, 187:7, 187:8, 187:9, 207:21, 208:9, 208:10, 208:14, 208:24, 208:25, 209:5, 209:8, 209:22, 210:8, 210:9, 210:10, 210:23, 210:24, 210:25,

211:16, 211:23, 212:3, 212:15, 212:16, 213:23, 213:24, 214:13, 215:2, 215:12, 215:13, 215:16, 216:2, 220:21, 221:1, 221:6, 221:11, 221:15, 221:25, 222:12, 223:3, 223:11, 223:15, 223:25, 224:2, 224:5, 225:17, 225:20, 225:25, 226:11, 226:20, 227:1, 227:8, 228:14, 229:5, 229:22, 229:25, 230:1, 230:13, 230:17, 230:18, 231:4, 231:5, 231:8, 231:18, 231:24, 231:25, 232:23, 233:13, 233:14, 234:3, 234:9, 234:24, 235:9, 235:21, 236:24, 237:18, 238:22, 239:12, 241:13, 244:12, 244:23, 245:6, 250:2, 250:3, 253:12, 253:15, 254:1, 254:12, 254:25, 255:22, 255:23, 256:3, 256:6, 256:7, 256:21, 257:4, 257:12, 257:14, 258:11, 258:24, 259:2, 259:5, 259:14, 259:16, 259:21, 260:1, 262:12, 267:9, 270:24, 272:5, 272:6, 272:17, 285:25, 286:7, 286:9, 286:10, 286:21, 286:24, 287:1, 287:2, 287:5, 287:10, 287:11, 287:14, 287:20, 287:21, 288:1, 288:3, 288:14, 288:16, 289:3, 289:14, 289:15, 296:23, 296:24, 298:3, 299:1, 299:4, 299:9, 300:4, 301:5, 301:11, 301:14, 302:5, 305:11,

306:1, 307:11, 307:12, 307:20, 311:4, 311:16, 319:17, 321:12, 321:16, 321:19, 321:21, 321:22, 325:1, 325:3, 325:12, 327:5, 327:6, 327:18, 327:19, 327:23, 330:22, 332:9, 334:3, 334:5, 334:17, 334:20, 334:21, 335:2, 335:3, 335:9, 335:17, 336:16, 337:17, 338:24, 339:1, 341:4, 344:3, 344:12, 346:5, 346:16, 347:4, 348:13, 349:4, 349:10, 350:6, 351:2, 360:24, 363:6, 365:11, 372:20, 376:15, 376:17, 377:8, 379:3, 380:21, 381:23, 381:24, 382:2, 388:14, 389:11, 390:1, 390:4
**lakes** [27] - 173:22, 214:15, 274:19, 281:6, 281:7, 286:4, 304:20, 310:1, 366:19, 366:21, 367:16, 367:23, 368:5, 368:25, 369:21, 371:3, 372:18, 378:9, 380:13, 381:22, 382:21, 384:5, 388:6, 388:12, 389:22, 389:24
**language** [15] - 179:22, 180:2, 210:13, 301:15, 301:16, 301:18, 302:11, 302:12, 312:6, 328:18, 348:15, 348:16, 348:17, 348:18, 348:20
**large** [7] - 153:14, 154:18, 236:13, 306:5, 356:14, 370:25, 379:11
**larger** [1] - 151:6
**Larry** [2] - 144:24, 266:2
**last** [16] - 195:6,

226:4, 266:10, 305:14, 327:1, 351:24, 359:14, 365:24, 378:7, 378:14, 378:16, 385:16, 385:19, 387:21, 387:25, 388:24
**late** [1] - 160:24
**law** [28] - 138:19, 142:14, 143:3, 149:5, 149:10, 150:8, 150:9, 150:10, 155:5, 166:4, 166:6, 166:7, 166:9, 167:15, 167:17, 168:3, 179:22, 187:20, 188:13, 193:10, 194:22, 222:20, 264:24, 281:4, 301:4, 328:12, 380:3
**LAW** [1] - 134:20
**laws** [2] - 138:18, 371:1
**lawsuit** [1] - 164:7
**lawyer** [14] - 139:2, 139:10, 139:12, 139:24, 142:24, 142:25, 143:2, 143:4, 143:6, 246:6, 248:1, 275:9, 275:13, 275:23
**lawyer's** [1] - 139:14
**lawyers** [10] - 138:24, 139:1, 139:17, 140:10, 141:18, 141:22, 141:24, 142:3, 188:22, 275:9
**lay** [3] - 195:14, 256:23, 256:25
**laying** [1] - 268:7
**lead** [2] - 308:21, 308:24
**leading** [1] - 243:21
**leads** [2] - 146:11, 194:16
**leaning** [1] - 186:22
**learn** [2] - 141:7, 155:5
**learned** [3] - 148:1, 155:5, 155:6
**lease** [6] - 173:20, 203:11, 292:18, 292:24, 293:4, 293:8
**leased** [4] - 173:9, 255:16, 312:24, 314:18
**least** [8] - 190:2, 191:16, 201:6,

248:14, 267:4,
274:8, 286:21,
369:24
**leave** [9] - 144:24,
155:23, 174:7,
226:11, 228:14,
241:2, 242:5,
340:10, 389:1
**leaves** [8] - 160:23,
172:7, 177:17,
177:18, 186:6,
271:14, 271:15,
271:20
**lectures** [1] - 275:14
**led** [1] - 388:3
**Lee** [1] - 158:17
**left** [13] - 153:7,
162:18, 162:19,
172:23, 212:12,
212:13, 251:8,
287:3, 287:4, 304:7,
304:8, 343:13
**left-hand** [1] - 304:7
**legal** [4] - 143:9,
148:9, 163:12,
170:18
**length** [1] - 178:15
**lengthwise** [1] -
230:10
**less** [15] - 146:3,
170:9, 171:3,
179:12, 261:17,
261:18, 261:23,
262:1, 278:12,
299:12, 315:20,
317:7, 328:18, 363:8
**lesser** [1] - 379:7
**letting** [3] - 247:6,
270:10, 375:1
**level** [5] - 232:1,
232:18, 233:18,
234:2, 380:3
**LexisNexis** [1] -
170:17
**liability** [2] - 165:2,
170:25
**library** [1] - 353:16
**license** [3] - 171:9,
293:3, 293:7
**licensed** [1] - 312:24
**lies** [1] - 393:15
**Life** [5] - 357:9,
371:12, 371:20,
371:23, 372:11
**life** [12] - 155:16,
155:17, 155:20,
168:23, 168:24,
169:5, 169:6,
169:21, 204:16,
210:7, 225:20,

389:23
**life-long** [1] - 169:5
**Lifeguard** [1] - 300:18
**lifeguard** [7] - 225:18,
246:10, 259:11,
302:3, 307:23,
350:14, 350:17
**lifeguards** [6] - 179:8,
181:3, 181:4, 245:6,
305:18, 308:1
**lifts** [1] - 295:19
**light** [24] - 146:10,
156:11, 157:23,
177:9, 184:20,
185:1, 185:3, 185:9,
232:10, 336:23,
340:1, 340:4, 340:7,
340:8, 341:16,
341:24, 343:19,
343:23, 344:2,
364:14, 364:24
**lighting** [24] - 179:6,
184:22, 184:23,
185:5, 185:10,
307:10, 307:11,
318:8, 362:5, 365:2,
365:5, 368:21,
369:10, 372:12,
372:23, 379:17,
379:20, 379:24,
380:3, 380:17,
380:20, 390:3
**lights** [61] - 149:3,
149:6, 149:8,
149:17, 149:18,
207:15, 270:3,
307:12, 319:14,
319:16, 319:17,
319:21, 319:22,
319:25, 320:1,
320:3, 320:5,
320:11, 320:17,
320:22, 321:3,
321:8, 326:24,
336:21, 336:22,
336:23, 336:24,
337:1, 337:16,
337:22, 338:8,
338:18, 339:19,
340:13, 340:14,
340:17, 341:2,
342:6, 342:12,
342:16, 342:17,
342:24, 343:9,
343:11, 343:12,
344:1, 344:13,
362:11, 364:24,
365:9, 365:10,
371:9, 373:23,
376:18, 380:13,

380:14, 385:9
**likely** [2] - 146:12,
146:19
**limit** [2] - 309:1,
385:23
**limited** [5] - 246:10,
259:9, 279:21,
279:22, 385:7
**limiting** [1] - 389:21
**line** [16] - 180:13,
191:12, 191:15,
191:23, 192:11,
192:16, 195:22,
270:8, 276:6,
277:22, 282:4,
313:6, 316:12,
318:12, 335:18,
345:5
**Line** [3] - 284:2, 346:2,
346:21
**lineup** [1] - 393:9
**list** [8] - 207:18,
207:20, 257:19,
257:20, 258:12,
264:19, 300:16,
357:14
**listen** [5] - 145:2,
184:7, 184:8,
185:21, 236:16
**listening** [3] - 144:19,
185:4, 350:1
**listing** [1] - 357:11
**lit** [1] - 380:10
**literally** [2] - 274:5,
274:23
**litigation** [1] - 389:16
**live** [2] - 268:17, 277:4
**lived** [3] - 168:22,
277:7, 277:14
**lives** [1] - 269:4
**LLC** [4] - 134:7, 134:9,
134:9, 134:21
**locate** [1] - 292:25
**located** [6] - 173:5,
180:9, 180:10,
291:21, 301:9
**location** [4] - 292:3,
334:18, 350:12,
352:23
**locations** [4] - 259:25,
337:4, 350:11,
350:18
**lock** [5] - 222:1, 222:2,
240:6, 241:23,
241:24
**locked** [5] - 222:2,
256:20, 320:23,
341:23, 362:6
**lodge** [1] - 285:16
**lodgings** [1] - 151:12

**look** [37] - 162:21,
174:16, 183:11,
183:12, 183:13,
183:24, 183:25,
184:1, 184:3,
184:19, 185:20,
208:16, 209:4,
216:19, 245:2,
251:9, 257:23,
269:8, 271:20,
271:21, 274:22,
280:20, 286:23,
288:4, 298:13,
299:6, 299:12,
304:7, 304:12,
353:20, 358:23,
363:7, 376:14,
377:20, 387:11,
389:2
**looked** [3] - 162:12,
206:8, 269:24
**looking** [18] - 156:15,
174:25, 180:8,
212:19, 254:5,
271:12, 272:8,
272:12, 274:13,
289:13, 302:21,
351:14, 359:1,
359:6, 360:9,
365:12, 365:14
**looks** [2] - 142:17,
304:1
**Lord** [2] - 193:18,
193:20
**lose** [2] - 171:9,
232:18
**loses** [4] - 169:4,
192:15, 232:1
**losing** [1] - 254:3
**loss** [6] - 166:2,
166:18, 167:18,
168:11, 192:20
**losses** [1] - 166:2
**lost** [1] - 183:22
**loved** [1] - 353:15
**lying** [1] - 389:16

# M

**magic** [3] - 148:23,
211:15, 244:3
**magician** [1] - 290:16
**maimed** [1] - 234:22
**main** [1] - 290:8
**maintain** [8] - 235:18,
235:21, 235:23,
236:16, 236:19,
237:21, 327:23
**maintaining** [1] -

393:16
**maintains** [2] - 236:3,
237:16
**maintenance** [24] -
180:19, 224:17,
224:22, 224:23,
226:19, 252:1,
271:7, 271:11,
271:13, 271:18,
271:22, 271:25,
272:3, 272:8,
272:15, 272:16,
273:6, 273:8,
277:13, 285:5,
287:8, 295:1, 327:3,
327:10
**major** [3] - 379:3,
380:6, 380:10
**majority** [52] - 278:21,
279:2, 279:3,
279:23, 281:6,
309:20, 309:23,
359:21, 360:1,
361:18, 361:19,
362:14, 366:2,
366:13, 366:15,
367:14, 368:20,
368:24, 369:21,
370:10, 370:14,
371:2, 372:17,
373:3, 373:9,
373:13, 373:15,
373:23, 374:7,
374:14, 374:23,
375:2, 376:23,
377:12, 378:10,
378:21, 379:6,
379:9, 379:12,
380:1, 380:4, 381:5,
381:8, 381:9,
381:22, 388:12,
388:22, 389:10,
389:22, 389:25,
390:2
**make-shift** [1] - 212:4
**man** [14] - 152:15,
152:16, 152:17,
153:6, 154:9, 155:7,
160:18, 161:6,
363:6, 367:16,
372:18, 393:6, 393:7
**man's** [1] - 291:14
**man-made** [10] -
152:15, 152:16,
152:17, 153:6,
160:18, 161:6,
363:6, 367:16,
372:18
**manage** [1] - 315:3
**managed** [6] - 234:13,

285:10, 285:16,
307:15, 307:21,
384:12
**management** [4] -
156:2, 163:9,
254:11, 277:13
**manager** [53] - 156:9,
171:7, 172:25,
180:19, 183:1,
197:14, 197:21,
199:17, 205:24,
205:25, 210:21,
217:7, 224:14,
233:23, 234:1,
234:7, 238:16,
238:19, 239:10,
248:10, 248:13,
261:10, 261:12,
261:15, 262:6,
262:9, 265:16,
266:13, 267:2,
268:17, 268:22,
282:5, 282:15,
285:7, 285:8,
285:12, 293:15,
313:14, 314:21,
314:22, 321:4,
328:2, 328:15,
328:25, 351:4,
351:7, 351:15,
364:18, 364:21,
366:14
**MANIACI** [1] - 134:16
**manner** [1] - 244:9
**manual** [2] - 200:4,
200:7
**manually** [3] - 333:15,
333:16, 333:17
**map** [1] - 286:18
**March** [3] - 345:7,
345:13, 347:11
**marches** [1] - 275:14
**mark** [4] - 152:18,
180:6, 265:2, 297:8
**marked** [19] - 151:3,
152:21, 152:22,
152:25, 179:18,
199:1, 199:2, 200:4,
200:12, 262:15,
288:7, 296:3,
296:13, 300:7,
300:14, 300:15,
303:21, 323:8, 348:2
**markedly** [1] - 281:5
**marker** [7] - 148:23,
211:15, 212:4,
254:3, 254:6, 254:7,
341:15
**married** [1] - 168:20
**Marriott** [1] - 285:14

**math** [1] - 219:24
**matter** [13] - 142:7,
173:2, 174:16,
188:5, 193:11,
206:24, 209:15,
245:24, 283:20,
284:6, 284:7, 293:24
**matters** [4] - 141:13,
143:23, 338:22,
370:25
**MAY** [2] - 134:13,
137:1
**mean** [63] - 137:17,
147:8, 149:6,
166:20, 168:6,
170:2, 170:14,
181:10, 187:2,
190:20, 192:11,
201:4, 203:19,
204:4, 205:17,
206:3, 222:23,
235:15, 236:12,
237:4, 238:6, 238:9,
240:15, 244:21,
249:19, 262:22,
263:13, 268:5,
271:15, 273:21,
274:4, 278:8, 281:3,
282:6, 282:18,
291:12, 291:18,
293:18, 297:23,
298:17, 317:10,
319:23, 325:4,
328:6, 328:7, 329:2,
337:2, 337:8,
358:10, 361:9,
363:20, 364:21,
367:3, 368:7,
371:15, 375:22,
376:19, 377:5,
381:13, 383:4,
386:15, 390:10,
390:15
**meaning** [2] - 225:24,
250:20
**means** [6] - 146:9,
146:19, 150:20,
156:1, 291:1, 312:19
**meant** [4] - 173:20,
308:9, 311:6, 371:13
**measure** [5] - 188:25,
193:13, 338:12,
338:16, 339:7
**measures** [4] -
267:15, 267:18,
275:2, 368:18
**mechanism** [1] -
259:20
**media** [1] - 353:16
**medical** [2] - 393:6,

393:7
**meet** [8] - 158:15,
159:14, 159:15,
159:17, 164:19,
177:2, 267:1, 303:3
**meeting** [1] - 175:9
**member** [2] - 140:13,
166:13
**members** [3] - 145:4,
152:11, 255:15
**memorial** [1] - 216:9
**Memorial** [2] - 216:18,
273:16
**memory** [1] - 342:20
**men's** [1] - 276:10
**mention** [4] - 187:15,
195:17, 267:13,
362:25
**mentioned** [15] -
164:10, 172:21,
173:14, 176:23,
176:24, 178:23,
180:14, 191:13,
194:2, 204:18,
206:13, 213:3,
269:19, 291:11,
292:9
**mentions** [1] - 269:24
**mere** [1] - 180:23
**merry** [2] - 160:12,
160:13
**merry-go** [1] - 160:12
**merry-go-round** [1] -
160:13
**message** [2] - 259:20,
376:18
**met** [6] - 174:25,
175:15, 197:6,
302:20, 302:22,
326:20
**method** [1] - 276:7
**Michael** [4] - 171:7,
196:16, 196:17,
196:23
**MICHAEL** [9] - 135:4,
135:5, 135:7, 135:9,
196:19, 197:1,
197:3, 284:22,
309:15
**Michelle** [22] - 159:16,
159:17, 159:18,
161:4, 161:5, 162:4,
162:7, 162:10,
162:16, 162:22,
177:3, 177:4,
177:18, 178:7,
178:9, 181:16,
182:23, 185:13,
392:19, 392:20,
392:21

**middle** [12] - 161:10,
162:2, 170:22,
229:22, 229:25,
230:17, 287:11,
293:13, 326:12,
375:9, 377:19
**midway** [1] - 337:21
**might** [33] - 140:11,
140:21, 141:5,
142:17, 143:13,
145:25, 155:20,
167:10, 174:7,
175:5, 184:11,
184:20, 185:16,
187:3, 195:18,
264:22, 269:15,
281:2, 292:25,
337:5, 342:19,
343:1, 343:3, 343:4,
369:24, 375:10,
385:23, 386:2,
388:14
**migrated** [1] - 360:19
**mileage** [1] - 289:22
**miles** [6] - 174:2,
174:4, 235:13,
289:23, 291:15,
291:20
**Miller** [33] - 158:16,
158:17, 160:6,
160:21, 163:1,
174:22, 174:23,
174:25, 175:14,
176:5, 176:9,
176:11, 177:7,
177:9, 177:14,
177:17, 177:18,
203:8, 203:10,
203:12, 203:14,
204:7, 302:16,
302:18, 302:20,
304:13, 313:4,
313:9, 392:14
**Miller's** [2] - 176:14,
304:4
**Miller/Dioscon** [1] -
176:20
**Millers** [11] - 158:11,
158:21, 175:3,
175:17, 176:13,
181:25, 182:21,
183:2, 203:7, 392:16
**millions** [1] - 390:21
**mind** [12] - 143:16,
143:24, 147:1,
185:3, 238:20,
239:11, 308:9,
308:13, 308:16,
320:14, 366:24
**minds** [5] - 164:15,

164:16, 164:20,
192:1, 192:4
**mine** [1] - 381:25
**minimum** [2] - 209:23,
292:21
**minor** [6] - 176:2,
228:6, 240:21,
282:9, 282:10,
305:12
**minority** [1] - 373:16
**minors** [3] - 176:2,
240:12, 305:12
**minute** [12] - 142:16,
186:1, 186:8,
203:21, 204:5,
273:25, 344:13,
344:14, 365:1, 375:5
**minutes** [16] - 142:19,
170:9, 196:1, 263:7,
263:25, 266:3,
266:11, 274:5,
276:5, 276:9,
276:14, 293:25,
298:18, 298:20,
338:2, 354:20
**mislead** [2] - 214:6,
320:15
**missing** [2] - 237:9,
378:13
**misspell** [1] - 156:6
**misstating** [3] -
223:16, 223:17,
327:9
**mistake** [2] - 350:22,
350:23
**mistakes** [1] - 193:1
**misunderstood** [1] -
350:22
**mobile** [14] - 154:8,
154:14, 173:10,
215:6, 215:11,
219:17, 225:4,
225:9, 256:4,
256:16, 260:10,
273:13, 273:17
**models** [1] - 144:14
**mom** [9] - 152:6,
168:13, 168:17,
168:19, 169:6,
169:19, 170:13,
367:9, 367:10
**mom's** [1] - 169:21
**moment** [4] - 140:18,
140:19, 149:2,
149:22
**moment's** [1] - 145:15
**Monday** [1] - 393:3
**money** [11] - 150:1,
167:23, 175:7,
194:19, 202:6,

202:19, 315:6, 315:8, 316:6, 318:11, 390:21

**monitor** [6] - 175:19, 249:5, 280:20, 306:5, 306:9, 347:18

**monitoring** [1] - 362:21

**monitors** [1] - 309:19

**monkey** [1] - 287:16

**Montana** [2] - 362:24, 362:25

**monthly** [1] - 290:19

**months** [7] - 174:24, 175:2, 181:20, 199:19, 329:17

**moon** [1] - 232:8

**mop** [1] - 152:8

**morning** [17] - 137:3, 138:4, 138:5, 154:10, 162:1, 171:8, 172:12, 172:21, 196:18, 197:4, 197:5, 276:1, 307:7, 311:11, 362:16, 364:3

**most** [13] - 150:20, 150:21, 154:20, 154:22, 163:19, 166:21, 173:8, 176:7, 234:7, 290:1, 291:21, 379:23, 380:1

**motels** [1] - 206:5

**mother** [4] - 168:22, 168:23, 177:14, 192:7

**motion** [20] - 157:22, 320:5, 320:11, 320:17, 320:21, 321:3, 321:7, 336:21, 336:24, 340:3, 340:4, 342:6, 343:7, 343:9, 343:11, 354:17, 354:18

**motions** [1] - 270:4

**mouth** [1] - 275:16

**move** [11] - 142:22, 148:13, 148:15, 148:16, 148:21, 174:13, 176:12, 274:4, 297:11, 298:14, 298:15

**moved** [4] - 148:17, 275:15, 324:25, 333:13

**movement** [3] - 336:22, 340:2, 340:8

**MR** [673] - 135:5,

135:7, 135:9, 135:12, 135:14, 135:16, 135:19, 137:2, 137:6, 137:9, 137:13, 137:19, 137:21, 137:23, 138:1, 145:10, 145:13, 145:20, 145:23, 147:24, 148:9, 148:17, 148:22, 148:23, 151:2, 151:5, 151:8, 151:10, 152:19, 152:20, 152:23, 161:13, 161:15, 161:18, 161:22, 165:16, 165:19, 165:20, 171:12, 172:1, 172:3, 172:6, 172:19, 180:6, 180:8, 186:2, 186:4, 187:25, 188:2, 188:4, 188:8, 188:11, 188:16, 188:19, 188:23, 189:2, 189:4, 189:7, 189:13, 189:20, 189:24, 190:7, 190:12, 190:23, 191:2, 191:7, 191:25, 192:3, 192:22, 192:24, 193:2, 193:4, 193:7, 193:18, 193:20, 193:24, 194:2, 194:12, 194:14, 194:21, 194:25, 195:3, 195:6, 195:16, 195:23, 196:2, 196:16, 197:2, 197:3, 197:18, 197:20, 197:23, 197:25, 198:4, 198:6, 198:10, 198:11, 198:20, 198:22, 200:2, 200:4, 200:6, 200:7, 200:10, 200:12, 200:15, 200:17, 200:18, 200:24, 200:25, 201:15, 201:25, 202:4, 202:9, 202:13, 202:16, 202:18, 204:1, 204:3, 205:6, 205:8, 205:9, 206:21, 206:25, 207:2, 208:13, 208:23, 209:2, 211:6, 211:8, 211:12, 211:14,

214:5, 216:1, 217:19, 219:3, 219:4, 221:21, 222:5, 222:16, 222:22, 222:25, 223:1, 223:18, 223:22, 223:24, 224:7, 227:3, 227:5, 228:21, 228:22, 230:8, 232:3, 232:12, 232:14, 234:20, 234:23, 236:14, 237:24, 238:1, 238:10, 239:6, 239:24, 239:25, 240:17, 240:19, 240:22, 241:1, 241:4, 241:7, 241:14, 241:16, 243:9, 243:14, 243:23, 244:3, 244:5, 244:8, 244:12, 244:16, 244:20, 244:21, 245:1, 245:8, 245:12, 245:15, 245:18, 245:20, 245:23, 246:1, 246:11, 246:15, 246:19, 246:21, 246:25, 247:2, 247:5, 247:9, 247:12, 247:17, 247:21, 247:24, 248:4, 248:6, 249:22, 249:24, 250:22, 251:11, 251:12, 251:19, 253:23, 254:3, 254:6, 254:8, 254:9, 254:15, 254:16, 254:18, 254:23, 255:2, 255:6, 255:10, 255:12, 255:13, 255:25, 256:15, 256:23, 257:3, 257:7, 257:15, 257:16, 257:21, 258:1, 258:4, 258:9, 258:14, 258:16, 259:4, 259:7, 260:6, 260:9, 260:25, 262:15, 262:17, 262:20, 263:3, 263:5, 263:6, 263:8, 263:10, 263:17, 263:19, 264:1, 264:3, 264:10, 264:15, 264:18, 264:25, 265:4,

265:6, 265:15, 265:19, 265:24, 268:12, 268:13, 268:16, 268:21, 268:24, 269:4, 269:6, 269:16, 270:8, 270:12, 270:15, 270:16, 271:4, 271:24, 272:10, 272:21, 273:7, 273:11, 273:24, 274:1, 274:3, 274:25, 275:4, 275:6, 275:7, 276:9, 276:12, 276:18, 277:2, 277:3, 278:10, 278:11, 278:22, 278:25, 279:8, 279:10, 279:11, 279:17, 279:19, 279:20, 280:2, 280:10, 280:11, 280:21, 280:23, 281:2, 281:8, 281:11, 281:12, 281:16, 281:18, 281:20, 282:10, 282:11, 282:20, 283:7, 283:8, 283:11, 283:14, 284:12, 284:14, 284:18, 284:21, 284:22, 288:2, 288:6, 288:8, 288:11, 288:13, 288:23, 289:2, 289:4, 289:16, 289:17, 292:8, 293:10, 293:21, 294:1, 294:4, 294:8, 294:11, 294:15, 294:16, 294:18, 295:7, 295:21, 295:24, 296:2, 296:4, 296:6, 296:9, 296:12, 297:11, 297:13, 297:17, 297:20, 297:22, 297:25, 298:2, 298:8, 298:10, 298:12, 298:19, 298:22, 298:25, 299:11, 299:14, 299:18, 299:24, 300:3, 300:6, 300:9, 300:11, 300:13, 300:17, 300:22, 300:24, 303:15, 303:23, 303:24, 306:15, 306:20,

306:22, 307:3, 308:12, 308:15, 308:17, 308:19, 308:24, 309:5, 309:10, 309:14, 309:15, 310:9, 310:12, 310:16, 310:20, 311:1, 311:4, 311:6, 311:9, 311:14, 311:24, 312:1, 312:3, 312:11, 312:12, 312:15, 312:17, 312:18, 313:6, 313:8, 313:12, 313:13, 313:17, 313:19, 313:21, 313:24, 314:12, 314:13, 314:16, 314:24, 315:1, 315:2, 315:5, 315:7, 316:2, 316:7, 316:9, 316:12, 317:16, 317:20, 317:24, 318:2, 318:4, 318:5, 319:2, 319:7, 320:10, 321:2, 321:14, 321:17, 321:18, 323:9, 323:10, 323:11, 323:16, 323:18, 323:21, 323:23, 324:8, 324:11, 324:13, 324:16, 324:18, 324:19, 325:10, 325:14, 325:16, 325:17, 325:19, 325:22, 326:2, 326:4, 326:19, 329:3, 329:5, 329:6, 332:13, 332:14, 332:18, 332:22, 332:23, 333:9, 336:19, 336:20, 337:24, 338:6, 338:11, 338:14, 338:18, 338:21, 338:24, 339:1, 339:3, 339:4, 339:6, 339:9, 339:12, 339:13, 339:16, 340:9, 340:12, 344:14, 344:17, 345:2, 345:6, 345:9, 345:11, 345:12, 346:11, 346:12, 349:13, 350:2, 350:4, 350:5, 351:16, 351:18, 352:1, 352:7,

352:16, 352:21,
353:1, 353:3, 353:7,
353:8, 354:1, 354:3,
354:5, 354:7, 354:9,
355:4, 355:7,
355:11, 355:15,
355:19, 355:21,
355:23, 355:25,
356:8, 356:19,
356:24, 357:19,
357:22, 359:21,
359:22, 361:1,
361:14, 361:24,
363:15, 365:2,
365:19, 365:23,
366:6, 366:11,
366:17, 366:22,
367:5, 367:7,
367:19, 367:21,
367:25, 368:9,
368:12, 369:5,
369:7, 369:9,
369:12, 369:15,
369:20, 370:1,
370:5, 370:9,
370:13, 370:19,
371:5, 371:13,
373:2, 373:8,
373:10, 373:12,
373:20, 373:25,
374:2, 374:4, 374:6,
374:13, 374:16,
374:19, 374:22,
374:25, 375:4,
375:8, 375:20,
375:24, 376:1,
376:3, 377:15,
378:4, 378:7,
378:10, 378:13,
378:19, 378:23,
379:1, 379:2, 379:3,
379:6, 379:14,
379:20, 379:23,
380:6, 380:8,
380:19, 380:22,
381:3, 381:7,
381:10, 381:15,
381:19, 382:2,
382:3, 382:10,
383:7, 383:15,
383:16, 383:19,
384:19, 384:24,
385:1, 385:4, 385:7,
385:13, 385:21,
386:7, 386:11,
386:14, 386:19,
386:21, 386:24,
387:3, 387:6, 387:8,
387:13, 387:18,
387:20, 387:25,
388:2, 388:7, 388:9,

388:21, 389:3,
389:14, 390:6,
391:4, 391:7, 391:8,
391:14, 391:16,
391:21, 392:1,
392:4, 392:7, 392:9,
392:13, 392:14,
392:17, 392:18,
392:19, 392:20,
392:22, 393:5,
393:7, 393:9,
393:11, 393:14,
393:18, 393:23,
394:1, 394:2
**municipal** [1] - 214:25
**must** [14] - 138:19,
143:9, 145:4,
175:24, 175:25,
176:3, 184:21,
274:12, 305:9,
305:10, 305:12,
305:20, 310:23,
379:15

## N

**nail** [1] - 265:12
**name** [17] - 159:15,
159:16, 171:7,
172:22, 196:22,
205:10, 205:12,
205:18, 205:22,
205:24, 276:2,
326:11, 326:12,
326:14, 326:15,
356:5, 373:16
**named** [2] - 213:19,
214:12
**names** [3] - 164:6,
174:20, 174:22
**narrowed** [1] - 239:9
**national** [3] - 278:2,
360:18, 360:20
**National** [1] - 356:17
**natural** [8] - 176:15,
363:5, 363:6, 363:7,
372:18, 378:8,
389:24
**nautical** [1] - 185:1
**near** [5] - 157:11,
341:22, 343:24,
348:13, 374:8
**nearly** [1] - 211:22
**necessarily** [6] -
165:12, 200:22,
317:12, 365:6,
389:11, 390:1
**necessary** [3] -
141:17, 141:18,
141:20

**need** [36] - 148:7,
157:14, 169:23,
169:25, 170:3,
170:9, 170:16,
171:14, 183:11,
183:12, 183:13,
183:21, 183:22,
185:3, 185:20,
196:23, 208:19,
209:25, 211:3,
218:2, 232:15,
256:25, 263:17,
271:11, 272:8,
304:22, 318:16,
336:18, 344:14,
353:19, 367:2,
376:15, 376:20,
377:19, 385:22
**needed** [2] - 170:23,
370:22
**needs** [2] - 271:21,
360:7
**negligence** [3] -
245:17, 246:4,
247:22
**negligent** [5] - 150:21,
182:15, 244:9, 246:7
**negligently** [2] -
186:17, 187:12
**Neshonoc** [2] - 200:1,
286:9
**net** [4] - 316:21,
316:25, 317:4,
317:25
**network** [1] - 289:21
**never** [20] - 161:7,
177:4, 204:16,
204:17, 234:12,
235:6, 238:2, 246:7,
263:6, 263:10,
264:5, 269:24,
272:7, 307:20,
309:9, 318:20,
329:24, 367:23
**NEW** [2] - 134:2,
134:12
**new** [10] - 241:8,
252:9, 265:13,
302:25, 332:19,
332:22, 359:7,
378:2, 381:6
**New** [23] - 150:11,
165:8, 166:3, 166:6,
166:9, 166:21,
167:14, 168:3,
179:1, 179:10,
188:13, 193:25,
207:12, 207:17,
210:1, 213:5, 214:2,
214:9, 260:21,

270:4, 295:13,
379:21
**next** [34] - 145:20,
146:7, 147:5,
185:17, 191:2,
192:24, 193:7,
262:15, 280:9,
283:7, 283:12,
283:13, 283:15,
294:17, 306:24,
307:2, 310:19,
311:9, 311:18,
314:14, 314:15,
320:25, 326:1,
326:3, 352:15,
357:7, 357:23,
362:16, 389:17,
392:12, 393:19,
393:21
**NFPA** [2] - 360:19,
379:21
**nice** [4] - 157:6, 287:1,
290:22, 303:1
**niches** [1] - 357:7
**night** [43] - 154:25,
155:1, 155:2, 158:4,
159:10, 159:11,
160:20, 162:14,
164:4, 170:22,
170:23, 176:24,
176:25, 182:6,
216:11, 216:12,
217:15, 217:22,
219:19, 220:2,
221:6, 232:8,
232:11, 232:15,
233:9, 234:3, 240:6,
241:24, 262:10,
269:1, 271:8,
272:17, 280:1,
307:6, 314:9,
314:11, 315:18,
362:19, 365:11,
367:13, 376:25,
379:25
**nightmare** [1] - 383:22
**nights** [15] - 215:7,
215:8, 216:7,
216:13, 216:14,
216:17, 217:11,
217:16, 219:23,
245:9, 245:11,
245:14, 273:2,
292:21
**nine** [2] - 174:1,
375:16
**Nixon** [2] - 373:17
**NO** [1] - 134:6
**no-swimming** [2] -
349:14, 349:15

**nobody** [22] - 152:12,
153:25, 154:2,
158:3, 160:18,
163:21, 171:8,
171:9, 176:10,
182:10, 187:6,
215:15, 216:2,
220:25, 221:6,
222:4, 226:22,
262:23, 265:9,
272:6, 277:13, 358:2
**NOI** [2] - 316:19,
316:21
**noise** [1] - 270:3
**noisiest** [1] - 217:21
**non** [2] - 167:12,
233:7, 359:2
**non-attraction** [1] -
233:7
**non-KOAs** [1] - 359:2
**none** [10] - 144:7,
185:7, 208:17,
236:2, 251:3, 270:5,
270:22, 293:21,
366:24, 366:25
**noneconomic** [1] -
167:8
**nonetheless** [2] -
185:9, 382:13
**nongovernment** [1] -
357:17
**norm** [1] - 358:2
**normally** [3] - 147:17,
298:13, 304:19
**North** [7] - 357:1,
357:12, 358:13,
358:19, 359:15,
360:5, 380:8
**north** [1] - 230:2
**note** [3] - 147:16,
147:17, 147:18
**notes** [15] - 137:6,
137:22, 137:24,
137:25, 144:10,
144:16, 144:18,
144:21, 144:23,
145:1, 145:3,
145:17, 186:15,
309:11
**nothing** [25] - 146:23,
165:21, 166:15,
179:5, 179:6, 179:7,
179:8, 181:8, 181:9,
181:13, 181:20,
188:2, 204:25,
206:7, 249:6,
252:18, 260:3,
269:2, 269:23,
271:23, 298:2,
298:5, 315:1, 366:3,

375:12

**notice** [4] - 145:5,
145:15, 188:19,
188:23

**noticed** [4] - 147:16,
264:6, 264:7, 268:9

**notion** [1] - 385:20

**nullification** [1] -
194:17

**NUMBER** [1] - 136:4

**number** [24] - 150:25,
180:4, 184:11,
194:5, 194:13,
210:11, 217:10,
259:9, 261:23,
262:16, 265:17,
279:22, 280:12,
294:23, 313:15,
314:19, 328:11,
337:6, 358:3,
358:13, 367:3,
379:11, 389:23

**numbers** [2] - 167:8,
262:5

**numerous** [3] - 210:1,
213:9, 235:15

---

**O**

---

**o'clock** [21] - 154:9,
154:10, 160:25,
161:1, 220:3,
220:12, 221:5,
221:14, 222:11,
223:3, 223:14,
223:19, 272:20,
272:22, 276:1,
277:17, 307:6,
349:16, 363:25,
364:2

**oath** [3] - 197:10,
227:10, 228:23

**object** [13] - 143:1,
143:2, 143:4,
233:16, 254:15,
293:21, 294:11,
297:13, 297:15,
299:11, 306:15,
306:17, 308:12

**objection** [39] -
137:14, 142:25,
143:11, 161:13,
161:14, 161:21,
165:19, 189:16,
190:15, 190:16,
197:18, 198:18,
200:18, 200:20,
205:6, 254:18,
265:6, 278:22,
280:2, 280:21,

294:14, 296:4,
296:5, 299:17,
300:11, 306:19,
306:23, 311:1,
313:6, 313:17,
314:12, 318:4,
338:7, 338:13,
346:6, 347:5, 386:17

**objections** [4] - 143:6,
143:8, 386:20

**objective** [1] - 233:17

**objects** [1] - 198:17

**observe** [1] - 305:20

**obtain** [2] - 302:23,
375:15

**obviously** [3] -
173:21, 317:4,
354:25

**occasion** [1] - 197:9

**occur** [1] - 184:9

**occurred** [7] - 174:17,
176:22, 176:25,
178:20, 179:13,
296:20, 363:22

**occurs** [2] - 176:24,
232:9

**Ocean** [3] - 152:5,
173:6, 292:4

**ocean** [3] - 155:19,
286:8

**October** [4] - 173:13,
174:8, 293:13,
304:10

**odds** [2] - 186:25,
187:22

**OF** [19] - 134:2,
134:20, 135:5,
135:7, 135:9,
135:12, 135:14,
135:16, 135:19,
197:3, 248:5, 266:1,
284:22, 309:15,
326:19, 339:15,
346:12, 350:5, 356:8

**offer** [4] - 190:14,
290:6, 361:17,
377:12

**offered** [5] - 143:5,
147:5, 347:10,
389:18, 391:19

**offering** [1] - 368:17

**office** [16] - 153:24,
261:9, 275:19,
286:25, 289:11,
289:12, 289:14,
303:9, 314:19,
330:16, 330:17,
331:11, 331:14,
331:15, 343:12,
343:14

**OFFICES** [1] - 134:20

**official** [1] - 145:6

**offshore** [1] - 229:25

**often** [3] - 141:17,
208:15

**Ohio** [1] - 194:18

**old** [7] - 159:19,
167:17, 182:22,
182:23, 193:10,
241:9, 290:12

**older** [3] - 168:18,
168:19

**on-call** [4] - 170:1,
170:2, 170:6, 170:20

**on-site** [8] - 152:1,
199:14, 268:17,
268:22, 269:4,
277:5, 277:7, 277:14

**once** [26] - 140:6,
149:7, 149:8, 149:9,
149:10, 149:17,
149:20, 162:1,
191:14, 195:21,
254:21, 266:8,
272:23, 280:18,
289:25, 290:1,
361:20, 367:11,
368:23, 369:15,
369:16, 370:15,
373:3, 374:7, 384:17

**one** [136] - 140:18,
141:20, 149:16,
151:15, 152:10,
153:8, 153:9,
153:21, 154:1,
155:6, 158:23,
159:8, 159:15,
159:20, 159:21,
160:11, 163:17,
165:2, 177:5,
178:25, 179:17,
180:1, 181:16,
185:7, 186:15,
186:24, 187:25,
188:21, 189:15,
192:24, 193:7,
193:9, 195:11,
197:23, 198:16,
199:4, 199:5, 199:6,
199:8, 199:24,
202:11, 211:8,
212:1, 212:11,
212:12, 212:13,
217:8, 219:17,
219:19, 222:3,
222:8, 223:10,
223:14, 223:19,
225:15, 226:5,
226:7, 227:17,
234:14, 239:16,

239:18, 239:19,
245:13, 245:25,
248:2, 250:9,
250:10, 250:25,
251:4, 251:5,
252:10, 255:9,
255:15, 256:7,
261:4, 263:21,
264:19, 264:24,
265:17, 274:13,
274:25, 275:13,
275:19, 276:4,
287:24, 290:7,
290:23, 296:23,
297:5, 300:17,
301:4, 301:6,
301:12, 307:6,
310:7, 314:17,
317:12, 317:13,
322:1, 327:23,
331:4, 331:10,
331:18, 331:21,
333:18, 334:1,
344:9, 344:11,
344:13, 344:16,
346:22, 350:14,
352:5, 357:8, 363:6,
364:9, 369:8,
369:16, 370:24,
372:13, 372:15,
373:15, 382:23,
384:17, 388:6,
389:6, 390:22,
393:18, 393:22,
393:23

**ONE** [1] - 134:11

**one's** [1] - 199:4

**one-person** [1] -
307:6

**one-third** [1] - 217:8

**one-year** [2] - 275:13,
275:19

**ones** [5] - 203:25,
253:20, 291:5,
332:20, 353:16

**ongoing** [3] - 169:22,
265:6, 314:12

**OnStar** [1] - 170:4

**OPEN** [2] - 137:1,
354:13

**open** [12] - 160:17,
173:11, 174:7,
206:25, 242:10,
293:12, 307:16,
320:21, 357:18,
359:15, 372:3, 372:7

**open-ended** [1] -
206:25

**open-to-the-public** [1]
- 359:15

**opened** [3] - 285:8,
357:12, 359:4

**opening** [16] - 147:3,
147:17, 147:21,
147:22, 165:14,
172:18, 177:20,
181:15, 189:14,
190:12, 194:3,
195:12, 195:14,
198:12, 198:18

**openings** [4] - 137:25,
186:23, 187:14,
187:15

**opens** [1] - 173:12

**operable** [2] - 253:18,
253:19

**operate** [15] - 208:14,
214:12, 235:18,
235:21, 235:24,
237:1, 237:21,
299:20, 306:10,
351:20, 360:15,
361:6, 361:7, 367:8

**operated** [5] - 185:22,
185:23, 207:5,
208:9, 366:25

**operates** [4] - 154:17,
155:12, 237:16,
269:3

**operating** [9] - 237:7,
244:9, 316:21,
316:25, 318:1,
347:18, 360:21,
361:5, 361:6

**operation** [24] - 152:6,
152:9, 165:12,
165:13, 165:23,
186:20, 207:10,
208:16, 209:5,
213:20, 213:21,
269:6, 269:20,
271:1, 276:8, 298:3,
298:6, 299:10,
299:15, 299:19,
360:3, 367:9,
367:10, 379:15

**operations** [8] -
186:16, 187:11,
187:12, 206:18,
234:25, 235:17,
269:10, 307:15

**opinion** [48] - 141:10,
141:14, 167:13,
167:14, 280:5,
280:6, 299:11,
299:12, 319:16,
321:4, 322:13,
354:24, 355:24,
363:14, 363:16,
365:21, 365:22,

368:17, 368:24, 369:3, 369:4, 369:10, 370:2, 370:24, 372:16, 376:5, 378:1, 378:2, 378:18, 378:19, 378:20, 378:23, 382:8, 382:10, 382:23, 383:13, 383:16, 385:7, 387:23, 387:24, 388:1, 388:3, 388:13, 388:23, 389:12, 389:21, 390:4, 390:23

**opinions** [6] - 377:21, 388:3, 388:15, 389:21, 390:8, 390:12

**opportunity** [1] - 384:21

**opposed** [4] - 205:23, 216:15, 241:12, 308:11

**opposite** [2] - 146:14, 343:21

**opted** [1] - 158:2

**oral** [2] - 227:20, 242:7

**orally** [5] - 227:17, 227:19, 227:20, 228:4, 310:15

**order** [1] - 155:13

**orders** [1] - 328:15

**organization** [1] - 360:14

**organizations** [1] - 363:5

**organized** [3] - 172:2, 186:3, 186:4

**orient** [2] - 178:3, 288:14

**oriented** [3] - 174:10, 174:11, 290:8

**original** [3] - 199:2, 200:10, 392:9

**orthopedist** [1] - 391:1

**otherwise** [1] - 163:20

**ou** [1] - 378:23

**outdoor** [1] - 292:14

**outline** [1] - 147:4

**outside** [14] - 140:8, 141:6, 141:7, 214:16, 265:10, 319:23, 322:1, 333:5, 336:10, 336:11, 336:12, 356:15, 356:16, 384:8

**overnight** [1] - 151:14

**override** [2] - 355:7, 355:8

**overrides** [1] - 351:21

**overruling** [3] - 161:21, 299:17, 314:15

**overview** [1] - 168:2

**overwhelming** [1] - 164:12

**overwriting** [1] - 351:23

**own** [17] - 141:5, 145:1, 149:1, 164:3, 168:6, 173:10, 174:6, 175:1, 193:22, 194:6, 218:11, 265:17, 292:9, 362:23, 366:14, 376:11, 389:15

**owned** [23] - 152:7, 152:8, 205:15, 205:19, 218:8, 261:13, 264:22, 274:14, 274:16, 277:24, 278:6, 279:2, 279:3, 279:23, 279:24, 280:13, 292:22, 358:22, 359:24, 360:2, 366:25, 379:12

**owner** [5] - 154:19, 191:3, 191:4, 351:4, 351:7

**Owners'** [1] - 356:18

**owns** [6] - 154:17, 155:11, 191:5, 191:10, 260:18, 269:25

**oxygenates** [1] - 232:2

---

**P**

---

**P-1** [2] - 211:6, 325:17
**P-1A** [3] - 151:3, 151:4, 211:5
**P-1B** [5] - 151:5, 211:6, 211:9, 211:13, 249:3
**P-3** [14] - 200:5, 200:12, 200:14, 200:15, 200:16, 324:3, 324:5, 324:7, 324:10, 324:12, 324:13, 324:17, 324:20, 325:16

**P-5** [6] - 323:8, 323:12, 323:14, 323:15, 323:16, 324:6

**P-6** [4] - 152:20, 152:21, 152:23, 232:25

**p.m** [17] - 176:4, 184:24, 217:18, 217:20, 218:24, 218:25, 219:1, 256:9, 266:5, 276:22, 276:24, 305:13, 353:23, 354:11, 354:13, 394:4

**pad** [5] - 144:15, 148:10, 292:1

**paddle** [2] - 362:18, 362:20

**pads** [5] - 144:11, 144:25, 147:16, 147:17, 147:18

**PAGE** [2] - 135:3, 136:4

**Page** [14] - 283:24, 284:2, 304:7, 304:12, 305:1, 323:18, 345:13, 346:2, 346:21, 366:2, 379:1, 383:11, 383:12, 387:15

**page** [8] - 188:22, 305:14, 323:18, 345:4, 366:1, 387:25, 388:23, 388:25

**pages** [1] - 269:18

**paid** [4] - 196:8, 313:4, 313:10, 362:15

**pain** [4] - 166:22, 183:25, 184:2, 188:12

**Palace** [4] - 287:10, 289:1, 337:20, 337:22

**panic** [1] - 162:22

**pants** [3] - 162:15, 162:18, 177:21

**paragraph** [8] - 311:18, 365:24, 378:14, 378:16, 380:2, 383:11, 385:19, 387:21

**parallel** [1] - 267:21

**paramount** [2] - 226:18, 299:19

**pardon** [6] - 151:8, 326:2, 329:3, 330:5,
344:21, 345:9

**parent** [7] - 192:14, 203:23, 204:4, 282:7, 282:15, 282:18, 283:2

**parental** [7] - 175:16, 282:5, 283:18, 305:4, 305:7, 310:6, 310:21

**parents** [19] - 158:15, 175:20, 176:1, 182:5, 201:17, 201:18, 201:20, 226:12, 226:21, 283:15, 283:16, 283:23, 284:2, 284:5, 305:11, 306:11, 306:16, 306:17, 308:11

**park** [44] - 151:19, 175:24, 185:23, 201:16, 201:18, 201:19, 201:21, 202:20, 203:15, 204:9, 206:15, 212:2, 226:18, 227:7, 235:14, 236:13, 237:1, 258:10, 279:15, 285:24, 290:8, 290:19, 295:17, 301:13, 305:8, 306:7, 306:10, 308:9, 322:23, 337:8, 337:10, 338:9, 376:7, 379:16, 379:24, 380:13, 380:14, 382:5, 382:6, 383:10, 384:6, 384:7

**Park** [3] - 278:2, 356:15, 356:17

**parking** [2] - 332:2, 343:23

**parks** [9] - 248:1, 379:23, 380:8, 380:9, 380:10, 381:6, 384:4, 384:5, 384:6

**part** [24] - 144:5, 162:4, 163:6, 163:8, 168:25, 173:8, 175:9, 175:23, 200:23, 215:19, 242:1, 263:11, 316:22, 330:7, 335:2, 335:3, 336:16, 346:3, 346:4, 347:1, 347:2, 359:12

**participation** [1] - 138:15

**particular** [21] - 143:3, 143:15, 160:20, 175:12, 175:21, 176:25, 177:4, 179:11, 180:25, 181:3, 181:8, 181:13, 181:21, 183:1, 193:12, 287:20, 302:11, 304:6, 305:25, 349:6, 377:3

**particularly** [5] - 168:17, 175:16, 185:23, 305:25, 360:24

**parties** [5] - 139:16, 142:14, 146:2, 147:20, 170:25, 171:1

**partner** [1] - 167:9

**partners** [1] - 169:15

**parts** [1] - 159:24

**party** [3] - 143:7, 147:4, 150:4

**pass** [2] - 227:21, 296:25

**passed** [1] - 227:17

**passes** [1] - 152:11

**passing** [1] - 389:13

**past** [3] - 140:25, 157:23, 188:9

**pathologist** [3] - 167:1, 393:5, 393:6

**patience** [3] - 185:14, 185:18, 353:20

**patient** [1] - 142:21

**patient's** [1] - 388:24

**PATRICK** [1] - 134:20

**Patrick** [2] - 171:18, 172:22

**patrol** [41] - 154:4, 154:8, 154:14, 157:24, 208:15, 215:2, 215:6, 215:12, 215:19, 218:22, 219:25, 242:9, 256:4, 256:16, 259:9, 260:10, 262:10, 269:7, 272:1, 272:3, 272:4, 272:5, 273:1, 273:13, 273:17, 275:22, 307:6, 361:21, 362:2, 363:17, 369:2, 371:3, 376:7, 376:24, 377:7, 381:22, 382:1,

382:22, 389:10,
390:1
**patrolled** [1] - 216:15
**patrollers** [1] - 225:4
**patrolling** [11] - 179:7,
217:7, 217:10,
269:14, 270:3,
271:8, 272:7,
361:20, 379:16,
382:6, 384:7
**patrols** [16] - 160:18,
245:6, 245:8,
246:10, 246:12,
268:22, 307:5,
363:25, 364:1,
364:2, 368:25,
371:8, 372:19,
375:2, 375:3, 388:12
**pay** [11] - 144:16,
148:4, 163:21,
170:10, 170:16,
170:17, 170:19,
175:7, 196:9,
320:12, 355:7
**paying** [2] - 202:5,
202:19
**payment** [1] - 303:7
**pen** [1] - 144:13
**Pennsylvania** [4] -
260:22, 260:23,
261:1, 267:23
**pens** [1] - 144:12
**people** [102] - 139:20,
150:13, 152:16,
153:3, 153:7,
153:12, 156:17,
156:18, 157:4,
157:9, 157:18,
163:23, 163:25,
164:1, 164:2,
170:14, 173:20,
182:24, 182:25,
202:5, 202:19,
205:4, 206:11,
210:22, 211:24,
212:2, 212:23,
223:23, 224:22,
225:3, 225:9,
225:14, 225:15,
226:8, 226:19,
228:14, 235:15,
236:5, 236:10,
236:25, 237:5,
242:18, 249:13,
249:17, 255:15,
259:17, 266:22,
268:25, 270:25,
271:7, 271:13,
271:25, 272:3,

272:15, 273:1,
273:5, 273:6, 273:8,
273:10, 289:24,
291:1, 291:22,
292:5, 292:13,
292:17, 292:24,
294:23, 294:24,
294:25, 301:11,
301:12, 301:13,
308:9, 308:21,
309:3, 319:18,
322:23, 327:6,
327:22, 330:25,
341:19, 342:6,
348:13, 359:6,
361:24, 362:17,
368:25, 372:8,
373:17, 373:24,
374:6, 374:15,
376:20, 377:5,
381:5, 381:6,
381:23, 383:3
**people's** [1] - 293:16
**per** [2] - 219:18,
359:13
**percent** [27] - 154:21,
154:22, 193:11,
316:19, 316:24,
317:25, 318:2,
358:12, 359:23,
363:8, 366:20,
366:23, 367:15,
367:17, 367:22,
371:3, 372:17,
373:3, 373:4,
373:20, 377:12,
378:8, 378:11,
381:21, 388:5,
389:9, 389:24
**percentage** [3] -
171:1, 388:9, 388:10
**percentages** [3] -
149:23, 150:1,
382:21
**perfection** [1] - 154:22
**perform** [1] - 150:9
**perhaps** [4] - 158:12,
167:10, 194:18,
346:14
**period** [4] - 173:8,
224:3, 279:21,
303:11
**permanent** [3] - 173:7,
291:13, 372:3
**permissible** [1] -
192:8
**permit** [1] - 198:2
**permits** [1] - 295:17
**permitted** [2] - 383:17,
384:20

**permitting** [1] - 387:9
**perpendicular** [1] -
180:13
**person** [13] - 156:1,
159:8, 170:23,
215:11, 239:18,
239:19, 303:4,
307:6, 312:20,
315:8, 351:6,
373:16, 383:1
**personal** [1] - 370:2
**personally** [3] -
180:20, 301:15,
304:17
**personnel** [1] - 175:20
**persons** [2] - 330:25,
351:1
**perspective** [2] -
153:21, 325:6
**persuasive** [1] - 140:4
**pertinent** [1] - 213:22
**petting** [1] - 362:20
**pH.D** [1] - 167:22
**Philadelphia** [2] -
175:3, 176:17
**phone** [4] - 138:7,
171:11, 276:3, 303:3
**photo** [10] - 300:20,
321:11, 321:13,
321:16, 321:19,
322:15, 324:9,
324:14
**photograph** [3] -
321:15, 325:5,
385:16
**phrase** [1] - 310:5
**physical** [3] - 186:11,
186:14, 187:3
**physically** [1] - 220:25
**pick** [3] - 137:3,
271:20, 354:22
**picked** [6] - 154:13,
182:3, 182:4,
238:12, 303:1,
327:16
**picking** [1] - 346:21
**pictorial** [1] - 177:25
**picture** [1] - 324:4
**pig** [1] - 386:10
**PINE** [3] - 134:7, 134:7
**Pine** [81] - 134:21,
150:22, 152:1,
152:7, 158:1,
158:14, 163:9,
164:8, 172:22,
172:25, 173:3,
173:4, 173:11,
175:18, 175:20,
176:8, 179:2,
179:15, 180:19,

181:25, 182:2,
182:25, 183:7,
183:11, 185:22,
197:14, 199:15,
205:10, 205:16,
205:18, 205:19,
205:20, 211:16,
215:5, 225:24,
227:22, 227:24,
228:1, 231:1,
234:25, 235:24,
237:16, 237:20,
250:23, 260:13,
260:16, 261:18,
261:20, 264:5,
264:12, 277:4,
277:17, 279:21,
282:7, 285:21,
286:11, 289:19,
290:8, 292:22,
293:14, 302:24,
304:4, 308:10,
308:21, 308:23,
309:4, 309:17,
323:12, 324:14,
324:15, 329:11,
340:13, 340:14,
348:8, 348:25,
376:6, 379:3,
379:15, 379:20
**Piney's** [6] - 287:10,
288:25, 337:18,
337:19, 337:20,
337:22
**pirate** [10] - 160:12,
160:21, 323:1,
323:2, 323:4, 324:2,
334:16, 334:20,
334:23, 335:4
**place** [44] - 141:22,
141:23, 142:8,
142:9, 149:18,
151:21, 157:19,
175:1, 175:5,
175:21, 180:2,
211:16, 217:24,
218:7, 218:10,
238:3, 239:4, 248:7,
254:25, 266:21,
267:21, 270:4,
281:25, 290:22,
291:15, 292:15,
294:19, 297:6,
300:4, 301:1, 301:6,
339:20, 340:14,
341:3, 341:4,
341:22, 348:1,
352:23, 359:20,
361:12, 365:12,
365:13, 380:21,
381:23

**placed** [7] - 180:20,
180:21, 210:19,
252:18, 281:25,
341:2, 369:18
**placement** [3] -
327:10, 328:25,
348:5
**places** [5] - 151:19,
151:24, 152:1,
206:5, 235:2,
235:23, 235:24,
236:25, 237:15,
238:6, 252:4,
302:10, 309:16,
309:18, 309:24,
366:15, 369:11
**placing** [1] - 330:13
**plaintiff** [19] - 146:7,
146:9, 146:11,
146:15, 146:18,
147:6, 147:8, 147:9,
147:23, 179:9,
182:16, 184:4,
184:22, 275:11,
298:22, 382:16,
383:24, 386:16
**Plaintiff** [2] - 134:5,
134:19
**plaintiff's** [6] - 146:13,
185:9, 185:11,
263:11, 275:9,
390:15
**plaintiffs** [1] - 189:14
**plan** [3] - 392:9,
392:10, 392:11
**play** [1] - 144:9
**played** [1] - 158:24
**playground** [29] -
160:8, 160:11,
160:17, 212:5,
212:8, 212:18,
212:20, 237:19,
239:1, 287:4,
287:13, 287:15,
322:7, 322:19,
322:20, 322:25,
323:2, 324:21,
324:25, 325:11,
334:2, 334:3, 334:4,
334:8, 334:9,
334:13, 334:15,
334:16
**playgrounds** [7] -
173:24, 211:22,
235:3, 235:10,
235:19, 236:24,
323:7
**playing** [3] - 158:25,
162:9, 322:24
**PLAZA** [1] - 134:11

**pleasure** [1] - 186:2
**plowing** [1] - 240:20
**point** [43] - 141:21, 145:17, 146:1, 148:20, 153:23, 177:24, 178:8, 181:7, 181:24, 187:19, 190:3, 190:25, 191:16, 192:18, 193:5, 195:4, 195:6, 195:11, 219:5, 246:3, 269:9, 269:11, 269:24, 274:25, 298:15, 302:23, 336:18, 339:8, 360:4, 361:3, 361:15, 364:5, 365:25, 366:8, 367:5, 372:9, 372:11, 372:12, 372:15, 376:22, 380:20, 386:14
**pointed** [11] - 178:21, 248:23, 289:7, 334:7, 335:5, 335:24, 352:23, 353:4, 355:13, 371:11, 381:15
**pointing** [5] - 333:3, 333:4, 333:22, 336:6, 361:15
**points** [7] - 180:10, 180:16, 194:22, 253:14, 371:20, 380:10, 386:22
**police** [7] - 170:7, 170:8, 229:12, 229:15, 229:16, 352:10, 376:7
**polluted** [2] - 207:23, 390:14
**pond** [3] - 362:19, 362:20, 363:6
**pony** [2] - 290:17, 290:18
**poo** [2] - 255:4
**poo-poo** [1] - 255:4
**pool** [103] - 153:11, 153:12, 153:14, 153:15, 157:11, 173:24, 176:1, 220:14, 220:15, 220:17, 220:18, 220:20, 220:21, 221:15, 234:9, 234:25, 235:9, 235:18, 236:24, 237:18, 237:19, 238:8, 238:22,

240:2, 240:3, 241:10, 241:12, 241:18, 242:14, 242:15, 242:17, 243:3, 244:23, 245:7, 246:16, 248:8, 248:9, 248:10, 248:14, 248:20, 248:21, 249:10, 249:17, 249:20, 250:1, 250:25, 251:5, 256:17, 256:18, 256:22, 257:2, 257:13, 258:10, 258:24, 259:2, 259:3, 259:5, 259:21, 262:7, 262:13, 267:4, 267:8, 267:9, 267:10, 267:25, 268:3, 286:5, 295:20, 301:21, 305:10, 307:10, 307:22, 310:23, 311:4, 311:16, 319:17, 319:18, 329:19, 330:19, 332:8, 337:17, 342:12, 342:19, 342:25, 343:9, 348:23, 349:1, 351:1, 360:15, 361:22, 361:23, 362:1, 362:4, 362:11, 362:20, 363:12, 372:19, 379:7, 390:3
**pool/lake** [2] - 305:16, 376:12
**pools** [20] - 214:15, 222:1, 274:20, 285:25, 286:4, 286:5, 286:7, 286:9, 286:10, 301:22, 304:20, 368:1, 368:2, 368:3, 368:6, 379:8, 379:10, 379:11, 379:13, 389:25
**poor** [1] - 291:14
**pop** [6] - 152:6, 152:8, 263:24, 367:9, 367:10, 368:15
**popped** [1] - 355:1
**popping** [1] - 297:24
**porch** [1] - 319:25
**portion** [4] - 334:6, 335:17, 370:15
**position** [11] - 140:23,

140:24, 140:25, 158:3, 163:4, 164:16, 185:10, 185:11, 188:5, 189:10, 377:18
**positioned** [3] - 251:21, 253:3, 333:13
**possibility** [1] - 370:17
**possible** [5] - 142:21, 145:25, 174:21, 217:11
**possibly** [4] - 281:1, 287:3, 316:10, 369:25
**post** [3] - 165:9, 214:9, 288:19
**posted** [6] - 156:24, 156:25, 165:7, 180:17, 302:9, 305:20
**pounding** [1] - 139:25
**pounds** [1] - 139:23
**power** [2] - 168:9, 328:5
**Powers** [1] - 384:12
**practice** [2] - 363:17, 383:9
**practices** [17] - 360:10, 360:11, 360:13, 366:3, 366:5, 366:6, 366:7, 371:2, 380:19, 380:22, 380:24, 381:1, 381:4, 381:7, 381:16, 388:22, 389:7
**precautions** [1] - 264:21
**precisely** [1] - 150:11
**preclude** [1] - 354:18
**prejudice** [3] - 141:19, 166:12, 191:16
**prejudiced** [2] - 143:6, 195:4
**prejudicial** [1] - 190:18
**preliminary** [1] - 138:14
**premarked** [2] - 200:5, 263:1
**premise** [1] - 186:17
**premises** [4] - 271:15, 351:5, 351:8, 389:11
**prepare** [3] - 146:4, 391:22, 391:23
**prepared** [1] - 254:4
**preparing** [1] - 377:18
**preponderance** [2] -

146:9, 146:18
**presence** [4] - 260:11, 260:15, 265:20, 351:7
**present** [8] - 147:6, 147:9, 174:14, 235:1, 240:9, 271:7, 302:4, 338:8
**presented** [3] - 174:3, 184:18, 390:11
**presenting** [1] - 147:8
**preserver** [3] - 155:16, 155:17, 155:20
**president** [7] - 356:9, 356:11, 356:13, 356:18
**press** [1] - 170:5
**pressure** [1] - 141:25
**presumably** [2] - 175:13, 266:18
**pretrial** [2] - 263:2, 269:17
**pretty** [12] - 140:9, 152:12, 153:17, 157:6, 168:14, 178:16, 209:8, 279:6, 287:10, 287:17, 291:10, 292:3
**prevent** [7] - 226:25, 240:2, 241:10, 241:18, 335:22, 336:3
**prevented** [1] - 368:19
**previously** [1] - 301:10
**prioritize** [1] - 149:15
**priority** [1] - 330:8
**prison** [1] - 384:7
**private** [14] - 277:24, 278:15, 357:1, 358:3, 358:7, 360:24, 363:4, 366:19, 366:20, 368:25, 369:21, 379:6, 388:6, 388:12
**private-owned** [1] - 277:24
**privately** [10] - 140:12, 278:6, 279:2, 279:3, 279:23, 279:24, 280:13, 359:24, 360:2, 379:12
**privately-owned** [7] - 278:6, 279:2, 279:3, 279:23, 279:24, 280:13, 360:2
**probability** [1] - 368:18
**probable** [1] - 376:6

**probative** [1] - 297:17
**problem** [2] - 369:19, 377:15
**problems** [1] - 306:12
**procedures** [1] - 248:7
**proceed** [4] - 178:12, 241:7, 258:1, 311:12
**proceeding** [1] - 171:10
**proceedings** [1] - 142:13
**produce** [5] - 146:10, 164:14, 165:18, 357:11, 386:15
**produced** [1] - 357:8
**producing** [1] - 145:16
**professional** [2] - 280:4, 280:6
**Professor** [3] - 168:10, 169:8, 393:1
**professor** [1] - 167:21
**proffer** [1] - 355:12
**profit** [8] - 316:9, 316:10, 316:11, 316:13, 316:14, 316:16, 317:4, 317:12
**profits** [5] - 293:18, 314:20, 314:22, 315:3, 315:4
**prognosis** [2] - 388:25, 389:1
**program** [1] - 218:20
**project** [2] - 168:18, 284:23
**promote** [1] - 291:9
**proof** [5] - 143:19, 143:21, 146:22, 146:24, 164:10
**proper** [12] - 175:23, 180:1, 180:2, 191:11, 202:3, 202:8, 202:9, 209:6, 305:7, 310:21, 310:22, 370:11
**properly** [2] - 143:5, 186:20
**properties** [2] - 234:13, 285:11
**property** [16] - 149:1, 149:2, 186:12, 186:15, 207:4, 218:11, 285:19, 286:4, 306:5, 317:9, 317:10, 362:17, 364:18, 364:19, 388:15, 390:2
**proposals** [1] - 361:4

prospective [1] - 298:5

protect [1] - 244:12

protection [1] - 360:20

Protection [1] - 295:13

prove [6] - 146:18, 147:5, 165:15, 166:1, 182:14, 195:15

proven [1] - 171:21

provide [7] - 144:11, 175:23, 192:6, 305:7, 379:24, 380:9, 380:10

provided [3] - 137:11, 297:4, 311:15

proving [2] - 146:8, 182:15

provoke [1] - 194:11

proximate [1] - 163:12

prudent [3] - 150:16, 154:24, 165:23

psychologically [1] - 140:24

public [5] - 295:1, 357:12, 357:18, 359:15, 372:4

pull [3] - 249:8, 292:11, 382:17

pulled [1] - 304:4

pulling [2] - 381:20, 382:11

pumps [1] - 181:19

punish [2] - 171:6, 171:7

punished [1] - 171:9

punitive [1] - 267:5

purchased [5] - 302:25, 348:24, 348:25, 349:1

pure [2] - 167:16, 214:20

purifies [1] - 233:9

purple [1] - 391:12

purpose [4] - 141:13, 147:21, 226:9, 233:8

purposes [2] - 147:20, 168:4

push [1] - 247:16

pushing [1] - 247:17

put [79] - 143:15, 146:12, 146:13, 147:1, 149:7, 149:8, 149:9, 149:11, 149:13, 149:15, 149:17, 149:18, 153:20, 157:8, 157:16, 157:22,

160:11, 160:14, 160:15, 169:1, 175:1, 178:2, 179:19, 179:22, 188:20, 189:14, 192:17, 195:18, 210:21, 211:17, 230:23, 240:5, 249:13, 249:15, 252:4, 253:9, 253:12, 253:17, 264:14, 280:14, 291:18, 292:13, 292:14, 307:1, 309:24, 309:25, 319:17, 328:1, 328:2, 328:7, 328:9, 328:10, 328:18, 330:8, 330:15, 330:16, 331:2, 331:11, 333:21, 335:21, 341:18, 350:7, 354:19, 361:4, 368:4, 369:16, 370:16, 370:17, 373:4, 373:22, 374:7, 374:8, 376:14, 376:16, 377:17

puts [2] - 231:8, 233:11

putt [4] - 173:25, 174:1

putting [9] - 196:15, 212:4, 231:20, 257:20, 307:12, 330:2, 330:22, 338:18, 350:22

**Q**

qualifications [3] - 354:21, 354:22

qualified [3] - 355:16, 355:17, 366:13

qualify [1] - 214:6

quality [2] - 207:21, 234:2

quarters [1] - 289:23

QUATTRONE [1] - 134:18

questioned [2] - 307:4, 346:15

questioning [3] - 243:15, 244:21, 313:7

questions [44] - 137:9, 137:18, 137:19, 139:1, 139:8, 141:12, 143:9,

202:3, 222:9, 243:21, 245:3, 245:4, 254:14, 255:24, 258:14, 268:10, 268:13, 270:9, 274:2, 274:3, 274:10, 275:1, 277:22, 282:4, 284:12, 284:15, 284:16, 284:19, 284:20, 286:11, 293:22, 307:22, 309:12, 314:13, 315:7, 325:19, 325:22, 326:23, 346:11, 347:15, 352:21, 353:8, 355:9, 388:17

quickly [3] - 309:14, 328:23, 341:1

quiet [1] - 142:2, 217:22, 365:13

quit [1] - 310:14

quite [7] - 188:13, 247:11, 286:23, 377:8, 382:8, 383:23, 390:19

quote [1] - 380:2

quotes [1] - 299:7

**R**

rabbit [1] - 368:13

races [1] - 290:13

railer [1] - 371:23

raise [5] - 138:10, 144:12, 312:1, 326:7, 356:1

raised [6] - 187:16, 212:2, 297:19, 298:1, 313:21, 386:16

raises [1] - 265:13

rake [1] - 208:15

ran [2] - 285:10, 285:14

ranch [3] - 285:15, 286:3, 286:6

range [1] - 340:13

rate [2] - 232:10, 371:25

rated [2] - 372:2, 372:6

rather [4] - 142:18, 265:20, 293:3, 293:8

rating [2] - 204:21, 372:1

ratio [1] - 316:19

reach [1] - 287:7

reached [1] - 355:14

read [19] - 138:22, 175:23, 180:9, 186:10, 189:6, 189:9, 207:19, 281:2, 304:22, 305:6, 310:5, 345:3, 346:20, 347:8, 364:23, 372:14, 376:5

reading [7] - 141:6, 283:23, 311:2, 331:13, 344:25, 345:2, 351:6

ready [3] - 186:4, 291:6, 307:1

real [6] - 140:7, 293:8, 321:23, 321:25, 341:1, 363:5

realize [1] - 299:21

really [27] - 141:23, 148:7, 149:23, 155:6, 174:18, 180:25, 186:18, 187:21, 187:22, 190:19, 191:21, 202:24, 204:19, 220:18, 228:15, 232:23, 237:4, 237:9, 239:9, 242:22, 245:25, 285:4, 287:9, 290:22, 293:3, 320:22, 363:20

reason [24] - 140:7, 149:12, 149:25, 157:20, 171:12, 194:2, 217:2, 231:12, 233:2, 249:8, 249:13, 249:14, 251:8, 252:15, 258:20, 258:22, 267:14, 293:20, 294:9, 294:11, 321:5, 335:21, 361:11

reasonable [23] - 146:22, 150:19, 150:20, 150:21, 154:13, 154:23, 155:7, 155:8, 155:10, 155:11, 155:15, 156:1, 156:2, 156:3, 156:5, 158:2, 164:12, 169:9, 185:7, 185:22, 187:10, 238:24, 247:23

reasonableness [5] - 155:14, 183:9,

183:10, 183:14, 185:19

reasonably [14] - 150:16, 154:19, 154:20, 154:24, 155:14, 156:11, 156:13, 156:16, 165:23, 169:9, 238:25, 239:3, 246:4, 376:6

reasons [5] - 159:20, 159:22, 252:5, 252:7, 290:23

recalcitrant [1] - 202:2

RECEIVED [2] - 136:6, 300:1

received [2] - 138:23, 354:17

RECESS [4] - 172:9, 196:4, 276:22, 354:11

recognize [12] - 147:20, 147:22, 156:23, 172:17, 196:14, 296:14, 300:25, 301:25, 303:25, 304:3, 348:3, 348:5

recognizes [1] - 139:7

recollection [1] - 343:8

recommend [1] - 318:7

record [16] - 138:23, 145:6, 168:14, 189:14, 190:16, 195:7, 196:22, 245:2, 305:6, 310:5, 326:11, 349:18, 356:5, 386:15, 391:19, 391:21

recording [1] - 347:23

recovered [1] - 229:23

recreation [1] - 173:25

REDIRECT [4] - 135:9, 135:16, 309:15, 350:5

refer [2] - 143:16, 331:16

reference [6] - 263:22, 264:12, 274:6, 380:24, 383:10

references [1] - 388:22

referred [1] - 380:25

referring [2] - 286:12, 303:18

refers [1] - 366:2

refrain [1] - 194:7

refresh [1] - 342:19

**refreshed** [1] - 343:8
**refuse** [4] - 386:13, 387:17, 387:19, 387:20
**regarding** [7] - 178:2, 183:4, 184:22, 189:13, 192:6, 275:1, 376:11
**regularly** [1] - 362:19
**regulated** [3] - 179:1, 295:9, 295:11
**regulation** [4] - 179:2, 179:11, 295:18, 295:19
**regulations** [32] - 175:11, 175:15, 175:16, 175:22, 179:5, 179:16, 180:24, 183:3, 207:11, 218:1, 239:14, 239:15, 240:10, 242:9, 244:13, 254:25, 255:8, 255:10, 255:14, 259:5, 259:6, 259:7, 279:25, 303:8, 303:16, 303:18, 304:2, 304:18, 304:20, 305:25, 306:10, 307:18
**regurgitates** [1] - 181:19
**reimbursed** [1] - 253:1
**reject** [1] - 144:2
**relate** [4] - 143:9, 299:10, 368:14
**related** [5] - 263:15, 269:12, 293:22, 293:23, 354:8
**relative** [9] - 179:2, 179:3, 180:22, 183:3, 183:4, 183:5, 184:7, 193:10, 274:7
**relatives** [1] - 353:17
**relevance** [7] - 200:19, 297:13, 313:18, 315:5, 316:10, 317:20, 372:5
**relevant** [8] - 263:14, 263:23, 263:24, 264:22, 269:15, 294:5, 318:6, 338:23
**rely** [1] - 381:4
**remark** [1] - 141:8
**remedial** [4] - 275:2, 338:11, 338:16, 339:7

**remediating** [2] - 338:17, 338:19
**remediation** [1] - 338:23
**remember** [41] - 144:4, 145:1, 145:5, 147:25, 154:6, 201:4, 201:5, 203:8, 203:14, 222:6, 223:8, 225:12, 225:15, 248:22, 261:23, 266:25, 268:6, 268:7, 270:19, 270:20, 271:3, 282:25, 283:19, 302:25, 303:5, 308:7, 313:3, 313:4, 313:5, 314:6, 314:8, 319:19, 329:7, 337:6, 342:21, 342:23, 344:5, 345:14, 354:25, 358:13, 393:13
**remember..** [1] - 342:23
**remembers** [2] - 159:8, 164:6
**remotely** [1] - 333:11
**remove** [1] - 240:11
**removed** [1] - 233:24
**render** [1] - 171:21
**RENO** [1] - 134:17
**Reno** [1] - 164:5
**rent** [4] - 173:8, 292:18, 292:20, 292:21
**rental** [1] - 314:3
**rentals** [4] - 292:20, 292:22, 294:25, 314:18
**rented** [3] - 158:17, 315:21, 315:23
**rents** [1] - 292:19
**repair** [2] - 275:12, 275:17
**repeat** [1] - 308:18
**repeating** [2] - 171:5, 310:16
**repetition** [1] - 180:25
**repetitive** [3] - 173:4, 239:23, 245:3
**rephrase** [6] - 198:20, 257:22, 279:8, 279:10, 339:13, 355:25
**replaced** [1] - 343:10
**report** [29] - 207:19, 210:16, 226:20, 229:12, 229:15,

229:16, 269:19, 299:6, 360:11, 363:1, 364:22, 371:14, 371:15, 371:17, 375:18, 375:21, 375:22, 375:23, 377:22, 377:24, 378:6, 382:11, 382:18, 386:16, 386:22, 387:10, 387:16, 387:21
**reporter** [2] - 145:6, 148:17
**REPORTER** [2] - 145:8, 349:19
**represent** [5] - 172:22, 268:17, 368:16, 373:5
**representation** [1] - 391:8
**representing** [1] - 260:15
**represents** [2] - 143:7, 309:20
**republicans** [1] - 373:15
**request** [2] - 143:3, 265:19
**require** [4] - 191:23, 209:13, 210:11, 375:10
**required** [27] - 134:23, 146:24, 179:10, 179:21, 185:7, 207:11, 207:17, 208:17, 208:20, 209:10, 214:8, 241:23, 242:1, 242:23, 283:18, 296:25, 299:3, 299:7, 301:4, 301:23, 328:11, 345:22, 349:2, 367:12, 376:1, 377:23
**requirement** [5] - 146:25, 209:23, 214:11, 214:14, 214:22
**requirements** [3] - 168:20, 209:25, 210:2
**requires** [8] - 179:6, 179:7, 179:8, 214:17, 214:18, 215:1, 267:23
**requiring** [1] - 380:3
**research** [2] - 170:16, 170:18

**reserve** [1] - 390:13
**residence** [1] - 372:3
**resolve** [1] - 142:18
**resort** [23] - 150:5, 150:23, 150:24, 151:11, 151:17, 151:21, 153:9, 154:18, 155:12, 165:4, 189:15, 190:2, 190:5, 190:19, 204:23, 205:11, 205:23, 206:11, 238:20, 246:8, 286:18, 319:12
**RESORT** [1] - 134:8
**Resort** [11] - 150:22, 158:1, 163:10, 197:14, 205:11, 205:19, 215:6, 234:25, 237:20, 250:24, 282:8
**resorts** [7] - 204:14, 260:19, 277:25, 278:1, 279:24, 280:13, 280:18
**respect** [8] - 188:16, 197:24, 208:9, 208:24, 211:3, 282:4, 350:23, 370:20
**respectfully** [3] - 243:14, 370:11
**respectively** [1] - 217:16
**respond** [3] - 189:24, 298:10, 298:12
**RESPONSE** [2] - 138:5, 354:15
**response** [1] - 178:10
**responsibilities** [2] - 226:9, 347:3
**responsibility** [17] - 145:1, 145:3, 163:4, 163:5, 163:6, 163:8, 175:17, 175:19, 209:21, 305:4, 305:7, 310:7, 310:21, 346:4, 346:7, 346:8, 347:6
**responsible** [16] - 171:1, 176:2, 209:19, 228:5, 283:22, 284:5, 293:15, 293:16, 305:11, 306:11, 327:6, 327:7, 327:9, 327:15, 346:1
**rest** [4] - 169:6, 169:20, 191:19,

342:13
**restaurant** [1] - 151:19
**rested** [1] - 175:19
**restrictions** [1] - 385:23
**rests** [3] - 147:8, 182:16
**result** [2] - 170:25, 171:2
**resumé** [1] - 363:2
**retail** [1] - 294:24
**retire** [1] - 147:14
**retired** [1] - 359:4
**retrieve** [1] - 288:2
**return** [2] - 183:6, 184:21
**reveal** [1] - 342:2
**revenues** [1] - 293:18
**review** [6] - 145:18, 146:1, 303:7, 303:16, 352:4, 352:12
**reviewed** [1] - 352:17
**reviews** [2] - 352:2, 352:5
**revisit** [1] - 298:9
**revocation** [1] - 303:10
**ride** [4] - 256:8, 271:20, 290:2, 290:18
**rides** [3] - 279:14, 290:17, 290:18
**right-hand** [1] - 305:1
**rights** [1] - 275:9
**ring** [1] - 241:21
**ringing** [1] - 171:11
**rise** [12] - 138:2, 138:10, 155:18, 172:6, 172:10, 186:6, 196:3, 196:5, 266:4, 276:23, 353:22, 354:12
**risk** [36] - 155:15, 155:18, 155:22, 155:24, 155:25, 156:3, 156:4, 156:7, 156:12, 156:16, 156:18, 156:23, 158:6, 158:10, 234:16, 234:24, 235:1, 235:10, 235:25, 237:21, 237:24, 238:15, 238:21, 238:25, 239:3, 239:11, 240:1, 241:21, 253:6, 258:23, 368:22, 382:16

risks [2] - 234:8, 241:17
river [1] - 155:17
RMR [1] - 134:24
road [23] - 180:12, 180:13, 180:14, 212:1, 215:14, 215:17, 236:16, 236:19, 287:25, 288:18, 288:20, 288:22, 288:25, 289:12, 289:21, 301:12, 322:23, 323:3, 325:1, 325:2, 325:3, 334:1
roads [12] - 174:3, 174:4, 235:14, 236:3, 236:9, 236:10, 236:12, 236:23, 236:24, 237:19, 239:5, 239:7
rocket [1] - 237:11
role [4] - 144:9, 171:14, 183:1, 293:14
roles [3] - 183:4, 183:5, 294:20
room [6] - 140:1, 276:10, 287:17, 330:15, 330:17, 332:25, 333:2, 333:5
rope [2] - 297:4, 297:5
rough [2] - 316:3, 316:4
roughly [6] - 199:19, 217:7, 278:6, 315:10, 316:6, 333:21
round [6] - 160:13, 173:12, 174:7, 266:23, 279:4
Round [7] - 261:5, 261:6, 263:7, 266:7, 274:4, 274:11, 275:1
rounded [1] - 261:24
Route [10] - 152:2, 173:6, 178:3, 180:14, 250:13, 331:20, 333:20, 333:23
rove [1] - 273:19
rover [11] - 225:5, 225:7, 225:8, 225:9, 273:18, 279:12, 279:25, 318:20, 383:19, 385:7
rovers [7] - 273:19, 295:3, 295:4, 295:5, 318:8, 319:9
roving [10] - 215:6,

215:11, 215:19, 218:22, 256:4, 259:8, 259:9, 372:19, 389:10, 390:1
rowdyism [1] - 215:20
rule [41] - 143:3, 148:3, 148:4, 149:3, 149:4, 149:16, 149:17, 154:1, 154:4, 154:10, 154:15, 159:10, 163:20, 163:21, 164:3, 165:10, 187:20, 188:9, 188:10, 188:11, 223:8, 225:16, 225:24, 226:6, 227:8, 227:9, 228:5, 228:24, 239:17, 272:12, 275:5, 309:20, 317:11, 346:5, 346:7, 346:25, 347:4, 347:7
RULE [1] - 135:18
rules [53] - 142:14, 148:5, 148:25, 153:8, 158:8, 164:22, 165:6, 165:7, 175:11, 175:15, 175:16, 175:22, 182:18, 182:19, 183:3, 218:1, 221:8, 221:10, 239:14, 239:15, 241:2, 242:9, 254:24, 255:3, 255:6, 255:8, 255:10, 255:14, 255:18, 256:16, 259:4, 259:6, 259:7, 272:16, 279:15, 279:25, 303:8, 303:16, 303:18, 304:1, 304:17, 304:20, 305:25, 306:9, 306:16, 307:17, 344:24, 345:14, 345:23, 363:10, 376:11, 379:15
ruling [7] - 137:20, 141:8, 190:17, 192:10, 377:13, 385:8, 386:18
rulings [1] - 143:8
run [8] - 156:2, 174:11, 182:25, 186:20, 232:15, 261:14, 276:10,

287:25
running [7] - 165:4, 180:14, 180:15, 359:20, 361:12, 362:2, 362:7
runs [12] - 157:6, 180:12, 180:13, 183:1, 191:5, 231:16, 248:1, 287:17, 304:9, 322:22, 359:13, 382:16
rush [1] - 310:17
rushing [3] - 257:21, 345:6, 380:23
RV [8] - 151:18, 158:18, 159:1, 173:10, 292:25, 379:23, 380:8, 383:10

---

# S

S-C-A-R-P-A [1] - 326:13
sad [2] - 338:5, 338:6
safe [2] - 144:25, 268:1
safely [3] - 360:17, 361:6, 361:7
safety [48] - 154:22, 163:22, 179:3, 209:7, 213:17, 226:17, 240:9, 241:19, 241:20, 241:22, 242:18, 246:21, 246:23, 248:7, 252:5, 252:19, 254:11, 254:25, 255:9, 256:1, 256:2, 257:6, 257:19, 257:20, 258:10, 258:11, 258:13, 258:17, 259:2, 263:15, 263:22, 264:21, 267:15, 267:18, 269:12, 270:25, 274:21, 276:8, 279:25, 281:22, 293:16, 298:6, 299:1, 299:9, 327:6, 327:22, 344:18, 361:9
salvage [1] - 375:21
Sam [1] - 357:11
samples [1] - 214:15
sampling [2] - 366:12
sand [4] - 157:7, 208:15, 231:16,

325:11
sanitary [1] - 296:25
sat [1] - 146:21
satisfactory [5] - 179:18, 297:9, 297:10
Saturday [10] - 159:12, 215:7, 216:10, 216:13, 273:2, 273:13, 307:7, 363:17, 376:9
Saturdays [8] - 154:3, 154:11, 154:13, 160:19, 164:3, 216:5, 216:6, 218:21
saved [4] - 347:20, 347:21, 351:20
saw [4] - 162:21, 174:3, 226:11, 383:11
scale [8] - 146:14, 146:15, 153:17, 159:4, 211:20, 212:6, 286:19, 286:22
scales [6] - 146:16, 164:15, 164:16, 164:20, 192:1, 192:4
scare [1] - 342:7
SCARPA [8] - 135:11, 135:12, 135:14, 135:16, 326:8, 326:19, 346:12, 350:5
Scarpa [21] - 180:18, 183:4, 224:17, 224:22, 228:9, 228:11, 228:23, 251:25, 281:21, 281:24, 320:12, 326:4, 326:12, 326:13, 326:16, 326:20, 339:17, 343:2, 344:15, 346:13, 350:3
Scarpa's [1] - 345:2
scenario [1] - 194:17
school [4] - 155:5, 162:8, 176:16, 291:7
SCHWEIZER [1] - 134:16
score [1] - 371:21
scores [1] - 371:15
Scout [2] - 182:8
screaming [1] - 275:13
Sea [2] - 152:4, 158:23
search [2] - 162:24, 163:1
season [15] - 159:12,

174:20, 175:9, 271:8, 272:23, 272:25, 273:15, 290:10, 290:11, 292:18, 292:20, 293:11, 294:19, 367:13
seasonal [9] - 173:12, 291:1, 291:11, 292:19, 293:5, 304:9, 312:25, 313:1, 372:3
seated [9] - 138:6, 138:13, 172:13, 172:23, 186:8, 196:7, 266:6, 276:25, 354:16
second [6] - 179:6, 180:17, 203:24, 228:11, 282:4
secondly [1] - 169:3
seconds [3] - 137:5, 332:11, 358:16
Section [1] - 134:23
sector [1] - 379:6
secured [1] - 362:2
security [4] - 152:12, 273:1, 273:5, 273:10
see [94] - 143:1, 144:13, 148:18, 149:20, 152:25, 153:13, 153:15, 153:16, 153:18, 155:24, 156:13, 157:9, 159:5, 166:4, 169:3, 186:17, 187:5, 187:14, 187:24, 190:16, 200:2, 200:6, 200:8, 200:11, 200:16, 201:7, 209:25, 210:23, 212:8, 212:12, 212:15, 212:20, 212:24, 220:4, 220:5, 225:19, 226:19, 227:8, 228:2, 242:4, 242:5, 267:9, 268:3, 283:24, 286:15, 286:16, 286:24, 287:4, 287:14, 288:5, 288:16, 288:18, 288:19, 288:24, 289:14, 299:9, 305:16, 311:21, 312:4, 316:18, 323:9, 324:3, 325:1,

325:16, 331:6,
331:7, 331:8, 331:9,
334:2, 334:4, 334:5,
334:23, 335:2,
335:3, 335:6, 336:1,
336:2, 350:19,
352:2, 353:10,
353:24, 354:8,
354:10, 365:6,
365:13, 368:14,
379:17, 383:8,
383:9, 394:3

**seeing** [3] - 268:6,
353:20, 362:17

**seem** [2] - 140:19,
140:21

**sees** [8] - 160:7,
160:21, 335:13,
335:15, 335:17,
335:19, 342:4

**select** [1] - 330:10

**self** [1] - 151:23

**self-contained** [1] -
151:23

**sell** [1] - 303:6

**send** [2] - 265:22,
266:2

**sense** [11] - 142:23,
147:12, 183:14,
184:9, 184:10,
184:19, 185:18,
187:18, 191:14,
191:15, 259:17

**senses** [1] - 340:7

**sensible** [4] - 140:9,
140:12, 140:19,
140:21

**sensor** [18] - 149:6,
259:20, 270:4,
319:14, 320:1,
320:3, 336:21,
340:1, 340:4,
340:13, 340:14,
341:2, 341:16,
342:6, 342:15,
342:17, 342:24

**sensors** [3] - 259:17,
340:17, 342:11

**sent** [1] - 363:2

**sentence** [3] - 311:19,
372:14

**separately** [1] -
315:12

**September** [1] -
304:11

**septic** [1] - 291:24

**serious** [15] - 166:5,
166:6, 173:2, 234:8,
235:1, 235:7,
235:25, 236:11,

237:22, 238:21,
239:11, 274:12,
373:14, 373:15,
390:19

**seriously** [2] - 235:12,
236:20

**seriousness** [1] -
390:20

**served** [1] - 361:3

**service** [4] - 170:14,
170:16, 170:17,
285:11

**Service** [1] - 278:2

**SERVICES** [1] - 134:9

**services** [2] - 168:11,
170:6

**set** [11] - 218:22,
237:11, 248:24,
292:12, 318:7,
318:8, 335:13,
350:16, 382:17,
383:25, 387:12

**sets** [2] - 287:16,
291:4

**settle** [2] - 275:24,
276:4

**settled** [2] - 276:5,
386:9

**seven** [1] - 364:3

**seventh** [1] - 191:12

**several** [3] - 163:19,
171:4, 226:8

**sewer** [1] - 291:24

**shall** [1] - 351:4

**shallow** [1] - 161:24

**shape** [1] - 267:11

**share** [4] - 142:6,
150:12, 169:24,
170:21

**shed** [1] - 287:8

**shift** [3] - 212:4,
219:18, 219:19

**shifts** [1] - 152:13

**ship** [9] - 160:12,
160:21, 323:1,
323:2, 323:4, 324:2,
334:16, 334:20,
335:4

**shirt** [1] - 260:13

**shirts** [2] - 162:17,
177:22

**shocked** [1] - 274:23

**shoddy** [1] - 265:14

**shoes** [1] - 177:22

**shook** [1] - 140:1

**shoot** [1] - 376:16

**shooting** [1] - 158:25

**shop** [1] - 271:23

**shore** [3] - 285:17,
291:21, 292:15

**short** [4] - 139:8,
178:16, 178:17,
243:10

**shorter** [1] - 294:5

**shorthand** [3] - 143:2,
150:14, 156:14

**shortly** [2] - 329:13,
329:16

**shorts** [2] - 162:15,
177:22

**shot** [1] - 187:19

**shoulder** [1] - 312:14

**show** [34] - 140:11,
141:19, 142:1,
152:21, 153:16,
156:20, 158:9,
168:3, 170:3,
171:20, 176:13,
179:4, 181:2, 185:6,
199:1, 199:2, 199:8,
200:3, 200:10,
200:13, 200:22,
201:1, 260:11,
262:19, 289:5,
296:13, 301:24,
303:21, 321:21,
323:8, 325:11,
340:25, 348:2, 388:5

**showing** [3] - 211:4,
322:14, 324:20

**shown** [2] - 156:21,
202:2

**shows** [4] - 232:25,
267:8, 289:21, 325:6

**side** [27] - 141:19,
141:20, 146:16,
146:17, 147:2,
153:13, 157:7,
162:11, 165:15,
186:24, 195:18,
201:8, 201:10,
212:3, 230:18,
268:11, 288:20,
288:21, 288:24,
288:25, 294:24,
302:10, 303:2,
305:1, 343:13

**side's** [2] - 195:13,
195:20

**sidebar** [5] - 142:15,
142:16, 161:15,
262:18, 337:25

**SIDEBAR** [6] - 243:13,
248:5, 262:21,
266:1, 338:4, 339:15

**sides** [4] - 146:14,
146:15, 148:14,
148:15

**sign** [48] - 157:11,
157:12, 157:14,

157:16, 165:9,
179:20, 180:17,
201:8, 201:10,
209:5, 210:21,
211:23, 212:16,
212:17, 212:19,
212:21, 212:24,
213:25, 240:5,
287:23, 300:19,
301:15, 302:3,
302:4, 302:11,
328:18, 328:19,
328:21, 348:3,
348:5, 348:14,
349:1, 349:2, 349:6,
349:14, 349:15,
350:10, 350:13,
350:16, 350:24,
351:6, 351:14,
364:17

**signage** [28] - 165:12,
179:3, 179:19,
180:1, 180:8,
180:15, 180:23,
183:4, 208:25,
209:3, 209:6, 214:2,
214:3, 214:4, 221:7,
221:8, 221:17,
221:23, 240:6,
241:20, 259:25,
297:7, 299:3, 299:7,
299:9, 300:21,
318:8, 349:5

**Signagel** [1] - 345:24

**signature** [1] - 304:14

**signed** [4] - 176:5,
176:7, 304:12,
304:15

**significantly** [1] -
253:11

**signs** [60] - 156:24,
157:2, 157:3, 157:8,
157:9, 157:12,
165:7, 179:22,
179:23, 179:24,
180:20, 180:24,
209:9, 209:13,
209:21, 210:10,
210:18, 210:23,
212:9, 214:8,
238:17, 300:4,
301:4, 301:6,
301:21, 303:11,
305:21, 327:7,
327:11, 327:24,
328:1, 328:2, 328:3,
328:7, 328:8,
328:10, 328:11,
328:14, 328:17,
345:22, 346:1,

348:7, 348:9,
348:12, 348:16,
348:22, 348:24,
348:25, 349:3,
349:7, 349:23,
349:24, 350:6,
350:10, 350:12,
350:15, 350:19

**similar** [3] - 388:6,
389:5, 389:22

**similarly** [1] - 143:14

**simple** [4] - 174:21,
186:13, 245:24,
340:6

**simply** [2] - 143:2,
194:5

**single** [1] - 367:13

**sired** [1] - 393:20

**sit** [4] - 142:18, 189:7,
291:8, 381:12

**site** [31] - 152:1,
158:18, 176:3,
199:14, 203:11,
226:14, 261:4,
261:6, 263:15,
263:21, 268:17,
268:22, 269:4,
269:19, 271:17,
274:8, 277:5, 277:7,
277:14, 292:12,
293:1, 302:21,
302:23, 303:1,
305:12, 317:12,
317:13, 317:17,
377:7

**sites** [14] - 173:8,
173:9, 261:1,
261:15, 262:5,
263:23, 264:22,
292:17, 292:18,
292:19, 303:6,
312:24, 312:25,
317:18

**sits** [1] - 289:13

**sitting** [4] - 141:22,
153:2, 160:20,
271:22

**situation** [2] - 142:5,
269:13

**six** [8] - 149:16,
229:11, 232:22,
264:17, 329:17,
332:15, 332:18,
375:16

**sixth** [1] - 191:12

**size** [7] - 154:19,
155:12, 165:5,
165:23, 178:2,
230:14, 367:9

**skateboard** [1] - 236:6

**skateboards** [1] - 235:14

**skeptical** [1] - 377:9

**skirting** [1] - 292:13

**slight** [2] - 146:16, 245:5

**slip** [1] - 186:13

**slipped** [1] - 320:14

**slower** [1] - 346:14

**slows** [1] - 137:16

**small** [9] - 211:8, 211:17, 285:10, 286:7, 287:15, 331:15, 379:8

**smaller** [3] - 261:19, 342:21, 342:22

**smart** [1] - 382:19

**snag** [1] - 187:1

**snap** [1] - 142:9

**sneaking** [1] - 249:17

**so..** [3] - 195:5, 315:20, 391:20

**solace** [2] - 169:23, 192:6

**sole** [1] - 377:22

**solely** [2] - 144:5, 233:7

**someone** [5] - 145:3, 166:21, 212:5, 218:9

**sometime** [3] - 162:1, 185:17, 193:20

**sometimes** [8] - 142:15, 142:17, 156:10, 169:16, 169:23, 245:4, 306:8, 373:14

**somewhat** [2] - 212:2, 232:20

**somewhere** [11] - 144:25, 161:10, 162:3, 162:19, 186:14, 210:22, 216:20, 229:22, 323:5, 343:10, 368:13

**son** [3] - 176:13, 176:15, 290:14

**song** [2] - 338:5, 338:7

**sorrow** [4] - 166:9, 166:14, 166:15, 166:16

**sorry** [35] - 145:10, 145:13, 152:24, 159:16, 183:20, 183:21, 190:23, 206:21, 211:2, 211:9, 211:15, 213:11, 214:3, 221:4, 221:18,

234:15, 250:10, 255:21, 277:20, 288:6, 288:23, 295:5, 297:15, 304:10, 311:6, 313:1, 313:16, 314:24, 324:6, 326:14, 345:6, 348:8, 349:19, 369:5

**sort** [2] - 192:14, 372:18

**sound** [3] - 157:23, 313:14, 313:15

**sounded** [2] - 206:8, 206:10

**sounds** [4] - 140:9, 224:12, 281:17, 314:1

**source** [2] - 231:13, 231:21

**South** [1] - 285:9

**south** [2] - 230:2, 285:16

**southerly** [1] - 248:20

**southern** [2] - 157:7, 335:25

**speaking** [2] - 197:10, 198:1

**special** [1] - 273:13

**specific** [9] - 204:24, 210:11, 239:18, 239:19, 377:1, 380:3, 380:21, 381:2

**specifically** [12] - 187:5, 198:6, 203:1, 203:13, 225:16, 256:6, 272:5, 273:22, 296:24, 300:7, 304:21, 380:13

**specify** [3] - 210:13, 210:17, 210:18

**sped** [1] - 393:17

**spell** [5] - 196:21, 196:24, 196:25, 326:10, 356:4

**spend** [6] - 169:7, 170:13, 176:20, 318:7, 354:20, 377:16

**spending** [1] - 177:1

**spent** [4] - 142:5, 142:6, 176:7, 285:23

**spin** [1] - 160:13

**spin-around** [1] - 160:13

**splashing** [2] - 162:6, 178:9

**spokesperson** [2] - 197:13, 197:15

**sporadic** [1] - 287:25

**spot** [3] - 149:16, 152:15, 158:18

**spots** [4] - 152:7, 152:9, 163:25, 180:9

**spout** [2] - 231:20, 231:23

**spouting** [1] - 159:9

**spouts** [2] - 231:7, 231:14

**spraying** [1] - 153:4

**spread** [1] - 152:9

**spreadsheet** [1] - 316:15

**squarely** [1] - 222:15

**staff** [17] - 225:2, 225:3, 225:8, 293:17, 294:19, 295:1, 295:2, 295:6, 306:4, 308:8, 362:15, 362:16, 362:21, 364:19, 372:21

**stage** [2] - 191:18, 191:24

**stand** [10] - 148:12, 148:15, 153:3, 171:15, 184:20, 353:19, 354:19, 384:3, 391:18

**standard** [1] - 146:24, 150:7, 155:9, 185:20, 191:4, 360:2, 360:14, 360:18, 360:21, 361:16, 381:1

**standards** [2] - 361:17, 371:1

**standing** [3] - 212:16, 334:19, 334:20

**Staples** [1] - 179:24

**start** [10] - 147:18, 173:2, 174:17, 178:9, 257:20, 285:1, 307:1, 368:23, 390:21, 391:5

**started** [9] - 139:25, 161:10, 162:12, 162:22, 272:25, 285:4, 355:2, 355:10, 376:10

**starting** [3] - 224:13, 273:16, 375:6

**starts** [7] - 161:5, 264:9, 270:7, 272:24, 272:25, 273:15, 322:20

**State** [8] - 193:25,

207:12, 207:17, 213:4, 214:2, 214:8, 267:22, 379:21

**state** [16] - 179:24, 196:21, 213:14, 214:19, 214:25, 222:20, 240:7, 241:24, 244:13, 264:1, 326:10, 328:12, 339:10, 352:10, 356:4, 358:5

**statement** [12] - 139:3, 139:5, 139:14, 141:8, 143:15, 143:16, 143:17, 147:3, 147:22, 172:18, 177:20

**statements** [3] - 139:1, 147:17, 147:21

**STATES** [3] - 134:2, 134:11, 134:14

**states** [10] - 166:13, 166:20, 166:21, 193:9, 193:12, 194:8, 194:15, 194:16, 194:20

**States** [13] - 277:23, 278:14, 280:18, 309:21, 309:24, 358:7, 361:18, 361:19, 362:15, 371:16, 376:24, 379:24

**statute** [3] - 149:5, 165:8, 167:17

**statutes** [1] - 193:15

**STAV** [1] - 356:5

**STAVES** [4] - 135:18, 135:19, 356:2, 356:8

**Staves** [13] - 189:17, 190:8, 190:10, 190:20, 264:6, 354:5, 354:18, 356:5, 356:9, 356:11, 359:4, 392:11, 392:23

**Stay** [2] - 259:21

**stay** [15] - 151:14, 151:21, 151:22, 158:22, 159:22, 194:24, 202:19, 203:2, 203:24, 266:22, 290:24, 291:2, 291:16, 343:7, 353:16

**staying** [1] - 158:12

**stays** [1] - 291:13

**steel** [1] - 376:14

**steno** [2] - 144:15, 145:17

**step** [5] - 196:18, 197:23, 325:24, 326:6, 353:9

**stepped** [1] - 195:21

**steps** [4] - 192:16, 192:17, 263:15, 325:3

**stepson** [1] - 176:14

**stick** [1] - 219:10

**sticker** [2] - 211:3, 300:18

**still** [15] - 162:21, 164:13, 177:9, 185:9, 193:16, 229:6, 249:7, 273:12, 283:21, 361:12, 364:24, 372:7, 375:24, 384:19, 389:1

**stinger** [1] - 382:14

**stipulate** [2] - 138:24, 225:20

**stipulated** [1] - 298:3

**stop** [9] - 251:9, 279:5, 284:9, 310:8, 310:10, 340:5, 362:1, 383:5

**stopped** [2] - 364:4, 387:1

**stopping** [1] - 193:3

**store** [33] - 151:20, 153:23, 153:24, 153:25, 220:1, 220:4, 220:6, 220:8, 223:13, 225:10, 250:6, 252:10, 271:14, 272:18, 277:6, 277:12, 286:25, 288:22, 294:24, 331:12, 331:13, 331:14, 331:15, 331:16, 331:17, 331:18, 332:5, 334:1, 334:22, 335:25, 342:18, 344:2

**stores** [2] - 151:24, 153:23

**story** [2] - 190:22, 244:1

**stow** [1] - 144:25

**straight** [2] - 221:12, 222:10

**stray** [1] - 391:9

**STREETS** [1] - 134:12

**stretch** [2] - 388:13, 388:15

**stretching** [1] - 264:23

strictly [1] - 243:22
strike [5] - 302:15, 307:10, 388:25, 390:15, 390:16
strong [1] - 140:25
strongest [2] - 360:4, 376:22
strongly [1] - 141:25
structure [1] - 286:1
structures [1] - 303:7
studies [2] - 358:23, 359:6
study [3] - 359:11, 359:13, 359:14
stuff [3] - 148:8, 244:1, 362:12
subject [2] - 139:18, 248:1
submit [3] - 163:7, 318:15, 318:17
submitted [2] - 214:16, 318:20
subsequent [6] - 275:2, 338:11, 338:14, 339:3, 339:6, 339:10
substance [2] - 160:1, 186:12
substantial [2] - 163:8, 163:15
subtle [2] - 269:11, 273:5
subtly [1] - 273:8
suffering [3] - 183:25, 184:2, 188:12
suffice [1] - 165:17
suggest [5] - 167:8, 194:13, 312:8, 312:9, 342:20
suggested [2] - 167:10, 187:6
suggesting [1] - 376:3
suit [1] - 162:17
summarize [3] - 147:11, 368:12, 368:15
summation [1] - 188:9
summer [13] - 159:12, 163:24, 164:4, 164:21, 175:2, 176:7, 181:20, 218:21, 231:25, 291:14, 291:17
sun [1] - 232:4
Sunday [20] - 150:17, 154:5, 154:25, 155:1, 155:2, 158:24, 159:14, 160:20, 176:24, 176:25, 215:8,

216:11, 220:2, 221:6, 222:11, 223:13, 224:1, 277:16, 376:8
super [1] - 178:19
supervise [6] - 202:20, 203:14, 203:19, 203:20, 204:4, 282:12
supervises [1] - 203:23
supervising [2] - 312:13, 312:20
supervision [24] - 175:23, 175:25, 176:1, 176:3, 282:4, 282:6, 282:15, 282:23, 283:3, 283:18, 305:8, 305:9, 305:10, 305:13, 310:4, 310:22, 310:23, 311:15, 311:19, 311:20, 311:22, 312:19
supplying [1] - 301:22
support [1] - 190:14
supposed [22] - 140:11, 153:3, 153:7, 153:10, 153:21, 160:14, 160:25, 165:14, 173:15, 173:16, 195:14, 215:15, 223:11, 223:14, 227:13, 227:14, 293:22, 298:14, 306:13, 306:14, 316:18, 377:21
surprise [1] - 179:1
surrounds [1] - 325:12
surveil [1] - 213:24
surveillance [52] - 149:1, 149:4, 149:7, 149:11, 149:13, 149:16, 163:22, 214:23, 242:23, 245:16, 246:15, 248:9, 249:4, 249:15, 249:25, 250:2, 250:8, 250:10, 250:24, 252:4, 279:4, 279:5, 279:6, 280:14, 280:19, 281:19, 281:23, 281:25, 308:3, 309:18, 309:19, 319:11, 328:25, 329:4,

330:2, 330:14, 347:15, 347:17, 347:20, 351:19, 369:16, 369:18, 369:22, 370:3, 370:16, 371:7, 373:4, 373:5, 373:7, 373:23, 374:8
surveilling [1] - 368:23
Survivor's [1] - 184:1
survivors [1] - 166:14
survivorship [3] - 166:19, 166:20, 167:5
suspect [1] - 185:17
sustain [3] - 143:11, 294:13, 306:19
sustained [2] - 205:7
sustaining [2] - 198:17, 306:23
SUV [1] - 151:18
swear [2] - 138:9, 354:20
sweep [1] - 186:11
swim [35] - 152:16, 153:3, 153:7, 157:4, 157:7, 157:11, 159:3, 159:8, 159:9, 161:5, 161:6, 161:7, 177:24, 211:16, 222:19, 225:20, 225:25, 227:8, 229:5, 230:13, 235:9, 235:21, 236:24, 237:18, 250:2, 250:3, 258:11, 272:17, 274:19, 327:22, 346:5, 347:4, 349:9, 361:25, 365:1
swimmer [2] - 187:7, 223:2
swimmers [1] - 376:16
swimming [68] - 152:16, 153:11, 157:13, 162:5, 162:10, 162:14, 162:16, 173:22, 177:19, 177:20, 177:21, 178:17, 178:19, 181:17, 187:8, 209:5, 210:8, 210:9, 213:23, 213:24, 214:13, 215:2, 215:12, 215:16, 216:2, 220:14, 220:15, 220:17, 220:20,

220:21, 221:1, 222:11, 223:3, 228:5, 237:18, 238:2, 238:21, 239:12, 240:2, 240:3, 241:12, 254:12, 274:19, 280:15, 282:22, 283:17, 284:4, 285:25, 286:9, 295:20, 305:16, 305:23, 346:16, 349:14, 349:15, 351:1, 362:20, 363:12, 365:25, 372:19, 376:12, 376:20, 379:3, 379:7, 379:10, 379:11, 379:13
swing [2] - 287:16, 335:13
swings [3] - 160:12, 160:21, 323:1
swivel [1] - 333:6
sworn [5] - 138:12, 138:14, 196:19, 326:8, 356:2
sympathy [5] - 142:1, 166:12, 166:16, 183:19, 191:9
symptoms [1] - 388:24

**T**

T-shirt [1] - 260:13
table [1] - 238:8
taint [1] - 265:20
tainted [1] - 274:7
TAKEN [4] - 172:9, 196:4, 276:22, 354:11
talks [4] - 269:19, 310:4, 379:14, 380:11
task [2] - 175:21, 346:24
tasked [2] - 272:11, 273:22
tasks [1] - 346:22
tax [1] - 317:10
taxes [2] - 170:11, 317:9
tech [1] - 148:8
technical [1] - 293:8
technically [1] - 284:17
teenage [1] - 160:3
teenagers [4] -

159:18, 160:2, 162:23, 384:16
television [1] - 146:23
ten [19] - 157:21, 186:1, 218:17, 218:19, 231:2, 248:14, 257:1, 264:17, 264:18, 266:11, 266:14, 276:5, 285:10, 298:20, 329:14, 385:24, 389:17
ten-minute [1] - 186:1
tendency [1] - 191:20
Tennyson [1] - 391:10
Tennyson's [1] - 391:15
tense [2] - 142:4, 338:8
tenure [1] - 205:12
TERKOWITZ [1] - 134:20
term [1] - 279:7
terms [6] - 209:4, 310:7, 327:22, 329:11, 356:25, 361:15
terrible [2] - 212:4, 375:22
Terry [4] - 172:24, 174:25, 196:17, 196:23
TERRY [9] - 135:4, 135:5, 135:7, 135:9, 196:19, 197:1, 197:3, 284:22, 309:15
test [2] - 140:14, 185:19
tested [1] - 214:15
testified [22] - 161:23, 196:20, 197:21, 223:7, 228:17, 228:20, 238:2, 258:22, 270:17, 285:18, 295:8, 310:16, 310:21, 311:15, 314:20, 318:21, 326:9, 337:3, 342:16, 356:2, 373:2, 373:6
testifies [2] - 190:8, 190:20
testify [20] - 171:8, 189:18, 190:14, 190:21, 236:5, 281:10, 299:14, 310:11, 310:15, 361:17, 374:24, 375:1, 377:25,

378:16, 381:18,
382:13, 383:18,
386:22, 387:9,
393:12

**testifying** [6] - 278:9,
310:8, 310:10,
325:8, 332:19,
387:14

**testimony** [47] -
137:25, 138:21,
141:16, 143:20,
144:2, 145:19,
150:23, 157:3,
159:21, 159:25,
161:8, 165:21,
167:1, 177:15,
178:1, 178:4,
178:13, 178:18,
184:7, 184:14,
184:16, 187:22,
189:19, 198:2,
200:21, 223:16,
223:17, 227:10,
270:6, 270:19,
310:17, 313:9,
313:11, 332:20,
337:5, 338:2,
344:18, 346:14,
347:10, 350:1,
354:18, 364:1,
380:17, 382:23,
383:25, 384:1,
384:20

**Texas** [5] - 260:24,
285:16, 285:23,
286:6

**THE** [874] - 134:2,
134:14, 137:4,
137:8, 137:11,
137:16, 137:20,
137:22, 137:24,
138:2, 138:4, 138:6,
138:9, 138:10,
138:13, 145:8,
145:9, 145:11,
145:14, 145:22,
145:24, 148:7,
148:13, 148:20,
150:25, 151:4,
151:7, 151:9,
152:22, 161:14,
161:16, 161:20,
165:14, 171:23,
172:2, 172:4,
172:10, 172:12,
172:17, 180:4,
180:7, 185:25,
186:3, 186:5, 186:8,
188:1, 188:7,
188:10, 188:13,
188:17, 188:21,

188:25, 189:3,
189:5, 189:9,
189:22, 190:1,
190:8, 190:16,
190:24, 191:6,
191:8, 192:2,
192:10, 192:23,
192:25, 193:3,
193:6, 193:14,
193:19, 193:21,
193:25, 194:10,
194:20, 194:22,
195:1, 195:11,
195:17, 195:25,
196:3, 196:5, 196:7,
196:12, 196:14,
196:18, 196:21,
196:23, 196:25,
197:1, 197:19,
197:21, 198:2,
198:5, 198:8,
198:17, 198:21,
200:8, 200:11,
200:14, 200:16,
200:20, 201:12,
201:13, 201:14,
201:24, 202:1,
202:7, 202:10,
202:14, 203:19,
203:22, 203:23,
204:2, 205:7,
206:19, 206:23,
208:12, 208:22,
208:25, 209:1,
211:5, 211:7,
211:10, 211:13,
214:2, 214:3, 214:4,
215:25, 217:12,
217:13, 217:14,
217:15, 217:17,
217:18, 218:24,
218:25, 219:1,
219:2, 221:19,
221:20, 221:22,
221:23, 222:13,
222:21, 222:23,
223:16, 223:19,
223:23, 224:6,
226:8, 226:10,
226:12, 226:13,
226:15, 226:17,
226:22, 226:24,
226:25, 227:2,
227:4, 228:19,
230:7, 231:13,
231:15, 231:18,
231:19, 231:20,
231:22, 231:23,
231:25, 232:9,
232:13, 234:18,
234:21, 236:3,

236:4, 236:5, 236:7,
236:8, 236:10,
237:23, 237:25,
238:2, 238:4, 238:5,
238:6, 239:5,
239:22, 240:11,
240:13, 240:15,
240:18, 240:20,
240:24, 241:2,
241:5, 241:12,
241:15, 243:12,
243:20, 243:24,
244:4, 244:6,
244:10, 244:14,
244:18, 244:25,
245:2, 245:10,
245:13, 245:17,
245:19, 245:21,
245:24, 246:3,
246:12, 246:17,
246:23, 247:1,
247:4, 247:7,
247:10, 247:13,
247:19, 247:22,
247:25, 249:19,
249:21, 250:20,
250:21, 251:9,
251:17, 251:18,
253:11, 253:13,
253:14, 253:16,
253:17, 253:19,
253:21, 253:25,
254:2, 254:5, 254:7,
254:20, 254:24,
255:4, 255:8,
255:11, 255:21,
255:23, 255:24,
256:9, 256:11,
256:12, 256:13,
256:14, 256:21,
256:25, 257:6,
257:18, 257:23,
258:2, 258:6,
258:12, 259:3,
259:6, 259:8,
259:10, 259:11,
259:12, 259:13,
259:14, 259:15,
259:18, 259:19,
259:22, 259:23,
259:24, 259:25,
260:2, 260:3, 260:4,
260:5, 260:7,
260:21, 260:22,
260:23, 260:24,
262:12, 262:14,
262:19, 262:22,
263:4, 263:9,
263:13, 263:18,
263:20, 264:2,
264:8, 264:14,

264:16, 264:21,
265:1, 265:5,
265:11, 265:16,
265:22, 265:25,
266:2, 266:4, 266:6,
266:8, 266:9,
266:10, 266:12,
266:13, 266:14,
266:16, 266:17,
266:20, 266:21,
266:22, 266:24,
266:25, 267:1,
267:3, 267:4, 267:7,
267:8, 267:12,
267:13, 267:14,
267:15, 267:17,
267:18, 267:20,
267:21, 267:22,
267:24, 268:2,
268:3, 268:4, 268:5,
268:6, 268:7, 268:8,
268:10, 268:14,
268:19, 268:20,
268:23, 269:2,
269:5, 269:8,
269:17, 269:22,
269:23, 270:1,
270:2, 270:10,
270:13, 271:2,
271:3, 271:15,
271:16, 271:17,
271:18, 272:4,
272:7, 272:20,
273:4, 273:9,
273:25, 274:2,
274:10, 274:15,
274:16, 275:5,
275:8, 276:11,
276:13, 276:15,
276:16, 276:19,
276:20, 276:21,
276:23, 276:25,
278:9, 278:23,
279:6, 279:9,
279:16, 279:18,
280:3, 280:4, 280:6,
280:8, 280:9,
280:22, 281:1,
281:5, 281:10,
281:14, 281:17,
282:9, 282:17,
283:6, 283:10,
283:12, 284:9,
284:11, 284:13,
284:15, 284:20,
288:5, 288:7,
288:10, 288:12,
288:25, 289:3,
291:23, 291:24,
292:1, 292:2, 293:3,
293:5, 293:7, 293:9,

293:24, 294:2,
294:6, 294:9,
294:13, 294:17,
295:3, 295:4,
295:23, 296:1,
296:3, 296:5, 296:7,
296:11, 297:15,
297:19, 297:21,
297:23, 298:1,
298:7, 298:9,
298:11, 298:13,
298:21, 298:23,
299:12, 299:16,
299:19, 299:21,
299:25, 300:2,
300:8, 300:10,
300:12, 300:14,
300:20, 300:23,
303:10, 303:12,
303:13, 303:14,
303:22, 306:19,
306:21, 306:23,
308:14, 308:18,
309:1, 310:8,
310:10, 310:14,
310:19, 311:3,
311:7, 311:13,
311:23, 311:25,
312:9, 312:16,
313:11, 313:23,
314:14, 314:23,
314:25, 315:9,
315:11, 315:12,
315:14, 315:15,
315:16, 315:17,
315:19, 315:21,
315:22, 315:23,
315:24, 315:25,
316:4, 316:8,
316:10, 316:13,
316:15, 316:21,
316:22, 316:24,
317:1, 317:2, 317:3,
317:4, 317:6, 317:7,
317:9, 317:10,
317:14, 317:15,
317:22, 317:25,
319:4, 319:6, 320:8,
320:9, 320:25,
321:13, 321:16,
323:15, 323:17,
323:20, 323:22,
324:6, 324:10,
324:12, 324:15,
324:17, 325:8,
325:15, 325:21,
325:24, 325:25,
326:1, 326:3, 326:5,
326:6, 326:10,
326:14, 326:15,
326:16, 326:17,

326:18, 329:2,
329:4, 332:8,
332:10, 332:11,
332:16, 332:19,
333:6, 333:8, 335:8,
336:17, 338:1,
338:5, 338:10,
338:16, 338:19,
338:22, 338:25,
339:2, 339:5, 339:7,
339:10, 339:14,
340:6, 340:10,
344:13, 344:25,
345:3, 345:8,
345:10, 346:9,
349:3, 349:5, 349:7,
349:8, 349:9,
349:11, 349:12,
349:16, 349:19,
349:21, 349:23,
349:24, 349:25,
351:11, 351:13,
351:17, 351:23,
351:25, 352:4,
352:5, 352:15,
352:22, 352:24,
352:25, 353:9,
353:12, 353:13,
353:22, 353:24,
354:2, 354:4, 354:6,
354:8, 354:10,
354:12, 354:14,
354:16, 355:5,
355:8, 355:14,
355:17, 355:20,
355:22, 355:24,
356:1, 356:4, 356:7,
356:16, 356:17,
356:22, 356:23,
357:17, 357:18,
357:20, 357:21,
359:19, 360:21,
360:23, 360:24,
360:25, 361:12,
361:13, 361:22,
362:1, 362:8, 362:9,
362:10, 362:13,
362:14, 362:22,
362:23, 362:25,
363:2, 363:4, 363:8,
363:10, 363:12,
363:14, 363:16,
363:19, 363:20,
363:21, 363:22,
363:24, 363:25,
364:5, 364:7, 364:8,
364:11, 364:13,
364:14, 364:17,
364:20, 365:3,
365:4, 365:8,
365:10, 365:14,

365:16, 365:17,
365:18, 365:22,
366:5, 366:9,
366:16, 366:19,
367:2, 367:6,
367:18, 367:20,
368:1, 368:3, 368:5,
368:7, 368:10,
368:24, 369:2,
369:3, 369:4, 369:6,
369:8, 369:10,
369:14, 369:19,
369:21, 369:23,
369:24, 370:2,
370:4, 370:8,
370:24, 371:6,
371:11, 371:15,
371:17, 371:18,
371:19, 371:20,
371:22, 371:23,
371:24, 371:25,
372:1, 372:2, 372:5,
372:7, 372:9,
372:11, 372:14,
372:21, 372:22,
372:24, 372:25,
373:6, 373:9,
373:11, 373:19,
373:22, 374:1,
374:3, 374:5,
374:11, 374:14,
374:18, 374:20,
374:24, 375:1,
375:5, 375:18,
375:21, 376:2,
376:4, 376:22,
377:1, 377:3, 377:5,
377:10, 377:11,
378:1, 378:6, 378:8,
378:11, 378:18,
378:22, 378:25,
379:5, 379:10,
379:19, 379:22,
380:5, 380:7,
380:12, 380:15,
380:16, 380:20,
380:25, 381:4,
381:9, 381:12,
381:13, 381:14,
381:17, 381:20,
381:25, 382:4,
382:5, 382:6, 382:7,
382:8, 382:14,
382:25, 383:1,
383:3, 383:13,
383:21, 384:10,
384:11, 384:13,
384:14, 384:15,
384:16, 384:17,
384:18, 384:22,
384:25, 385:3,

385:5, 385:9,
385:10, 385:11,
385:14, 385:15,
385:17, 385:18,
385:20, 385:22,
386:1, 386:2, 386:4,
386:5, 386:6, 386:9,
386:12, 386:18,
386:20, 386:25,
387:5, 387:7,
387:11, 387:16,
387:19, 387:23,
388:1, 388:5, 388:8,
388:11, 388:17,
388:19, 388:20,
389:2, 389:4,
389:15, 390:7,
390:25, 391:1,
391:5, 391:9,
391:15, 391:17,
391:24, 392:3,
392:6, 392:8,
392:12, 392:16,
392:21, 393:4,
393:6, 393:8,
393:10, 393:13,
393:15, 393:19,
393:25, 394:3
**theme** [1] - 290:19
**themselves** [1] -
179:23
**theoretically** [1] -
234:5
**thereby** [1] - 376:11
**therefore** [1] - 147:1
**they've** [3] - 339:23,
339:24, 378:20
**thin** [2] - 381:21,
382:12
**thinking** [5] - 143:10,
194:17, 354:25,
369:13, 369:15
**thinks** [2] - 320:20,
372:22
**third** [5] - 169:11,
216:11, 216:12,
217:8
**thousand** [3] - 274:13,
367:17, 367:22
**thousands** [4] - 164:1,
164:2, 382:20
**three** [46] - 150:24,
152:13, 161:3,
162:19, 168:10,
174:23, 179:12,
179:13, 180:23,
204:14, 206:14,
208:1, 216:7,
216:14, 217:15,
218:21, 223:20,

226:4, 235:13,
245:4, 245:14,
260:11, 261:1,
265:17, 270:2,
275:18, 276:9,
276:13, 289:23,
291:15, 291:20,
296:19, 303:10,
305:3, 309:16,
332:24, 342:18,
344:5, 344:6, 344:7,
348:11, 353:18,
369:12, 377:16,
385:1, 392:16
**three-and-a-half** [2] -
291:15, 291:20
**three-day** [2] - 260:11,
303:10
**three-fourths** [1] -
305:3
**throughout** [12] -
162:8, 172:24,
174:3, 174:4, 175:8,
182:5, 182:6,
262:10, 268:25,
337:8, 337:10,
379:24
**Thursday** [2] - 393:1,
393:2
**tide** [1] - 181:12
**tied** [1] - 192:5
**tilt** [2] - 146:16, 146:17
**tilting** [1] - 146:16
**Tim** [9] - 158:16,
160:21, 174:22,
174:25, 175:3,
175:14, 302:16,
302:20
**Timothy** [1] - 392:14
**Tinari** [5] - 167:22,
168:10, 169:9,
392:6, 393:1
**tip** [1] - 164:19
**tipping** [2] - 192:1,
192:3
**tips** [2] - 164:15,
164:16
**Title** [1] - 134:23
**today** [12] - 172:15,
188:18, 189:23,
197:10, 229:6,
284:8, 310:13,
336:17, 346:4,
347:2, 347:13, 379:1
**together** [3] - 167:5,
176:16, 365:12
**toll** [1] - 192:20
**Tom** [1] - 246:19
**TOM** [1] - 134:18
**tombstone** [4] -

393:13, 393:14,
393:19, 393:21
**tombstones** [1] -
393:24
**tomorrow** [11] -
353:10, 353:21,
377:17, 391:5,
391:25, 392:4,
392:6, 392:11,
392:24, 394:3
**took** [8] - 167:3,
248:10, 248:13,
249:3, 281:25,
348:1, 352:23,
375:13
**tool** [1] - 233:3
**Top** [8] - 261:6, 262:1,
263:7, 266:7, 274:4,
274:11, 275:1
**top** [9] - 153:2,
248:23, 269:7,
297:8, 304:7, 304:8,
341:10, 379:5,
383:10
**TORIBIO** [3] - 134:3,
134:4, 134:5
**Toribio** [7] - 150:15,
150:18, 158:14,
176:16, 178:7,
178:8, 192:6
**Toribio's** [1] - 183:13
**Toribios** [1] - 194:18
**total** [12] - 252:13,
289:19, 289:22,
332:15, 332:18,
349:5, 357:1,
357:19, 358:12,
359:8, 359:9, 359:16
**totally** [1] - 191:7
**tough** [3] - 141:22,
141:23, 142:8
**toward** [2] - 333:23,
335:5
**towards** [17] - 152:4,
162:2, 230:17,
248:21, 249:10,
250:13, 250:14,
290:11, 331:21,
332:2, 334:1, 334:3,
334:7, 334:8,
344:12, 353:4
**township** [4] - 213:8,
213:10, 213:12,
213:14
**Township** [2] -
213:13, 295:14
**trade** [1] - 142:10
**tradition** [1] - 227:20
**trailer** [8] - 160:24,
173:10, 277:9,

291:13, 292:9,
292:25, 302:25,
371:20
**Trailer** [3] - 357:9,
371:12, 372:11
**transactions** [1] -
160:11
**transcript** [4] -
145:14, 145:16,
145:18, 146:4
**transferred** [3] -
285:5, 285:23, 286:2
**transients** [1] - 292:21
**trash** [1] - 327:16
**trauma** [1] - 192:14
**travesty** [5] - 382:19,
384:1, 387:16,
390:10, 390:11
**treated** [2] - 390:20
**tree** [4] - 157:17,
180:13, 248:22,
248:25
**trees** [7] - 157:13,
271:21, 287:19,
287:25, 288:17,
288:19, 288:24
**trial** [25] - 137:7,
137:10, 138:15,
139:15, 139:18,
139:19, 140:15,
141:2, 141:9,
142:12, 142:22,
142:23, 142:24,
144:11, 145:6,
147:2, 172:24,
191:19, 264:9,
265:9, 270:7, 355:2,
375:9, 377:18, 392:2
**trials** [1] - 345:10
**tried** [7] - 142:7,
237:14, 241:5,
246:16, 262:24,
275:8, 390:22
**trips** [1] - 151:22
**trivial** [1] - 163:15
**trouble** [5] - 140:12,
140:22, 157:19,
170:4, 219:3
**true** [13] - 134:23,
139:4, 139:10,
146:12, 146:20,
221:16, 238:17,
247:3, 247:4, 282:16
**truly** [2] - 314:8, 363:6
**trust** [1] - 382:21
**truth** [5] - 139:5,
139:8, 243:25,
246:19, 293:24
**try** [14] - 141:7,
142:20, 144:14,

149:25, 173:4,
174:20, 193:5,
217:21, 246:17,
284:23, 290:25,
291:9, 350:4, 383:14
**trying** [26] - 168:1,
191:9, 194:18,
210:7, 214:6,
240:20, 245:17,
247:15, 247:18,
256:23, 258:4,
271:12, 273:8,
327:20, 362:12,
368:12, 368:15,
370:5, 370:6,
375:21, 383:4,
383:5, 383:21, 389:4
**turn** [5] - 232:22,
292:14, 305:14,
384:25, 385:3
**turned** [3] - 212:13,
234:3, 391:20
**turning** [2] - 383:22,
385:4
**turns** [1] - 145:24
**TV** [1] - 143:1
**twice** [2] - 230:11,
279:18
**twilight** [1] - 185:1
**two** [112] - 137:2,
137:19, 140:20,
141:23, 142:2,
142:16, 143:18,
146:15, 152:13,
154:9, 158:11,
158:24, 159:14,
159:17, 160:2,
160:3, 160:7,
163:16, 165:2,
165:18, 166:18,
170:9, 170:25,
171:1, 173:22,
179:17, 180:2,
180:9, 180:10,
180:16, 180:17,
183:17, 183:18,
183:24, 185:7,
188:22, 201:8,
209:9, 209:22,
211:1, 212:9,
217:16, 218:21,
220:14, 226:3,
234:6, 234:7,
243:15, 245:11,
245:13, 250:5,
250:6, 250:7,
252:10, 252:11,
252:12, 256:4,
256:14, 259:25,
261:1, 261:3,

264:16, 277:22,
285:23, 285:25,
286:1, 286:6, 286:9,
286:10, 292:21,
298:22, 298:24,
302:8, 310:7,
311:11, 323:7,
331:10, 332:24,
334:1, 343:9, 349:6,
349:7, 349:16,
349:24, 349:25,
350:7, 350:10,
350:12, 350:15,
350:16, 350:18,
350:19, 350:22,
355:12, 355:15,
355:16, 361:16,
364:2, 369:6,
375:10, 377:16,
380:10, 386:22,
389:21, 390:12,
392:16
**two-and-a-half** [1] -
311:11
**two-page** [1] - 188:22
**type** [8] - 175:4,
178:11, 182:9,
285:25, 290:6,
320:13, 372:3, 372:6
**typical** [1] - 377:4
**typically** [3] - 174:5,
174:6, 289:24

---

## U

**U.S.C** [1] - 134:23
**ugly** [1] - 376:18
**ultimate** [1] - 168:4
**unaccompanied** [1] -
240:12
**unanimously** [1] -
183:23
**unattended** [3] -
225:17, 227:1, 227:8
**unconscious** [1] -
167:3
**uncontested** [2] -
178:6, 181:24
**under** [20] - 150:17,
162:15, 168:3,
175:24, 175:25,
176:3, 179:10,
184:1, 192:9, 197:9,
221:3, 224:16,
227:10, 228:23,
282:21, 305:9,
305:12, 310:22
**underage** [1] - 159:23
**underaged** [8] -
203:15, 204:8,

215:21, 215:23,
223:2, 242:4, 336:4
**underlined** [1] - 379:9
**underneath** [2] -
177:22, 231:16
**understood** [2] -
195:16, 211:21
**undertake** [1] - 150:9
**undertow** [1] - 187:1
**undisputed** [3] -
174:15, 181:6, 181:7
**unfairly** [1] - 243:16
**uniform** [1] - 260:12
**unit** [2] - 188:9,
188:11
**UNITED** [3] - 134:2,
134:11, 134:14
**United** [13] - 277:23,
278:14, 280:18,
309:20, 309:24,
358:7, 361:18,
361:19, 362:15,
371:16, 376:24,
379:24
**units** [5] - 152:6,
269:25, 315:9,
315:21, 367:1
**universal** [1] - 368:1,
368:3, 368:8
**universe** [2] - 274:17,
370:15
**unless** [6] - 155:9,
188:3, 212:16,
228:6, 352:5, 364:18
**unlike** [1] - 195:12
**unpredictable** [1] -
191:20
**unreasonable** [1] -
164:21
**unrelated** [2] - 275:1,
354:9
**unsafe** [1] - 154:22
**unsatisfactory** [1] -
179:17
**unsupportable** [1] -
161:18
**unsupported** [1] -
378:17
**up** [114] - 137:3,
143:25, 144:5,
144:13, 149:7,
149:8, 149:9,
149:11, 149:13,
149:18, 153:1,
153:4, 153:12,
156:14, 157:8,
157:16, 157:22,
157:25, 159:4,
159:14, 159:17,
168:5, 168:8,

168:12, 169:8,
178:3, 179:20,
182:3, 182:4,
184:20, 190:22,
192:13, 195:18,
196:18, 207:19,
212:1, 212:2,
216:16, 217:10,
220:25, 231:7,
231:9, 231:17,
238:12, 238:17,
240:5, 240:14,
240:20, 244:25,
245:1, 250:19,
263:24, 265:7,
269:17, 270:6,
271:20, 275:12,
278:5, 285:8,
286:23, 287:17,
287:25, 288:3,
289:12, 290:12,
291:3, 291:5,
292:12, 294:22,
297:21, 301:12,
302:12, 307:1,
309:24, 309:25,
317:17, 319:17,
323:3, 324:25,
326:5, 326:7,
327:16, 328:1,
328:2, 328:3, 328:7,
328:9, 328:10,
328:19, 332:12,
333:10, 341:10,
343:19, 343:23,
346:3, 347:2,
348:18, 348:20,
351:8, 352:6, 352:8,
353:1, 355:1, 359:4,
366:23, 368:15,
369:16, 373:4,
374:7, 388:3,
389:23, 392:10
**useful** [1] - 234:19
**ut** [1] - 371:1
**utilize** [3] - 175:8,
280:19, 362:15
**utilized** [2] - 173:20,
376:7

---

## V

**valuable** [2] - 169:15,
169:17
**value** [8] - 167:22,
169:2, 170:2,
170:13, 170:20,
297:17, 298:5, 321:7
**vandalism** [7] - 252:8,
252:16, 334:12,

335:22, 336:3,
336:4, 336:7
**variables** [1] - 357:5
**variation** [1] - 194:23
**various** [5] - 173:19,
253:14, 289:21,
369:11
**vary** [1] - 281:5
**vast** [1] - 382:18
**vendor** [2] - 301:21,
302:13
**verbal** [1] - 309:2
**verbally** [1] - 309:2
**verdict** [7] - 147:15,
183:7, 382:17,
387:12, 390:15,
390:16, 390:17
**version** [3] - 156:15,
161:17, 325:17
**versus** [2] - 204:14,
204:22
**Vesper** [25] - 147:22,
161:21, 165:14,
171:23, 173:1,
173:4, 176:23,
177:19, 178:21,
182:20, 183:10,
188:6, 191:11,
192:25, 195:4,
195:8, 196:14,
201:14, 264:21,
277:1, 287:23,
345:3, 346:16,
346:20, 381:17
**VESPER** [512] -
134:18, 134:18,
135:6, 135:10,
135:13, 135:17,
135:19, 137:2,
137:6, 137:9,
137:13, 137:19,
137:21, 137:23,
138:1, 145:10,
145:13, 145:20,
145:23, 147:24,
148:9, 148:17,
148:23, 151:2,
151:5, 151:8,
151:10, 152:20,
152:23, 161:22,
165:16, 165:20,
171:12, 186:2,
186:4, 187:25,
188:2, 188:8,
188:11, 188:16,
188:19, 188:23,
189:2, 189:4, 189:7,
189:20, 189:24,
191:7, 193:2, 193:4,
193:18, 193:20,

193:24, 194:2,
194:12, 194:25,
195:3, 196:2,
196:16, 197:2,
197:3, 197:20,
197:23, 197:25,
198:4, 198:10,
198:11, 198:20,
198:22, 200:4,
200:7, 200:10,
200:12, 200:15,
200:17, 200:24,
200:25, 201:15,
201:25, 202:4,
202:9, 202:13,
202:16, 202:18,
204:1, 204:3, 205:8,
205:9, 206:21,
206:25, 207:2,
208:13, 208:23,
209:2, 211:6, 211:8,
211:12, 211:14,
214:5, 216:1,
217:19, 219:3,
219:4, 221:21,
222:5, 222:16,
222:22, 222:25,
223:1, 223:18,
223:22, 223:24,
224:7, 227:3, 227:5,
228:21, 228:22,
230:8, 232:3,
232:12, 232:14,
234:20, 234:23,
236:14, 237:24,
238:1, 238:10,
239:6, 239:24,
239:25, 240:17,
240:19, 240:22,
241:1, 241:4, 241:7,
241:14, 241:16,
243:9, 243:14,
243:23, 244:3,
244:5, 244:8,
244:12, 244:16,
244:21, 245:1,
245:8, 245:12,
245:15, 245:18,
245:20, 245:23,
246:1, 246:11,
246:15, 246:21,
246:25, 247:2,
247:5, 247:9,
247:12, 247:17,
247:21, 247:24,
248:4, 248:6,
249:22, 249:24,
250:22, 251:11,
251:12, 251:19,
253:23, 254:3,
254:8, 254:9,

254:16, 254:23,
255:2, 255:6,
255:10, 255:12,
255:13, 255:25,
256:15, 256:23,
257:3, 257:7,
257:16, 257:21,
258:1, 258:4, 258:9,
258:14, 258:16,
259:4, 259:7, 260:6,
260:9, 260:25,
262:15, 262:20,
263:3, 263:5, 263:8,
263:17, 263:19,
264:1, 264:3,
264:10, 264:15,
264:18, 264:25,
265:15, 265:24,
268:12, 268:16,
268:21, 268:24,
269:4, 269:6,
269:16, 270:8,
270:12, 270:15,
270:16, 271:4,
271:24, 272:10,
272:21, 273:7,
273:11, 274:1,
275:4, 275:6, 277:2,
277:3, 278:10,
278:11, 278:25,
279:8, 279:10,
279:11, 279:17,
279:19, 279:20,
280:10, 280:11,
280:23, 281:2,
281:8, 281:11,
281:12, 281:16,
281:18, 281:20,
282:10, 282:11,
282:20, 283:7,
283:8, 283:11,
283:14, 284:12,
288:23, 289:2,
289:16, 293:21,
294:1, 294:4, 294:8,
294:11, 294:15,
296:4, 296:6,
297:13, 297:17,
297:20, 297:22,
297:25, 298:2,
298:8, 299:11,
299:14, 299:18,
299:24, 300:11,
306:15, 308:12,
308:15, 308:24,
309:14, 309:15,
310:9, 310:12,
310:16, 310:20,
311:6, 311:9,
311:14, 311:24,
312:1, 312:3,

312:11, 312:12,
312:17, 312:18,
313:8, 313:12,
313:13, 313:19,
313:21, 313:24,
314:13, 314:16,
314:24, 315:1,
315:2, 315:7, 316:2,
316:7, 316:9,
316:12, 317:16,
317:24, 318:2,
318:5, 319:7,
320:10, 321:2,
321:14, 321:17,
321:18, 323:10,
323:11, 323:16,
323:18, 323:21,
323:23, 324:8,
324:11, 324:13,
324:16, 324:18,
324:19, 325:10,
325:14, 325:17,
326:2, 326:4,
326:19, 329:3,
329:5, 329:6,
332:13, 332:14,
332:18, 332:22,
332:23, 333:9,
336:19, 336:20,
338:14, 339:4,
339:13, 339:16,
340:9, 340:12,
344:14, 344:17,
345:2, 345:6, 345:9,
345:11, 345:12,
346:11, 350:4,
350:5, 351:16,
351:18, 352:1,
352:7, 352:16,
352:21, 353:1,
353:3, 353:7, 354:1,
354:3, 354:5, 354:7,
354:9, 355:4, 355:7,
355:11, 355:15,
355:19, 355:21,
355:23, 355:25,
356:8, 356:19,
356:24, 357:19,
357:22, 359:21,
359:22, 361:1,
361:14, 361:24,
363:15, 365:2,
365:19, 365:23,
366:6, 366:11,
366:17, 366:22,
367:5, 367:7,
367:19, 367:21,
367:25, 368:9,
368:12, 369:5,
369:7, 369:9,
369:12, 369:15,

369:20, 370:1,
370:5, 370:9,
370:13, 370:19,
371:5, 371:13,
373:2, 373:8,
373:10, 373:12,
373:20, 373:25,
374:2, 374:4, 374:6,
374:13, 374:16,
374:19, 374:22,
374:25, 375:24,
376:3, 378:4, 378:7,
378:10, 378:13,
378:19, 378:23,
379:1, 379:3, 379:6,
379:14, 379:20,
379:23, 380:6,
380:8, 380:19,
380:22, 381:3,
381:7, 381:10,
381:15, 382:2,
383:7, 383:15,
383:19, 385:7,
385:13, 386:24,
387:13, 387:18,
387:20, 387:25,
388:2, 388:7, 388:9,
388:21, 389:14,
390:6, 391:4, 391:7,
391:14, 392:1,
392:4, 392:7, 392:9,
392:13, 392:18,
392:20, 392:22,
393:5, 393:7, 393:9,
393:11, 393:14,
393:18, 393:23,
394:2
**veto** [1] - 328:5
**Victor** [1] - 356:6
**video** [8] - 330:14,
351:19, 351:20,
352:2, 352:4, 352:5,
352:13
**videos** [2] - 328:25,
352:12
**view** [1] - 335:24
**virtually** [1] - 360:5
**vis** [2] - 288:14
**vis-a-vis** [1] - 288:14
**visible** [2] - 157:2,
157:13
**visit** [2] - 359:11,
360:9
**visited** [2] - 359:14,
377:11
**visiting** [1] - 358:19
**visualize** [1] - 350:4
**voice** [1] - 312:2
**voiced** [1] - 382:11
**volleyball** [1] - 238:7

# W

**W-E-L-L** [1] - 231:17
**wading** [4] - 220:18, 220:20, 221:15, 237:18
**wait** [9] - 141:2, 184:13, 184:15, 184:16, 264:10, 273:25, 344:16, 347:24
**waited** [1] - 140:20
**waiting** [1] - 145:9
**walk** [8] - 159:7, 161:8, 161:23, 171:15, 301:11, 301:13, 320:18, 320:21
**walked** [1] - 162:13
**walking** [6] - 157:5, 161:2, 161:4, 290:5, 362:17
**wall** [5] - 160:16, 384:8, 386:4, 386:5
**wants** [4] - 200:23, 234:21, 276:13, 370:24
**WAS** [2] - 136:6, 300:1
**washroom** [1] - 151:13
**waste** [1] - 298:16
**watch** [4] - 175:19, 291:5, 322:23, 368:13
**watched** [1] - 309:19
**watching** [3] - 176:10, 308:4, 347:18
**water** [72] - 153:1, 153:4, 153:22, 153:25, 157:14, 157:15, 157:18, 158:4, 159:10, 160:16, 160:23, 161:5, 161:9, 161:11, 161:24, 177:23, 181:8, 181:9, 181:14, 181:20, 207:21, 207:23, 214:14, 214:16, 214:20, 229:17, 231:7, 231:8, 231:9, 231:14, 231:16, 231:18, 231:21, 232:2, 232:5, 232:8, 232:18, 232:20, 233:8, 233:9, 233:11, 233:14, 233:17, 233:18,

234:2, 258:10, 258:11, 258:12, 258:17, 258:18, 258:19, 259:2, 274:20, 283:2, 291:23, 291:24, 311:6, 315:13, 361:24, 363:8, 366:1, 367:24, 368:21, 368:22, 370:16, 374:8
**waving** [1] - 162:6
**ways** [2] - 235:15, 376:19
**weakens** [1] - 382:8
**wear** [3] - 155:16, 155:17, 155:20
**wearing** [2] - 162:17, 260:11
**website** [7] - 199:9, 199:13, 201:6, 264:4, 264:5, 264:12
**Wednesday** [1] - 392:25
**week** [10] - 145:20, 182:3, 185:17, 214:14, 264:16, 279:18, 280:1, 291:16, 363:18, 364:4
**weekend** [12] - 176:12, 176:20, 177:16, 216:15, 256:5, 273:13, 290:20, 290:21, 290:22, 293:12, 293:13
**weekends** [11] - 176:8, 216:7, 216:8, 216:10, 216:14, 217:1, 245:13, 260:10, 260:11, 290:11, 290:19
**weekly** [1] - 290:20
**weeks** [10] - 151:23, 179:12, 179:13, 180:23, 206:14, 208:2, 264:16, 264:17, 296:19, 375:10
**weigh** [1] - 165:22
**weight** [1] - 141:15
**weird** [1] - 388:25
**welcome** [2] - 325:15, 364:9
**well-lit** [1] - 380:10
**West** [1] - 193:17
**west** [2] - 289:3, 289:5
**Western** [1] - 362:24
**western** [2] - 290:18,

290:21
**Westlaw** [1] - 170:17
**WESTMORELAND** [1] - 134:18
**whale** [24] - 153:2, 153:6, 159:9, 181:15, 181:17, 181:18, 185:11, 185:13, 230:16, 230:20, 231:5, 231:12, 231:16, 232:15, 232:22, 232:25, 233:2, 233:16, 233:19, 233:24, 234:3
**whatsoever** [3] - 153:10, 167:9, 252:18
**Wheeler** [10] - 159:17, 159:18, 177:3, 177:4, 177:18, 181:16, 182:23, 185:13, 392:21, 392:22
**whichever** [1] - 223:10
**whistles** [1] - 151:15
**white** [4] - 288:19, 325:7, 325:11, 368:13
**whole** [14] - 274:18, 291:14, 291:17, 306:25, 311:2, 319:1, 337:10, 374:17, 382:6, 382:22, 382:24, 384:7, 390:2, 390:13
**wholesome** [1] - 291:9
**widely** [1] - 390:9
**wife** [9] - 139:22, 139:23, 169:4, 169:16, 175:2, 285:16, 294:9, 294:12
**Wildwood** [1] - 292:4
**wintertime** [1] - 266:20
**wire** [2] - 376:14, 386:3
**Wisconsin** [2] - 200:1, 285:23
**wise** [2] - 194:11, 286:1
**wish** [1] - 323:14
**withdraw** [2] - 205:8, 206:21
**withstanding** [1] - 140:4
**WITNESS** [198] -

135:3, 196:23, 197:1, 201:13, 203:22, 204:2, 209:1, 214:3, 217:13, 217:15, 217:18, 218:25, 219:2, 221:20, 221:23, 226:10, 226:13, 226:17, 226:24, 227:2, 231:15, 231:19, 231:22, 231:25, 236:4, 236:7, 236:10, 238:4, 238:6, 240:13, 249:21, 250:21, 251:18, 253:13, 253:16, 253:19, 254:2, 254:24, 255:23, 256:11, 256:13, 259:10, 259:12, 259:14, 259:18, 259:22, 259:24, 260:2, 260:4, 260:22, 260:24, 262:14, 266:8, 266:10, 266:13, 266:16, 266:20, 266:22, 266:25, 267:3, 267:7, 267:12, 267:14, 267:17, 267:20, 267:22, 268:2, 268:4, 268:6, 268:8, 268:19, 268:23, 269:2, 269:5, 269:22, 270:1, 271:3, 271:16, 271:18, 272:7, 274:15, 276:15, 276:20, 280:4, 280:8, 284:11, 288:25, 289:3, 291:24, 292:2, 293:5, 293:9, 294:9, 295:4, 299:19, 303:12, 303:14, 315:11, 315:14, 315:16, 315:19, 315:22, 315:24, 316:15, 316:22, 317:1, 317:3, 317:6, 317:9, 317:14, 319:6, 320:9, 323:22, 325:15, 325:25, 326:15, 326:17, 332:10, 333:8, 349:5, 349:8, 349:11, 349:21, 349:24, 351:25,

352:5, 352:24, 356:17, 356:23, 357:18, 357:21, 360:23, 360:25, 361:13, 362:8, 362:10, 362:14, 362:23, 363:2, 363:8, 363:12, 363:19, 363:21, 363:24, 364:5, 364:8, 364:13, 364:17, 365:4, 365:10, 365:16, 365:18, 368:3, 368:7, 369:2, 369:4, 369:10, 369:14, 369:19, 369:23, 370:2, 371:11, 371:15, 371:18, 371:20, 371:23, 371:25, 372:2, 372:7, 372:11, 372:21, 372:24, 376:22, 377:3, 377:10, 380:15, 380:25, 381:4, 381:9, 381:13, 381:25, 382:5, 382:7, 382:25, 383:3, 384:10, 384:13, 384:15, 384:17, 385:10, 385:15, 385:18, 386:1, 386:4, 386:6, 388:17, 388:20, 390:25
**witness** [44] - 139:5, 139:7, 140:23, 141:16, 143:1, 143:11, 144:7, 144:8, 145:21, 190:13, 196:19, 198:3, 200:3, 202:2, 240:23, 243:16, 246:5, 268:15, 274:24, 293:24, 295:22, 298:17, 306:24, 308:15, 309:12, 319:3, 319:5, 324:8, 326:1, 326:3, 326:8, 353:19, 356:2, 365:20, 373:22, 384:3, 386:8, 386:15, 391:6, 392:8
**witness's** [1] - 144:1
**witnesses** [18] - 137:14, 138:21, 139:16, 141:12, 143:25, 144:1, 144:4, 144:17,

145:25, 147:6, 147:9, 147:10, 147:18, 182:12, 391:23, 391:24, 392:2, 392:3

**wolf** [1] - 391:11
**woman** [1] - 155:8
**wonder** [1] - 142:11
**wooded** [2] - 287:22, 288:1
**woods** [1] - 157:4
**word** [6] - 147:12, 194:10, 217:9, 272:4, 360:11, 380:24
**words** [5] - 146:7, 177:11, 328:21, 381:25, 388:21
**wore** [1] - 162:15
**works** [2] - 266:23, 317:19
**world** [1] - 356:13
**worried** [1] - 387:3
**worse** [1] - 384:16
**worst** [1] - 194:16
**worth** [2] - 167:13, 169:14
**write** [6] - 144:15, 188:22, 310:9, 310:12, 328:21, 386:16
**writes** [1] - 361:4
**writing** [8] - 206:9, 227:18, 248:25, 258:5, 303:19, 309:2, 310:14, 366:4
**written** [10] - 346:24, 346:25, 360:14, 360:18, 361:16, 361:17, 376:11, 377:22, 381:2, 390:7
**Wrongful** [1] - 192:9
**wrongful** [6] - 166:2, 167:4, 167:7, 167:14, 169:12, 193:13
**wrote** [2] - 331:6, 378:6

## X

**X's** [2] - 350:20, 350:22

## Y

**yards** [10] - 178:5, 229:25, 230:3, 230:5, 230:6,

230:11, 322:2, 334:21, 364:25
**year** [23] - 158:17, 173:12, 174:7, 218:15, 226:4, 266:10, 266:23, 275:13, 275:19, 290:12, 291:2, 291:3, 294:21, 314:17, 326:21, 326:22, 329:16, 359:8, 375:25, 378:20
**year-round** [4] - 173:12, 174:7, 266:23
**years** [42] - 139:21, 140:2, 142:6, 150:4, 159:19, 166:7, 175:25, 182:22, 182:23, 193:14, 197:7, 201:2, 204:19, 218:17, 218:19, 231:2, 243:7, 248:15, 262:24, 264:17, 264:18, 264:19, 266:14, 269:9, 275:21, 285:7, 285:10, 285:13, 285:24, 286:1, 291:6, 305:10, 307:25, 329:14, 358:17, 359:1, 359:9, 359:14, 359:16, 389:8, 389:17
**yell** [1] - 275:13
**yesterday** [8] - 151:3, 172:22, 189:9, 264:7, 264:14, 265:12, 267:8, 355:2
**young** [4] - 159:18, 160:6, 160:23, 167:3
**younger** [1] - 301:11
**youngest** [2] - 177:8
**yourself** [3] - 140:9, 180:9, 184:8
**yourselves** [4] - 140:17, 141:1, 156:10, 353:14

## Z

**zero** [2] - 181:22, 184:13
**zoo** [1] - 362:20