```
 1

 2                  UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF NEW JERSEY
 3   _____
     BETANIA TORIBIO, Administratrix
 4   of the Estate of JOHN JOAQUIN
     TORIBIO, Deceased; and BETANIA
 5   TORIBIO, individually,
              Plaintiff              CIVIL ACTION
 6        v.                         NO. 12-4975 (JEI/JS)

 7   PINE HAVEN, LLC, d/b/a PINE HAVEN
     CAMPGROUND and PINE HAVEN CAMPING
 8   RESORT; and DIVERSIFIED INVESTMENTS,
     INC. a/k/a DIVERSIFIED INVESTMENTS,
 9   LLC a/k/a DIVERSIFIED INVESTMENT
     SERVICES LLC,
10            Defendants.
     _____
11                                   UNITED STATES COURTHOUSE
                                     ONE JOHN F. GERRY PLAZA
12                                   4TH AND COOPER STREETS
                                     CAMDEN, NEW JERSEY 08101
13                                   MAY 6, 2015

14   B E F O R E:      THE HONORABLE JOSEPH E. IRENAS
                       UNITED STATES DISTRICT JUDGE
15
     A P P E A R A N C E S:
16
     MANIACI, CICCOTTA & SCHWEIZER
17        BY:  RENO JOHN CICCOTTA, ESQUIRE
          - and -
18   WESTMORELAND, VESPER, QUATTRONE & BEERS
          BY:  TOM VESPER, ESQUIRE
19            Counsel for Plaintiff

20   LAW OFFICES OF TERKOWITZ & HERMESMANN
          BY:  PATRICK J. HERMESMANN, ESQUIRE
21            Counsel for Defendant, Diversified Investments
              Pine Haven, LLC
22

23        Certified as true and correct as required by Title 28,
     U.S.C., Section 753.
24                       /S/ Karen Friedlander, CRR, RMR
                         /S/ Robert Tate, CCR, RMR
25
```

1                    **W I T N E S S   I N D E X**

2    **WITNESS**                                                    **PAGE**

3    **HOMER STAVES**                                               436

4    DIRECT VOIR DIRE EXAMINATION OF HOMER STAVES BY MR.            436

5    VESPER:

6    CROSS VOIR DIRE EXAMINATION OF HOMER STAVES BY MR.             443

7    HERMESMANN:

8    DIRECT EXAMINATION OF HOMER STAVES BY MR. VESPER:              444

9    CROSS-EXAMINATION OF HOMER STAVES BY MR. HERMESMANN:           462

10   REDIRECT EXAMINATION OF MR. STAVES BY MR. VESPER:              494

11   RECROSS EXAMINATION OF MR. STAVES BY MR. HERMESMANN:           501

12   **ANTHONY DIOSCON**                                            504

13   DIRECT EXAMINATION OF MR. DIOSCON BY MR. CICCOTTA:             504

14   CROSS EXAMINATION OF MR. DIOSCON BY MR. HERMESMANN:            547

15   REDIRECT EXAMINATION OF MR. DIOSCON BY MR. CICCOTTA:           559

16   RECROSS EXAMINATION OF MR. DIOSCON BY MR. HERMESMANN:          563

17   **HEATHER LEE DIOSCON-MILLER**                                 565

18   DIRECT EXAMINATION OF MS. DIOSCON-MILLER BY MR.                566

19   CICCOTTA:

20   CROSS EXAMINATION OF MS. DIOSCON-MILLER BY MR.                 602

21   HERMESMANN:

22   REDIRECT EXAMINATION OF MS. DIOSCON-MILLER BY MR.              608

23   CICCOTTA:

24   **MICHELLE WHEELER**                                           621

25   DIRECT EXAMINATION OF MICHELLE WHEELER BY MR.                  622

*United States District Court*
*Camden, New Jersey*

1 CICCOTTA:

2 CROSS EXAMINATION OF MICHELLE WHEELER BY MR.                    642

3 HERMESMANN:

4 REDIRECT EXAMINATION OF MICHELLE WHEELER BY MR.                 647

5 CICCOTTA:

6 RECROSS EXAMINATION OF MICHELLE WHEELER BY MR.                  650

7 HERMESMANN:

8 REDIRECT EXAMINATION OF MICHELLE WHEELER BY MR.                 650

9 CICCOTTA:

10 **TIMOTHY MILLER**                                             652

11 DIRECT EXAMINATION OF TIMOTHY MILLER BY MR. CICCOTTA:          652

12 CROSS EXAMINATION OF TIMOTHY MILLER BY MR.                     673

13 HERMESMANN:

14 REDIRECT EXAMINATION OF TIMOTHY MILLER BY MR.                  684

15 CICCOTTA:

16

17

18

19

20

21

22

23

24

25

1          **E X H I B I T   I N D E X**

2

3

4   **EXHIBIT NUMBER**                                    **PAGE**

5

6   DEFENDANT EXHIBIT D-42 WAS MARKED FOR              641

7   IDENTIFICATION

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE DEPUTY CLERK:  All rise.

2          (JURY ENTERS; 8:31 a.m.)

3          (OPEN COURT, May 6, 2015, 8:31 a.m.)

4          THE COURT:  Good morning, everybody.  Please be

5    seated.

6          RESPONSE:  Good morning, Your Honor.

7          MR. VESPER:  Mr. Homer Staves, please.

8          THE DEPUTY CLERK:  Good morning, sir, please step up.

9    Please raise your right hand.

10   (**HOMER STAVES**, having been duly sworn as a witness, testified

11   as follows:)

12         HOMER STAVES, having been first duly sworn, was

13   examined and testified as follows:

14         THE DEPUTY CLERK:  Please state and spell your full

15   name for the record.

16         THE WITNESS:  My name is Homer, H-O-M-E-R, Staves,

17   S-T-A-V-E-S.

18   (DIRECT VOIR DIRE EXAMINATION OF HOMER STAVES BY MR. VESPER:)

19   Q.   Good morning, Mr. Staves.  Where do you come from?

20   A.   I live in Billings, Montana.

21   Q.   All right.  And what do you do for a living, sir?

22   A.   I -- lots of different things at my age, but primarily,

23   my primary business right now is a campground consultant

24   helping people build campgrounds, buy campgrounds, operate

25   campgrounds, and then my family -- I own a campground in

STAVES – DIRECT – VESPER

1    Western Montana, and I'm a partner in a very large 2,000-acre

2    park down in Texas.

3    Q.   Oh.   And the campground in -- where is it in Montana?

4    A.   It's right outside of Glacier Park.   It's in the little

5    town of Whitefish, Montana.   We're 24 miles from Glacier

6    National Park.   So right in the mountains and still have -- go

7    snowmobiling in July.

8    Q.   Okay.   How big is that?

9    A.   That's a 40-acre park.   We have about 150 campsites.

10   Q.   And how about the one in Texas?

11   A.   As I said, it's 2,000 acres.   We've got some 2,000 lots.

12   It's involved with lot sales, as well as membership, as well

13   as open to the public.   It's a --

14   Q.   Okay.   Now, how long have you been in the -- well, in the

15   campground business?

16   A.   Basically, as far as the organized campground business, I

17   really kind of started out when I was back in school.   I was

18   very active in Boy Scouts and worked at a Scout camp during

19   the summers.   And then during college I worked as an

20   electrician, worked my way through college and then worked for

21   a couple years as an electrician, after I graduated from

22   college.   And during that stint, I was actually the electrical

23   contractor for one of the first KOA campgrounds being built

24   back in about 1962, '63.

25   Q.   The first KOA --

STAVES – DIRECT – VESPER

1    A.   One of the first ones.  It wasn't "the" first -- the

2    first one was built in Billings, Montana, and I moved to

3    Billings and went to work for KOA Corporation in 1967.  At

4    that time, there was a president, the secretary and myself.

5    The company has grown tremendously since then, but -- so I was

6    at the very start of KOA and worked -- spent 25 years working

7    for KOA in numerous different capacities, including building

8    campgrounds, operating company-owned, company -- training

9    franchisees to run campgrounds and other...

10   Q.   So you've been -- you've been operating campgrounds for

11   50 years?

12   A.   Yeah.

13   Q.   All right.  So -- and in this case, why should the jury

14   believe that you --

15        THE COURT:  No, no, no, no, no.  That's not -- give

16   him his qualifications.

17   BY MR. VESPER:

18   Q.   All right.  Why don't you tell the jury your

19   qualifications to be an expert on campgrounds.

20   A.   In addition to 50 years of actually building campgrounds

21   and operating campgrounds and helping other people, I also

22   have served since 1970 as a member of the National Fire

23   Protection Association committee that writes the codes for the

24   construction of campgrounds.  So I've been involved with

25   setting the rules for campgrounds, as well as being on the

STAVES – DIRECT – VESPER

1    operating side of the campgrounds.

2    Q.   All right.  And how do you -- can you speak to --

3         THE COURT:  No, no, not how can you speak to.  You

4    get his qualifications and then you get his testimony.  Come

5    on.

6    BY MR. VESPER:

7    Q.   Do you have experience with -- let's start this way:  How

8    many campgrounds are there, total, in North America?

9    A.   It's -- interesting thing about our industry is it's not

10   very well defined.  The majority of the campgrounds are

11   mom-and-pop operations, family owned, and consequently there's

12   not a lot of data available.

13        The quickest answer to your question is the fact that a

14   company called *Trailer Life* publishes a big, thick directory

15   every year of all the campgrounds in North America that are

16   open to the public to come in to spend the night.  And they --

17   their 2015 issue of that directory lists over 15,000

18   campgrounds in the U.S. and Canada.  About half of those

19   campgrounds are government owned.  Here in the United States,

20   it's Forest Service, National Park Service, Bureau of

21   Reclamation, BLM, et cetera -- BLM, Bureau of Land Management.

22   And in Canada, it's more provincial, which is equivalent to

23   our states here.

24   Q.   So -- I'm sorry to interrupt.

25   A.   So there's -- there's about 6,000 private campgrounds in

STAVES – DIRECT – VESPER

1  North America.

2  Q.   That's what I was going to ask.  There's 6,000 private

3  campgrounds, and that's the United States alone or just --

4  A.   That's -- it's approximately 6,000 in the United States.

5  Q.   Okay.  Now, of those 6,000 in the United States, how many

6  have you been to?

7  A.   In 50 years, I've visited lots of campgrounds, but

8  primarily, in the last 15 years as a consultant, I'm doing

9  about -- probably about -- almost 500 clients that I've done

10  feasibility studies for in the last 15 years.

11       Every time I do a feasibility study, I go into an area

12  and I actually visit all of the campgrounds in that area,

13  because I have to analyze the competition.  So I -- as near as

14  I can figure, I've probably in the last 15 years have actually

15  been on and talked to the owners or managers of about 4,000

16  campgrounds.

17  Q.   Four thousand of the 6,000?

18  A.   Yeah.

19  Q.   All right.  So you've got a lot of frequent-flyer miles.

20  A.   Oh, yeah.  I've spent -- I'm away from home about --

21       THE COURT:  Stick to the qualifications.  We don't

22  need this banter.

23       MR. VESPER:  Yes, Your Honor.

24  BY MR. VESPER:

25  Q.   Are there written standards for the operation of

*United States District Court*
*Camden, New Jersey*

STAVES – DIRECT – VESPER

1  campgrounds?

2  A.   There -- basically the quick answer is, no, there is not.

3  There's -- there's written codes for the construction of

4  campgrounds and then various state organizations, such as the

5  Department of Health have sanitary-type requirements, but to

6  the best of my knowledge, no state, no governmental agency has

7  a written requirement on operations of how you operate the

8  campground.

9  Q.   All right.  Just a few questions, then, before I ask the

10  Court to accept you as an expert.

11      Are there organizations, reputable organizations in the

12  United States, that publish guidelines or standards?

13  A.   The -- as I mentioned earlier, *Trailer Life* inspects

14  every campground that's open to the public, and they rate the

15  campgrounds but they don't provide standards, per se.

16  Q.   Okay.  So they do not.

17          THE COURT:  So the answer is no.

18          THE WITNESS:  And then there's two franch --

19          THE COURT:  The answer is no.

20          THE WITNESS:  No, it's not.  There's two franchise

21  companies that do provide operating standards for their brand

22  members, KOA and Jellystone.  But those are not available to

23  non-franchisees.

24  BY MR. VESPER:

25  Q.   All right.  I'm just asking, those are the only two

STAVES – DIRECT – VESPER

1  organizations that publish some kind of standard?

2  A.   Correct.

3       THE COURT:  Does KOA have standards of operations of

4  swimming areas?

5       THE WITNESS:  It's included in their training manuals

6  and stuff, yes.

7  BY MR. VESPER:

8  Q.   And the other one was?

9  A.   The Jellystone -- Yogi Bear Jellystone Park.

10 Q.   And the Yellowstone --

11      THE COURT:  As in Yogi Bear?

12      THE WITNESS:  Yeah, as in Yogi Bear.  With the bear

13 costume.  No chipmunks.

14 BY MR. VESPER:

15 Q.   So the Yogi -- the Jellystone place -- organization, do

16 they publish standards for the operation of campgrounds,

17 specifically for lakes and pools?

18 A.   Not -- not specifically.  It's a complete operation

19 manual for the operating of a franchise campground.

20 Q.   All right.  And in terms of -- you mentioned that there's

21 no written standards for the operation of the campgrounds?

22 A.   No general ones, no.

23 Q.   All right.  Are there -- there's no written standards.

24 Are there best practices?

25 A.   Oh, definitely.  The franchise -- the nature of the

STAVES - CROSS - HERMESMANN

1    campground business is, the owners of campgrounds, the

2    managers talk to each other on a regular basis.  There's

3    regional meetings, association meetings, there's a national

4    association.  So the industry is very open with each other,

5    and as a result, kind of a standard best practices have

6    developed that most of the campgrounds tend to follow.

7         It's not -- they're not required to follow it, but it's

8    what the customer really expects and wants when they check

9    into a campground.

10   Q.   And are these best practices, are they published?

11   A.   No, they are not.

12   Q.   They are not.  All right.

13        MR. VESPER:  Your Honor, I would offer Mr. Staves as

14   an expert in the operation of campgrounds.

15        THE COURT:  Any voir dire?

16        MR. HERMESMANN:  Briefly.

17   (CROSS VOIR DIRE EXAMINATION OF HOMER STAVES BY MR.

18   HERMESMANN:)

19   Q.   Sir, you mentioned that you were a member of the NFPA, is

20   that correct?

21   A.   That's correct.

22   Q.   And they provide some guidance relative -- they provide

23   some guidance relative to safety in campgrounds, is that

24   correct?

25   A.   Yes.

STAVES - DIRECT - VESPER

1  Q.   And they also indicate -- you also indicated that there

2  are some standards relative to the construction of

3  campgrounds, correct?

4  A.   That's what I was referring to.  It's primarily -- the

5  National Fire Protection Association writes the national

6  electrical code and other codes.  They write the 119.4 code

7  for the construction of campgrounds, but not for operations.

8  Q.   And that -- that construction code that they write

9  relates --

10  A.   It's --

11  Q.   Let me finish, please -- relates to safety issues amongst

12  other things, corrects?

13  A.   Amongst other things, some safety issues, yes.

14        MR. HERMESMANN:  That's all I have.  No objection to

15  his qualifications, Your Honor.

16        THE COURT:  Okay.

17  (DIRECT EXAMINATION OF HOMER STAVES BY MR. VESPER:)

18  Q.   Just so we -- we put a point on that.  The NFPA?

19  A.   Correct.

20  Q.   Does not have any written standards for the operation of

21  any kind of campgrounds.

22  A.   Correct.

23  Q.   Small, large, medium?

24  A.   Correct.

25  Q.   Now, tell us --

STAVES – DIRECT – VESPER

1          THE COURT:  Before you -- I just have one question.

2          THE WITNESS:  Sure.

3          THE COURT:  In your hundreds and hundreds of

4    consulting jobs and your work in your field, have you ever

5    investigated or been involved in the investigation of a

6    drowning?

7          THE WITNESS:  No.

8          THE COURT:  Okay.

9    BY MR. VESPER:

10   Q.   You do -- you do, however, know what the best practices

11   are for operations that have either pools or lakes?

12   A.   Correct.

13         MR. VESPER:  All right.  Your Honor, I would ask that

14   Mr. Staves --

15         THE COURT:  I'm -- he can testify.

16         MR. VESPER:  I thought you might have some questions

17   or additional --

18         THE COURT:  Well, it's your --

19         MR. VESPER:  I know, but you didn't say he was

20   accepted as an expert and I thought --

21         THE COURT:  I don't -- I don't do that.  He's -- I'm

22   going to permit him to testify.

23         MR. VESPER:  Oh, I see.  All right.  Thank you, Your

24   Honor.

25   BY MR. VESPER:

STAVES – DIRECT – VESPER

1  Q.   Now, Mr. Staves, in this case, you've reviewed what

2  materials?

3  A.   I have read the depositions that have been taken of the

4  various other witnesses, including the family that was there

5  and the people at the campground.

6  Q.   The Millers?

7  A.   The Millers.  And then yesterday, sat through the

8  testimonies that were conducted yesterday.

9  Q.   All right.  And in addition to hearing the testimony of

10 Mr. Jordan, the general manager, and Mr. Scarpa, the chief of

11 maintenance, did you read their deposition testimony?

12 A.   Yes, I did.

13 Q.   All right.  And you've not only seen -- you've seen the

14 Pine Haven Camping Resort?

15 A.   I have not been able to walk through the entire

16 campground, I've been to it.  I've been through the entrance

17 and talked to some of the maintenance people --

18       THE COURT:  What do you mean you were not able to?

19 What does that mean?

20       THE WITNESS:  There's a gate, security, that they

21 don't allow people into the campground unless you have a

22 lease.

23       THE COURT:  But as part of this litigation, you could

24 have gotten access to it.

25       THE WITNESS:  I -- I walked into the campground and

STAVES - DIRECT - VESPER

1    -- partway in.

2             THE COURT:  Did you make any arrangements in advance

3    through counsel to go inspect it?

4             THE WITNESS:  No, I did not.

5             THE COURT:  So you don't -- you don't suggest that

6    you would have been barred had you gone through counsel and

7    done it --

8             THE WITNESS:  Probably not.

9             THE COURT:  All right.  I don't want you to imply

10   that they were blocking you.

11            THE WITNESS:  No, I -- they weren't -- no, they did

12   not stop me, at all.  They -- I don't want to -- I don't want

13   to give that --

14            MR. HERMESMANN:  Your Honor, if there's going --

15            THE COURT:  What?

16            MR. HERMESMANN:  If there are going to be more

17   questions regarding this, I'd like to be heard, because --

18            MR. VESPER:  No, there's not.

19            MR. HERMESMANN:  -- this is news to me.

20            MR. VESPER:  No, there's not.

21            THE COURT:  No, I just want to make it clear, that I

22   don't want -- I don't want anybody to think that -- because I

23   don't think it's appropriate evidence that he was blocked.

24            MR. VESPER:  We're not suggesting it.

25            THE WITNESS:  That's a very good point, Your Honor.

*United States District Court*
*Camden, New Jersey*

STAVES – DIRECT – VESPER

1          THE COURT:  He made -- he made a choice.

2          THE WITNESS:  Yeah.

3          THE COURT:  To do what he did.

4          THE WITNESS:  Yeah.  Good point, Your Honor.  I

5  absolutely was not blocked.

6          MR. HERMESMANN:  When was that?  That's, again, news

7  to me.

8          THE COURT:  What's news?

9          MR. HERMESMANN:  That he's been to the site and

10  apparently has talked to some people at the site.  It's not in

11  his report.  I've never heard of it until just this moment,

12  Your Honor.

13          MR. VESPER:  That's not going to relate to --

14          THE COURT:  Well, you can cover that on cross.  Go

15  ahead.

16          MR. VESPER:  Thank you, Your Honor.

17  BY MR. VESPER:

18  Q.  So, had you been to the website?

19  A.  Yes.

20  Q.  And have you seen the overall layout?

21  A.  Yes.  I've been to the website, I've looked at Google

22  Earth pictures of the campground.

23  Q.  Based on what you saw, before you came to New Jersey, did

24  you need to make an inspection?

25  A.  Not really.  I mean...

*United States District Court*
*Camden, New Jersey*

STAVES – DIRECT – VESPER

1  Q.   Right.  Okay.  That's enough.

2       Let's get to your opinions.  First opinion, there's two

3  opinions.  The lights.  You're familiar now with the -- based

4  on the testimony and your review of the information that

5  you've already told the jury about, you're familiar with the

6  positioning of the lights and the type of day, dusk, dark,

7  lighting that's light sensitive, and the positioning of the

8  motion sensor lights.

9  A.   I -- I heard the testimony yesterday.  I don't --

10 Q.   And you saw the locations --

11      MR. HERMESMANN:  Objection.  Leading.

12      THE COURT:  Yeah, you can't lead this witness.

13      MR. VESPER:  All right.

14 BY MR. VESPER:

15 Q.   You know the -- do you know the approximate location?

16 A.   I -- yes.

17 Q.   All right.  And based on what you've heard, and based on

18 best practices, did -- and again, based on -- on your

19 experience with the number of campgrounds that you've been to

20 -- I'm sorry, I didn't ask this first question.

21      Are there different categories of campgrounds?

22 A.   Definitely.  That's one of the reasons why there's not a

23 lot of statistics or written operation manuals.  Every

24 campground in the United States is different.

25 Q.   All right.  What are the three general categories,

STAVES – DIRECT – VESPER

1  understanding that every campground has its own individuality,

2  but --

3  A.  Well, there's -- there's basically in the private sector,

4  there's three basic business plans.

5  Q.  All right.

6  A.  One business plan is lot sales, where people actually buy

7  a lot and own the property and fee simple.  The second one is

8  a membership park where people, like a country club, they buy

9  a membership and they go camping when they want to at the

10  campground.

11  Q.  Right.

12  A.  The third and most common is the open to the public,

13  where they, either through seasonal rentals or monthly rentals

14  or overnight rentals, rent a site for people to come and stay

15  at the campground.

16  Q.  All right.  And based on what you know, the facts in this

17  case, where does Pine Haven fall in those three categories?

18  A.  Pine Haven is an open-to-the-public campground.  They

19  concentrate on seasonal rentals rather than daily rentals.

20  Q.  Okay.  And there's also -- the KOA has three categories

21  of journey, holiday, resort?

22  A.  Correct.  It's brand-new.  It's just being promoted at

23  this time.

24  Q.  Oh, so was it around in 2010?

25  A.  No.

STAVES – DIRECT – VESPER

1  Q.  All right.  Then I won't ask about it.

2      All right.  So with respect to the lights, I started to

3  ask.  Based on the facts that you've reviewed and the location

4  of the different lights, did Pine Haven Camping Resort, did

5  they follow best practices?

6  A.  In general, the best practices are to have lights in all

7  of the public areas.  KOA requires that of the franchisee.

8  *Trailer Life* gives campgrounds extra points on the inspections

9  if they have lights in all the public areas.

10      I don't necessarily feel qualified to say whether Pine

11  Haven had lights in all the public areas, but I think that we

12  heard yesterday that they did not.

13  Q.  All right.  So --

14      THE COURT:  Well, hold it.  At 8:10 on August 8th,

15  8:10 p.m., was it light out, dark out?

16      THE WITNESS:  I have no idea.

17      THE COURT:  You have no idea?

18      THE WITNESS:  No.

19      THE COURT:  If the deposition testimony of one of the

20  teenagers said it was light out, would you --

21      MR. VESPER:  Excuse me, Your Honor.  May I object to

22  your questioning at this point?

23      THE COURT:  No, you may not.  Go ahead.

24      THE WITNESS:  Yeah, I read that testimony that the

25  teenager said it was light out.

*United States District Court*
*Camden, New Jersey*

STAVES – DIRECT – VESPER

1          THE COURT:  Okay.  But you –- you have no opinion one

2    way or another.

3          THE WITNESS:  No, I'm saying best practices are to

4    light the public areas.

5          THE COURT:  Yeah, but that's not significant to

6    something that would happen at 12 noon, so...

7          THE WITNESS:  Right.  Well, a little bit of

8    disagreement there, Your Honor.  Because if people know that

9    an area is going to be lit at night; even if it's not there,

10   they know it's not going to be a dark area where they can hide

11   or whatever, I mean, it –- it becomes part of the knowledge of

12   the camper, that this is going to be bright all night.

13         THE COURT:  Okay.

14         MR. HERMESMANN:  Your Honor, I have an objection and

15   a motion relative to this, based upon a recent comment, that

16   he's testified, himself, he's not qualified to make this

17   comment.

18         MR. VESPER:  Let me ask just –-

19         MR. HERMESMANN:  I'm in the middle, I'm in the

20   middle.  I would like to –-

21         THE COURT:  I would cover that on cross-examination.

22         MR. HERMESMANN:  Judge, that's fine.  I want to put

23   it on the record, though.

24         THE COURT:  That's okay.

25         MR. HERMESMANN:  And the record is that he just

*United States District Court*
*Camden, New Jersey*

STAVES – DIRECT – VESPER

1  testified he's not qualified to make this opinion.  And he's

2  testified he hasn't been to the campground, doesn't know where

3  the lights are located, couldn't -- and he should be barred

4  from testifying as to lights.

5          MR. VESPER:  That objection is out of context, and we

6  had a hearing yesterday.  Could we just please --

7          THE COURT:  Ask your next question.

8          MR. VESPER:  Yes.

9          THE COURT:  He does -- let's make it clear, he

10  doesn't know where -- there were lights, we've had testimony

11  there were lights.

12          MR. VESPER:  Yes, may I --

13          THE COURT:  And there's four and-a-half miles of

14  roadways.  I mean, there's lights.

15          MR. VESPER:  May I proceed?

16          THE COURT:  And he doesn't know where they are.

17          MR. VESPER:  May I proceed?

18          THE COURT:  Yes, go ahead.

19          MR. VESPER:  Thank you.

20  BY MR. VESPER:

21  Q.  Do you know what the practices are for the campgrounds

22  that have pools or lakes?  The majority of them.

23  A.  Again, best practices, you mean as far as lighting, as

24  far as --

25  Q.  Once lights -- yeah, let me phrase it this way:  Once a

STAVES – DIRECT – VESPER

1  campground decides to put up motion detector lights, day-dusk

2  lights, and they have pools or swimming lakes --

3          THE COURT:  No, no, no, no, no, you're leading this

4  witness.

5          MR. VESPER:  I'm trying to get the qualification that

6  he can give an opinion about what the majority, the majority

7  of those that do have pools and swimming lakes --

8          THE COURT:  He hasn't established that he --

9          MR. VESPER:  -- what they do.

10          THE COURT:  You mean swimming pools, just any body of

11  water?

12          MR. VESPER:  Yes, swimming pools.

13          THE COURT:  You mean an inground pool?

14          MR. VESPER:  Any body of water where people are

15  invited to swim, yes, sir.

16          MR. HERMESMANN:  Objection as to relevance.

17          THE COURT:  I'm going to let him answer it.  Go

18  ahead.

19          MR. VESPER:  Do you know whether --

20          THE COURT:  Let him give an answer.

21          MR. VESPER:  Oh, okay.

22          THE WITNESS:  Both Jellystone and KOA require their

23  franchisee to have lighting around any swimming area.  Best

24  practices are, the independent campgrounds, the majority of

25  those that I've visited, some 6,000, also provide lighting in

STAVES – DIRECT – VESPER

1    any place where people go swimming.

2    BY MR. VESPER:

3    Q.   Any place where people go swimming?

4    A.   Right.  I mean, it might be a water park, it might be a

5    stream, it might be a lake, it might be a splash park,

6    whatever.

7    Q.   Right.

8         THE COURT:  Next question.

9    BY MR. VESPER:

10   Q.   Next question.  And the next -- and the next opinion has

11   to do with the employees' presence or the roving patrol.

12   You've heard testimony about that?

13   A.   Yes.

14   Q.   And about the roving patrol only being between certain

15   hours and also only being on certain days or holidays.  You

16   heard that?

17   A.   Yes.

18   Q.   Now, the same question about the majority of those

19   campgrounds, which you have experience seeing.  When

20   campgrounds have swimming facilities, what do the majority of

21   campgrounds that have swimming facilities do with the --

22   either -- yeah, the roving patrols?  Do they have roving

23   patrols?

24   A.   The majority of campgrounds in the United States --

25   Q.   No, those -- those with water.

STAVES – DIRECT – VESPER

1    A.    Including those with water.

2    Q.    Okay.

3    A.    Their best practices is the -- always have somebody that

4    lives on the property 24/7, so somebody's always available.

5    Even the IRS in the United States has ruled --

6          THE COURT:  Oh, come on, the IRS has nothing to do

7    with this.

8          THE WITNESS:  Yes, it does, Your Honor.

9          THE COURT:  No.

10         THE WITNESS:  They have ruled that --

11         THE COURT:  I'm not going to permit testimony as to

12   what the IRS does.

13         THE WITNESS:  Okay.  So that there's a full-time

14   employee living on the campground.

15   BY MR. VESPER:

16   Q.    Right.

17   A.    And the best practices are, every campground, with or

18   without water, somebody walks the campground or rides it in a

19   golf cart or whatever, from the time they close the office,

20   like normally it's 10 o'clock for most campgrounds.  This one

21   is earlier.

22   Q.    Seven o'clock.

23   A.    And they -- they are a visible presence on the campground

24   until everybody goes to bed.

25         THE COURT:  But that's not necessarily just around

STAVES – DIRECT – VESPER

1   the water.  That's --

2           THE WITNESS:  No, it's not.  It's the entire

3   campground.

4           THE COURT:  That's somebody around the entire

5   campground.

6           THE WITNESS:  That's right, that's what I said.  It's

7   the entire campground including water.

8           THE COURT:  I mean, it could be a hundred acres or

9   200 acres.

10          THE WITNESS:  That's right.  Or 2,000 in my case.

11          THE COURT:  Oh, that's right.

12          THE WITNESS:  And we have people that are driving all

13  night.

14          THE COURT:  Now, 2,000 acres is many square miles.

15          THE WITNESS:  Yes, it is.

16  BY MR. VESPER:

17  Q.   Gee, why did -- why did they do that?  Because they can't

18  be at one -- at every point, why would they drive around?

19  A.   It's the -- it's the presence, that the customer knows

20  that there are staff there available.  Yes, you're right,

21  they're not going to be everywhere at every time.

22  Q.   Right.

23  A.   But that -- but it's a presence, which is a deterrent to

24  people doing things that they're not supposed to.  And if a

25  kid knew that somebody was coming by the pool at some point,

STAVES - DIRECT - VESPER

1   and they weren't supposed to be in the pool, they probably

2   wouldn't be.

3   Q.   Because of that presence.

4   A.   Yeah.

5   Q.   Final question about the lighting, because His Honor

6   asked you, the -- assume that it's not dusk yet, would the --

7   the motion lights would come on, wouldn't they?

8   A.   Most motion lights are also have a dawn-to-dark switch on

9   them.

10  Q.   Okay.

11  A.   I mean a dark-to- -- dark-to-dawn.

12  Q.   Whatever.

13  A.   So they don't come on with the motion until it's dark.

14  Q.   Oh, all right.

15  A.   You can get the others, but it's rare.

16  Q.   Okay.  So you can get just motion lights to come on --

17  A.   Right, but that's rare.

18  Q.   All right.  And with respect to lights, there was

19  testimony about --

20          THE COURT:  No, now you're leading again.

21          MR. VESPER:  Well, I have to ask a question.

22  BY MR. VESPER:

23  Q.   Let me ask the question this way:  Do you agree that

24  having lights on this -- do you know where the swim lake is,

25  right?

STAVES – DIRECT – VESPER

1  A.   Yes.

2  Q.   Do you agree or disagree with having lights that are on,

3  all through dusk and dark until dawn, having them on would

4  attract children, based on your experience?

5  A.   Based on my experience and my --

6        MR. HERMESMANN:  Objection; leading.

7        THE WITNESS:  -- visits to a lot of campgrounds, I

8  feel very strongly that lights are a deterrent to mischievous

9  actions.  Usually people are looking for a dark place to go do

10 something that they shouldn't be doing.

11       THE COURT:  You know this case, these kids were

12 looking for some dark place, is that -- is that your

13 testimony?

14       THE WITNESS:  They were looking for a place where

15 there was no adults.

16       THE COURT:  At 8:05 or 8:10 p.m. on August 8th, if

17 the parents had been with these kids, been right there on the

18 beach with them.

19       THE WITNESS:  Mm-hmm.

20       THE COURT:  Could they have gone into the pool --

21 into the lake?

22       THE WITNESS:  Not legally.

23       THE COURT:  Why not?

24       THE WITNESS:  Because there was no management on the

25 premise.  The sign that was posted there said it was closed

STAVES – DIRECT – VESPER

 1  for swimming unless management was present on the premise, and

 2  everybody left at 5 o'clock.

 3  BY MR. VESPER:

 4  Q.   Mr. Staves, in the majority of campgrounds that you've

 5  been to, does management take the position that the parents

 6  have to be with the child at -- you know, every minute of the

 7  day?

 8  A.   No.

 9  Q.   All right.  And --

10          THE COURT:  The children have to be supervised --

11  where there's no lifeguard, doesn't it require adult

12  supervision to go into a body of water, even in the middle of

13  the day?

14          THE WITNESS:  Now if I remember right, yesterday, you

15  said supervision does not require physical presence.

16          THE COURT:  Don't -- don't ask what I said.

17          THE WITNESS:  Well, that's what you said.

18          THE COURT:  No, you answer the question.

19          THE WITNESS:  I didn't hear the --

20          THE COURT:  Am I the source of your expertise?

21          THE WITNESS:  No, I'm saying supervision is different

22  from --

23          THE COURT:  Answer the question.

24          THE WITNESS:  Supervision is different from being --

25          THE COURT:  Answer the question.

STAVES – DIRECT – VESPER

**1**          MR. VESPER:  He's trying to, Your Honor.

**2**          THE COURT:  No, he's trying to tell me what I've said

**3** or what I say --

**4**          THE WITNESS:  Okay, rephrase the question, would you,

**5** please.

**6**          THE COURT:  Where there's no lifeguard --

**7**          THE WITNESS:  Right.

**8**          THE COURT:  -- can children go into a body of water

**9** at a campground without supervision, without adult

**10** supervision?

**11**          THE WITNESS:  They can, but they're not supposed to.

**12**          THE COURT:  Let's assume it's 1 o'clock in the

**13** afternoon and they were going to go either into the lake or to

**14** a swimming pool.  There is no lifeguard.

**15**          THE WITNESS:  And there's a sign that says they

**16** should be accompanied by an adult.

**17**          THE COURT:  So the answer is, they need to have adult

**18** supervision to go in, even in the middle of the day.

**19**          THE WITNESS:  If they want to obey the law, they do.

**20**          THE COURT:  Okay.

**21** BY MR. VESPER:

**22** Q.  The children and their parents are supposed to follow the

**23** rules, aren't they?

**24** A.  Correct.

**25** Q.  Who's supposed to enforce the rules?

*United States District Court*
*Camden, New Jersey*

STAVES – CROSS – HERMESMANN

1   A.   The park, management.

2        MR. VESPER:   Thank you.

3        MR. HERMESMANN:   Thank you, Your Honor.

4   (CROSS-EXAMINATION OF HOMER STAVES BY MR. HERMESMANN:)

5   Q.   Good morning, Mr. Staves.

6   A.   Good morning.

7   Q.   On August 8th, 2010, the day of this -- the day of this

8   drowning, what time did the sun set?

9   A.   I have no idea.

10  Q.   What time did this drowning occur?

11  A.   I wasn't there, but based on the testimony, I believe it

12  was about 8 o'clock.

13  Q.   What time is civil twilight on August 8th, 2010, at the

14  location of this drowning?

15  A.   I have no idea.

16  Q.   And what time is nautical twilight?

17  A.   No idea.

18  Q.   Are you familiar with what civil twilight and nautical

19  twilight are?

20  A.   Not technically.  Not from a legal standpoint.

21  Q.   Would you concur that following sunset, it remains light

22  for a period of time?

23  A.   In most places, depending on the clouds and the weather,

24  yes.

25  Q.   Assuming it's a nice, clear day, would you agree that for

STAVES − CROSS − HERMESMANN

1  a period of time after sunset that it remains light out?

2  A.   Yes.

3  Q.   You had the opportunity to read the deposition transcript

4  of Anthony Dioscon, is that correct?

5  A.   Yes.

6  Q.   Did you bring that with you today?

7  A.   I don't have a hard copy of it, no.  It's on my computer,

8  but...

9        MR. HERMESMANN:  May I approach the witness, Your

10  Honor?

11        THE COURT:  Sure, you may.  Yes, you may.

12        MR. HERMESMANN:  Counsel, I'm going to refer to

13  Mr. Dioscon's testimony at Page 86, Line 23 initially.

14        MR. VESPER:  Okay.

15  BY MR. HERMESMANN:

16  Q.   Now, Anthony Dioscon, he was the young boy who was with

17  John Toribio, is that correct?

18  A.   Yes.

19  Q.   And 14 years old, correct?  Read along with me here.  Can

20  you see that?

21  A.   Sort of.

22  Q.   All right.  And this is the question asked to Anthony at

23  his deposition on October 15th, 2013.

24        All right, all right.  And at some point in time, your

25  step-dad leaves, right, about 20 to 30 minutes later, and at

STAVES – CROSS – HERMESMANN

1    that time he leaves, how would you characterize how light or

2    how dark it was at that time?

3            Answer:  It was still light out.

4            Okay.  Was it starting to get dark or?

5            Answer:  It was starting to get dark but you could tell

6    that it was just getting dark around that time, but it wasn't

7    nowhere near dark still, the sun was still up.

8            Did I read that portion correctly?

9    A.   Yes, you did.

10   Q.   Let's move forward to Anthony's testimony on Page 91.

11   Line 9.

12           Okay.  And from the time that your step-dad left until

13   the time that John went into the lake, do you know how much

14   time passed?

15           Maybe five, ten minutes.

16           Was it still light out at the time that John went into

17   the lake?

18           Answer:  Yes, sir.

19           And then did Michelle go into the lake next?

20           Answer:  Yes, sir.

21           Did I read that portion correctly?

22   A.   Yes.

23   Q.   Let's move forward to Page 98, Line 1.

24           Question:  Okay, okay.  So that at the time that you

25   got into the lake, was it still light out?

STAVES - CROSS - HERMESMANN

1          Answer:  Yes, sir.

2          Did I read that correctly?

3   A.   Yes.

4   Q.   Mr. Staves, are you aware of any fact in this case, based

5   upon what you've reviewed, that contradicts Anthony Dioscon's

6   testimony that it was light out at the time this drowning

7   occurred?

8   A.   No, sir.

9   Q.   And I believe you just testified on direct examination

10  that the motion lights that you were referring to, they only

11  go on once it's dark.  Is that correct?

12  A.   Yes.

13  Q.   So at least applied to the facts of this case, if it's

14  light out, like Anthony Dioscon testified to, then motion

15  lights or any other type of lights would have zero consequence

16  on this particular drowning.  Would you agree?

17  A.   Yes.

18  Q.   Would you also agree that there's no statute, ordinance,

19  code, rule, from the State of New Jersey that relates to

20  lighting required at lakes on campgrounds?

21  A.   To the best of my knowledge, from the stuff I've read,

22  yes.

23  Q.   Okay.  And you researched that for this case, correct?

24  A.   Yes.

25  Q.   And couldn't find a thing, right?

STAVES - CROSS - HERMESMANN

1  A.   Right.

2  Q.   And the NFPA that you testified to regarding the

3  construction of campgrounds -- now, the NFPA --

4        THE COURT:  That's nationwide, isn't it?  That's a

5  code that applies --

6        THE WITNESS:  Yes.

7        THE COURT:  -- not just in New Jersey.

8        THE WITNESS:  It doesn't apply -- it's a code written

9  on a national level that has to be adopted by the local

10 authority having jurisdiction.

11 BY MR. HERMESMANN:

12 Q.   And in your report that you authored relative to this

13 case; you recall that report, correct?

14 A.   Yes.

15 Q.   In this report that you authored, there's no reference at

16 all as to the NFPA having lighting requirements on a lake of

17 this nature.  Would that be correct?

18 A.   Yes.

19 Q.   The opinions that you've expressed here today, am I

20 correct, you cannot turn to a single textbook that supports

21 them, is that correct?

22 A.   Correct.

23 Q.   Not a single treatise, is that correct?

24 A.   Correct.

25 Q.   Not a single standard, is that correct?

STAVES - CROSS - HERMESMANN

1  A.  With the exception of the Jellystone, KOA standards but

2  that are proprietary.

3  Q.  Jellystone and KOA, they don't even apply to this park.

4  A.  Right.

5  Q.  Would you agree with that?

6  A.  Right.

7  Q.  So if they don't apply to this park, you agree it's not a

8  standard that should even be applied in this case?

9  A.  Well, you said there was a -- whether there was a

10  standard available, and I want to make clear that, yes, there

11  is a written standard, but it's not applicable to this

12  campground.

13  Q.  Okay.  It's not applicable to this campground, it's not

14  applicable to this case.

15      Let me talk to you a little bit about roving patrols

16  and the rules regarding roving patrols.  Most campgrounds that

17  you've seen, they begin their roving patrols at 10 o'clock,

18  correct?

19  A.  When the store closes, correct.

20  Q.  Most campgrounds begin their patrols at 10 o'clock, is

21  that correct?

22  A.  Yes.

23      MR. VESPER:  He just answered that question, when the

24  store closes.

25      THE COURT:  No, but that -- that -- I think the

*United States District Court*
*Camden, New Jersey*

STAVES – CROSS – HERMESMANN

1   clarification, that in most cases, that that's 10 o'clock is a

2   proper --

3          MR. VESPER:  He didn't clarify it.  If they close at

4   10 -- if they close at 7 that's -- this case, 7 o'clock.  Not

5   10 o'clock.  That's --

6          THE COURT:  Go ahead and ask your question.

7   BY MR. HERMESMANN:

8   Q.  Most campgrounds begin their roving patrols at 10

9   o'clock, correct?

10          MR. VESPER:  Same objection.

11          THE COURT:  Okay.  Overruled.

12          MR. VESPER:  All right.

13          THE WITNESS:  Most campgrounds have staff roaming the

14   campground all day long.

15   BY MR. HERMESMANN:

16   Q.  That's not what you testified to on direct examination,

17   though, was it?  Did you not say on direct examination that

18   most campgrounds start their patrol at 10 o'clock?

19   A.  No, I said when the store closes.

20   Q.  You made no mention --

21   A.  And I also said most stores close at 10 o'clock.

22          THE COURT:  I think the jury has that understanding.

23          MR. HERMESMANN:  Understood, Your Honor.

24          THE COURT:  Yeah.

25   BY MR. HERMESMANN:

STAVES – CROSS – HERMESMANN

1  Q.   In this case, would you agree, based upon your review of

2  the deposition transcripts that you saw, that John Toribio and

3  Anthony Dioscon, they both knew not to go in that water?  Is

4  that correct?

5  A.   I have no way of knowing what they knew.

6  Q.   Did the testimony that you reviewed not indicate that

7  they were told time and time and time, not to go in the water?

8  A.   Yes.

9  Q.   Now, of course, you can't get inside their head, but as

10 an expert, you read testimony and review other things and you

11 rely upon that in forming your opinions, correct?

12 A.   They did say that their parents had told them not to go

13 swimming.

14 Q.   And their parents also -- Mrs. Miller, did she not

15 testify at her deposition, that on at least 20 occasions she

16 told them not to go in the water?

17 A.   Yes.

18 Q.   And did Mr. Miller not say in his deposition that right

19 before he left the boys, he told them, don't go in the water?

20 A.   Yes.

21 Q.   And did Anthony Dioscon not testify at his deposition

22 that both his mother and stepfather repeatedly told him not to

23 go in the water?

24 A.   Yes.

25 Q.   And do you have any reason to believe, based upon your

STAVES – CROSS – HERMESMANN

1  review of this case, that those boys had not been told to not

2  go in the water?

3  A.  No.

4  Q.  The rules that were in place at Pine Haven required

5  parental supervision of those boys, is that correct?

6  A.  Yes, as far as -- yes.

7  Q.  And long before this occurred, when Mr. Miller met with

8  Mr. Jordan, based upon your review of Mr. Miller's deposition

9  transcript, Mr. Miller knew that, correct?

10  A.  I would assume he did.

11  Q.  Well, that's what he testified to.

12  A.  Right.

13  Q.  And he also testified he thought it was his

14  responsibility to watch the boys, is that correct?

15  A.  No, to supervise.  The rules specify supervision.

16  Q.  My question is, did Mr. Miller not indicate he thought it

17  was his responsibility?

18  A.  He indicated that, yes.

19  Q.  He testified, in fact, that he felt responsible, correct?

20        MR. VESPER:  I object to that.  What -- he's not a

21  party to this case.  What relevance is that?

22        MR. HERMESMANN:  Would you like me to address

23  relevance?

24        THE COURT:  No.  I don't want to do closing arguments

25  here, I want him -- I want him to testify as to what his

*United States District Court*
*Camden, New Jersey*

STAVES - CROSS - HERMESMANN

1  opinion is.

2          THE WITNESS:  I mean, I'm just testifying to what the

3  other people have said.

4          THE COURT:  No, the issue of whether the children

5  knew, that the 14-year-olds were aware that they were not

6  supposed to be there without supervision, could be relevant to

7  this case.  I'm going to allow it.

8          MR. VESPER:  I agree with that.  He's talking now

9  about responsibility.  It's prejudicial and it's not relevant.

10  It's not relevant if --

11          THE COURT:  Okay.  I'm overruling that objection.  I

12  think this line of questioning is completely proper.

13          MR. VESPER:  All right.

14  BY MR. HERMESMANN:

15  Q.  Okay.  Going to Mr. Miller's deposition transcript, July

16  1st, 2013, Page 125.  And you -- you've indicated in your

17  report, you read Mr. Miller's transcript, correct?

18  A.  Sure.  Yes, I did.

19  Q.  Now, he offers an answer up here.  You're asking me -- he

20  actually asked a question, but he said -- "he" being

21  Mr. Miller:

22          You're asking me whether I, as a parent, understood

23  that I would supervise John.

24  A.  Correct.

25  Q.  Question:  Yes.  Or felt any responsibility to supervise

STAVES – CROSS – HERMESMANN

1  him.

2       Answer:  Absolutely.

3  A.   Correct, supervise him.

4  Q.   Question:  While he was with you and not with his mom or

5  whatever?

6       Answer:  I felt responsible for the child, yes.

7  A.   That's what he said.

8  Q.   That's what he said, right?

9       Now, based upon the practice that Pine Haven had in

10 place, which was patrols from 10 to 2 in the morning, on

11 Fridays and Saturdays, that particular practice would not

12 apply at the time of this drowning.  Would you agree with

13 that?

14 A.   Correct, nobody was on duty at the time.

15 Q.   Would you agree that there's nothing in anything that you

16 reviewed that indicates Pine Haven gave the impression, to the

17 Millers or anybody else, that John and Anthony were in their

18 care and custody?

19      MR. VESPER:  I object.  That's way beyond direct.

20 The impression --

21      THE COURT:  His cross doesn't have to be limited to

22 your direct.

23      MR. VESPER:  But the impression they gave?  I didn't

24 bring him here to talk about impressions.  But the standards

25 for the majority of the campgrounds.  That was a prior ruling.

THE COURT: I'm over -- I'm going to let him --

MR. VESPER: Very well.

THE COURT: Ask your question and you can answer it.

MR. HERMESMANN: If I can remember the question.

MR. VESPER: Impressions.

BY MR. HERMESMANN:

Q. The question was, would you agree that nobody at Pine Haven at any time ever gave the impression to the Millers that Pine Haven had the care and custody of these children?

MR. VESPER: I have to object.

THE WITNESS: I have no way of knowing.

THE COURT: Well, he's answered it. There's no way of knowing.

MR. VESPER: Okay.

THE COURT: Next question.

BY MR. HERMESMANN:

Q. Okay. You reviewed the record, is there anything that suggests that?

A. I have no idea what people --

MR. VESPER: Again, object.

THE COURT: All right. You got your answer. Let's go to the next question.

BY MR. HERMESMANN:

Q. Let's go back to the New Jersey sanitary code. You reviewed it, correct?

STAVES - CROSS - HERMESMANN

1  A.   Correct.

2  Q.   And it requires signage, correct?

3  A.   Correct.

4  Q.   And it requires certain language on signage, correct?

5  A.   Correct.

6  Q.   And in this particular case, the campground was inspected

7  by the Cape May County Department of Health about three weeks

8  before this incident, correct?

9  A.   That's what we were told.

10  Q.   Well, we saw documentation from it also, did we not?

11  A.   I didn't, but --

12  Q.   You didn't see it?

13  A.   No.  He didn't show it to me, but I understand that it

14  was inspected, yes.

15  Q.   Okay.  Your attorney didn't provide that to you?

16        MR. VESPER:  He understands it was inspected.

17        MR. HERMESMANN:  I'm asking him if he's seen the

18  document.

19        MR. VESPER:  No, no.

20        THE COURT:  He said no.  Once you get your answer, go

21  to your next question.  The jury understands it, they don't

22  need it three times.

23  BY MR. HERMESMANN:

24  Q.   A document indicated that they passed the inspection, is

25  that correct?

*United States District Court*
*Camden, New Jersey*

STAVES - CROSS - HERMESMANN

1   A.   Yes.

2   Q.   We talked a little bit about other bodies of water.  You

3   would agree at a campground a lake is different than a pool,

4   is that correct?

5   A.   Yes.

6   Q.   Different requirements --

7   A.   Yes.

8   Q.   -- as to a lake, compared to a pool, is that correct?

9   A.   Yes.

10  Q.   This particular campground, do you know how many guests

11  would be there on a Sunday evening?

12  A.   I have no idea how many were there.

13  Q.   Did you make any -- any inquiry relative to that?

14  A.   To me, it was immaterial.  They have 500-and-some sites

15  and they are open during the season, so if there's one guest

16  or a thousand guests, it's still open for business.

17  Q.   Okay.  So -- and what should be done relative to a

18  thousand guests, 10,000 guests or one guest being on ground,

19  same same all the time, is that correct, or incorrect?

20  A.   As far as employees being on duty, you would -- yes, it

21  makes no difference.

22  Q.   And as you've indicated, you've never even been to this

23  campground, is that correct?

24          THE COURT:  No, he's been to the campground.

25          THE WITNESS:  I stopped by the campground two days

STAVES – CROSS – HERMESMANN

1   ago.

2   BY MR. HERMESMANN:

3   Q.   And you never got past the gate.

4   A.   And I didn't bother -- I wasn't -- I just wanted to see

5   where it was physically located.

6   Q.   Okay.  And you never did, though, is that correct?  You

7   never got into the campground?

8   A.   Well, I walked in -- 20 feet in and talked to some people

9   that were there working.

10          THE COURT:  What -- this was yesterday, day before?

11          THE WITNESS:  Day before.

12          THE COURT:  Monday.

13          THE WITNESS:  Yeah, I was -- Monday I had time to

14   kill and so I thought, well, I'd like to go see it.

15          THE COURT:  I didn't have time to kill, I picked this

16   jury.

17          MR. VESPER:  I didn't -- he wasn't suggesting you

18   should have driven to Cape May.

19          THE COURT:  I thought maybe I should have driven him.

20          MR. VESPER:  No.  No, he wasn't suggested that.

21          THE WITNESS:  I would have liked to have you with me.

22          THE COURT:  Although I would have liked to go to -- I

23   love Cape May.  I want to make it clear to everybody, I think

24   Cape May is a great place.

25          MR. VESPER:  I think we're all in the record of

STAVES - CROSS - HERMESMANN

**1**  agreeing with that, it's a great place.

**2**          THE COURT:  My wife and I go down and we rent, you

**3**  know, bed and breakfast places in Cape May.

**4**          THE WITNESS:  You don't stay at the campground?

**5**          THE COURT:  No, no, my wife went to Girl Scout camp

**6**  at the age of 10.  On the second day she prevailed on her

**7**  parents to take her home.  So that should explain --

**8**          THE WITNESS:  Now, does that --

**9**          THE COURT:  -- her commitment to camping.

**10**          THE WITNESS:  Now, does that mean you should be

**11**  disqualified from being the Judge?

**12**          THE COURT:  They'll have to make a motion.

**13**          (Laughter.)

**14**          THE WITNESS:  Excuse me, Judge.

**15**          THE COURT:  Go ahead.

**16**  BY MR. HERMESMANN:

**17**  Q.   Sir, I believe you testified that it's the best practices

**18**  for bodies of water at any campground to be lighted, is that

**19**  correct?

**20**  A.   Yes.

**21**  Q.   So if you have a --

**22**          THE COURT:  In 24 hours lighted?

**23**          THE WITNESS:  From dusk to dawn.

**24**          THE COURT:  Well, yeah, I mean, when it's dark out.

**25**          THE WITNESS:  Yeah.

*United States District Court*
*Camden, New Jersey*

STAVES – CROSS – HERMESMANN

1  BY MR. HERMESMANN:

2  Q.   Okay.  So if you had a campground with a –– with a stream

3  that might be a couple feet deep, you should light that,

4  correct?

5  A.   Yes.

6  Q.   If you have any type of lake, you should light that,

7  correct?

8  A.   Yep.

9  Q.   And any type of water, no matter what it might be, it's

10  your belief, that you've testified, that these campgrounds

11  across the country, best practices is just to light them up at

12  all times, is that correct?

13  A.   Correct.

14  Q.   Did you ever think for a moment that lighting up a body

15  of water might be an attraction to people, to make them think,

16  hey, it's lit up, we should swim here?

17  A.   That subject has been debated back and forth, but the

18  consensus of most people in the industry is that light deters

19  people from coming rather than attracting.

20  Q.   And you say "people in the industry," there's no treatise

21  on this, correct?

22  A.   Right.

23  Q.   No textbook, correct?

24       THE COURT:  It's debated, though?  There are people

25  who are ––

STAVES – CROSS – HERMESMANN

1          THE WITNESS:  It gets discussed in workshops and

2    sessions and –– as I said earlier, the campground industry is

3    very open to talk to each other at all of these conventions

4    and meetings, and it's the subject that gets kicked around

5    quite a bit.

6    BY MR. HERMESMANN:

7    Q.   You don't think it's a good idea, though, do you?

8    A.   Yeah, my –– my pond is lit 24/7.

9    Q.   Do you remember testifying yesterday that you didn't

10   think lighting was good?

11   A.   What?

12   Q.   You don't recall that?

13   A.   Testify ––

14   Q.   That hearing we had yesterday?

15   A.   I didn't testify that lighting –– what?

16   Q.   You don't recall it?

17          MR. VESPER:  That wasn't the testimony.  I object.

18   He's misstating the testimony.

19          THE COURT:  Well ––

20          MR. HERMESMANN:  I don't believe I am.

21          THE COURT:  He said he didn't testify to that.

22          MR. HERMESMANN:  Okay, that's fine.

23          THE COURT:  Go to the next question.

24   BY MR. HERMESMANN:

25   Q.   Sir, you said that roving patrol, amongst other things,

STAVES - CROSS - HERMESMANN

1   would be a deterrent, correct?

2   A.    Correct.

3   Q.    When did John Toribio come down to the lake prior to this

4   incident?

5          THE COURT:  When you say "when," do you mean time?

6          MR. HERMESMANN:  What day.

7          THE COURT:  Oh, what day.

8          THE WITNESS:  What day he came to the lake?

9   BY MR. HERMESMANN:

10  Q.   Yes, sir.  What day did he come to the lake?  What day

11  did he come to --

12  A.   I don't remember that being in anybody's deposition.

13  Q.   You don't recall there being --

14         THE COURT:  He doesn't recall.  Go to the next

15  question.

16         MR. HERMESMANN:  I'm trying to refresh --

17         THE COURT:  He doesn't know.

18         MR. HERMESMANN:  Judge, I'm going to try to refresh

19  his memory, which I have the right to do.

20         THE COURT:  Okay, then, what are you going to refresh

21  his memory with?

22         MR. HERMESMANN:  I can refresh it with the deposition

23  transcript --

24         THE COURT:  Well, do it.

25         MR. HERMESMANN:  -- but I'm going to ask the question

STAVES – CROSS – HERMESMANN

1    first.

2             THE COURT:  Go ahead and do it.

3             MR. VESPER:  No objection.

4    BY MR. HERMESMANN:

5    Q.   Do you have a recollection that they came to the

6    campground on Friday before this Sunday incident?

7    A.   Yes, to the campground, but I don't know if he went to

8    the lake, which was your question.

9    Q.   No, I rephrased it to say the campground.

10   A.   I mean, you asked me before whether --

11            THE COURT:  All right.  Let's not argue.

12            THE WITNESS:  Well, I'm just trying to be precise

13   with the question.

14            MR. HERMESMANN:  Okay.  So -- and that's -- that's

15   why I'm re-asking the question.

16            THE WITNESS:  I mean, I have no idea when he went to

17   the lake.  But yes, he went -- they came in a couple days

18   ahead to the campground.

19   BY MR. HERMESMANN:

20   Q.   He came in on a Friday, correct?

21   A.   Yeah.

22   Q.   And this incident occurred on a Sunday, correct?

23   A.   Mm-hmm.  Yes.

24   Q.   And do you know -- do you know whether or not, on either

25   Friday or Saturday, John was out and about in the -- on the

STAVES – CROSS – HERMESMANN

1  campground after -- after dark or at any other time?

2  A.   I'm sure he was out and about the campground, yes.

3  Q.   And do you have any testimony to support that?

4  A.   What?

5  Q.   You're assuming --

6  A.   I don't remember a specific case, but I know that the --

7  through their testimony, the depositions and stuff, that the

8  young people were out playing basketball and other activities

9  on the park.

10  Q.   As to a roving patrol being a deterrent, not generally at

11  campgrounds across the nation, but applied to the facts of

12  this case, do you have any reason to believe that a boy who

13  had only been at the camp -- campground for three days, would

14  have somehow been deterred from going into this water, had

15  there been somebody on a golf cart somewhere in the park?

16  A.   I would have hoped that he would've been told it was

17  illegal for him to be swimming there.

18  Q.   Well, he was told that, wasn't he?  Wasn't he told not to

19  go in the water?

20  A.   Not by any staff members, as far as I know.

21  Q.   But he was told 20 times by Mrs. Miller, correct?

22  A.   You did everything your mother told you?

23       THE COURT:  Of course.

24       THE WITNESS:  I mean, he's a 14-year-old kid.

25       MR. VESPER:  You did, Your Honor?

STAVES – CROSS – HERMESMANN

1          THE COURT:  My mother was a New York City school

2   teacher.  When she spoke, you jumped.

3   BY MR. HERMESMANN:

4   Q.  So if he's not going to listen to his mother or an adult

5   telling him 20 times not to go in the water, do you have any

6   reason to believe that somebody driving around on a golf cart

7   somewhere within the park, for a boy who had been there three

8   days, do you have any reason to believe that that would deter

9   him from going in the water?

10  A.  Yes, I do.

11  Q.  You do.

12         THE COURT:  And, in fact, he's already testified to

13  that.

14         MR. HERMESMANN:  That's all I have for you, Mr.

15  Staves, thank you.

16         MR. VESPER:  I need to address something out of the

17  presence of the jury, because I think a door was opened.  I

18  don't know that -- I think this requires a little

19  consideration.  If we could just take a brief --

20         THE COURT:  All right.  Are you going to switch --

21  Karen, are you going to switch reporters now?

22         COURT REPORTER:  We can.

23         THE COURT:  Okay, let's break.

24         MR. VESPER:  Just need five minutes.

25         THE COURT:  Well, they'll make the switch.  I'll send

*United States District Court*
*Camden, New Jersey*

STAVES – CROSS – HERMESMANN

1  the jury out for 10 minutes or so, and we will take up

2  whenever you want to take up.

3          THE DEPUTY CLERK:  All rise.

4          (JURY EXITS; 9:23 a.m.)

5          THE COURT:  Okay.

6          MR. VESPER:  If I could address two things very

7  quickly.

8          THE COURT:  Go ahead.

9          MR. VESPER:  First I think counsel, respectfully, I

10  think he opened a door he didn't want to open when he asked,

11  he asked the question, you don't believe in lighting up the

12  swimming areas.  His testimony yesterday was he didn't believe

13  in surveillance cameras.  Now, you said I couldn't go into

14  that area, but I think the door has been opened.

15          THE COURT:  Door to what?  Doors open to what?

16          MR. VESPER:  The door is open for me to ask him the

17  question about surveillance cameras.  Here's my question.

18  What he doesn't believe in -- he does believe in lights.  He

19  personally, personally doesn't believe in surveillance

20  cameras, but to the majority --

21          THE COURT:  So, you want to ask him if he believes

22  there should have been surveillance cameras and have his

23  answer be no, I don't.

24          MR. VESPER:  No, that's not his answer.  Yesterday I

25  gave a bad example about the Republicans.  Let me give you a

STAVES – CROSS – HERMESMANN

1  better example.  He said yesterday that the majority of

2  campgrounds don't use surveillance.  However, within that

3  universe --

4          THE COURT:  Surveillance cameras.

5          MR. VESPER:  Surveillance cameras, yes.

6          THE COURT:  That's different than surveillance.

7          MR. VESPER:  It is.  I should say cameras.  So, the

8  majority of campgrounds in the United States and Canada don't

9  use surveillance cameras.  However, in the subset, in the

10  sub-universe of campgrounds that have swimming facilities, the

11  majority of them, that was his testimony, the majority of them

12  do use it.  He doesn't believe in it, but the majority of

13  campgrounds do use it.

14          THE COURT:  On lakes?

15          MR. VESPER:  On any swimming --

16          THE COURT:  No, no, no.

17          THE WITNESS:  You're also misrepresenting.

18          MR. VESPER:  All right.

19          THE WITNESS:  What I said was first I don't believe

20  in surveillance cameras.

21          THE COURT:  I know.  That was very clear.

22          THE WITNESS:  I'm very clear.  Now, if a campground

23  elects to use surveillance cameras, then I feel very strongly

24  that they should use them every place where there's an

25  activity.

STAVES – CROSS – HERMESMANN

 1          MR. VESPER:  Because that's what the majority do that

 2   use surveillance cameras.

 3          THE WITNESS:  But you made the statement that the

 4   majority of the campgrounds use them in their swimming pools

 5   and that's not true.

 6          MR. VESPER:  All right.  Then I'll rephrase the

 7   question.  I think the door was open.  I think I should be

 8   allowed to ask him about once a campground decides to use

 9   surveillance cameras, that the majority of them do put them in

10   strategic areas, and that's --

11          THE COURT:  That's the majority that use them.  He

12   didn't say that a majority actually uses them.  He said the

13   majority don't.

14          MR. VESPER:  No, you're confusing the issue again.

15          THE COURT:  I'm not confusing the issue.  You're

16   confusing it because you want to confuse the jury.

17          MR. VESPER:  I'm not confusing the jury.  If the

18   majority of campgrounds don't use them, those that do, those

19   that decide to install them and install --

20          THE COURT:  What is that relevant to?

21          MR. VESPER:  It's relevant to best practices, your

22   Honor.

23          THE COURT:  It's not best practices if a majority

24   don't do it.

25          MR. VESPER:  It's the majority that decide to use it.

STAVES – CROSS – HERMESMANN

**1**        THE COURT:  So, if one campground decides to do it,

**2**  that becomes a best practice?

**3**        MR. VESPER:  It's not one in this case.  And you're

**4**  degrading his testimony.

**5**        THE COURT:  I'm not degrading his testimony.  It was

**6**  his testimony.

**7**        MR. VESPER:  If your Honor please.

**8**        THE COURT:  I hadn't even thought of it.

**9**        MR. HERMESMANN:  Judge, if I could be heard on this.

**10**  I didn't ask him a single question about surveillance.  So,

**11**  how it would possibly open the door, I don't know.

**12**        THE COURT:  I'm ruling that the door was not opened,

**13**  and he's -- there's no indication his expertise were to place

**14**  cameras.  His testimony is he doesn't believe in it.  That can

**15**  only confuse the jury, to have somebody say what best

**16**  practices is if they choose to do what he thinks they

**17**  shouldn't do.  That's a great expert opinion.

**18**        MR. VESPER:  Here's the great law, here's the great

**19**  law, and you're almost overlooking this, and I don't know how

**20**  else to say this.  You're overlooking the fact that the law

**21**  says you may not have a duty to install any surveillance

**22**  cameras, but when you do have a duty, you have to exercise it

**23**  reasonably.  You're not allowing me to develop with this

**24**  witness --

**25**        THE COURT:  No.

STAVES – CROSS – HERMESMANN

 1          MR. VESPER:  -- that the majority that do choose to

 2    use a surveillance camera --

 3          THE COURT:  He rendered a report that never mentioned

 4    surveillance cameras, never mentioned them once.  In our

 5    hearing, he said he doesn't believe in it.  If ever there was

 6    an issue that would confuse the jury, this is it.  I'm not

 7    allowing it.  I don't want to beat that horse anymore.  What's

 8    the second point?

 9          MR. VESPER:  The second point was that in my direct

10    examination and even during your cross-examination, you, in no

11    uncertain terms, sent a message to this jury that you dis --

12    you have discounted this witness.  I may as well not have

13    called him as a witness because of your conduct.  And I

14    even -- I said I object to your questions.  You asked

15    questions that if the defense attorney had asked them, I would

16    have said were off the wall, but with respect to your Honor,

17    there was no reason for you to cross-examine this witness.  He

18    had been qualified, and you went out of your way to almost

19    disgrace him to the jury.  I find that objectionable.  I'm not

20    moving for a mistrial, but I'm asking that -- well, how can

21    you unring that?  We've been seriously prejudiced.  The one

22    expert that I now have been able to call on liability you've

23    basically trashed.

24          THE COURT:  The one expert that I had very sound

25    grounds for barring altogether the report, and I said it

STAVES - CROSS - HERMESMANN

1    before, was a travesty.  It may be one thing if he identified

2    10 campgrounds that had very similar configurations as to what

3    they did.  This was all kind of -- I'd love the circuit to

4    look at that report, but I felt in a sense, because maybe he

5    was the only expert you had on that point, I'd let him in on

6    narrow grounds, and he's testified as to those grounds.

7            MR. VESPER:  I obeyed your Honor's ruling, but you

8    transferred to the jury your disrespect.

9            THE COURT:  What is your -- what is it you want me to

10   do?  I believe I was excessively generous to you letting you

11   put this witness on at all.

12           MR. VESPER:  You were, and I thanked your Honor, but

13   when the witness --

14           THE COURT:  And he wound up giving testimony that

15   nowhere appears in his report, nowhere.

16           MR. VESPER:  The testimony today?

17           THE COURT:  Yes.

18           MR. VESPER:  I totally disagree with that, and you're

19   misrepresenting.  His report absolutely dealt with lighting

20   and roving.

21           THE COURT:  You want to fight with me.

22           MR. VESPER:  No, I don't, but could you please --

23           THE COURT:  I understand you have an issue, but you

24   argue to a judge, you don't argue with a judge.

25           MR. VESPER:  I argue to.

*United States District Court*
*Camden, New Jersey*

STAVES – CROSS – HERMESMANN

**1**          THE COURT:  No, you're arguing with a judge.

**2**          MR. VESPER:  Then I will stop.

**3**          THE COURT:  What is it you want me to do?

**4**          MR. VESPER:  I don't know what you can do at this

**5**  point.

**6**          THE COURT:  You have to ask me to do something.

**7**          MR. VESPER:  I guess stop cross-examining our

**8**  witnesses or any witness.

**9**          THE COURT:  Oh, no.  You mean in the future not to

**10**  ask questions of your witnesses?  I refuse to commit myself to

**11**  that.

**12**          MR. VESPER:  Very well.

**13**          THE COURT:  What's the next thing you would like me

**14**  to do?

**15**          MR. VESPER:  That was just take a break.

**16**          THE COURT:  What?

**17**          MR. VESPER:  We were on break, so I was just saying

**18**  I'm finished.

**19**          THE COURT:  Do you have anything you want to add?

**20**          MR. HERMESMANN:  Judge, I just always like to take

**21**  the opportunity to make a head call if we're not going to have

**22**  another break soon.  That's my only request.  I don't know if

**23**  we're considering this the break.

**24**          MR. VESPER:  I have some redirect.

**25**          THE COURT:  You do have redirect?

STAVES – CROSS – HERMESMANN

1          MR. VESPER:  Yes.

2          THE COURT:  What we'll do is we'll take 10 more

3     minutes.  We'll go to 20 of 10.

4          MR. VESPER:  Thank you.

5          MR. HERMESMANN:  Thank you.

6          THE COURT:  And then we'll have whatever break you

7     deem sufficient, and then we'll continue with redirect.

8          MR. VESPER:  Redirect.

9          THE COURT:  Redirect of this witness.

10          THE DEPUTY COURT CLERK:  All rise.

11          (Recess at 9:32 a.m..)

12          (In open court at 9:43 a.m..)

13          THE DEPUTY COURT CLERK:  All rise.

14          THE COURT:  Counsel, you said you wanted to see me

15     before?

16          MR. HERMESMANN:  Just briefly, your Honor.  My

17     concern is the family members in the back, on this particular

18     instance, Mr. Staves making a comment, asking me a question

19     did I always listen to my mother, family members laugh.  They

20     certainly have a right to be here, but they just need to --

21          THE COURT:  Of course they have a right to be here.

22          MR. HERMESMANN:  They don't have a right, though, to

23     really make any noise, any gestures, any laughing, nothing.

24          MR. VESPER:  I didn't hear any laughter, but I'll

25     instruct them not to make any --

*United States District Court*
*Camden, New Jersey*

STAVES – CROSS – HERMESMANN

1         THE COURT:  The answer is, again, this is a big

2   group, I can't look at each one, but I have to say that on the

3   whole they seem to have conducted themselves very

4   appropriately.  Believe me, I remember I had a case with, back

5   in the '90s, with the former owner of the Eagles, and we had

6   people in the audience doing things they shouldn't be doing,

7   but the sense I got here is different.  Again, I can't say I

8   listen to every comment by every person, but I'm observing on

9   a continuous basis.

10        MR. VESPER:  After Betty had a little bit of an

11  emotional breakdown, we, both my co-counsel and I, instructed

12  all the members of the family, and we'll do it again today,

13  not to show any kind of emotion.

14        THE COURT:  Well, my sense -- I don't think -- things

15  happen.  The question do you always follow your mother, is

16  that a proper thing to say?  Everyone agrees it is not, but

17  things like that happen, and I don't -- I must say I did not

18  see any inappropriate conduct by what's called the family

19  grouping back there.  I didn't see it.

20        MR. HERMESMANN:  It is going to get tougher because

21  Mrs. Toribio is coming on the stand, and these folks, I don't

22  know what experience they have in court, but they certainly

23  haven't been instructed by the Court relative to appropriate

24  decorum, be quiet.

25        THE COURT:  But they've been -- they've, as far as I

STAVES – CROSS – HERMESMANN

1    can tell, that's all I can do, is give you my perception.

2           MR. VESPER:  I have no objection, if you want to tell

3    all the family before Betty testifies to -- whatever you want

4    to tell them.

5           THE COURT:  I think they have heard it from both of

6    you.

7           MR. VESPER:  They have.

8           THE COURT:  All I can say is I echo what both counsel

9    appear to agree to, is that we don't want any laughing,

10   crying, noise in front the jury.  But I want to make it clear,

11   for the two days that I've been here, I have not seen any

12   inappropriate conduct.

13          MR. VESPER:  Did you all hear that?

14          RESPONSE:  Yes.

15          THE COURT:  I haven't seen it.  So, I don't want them

16   to think, you know, we're doing this because we're critical of

17   what they've done because I'm not critical of what they've

18   done, and I thought that everyone has acted very

19   appropriately.  We did have that thing in the very, very

20   beginning, but even that was understandable, let me put it

21   that way, even if it's not appropriate, it was understandable.

22   I mean, it wasn't malicious, let me put it that way, in any

23   sense, or any form of trickery or anything like that.  It

24   seemed very genuine.  And so I want to proceed now with --

25   well, it is going to be the redirect of this witness, Mr.

STAVES – REDIRECT – VESPER

1  Staves.  Right?

2          MR. VESPER:  Yes.

3          THE COURT:  You're going to continue with the

4  redirect?

5          MR. VESPER:  Yes, your Honor.

6          THE COURT:  Let's get the jury out.

7          THE DEPUTY COURT CLERK:  All rise.

8          (Whereupon the jury entered the courtroom.)

9          THE COURT:  Okay.  Everybody please be seated.  I'll

10  allow Mr. Vesper to do redirect.

11          MR. VESPER:  Thank you, your Honor.

12  (REDIRECT EXAMINATION OF MR. STAVES BY MR. VESPER:)

13  Q.  Very briefly, I want to ask, counsel asked you about you

14  not referencing the NFPA codes for campgrounds.  You did put

15  that in your report, didn't you?

16  A.  Yes.

17  Q.  Why did you put it in your report?

18  A.  To convey the fact that there's national standards for

19  the construction of RV park campgrounds, but not for

20  operations.

21  Q.  In fact, it specifically says, while neither the State of

22  New Jersey nor the NFPA code for campgrounds and RV parks

23  contain any specific rules pertaining to the lighting of

24  common areas in RV parks, most RV parks, most RV parks in the

25  United States provide lighting throughout the park during the

STAVES – REDIRECT – VESPER

 1  night with full --

 2          MR. HERMESMANN:  Objection.

 3          THE COURT:  Now you're just reading his report, which

 4  you can't do.

 5          MR. VESPER:  May I ask him to read it?

 6          MR. HERMESMANN:  Same objection.

 7          THE COURT:  No.  He answered the question.  Did he

 8  put it in his report?  Yes, he did.

 9          MR. VESPER:  Can the jury hear the context in which

10  it was put in the report?

11          THE COURT:  No.

12          MR. VESPER:  No, all right.

13  BY MR. VESPER:

14  Q.  So, the question was asked about 14-year-olds that are

15  told repeatedly by their parents not to go in the water.  In

16  your experience in RV parks, do they follow those parental

17  instructions?

18          MR. HERMESMANN:  Objection.

19          THE COURT:  I'll let him answer it.

20          THE WITNESS:  Some do, some don't.

21  BY MR. VESPER:

22  Q.  Right.  And the question about the nautical or whatever

23  it was, nautical, maritime, agricultural sunset --

24          THE COURT:  No, the point was that even after the sun

25  goes below the horizon, there's still light.

STAVES - REDIRECT - VESPER

1          MR. VESPER:  That was the point, yes.

2          THE COURT:  Yes.  All right.  What's the question?

3          MR. VESPER:  Here's the question.

4   BY MR. VESPER:

5   Q.   Even if the light was bright at 7 o'clock at night, no

6   14-year-olds were allowed in that lake according to their

7   rules; isn't that true?

8   A.   Correct.

9   Q.   And you mentioned that -- so, that was their rule?

10  A.   Correct.

11  Q.   Regardless of what the sun was doing, no 14-year-old was

12  allowed in that lake unless accompanied by an adult?

13  A.   And there was --

14          THE COURT:  Supervised by an adult and the presence

15  of a management personnel.

16          THE WITNESS:  Yes.

17          THE COURT:  That's what he testified to.

18          THE WITNESS:  Because the state law required a

19  management owner or manager to be on premise.

20  BY MR. VESPER:

21  Q.   Okay.  And you testified that, in the cross-examination,

22  that there was no one on duty at the time of this drowning?

23          THE COURT:  After 7 o'clock, he said.

24          MR. VESPER:  I stand corrected.

25  BY MR. VESPER:

*United States District Court*
*Camden, New Jersey*

STAVES – REDIRECT – VESPER

1   Q.   You testified no one was on duty at 7 o'clock.

2          THE COURT:  After 7.

3          MR. VESPER:  After 7 in the evening.

4   BY MR. VESPER:

5   Q.   And there was one employee on duty, wasn't there?

6   A.   Yes.  There was an employee up at the front security

7   guardhouse, but I'm sure that his written job description did

8   not require him to leave that guardhouse.

9          THE COURT:  And he didn't have a view of where the

10   entry point was to the lake anyhow.

11          THE WITNESS:  He didn't have a view, right.

12   BY MR. VESPER:

13   Q.   Let me follow up on what the judge just asked.  From the

14   guardhouse, could he see the whale, or do you know?

15   A.   I don't think so.  I don't know for sure.

16   Q.   You don't know?  Okay.  And there was no -- he was not,

17   this is the gate attendant that's on duty 24 hours, he did not

18   have the responsibility to make sure anybody was in the pool

19   or the lake, did he?

20          THE COURT:  Or not in the pool or lake.

21          MR. VESPER:  I stand corrected.

22   BY MR. VESPER:

23   Q.   He did not have any responsibility, did he?

24   A.   I have no way of knowing what his job description was.

25   In most cases, the security guard is not allowed to leave the

STAVES – REDIRECT – VESPER

1    security gate, but I have no idea.

2    Q.   All right.  I don't know whether you gave your -- the

3    question was asked about why leaving the lights on would deter

4    children.

5    A.   It's been my experience from numerous campgrounds that

6    the people on a campground, if they know an area is going to

7    be full light all the time, 24 hours a day, it loses the --

8    it's a deterrent from people going there to do something that

9    they aren't supposed to do.

10   Q.   Right.

11            THE COURT:  And he's testified to this.

12            MR. VESPER:  Yes.

13            THE COURT:  Several times already.

14   BY MR. VESPER:

15   Q.   And the question was also asked about the roving patrols.

16   The question was asked about John was only there for the first

17   time, so John -- you don't know one way or another whether

18   John knew that there were patrols or not?

19   A.   No, but I'm sure his -- if there had been regular people

20   on duty, I'm sure the other people with John would have known

21   it.

22   Q.   Well, there was a 14-year-old girl that was her first

23   time, also.

24   A.   Right.

25   Q.   But his 14-year-old friend Anthony Dioscon --

STAVES − REDIRECT − VESPER

**1**          THE COURT:  Dioscon.

**2**          MR. VESPER:  Thank you.

**3** BY MR. VESPER:

**4** Q.  −− Anthony Dioscon had been there before.

**5** A.  Correct.

**6**          THE COURT:  Redirect should be something new.  You're

**7** just plowing up stuff he was very clear about.

**8** BY MR. VESPER:

**9** Q.  All right.  Final question with respect to the roving

**10** patrols, with respect to the, because the question was asked

**11** on cross, about the operational hours and the weekends and

**12** holidays that Pine Haven had their roving patrol rove, was

**13** that according to the best practices?  Let me −− can you name

**14** all of the campsites that you've been to?

**15** A.  No.

**16**          MR. HERMESMANN:  Objection.  Beyond the scope.

**17**          MR. VESPER:  I just wanted him to respond.

**18** BY MR. VESPER:

**19** Q.  But you have been, just so there's no mistake, to more

**20** than −− more than 50 percent −−

**21**          MR. HERMESMANN:  Judge, this is way beyond the scope.

**22**          MR. VESPER:  Your Honor raised the question, so I

**23** wanted to make sure that −−

**24**          THE COURT:  What question did I raise?  You're

**25** accusing me of all kinds of things I'm not doing.

STAVES – REDIRECT – VESPER

1          MR. VESPER:  I'm not accusing.  I'm just asking.

2   BY MR. VESPER:

3   Q.   You've been to more than 50 percent of the campgrounds in

4   the United States?

5   A.   Yes.

6   Q.   And those 50 percent, when they -- those -- what do most

7   of the campgrounds in the United States do during the summer

8   for weekends or the rest of the week?

9          MR. HERMESMANN:  As to what?

10          THE COURT:  As to what?

11          MR. VESPER:  As to roving patrols, I thought I said,

12   roving patrols.

13          THE COURT:  Okay.

14          MR. HERMESMANN:  Objection.

15          THE COURT:  He said maybe 10 times if they have

16   roving patrols, not necessarily just around the lake, but

17   around the property as a whole, he said that over and over and

18   over again.

19          MR. VESPER:  May I ask?

20   BY MR. VESPER:

21   Q.   Do they limit to just the weekends?

22   A.   No, they -- the majority of the campgrounds have staff

23   available on property 24 hours a day for the entire season

24   that they're open, day, weekends, weekdays, holidays.

25   Q.   In the business of the campground, is there any such

STAVES – RECROSS – HERMESMANN

1   thing as a weekend?

2   A.   That's when we're busy.

3   Q.   But is it limited to security to weekends?

4   A.   No.

5   Q.   Why?

6   A.   As I say, there's -- in virtually every campground I've

7   ever been to, there's staff present 24 hours a day the entire

8   season that they're open.

9          MR. VESPER:  No further questions.

10         THE COURT:  How many times does he have to say that?

11   The jury gets it after the 10th time.

12         MR. VESPER:  No further questions.

13         THE COURT:  Okay.  Any recross?

14         MR. HERMESMANN:  Yes, your Honor.  May I approach?

15         THE COURT:  Yes.  But don't block the jury's view.

16         MR. HERMESMANN:  I'll try not to.

17   (RECROSS EXAMINATION OF MR. STAVES BY MR. HERMESMANN:)

18   Q.   Your report, correct?

19   A.   Yes.  I thought that was not supposed to be presented.

20   Isn't that what the judge said?

21         THE COURT:  He's using it to cross-examine.  He's not

22   presenting it to the jury.

23         THE WITNESS:  I'm just asking.  I don't want to get

24   in trouble.

25   BY MR. HERMESMANN:

STAVES – RECROSS – HERMESMANN

1   Q.   I'm reading this, bottom of, I believe it's the second
2   page, maybe third page, as a best practice in the RV park
3   industry, most parks have a 10 p.m. quiet hour and also have
4   employees patrol the park after dusk until all the campers
5   have retired for the night.  That's what you put in your
6   report, correct?

7   A.   Yes.

8   Q.   And your report made no mention of a 24-hour patrol,
9   correct?

10   A.   Correct.

11   Q.   And your patrol -- your report made no mention of 24-hour
12   lighting, correct?

13   A.   I guess.

14   Q.   And you said the Pine Haven had a rule regarding
15   16-year-olds must be accompanied by an adult.  Do you remember
16   saying that?

17   A.   No, I said supervised.

18        THE COURT:  He did say supervised.

19   BY MR. HERMESMANN:

20   Q.   That's actually -- that's actually the New Jersey
21   Sanitary Code requirement; is that correct?

22   A.   Correct, yes.

23   Q.   And you're just following --

24   A.   But in their rules, they use the word "supervise."

25   Q.   They do?

STAVES – RECROSS – HERMESMANN

1    A.    And on the sign they use the word "accompany."

2    Q.    And the sign, the sign is based upon the code, correct?

3    A.    Correct.

4    Q.    And they're required by law to put that language on that

5    sign, correct?

6    A.    Correct.

7    Q.    And whatever language that they put into their rules and

8    regulations that people read and understand, they can put in

9    what they want, correct?

10   A.    Correct.

11            MR. HERMESMANN:  That's all I have, your Honor.

12            THE COURT:  And again, just to be fair, in fairness

13   to his position, your position is that after 7, there was not

14   a management person on grounds, and, therefore, it didn't even

15   make a difference whether there was a parent there or not?

16            THE WITNESS:  That's correct.  They could legally

17   swim.

18            THE COURT:  But at 6 in the evening, so long as a

19   parent was there, or a parent supervising, they would have

20   been allowed to swim?

21            THE WITNESS:  Right.

22            THE COURT:  So, the point was not so much the absence

23   of anything, except the absence of a management person?

24            THE WITNESS:  Correct.

25            THE COURT:  Okay.  That's been his testimony.

A. DIOSCON – DIRECT – CICCOTTA

**1**          MR. VESPER:  No further questions.

**2**          MR. HERMESMANN:  No further questions.

**3**          THE COURT:  Okay.  Thank you very much.

**4**          THE WITNESS:  Thank you.

**5**          (Witness excused.)

**6**          THE COURT:  You can call your next witness.

**7**          MR. CICCOTTA:  Your Honor, we call Anthony Dioscon.

**8**          THE COURT:  Anthony Dioscon, okay.

**9**          MR. CICCOTTA:  Yes.

**10**          THE DEPUTY COURT CLERK:  This way, please.  Please

**11** step up.  Please raise your right hand.

**12** (**ANTHONY DIOSCON,** HAVING BEEN DULY SWORN, TESTIFIED AS

**13** FOLLOWS:)

**14**          THE DEPUTY COURT CLERK:  Please state and spell your

**15** name for the record.

**16**          THE WITNESS:  Spell my name?

**17**          THE DEPUTY COURT CLERK:  Yes.

**18**          THE WITNESS:  A-N-T-H-O-N-Y, D-I-O-C-S-O-N.

**19**          THE DEPUTY COURT CLERK:  Please be seated.

**20**          MR. CICCOTTA:  Your Honor, may I exam?

**21**          THE COURT:  Yes, you may.

**22**          MR. CICCOTTA:  Thank you.

**23** (DIRECT EXAMINATION OF MR. DIOSCON BY MR. CICCOTTA:)

**24** Q.  Mr. Dioscon, how old are you presently?

**25** A.  I'm 18.

*United States District Court*
*Camden, New Jersey*

A. DIOSCON – DIRECT – CICCOTTA

1  Q.   The drowning incident that we're here for today happened

2  August of 2010.  So, at that time were you 14 years of age?

3  A.   Yes, sir.

4  Q.   Okay.  What was your relationship to John Toribio?

5  A.   We were best friends.

6  Q.   Okay.  Please, if you can, keep your voice up.

7       THE COURT:  Try to do the best you can.  Also there's

8  a mic there.  Bring it closer.

9       MR. CICCOTTA:  Thank you.

10 BY MR. CICCOTTA:

11 Q.   How long had you been best friends with John?

12 A.   We were friends since sixth grade, and I'd say that we

13 were best friends from about the end of seventh grade on to

14 the incident.

15 Q.   And in August of 2010, John was also 14 years of age?

16 A.   Yes, sir.

17 Q.   And were you in eighth grade together?

18 A.   We were going into eighth grade.

19 Q.   So, that September both of you would have been going into

20 eighth grade?

21 A.   Yes, sir.

22      THE COURT:  You were finished the seventh grade.  You

23 were heading into eighth?

24      THE WITNESS:  Yes, sir.

25 BY MR. CICCOTTA:

A. DIOSCON – DIRECT – CICCOTTA

1    Q.   Okay.  And prior to that weekend when you went down to

2    Pine Haven with your family and John, can you give the jury a

3    sense as best friends what kind of activities you and John

4    over the previous couple of years had been engaged in

5    together?

6            MR. HERMESMANN:  I just object to relevance.

7            THE WITNESS:  We would walk --

8            THE COURT:  I'm going to allow it for just a little

9    background, but let's stick to what the facts are, but you can

10   answer the question.

11           THE WITNESS:  When we would walk home from school,

12   even though we had trans passes, just to hang out.  We'd play

13   football, basketball.  We'd take walks down Tookany Creek,

14   play basketball down there.  We'd run around and just stay

15   active, everything.

16   BY MR. CICCOTTA:

17   Q.   So, at that time you were living in Philadelphia?

18   A.   Yes, sir.

19   Q.   And John and his family lived close by, nearby?

20   A.   Yes, sir.

21   Q.   Both in rowhomes in Northeast Philadelphia?

22   A.   Yes, sir.

23   Q.   Okay.

24           THE COURT:  And you were both in the same school?

25           THE WITNESS:  Yes, sir.

A. DIOSCON – DIRECT – CICCOTTA

1    BY MR. CICCOTTA:

2    Q.   Did you play rec football together?

3    A.   Yes, sir.

4    Q.   What position did John play?

5    A.   He wasn't given a position yet.  We were still

6    practicing.

7    Q.   So, Mr. Dioscon, your mom is Heather, Heather Miller?

8    A.   Yes, sir.

9    Q.   And your stepdad is Tim Miller?

10   A.   Yes, sir.

11   Q.   So, in the summer of 2010, did your family, did your mom

12   and your stepdad, have a rental at the -- at a camp site at

13   Pine Haven?

14   A.   Yes, they did.

15   Q.   Had you ever camped as a family at Pine Haven prior to

16   that summer?

17   A.   Yes, sir -- oh, no, sir.

18        MR. HERMESMANN:  Your Honor, I ask that he not lead

19   him on every single question.  I know some of this is

20   background, but we're getting into the substance.

21        THE COURT:  No, at this point I'm overruling it -- up

22   to this point I'm overruling the objection.

23        MR. CICCOTTA:  Thank you, your Honor.

24   BY MR. CICCOTTA:

25   Q.   So, your family had not been down to Pine Haven as a

A. DIOSCON – DIRECT – CICCOTTA

 1  seasonal summer rental prior to that summer?

 2  A.   I'm not entirely sure.  We might have –– we may have

 3  started that summer or we may have had it the year before.

 4  Q.   Okay.  How many times, if you can estimate, how many

 5  times had you personally been at Pine Haven prior to that

 6  weekend when John passed away?

 7  A.   Like three or four times, maybe not even that.

 8  Q.   And on those prior visits, were you accompanied on any of

 9  those prior visits with John?

10  A.   No, sir.

11  Q.   Who would you have –– who did you go with on those prior

12  visits?

13  A.   I'd go by myself and one time my friend Jude came with

14  me.

15  Q.   Were you, on those visits, those prior visits, were you

16  always with your mom and your stepdad?

17  A.   Yes, sir.

18  Q.   And you have a younger sister, also?

19  A.   Yes, sir.

20  Q.   All right.  And in the summer of 2010, that was Sophia

21  and she was three years old at that time?

22  A.   Yes, sir.

23  Q.   And on those prior visits when you would go down with

24  your mom and your stepdad, would Sophia, your younger sister,

25  usually go with you?

A. DIOSCON – DIRECT – CICCOTTA

1   A.   Yes, sir.

2   Q.   All right.  During those days, those prior visits, the

3   three or four times you had been to Pine Haven prior to the

4   weekend when John passed away, did you have an opportunity

5   during those prior visits to kind of familiarize yourself with

6   the campground?

7   A.   Slightly.

8   Q.   Okay.  Did you -- were you familiar from those prior

9   visits with kind of the general set-up of the swimming lake

10  area?

11  A.   Yes, sir.

12  Q.   Yes?

13  A.   Yes, sir.

14  Q.   Okay.  We heard some testimony so far up to this point in

15  this case from Mr. Jordan and Mr. Scarpa about signs at the

16  lake and I have some questions for you about that.  Were you

17  in the courtroom yesterday when Mr. Jordan and Mr. Scarpa

18  testified?

19  A.   No, sir.

20  Q.   All right.  That entire summer of 2010, up to and

21  including the weekend when John passed away, did you see any

22  signs at all anywhere near the swimming lake?

23  A.   No, sir.

24  Q.   All right.  Did you find out after John had passed away

25  anything about signage anywhere near the swimming lake?

A. DIOSCON – DIRECT – CICCOTTA

1              MR. HERMESMANN:  Objection.

2              THE COURT:  What's your objection?

3              MR. HERMESMANN:  Did he find anything out after he

4    passed away?  I mean, his knowledge as to what he discovered

5    sometime following that is irrelevant.

6              THE COURT:  I agree with that.  I'm going to sustain

7    that objection.  What he learned later on after active

8    litigation is going on is a different story.

9              MR. CICCOTTA:  Well, I guess, your Honor, the

10   testimony in this case up to this point from Mr. Jordan and

11   Mr. Scarpa has been that signs were prominently displayed.

12             THE COURT:  Don't repeat.  The jury has heard their

13   testimony and will evaluate it.

14             MR. VESPER:  Can we approach, please?

15             THE COURT:  Come on.  Let's get to the --

16             MR. VESPER:  I ask this, this is an important

17   question, may we approach?

18             THE COURT:  All right.

19             (Sidebar.)

20             MR. CICCOTTA:  Your Honor, the defense's entire case

21   is satisfaction of the singular requirement in the sanitary

22   code regarding the signage.

23             THE COURT:  That's not their entire case.

24             MR. CICCOTTA:  Well, it's a significant part of it.

25             THE COURT:  They've got a significant comparative

1  negligence case.  Believe me, there's all kind of things.

2       MR. CICCOTTA:  And we're conceding that.

3       THE COURT:  What's the issue?

4       MR. CICCOTTA:  The issue here is this witness is

5  going to testify that there were no signs.

6       MR. HERMESMANN:  He just testified to that.

7       THE COURT:  I have no idea as to any objection, but

8  when you start asking what did he find out after the incident,

9  that's a different kettle of fish.

10      MR. CICCOTTA:  What he discovered after the drowning

11 was that there was one sign, but it was way back in the woods

12 covered by foliage, and Mr. Jordan himself needed to bring

13 this witness back there and show him here is the sign, but it

14 wasn't a prominently displayed sign, it wasn't the four signs

15 he testified to.

16      THE COURT:  I'm not going to allow him to testify

17 what he claims he saw after the incident.  That's my ruling.

18 You have witnesses here.  You can have other witnesses who can

19 testify -- he's already said he didn't see any signs.

20      MR. HERMESMANN:  Right.  That's the point they wanted

21 to make.  It's been known.

22      MR. CICCOTTA:  But why wouldn't you permit him to say

23 yes, there was one sign?

24      THE COURT:  Because the signs may have been moved.

25 Who knows what happened?

A. DIOSCON – DIRECT – CICCOTTA

1          MR. HERMESMANN:  His deposition testimony is this

2     occurred in 2012, two years after this incident.

3          MR. CICCOTTA:  That's when he saw the signs.  That's

4     when he saw the signs they're talking about.

5          THE COURT:  You're just going to have to accept it.

6     You and Vesper just don't accept my rulings.

7          MR. CICCOTTA:  I just wanted to add, this is not a

8     subsequent remedial issue anymore.

9          THE COURT:  I don't think it's a remedial issue.  I

10    think it's a question of him to testify what he claims he saw

11    two years later is irrelevant.

12         MR. HERMESMANN:  It is irrelevant.

13         MR. CICCOTTA:  May I ask if he saw the signs?

14         THE COURT:  Take me up on appeal.  Go ahead.

15         MR. CICCOTTA:  No, no.  May I ask him whether he saw

16    signs where they suggested signs were on the day of the

17    drowning?

18         MR. HERMESMANN:  He's already said he saw no signs.

19         THE COURT:  You can ask him about the day of the

20    drowning, what he saw then, or even the days before, the

21    weekend, the two days he was there on a Friday I think,

22    Friday, Saturday, three days he was there, or even a prior

23    visit before that.

24         MR. CICCOTTA:  Okay.

25         THE COURT:  But not afterwards.

A. DIOSCON – DIRECT – CICCOTTA

1          MR. HERMESMANN:  And here's my next point relative to

2     all this, Judge, is that the questions to date on this witness

3     have all been leading.  We're getting into the substance.  So,

4     the questions should not be did you see.  The questions should

5     be what did you see.  They need to be non-leading.

6          MR. CICCOTTA:  I can't say the word "sign?"

7          MR. HERMESMANN:  You can say "sign."  What signs did

8     you see if any.  That's the question, that's an appropriate

9     question.

10         MR. CICCOTTA:  This is background.  We're going to

11    get into substance now.  I won't be leading.

12         THE COURT:  And the issue is did he think it was

13    lawful, did he think it was unlawful, those kind of questions,

14    but what he thought two years later --

15         MR. HERMESMANN:  Right.  That's my objection.

16         MR. CICCOTTA:  It's what he saw two years later.

17         MR. HERMESMANN:  It doesn't matter if he saw

18    something two years later.  It's irrelevant.

19         THE COURT:  You're going to have to accept my ruling

20    that, I mean, there's enough grist for this mill of what

21    happened on this very day.

22         MR. CICCOTTA:  I understand.  I'll limit my questions

23    to what he saw or did not see prior to.

24         THE COURT:  What he knew of or what he knew or saw

25    and prior to 8/10 or whatever it was, that Sunday, August 8th.

*United States District Court*
*Camden, New Jersey*

A. DIOSCON – DIRECT – CICCOTTA

1      MR. CICCOTTA:  And that day.

2      THE COURT:  That's all grist for the mill.  What he

3  saw two years later or said he saw two years later is not

4  grist for the mill.

5      MR. CICCOTTA:  Got you.  Thank you, your Honor.

6      (End of sidebar.)

7      THE COURT:  You may continue, sir.

8      MR. CICCOTTA:  Thank you, your Honor.

9  BY MR. CICCOTTA:

10  Q.  Mr. Dioscon, I think you testified earlier that there

11  were a number of occasions prior to when John passed away when

12  you were up at the lake at Pine Haven with your parents and

13  some others, right?

14  A.  Yes, sir.

15  Q.  Okay.  On any of those prior occasions when you were at

16  Pine Haven, the prior occasions when you were at Pine Haven,

17  did you have an opportunity to take a look at the area around

18  the swimming lake?

19  A.  Like I said, slightly.

20  Q.  Okay.  On any of those prior --

21      THE COURT:  Before you go on, did you swim in the

22  lake prior to Sunday?

23      THE WITNESS:  No, sir.  I don't swim very often.

24      THE COURT:  So, that was the first time you had

25  actually put your toe in the water of that lake?

*United States District Court*
*Camden, New Jersey*

A. DIOSCON – DIRECT – CICCOTTA

1          THE WITNESS:  Yes, it was.

2    BY MR. CICCOTTA:

3    Q.   Okay.  And following up on what his Honor had asked, the

4    first time that you personally had ever been in the lake

5    swimming in the lake was August 8th of 2010?

6    A.   Yes, sir.

7    Q.   Okay.  Now, on those prior occasions, Mr. Dioscon, when

8    you had been at Pine Haven with your family and you did have

9    some opportunity to see the lake area, did you, on those prior

10   occasions, see any signs?

11   A.   No, sir.

12   Q.   All right.  On the day, let's say the weekend that John

13   passed away at Pine Haven, did you that weekend see any signs

14   anywhere near the swimming lake?

15   A.   No, sir.

16   Q.   On the day that John drowned and passed away, on that

17   very day when you did enter the lake --

18          MR. HERMESMANN:  Objection.  Leading.

19          THE COURT:  Well, I want to hear the rest of the

20   question.

21   BY MR. CICCOTTA:

22   Q.   On the day that John passed away, the day that you

23   actually were in the water, on that day did you see any signs

24   anywhere in the area of the lake?

25   A.   No, sir.  I never seen any signs until --

*United States District Court*
*Camden, New Jersey*

A. DIOSCON – DIRECT – CICCOTTA

1              THE COURT:  No, no, no.  The day you were there, you

2    didn't see any?

3              THE WITNESS:  No, sir.

4              THE COURT:  Okay.

5    BY MR. CICCOTTA:

6    Q.   Okay.  Did you have a sense, Mr. Dioscon, that there was

7    a rule, not a rule that you had heard from a family member,

8    your mom, your stepdad, but a rule at the park, a rule at the

9    resort that prohibited you from entering the water without a

10   supervising parent?

11             MR. HERMESMANN:  Objection, your Honor.  The question

12   does he have a sense?  The question is what did you know.

13   It's an improper question.

14             THE COURT:  I'm going to allow it.  Go ahead.

15             THE WITNESS:  What was the question again?

16   BY MR. CICCOTTA:

17   Q.   Yes, did you know or were you aware of any rule --

18             THE COURT:  Let me put it this way, did you believe

19   on August 8th at eight o'clock in the evening that there was a

20   rule barring you from entering the water under the

21   circumstances in which you entered it?

22             THE WITNESS:  No, sir.

23             THE COURT:  You thought -- did you think it was

24   lawful, when I say lawful, consistent with the rules to go in

25   the lake at that point?

A. DIOSCON – DIRECT – CICCOTTA

1           THE WITNESS:  Meaning that it's okay?

2           THE COURT:  It's okay.  Did you think it was okay,

3    that you weren't violating anybody's rules?

4           THE WITNESS:  Yes, sir.

5    BY MR. CICCOTTA:

6    Q.   And by that, Anthony, by that, Mr. Dioscon, I mean, were

7    you aware of any camp resort rules that indicated that you

8    should not be swimming in the lake without parents at any

9    time?

10   A.   No, sir.

11   Q.   And prior to the day of the drowning, you did not see any

12   signage anywhere in the area of the swimming lake that would

13   indicate that to you, that there was a prohibition on swimming

14   without parents in the lake at your age, 14?

15   A.   No, sir.

16          THE COURT:  Did your parents and stepdad talk to you

17   about swimming in the lake without parents present?

18          THE WITNESS:  Yes, sir.

19          MR. CICCOTTA:  I will be getting into that.

20          THE COURT:  And what did they say?

21          THE WITNESS:  They just told us not to go swimming

22   without them.

23   BY MR. CICCOTTA:

24   Q.   On the prior occasions when you were at Pine Haven with

25   your family but not the weekend when you were there with John,

A. DIOSCON – DIRECT – CICCOTTA

1  did you yourself personally see children, teens under the age

2  of 16 swimming in the lake without parents?

3  A.   Yes, sir.

4  Q.   How often did you actually observe that yourself,

5  children swimming in the lake without parents?

6  A.   Every single day.

7  Q.   Now, his Honor had raised a question and raised a point

8  about your mom, Heather Miller, and some of her warnings.

9  When you went down as a family that weekend, when did you

10  actually go down to Pine Haven?  The drowning happened on the

11  Sunday, Sunday the 8th, but when did the family go down?

12  A.   Thursday or Friday.

13  Q.   Okay.  At some point when you were either on your way or

14  you got down to the lake, did your mom lay out some rules for

15  you and for John as to what her expected behavior was from you

16  that weekend?

17  A.   To be home by curfew and just don't do anything stupid.

18  Q.   Okay.  Did she give you, Mr. Dioscon, did she give you

19  any specific warnings about water and about staying out of

20  water?

21  A.   Yes, sir.

22  Q.   And how often or how many times, if you can estimate, how

23  many times do you think your mom said to you don't go in the

24  water without us?

25  A.   Probably like two or three times.

A. DIOSCON – DIRECT – CICCOTTA

1   Q.   Okay.  Do you have any idea or did she express to you why

2   she was telling you, why she was giving you that rule?

3   A.   No, sir.  She was just telling us to be careful.

4   Q.   Okay.  Now, that weekend, Mr. Dioscon, had John himself

5   expressed to you an interest in swimming in the swimming lake?

6   A.   Yes, sir.

7            THE COURT:  The answer is yes?

8            THE WITNESS:  Yes, sir.

9   BY MR. CICCOTTA:

10  Q.   All right.  Were you quite as interested yourself in

11  swimming in the lake?

12  A.   No, sir.

13  Q.   You're not as much of a swimmer or you're not really

14  interested in swimming as much?

15  A.   Not that.  I just didn't want to swim in a lake.

16  Q.   Was there a reason?

17  A.   It's just there's a pool.

18  Q.   I'm sorry?

19  A.   There is also a pool.

20  Q.   Okay.  When the pool is open, okay.  So, did -- when you

21  first entered the resort, what was, in your view, from someone

22  actually going through the gates and entering the resort, what

23  was kind of the first thing you see or the first thing you

24  notice when you would drive into the resort?

25  A.   That there's a huge whale right on the center of the

A. DIOSCON – DIRECT – CICCOTTA

 1  lake.

 2  Q.   You don't have to get so close to the microphone.  A huge

 3  whale.  And I think you had said that, you had actually

 4  phrased it in such a way at your deposition that it's kind of

 5  the first thing that you --

 6       MR. HERMESMANN:  Your Honor, he is testifying.  Every

 7  single question has been leading.

 8       THE COURT:  Now you have to ask rather than leading.

 9       MR. CICCOTTA:  I'm sorry, your Honor, I'm sorry.

10  BY MR. CICCOTTA:

11  Q.   Can you describe the whale?

12  A.   Black and white.  It's on like a platform.  It has a

13  spigot of water that shoots water out of it, I guess it's some

14  sort of filter, and apparently it was chained up as well and

15  it would float through separate parts of the lake.  It wasn't

16  stationary.

17  Q.   So, during the times that you had been to the lake prior

18  to that weekend and that weekend before you went into the lake

19  yourself, did you see children playing on and near the whale?

20  A.   Yes, sir.  Kids were always trying to swim out to it.

21  Q.   Did you see them, when they would swim out to the whale

22  in the lake, did you see what they did with the whale or how

23  they interacted with it in the lake?

24  A.   People would jump off of it, and my last year there,

25  there was actually something --

A. DIOSCON - DIRECT - CICCOTTA

1        MR. HERMESMANN:  Objection, your Honor.  His last

2  year there is way after all this occurred.  It's got nothing

3  to do with nothing.

4  BY MR. CICCOTTA:

5  Q.  No, my question, Anthony, was prior, on those prior

6  visits and on the weekend that John passed away, did you see

7  children interacting with the whale?

8  A.  Yes, sir.

9  Q.  And on those occasions when you did see children

10  interacting with the whale in the lake, were they with or --

11  were they always with parents or were they sometimes without

12  parents?

13  A.  Sometimes without.

14  Q.  Okay.  The whale, does it have a feature -- we heard some

15  testimony yesterday about a feature of the whale, and I think

16  you had mentioned it, where water spouts out?

17  A.  Yes, sir.

18  Q.  So, can you give us an estimate how far it goes, what

19  kind of trajectory we're talking about?

20  A.  Like how high up?

21  Q.  Yeah.

22  A.  Possibly 10 feet.

23  Q.  Okay.  Can you feel, if you're just -- if you're not in

24  the water but you're just kind of on the beach area, can you

25  feel any sensation from the spouting of the whale?

A. DIOSCON – DIRECT – CICCOTTA

1   A.   Yes, sir.

2   Q.   What do you feel?

3   A.   Like mist.

4         THE COURT:  Even to the shore, it was close enough to

5   the shore?

6         THE WITNESS:  Yeah.

7   BY MR. CICCOTTA:

8   Q.   And it had that kind of trajectory --

9         THE COURT:  On August 8th when the three of you went

10  into the water, did either you or -- what was the other name?

11        MR. CICCOTTA:  Michelle.

12        THE COURT:  -- Michelle, stop or interact with the

13  whale in any way?

14        THE WITNESS:  No, sir.  We swam somewhat out to it.

15        THE COURT:  But you just went to the other shore.

16  You didn't stop at the whale, play with the whale or --

17        THE WITNESS:  No, sir.

18        THE COURT:  -- or interact some way with it?  You

19  just went straight to the other side?

20        THE WITNESS:  Yes, sir.

21  BY MR. CICCOTTA:

22  Q.   Did John express to you some interest in the whale?

23  A.   Before everything happened, he talked about swimming out

24  to it, and then we swam out to it a little bit, and then

25  that's when I turned around and realized that he wasn't there,

A. DIOSCON – DIRECT – CICCOTTA

1   and then I thought of --

2   Q.   We'll get into some of those details in a minute.  But

3   even before, well, before the day that he drowned, had John

4   mentioned the whale at all any other time that weekend?

5   A.   Yes, sir.

6   Q.   What did he say?

7   A.   I don't recall.

8   Q.   Okay.  Did he -- okay.  That's fine.  Do you recall in

9   the previous occasions when you were at the lake or that

10  weekend in particular if the whale had this spouting feature

11  both during the daytime and in the evening?

12  A.   Yes, sir.

13  Q.   And so did you make any observations on whether the whale

14  was spouting water into the air when it was dark out?

15  A.   Yes, sir.

16  Q.   Did you ever see on any occasion the whale not spouting

17  water?

18  A.   Yes, sir.

19  Q.   When?

20        THE COURT:  Did you say no?

21        THE WITNESS:  I said yes, sir.

22        MR. CICCOTTA:  He answered yes.

23        THE COURT:  I'm sorry.

24        MR. HERMESMANN:  I don't know if we're getting

25  into -- it should be limited up until the time of this

A. DIOSCON – DIRECT – CICCOTTA

1   incident.  It really has nothing to do with anything, but --

2          THE COURT:  Prior to the incident, had you seen the

3   whale turned off, the spout turned off?

4          THE WITNESS:  I don't believe so.

5          THE COURT:  That's what I thought he said.

6          MR. CICCOTTA:  Okay.

7   BY MR. CICCOTTA:

8   Q.  Okay.  Now, on the night that John passed away at Pine

9   Haven, August 8th of 2010, while you were there at the lake,

10  were you at some point that evening accompanied by your

11  stepfather, Tim Miller, and your sister Sophia?

12  A.  Yes, sir.

13  Q.  Okay.  When was that?

14  A.  Probably around 7, 7:30.

15  Q.  Okay.  And had you had dinner with the family that

16  evening?

17  A.  Yes, sir.

18  Q.  Okay.  And where did you have dinner that evening?

19  A.  In my campground.

20  Q.  Okay.  At the trailer?

21  A.  At the trailer, yeah.

22  Q.  The family's trailer?  And then after dinner, did you

23  have set plans for what you and John were going to do that

24  night?

25  A.  No, sir.  We just went out.

A. DIOSCON – DIRECT – CICCOTTA

1 Q.  Okay.  And when you went out, you went out where?

2 A.  Towards, towards the lake.  That's where most of the

3 activities happen.

4 Q.  Okay.  That's where most of the activities happen?

5 A.  Yes, sir.

6 Q.  In the evenings as well?

7 A.  Yes, sir.

8 Q.  And in that area, and the jury has gotten some sense of

9 this, but in that area where the lake is, what else is -- they

10 call that the up front area?  We've heard it called the up

11 front area of the park.  What else is up there in that area

12 around the lake?

13 A.  There is an arcade to the left.  There's a playground

14 right on the beach by the lake.  There's woods.  There's a

15 basketball court, had horseshoes, and the pool is a little bit

16 ahead, and then there's like the store and like the main hall,

17 I guess you would call it, where they do like karaoke and

18 whatnot.

19 Q.  Okay.  So, on that night after you had dinner and you

20 went up to this area where all the activities were and where

21 the lake was, during that time when you went up there, at any

22 point during that time up to the point where you went into the

23 lake, did you see any camp staff, management, a presence from

24 anybody from the camp?

25          MR. HERMESMANN:  Leading again.

A. DIOSCON – DIRECT – CICCOTTA

1            THE COURT:  No, it wasn't.  It could be yes or no.

2    It's not leading.

3            THE WITNESS:  No, sir.

4    BY MR. CICCOTTA:

5    Q.   I'm sorry?

6    A.   No, sir.

7    Q.   Okay.  When, prior to the incident, prior to John's

8    passing, when did you ever see camp management, camp staff,

9    anywhere in this area where people congregate?

10   A.   Usually not until the curfew period.

11   Q.   Which was what time?

12   A.   10 or 11, I believe.

13   Q.   Okay.  Now, when you were up there after dinner, where

14   did you go initially?  You mentioned all these areas where you

15   could hang out.  Where did you first go with John initially

16   after dinner?

17   A.   To the lake and the basketball court.

18   Q.   Okay.  And while you were there at the basketball courts,

19   did you meet anyone else?

20   A.   Yes, sir.

21   Q.   Who did you meet?

22   A.   There was a large group of other kids there, but they

23   were drinking and smoking and we weren't into that.  So, we

24   left and then we went to the park.

25   Q.   Okay.  So, where were these -- where were these kids

A. DIOSCON – DIRECT – CICCOTTA

1   drinking?

2   A.   At the basketball court.

3   Q.   And what were they drinking?

4   A.   Alcohol.

5          MR. HERMESMANN:  Objection as to relevance.

6          THE COURT:  I'm going to overrule it.  Go ahead.

7          MR. CICCOTTA:  Thank you.

8          THE COURT:  So, you didn't shoot baskets.  You

9   didn't, you and John did not shoot baskets?

10         THE WITNESS:  No, sir.

11  BY MR. CICCOTTA:

12  Q.   Were you involved in any way, shape or form with any of

13  the drinking that was going on at the basketball courts?

14  A.   No, sir.

15  Q.   When you did see that happening, when you saw the

16  drinking going on at the basketball courts, again, was there

17  any staff member, campground management, anybody from the camp

18  anywhere near what was going on?

19  A.   There was people inside the store, but they were not

20  outside.

21  Q.   Okay.  So, you got away, you didn't -- you got away from

22  the kids drinking and where did you go?

23  A.   To the playground out in front of the lake.

24  Q.   Okay.  So, where is that playground positioned with

25  regard to the lake?

A. DIOSCON - DIRECT - CICCOTTA

1   A.   If I'm the playground, the lake is right there.

2   Q.   You're pointing.

3   A.   Yeah.  To the --

4   Q.   Are you pointing to this podium?

5        THE COURT:  How far to the water's edge is the

6   playground?

7        THE WITNESS:  Probably like 15, 20 feet.

8   BY MR. CICCOTTA:

9   Q.   Okay.  All right.  So, who went to the playground?

10  A.   Me and John.

11  Q.   Anyone else?

12  A.   No.  That was all.

13  Q.   So, you had mentioned earlier that at some point your

14  stepdad came up, Tim Miller came up?

15  A.   Yeah, he was there when we arrived.

16  Q.   And he was there with your sister Sophia?

17  A.   Yes, sir.

18  Q.   All right.  Did you talk to your stepdad while you were

19  up there at the playground?

20  A.   Yeah, a little bit.

21  Q.   Did he tell you anything at that time about the water and

22  what his expectations were?

23  A.   I believe all he said was don't go swimming.

24  Q.   Okay.  All right.  Did you have -- were you prepared in

25  any way as far as your dress, as far as what you were wearing,

A. DIOSCON – DIRECT – CICCOTTA

1  that if you did go swimming, that you would –– you would be

2  able to get into the water?

3  A.  Yes, sir.

4  Q.  What were you wearing that enabled you to do that?

5  A.  Basketball shorts.

6         THE COURT:  Basketball shorts under some other dress?

7         THE WITNESS:  Yes, sir.

8         THE COURT:  Like cargo pants?

9         THE WITNESS:  Yes, sir.

10  BY MR. CICCOTTA:

11  Q.  All right.  So, you had mentioned Michelle Wheeler.  At

12  some point you met up with some girls?

13  A.  Yes, sir.

14  Q.  And had you ever met those girls before?

15  A.  I knew her –– I've known her cousin a couple weeks

16  before, she was like the first person I met down there, but

17  Michelle, that was her first night down there, and John was

18  talking to her.  He met her.

19  Q.  So, you had known, you met Michelle's cousin on some

20  previous visit?

21  A.  Yes, sir.

22  Q.  And was Michelle's cousin –– do you remember her name?

23  A.  Nikki.

24  Q.  Nicole, Nikki, okay.  And was her family, were they also

25  renting for that summer?

A. DIOSCON - DIRECT - CICCOTTA

1    A.   Yes, sir.

2    Q.   Okay.  And where did you meet these girls?

3    A.   By the lake.

4    Q.   Okay.  And struck up a conversation with them?

5    A.   Well, he did.  I was on the swings, just swinging, like

6    contemplating everything, and he was walking around the lake

7    with her.

8    Q.   Do you have a sense -- do you recall what, around what

9    time of day this was?

10   A.   7, 7:30.

11   Q.   Okay.  At some point did your stepdad leave the area?

12   A.   Yes, sir.

13   Q.   Took your little sister with him?

14   A.   Yes, sir.

15   Q.   So, when he left, who was left at the lake area?

16   A.   It was me, John and Michelle.

17   Q.   All right.  Were any of the other girls still around,

18   Nikki or any of the other girls that you saw that day?

19   A.   No, sir.  They were all at the basketball court.

20   Q.   Can you -- you gave us some sense of the distance between

21   the playground and the lake.  How far is the basketball court

22   from the lake, approximately?

23   A.   60, 70 feet.

24   Q.   Okay.  Is there anything, any kind of feature, anything

25   that separates the basketball courts from the beach and the

A. DIOSCON – DIRECT – CICCOTTA

1   lake?

2   A.   Yeah, the main road.

3   Q.   Okay.  And can you describe that road?  What kind of road

4   is that?

5   A.   It's asphalt, speed bumps.  Actually, yeah, the main road

6   is asphalt and then there's like branch-in roads that are

7   dirt, rocks.

8   Q.   Okay.  And that road, that asphalt road actually sits

9   between where the basketball courts are, where the beach and

10  the lake begin?

11  A.   Yes, sir.

12  Q.   Okay.  Who decided to go into the lake?  Who first came

13  up with the idea to go into the lake?

14  A.   I'm guessing it was John.

15  Q.   I don't want you to guess.  If you recall.

16  A.   John.

17  Q.   Okay.  And he proposed that all three of you go into the

18  lake at that point?

19  A.   That's why I said I guess because they must have been

20  talking about it and then he walked up to me and he asked do

21  you want to go swimming with us.

22  Q.   All right.  Who went into the lake first?

23  A.   I believe John.

24  Q.   All right.  Who next and then who next?

25  A.   Michelle and then myself.

*532*

A. DIOSCON – DIRECT – CICCOTTA

1  Q.  Okay.  All right.  Was Michelle wearing -- was she in a

2  bathing suit?

3  A.  Yes, sir.

4  Q.  Had you seen her in the lake at any point that day prior

5  to the time when you all went into the lake together?

6  A.  No, sir.

7  Q.  Now, you, as you had said earlier and his Honor was

8  asking you, you dropped the cargo shorts and you had your

9  basketball shorts on, right?

10  A.  Yes, sir.

11  Q.  So, where did you leave the cargo shorts?

12  A.  Right on the shore.

13  Q.  Okay.  When you entered the lake, were you the third

14  person into the lake?

15  A.  Yes, sir.

16  Q.  All right.  When you entered the lake, can you describe

17  for us what you experienced as you made your way in?

18       THE COURT:  Before you ask that, when the three of

19  you went in, was there anybody else in the lake?

20       THE WITNESS:  No, sir.

21       THE COURT:  So, you were the only three that you

22  were -- the three of you were the only three you observed

23  being in the lake at all at that time?

24       THE WITNESS:  Yes, sir.

25       THE COURT:  Okay.  I'm sorry.  Go ahead.

A. DIOSCON – DIRECT – CICCOTTA

1       MR. CICCOTTA:  Thank you, your Honor.

2  BY MR. CICCOTTA:

3  Q.  And along those lines, did you see anybody on the beach?

4  A.  No, sir.  It was clearing out.

5  Q.  And by clearing out, I guess were we getting around kind

6  of closing down?

7  A.  Yeah, it's like sundown.

8  Q.  All right.  Did you notice, while you were up there and

9  before you actually went into the water, that that was

10  actually happening, that things were closing down, that the

11  store was closing, that the arcade was closing, that things

12  were getting shut down?

13  A.  No, they don't shut down until a little later after

14  sundown.

15  Q.  Okay.  After sundown?

16  A.  Yes, sir.

17  Q.  All right.  So, now when you're at the lake and you're

18  starting to enter into the lake with the other kids, around

19  what time of day is this now?

20  A.  Probably 7:30, 8 o'clock.

21  Q.  Okay.  And at that point was there sunlight?

22  A.  Slight sunlight, yeah.  It was sundown.

23  Q.  There was sundown?

24  A.  Um-hmm, like, yeah.

25  Q.  All right.  So, when you personally first -- strike that.

A. DIOSCON – DIRECT – CICCOTTA

1      Before you yourself entered the lake and you saw

2  Michelle and John going into the lake, at that point before

3  you got in yourself, did it look like either one of them was

4  having any problems or issues in the lake?

5  A.   No, sir.

6  Q.   All right.  When you yourself personally stepped into the

7  lake, can you describe for us what you experienced as you

8  walked in?

9  A.   Yes, sir.  Well, it was sandy and I took a couple steps

10  out, probably like four to six feet, and there's a drop, like

11  you're still kind of on the beach and then it drops down, say,

12  yeah.

13  Q.   Okay.  So, can you give us a sense of -- can you describe

14  for us that drop, how deep it drops off from when you first

15  walk in?

16  A.   Yeah.  The drop --

17          MR. HERMESMANN:  Objection.  I just have an objection

18  as to relevance.

19          THE COURT:  I'm going to allow it.  Go ahead.

20          MR. CICCOTTA:  Thank you, your Honor.

21          THE WITNESS:  Yes, sir.  The drop is probably 10, 15

22  feet, because once the drop hits, you're not standing in the

23  water anymore.  I remember floating in the water, swimming.

24          MR. HERMESMANN:  Can I be heard at sidebar on this

25  issue?

A. DIOSCON – DIRECT – CICCOTTA

1          THE COURT:  No.  Let's go.  Keep questioning.

2          MR. CICCOTTA:  Thank you, your Honor.

3   BY MR. CICCOTTA:

4   Q.   So, do you remember describing that drop as a mountain?

5          MR. HERMESMANN:  Your Honor, I'm insisting to be

6   heard at sidebar.

7          THE COURT:  There's no issue in this case that the

8   drop had anything to do with anything.

9          MR. HERMESMANN:  It shouldn't even be testified to.

10  It doesn't have anything to do with anything.

11         MR. CICCOTTA:  Your Honor, it's the condition of the

12  land.

13         THE COURT:  He's answered the question.  Now go to

14  another question.

15         MR. CICCOTTA:  Your Honor, I just respectfully

16  disagree with your statement.

17         THE COURT:  Go to another question.

18         MR. CICCOTTA:  Okay.  Thank you.

19  BY MR. CICCOTTA:

20  Q.   Before you experienced that drop, did you expect it?

21  A.   No, sir.

22         MR. HERMESMANN:  Your Honor, he's continuing on

23  questions on the drop.

24         THE COURT:  What's your next question?

25  BY MR. CICCOTTA:

A. DIOSCON – DIRECT – CICCOTTA

1  Q.  Did you, before you experienced the drop, did you see any

2  kind of barriers or buoys or ropes or anything?

3       MR. HERMESMANN:  Your Honor, I insist on being heard

4  at sidebar on that issue.

5       THE COURT:  Stop it.  That's the end of this

6  discussion.  We now know it drops off.  There's never been a

7  shred of testimony in any discovery that there were buoys or

8  ropes or anything.

9       MR. CICCOTTA:  No, that's correct, but there's

10  certainly been testimony here today and in deposition of the

11  drop-off.

12       MR. HERMESMANN:  Your Honor, can I be heard?

13       THE COURT:  I know.  You've got it now.  The jury has

14  got it.  Everybody knows it drops down to about 15 feet deep.

15  We know that.  Now let's go to the next question.

16       MR. HERMESMANN:  Your Honor, I'd like to be heard.

17       THE COURT:  No.  Next question.

18       MR. CICCOTTA:  Thank you.

19       THE COURT:  And not on this subject.

20       MR. CICCOTTA:  I agree.  Thank you.

21  BY MR. CICCOTTA:

22  Q.  Mr. Dioscon, do you know how the lake, in terms of its

23  dimensions, how long the lake is, approximately?

24  A.  Probably 25, 30 feet.

25  Q.  Okay.  And by length, I mean -- is there a shape to the

A. DIOSCON - DIRECT - CICCOTTA

1    lake?  Is it circular, rectangular, is there some kind of

2    geometric shape?

3    A.   It's kind of oval-shaped.

4    Q.   Okay.  So, as far as that oval is concerned, long-ways,

5    as far as the length of the lake, how far would you say, if

6    you could give us an estimate of distance, how long would you

7    say the lake is long-ways?

8    A.   It's probably 25, 30 feet.

9    Q.   Okay.  And how about widthwise?

10           THE COURT:  I'm sorry.  How many?

11           THE WITNESS:  About 25, 30 feet.

12           THE COURT:  In the long dimension?

13           THE WITNESS:  I mean, I don't really know.

14           THE COURT:  Envision an oval.  It has a long axis

15   from end to end, and then a short axis going, let's say

16   north-south, up and down.  The long axis, how long was it?

17           THE WITNESS:  You know what, a guess, like a hundred

18   yards.  It's like the size of a football field.

19           MR. CICCOTTA:  Thank you.

20   BY MR. CICCOTTA:

21   Q.   And maybe, I'm sorry, Anthony, maybe I wasn't clear, the

22   dimension I was asking you about at least first was, this

23   oval, the length as his Honor had said, if you were to draw a

24   cross, the long area, so you're saying like a hundred?

25   A.   Um-hmm.

A. DIOSCON – DIRECT – CICCOTTA

1   Q.   A hundred feet?

2   A.   Yes, sir.

3   Q.   A hundred feet or hundred yards?

4   A.   Yes, sir.

5   Q.   How about widthwise, across the lake from the point where

6   you enter across the lake, how far would you estimate that

7   distance is?

8   A.   Probably 25, 30 feet, I'm guessing.

9          THE COURT:  This room is about 60 feet.

10         THE WITNESS:  All right.  Then I'll say 60 feet.

11         THE COURT:  Or 70 feet if you go from here to the

12   wall.  Compare it to that.

13         THE WITNESS:  60, 70 feet.

14         THE COURT:  About the same distance as the width of

15   this room?

16         THE WITNESS:  Yes, sir.

17   BY MR. CICCOTTA:

18   Q.   All right.  So, that's the distance from -- would that be

19   the distance -- is it your testimony that would be the

20   distance from where you entered to the point where you would

21   make your way across the width of the lake?

22   A.   Yes, sir.

23   Q.   Okay.  Can you describe for us, after you entered the

24   lake yourself, what happened after that?

25   A.   Excuse me?

539

A. DIOSCON – DIRECT – CICCOTTA

1  Q.   After you went into the lake, you had testified earlier

2  that John and Michelle were already in the lake, what did you

3  observe?

4  A.   Just playing around, splashing.  I mean, I was also

5  splashing around and we were just swimming.

6  Q.   Okay.  What happened next?

7  A.   John recommended swimming out further towards the whale,

8  like I stated earlier, and I began to swim and so did

9  Michelle, and we were just swimming out talking, and then I

10  turned around to see where John was, and he was splashing a

11  little bit.  I didn't really think too much of it because we

12  were just, you know what I mean, horse playing.

13       THE COURT:  Did he say anything?  In addition to

14  splashing, did you hear any words?

15       THE WITNESS:  No, sir.

16  BY MR. CICCOTTA:

17  Q.   Okay.  Before he was splashing around like that, you said

18  something earlier about, something about the whale.  Did he

19  say, while he was in the water, let's swim out to the whale?

20  A.   Yeah, right before we started swimming out, that's what

21  he said.

22  Q.   And where was the whale in relation to where you were

23  when you first entered the lake, about how far was it from

24  your entry point of the lake?

25  A.   Like --

*United States District Court*
*Camden, New Jersey*

A. DIOSCON - DIRECT - CICCOTTA

1  Q.   Again, as his Honor pointed out, this is like 60 or 70

2  feet.  How far --

3  A.   I'd say like 35, 40 feet.

4  Q.   Okay.  So, you had proceeded and there was a point where

5  you looked back and you saw John and he was making some kind

6  of a motion.  His Honor asked you, was he saying anything?

7  A.   No, sir.

8  Q.   All right.  What did you -- what kind of motion was he

9  making in the water?

10  A.   Splashing.

11  Q.   Did it look -- what did it look like to you, what was

12  happening to him as far as your observation?

13  A.   I thought, me personally, I thought he was like messing

14  around.

15  Q.   Okay.  Was that -- would that have been consistent with

16  his personality?

17  A.   Yes, sir.

18  Q.   All right.  Was he like a jokester, kind of like somebody

19  who would --

20  A.   Yeah, we played around a lot.

21  Q.   Okay.  All right.  Where were you and Michelle at the

22  point where you turned around and you saw him making these

23  motions?

24  A.   About like halfway towards the whale.

25  Q.   Okay.  All right.  Had you -- you had not yet reached the

A. DIOSCON - DIRECT - CICCOTTA

1  whale when you turned back and you saw him making these

2  motions?

3  A.   No, sir.

4  Q.   All right.  How much longer, after you saw John making

5  those motions, did you remain in the lake?

6  A.   Like three to five minutes.

7  Q.   Well, about three to five minutes?

8  A.   Three to five.

9        THE COURT:  And you swam to the other side?

10       THE WITNESS:  No, sir.  I started here, and then I

11  swam towards the right side because that's when I realized

12  that he wasn't in the water, so I got out of the water.

13  BY MR. CICCOTTA:

14  Q.   So, three to five minutes after you saw him making these

15  motions, you swam on some kind of an angle to exit, to exit

16  the lake?

17  A.   Yes, sir, the end of the oval.

18  Q.   Okay.  And where was Michelle?

19  A.   She was with me the whole time.

20  Q.   Did she exit the lake with you?

21  A.   Yes, sir.

22  Q.   All right.  Now, at this point, Mr. Dioscon, when you

23  exited the lake, what were the lighting conditions, natural

24  light, the sun at that point?

25  A.   Yeah, it was almost dark.

A. DIOSCON – DIRECT – CICCOTTA

1  Q.  Okay.  And were there any, that day, any previous day

2  when you were there that summer, did you notice if there were

3  any artificial lights anywhere near the lake?

4  A.  Besides on the road, no.

5  Q.  Okay.

6        THE COURT:  How long were you in the lake?

7        THE WITNESS:  For about 10 minutes.

8        THE COURT:  So, from the time you got in, in those 10

9  minutes it got dark?

10        THE WITNESS:  I said it was sundown by the time I was

11  getting into the water, yes, sir.

12        THE COURT:  So, in 10 minutes it went from light to

13  dark?

14        THE WITNESS:  Yes, sir.

15        MR. CICCOTTA:  Your Honor, I believe his testimony

16  was that it was getting dark, you know.

17        THE COURT:  I asked him a question, he answered it.

18        MR. CICCOTTA:  Okay.  Thank you.

19  BY MR. CICCOTTA:

20  Q.  So, I'm not sure you had answered the question.  So, at

21  any time either that day when John drowned or on any previous

22  days, did you ever see any kind of artificial lighting

23  anywhere in the area of the lake?

24  A.  No, sir, besides on the main road.

25  Q.  Besides on that road that you were describing earlier,

*United States District Court*
*Camden, New Jersey*

A. DIOSCON – DIRECT – CICCOTTA

1   the asphalt road?

2   A.   Yes, sir.

3   Q.   So, at night, at night at that time in the summer of

4   2010, what did the lake look like in terms of illumination at

5   night?

6   A.   What do you mean?

7   Q.   Yeah.  Were there any lights whatsoever on the lake at

8   nighttime?

9   A.   No, sir.

10  Q.   So, after you exited the lake with Michelle, did you see

11  John at that point at all?

12  A.   No, sir.  We were looking for him and she kept saying

13  maybe he got out and he's hiding.  So, I went over to the

14  coves.

15          MR. HERMESMANN:  Objection to any testimony beyond

16  the drowning.  It's irrelevant to what's at stake in this

17  case.

18          THE COURT:  I'm going to let him say what he -- you

19  looked for her, right?  Looked for him, excuse me, looked for

20  him?

21          THE WITNESS:  Yes, sir.

22          THE COURT:  And you didn't see him and you never

23  found him?

24          THE WITNESS:  No, sir.

25  BY MR. CICCOTTA:

A. DIOSCON – DIRECT – CICCOTTA

1  Q.   You never personally found him?

2  A.   No, sir.

3        THE COURT:  There's no dispute about the facts.

4        MR. CICCOTTA:  No.

5  BY MR. CICCOTTA:

6  Q.   Anthony, you had mentioned that John –– I think you

7  called him your best friend.

8        MR. CICCOTTA:  I'm just going to ask you just a few

9  questions, your Honor, if I might, about the decedent's

10 interests, hobbies, perhaps career plans which may go to ––

11       THE COURT:  What does his hobbies have to do with it?

12 Tell me what they could possibly have to do with this case.

13       MR. CICCOTTA:  It goes to damages, it goes to what

14 his potential career plans might have been, what his interests

15 were.

16       THE COURT:  You're going to talk about his hobbies?

17 Come on.

18       MR. CICCOTTA:  Well, hobbies in the sense of

19 interests, potential career plans, things of that nature.

20       MR. HERMESMANN:  Judge, completely improper.

21       MR. CICCOTTA:  It will be very limited.

22       THE COURT:  Ask the question.  Let me hear it.

23       MR. CICCOTTA:  Okay.

24 BY MR. CICCOTTA:

25 Q.   During the time that you spent with John during all those

A. DIOSCON – DIRECT – CICCOTTA

1   times that you had talked about, did he ever talk to you about

2   what he might like to do when he was an adult, what kind of

3   career plans he had?

4   A.   We were basically dreamers, and the main thing that we

5   talked about was just making music and writing -- we would

6   write and like recite our lyrics to each other and, yes, sir.

7          THE COURT:  You wanted to be a song writer and

8   musician?

9          THE WITNESS:  Yes, sir.

10         THE COURT:  Okay.

11         THE WITNESS:  That's my main remembrance of him, it's

12  what we always talked about.

13  BY MR. CICCOTTA:

14  Q.   Did John, did he write music or lyrics?

15  A.   Both.

16  Q.   Did he have any kind of training --

17         MR. HERMESMANN:  Your Honor, this goes beyond what's

18  permitted in this claim.  The question has been asked and

19  answered.

20         THE COURT:  What's your next question?

21         MR. CICCOTTA:  My question only was, your Honor,

22  whether he was more of a lyricist or whether he had --

23         THE COURT:  Was he more a lyricist or a music writer?

24         THE WITNESS:  I guess a lyricist.  He could have been

25  anything he wanted, that's what I believe.

A. DIOSCON – DIRECT – CICCOTTA

1          THE COURT:  What instrument did he play?

2          THE WITNESS:  He didn't play an instrument.  By

3    lyricist I assumed that you meant lyrics.

4          THE COURT:  So, he played no instrument, like a

5    guitar, a tuba?

6          THE WITNESS:  Not that I recall of.

7          THE COURT:  What?

8          THE WITNESS:  Not that I recall of.

9          THE COURT:  Did you play an instrument, too?

10          THE WITNESS:  No, sir.

11          THE COURT:  Neither of you played an instrument?

12          THE WITNESS:  No, sir.

13          THE COURT:  But he still talked about being a

14    musician?

15          THE WITNESS:  Yes, sir.

16          THE COURT:  Next question.

17    BY MR. CICCOTTA:

18    Q.  Did he write lyrics?

19    A.  Yes, sir.

20    Q.  Did he write poetry?

21    A.  Yes, sir.

22    Q.  During the time, Mr. Dioscon, when you were best friends

23    with John, did you have an opportunity to see him interacting

24    with his mom?

25    A.  Yes, sir.

A. DIOSCON - CROSS - HERMESMANN

1   Q.   Did you -- what did the relationship look like to you in

2   the times that you saw them interacting together?

3   A.   He definitely loved his mom and listened to her.

4           MR. HERMESMANN:  Objection.

5           THE WITNESS:  He was respectful.

6           THE COURT:  You're pushing as close as you can to

7   what you know is forbidden and trying not to cross the line.

8   All right.  He's answered the question.  He loved his mom.

9   That's not so unusual.  Next.

10          MR. CICCOTTA:  No, it's not.

11          THE COURT:  Next question.

12          MR. CICCOTTA:  That's it, your Honor.  That's all I

13  have.  Thank you.

14          THE COURT:  That's all you have in total?

15          MR. CICCOTTA:  Yes.

16          THE COURT:  Okay.  Cross-examine.

17          MR. HERMESMANN:  Thank you, your Honor.

18  (CROSS EXAMINATION OF MR. DIOSCON BY MR. HERMESMANN:)

19  Q.   Good morning, Anthony.

20  A.   Good morning.

21  Q.   Before you testified, did you have the opportunity to

22  speak with this attorney regarding the questions he was going

23  to ask you?

24  A.   No, sir.  We spoke, though.

25  Q.   You what?

*United States District Court*
*Camden, New Jersey*

A. DIOSCON - CROSS - HERMESMANN

1  A.   No, sir.  We did speak, though.

2  Q.   That's what I just asked you, did you speak?

3  A.   Yes, sir.  But you asked me if we spoke about the

4  questions that he was going to ask me.

5  Q.   You spoke about coming in here today?

6  A.   Yes, sir.

7  Q.   When this incident occurred, you were 14 years old,

8  correct?

9  A.   Yes, sir.

10 Q.   And John was 14, also?

11 A.   Yes, sir.

12 Q.   And I'm assuming that when you went down to the Pine

13 Haven Campground, you weren't inquiring of anybody on the

14 staff as to what the rules and regulations are.  Would that be

15 correct?

16 A.   Excuse me?

17 Q.   When you went to Pine Haven, you didn't ask the staff,

18 hey, what are the rules and regulations around here; would

19 that be a correct assumption?

20 A.   No, I never asked them the rules.

21 Q.   Okay.  You were there with your mother and your

22 stepfather, correct?

23 A.   Yes, sir.

24 Q.   And as far as rules and regulations, they were the

25 authority over you.  Would you concur with that?

A. DIOSCON - CROSS - HERMESMANN

1   A.   Yes, sir.

2   Q.   And you were going to do what they told you to do,

3   correct?

4   A.   Yes, sir.

5   Q.   As to the lake, I believe your words were that you were

6   slightly familiar with the area around the lake, correct?

7   A.   Yes, sir.

8   Q.   And you testified you had been down there, I think you

9   said three or four times before and then you said maybe two or

10  three.  Would that be correct?

11  A.   Yes, sir.

12  Q.   And you never even had gone into the lake and gone

13  swimming before this particular evening; is that correct?

14  A.   I never went swimming one time down there.

15  Q.   Okay.

16          THE COURT:  Not in the lake?

17          THE WITNESS:  Excuse me?

18          THE COURT:  What did you just say?

19          THE WITNESS:  I said that I never went swimming one

20  time down there.

21          THE COURT:  So, this was the first time you had been

22  in any body of water?

23          THE WITNESS:  Yes, sir.

24          THE COURT:  At Pine Haven?

25          THE WITNESS:  Yes, sir.

A. DIOSCON - CROSS - HERMESMANN

1           THE COURT:  Okay.

2    BY MR. HERMESMANN:

3    Q.   Now, you knew, though, from what your mother had told you

4    that you boys were not to go in the lake; is that correct?

5    A.   Yes, sir.

6    Q.   And John was present when your mother told both of you

7    not to go in the lake; is that correct?

8    A.   Yes, sir.

9    Q.   And as to when the incident occurred, when you went into

10   the lake, it was nowhere near dark; is that correct?

11   A.   I said it was sundown.

12           MR. HERMESMANN:  Your Honor, may I approach?

13           THE COURT:  Approach the witness?

14           MR. HERMESMANN:  Yes, sir.

15           THE COURT:  Yes, sure.  If you're going to refer to a

16   dep, give the page and lines.

17           MR. HERMESMANN:  I am.  It's Mr. Dioscon's

18   deposition, page 86.

19   BY MR. HERMESMANN:

20   Q.   Do you remember, it wasn't me, but another attorney asked

21   you some questions at a deposition where there was somebody

22   sitting just like this gentleman taking down everything

23   everybody said?

24   A.   Yes, sir.

25   Q.   And do you recall that was on October 15th, 2013?

A. DIOSCON - CROSS - HERMESMANN

1  A.   No, sir.

2  Q.   Does that sound about right, that it was a year and a

3  half ago or so?

4  A.   Yes, sir.

5  Q.   Let me read you part of what you said, and read along

6  with me.

7        Question:  "All right, all right.  Then at some point

8  in time your stepdad leaves, right, about 20 to 30 minutes

9  later, and at the time he leaves, how would you characterize

10 how light or how dark it was at that time?"

11       "It was still light."

12       "Okay.  Was it starting to get dark or --"

13       "It wasn't starting to get dark, but you could just

14 tell that it was getting around that time, but it wasn't

15 nowhere near dark still.  The sun was still up."

16       So, that's when your stepfather leaves, correct?

17 A.   Um-hmm.

18 Q.   Did I read that correctly?

19 A.   Yes, sir.

20 Q.   Moving on to page 91, the question continues:  "Okay.

21 And from that time your stepdad left until the time that John

22 went into the lake, do you know how much time passed?"

23       "Maybe five, 10 minutes."

24       "Was it still light out at the time that John went into

25 the lake?"

A. DIOSCON - CROSS - HERMESMANN

1    "Yes, sir."

2    "And then did Michelle go into the lake next?"

3    "Yes, sir."

4    Did I read that correctly?

5  A.  Yes, sir.

6  Q.  So, you went from at least where it was nowhere near dark

7  to five to 10 minutes later when they went in the lake, it's

8  still light; is that correct?

9  A.  Yes, sir.

10 Q.  And then final question, page 98, line 1:  "Okay, okay.

11 So, at the time that you got into the lake, was it still light

12 out?"

13    Answer:  "Yes, sir."

14    Did I read that correctly?

15 A.  Yes, sir.

16 Q.  Now, you were asked some questions about signs.

17 A.  Yes, sir.

18 Q.  You didn't need a sign to tell you you weren't supposed

19 to go in that lake.  You already knew that; is that correct?

20 A.  Yes, sir.

21 Q.  And you had mentioned a drop.

22 A.  Yes, sir.

23 Q.  The drop is right as you go into the water; is that

24 correct?

25 A.  A couple feet out, yes, sir.

A. DIOSCON - CROSS - HERMESMANN

1  Q.   All right.  So, if the wall -- you mentioned it was about

2  the length of this room, correct?

3  A.   Um-hmm.

4  Q.   So, by the time, if you entered by the wall, if you're at

5  where you are now, would the drop have already occurred?

6  A.   If not here, right the next step.

7  Q.   Okay.  And you saw John swimming beyond that point,

8  correct?

9  A.   Yes, sir.

10  Q.   And again, utilizing this room, where was it that you

11  last saw John when he was actually swimming without any

12  problem whatsoever?

13  A.   He was probably where I am now to right where the stands

14  are.

15  Q.   So, somewhere in-between there?

16  A.   Yes, sir.

17  Q.   And you're about halfway out, correct?

18  A.   About that.

19  Q.   That you noticed that he's struggling; is that correct?

20  A.   Yes, sir.

21  Q.   And you and Michelle were out ahead of him; is that

22  correct?

23  A.   Yes, sir.

24  Q.   And whatever you saw, you thought he was joking around,

25  correct?

A. DIOSCON - CROSS - HERMESMANN

1   A.   Yes, sir.

2   Q.   And Michelle Wheeler said something to you about that,

3   correct?

4   A.   Yes, sir.

5   Q.   And you told, you told her, oh, he's just joking around;

6   is that correct?

7   A.   Yes, sir.

8   Q.   And again, you all had met Michelle Wheeler about 30

9   minutes before you had entered the lake; is that correct?

10  A.   Yes, sir.

11  Q.   At any point -- strike that.

12       Would I also be correct that before your stepfather

13  left with your three-year-old sister, he told you not to go

14  into the lake?

15  A.   Yes, sir.

16  Q.   And do you recall giving a recorded statement to the

17  State Police following this incident?

18  A.   Yes, sir.

19  Q.   Do you remember telling them that Michelle wanted to swim

20  out to a green bucket or tub?

21  A.   No, sir.

22  Q.   Do you recall if you told them anything about wanting to

23  swim, anybody wanting to swim to the whale?

24  A.   I believe so.

25  Q.   In John's discussions with you, he wanted to be a rapper;

A. DIOSCON - CROSS - HERMESMANN

1   is that correct?

2   A.   Yes, sir.

3   Q.   And he wanted to move to Florida, correct?

4          THE COURT:  I'm sorry.  I didn't hear that.

5          MR. HERMESMANN:  He wanted to move to Florida.

6          THE COURT:  Oh.

7          THE WITNESS:  I don't know.

8   BY MR. HERMESMANN:

9   Q.   Did he tell you that?

10  A.   I don't recall.

11  Q.   I'm going to page 45 and 46.  Let's look at -- can you

12  see that okay?

13  A.   Uh-hmm.

14  Q.   Yes?

15  A.   Yes, sir.

16  Q.   Page 45: "All right.  Did John ever say to you what he

17  wanted to do with his life when he grew up?"

18         "Always told me he wanted to be a rapper.  He would

19  show me like lyrics, poetry he would write on his laptop."

20         Move forward.

21          THE COURT:  Keep your voice up, please.

22          MR. HERMESMANN:  I will.

23  BY MR. HERMESMANN:

24  Q.   "Are you able to estimate how many times he indicated to

25  you he wanted to be a rapper when he grew up?"

A. DIOSCON – CROSS – HERMESMANN

1         "Probably every day."

2         Moving down to 46, line 16:  "Did John ever say to you

3    that when he grew up he wanted to live with his mother?"

4         Answer:  "No, sir."

5         "Did John ever say to you when he grew up where he

6    wanted to live?"

7         "I think Florida."

8         "Why did he say he wanted to live in Florida?"

9         "It's nice and there's a lot of girls."

10        Did I read that correctly?

11   A.   Yes, sir.

12   Q.   Does that refresh your memory that he wanted to move down

13   to Florida?

14   A.   Not really, but it refreshed my memory of his love of

15   women.

16   Q.   And, in fact, he, from your perception, he was attracted

17   to Michelle Wheeler; is that right?

18   A.   Yes, sir.

19   Q.   And you actually thought when you were in the water that

20   he was a little jealous because you were ahead of him; would

21   that be correct?

22   A.   Yes, sir.

23   Q.   And you were interested in Michelle's cousin Nikki; is

24   that correct?

25   A.   Yes, sir.

A. DIOSCON - CROSS - HERMESMANN

1  Q.   And is it your recollection that Michelle ever suggested

2  let's go in the water?

3  A.   Not to me, because I was on the swings.

4  Q.   So, you don't know if Michelle said let's go in the water

5  or John said let's go in the water?

6  A.   No, but John asked me if I would go into the water with

7  him.

8  Q.   And you agreed to do so?

9  A.   Yes, sir.  At first I said no, and then he kept bugging

10  me, and I was, like, all right, I got -- I got you.

11  Q.   Do you recall at one point where you all got out into the

12  deeper end and you were treading water?

13  A.   Yes, sir.

14  Q.   And when you were all treading water together, how far

15  out were you?

16  A.   10, 15 feet.

17  Q.   And that was in an area above your head, correct?

18  A.   Yes, sir.

19  Q.   And how close is John to you at that point in time?

20  A.   Probably right where this desk is.

21  Q.   Okay.  So, you're all within an area between where you

22  are and the desk, correct?

23  A.   Yes, sir.

24  Q.   And you're all treading water together, correct?

25  A.   You mean swimming?

A. DIOSCON - CROSS - HERMESMANN

1  Q.  I mean treading -- do you know what treading water is?

2  A.  No, sir.

3  Q.  You never heard that expression?

4  A.  No, sir.

5  Q.  Do you know what it is to stay afloat, move your legs or

6  your arms without actually moving forward but keeping yourself

7  above water?

8  A.  You mean floating.

9  Q.  Did you ever hear of doing something other than floating,

10 which might be on your back or your stomach, but did you ever

11 hear of or ever have the phenomenon of keeping yourself in a

12 stationary position where you're moving your legs and your

13 arms but not going down?

14 A.  Yes, sir.

15 Q.  Did you know that was called treading water?

16 A.  No, sir, I didn't.

17 Q.  Had John been eating ice cream throughout the day?

18 A.  Yes, sir.

19       MR. HERMESMANN:  Thank you.  I have no further

20 questions.

21       THE WITNESS:  Thank you.

22       MR. VESPER:  I'm not going to ask questions.  May I

23 just --

24       MR. CICCOTTA:  Thank you, your Honor.  Your Honor,

25 may I approach the witness?

*United States District Court*
*Camden, New Jersey*

A. DIOSCON – REDIRECT – CICCOTTA

1          THE COURT:  Yes.

2          MR. CICCOTTA:  Thank you.

3  (REDIRECT EXAMINATION OF MR. DIOSCON BY MR. CICCOTTA:)

4  Q.   Mr. Dioscon, you had testified earlier that at the point

5  where you entered the lake, it was essentially sundown?

6  A.   Yes, sir.

7  Q.   All right.  And approximately how long would you say you

8  spent in the lake with John and Michelle the entire time?

9  A.   About 20 minutes in total.

10  Q.   Okay.

11          THE COURT:  20 minutes?

12          THE WITNESS:  Yes, sir.

13          THE COURT:  All right.

14  BY MR. CICCOTTA:

15  Q.   Okay.  And by the time you had spent your time in the

16  water and had seen what was happening with John and you got

17  out of the water, what were the lighting conditions at that

18  time, the natural lighting conditions?

19  A.   By the time I got out of the water?

20  Q.   Yeah.

21  A.   The sun was going down.

22  Q.   All right.  And Mr. Hermesmann had asked you some

23  questions about lighting and the conditions of the lighting.

24  Do you recall being in my office to give your deposition

25  however many years ago, October 15 of 2013?

A. DIOSCON – REDIRECT – CICCOTTA

1   A.   Yes, sir.

2   Q.   Okay.  And do you recall at that time the question was

3   asked to you not by Mr. Hermesmann but I think by someone

4   else --

5        MR. HERMESMANN:  Can we have a line reference,

6   please?

7        MR. CICCOTTA:  I'm sorry.  Page 56 -- I'm sorry.  No,

8   I apologize.  Oh, okay.  I'm sorry, page 105, line 7.

9        THE COURT:  All right.

10  BY MR. CICCOTTA:

11  Q.   Okay.  And you were asked the question by Mr.

12  Hermesmann's associate:  "Okay.  In terms of how light or dark

13  it was at the time you got out, was there still sunlight or

14  no?"

15       And your answer was:  "A little bit."

16  A.   Um-hmm.

17  Q.   Is that right?

18  A.   Yes, sir.

19  Q.   And that was your testimony at your deposition, right?

20  A.   Yes, sir.

21       THE COURT:  I don't want -- you can't try to

22  characterize what you just heard.

23       MR. CICCOTTA:  No, and I won't.

24  BY MR. CICCOTTA:

25  Q.   On those previous occasions, Mr. Dioscon, when you were

A. DIOSCON - REDIRECT - CICCOTTA

1  at the lake with your family, you had mentioned earlier that

2  you had an opportunity, some opportunity to see the lake at

3  different times.  Had you seen on those previous occasions the

4  lake at night?

5  A.   Yes, sir.

6  Q.   All right.  And on those previous occasions when you were

7  there at the park and you saw the lake at night, was it

8  illuminated, were there lights around it in any way, shape or

9  form?

10  A.   No, sir.

11  Q.   All right.  Did you see on those prior occasions if there

12  was any kind of motion detection type of lighting, like a

13  motion detector type of light anywhere near the lake on those

14  prior occasions?

15          THE COURT:  He saw no lights.  How could he see a

16  particular type of light?

17          MR. CICCOTTA:  Maybe I didn't ask that artfully.

18  BY MR. CICCOTTA:

19  Q.   There were no regular lights that you saw around the lake

20  at night.  Did you on any previous occasions notice that there

21  was any kind of motion detecting type lights around the lake?

22  A.   No, sir.

23          THE COURT:  Is there any dispute that there were

24  none?

25          MR. CICCOTTA:  No.

A. DIOSCON - REDIRECT - CICCOTTA

 1          THE COURT:  Isn't the testimony undisputed that there

 2   were no motion detectors?

 3          MR. CICCOTTA:  Yes.  I understand, your Honor.

 4          THE COURT:  Redirect is not to say what 10 other

 5   witnesses have already said.

 6          MR. CICCOTTA:  And I'm not going to cover old ground,

 7   your Honor.

 8   BY MR. CICCOTTA:

 9   Q.  Anthony, if there were lights around the lake, regularly

10   on around the lake, or if there were motion --

11          MR. HERMESMANN:  Objection, objection.

12          THE COURT:  Let him finish the question.  Don't

13   answer it until he finishes.

14   BY MR. CICCOTTA:

15   Q.  If there were lights regularly around the lake in the

16   evenings or if there were motion detection type of lights

17   around the lake in the evenings, would you have entered the

18   lake that day knowing that while you were in the lake --

19          MR. HERMESMANN:  Objection.

20          THE COURT:  Object to the question.  I sustain the

21   objection.  Asking him what he would have done if something

22   that didn't happen happened, I can predict the answer.

23          MR. CICCOTTA:  Okay.

24   BY MR. CICCOTTA:

25   Q.  Mr. Hermesmann had just asked you a little bit about --

A. DIOSCON – RECROSS – HERMESMANN

1  he asked you a few questions about signs and what you saw as

2  far as signs.

3         THE COURT:  He said he saw no signs.

4         MR. CICCOTTA:  I understand, your Honor.

5         THE COURT:  So, what possibly could there be to

6  redirect on that?  He said -- you saw no signs, did you, that

7  day?

8         THE WITNESS:  No, sir.

9         THE COURT:  Or even before that day, the two times

10 you had been there, you had not seen any signs, right?

11        THE WITNESS:  No, sir.

12        MR. CICCOTTA:  Okay.  We'll leave it at that.  Thank

13 you, your Honor.

14 BY MR. CICCOTTA:

15 Q.  Did you, Mr. Dioscon, see either Mr. Jordan or Mr. Scarpa

16 at the lake on the day that Anthony drowned at all, anywhere

17 near the lake on the day that Anthony drowned?

18 A.  Excuse me?

19 Q.  Either Mr. Jordan -- do you know Mr. Jordan and Mr.

20 Scarpa?  Mr. Jordan, the manager at the lake, do you know him?

21 A.  I don't think so.

22        MR. CICCOTTA:  Okay.  I'll withdraw it.  That's all I

23 have.  Thank you.

24        THE COURT:  Recross.

25 (RECROSS EXAMINATION OF MR. DIOSCON BY MR. HERMESMANN:)

A. DIOSCON – RECROSS – HERMESMANN

1  Q.  I believe you initially testified you were in the water

2  five to 10 minutes, and then I believe you just testified you

3  were in the water for 20 minutes.  I don't know if I misheard,

4  but I want you to tell us how long were you in the water.

5  A.  I guess 10 to 20 minutes.  It was four years ago.  Look,

6  you have to think that I've been trying to block that out of

7  my life.

8  Q.  I just asked you how long you remember being in the

9  water.

10  A.  15, 20 minutes I'm going to say.

11  Q.  And it took you to swim from that wall to me --

12  A.  I wasn't just swimming around.  I was hanging out as

13  well.  I'm hanging out with my friends in the water.  That's

14  all.

15          MR. HERMESMANN:  Thank you.

16          THE WITNESS:  Thank you.

17          MR. CICCOTTA:  That's all, your Honor.  Thank you.

18          THE COURT:  Is that all?  Okay.  Thank you very much,

19  Mr. Dioscon.

20          THE WITNESS:  Thank you.

21          THE COURT:  You can step down.

22          (Witness excused.)

23          THE COURT:  We're going to take a break.  Somebody

24  from the U.S. Attorney's Office wants to see me.  So, we'll go

25  to -- at 25 after 11 we'll resume promptly.

A. DIOSCON - RECROSS - HERMESMANN

1          THE DEPUTY COURT CLERK:  All rise.

2          (Whereupon the jury exited the courtroom.)

3          THE COURT:  Who is the next witness?

4          MR. CICCOTTA:  Heather Miller.

5          THE COURT:  So he knows.  And who is going to

6   present?  You're going to present?

7          MR. CICCOTTA:  Yes.

8          THE COURT:  Okay.

9          (Recess at 11:08 a.m..)

10         (In open court at 11:26 a.m..)

11         THE DEPUTY COURT CLERK:  All rise.

12         (Whereupon the jury entered the courtroom.)

13         THE COURT:  Everyone please be seated.  Counsel?

14         MR. CICCOTTA:  Yes, your Honor.  We'll call next

15  Heather Dioscon Miller.

16         THE DEPUTY COURT CLERK:  Good morning.  Please step

17  up.  Please raise your right hand.

18  (**HEATHER LEE DIOSCON-MILLER**, HAVING BEEN DULY SWORN, TESTIFIED

19  AS FOLLOWS:)

20         THE DEPUTY COURT CLERK:  Please state and spell your

21  name for the record.

22         THE WITNESS:  Heather Lee Dioscon-Miller,

23  H-E-A-T-H-E-R, L-E-E, D-I-O-C-S-O-N - M-I-L-L-E-R.

24         THE DEPUTY COURT CLERK:  Thanks.  You can be seated.

25         MR. CICCOTTA:  Your Honor, may I?

DIOSCON-MILLER – DIRECT – CICCOTTA

1          THE COURT:  Yes, you may, of course.

2          MR. CICCOTTA:  Thank you.

3  (DIRECT EXAMINATION OF MS. DIOSCON-MILLER BY MR. CICCOTTA:)

4  Q.  Ms. Miller, good morning.  Your son is Anthony Dioscon?

5  A.  Yes.

6  Q.  Okay.  And Anthony and John, we've established, were

7  friends?

8  A.  Yes.

9  Q.  Okay.  How would, from your point of view as a mom, how

10  would you describe their friendship?

11  A.  They were best friends.

12  Q.  All right.  Prior to the time that you and your husband

13  Tim brought the boys down to Pine Haven, did you have an

14  opportunity to observe the boys and their activities and the

15  things they did together as best friends?

16  A.  Yes.

17  Q.  What kind of things did you, and you don't have to go

18  into great detail, but what kinds of things did you observe

19  the boys doing in the year or two before they went down to

20  Pine Haven with you?

21  A.  Playing football, playing computer games, talking,

22  writing.

23  Q.  Did the boys spend time together at your home?

24  A.  Yes, they did.

25  Q.  And back in 2010, you were living in Philadelphia?

DIOSCON-MILLER – DIRECT – CICCOTTA

1   A.   Yes.

2   Q.   Do you still live -- do you still live at the same

3   location?

4   A.   Yes.

5   Q.   And approximately how far, how far was your home from

6   John's home, from the Toribio home?

7   A.   Less than a half a mile.

8   Q.   Could the boys walk to each other's houses?

9   A.   Yes.

10   Q.   All right.

11       THE COURT:  They went to the same school?

12       THE WITNESS:  Yes, that's correct.

13   BY MR. CICCOTTA:

14   Q.   And they were in the same grade?  They were in seventh

15   grade going into eighth?

16   A.   Yes.

17   Q.   Were they actually in the same class?

18   A.   I believe they were in some classes together.

19   Q.   Okay.  They actually had some classes, all right.  And in

20   the summer of 2010, both boys were 14?

21   A.   Correct.

22   Q.   And do you have any other children?

23   A.   Yes, I do.

24   Q.   How many other children?

25   A.   I have two other children that I bore myself.

DIOSCON-MILLER – DIRECT – CICCOTTA

1  Q.  Okay.  And Sophia is your daughter.  We heard about

2  Sophia.

3  A.  Yes.

4  Q.  All right.  She was three at the time of the Pine Haven

5  trip?

6  A.  Yes.

7  Q.  All right.  And so she's what, eight now?

8  A.  She's eight.

9  Q.  Okay.  As far as your son Anthony was concerned back then

10  in August of 2010, was he generally -- did he generally follow

11  your instructions if you told him to do something or not do

12  something?

13  A.  Yes.

14  Q.  And was he ever -- was he ever a discipline problem at

15  home or at school?

16  A.  No.

17  Q.  If there is such a thing as a typical 14-year-old boy,

18  would that describe Anthony?

19  A.  Yes.

20  Q.  John, so you saw John interacting with Anthony while they

21  were friends before the weekend when this event happened.

22  Was, from your observations, was John a generally respectful

23  and obedient young man?

24  A.  Yes.

25  Q.  All right.  Did you ever have an opportunity to tell him

DIOSCON—MILLER — DIRECT — CICCOTTA

1    to do something or not do something where he listened to you

2    or followed your instructions?

3    A.   Yes.

4    Q.   Okay.  Did you get, based on your observations, did you

5    believe that John was a young man who respected authority?

6    A.   Yes.

7    Q.   At your deposition, you described him as playful and

8    funny and respectful.  Is that the way you would describe

9    John?

10   A.   Yes, it is.

11   Q.   Before the weekend that you took the boys down to -- down

12   the shore to Pine Haven, did you have much of a relationship

13   with John's family?

14   A.   No.

15   Q.   Did you -- had you ever met or spoken to his mother

16   before the planning stage for that weekend?

17   A.   Not prior to the planning stage.

18   Q.   Okay.  When it was first suggested that there was going

19   to be this trip, who brought it up?  Who conceived of the idea

20   of going down the shore to Pine Haven?

21        MR. HERMESMANN:  Judge, I'm just going to object as

22   to relevance.  All of this leading up as to why they went, how

23   they got there, it has nothing to do with anything.

24        THE COURT:  I'm going to allow a limited amount of

25   background.

DIOSCON-MILLER – DIRECT – CICCOTTA

1          MR. CICCOTTA:  Thank you, your Honor.  It won't be

2   much more.

3   BY MR. CICCOTTA:

4   Q.   Who came up with the idea to take the boys down the

5   shore?

6   A.   I believe it was John and myself.

7   Q.   Okay.  Did you speak to his mother before taking the boys

8   down the shore?

9   A.   Yes, I did.

10  Q.   All right.  And when was that prior to leaving for the

11  shore, if you can recall?

12  A.   Well, I had spoken to his sister before the day that we

13  left, but I saw and spoke with his mother face-to-face the day

14  prior to leaving.

15  Q.   Okay.  So, we know the incident happened on a Sunday.

16  When did you leave to go down to Pine Haven?

17  A.   We left --

18  Q.   If you can recall.

19  A.   I don't really quite recall.  I know we were planning on

20  leaving one day and then we got held up due to work and other

21  obligations and we left the following day.  I do believe we

22  got there Friday, we got there Friday night.

23  Q.   Okay.  So, and before you left, you spoke to John's

24  sister, and that's Odalie?

25  A.   Yes.

DIOSCON-MILLER - DIRECT - CICCOTTA

1   Q.   Odalie Toribio.  And you spoke to Betania, Betty Toribio?

2   A.   Yes.

3   Q.   What did you and Betty, what did you say to each other

4   before the trip began?

5        MR. HERMESMANN:  Judge, objection again.  Relevance,

6   hearsay.

7        THE COURT:  I'm going to allow it.  Go ahead.

8        THE WITNESS:  Other than exchanging pleasantries and

9   introducing ourselves to one another, we were just discussing

10  what we would be doing for the weekend, and Betty was

11  concerned to make sure, you know, that everything would be

12  okay.

13  BY MR. CICCOTTA:

14  Q.   Did she -- was she hesitant or resistant about sending

15  her son to the shore with you?

16  A.   She seemed a little nervous.

17  Q.   Okay.  All right.  So, who chose Pine Haven as a place to

18  rent a camp site?  Was it you or your husband?

19       THE COURT:  You're beginning to get far afield now.

20       MR. CICCOTTA:  There's only a few questions and then

21  your Honor will see where I am.

22  BY MR. CICCOTTA:

23  Q.   Who chose Pine Haven as a camp resort?

24  A.   I do believe it was my daughter Sophia was the one who

25  chose Pine Haven.

DIOSCON-MILLER - DIRECT - CICCOTTA

1  Q.  Okay.  So, she was three, right?  So, were you the one

2  who did some research into picking a campground?

3  A.  Yes, I'm the one who did the research.

4  Q.  And you went on the Internet and you actually visited

5  Pine Haven?

6  A.  Correct.

7  Q.  All right.  And what was the main factor in your choice

8  to choose Pine Haven as opposed to another campground?

9  A.  The structured family activities.  It just seemed like it

10  was better organized --

11  Q.  Okay.  Than some of --

12  A.  -- than some of the other campgrounds that were -- you

13  know, that I was researching.  I liked the idea it was

14  marketed as a family friendly place.

15  Q.  Okay.  So, it was -- so, the marketing that it was family

16  friendly, children friendly?

17  A.  Correct.

18  Q.  Okay.  So, whether it was -- it was either Thursday or

19  Friday, you don't recall exactly when, when you took the trip

20  down?

21  A.  I believe we got there, we left Friday.

22  Q.  Okay.  So, let's be clear.  So, you went down, it was you

23  and your husband Tim, and Anthony, John and Sophia?

24  A.  Correct.

25  Q.  No one else?  That was your group?

DIOSCON—MILLER – DIRECT – CICCOTTA

1  A.   That was our group.

2  Q.   Okay.  So, when you, either on the way or when you

3  arrived at Pine Haven, did you yourself give the boys some

4  rules and instructions for what you expected from them that

5  weekend?

6  A.   I gave them rules continuously prior to leaving and then

7  through the duration of the weekend.

8  Q.   Okay.  What rules did you give them?

9  A.   To come home by curfew, to stay away from the water, and

10  they were basically –– they were the rules.

11  Q.   Okay.  So ––

12        THE COURT:  And curfew was 10 o'clock?

13        THE WITNESS:  I do believe so.

14  BY MR. CICCOTTA:

15  Q.   So, be back by 10 to the camp site and stay out of the

16  water?

17  A.   Right.

18  Q.   Stay out of ––

19  A.   Not to leave the campground.

20  Q.   And not to leave the campground, okay.

21  A.   Right.

22  Q.   Why was there a water warning from your perspective?  Why

23  did you warn them about the water?

24  A.   Well, I think that as a parent, you always warn your

25  children about being near open water.

DIOSCON-MILLER – DIRECT – CICCOTTA

1   Q.   Did you have, did you yourself have a particular concern

2   or fear about the swimming lake at Pine Haven so much so that

3   you would give them warnings about it?

4   A.   Well, yes.  I'm concerned about any -- any water, yes.

5   Q.   Okay.  And do you recall your deposition that we took in

6   my office back in 2013?

7           THE COURT:  What, are you impeaching her?

8           MR. CICCOTTA:  No, no.

9           THE COURT:  Well, don't be -- just ask her questions.

10          MR. CICCOTTA:  Okay.

11  BY MR. CICCOTTA:

12  Q.   So, can you estimate for us how many times you might have

13  told them not to go in the water?

14  A.   At least two dozen.

15  Q.   Two dozens times, okay.

16  A.   Or more.

17  Q.   Were you -- were you hyper-concerned about the water?

18  A.   Yes.

19  Q.   All right.  Did you -- what role, if any, did your

20  husband Tim play in also warning the boys about water, you

21  know, going into the water?

22  A.   I think my husband just, he tells children to follow my

23  rules.

24  Q.   Okay.  So, he just made sure they knew to follow what you

25  were telling them?

DIOSCON-MILLER - DIRECT - CICCOTTA

1          THE COURT:  He supported you, in other words?

2          THE WITNESS:  Absolutely, as he should.

3          MR. CICCOTTA:  As he should.

4          THE COURT:  I've had -- I've had 53 years of

5     experience, and I met my wife 61 years ago on the first day of

6     the sixth grade.  I know what it's like to be ordered about.

7     BY MR. CICCOTTA:

8     Q.   So, whether you were going Thursday or Friday, I actually

9     think your testimony was that you went down on Friday, but

10    let's get to, you got there late one night.  Now, let's focus

11    on Saturday, that's Saturday, the 7th of August.  Do you

12    remember what you did that day or what the family was doing on

13    Saturday, the day before the incident occurred?

14    A.   Saturday, we got up early and we went to the beach.

15    Q.   Okay.  Which beach?  Was it Sea Isle?

16    A.   Sea Isle.

17         THE COURT:  Not the beach at the resort, but a beach

18    elsewhere?

19         THE WITNESS:  Yes, a beach on the island, the actual

20    island of Sea Isle.

21    BY MR. CICCOTTA:

22    Q.   So, you left the camping resort and you went to Sea Isle

23    City's beach?

24    A.   Yes.

25         THE COURT:  And that's the Atlantic coast?

*United States District Court*
*Camden, New Jersey*

DIOSCON-MILLER – DIRECT – CICCOTTA

1          THE WITNESS:  Yes.

2    BY MR. CICCOTTA:

3    Q.  And was it your intention that the family would be

4    swimming in the ocean when you went to the beach that day?

5    A.  Yes.

6    Q.  Okay.  Did you have any knowledge at that time as to

7    whether or not John could swim?

8    A.  Well, his mother told me that he could swim, and I

9    observed him swimming in the ocean that day with Anthony.

10   Q.  Okay.  Had you ever seen him swimming before in a pool at

11   your home or anywhere else?

12   A.  Yes.

13   Q.  All right.  And this was a pool that you had in your

14   backyard in Philadelphia?

15   A.  Yes.

16   Q.  How deep was that pool?

17   A.  Four feet.

18   Q.  Okay.

19   A.  Four --

20   Q.  It's only four feet, but did you notice that he was able

21   to swim when he was in your pool in your backyard?

22   A.  Yes.

23   Q.  And when, do you have any idea when that might have been

24   prior to this weekend when you saw him swimming in your pool?

25   A.  I mean, I don't have exact dates.  I mean, prior to --

DIOSCON—MILLER – DIRECT – CICCOTTA

1  Q.   Would it have been six months or a year before or two

2  years?

3  A.   It would have been the summer before and then maybe that

4  spring.

5  Q.   Did you make any observations about whether he could

6  swim, I know it's just four feet, but did you make any

7  observations yourself about whether he was able to swim in

8  your backyard pool?

9  A.   Yeah, they would swim and throw the ball around, catch

10  the ball.

11  Q.   Okay.  And then I think you said you also discussed with

12  either his sister or his mom about whether he could swim?

13  A.   Yes.  Well, my question was more about the ocean.

14  Q.   Okay.

15  A.   I was asking, you know, about swimming issues.

16  Q.   And was that the conversation you had with his sister and

17  his mom before you went down to Pine Haven?

18  A.   Yes.

19  Q.   Okay.  So, you went to the ocean on Saturday, the day

20  before the drowning.  Did the boys, John and Anthony, go into

21  the Atlantic Ocean?

22  A.   Yes, they did.

23  Q.   How far in –– strike that.  Let me go back.

24       Did you observe them in the ocean?

25  A.   Yes, I did.

*578*

DIOSCON—MILLER — DIRECT — CICCOTTA

1  Q.  And who else was there with you at the beach in Sea Isle

2  City?

3  A.  My husband and daughter.

4  Q.  So, Tim Miller and your daughter Sophia.  So, did you go

5  in the ocean at all?

6  A.  Maybe to wet my feet.  I'm not a big ocean swimmer.

7  Q.  So, you didn't swim in the ocean?

8  A.  No.

9  Q.  Did you observe the boys swimming in the ocean?

10  A.  Yes.

11  Q.  How far, if you can estimate for us, how far out did John

12  go out into the ocean when you saw him swimming in the ocean?

13  A.  Well, I'm not too good with feet.  I do know how to

14  measure it with a stick.  But I would say they were out maybe

15  back towards the back of the courtroom.

16  Q.  Okay.

17  A.  However many feet that is, 20.

18      THE COURT:  Was there a surf there, little waves?

19      THE WITNESS:  Little waves, yes.

20      THE COURT:  Did he get as far as the waves?

21      THE WITNESS:  Yes.  They were riding the waves,

22  throwing a football around.

23  BY MR. CICCOTTA:

24  Q.  Okay.  Could you tell from your perspective on the beach

25  whether the boys, or let's say John in particular, whether he

DIOSCON-MILLER - DIRECT - CICCOTTA

1   was out far enough that he would need to swim because he

2   couldn't stand on the bottom of the ocean?

3   A.   He didn't seem to be having any difficulties.

4   Q.   Okay.  All right.

5          THE COURT:  I assume with the ocean there was a

6   lifeguard there?

7          THE WITNESS:  Yes.

8          THE COURT:  It was patrolled by whoever, the city or

9   whoever runs that?

10          THE WITNESS:  Yeah, the city of Sea Isle, they have

11   paid lifeguards that are there.

12   BY MR. CICCOTTA:

13   Q.   So, there were no problems or episodes that day when you

14   were at the beach with the boys and they were swimming in the

15   ocean?

16   A.   No, no problems at all.

17   Q.   Okay.  How long do you think you were in the ocean or

18   down by the beach and in the ocean at Sea Isle on Saturday,

19   August 7th?

20   A.   We were probably there all day.  That's usually, I would

21   pack a cooler and take the umbrellas and it would be a day

22   long event.  We probably got back in time for showers and

23   dinner.

24   Q.   Okay.  So, when you got back later that day, do you know

25   roughly about when you might have gotten back?

DIOSCON-MILLER – DIRECT – CICCOTTA

1  A.   I'd say late afternoon.

2  Q.   Did you have dinner back at the camp site on Saturday,

3  August 7th?

4  A.   Yes.

5  Q.   At your trailer?

6  A.   Yes.

7  Q.   All right.  And is that a typical thing, you or your

8  husband usually cook at the trailer?

9  A.   Yes.

10  Q.   So, after dinner on Saturday, August 7, 2010, what did

11  the boys do?

12  A.   I'm sorry.  Could you repeat that?

13  Q.   Yes.  On Saturday, August 7th of 2010, when you got back

14  from Sea Isle, you had dinner at the trailer, what did the

15  boys then do that night, Saturday night?

16  A.   They went out and up to the front of the campground and

17  hung out with the other children.

18  Q.   Okay.  And by the front of Pine Haven, can you be more

19  specific?  What area are you actually talking about?  What's

20  up there, up front?

21  A.   There's the convenience store, the arcade, the lake, the

22  pool, the activity center, the basketball court, golfing,

23  miniature golf.

24  Q.   Okay.  And so when they were up there, up front in that

25  area -- and is that, all those amenities that you've just

DIOSCON-MILLER - DIRECT - CICCOTTA

1 described, are they also somewhere near and in proximity to

2 the lake, the swimming lake?

3 A.  Yes.

4 Q.  When they were up there Saturday evening, the boys, John

5 and Anthony, were you or your husband with them Saturday

6 evening?

7 A.  No.

8 Q.  Okay.  Were you aware, Ms. Miller, of any rules, any camp

9 resort rules that said that children under the age of 16 had

10 to be supervised 24/7 by a parent?

11 A.  No.

12 Q.  You had never seen that on any kind of signage or any

13 kind of documents that you were given as a camper, as a renter

14 there, that you had to have 24/7 presence and observation and

15 supervision of your children?

16 A.  I saw that after the incident.  It was brought to my

17 attention.

18 Q.  Okay.  All right.  But prior to, prior to the drowning,

19 had you ever seen any documentation to that effect?

20 A.  No, I did not.

21 Q.  Had anybody at the camp, Mr. Jordan, Mr. Scarpa, anybody

22 else in the management of the campground ever told you that

23 prior to the drowning?

24 A.  No.

25 Q.  All right.  Did you, in your own observations -- well,

DIOSCON-MILLER - DIRECT - CICCOTTA

1   strike that.  Let me go back a second.

2         Now, when did you -- you first rented the camp site

3   that summer, the summer of 2010?

4   A.  Yes.  It was only a few months before the incident.

5   Q.  Okay.  So, had you ever been there on any prior summers,

6   any prior seasons?

7   A.  No.

8   Q.  Okay.  So, you started your rental season, your first

9   season with Pine Haven would have been the spring, May of

10  2010?

11  A.  Yes.

12  Q.  All right.  Can you approximate for us or estimate for us

13  how many times --

14  A.  It was Memorial Day weekend, to be exact.

15  Q.  Memorial.  Was that your first time down there?

16  A.  Yes.

17  Q.  Can you approximate for us or give us an estimate of how

18  many times you yourself personally were at Pine Haven prior to

19  the weekend that John passed away?

20  A.  I was probably there every weekend from Memorial Day

21  weekend up until the weekend of August 8th.

22  Q.  Okay.  So, with respect to this rule that children under

23  the age of 16 are supposed to be supervised by an adult, on

24  previous occasions, when you were at the campground on

25  previous occasions before the drowning, had you seen children

*United States District Court*
*Camden, New Jersey*

DIOSCON-MILLER – DIRECT – CICCOTTA

1  under the age of 16 unsupervised by parents anywhere

2  throughout the park?

3  A.   Often.

4  Q.   How often?

5  A.   Every day.

6  Q.   Okay.

7  A.   All throughout the day.

8  Q.   All right.  What ages, when you made those observations

9  and you saw children unsupervised in the park on those prior

10  occasions, what ages are we talking about?

11  A.   I've seen children age five years old riding bikes along

12  with their siblings all running around.

13  Q.   Would you have seen children that young without parents

14  during daytime hours?

15  A.   Yes.

16  Q.   Did you see children that young without parents in the

17  evening hours?

18  A.   Occasionally you'd see a straggler, a little one running

19  around.

20  Q.   Okay.  All right.  So, did the boys return from the up

21  front area at the appropriate curfew time on Saturday, August

22  7, 2010?

23  A.   Yes.

24  Q.   All right.  So, they followed the rule, they came back

25  and they were back -- they were back in your trailer at 10?

DIOSCON–MILLER – DIRECT – CICCOTTA

1   A.   Yes.

2   Q.   All right.  So, now Sunday, August 8th of 2010, were

3   there any events, anything planned for you and your family and

4   the boys Sunday morning, you know, during that day Sunday?

5   A.   No.  We had gone back a little bit on plans.  The boys

6   had made their minds up, they wanted to hang out at the

7   campground because they had made some friends.

8   Q.   Okay.  Did you know -- did you know what friends they had

9   made?

10  A.   Not off the top of my head.

11  Q.   Were they some girls?

12  A.   There was girls.  Definitely, there were some girls.

13  Q.   Okay.  Did you know if they were, if one or more of those

14  girls were girls that Anthony had met on a previous trip to

15  Pine Haven that summer?

16  A.   It could have been possible.  I believe Anthony was only

17  there maybe, at the most he was there three times.

18  Q.   Okay.  So, when you say that, when you say that, you

19  believe that Anthony may have only been at Pine Haven two or

20  three times before the weekend that John drowned?

21  A.   And that's maximum.

22  Q.   Okay.  And so do you know if any of the girls that they

23  were interested in spending time with on that Sunday were, if

24  any one of those girls were girls that Anthony had met on one

25  of the previous trips?

DIOSCON-MILLER – DIRECT – CICCOTTA

1  A.  I don't know.

2  Q.  Okay.

3  A.  To be sure.

4  Q.  Okay.  Were there any family activities involving you and

5  your husband and the boys all together at all on that Sunday,

6  August 8th of 2010?

7  A.  Well, the boys wanted to -- they didn't want to go to the

8  pool, they didn't want to go to the lake.  They wanted to hang

9  out with the girls.  So, what we were going to do, we were

10  going to go to the Boardwalk that evening and that's how we

11  were going to wind down our weekend.

12  Q.  Okay.  That was your plan?

13  A.  That was my plan.

14  Q.  Okay.  So, and that would have been which Boardwalk?

15  A.  Ocean City.

16  Q.  Okay.  So, you were planning on taking the boys down.

17  Were you vetoed in that, were you told --

18  A.  Yes.

19  Q.  -- no?

20  A.  I was vetoed.

21  Q.  Who vetoed that plan?

22  A.  Well, the boys didn't want to and my husband told me to

23  just let them --

24  Q.  Hang out?

25  A.  -- hang out.

DIOSCON-MILLER - DIRECT - CICCOTTA

1  Q.  Okay.  So, your long-term plans for that weekend, were

2  you planning on going home that night, were you planning on

3  going back to Philly on Sunday night, or sometime thereafter?

4  A.  We were going to leave first thing Monday morning.

5  Q.  Was there a reason for that?  Why were you going to leave

6  on Monday morning?

7  A.  Because we wanted to go to the Boardwalk because we

8  hadn't had the time to incorporate that in, because like I

9  said, we had gone down almost 24 hours after we had initially

10  planned on going down, so we still wanted to do everything

11  that we had planned.

12  Q.  Okay.  So, was it a good weather weekend?  Was weather --

13  the weather was good?

14  A.  Yes.

15  Q.  Was it hot?

16  A.  I imagine.  It was August.

17  Q.  Okay.  Was the general shore area pretty crowded on that

18  early August 2010 weekend?

19  A.  Yes.

20  Q.  So, the decision was made to stay that one additional

21  night, and even though the boys had vetoed your plan to go to

22  the Boardwalk, was it still the plan to stay one more night,

23  that Sunday night?

24  A.  Yes.

25  Q.  Okay.  Did you see the boys at all that Sunday?  Did you

DIOSCON-MILLER - DIRECT - CICCOTTA

1   see them at all during the course of the day?

2   A.   Yes.

3   Q.   All right.  Where did you see them?

4   A.   I saw them coming in to eat lunch.  We had taken a ride

5   to Acme and to the Dollar Store on Route 9 to pick up some

6   items.  We stopped at McDonald's.  Well, I saw them because I

7   would check on them going, going back and forth.  I saw them

8   playing.

9   Q.   Okay.  So, you saw --

10  A.   Then around dinnertime they came in and got changed.

11  Q.   You saw them during the Acme trip?

12  A.   Yes.

13  Q.   You saw them during the course of the day.  Was there a

14  time when the family assembled for dinner?

15  A.   Yes.

16  Q.   All right.  And that was back at the trailer?

17  A.   Yes.

18  Q.   And around what time of the day was that?

19  A.   I believe that was around five o'clock-ish.

20  Q.   Okay.  So, you had said a few minutes ago that you had

21  been at the -- at Pine Haven, was it pretty much every weekend

22  from Memorial Day until the weekend when John passed away?

23  A.   Correct.

24  Q.   All right.  And did you during those -- was it usually

25  weekends, was it usually a weekend time that you were down

DIOSCON—MILLER — DIRECT — CICCOTTA

1   there?

2   A.   At that time, yes.

3   Q.   Okay.  All those previous occasions when you were there

4   from May until August, were they usually weekends?

5   A.   They were usually weekends.

6   Q.   Were there some weekdays?

7   A.   Yes.

8   Q.   Okay.  And so while you were there on those previous

9   occasions, did you have an opportunity to kind of familiarize

10  yourself with the lake area?

11  A.   Yes.

12  Q.   Prior to John's drowning, prior to John passing away, did

13  you see any signs whatsoever anywhere near the lake?

14  A.   No.  Well, I saw —— yes, I did.  I saw a sign that was

15  near the arcade.

16  Q.   Okay.

17  A.   But you couldn't really make out what was on the sign

18  because it was an old, dilapidating sign and it had brush in

19  front of it.

20  Q.   It had what in front of it?

21  A.   Like weeds and ——

22  Q.   Oh, okay.

23  A.   —— bushes.

24  Q.   And based on your observations on all those previous

25  times that you were near the lake or at the lake that summer,

DIOSCON-MILLER – DIRECT – CICCOTTA

1  was that the only sign that you saw near the lake?

2  A.   That was the only sign I saw near the lake.

3  Q.   Could you make out the wording, could you make out some

4  of the wording on the sign?

5  A.   I guess if you walked over closely to look at it, you

6  could have.

7  Q.   Okay.  So, if you were -- and that sign --

8       MR. CICCOTTA:  Your Honor, may I just --

9  BY MR. CICCOTTA:

10  Q.   The jury has seen these.  The sign you're talking about,

11  the one sign that you remember being there at the lake,

12  anywhere near the lake prior to the drowning, was it this

13  sign?

14  A.   No.

15  Q.   The sign you remember, the one you said was worn out and

16  difficult to see and covered in brush, was it this sign?

17  A.   No.

18  Q.   Did you see either of these signs anywhere near the lake

19  before John died?

20  A.   No, I did not.

21  Q.   Ms. Miller, I'm sorry, we've been working with this.  On

22  any of the documentation that you have seen from Pine Haven,

23  that you saw from Pine Haven as a renter there, had you ever

24  seen a smaller version of a map like this?

25  A.   No.  I think this might have been mine because it has my

DIOSCON-MILLER - DIRECT - CICCOTTA

1  name on it.

2  Q.  Oh, there you go, okay.  So, this came from you?

3  A.  Yeah.

4  Q.  All right.  And so it was your -- what was it, from what

5  document did you provide this?

6  A.  It was one of the marketing materials, the flyer.

7  Q.  Okay.  Like a flyer, brochure kind of thing?

8  A.  Yes.

9  Q.  All right.  And so had you looked at this that summer,

10  the summer leading up to John's --

11  A.  Well, that's how we found our site.

12  Q.  Can you show us?  Can you step down for a second and show

13  us where your site is, if you can?  Watch your step.

14  A.  Right here.

15  Q.  Okay.

16  A.  The one that's circled.

17  Q.  Okay.  Yeah, somebody had circled it earlier.  So, that's

18  the site.  Is that the site you had for the entire time that

19  you were a renter at Pine Haven?

20  A.  Yes.

21  Q.  Okay.  And with respect to that site, it would be a site

22  where you would drive your RV in, and it wasn't stationary

23  there, you would drive it in and hook it up there?

24  A.  Yes.

25  Q.  To utilities and anything you would need?

DIOSCON-MILLER - DIRECT - CICCOTTA

1   A.   Yes.

2   Q.   Okay.  And so when you refer to a sign that you saw near

3   the lake, and we realize this is not to scale in any way,

4   shape or form, but this has been identified as the swimming

5   lake, Pine Haven swimming lake.  Where -- and the arcade has

6   been marked off as well, game room arcade.  Where, with

7   respect to the lake and the arcade, did you see that sign that

8   you described?

9   A.   It's marked where these crosses are.

10  Q.   Okay.

11  A.   It was behind the arcade and there was brush here.  There

12  used to be --

13          MR. HERMESMANN:  Your Honor, she's answered the

14  question.

15          MR. VESPER:  She's still answering.

16          MR. HERMESMANN:  The question was where was the sign.

17  She said it, and now she's going to expand.

18          THE WITNESS:  The sign is there and there used to be

19  a sliding board that used to go into the lake.  I believe they

20  had taken that down prior to me coming because I never saw it.

21  BY MR. CICCOTTA:

22  Q.   Okay.  So, there's two little marks there between the

23  arcade and the lake.  Did you see one or -- the sign you

24  described, you only saw one sign?

25  A.   Yes.

DIOSCON-MILLER - DIRECT - CICCOTTA

1   Q.   Okay.  All right.  Did you see at any time that summer

2   before the weekend that John drowned, did you see any signs in

3   front of the lake between the road and the lake, any signs

4   about rules for using the lake?

5   A.   No.

6   Q.   Okay.  There's been some testimony in this case about the

7   lake, some other testimony in this case about the lake, and

8   some kind of a whale positioned somewhere in the lake.  Do you

9   remember the whale?

10  A.   Yes.

11  Q.   All right.  Can you describe what you saw as what the

12  whale looked like to you?

13  A.   Well, we nicknamed it Shamu.

14  Q.   Okay.

15  A.   And it was just a large waterfall type.  It had a spout

16  and it shot out water through the top of it.

17  Q.   Okay.  For you in deciding that this was a family

18  friendly type of resort, did the whale factor in at all in the

19  impression you got about the kid friendly atmosphere at the

20  lake?

21  A.   Well, when you drive in, it's the first thing you see,

22  was a big waterfall, and you're looking to see what it is, and

23  the kids get -- my daughter loved it.

24          THE COURT:  Sophia?

25          THE WITNESS:  Yes.

DIOSCON-MILLER - DIRECT - CICCOTTA

1  BY MR. CICCOTTA:

2  Q.   And during that summer before John passed away, had you

3  seen children swimming up to the -- up to the whale in the

4  lake?

5  A.   Yes.

6  Q.   All right.  Had you seen children swimming in the lake

7  and in the area of the whale without parents prior to John's

8  passing?

9  A.   Yes.

10 Q.   Did you see, have you ever, on those prior occasions when

11 you saw children in the lake and at the whale, had you -- did

12 you ever see them --

13      THE COURT:  How did you know they were without

14 parents?  There's people on the beach.  How can you tell?  You

15 see a child swimming in the water.  How do you know whether

16 his parents are at the beach or not?

17      THE WITNESS:  Well, at night when there's no one

18 there and there's children swimming, so obviously there was no

19 one there.

20      THE COURT:  So, you saw children swimming at night?

21      THE WITNESS:  Yes, I did.

22 BY MR. CICCOTTA:

23 Q.   Okay.  Were you ever there, Ms. Miller, did you ever,

24 during that time, that summer leading up to from the time you

25 started renting to the time of the drowning, did you ever see

DIOSCON-MILLER – DIRECT – CICCOTTA

1  anybody from the resort chasing children out of the lake at

2  any hour of the day?

3  A.   I never personally witnessed that, no.

4  Q.   Okay.  Were you familiar with what the lake looked like

5  when it was dark, at nighttime?  Did you know what that area

6  looked like at night?

7  A.   Yes.

8  Q.   Were there, from your observation, was there any

9  illumination, any kind of artificial lighting anywhere near

10  the lake in the evenings?

11  A.   It was very difficult to see -- it was very difficult to

12  see the lake area unless there was campers at the top of the

13  lake and they had their lights on or if there was a full moon

14  or a half a moon, or some kind of --

15  Q.   Okay.

16  A.   -- maybe natural light.

17  Q.   When, after you had had dinner on Sunday evening, August

18  8th of 2010, the boys went up front to the area up front, when

19  was the next time you heard from them?

20  A.   When was this, on Sunday?

21  Q.   Yes, Sunday night, the night of the drowning.

22  A.   And after dinner?

23  Q.   Yes, after dinner.  When was the next time after they

24  left to go up front that you heard from the boys?

25  A.   I didn't hear from them until my son came home alone.

DIOSCON-MILLER – DIRECT – CICCOTTA

1   Q.   Okay.  Before that time, did your husband Tim, did he go

2   up -- was he up near the lake when the boys were up there?

3   A.   Yes.

4   Q.   What was he doing, what was Tim doing up by the lake

5   earlier that night?

6   A.   He had taken Sophia up.

7          MR. HERMESMANN:  Judge, objection.  She's not there.

8   How does she know what Tim is doing up at the lake?

9          MR. CICCOTTA:  Well, she knows --

10         MR. HERMESMANN:  How could she know?

11         MR. CICCOTTA:  Well --

12         THE COURT:  Answer the question.  Go ahead.  You're

13  always pushing to the line.

14         MR. CICCOTTA:  I'll ask it this way.  I understand.

15  Thank you, your Honor.

16  BY MR. CICCOTTA:

17  Q.   Did Tim have some kind of reason to go up?

18  A.   The reason he took Sophia up to the lake, when she woke

19  up from her nap, she was quite perturbed that we were not

20  going to the Boardwalk.  So, in order to make her happy, he

21  took her up so she could play at the playground.

22  Q.   Do you know, do you personally know whether he saw the

23  boys up there when he brought Sophia up to the playground?

24  A.   That's what I was told.

25  Q.   Tim told you that?

DIOSCON-MILLER - DIRECT - CICCOTTA

1   A.   Yes.

2           MR. HERMESMANN:  Hearsay.

3           THE COURT:  Did he see them going into the water?

4           THE WITNESS:  No, he said he did not see them go into

5   the water.

6   BY MR. CICCOTTA:

7   Q.   Did Tim at some point come back to the trailer with

8   Sophia?

9   A.   Yes, he did.

10  Q.   Okay.  Do you know what time that was approximately when

11  he returned to your trailer with Sophia?

12  A.   It was about 7:30, quarter to 8, right in that vicinity.

13  Q.   When he came back, okay.  And then you had said the next

14  time you had seen either of the boys is when Anthony came back

15  alone?

16  A.   Yes.

17  Q.   I say alone.  Was he with anyone else?

18  A.   There were three young ladies with him.

19  Q.   All right.  Do you know if one of those ladies was

20  Michelle Wheeler?

21  A.   Yes.

22  Q.   And is that the first time you had learned that John was

23  missing?

24  A.   Yes.

25  Q.   What did you do?

DIOSCON-MILLER - DIRECT - CICCOTTA

1          MR. HERMESMANN:  Judge, I have an objection.  What

2     she did post drowning, it's completely irrelevant.

3          THE COURT:  What does it have do with the case?  What

4     does it remotely have to do with the case?

5          MR. CICCOTTA:  It's just her observations when she

6     got to the lake, what she saw when she got up there.

7          MR. HERMESMANN:  Which are absolutely irrelevant.

8          THE COURT:  Did you go down to the lake?

9          THE WITNESS:  Yes, I did.

10         THE COURT:  And what did you see when you were there?

11         THE WITNESS:  The lake.

12         THE COURT:  All right.

13    BY MR. CICCOTTA:

14    Q.   Okay.  When you got up to the lake, was it -- what was

15    the lighting like?

16    A.   It was dark.

17         THE COURT:  What time did you get to the lake?

18         THE WITNESS:  A little after 10 o'clock p.m.

19         THE COURT:  That's like hours after they were in the

20    water, that's two hours later.

21         THE WITNESS:  Yes.

22    BY MR. CICCOTTA:

23    Q.   So, it's later in the evening?

24    A.   Yes.

25    Q.   But when you got up to the lake --

*United States District Court*
*Camden, New Jersey*

DIOSCON-MILLER - DIRECT - CICCOTTA

1          THE COURT:  It's not just later.  It's two hours

2     later.

3          MR. CICCOTTA:  Oh, sure.  Yes, I wasn't suggesting

4     otherwise.

5     BY MR. CICCOTTA:

6     Q.   When you got up to the lake after you were notified that

7     John was missing, was there any lighting, anything around the

8     lake that illuminated the lake when you got there?

9     A.   No.

10    Q.   Did you go into the lake?  Did you go into the lake?

11    A.   Yes, I did.  I drove my truck onto the beach of the lake

12    and put my high beams onto the water so that I could see.

13    Q.   Why did you need to do that?

14    A.   Because it was dark.

15    Q.   And so did you yourself physically try to go into the

16    lake?

17    A.   Yes, I did.

18         MR. HERMESMANN:  Your Honor, I have an ongoing

19    objection.

20         THE COURT:  What does this have to do with the case?

21    Maybe you're trying to engender some kind of sympathy that has

22    nothing to do with the merits of the case.

23         MR. CICCOTTA:  No, no, not at all, not at all.  I'm

24    just asking this witness what she observed about the

25    conditions of the area where John was last seen.

DIOSCON-MILLER - DIRECT - CICCOTTA

1          THE COURT:  Nobody disputes that at 10 o'clock it was

2   dark out.

3          MR. CICCOTTA:  No, no, absolutely right.

4          THE COURT:  There were other cars actually had put

5   their high beams on, weren't there?  You weren't the only one?

6          THE WITNESS:  No, not until the rescue came.

7          THE COURT:  When the rescue came, didn't other

8   vehicles shine their lights in?

9          THE WITNESS:  Yes.

10          THE COURT:  All right.

11   BY MR. CICCOTTA:

12   Q.   How did you know or did you know approximately where John

13   was last seen?

14          MR. HERMESMANN:  Your Honor, this again has nothing

15   to do with the liability or damages.

16          THE COURT:  You just won't give up.  I let you go

17   thinking you'll stop and go on to something else and you just

18   keep going.

19          MR. CICCOTTA:  Your Honor, I think that it's relevant

20   to --

21          THE COURT:  To what?

22          MR. CICCOTTA:  -- to have this witness describe what

23   she saw when she went up to the area where the boy was last

24   seen.

25          THE COURT:  It was dark.  There's no dispute that two

DIOSCON-MILLER - DIRECT - CICCOTTA

1   hours later, 10 o'clock, it was dark.

2          MR. CICCOTTA:  It's not a question of lighting.  It's

3   just a question of what she observed when she got to the lake.

4          THE COURT:  She observed the lake.

5          MR. CICCOTTA:  I just have one or two more questions.

6          THE COURT:  What's the next question?

7   BY MR. CICCOTTA:

8   Q.  So, when you got to the lake, did you attempt -- did you

9   attempt to go into the area where John was last seen?

10  A.  Yes, I did.

11  Q.  And what happened?

12         MR. HERMESMANN:  Same objection, your Honor.

13         THE COURT:  Go ahead.  What happened?

14         THE WITNESS:  Well, the children had told me where he

15  was last seen, and after we searched the perimeter of the

16  lake, we went to the spot where they had last seen him and I

17  started just to walk out into the lake, I don't know why, but

18  I did, and I guess I had taken about five, six steps, and it

19  had dropped off.

20         THE COURT:  And then you turned around and went back

21  or backed up?

22         THE WITNESS:  I went back to the -- I backed up.

23  BY MR. CICCOTTA:

24  Q.  When you got up there, was there anybody from camp

25  management anywhere near the lake?

DIOSCON-MILLER – DIRECT – CICCOTTA

 1  A.  No.

 2  Q.  All right.  Did you see anyone from camp management --

 3       MR. HERMESMANN:  Objection, your Honor.  Again, what

 4  does this have to do with the liability as to what happened

 5  after the drowning?

 6       THE COURT:  Maybe engender some sympathy that's

 7  irrelevant, I don't know.

 8       MR. HERMESMANN:  Right.  That's the point.

 9       MR. CICCOTTA:  Well, she answered the question, she

10  answered the question.

11       THE COURT:  At 10 o'clock or 10:30, were there a lot

12  of people around the lake?

13       THE WITNESS:  No.

14       THE COURT:  Who was there?

15       THE WITNESS:  There was no one there.  There was

16  children that were playing over in the basketball court and

17  that was it.  There was nobody else around.

18       THE COURT:  And didn't you say there were search

19  vehicles, other vehicles?

20       THE WITNESS:  Yes, after I called 911.

21       THE COURT:  You called 911?

22       THE WITNESS:  Yes.

23       THE COURT:  And then vehicles came?

24       THE WITNESS:  Yes.

25       THE COURT:  People came?

DIOSCON-MILLER - CROSS - HERMESMANN

1           THE WITNESS:  Yes.

2           THE COURT:  You didn't know everybody who was around

3    the lake at that point, did you?

4           THE WITNESS:  No, I did not.

5           THE COURT:  Okay.  Go ahead.  Next question.

6    BY MR. CICCOTTA:

7    Q.   They located John at the bottom of the lake?

8    A.   Yes.

9           MR. CICCOTTA:  Thank you.  I have nothing else.

10          THE COURT:  Cross-examine.

11   (CROSS EXAMINATION OF MS. DIOSCON-MILLER BY MR. HERMESMANN:)

12   Q.   Good afternoon, ma'am.  Let me take you back to before

13   August of 2010 when you and your husband were deciding what

14   campground to go to, and I think you testified a little bit

15   about this on your direct examination.  Do you recall that?

16   A.   Yes.

17   Q.   And you looked at multiple campgrounds in and around the

18   Jersey shore area; is that correct?

19   A.   Yes.

20   Q.   And did you go and actually visit various sites?

21   A.   Yes, we did.

22   Q.   And out of all the sites that you saw, you chose Pine

23   Haven, correct?

24   A.   That's correct.

25   Q.   And as you viewed it, child friendly, family atmosphere,

DIOSCON-MILLER – CROSS – HERMESMANN

1   organized, not run down, clean; would you agree with all of

2   that?

3   A.   Yes.

4   Q.   And that summer from Memorial Day up through the time

5   this occurred --

6          THE COURT:   You mean 2010?

7          MR. HERMESMANN:   Yes, sir.

8   BY MR. HERMESMANN:

9   Q.   From Memorial Day 2010 up until this occurs, you and your

10  husband went down there every single weekend, correct?

11  A.   Some weekends I was there myself, yes.

12  Q.   Okay.  And I assume you brought your three-year-old with

13  you?

14  A.   Yes.

15  Q.   And it's your recollection that your son Anthony was

16  there at most three times, maybe two times.  Would that be

17  correct?

18  A.   That's correct.

19  Q.   And you understood that this was, this was a campground

20  where you could certainly bring your family, but you didn't

21  leave your children at the campground either overnight or for

22  the course of the day without the parents being there.  Did

23  you understand that?

24  A.   Well, no one had said that to me, but no, I wouldn't

25  leave my children anywhere.

DIOSCON-MILLER – CROSS – HERMESMANN

1          THE COURT:  You knew this wasn't a day camp where you

2     would deliver the children and pick them up at the end of the

3     day?

4          THE WITNESS:  No, like a daycare, no.

5          THE COURT:  Not daycare, a day camp.  Around my

6     house, there's even in North Jersey, we have day camps, you

7     take your kids, you leave your kids in the summer, and they

8     spend from 9 to 4, and then you pick them up and take them

9     home.

10          THE WITNESS:  Yes, I was aware it was not a day camp.

11     BY MR. HERMESMANN:

12     Q.   It was a family camp where the family brought their

13     children down and the families were there all together,

14     correct?

15     A.   Yes.

16     Q.   And on this particular weekend when you went down, you

17     discussed at length with the boys your rules, correct?

18     A.   That's correct.

19     Q.   And your rules were don't go in that lake or pool without

20     me or Tim, being your husband, present; is that correct?

21     A.   That's correct.

22     Q.   And be back by curfew at 10 o'clock; is that correct?

23     A.   Yes, that's correct.

24     Q.   And you didn't just tell them once, right?

25     A.   No, I told them multiple times.

DIOSCON-MILLER – CROSS – HERMESMANN

1  Q.   You just, throughout the course of the weekend, you kept

2  repeating it, right?

3  A.   Yes.

4  Q.   I think you testified that you told them two dozen times?

5  A.   Could have been more.

6  Q.   Could have been more than two dozen times.  And these

7  were boys who you had never had any occasion where you told

8  them not to do something and they did it anyway; is that

9  correct?

10  A.   No.

11  Q.   This was the first time?

12  A.   Yes.

13  Q.   They actually told you, when you gave them this

14  instruction time and time again, that they understood; is that

15  correct?

16  A.   Yeah, we heard you, we heard you.

17  Q.   And the concern with the water, as a mother, wasn't just

18  you, but that concern was shared with your husband; is that

19  correct?

20  A.   Yes, it is.

21  Q.   And am I correct, you didn't have any expectation during

22  this weekend or any other weekend that Pine Haven was going to

23  supervise your children, did you?

24  A.   No.

25  Q.   And you said you had seen occasions where --

DIOSCON-MILLER - CROSS - HERMESMANN

1          THE COURT:  There were no lifeguards at either the
2     swimming pool or the swimming lake?

3          THE WITNESS:  No, there's not.

4     BY MR. HERMESMANN:

5     Q.   And you knew that, right?

6     A.   Yes.

7     Q.   You offered some testimony regarding not seeing a sign.

8     You lived here, correct?

9     A.   Correct.

10    Q.   And is the lake here?

11    A.   Yes.

12    Q.   Where was the basketball court?

13    A.   Right on the other side of that corner of the store, that

14    square on the opposite side of the store.

15    Q.   And am I correct that in this little area here between

16    the road and the lake there's some light amount of trees?

17    A.   There's trees.

18    Q.   Not like a forest, light amount meaning that you could

19    walk through here?

20    A.   Yes, you could walk through.

21    Q.   But there were some pine trees down there, would that be

22    correct?

23    A.   Yes, there's pine trees all along that area.

24    Q.   Okay.  And when you came from your home, I take it you

25    would come up here with your daughter when you went to the

DIOSCON-MILLER – CROSS – HERMESMANN

1  lake; would that be correct?

2  A.   Yes.

3  Q.   And during the course of the day, I take it there would

4  be kids in the lake, correct?

5  A.   Yes.

6  Q.   And there would be parents sitting on the beach.  Would

7  that be correct?

8  A.   Yes.

9  Q.   And this campground would have about how many on a,

10 before this incident occurred, on a hot summer weekend, how

11 many people would be sitting on that beach?

12 A.   Well, you know, I never counted them, to be honest with

13 you, and sometimes there was a lot people on the beach,

14 sometimes there are a lot of people at the pool.  There's a

15 lot of people in other places.

16 Q.   I'm sorry.  I'm trying to get a feel for an August sunny

17 day at this campground or any summer day in 2010, and if you

18 walk onto this beach, are there 10 people there, are there 200

19 people there, can you give us a range as to how many people

20 would be on that beach?

21 A.   I think I answered that for you.  I never counted people.

22 Q.   I understand you didn't count them, but can you give

23 us -- can you give us a range?

24 A.   Do you want me to guess and then later you will say I

25 guessed wrong?  I don't know.

*United States District Court*
*Camden, New Jersey*

DIOSCON-MILLER – REDIRECT – CICCOTTA

1   Q.   I'm not asking you --

2   A.   More than 10.

3   Q.   Okay.  What I'm trying to do for the benefit of the jury

4   is to get a range.  When you say more than 10, do you know

5   if --

6   A.   I'd say more than 10, less than 200.

7   Q.   So, somewhere between 10 and 200 people would typically

8   be on the beach?

9   A.   Yes.

10  Q.   And how about what's the most number of people that you

11  would see in the water?

12  A.   Again, I don't -- I can't answer that question.  I don't

13  know.  I never counted people.  I was busy watching my child.

14  Q.   Right.  And could you tell if other people were busy

15  watching their child?

16  A.   I really wasn't paying attention to what other people

17  were doing.

18  Q.   Okay.  You said also, going to the evening in question,

19  that your husband Tim came back at about 7:30, 7:45, correct?

20  A.   Somewhere around there, yes.

21  Q.   And it was still light out, correct?

22  A.   It was, yes.

23       MR. HERMESMANN:  Thank you, ma'am.  No further

24  questions.

25  (REDIRECT EXAMINATION OF MS. DIOSCON-MILLER BY MR. CICCOTTA:)

*United States District Court*
*Camden, New Jersey*

DIOSCON-MILLER – REDIRECT – CICCOTTA

1  Q.  Mr. Hermesmann had asked you a few moments ago, Ms.

2  Miller, about the repeated warnings that, you know, just

3  repeatedly warning the boys, stay out of the water, stay away

4  from the water, and your reason for that was, the one thing

5  that you feared the most was the water, the boys going into

6  the water; isn't that true?

7  A.  Yes.

8  Q.  All right.  As far as dangers and your assessment of

9  dangers as a parent on that camp resort that weekend with the

10  boys under your supervision, the thing that you feared the

11  most was the water?

12  A.  Yes.

13  Q.  You considered that the biggest danger that was

14  potentially facing them as 14-year-old boys who would be

15  walking about the park?

16         MR. HERMESMANN:  Objection.  Is that a question?

17         THE COURT:  So, you've testified now.  Thank Mr.

18  Vesper for that.  What's the next question?

19         MR. VESPER:  I didn't do anything.

20  BY MR. CICCOTTA:

21  Q.  You had mentioned earlier -- I had asked you a question

22  about who you saw from the campground management when you went

23  up to the lake.  On prior occasions, that whole summer when

24  you were there on prior occasions, did you observe camp staff,

25  camp management, Mr. Jordan, Mr. Scarpa, doing any kind of

DIOSCON-MILLER – REDIRECT – CICCOTTA

1  patrols on that –– on weekends?

2  A.   There were occasionally patrols on holiday weekends.

3  Q.   Okay.  And was that –– when would you usually see that,

4  usually what time of day?

5  A.   At night.

6  Q.   Okay.

7  A.   Well, Mr. Jordan would drive through the campground

8  frequently during the day.

9  Q.   During the day?

10 A.   And as would Mr. Scarpa and some of the other staff.

11 Q.   Okay.

12 A.   They were back and forth doing different things, I guess.

13 Q.   But the patrols at night, would they typically be around

14 curfew?

15 A.   Yes.

16 Q.   At night, all right.  Mr. Hermesmann asked you questions

17 about your responsibility to warn the boys and supervise the

18 boys during the time –– during that weekend when you were

19 there and you brought the boys to your camp site.  You're

20 testifying today as a witness by subpoena, my office

21 subpoenaed you to be here to testify?

22 A.   Yes.

23 Q.   At some earlier stage in these proceedings, were you also

24 a party?

25         THE COURT:  What does that have to do with this case?

*United States District Court*
*Camden, New Jersey*

DIOSCON-MILLER – REDIRECT – CICCOTTA

1    What does that have to do with this case?

2            MR. CICCOTTA:  Well --

3            THE COURT:  What are you trying to achieve, prove for

4    the jury with that?

5            MR. CICCOTTA:  No, in this --

6            THE COURT:  She's not a party to the case now, is

7    she?

8            MR. CICCOTTA:  That's true.

9            THE COURT:  Then why are you asking that question?

10   Why are you asking it?  What proof, what does that tell the

11   jury?

12           MR. CICCOTTA:  May we have a sidebar?

13           THE COURT:  No.  I sustain any objection to the prior

14   status.

15           MR. CICCOTTA:  Okay.  I have nothing else.  Thank

16   you.

17           THE COURT:  Any --

18           MR. HERMESMANN:  Nothing further.

19           THE COURT:  Okay.  Thank you very much.

20           THE WITNESS:  Thank you.

21           (Witness excused.)

22           MR. VESPER:  I have a motion to make before the next

23   witness.

24           THE COURT:  Who is the next witness?

25           MR. VESPER:  The next witness is Mr. --

DIOSCON-MILLER – REDIRECT – CICCOTTA

1          MR. CICCOTTA:  Michelle Wheeler will testify next.

2          THE COURT:  She's probably sitting outside.

3          MR. VESPER:  Right.

4          THE COURT:  You have a motion relating to her

5     testimony?

6          MR. VESPER:  No, your Honor.  Could we do this out of

7     the presence of the jury?

8          THE COURT:  Come to sidebar.

9          (Sidebar.)

10          THE COURT:  Yes.

11          MR. VESPER:  I was -- I have considered moving for a

12     mistrial.  I'm not doing that, but I'm asking your Honor by

13     motion to instruct the jury that what you said about my

14     co-counsel trying to engender sympathy was way out of line.

15     It was improper for you to say that.  You are, again,

16     respectfully, I'm saying this, you are absolutely sending a

17     message to this jury that what Mr. Ciccotta did was improper

18     and it wasn't.  In fact, the question that he asked had

19     nothing to do with sympathy at all, absolutely nothing, but

20     that's the way you characterized it, and I am -- that's my

21     request.

22          THE COURT:  Counsel?

23          MR. HERMESMANN:  I would absolutely disagree.  The

24     question -- I don't recall the exact question that was made at

25     that particular time, but time and time again -- if I may.

DIOSCON-MILLER – REDIRECT – CICCOTTA

 1        MR. CICCOTTA:  I know.  I'm talking.

 2        MR. HERMESMANN:  I know.  I'm trying to speak and I

 3   don't want to hear someone else.

 4      Time and time again questions had been asked of these

 5   witnesses where they're trying to get into the sympathy

 6   factor.  It's a wrongful death claim.  There really should be

 7   no testimony whatsoever going beyond the actual happening of

 8   the death.  It doesn't go to anything other than an attempt to

 9   engender sympathy.  So, for the Court to keep counsel in line

10   and direct them not to ask questions engendering sympathy is

11   absolutely proper.

12        THE COURT:  I think I charged the jury again about

13   that.

14        MR. VESPER:  I remember the question.  It had nothing

15   whatsoever --

16        THE COURT:  What was the question?  You said you

17   remember.

18        MR. VESPER:  It had to do is what did you do when you

19   walked into the lake, and you cut him off and you said what

20   can that possibly have to do, and you accused him of trying to

21   engender sympathy.  What he wanted to do which, he didn't want

22   to blurt out, was she felt what the son felt was the drop-off

23   in the lake.  The lake has to do with the dangerous condition.

24        THE COURT:  She testified to that.

25        MR. CICCOTTA:  She did, but that was only after your

DIOSCON-MILLER – REDIRECT – CICCOTTA

**1** Honor mentioned --

**2**      MR. VESPER:  Only after your Honor scolded my

**3** co-counsel.

**4**      THE COURT:  What does that have to do with this case?

**5**      MR. VESPER:  I'll tell you what it has to do with the

**6** case.  There's a dangerous condition in the lake that they're

**7** not warning anybody about.  The lake is in issue, the lake is

**8** in issue.  Should you light up the lake, should you light up

**9** the lake?  Absolutely.

**10**      THE COURT:  We had one expert so far who didn't even

**11** mention the drop-off.

**12**      MR. VESPER:  Doesn't have to.

**13**      MR. HERMESMANN:  No, they do, and this has been the

**14** basis for my objection continually relative to the drop-off,

**15** is that this has not been a theory of this case supported by

**16** expert testimony at any point in time.  There's testimony --

**17**      THE COURT:  There's endless testimony about the

**18** drop-off.  There's no dispute about that.  Is the drop-off

**19** five feet or six feet in?  There's been about four people who

**20** have said that.

**21**      MR. HERMESMANN:  There's no expert saying what caused

**22** this drowning.

**23**      THE COURT:  I understand that.  There's no dispute

**24** that when you go, I don't know whether it's five feet or six

**25** feet in, it goes down to 15 feet.

*United States District Court*
*Camden, New Jersey*

DIOSCON-MILLER - REDIRECT - CICCOTTA

 1            MR. VESPER:  Right.

 2            THE COURT:  I agree.

 3            MR. VESPER:  And if there's no warnings --

 4            THE COURT:  You just can't say that's a dangerous

 5    condition.  Every ocean on the New Jersey shore has that.

 6            MR. VESPER:  A sudden drop-off?

 7            THE COURT:  Some do, some don't.

 8            MR. VESPER:  I respectfully disagree.

 9            THE COURT:  Just you're saying that's a dangerous

10    condition, for someone who knows how to swim, it's not a

11    dangerous condition.

12            MR. VESPER:  In a swimming lake where you expect the

13    surface is going to be consistent --

14            THE COURT:  Well, you and I are going to have trouble

15    if you're going to try to make a closing on that without an

16    expert saying that that contributed in some fashion to the

17    drowning.  This was a kid who was swimming in the ocean the

18    day before.

19            MR. VESPER:  We can argue about that later, but I am

20    asking the Court to give an instruction now, after what you

21    said about my --

22            THE COURT:  I'm not going to give an instruction.  I

23    think I've been trying, as you know, I don't cut things off, I

24    try to let things in.  What happens sometimes, that every time

25    I give an inch, the lawyer takes a mile, and maybe I should

DIOSCON-MILLER – REDIRECT – CICCOTTA

1    change.  I'm in favor of getting things in, not keeping things

2    out.

3         MR. CICCOTTA:  Your Honor, whatever it was that I was

4    trying to elicit from the witness about the condition of the

5    lake, it certainly had nothing to do with sympathy.

6         THE COURT:  There was one of two possibilities.

7    Here's a woman who is in charge of this child.  She's clearly

8    distraught.  The child has now disappeared.  She's going into

9    the lake for no apparent purpose.  She's not going to find

10   anything.  And you're trying to elicit there's a drop-off,

11   which there's been no dispute about, which is a fact that's

12   not disputed at all.

13        MR. HERMESMANN:  I don't know if it is disputed or

14   not because it hasn't been a part of this case supported by

15   expert testimony.  So, I might have disputed it if I thought

16   it was proper to come in.

17        THE COURT:  Let me say so far all of the witnesses

18   have been consistent that you go in, I don't know whether it's

19   five feet or six feet, you go in a certain distance and then

20   there's a sudden drop-off from what might be four feet or

21   something like that, three feet or four feet to 15 feet depth,

22   above and beyond.

23        MR. CICCOTTA:  But my point, your Honor --

24        THE COURT:  Everyone has said that.

25        MR. CICCOTTA:  I agree.

DIOSCON-MILLER – REDIRECT – CICCOTTA

1          THE COURT:  But when she's being called to say that,

2    all you have is –– what you're emphasizing is a distraught,

3    had to be distraught, this is a boy she was caring for.  She's

4    doing something that's kind of semi-irrational, you walk in

5    two hours later and find something.

6          MR. CICCOTTA:  But, your Honor, with all due respect,

7    I think your Honor is making a leap to and concluded that the

8    purpose of my question was to engender sympathy, and that's

9    when you tell the jury ––

10          THE COURT:  Of course it was.

11          MR. CICCOTTA:  It certainly was not.

12          THE COURT:  All right.

13          MR. CICCOTTA:  Not in any way, your Honor.

14          THE COURT:  Okay.

15          MR. CICCOTTA:  It wasn't a sympathy move at all.  It

16    was a factual question which your Honor may disagree with.

17          THE COURT:  I don't disagree.

18          MR. CICCOTTA:  You may not think the condition of the

19    land is ever going to be an issue.

20          THE COURT:  My point is there's no dispute on that

21    fact, and redirect is not to bring out a fact that nobody has

22    disputed, was not an issue on direct.

23          MR. CICCOTTA:  Frankly, she was the only one ––

24          THE COURT:  What other purpose could it have had?

25    There's only two purposes it could have had, is to engender

DIOSCON-MILLER – REDIRECT – CICCOTTA

**1** sympathy for her clearly distraught situation.

**2**        MR. CICCOTTA:  Which is what you told the jury.

**3**        THE COURT:  Or to imply that that had something to do

**4** with the drowning, which at least up to this point, A, she's

**5** not equipped to know that, and I've not seen any expert who is

**6** going to say that.  So --

**7**        MR. VESPER:  I've represented to the Court, the

**8** purpose was to try to establish that there should have been

**9** more care in the operation of that lake.  That's all.

**10**        THE COURT:  That's a legal argument.  To say that

**11** because there was a drop-off, there should have been different

**12** kinds of care, that's a different story.  But she didn't help

**13** that, she didn't help that.  Everybody has testified,

**14** everybody, that there's a drop-off.

**15**        MR. VESPER:  There was a 14-year-old -- or now

**16** 18-year-old boy that testified.  We wanted to have the adult

**17** say the same thing, and you keep saying it's for no other

**18** reason than sympathy.  Respectfully, your Honor, you're way

**19** off base.

**20**        THE COURT:  If you have a fact that everybody agrees

**21** to that was not the subject of direct examination and the

**22** person starts bringing it out on redirect, what am I supposed

**23** to think?

**24**        MR. CICCOTTA:  It was direct.

**25**        MR. VESPER:  They already admitted, my adversary

*United States District Court*
*Camden, New Jersey*

DIOSCON-MILLER – REDIRECT – CICCOTTA

 1   already said he doesn't agree there's a drop-off.

 2          MR. HERMESMANN:  I don't know.  I don't know if

 3   there's a drop-off or not.

 4          THE COURT:  The answer is, I only know what he thinks

 5   or doesn't think or what you think.  From the witness stand,

 6   everyone agrees there's a drop-off so far.  Maybe you can put

 7   a witness on to say otherwise.

 8          MR. VESPER:  Two people.

 9          MR. HERMESMANN:  But again, the problem is that it

10   goes to the issue of whether the drop-off caused the drowning.

11   That's the implication and that implication is improper.

12          MR. CICCOTTA:  That's not the point of Tom's motion.

13          THE COURT:  Look, you're trying to try this case

14   without having experts back it up.

15          MR. VESPER:  I don't need an expert to show they

16   didn't show sufficient care, reasonable care for the operation

17   of the lake.  That's all.

18          THE COURT:  But that's a different -- you can make

19   that argument.

20          MR. VESPER:  Okay.

21          THE COURT:  Indeed.

22          MR. VESPER:  My motion is denied?

23          THE COURT:  Your motion is denied.

24          MR. VESPER:  Thank you.

25          THE COURT:  And again, I think you ought to have more

DIOSCON-MILLER – REDIRECT – CICCOTTA

1  faith in your case than you actually really have.

2          MR. VESPER:  I do, I do.  It's just I'm losing faith

3  in the process.  I'm losing faith in the process for this

4  reason, if you scold us, when I say us, me and my co-counsel,

5  in front of the jury, it's almost like saying don't listen to

6  these idiots, and I don't -- I'm not the smartest person --

7          THE COURT:  Hey, look, you've tried cases, you've

8  tried cases before me.  If anything, I'm a plaintiff-oriented

9  guy.

10          MR. VESPER:  You're what?

11          THE COURT:  I've had people say that I'm

12  plaintiff-oriented, and I don't believe it's true, but they

13  say that.

14          MR. VESPER:  No, no, not at all.  I'm not saying

15  that.

16          THE COURT:  But you tried a case before me, a big

17  one, big dollars.

18          MR. VESPER:  I didn't say you're plaintiff or

19  defense-oriented.  Here's what I'm saying.  You're casting,

20  it's worse than stones.  You're not throwing stones at us.

21  They're like big boulders are coming.  Thank you for

22  listening.

23          THE COURT:  Go to the circuit.  They'll slap me about

24  the head and shoulders and so be it, and so be it, maybe I

25  deserve it that.

DIOSCON-MILLER – REDIRECT – CICCOTTA

1           MR. VESPER:  Thank you, your Honor.

2           (End of sidebar.)

3           MR. CICCOTTA:  Your Honor, can we ask for a short

4    break before the next witness?

5           THE COURT:  We had one not too long ago.

6           MR. CICCOTTA:  That's fine, your Honor, if you want

7    to proceed.

8           THE COURT:  I really want to get moving on this.

9           MR. VESPER:  We have a scheduling problem.  That's

10   what he's referring to.  There's a scheduling problem with the

11   witness that's coming in tomorrow.  If we could just make a

12   quick --

13          THE COURT:  Let's start this witness.  I'll deal with

14   the issue tomorrow.  I'm telling you right now, if you have a

15   scheduling problem, I'm very sympathetic for taking witnesses

16   out of turn if that's what you require.  Mr. Ciccotta?

17          MR. CICCOTTA:  Next we're going to call Michelle

18   Wheeler as our next witness.

19          THE COURT:  Okay.

20          THE DEPUTY CLERK:  Good afternoon.  Please step up.

21   Please raise your right hand.

22   (**MICHELLE WHEELER**, Having been duly sworn as a witness,

23   testified as follows:)

24          THE DEPUTY CLERK:  Please state and spell your name

25   for the record.

WHEELER – DIRECT – CICCOTTA

1          THE WITNESS:  Michelle Wheeler.  M-I-C-H-E-L-L-E
2  W-H-E-E-L-E-R.
3          THE DEPUTY CLERK:  Thank you, you can be seated.
4          MR. CICCOTTA:  Ms. Wheeler, good afternoon.
5      Your Honor, may I?
6          THE COURT:  Yes, you may, go ahead.
7  (DIRECT EXAMINATION OF MICHELLE WHEELER BY MR. CICCOTTA:)
8  Q.  Ms. Wheeler, good afternoon.
9  A.  Good afternoon.
10 Q.  If you can, speak -- yeah, speak into the microphone.
11     How old are you currently?
12 A.  Nineteen.
13 Q.  Okay.  And were you at the Pine Haven Camping Resort on
14 August 8 of 2010, when John Toribio drowned?
15 A.  Yes.
16 Q.  All right.  Had you ever met, prior to that day, John
17 Toribio?
18 A.  No.
19 Q.  Were you a guest at Pine Haven on that day?
20 A.  Yes.
21 Q.  All right.  Did you have a rental there, or were you a
22 guest of someone who had a rental there?
23 A.  I was a guest of somebody who had a rental.
24 Q.  Who was the -- who was the renter?
25 A.  My aunt and uncle.

WHEELER – DIRECT – CICCOTTA

1  Q.  Okay.  Prior to that day, August 8th of 2010, had you

2  ever been to Pine Haven to visit them on any previous

3  occasion?

4  A.  No.

5  Q.  Had you ever been to Pine Haven on any previous occasion

6  to visit anybody else?

7  A.  No.

8  Q.  All right.  Were you -- was it just a day trip or were

9  you -- were you going to be sleeping at Pine Haven?

10  A.  It was a day trip.

11  Q.  Okay.  And were you -- where were you staying otherwise?

12  Were you staying at some other location?

13  A.  Yes.  I was staying at a campground in Cape May.

14  Q.  Okay.  So you were staying at a different campground?

15  A.  Yes.

16  Q.  And was that with your -- with your parents?

17  A.  Yes.

18  Q.  All right.  And who -- who accompanied you to visit Pine

19  Haven that afternoon?  Who was with you?

20  A.  My parents and my brother and my friend.

21  Q.  Okay.  What was your friend's name?

22  A.  Julia.

23  Q.  Julia Kolman?

24  A.  Yes.

25  Q.  All right.  K-O-L-M-A-N.

WHEELER – DIRECT – CICCOTTA

1  A.  Yes.

2  Q.  All right.  Do you know if -- well, strike that.  The

3  people you were visiting at Pine Haven, did the family that

4  you were visiting, did that include some of your younger

5  cousins?

6  A.  Yes.

7  Q.  All right.  How many younger cousins were you visiting

8  there?

9  A.  Just one younger one.

10  Q.  When I say "younger cousins," I mean younger relative to

11  me.  So how many -- how many cousins were you seeing?

12  A.  Two.

13  Q.  Okay.  And what were their names and ages?

14  A.  Tommy, and he was maybe 10; and Nikki, who was 18, 19.

15  Q.  Okay.  That's Nicole?

16  A.  Nicole, yes.

17  Q.  Nicole Sharp?

18  A.  Yes.

19  Q.  All right.  So do you remember approximately what time

20  you arrived at Pine Haven?

21  A.  Maybe around 6.

22  Q.  6 p.m.?

23  A.  Yes.

24  Q.  Okay.  Had you -- had you been swimming that day at any

25  other location?

WHEELER - DIRECT - CICCOTTA

1    A.   No.

2    Q.   All right.  Meaning -- meaning the ocean or meaning the

3    other campground where you were staying?

4    A.   Not that I remember.

5    Q.   Okay.  When you got to Pine Haven that night at around 6,

6    were you wearing a bathing suit?

7    A.   Yes.

8    Q.   All right.  And was that -- were you wearing a bathing

9    suit underneath clothes or did you arrive in a bathing suit?

10   A.   Underneath clothes.

11   Q.   Okay.  So, did you know that there was a -- there was

12   swimming opportunities, that there were swimming facilities at

13   Pine Haven that you would be using?

14   A.   Yes.

15   Q.   All right.  How did you know that?  Who told you that you

16   would be able to swim?

17   A.   My aunt and uncle.

18   Q.   Okay.  And so you knew and planned on, at some point,

19   swimming at Pine Haven?

20   A.   Yes.

21   Q.   All right.  What did you know about the swimming

22   facilities?  Did you -- did you think it was a pool or a pond

23   or a lake, or what did you understand you were going to be

24   swimming in?

25   A.   A lake.

WHEELER – DIRECT – CICCOTTA

1  Q.  Okay.  You had been -- and you were down there -- weren't

2  you down at the shore for a couple of days at your family's

3  campground?

4  A.  Yes.

5  Q.  All right.  When you -- when you first arrived at Pine

6  Haven, when you first got there, where did you go in the camp

7  resort?  Where did you go?

8  A.  To my cousin's trailer.

9  Q.  Okay.  Do you -- I don't know if you can do this or not,

10  but we've been referring to kind of a map of the -- of the

11  whole resort.  Do you think you would be able to refer to that

12  map and show us where your aunt's campsite is?

13  A.  Yes.

14  Q.  Okay.  Have you ever seen this before, you know, a

15  smaller version of this?

16  A.  Not that I remember.

17  Q.  Okay.  You can step down, if you can.  And you may not --

18  I mean, if you can do it, if you can tell us the specific

19  site, that's fine, or if you have a general idea of where your

20  aunt's campsite was.

21  A.  Is this the lake?

22  Q.  Well, this has been labeled as the Pine Haven swimming

23  lake.

24  A.  Okay.  So it was right here (indicating).

25  Q.  Can you mark off just with a -- we've done X's and T's,

WHEELER – DIRECT – CICCOTTA

1  maybe just a circle, approximately where your aunt's campsite

2  was with respect to the swimming lake.

3  A.   (Witness complies.)

4  Q.   Okay.  Can you do it a little darker.  It's a tough

5  little -- okay.  All right.  Thank you.  And you can sit back

6  down.

7       And was it your testimony, you had never been at Pine

8  Haven on any previous occasion?

9  A.   Yes.

10  Q.   Okay.  Had your aunt or your family members ever kind of

11  filled you in or informed you about the setup, about, you

12  know, kind of what the -- what the resort looked like and what

13  kind of attractions there were?

14  A.   Not before that day.

15  Q.   Okay.  So after you went to your aunt's trailer, what did

16  you do next?

17  A.   We went swimming.

18  Q.   Okay.  In the lake?

19  A.   Yes.

20  Q.   All right.  Who went swimming?

21  A.   Me, my mom, my aunt, my cousin, my friend, and my brother

22  and my other cousin.

23  Q.   Okay.  So all those folks got into the lake and they were

24  in the swimming lake for some time?

25  A.   Yes.

WHEELER – DIRECT – CICCOTTA

1  Q.   Do you know, was there -- was there a point in time,

2  before you met up with the boys, which we'll talk about in a

3  second.  But was there a point in time when you got out of the

4  lake with your family members and your friend and went to go

5  do something else?

6  A.   Not that I remember.

7  Q.   Okay.

8        THE COURT:  What time were you in the lake the first

9  time?

10        THE WITNESS:  Probably like 6:30.

11        THE COURT:  6:30 in the evening?

12        THE WITNESS:  Yes.

13  BY MR. CICCOTTA:

14  Q.   So was there a period of time where you met, for the

15  first time ever, John Toribio and Anthony Dioscon?

16  A.   Yes.

17  Q.   All right.  And where did you meet them?

18  A.   At the basketball courts.

19  Q.   Okay.  So there was a point at which you had gotten out

20  of the lake and there was a meeting of some sort at the -- at

21  the basketball courts with the boys?

22  A.   Yes.

23  Q.   Okay.  Had you ever met Anthony before?

24  A.   No.

25  Q.   All right.  Had your -- had your cousin, Nicole, who you

629

WHEELER – DIRECT – CICCOTTA

1   were with, had she ever met either of the boys before?

2   A.   She met Anthony.

3   Q.   Okay.  How had she met him before, do you know?

4   A.   Just from being in the campground.

5   Q.   On some previous visit?

6   A.   Yes.

7   Q.   Okay.  So this was August 8th of 2010.  Do you have any

8   recollection as to, you know, what kind of weather day it was,

9   whether it was hot, you know, what kind of day it was

10  weather-wise?

11  A.   Not that I remember.

12  Q.   Okay.  Was the weather good enough to go swimming?

13  A.   Yes.

14  Q.   All right.  Did you -- when you were swimming in the lake

15  with your family members, did you notice any signs whatsoever,

16  anywhere near or around the lake, with rules or instructions

17  about how and when to use the lake?

18  A.   No.

19  Q.   All right.  When you went to the basketball courts and

20  you met the boys for the first time, was there a conversation

21  there, did you speak to the boys?

22  A.   Yes.

23  Q.   All right.  And so it's you and Nicole, Anthony and John?

24  A.   And my friend.

25  Q.   And Julia?

WHEELER – DIRECT – CICCOTTA

1  A.   Yes.

2  Q.   Okay.  Were there other -- at that point in time --

3  around what time of day, now, is that when you're at the

4  courts?

5  A.   Seven, 7:30.

6  Q.   Okay.  Were there any other teens or children in the

7  basketball court area?

8  A.   Yes.

9  Q.   All right.  When you were -- step back.  When you were in

10 the lake with your family, were -- did you notice if there

11 were any other people in the lake at that time?

12 A.   Yes.

13 Q.   Okay.

14       THE COURT:  The answer is, there were other people.

15       MR. CICCOTTA:  Yes.

16       THE WITNESS:  Yes.

17 BY MR. CICCOTTA:

18 Q.   So during that time, when you were with your family in

19 the lake, there were other children and adults?

20 A.   Yes.

21 Q.   All right.  Was there -- there's been some mention, quite

22 a bit of mention in this case about some kind of a whale.  Was

23 there some kind of a whale in the lake?

24 A.   Yes.

25 Q.   Can you describe it from your -- what you saw?

WHEELER - DIRECT - CICCOTTA

1  A.   I just saw a whale sitting on top of, like, wood, and

2  that's all I can remember.

3  Q.   Was it -- was it stationary or was it moving, or what do

4  you recall about it?

5  A.   It wasn't moving.

6  Q.   Okay.  When you were -- when you were in the lake earlier

7  with your family, with your family members, did anybody swim

8  up to the whale at that time?

9  A.   No.

10  Q.   Okay.  Did you observe any other -- during that period of

11  time when you were there, did you observe anybody else

12  swimming up to the -- any other people in the lake swimming up

13  to the whale?

14  A.   No.

15  Q.   Okay.  So when you got to the basketball courts with the

16  boys, what did you do at that point?  What happened with you

17  and the boys?

18  A.   We went down to go catch tadpoles in the lake.

19  Q.   Okay.  So -- tadpoles, okay.  So you went down to, like a

20  shoreline?

21  A.   Yes.

22  Q.   All right.  If we -- if you're looking at this map,

23  again, and understanding that it is certainly not to scale,

24  but if you're looking just at this, can you -- I'm sorry, I

25  have to have you step down again.  Do you see where the

WHEELER – DIRECT – CICCOTTA

1  basketball courts are on this particular diagram?

2  A.  Over here.

3  Q.  All right.  You're pointing -- you're pointing kind of

4  generally to this area near the road, near Pine Haven Drive?

5  A.  Up here.

6  Q.  Okay.  All right.  All right.  So when you went to the

7  lake to catch tadpoles with the boys, it was you, John,

8  Anthony, and any of the other girls?

9  A.  Just Julia.

10  Q.  Just Julia.  Nicole did not go?

11  A.  No.

12  Q.  All right.  So where -- where along the shoreline,

13  anywhere along the shoreline of the lake, did you go to catch

14  tadpoles with the boys?

15  A.  Right along here.

16  Q.  All right.  And what is this -- do you know what this

17  area here is, what that's depicting?

18  A.  No.

19  Q.  Okay.  Do you remember anything else in the area around

20  the lake, any other features around the lake, on the beach

21  area, in the area around the lake?

22  A.  There was a park, and I remember -- I do remember the

23  game room.

24  Q.  Okay.

25  A.  And the arcade and the shop.

WHEELER – DIRECT – CICCOTTA

1  Q.  Okay.  When you say there was a park, like, what do you

2  mean by "park"?

3  A.  There was a little play -- like a wooded playground right

4  here.

5  Q.  Oh, okay, playground.  And was that playground on the

6  beach?

7  A.  Yes.

8  Q.  And where was that playground in relation to where you

9  and the boys went to catch tadpoles?

10  A.  It was like diagonal from us.

11  Q.  About how far away?

12  A.  Maybe like 10, 15 feet from us.

13  Q.  Okay.  Okay.  While you were -- you can have a seat.

14  While you were catching tadpoles, did you see either of the

15  boys' parents anywhere near the lake, if you can recall?

16  A.  No.

17  Q.  Okay.  At any time that day before you went into the

18  water again with the boys, did you see either of the boys

19  speaking to any of their parents in any location?

20  A.  No.

21  Q.  Okay.  When you say you were catching tadpoles, what

22  exactly were you doing?  Just down by the shore and just kind

23  of catching them as they kind of leaped around?

24  A.  Yes.

25  Q.  How long did you do that for, how long?

WHEELER – DIRECT – CICCOTTA

1  A.   Ten minutes.

2  Q.   Okay.  And then what?  What did you decide to do at that

3  point?

4  A.   We decided to go swimming.

5  Q.   Okay.  Do you know whose idea it was to go into the

6  water?

7  A.   It was mine.

8  Q.   Okay.

9         THE COURT:  I'm sorry, your idea?

10         THE WITNESS:  Yes.

11 BY MR. CICCOTTA:

12 Q.   All right.  And did the boys agree?

13 A.   Yes.

14 Q.   All right.  Did -- at that point, did -- you said Julia

15 was still with you?

16 A.   Yes.

17 Q.   Did she go into the water?

18 A.   No, she didn't want to.

19 Q.   Okay.  So where did she go?

20 A.   She went back up to the basketball courts.

21 Q.   Okay.  All right.  So now the decision was made, you're

22 going to go into the water.  Do you know roughly what time of

23 day it is now, at that point?

24 A.   Around 8.

25 Q.   Okay.  And generally, kind of what were the lighting

WHEELER – DIRECT – CICCOTTA

1  conditions then?  Just the natural light?

2  A.   It was still light, but it was like -- you could tell the

3  sun was going down.

4  Q.   Okay.  And do you remember who went into the lake first?

5  A.   No.

6  Q.   All right.  Do you know for sure that it wasn't you, that

7  it was one of the other two boys?

8  A.   No, I don't know.

9  Q.   Okay.  Describe for us what happened as you -- the three

10  of you entered the lake.

11  A.   We just started swimming and, I know me and Anthony were

12  ahead of John, and I heard, like, splashing and like saying,

13  help, and I turned around and I saw --

14          THE COURT:  You heard -- I'm sorry, you heard the

15  word "help" --

16          THE WITNESS:  Yes.

17          THE COURT:  -- coming from John.

18          THE WITNESS:  From John, yes.  And I turned around

19  and I said, What is he doing?  Because I didn't know what he

20  was doing, and Anthony said that he was probably just messing

21  around because he does that stuff all the time, so I just -- I

22  went with it and I said okay.

23          So we kept swimming, and when we got to the end of the

24  lake we got out, and I was like, Well, where's John, like,

25  where did he go?  And he was like, Well, he could be just

WHEELER – DIRECT – CICCOTTA

1 playing a prank on us.  Maybe he got out, so let's go look for

2 him.

3        So we went to go look for him.  We went up to the

4 basketball courts, and we asked anybody, like, Did you see

5 him?  They were like, No.  So we asked for them to help us

6 look for him.  'Cause at that time it was dark out now.

7 BY MR. CICCOTTA:

8 Q.  Okay.

9 A.  And we all got flashlights and phone lights and we

10 circled around the whole --

11        MR. HERMESMANN:  Objection as to relevancy for search

12 and what it has to do with --

13        THE COURT:  I'm going to -- within limits, I'm going

14 to allow it.

15        Okay.

16        THE WITNESS:  So we circled around the lake and we

17 couldn't find him, so I told my mom and then --

18        THE COURT:  You mean you went back to your campsite?

19        THE WITNESS:  Yes, and I told my mom that I think

20 that he drowned, and so we started --

21 BY MR. CICCOTTA:

22 Q.  I'm going to stop -- I'm going to stop you there and just

23 kind of step back a few seconds.

24 A.  Okay.

25 Q.  There was a point in time, I think, that you've described

637

WHEELER – DIRECT – CICCOTTA

1  where you and Anthony proceeded, that you went forward, and

2  that John was in the lake back near the entry point.

3  A.   Yes.

4  Q.   Did there seem to be a reason for that, why you and

5  Anthony were able to proceed and John was behind you?

6  A.   No.

7  Q.   All right.  Before you separated that way, before you and

8  Anthony moved forward and John was behind you, was there any

9  period of time where you were all kind of in the lake

10 together?

11 A.   Yes.

12 Q.   Doing what?

13 A.   That was when we were just about to, like, swim across

14 the lake.  Because we decided to swim across the lake and then

15 I guess that's how me and Anthony got ahead of him, and that's

16 when it happened.

17 Q.   Okay.  As you --

18       THE COURT:  Excuse me.  There was some discussion

19 about where you were going to go.

20       THE WITNESS:  Yes.

21       THE COURT:  And the three of you agreed to go swim

22 across the lake?

23       THE WITNESS:  Yes.

24       THE COURT:  To the other side?

25       THE WITNESS:  Yes.

WHEELER – DIRECT – CICCOTTA

1              THE COURT:  Okay.

2   BY MR. CICCOTTA:

3   Q.   Can you estimate for us how long you and Anthony were

4   actually in the lake?

5   A.   Maybe like three minutes.

6   Q.   Okay.  Short -- short period of time --

7   A.   Yes.

8   Q.   -- from the time you decided to enter in until the time

9   you swam across the width of the lake and got to the other

10  side?

11  A.   Yes.

12  Q.   All right.  All right.  And can you -- of course, that is

13  not to scale, but you have -- can you estimate for us, what

14  kind of geographic shape is that?  What kind of geographic

15  shape is that lake?

16  A.   It's kind of like an oval.

17  Q.   Okay.  And you have -- can you estimate for us the length

18  of it, how -- what the -- what size the long way of the length

19  is?

20  A.   Maybe like the size of a football field.

21  Q.   Okay.  A football field from end zone to end zone?

22  A.   Yes.

23              THE COURT:  That's the long axis.

24              THE WITNESS:  Yes, yes.

25              THE COURT:  What about the short axis?

WHEELER - DIRECT - CICCOTTA

1          THE WITNESS:  It's like half of a football field.

2   BY MR. CICCOTTA:

3   Q.   Okay.  So maybe 50, 50 yards?

4   A.   Yes.

5   Q.   Okay.  And is it your testimony that it took you

6   approximately a few minutes, three or four minutes, to make

7   your way -- your way and Anthony's way across the width of the

8   lake?

9   A.   Yes.

10  Q.   Those 50 yards?

11  A.   Yes.

12  Q.   All right.  Okay.  So by the time you got to the other

13  side of the lake, and you exited the lake with Anthony, can

14  you tell us what kind of lighting conditions there were at

15  that time?

16  A.   It was -- the sun was going down, but it was still light

17  out.

18  Q.   Okay.  Did you, at any time during the time you were at

19  the lake, notice if there was any kind of artificial lighting

20  near the lake?

21  A.   No.

22  Q.   Okay.  No, that you didn't notice it, or no, there wasn't

23  any?

24  A.   I don't think there was any.

25  Q.   Okay.  During the period of time, say after 7 p.m., when

WHEELER – DIRECT – CICCOTTA

1  you were in the lake that Sunday evening, did anyone from the

2  camping resort management come over to anyone in the lake and

3  say, all right, time to get out, we're shutting down?

4  A.   No.

5  Q.   During that period of time -- during the entire period of

6  time you were at the lake visiting your family and interacting

7  with the boys, did you see anybody that looked like they were

8  part of campground management?

9  A.   Yes.

10 Q.   Who did you see?

11 A.   I don't remember what he looks like, but he was driving

12 around in a golf cart.

13 Q.   Okay.  Where did you see him?

14 A.   By the store and the basketball courts.

15 Q.   Okay.  And do you remember what -- what time that was?

16 A.   That was around 7.

17 Q.   About 7?

18 A.   Yes.

19 Q.   Okay.  Did you ever see that man after that?

20 A.   No.

21 Q.   All right.  Did it appear that that gentleman was closing

22 down the store when you saw him?

23 A.   Not that I remember.

24 Q.   Okay.  So after you saw that gentleman around 7, was

25 there anybody else that you saw for the rest of the night?

WHEELER – DIRECT – CICCOTTA

1  Did you see anybody else from campground management anywhere

2  near the lake?

3  A.  No.

4  Q.  Okay.  Did John himself say anything to you about his

5  interest in swimming out anywhere near the whale, did he say

6  anything about the whale to you?

7  A.  No.

8  Q.  All right.  That's all I have.  Thank you.

9       THE COURT:  Okay.  Thank you very much.

10  Cross-examine.

11       MR. HERMESMANN:  I do have an exhibit I need to mark

12  first, Your Honor.

13       THE COURT:  You mean one of the exhibits you didn't

14  premark prior to trial, one of those?

15       MR. HERMESMANN:  That would be correct.

16       THE COURT:  Okay.  What's the number?

17       MR. HERMESMANN:  42.

18       THE COURT:  42.  I assume it's D-42.

19       MR. HERMESMANN:  It is, Your Honor.

20       THE COURT:  And what's -- just roughly, what is it?

21  Describe it briefly.

22       MR. HERMESMANN:  It's a diagram that Ms. Wheeler drew

23  at her deposition.

24       THE COURT:  Okay.

25  (DEFENDANT EXHIBIT D-42 WAS MARKED FOR IDENTIFICATION)

WHEELER – CROSS – HERMESMANN

1   (CROSS EXAMINATION OF MICHELLE WHEELER BY MR. HERMESMANN:)

2   Q.   Good afternoon.

3   A.   Good afternoon.

4   Q.   I just wanted to go through probably some of the stuff

5   you've already testified to, and a few other -- a few other

6   different things.  You were 14 years old at the time, is that

7   -- is that correct?

8   A.   Yes.

9   Q.   And you were visiting your cousins, correct?

10  A.   Yes.

11  Q.   And this was the first time you had ever been to Pine

12  Haven, is that right?

13  A.   Yes.

14  Q.   You talked about the basketball courts, meeting the boys

15  over there.  I assume that was just coincidental that you saw

16  them over there?

17  A.   Yes.

18  Q.   And do you have any recollection as to if the basketball

19  courts were on the other side of the road?

20  A.   Not that I remember.

21  Q.   Do you know one way or the other?

22  A.   Say that again.

23  Q.   Do you know, one way or the other, whether they were or

24  were not on the other side of the road?

25  A.   I do not know.

WHEELER – CROSS – HERMESMANN

1  Q.   And am I correct that the two boys -- you're with them

2  for about 20 to 30 minutes before you all enter the water, is

3  that right?

4  A.   Yes.

5  Q.   And at some point, you're the one that makes the

6  suggestion, hey, let's go swimming, or words to that effect,

7  right?

8  A.   Yes.

9  Q.   Did you say that directly to just John, just Anthony or

10  to both of them?

11  A.   To both of them.

12  Q.   And what was their reply?

13  A.   They said yes.

14  Q.   Any resistance?  Anybody say no, or just immediately say

15  yes?

16  A.   Not that I remember.

17  Q.   Okay.  And then, at that point in time, did they have

18  shorts on over-neath what they ultimately swam in?

19  A.   Not that I remember.

20  Q.   And did you have anything else on other than a bathing

21  suit at that point in time?

22  A.   Not that I remember.

23        THE COURT:  But you had a bathing suit on.

24        THE WITNESS:  Yes.

25  BY MR. HERMESMANN:

WHEELER – CROSS – HERMESMANN

1  Q.  Right.  You were wearing a bathing suit.

2  A.  Yes.

3      THE COURT:  Was that the same bathing suit you wore

4  when you went in at 6:30 with your family?

5      THE WITNESS:  Yes.

6  BY MR. HERMESMANN:

7  Q.  After you made the suggestion, let's go swimming, did you

8  all go into the water pretty much together?

9  A.  Yes.

10  Q.  And was there a short period of time where you're in the

11  water together before you began swimming over?

12  A.  Yes.

13  Q.  Are you all standing at that point in the water, are you

14  treading water?  What were you doing?

15  A.  We were standing.

16  Q.  Okay.  And then one of the three of you starts swimming,

17  is that correct?

18  A.  Not that I remember.  I'm not sure who swam first.

19  Q.  Right.  But one of the -- one of the three of you,

20  somebody started swimming first, correct?

21  A.  Yes.

22  Q.  Okay.  Let me -- let me show you what we've marked as

23  Defendant's Exhibit 42.  Do you recognize that?

24  A.  Yes.

25  Q.  And that's a diagram that you prepared, I think, at my

WHEELER – CROSS – HERMESMANN

1  request, when I took your -- your deposition back in November

2  of 2013, is that right?

3  A.  Yes.

4  Q.  And in that diagram, I had you just draw an oval to show

5  the lake, correct?

6  A.  Yes.

7  Q.  And I also had you put in your entry point and your exit

8  point.

9  A.  Yes.

10  Q.  Was that accurate when you did that?

11  A.  Yes.

12  Q.  You recognize that?

13  A.  Yes.

14  Q.  Does that look like the lake where this occurred?

15  A.  Yes.

16  Q.  Are you capable of utilizing this picture of the lake and

17  showing where it was you entered the lake and where it was you

18  exited the lake?

19        THE COURT:  What number is that, by the way?

20        MR. HERMESMANN:  It is Defendant's Exhibit No. 1.

21        THE WITNESS:  Where is the --

22        THE COURT:  Okay.

23        THE WITNESS:  -- entrance of the campground?

24  BY MR. HERMESMANN:

25  Q.  There's been testimony that it's up here.

WHEELER – CROSS – HERMESMANN

1  A.   Okay.  So where we entered the lake was --

2  Q.   Okay, come on down here, so the jury can see.

3  A.   Where we entered the lake was right around maybe here.

4  Q.   Okay.  Why don't you put a big X there.

5  A.   (Witness complies.)

6  Q.   Okay.  And where were you going to?

7  A.   Over here.

8  Q.   Put another X.

9  A.   (Witness complies.)

10  Q.   So -- why don't you stand aside so the jury can see.  So

11  if I got it right, you're going from here to here, is that

12  correct?

13  A.   Yes.

14  Q.   So you aren't swimming all the way across the width of

15  the lake, were you?

16  A.   No.

17  Q.   So it would have been something less than 50 yards that

18  you were swimming, is that correct?

19  A.   Yes.

20  Q.   Can you approximate how many yards that you swam in

21  total?

22  A.   Not that I remember.

23  Q.   Okay.  But something less than 50, from here to here?

24  A.   Yes.

25  Q.   And the width of the lake would be -- would that be from

WHEELER – REDIRECT – CICCOTTA

1   here to here, would be about 50?

2   A.   Yes.

3   Q.   Okay.  You can resume your seat, if you will.

4        And your recollection is that you were in the lake for

5   two to three minutes total?

6   A.   Yes.

7   Q.   And am I also correct that nobody, not you, not Anthony,

8   not John, made any mention of going to the whale.  Is that

9   correct?

10  A.   No -- yes, that's correct.

11  Q.   That is correct.

12       And I believe you already testified that when you went

13  in, it was still light out, correct?

14  A.   Yes.

15  Q.   And when you got out, it was still light out, correct?

16  A.   Yes.

17  Q.   Thank you.  That's all I have.

18  (REDIRECT EXAMINATION OF MICHELLE WHEELER BY MR. CICCOTTA:)

19  Q.   But it was getting dark when you got out of the lake,

20  right?

21       THE COURT:  It was three minutes later, so it was two

22  minutes darker than it was before, right?

23       THE WITNESS:  Yes.

24       MR. CICCOTTA:  No, well --

25       THE COURT:  Three minutes she said.

*United States District Court*
*Camden, New Jersey*

WHEELER — REDIRECT — CICCOTTA

1 BY MR. CICCOTTA:

2 Q.   Was it getting dark when you got out of the lake?

3 A.   The sun was going down, yes.

4 Q.   The sun was going down, okay.

5     Mr. Hermesmann just asked you, did — was there a

6 conversation among the three of you about swimming over to the

7 whale, and you said —

8 A.   No.

9 Q.   — no, there was not.

10 A.   No.

11 Q.   There was no conversation that you overheard between John

12 and Anthony about swimming out to the whale?

13 A.   No.

14 Q.   But if they had a conversation about that and you didn't

15 hear it, would be something that —

16     THE COURT:  No, come on, that's not a — strike that

17 question.

18 BY MR. CICCOTTA:

19 Q.   This — this defense exhibit, this photo that Mr.

20 Hermesmann was showing you — can you just step down one

21 second now.

22     THE COURT:  Will a pointer help you?  I have a

23 pointer here.

24     MR. CICCOTTA:  That would, Your Honor, thank you.

25 BY MR. CICCOTTA:

WHEELER - REDIRECT - CICCOTTA

1 Q.  This exhibit, Defense Exhibit No. 1, in this photograph,

2 from the perspective shown in this photograph, can you tell us

3 where the playground area was that you referred to here, when

4 you were showing us the -- you know, referring to the map.

5 Where would it be?  It's not shown in this photo, but where

6 would the playground be?

7 A.  It would be over here.

8 Q.  Okay.  But it's not shown in the photo.

9 A.  No.

10 Q.  Okay.  Can you see -- can you see the whale in this

11 photo?

12 A.  No.  Well, yes, right here.

13 Q.  Is that it?  Okay.  So this Defense Exhibit No. 1 shows

14 that that's the whale?

15 A.  Yes.

16 Q.  All right.  Yes, can you see -- well, you can't see it,

17 but can you tell us -- give us a perspective of where the

18 arcade game room is with respect to this Defense Exhibit No.

19 1, if you can?

20 A.  It's over here.

21 Q.  Okay.  All right.  And again, for perspective, can you --

22 because the exhibit doesn't show, was there -- can you show us

23 where the basketball courts were with respect to this exhibit.

24 A.  Diagonally.

25 Q.  Okay.  Again, the photograph doesn't show that, but it's

1   over here somewhere?

2   A.   Yes.

3   Q.   All right.  Okay.  All right.  That's all I have on this.

4   Thank you very much.  Will you hand this to His Honor?

5        THE WITNESS:  Yes.

6        THE COURT:  Thank you very much.

7   BY MR. CICCOTTA:

8   Q.   During the time period you were there at Pine Haven that

9   day, I know we talked about signs, but did you see any kind of

10  written rule anywhere, from the time you entered Pine Haven

11  until the time you left Pine Haven, instructing campers or

12  guests as to what they were to do or not do, anywhere near the

13  lake?

14  A.   No.

15  Q.   All right.  Thank you.

16       THE COURT:  Any recross?

17  (RECROSS EXAMINATION OF MICHELLE WHEELER BY MR. HERMESMANN:)

18  Q.   And you got there at 5:30, right?

19  A.   5:30, 6 o'clock.

20  Q.   That's the first time you had ever been there, right?

21  A.   Yes.

22       MR. HERMESMANN:  Thank you.

23  (REDIRECT EXAMINATION OF MICHELLE WHEELER BY MR. CICCOTTA:)

24  Q.   I know you said you didn't see any -- any kind of rules

25  written anywhere, but did you think by going into the lake at

WHEELER – REDIRECT – CICCOTTA

1  the times you went into the lake, without adults –– because

2  you were 14, right?

3  A.   Yes.

4  Q.   Did you think you were breaking some kind of park rule?

5  A.   No.

6  Q.   Okay.  Thank you.

7            Nothing:  Further.

8            THE COURT:  Okay.  I want to thank you very much.

9  You are excused.

10            MR. CICCOTTA:  Thank you.

11       Your Honor, may we take that 5 minutes or 10 minutes

12  now?

13            THE COURT:  Yeah, come up here and tell me about it.

14            MR. VESPER:  We have one more witness, and I can make

15  this call if you want to start with the next witness.  I need

16  to talk to Professor Tinari, but the next witness is outside

17  ready to go.

18            THE COURT:  Is that Professor Tinari?

19            MR. CICCOTTA: No.

20            MR. VESPER:  No.  I have to make a call to Professor

21  Tinari, but the next witness is ready if you want to keep

22  going.  Mr. Miller.

23            MR. CICCOTTA:  Tim Miller.

24            MR. VESPER:  Mr. Miller.

25            THE COURT:  Tim?

MILLER - DIRECT - CICCOTTA

1          MR. VESPER:  Yes.

2          THE COURT:  I'd like to try to get him started.  We

3  still have more than a half hour.

4          MR. VESPER:  I know you would, Your Honor.  Why don't

5  I get him right now.

6          THE DEPUTY CLERK:  This way, please, sir.  Good

7  afternoon.  If I could ask you to please step up.  Please

8  raise your right hand.

9  (**TIMOTHY MILLER,** having been duly sworn as a witness,

10  testified as follows:)

11          THE DEPUTY CLERK:  Please state and spell your name.

12          THE WITNESS:  Timothy Miller, T-I-M-O-T-H-Y

13  M-I-L-L-E-R.

14          THE DEPUTY CLERK:  Thanks.  You can be seated.

15          MR. CICCOTTA:  May I?

16          THE COURT:  You may.

17          MR. CICCOTTA:  Thank you.

18  (DIRECT EXAMINATION OF TIMOTHY MILLER BY MR. CICCOTTA:)

19  Q.   Good morning -- good afternoon, Mr. Miller.

20  A.   Good afternoon.

21  Q.   I'm going to try not to cover ground that's been covered

22  already by your step-son and by your wife, Heather.

23          You are Anthony Dioscon's -- maybe I'm mispronouncing

24  -- Dioscon's stepfather?

25  A.   Correct.

MILLER - DIRECT - CICCOTTA

1   Q.   Okay.  And in -- back in August of 2010, was Anthony

2   living with you in your home?

3   A.   Yes.

4   Q.   All right.  And that was in Northeast Philadelphia?

5   A.   Correct.

6   Q.   All right.  And who -- who resided with you at that home

7   in Northeast Philadelphia in August of 2010?

8   A.   My wife, Heather; Anthony; my niece, Marlita; and

9   Anthony, himself, and Sophia.

10  Q.   And Sophia.  Okay.

11       All right.  You -- you knew the young man John Toribio

12  before the weekend when you brought him down to Pine Haven?

13  A.   Yes.

14  Q.   You had met him on some previous occasions?

15  A.   Several.  He was -- him and Anthony were friends.

16  Q.   Okay.  We've had some characterizations of that

17  friendship, but were they -- did it seem to you that they were

18  close friends?

19  A.   I mean, they played sports together.  They were -- as far

20  as I could see, I mean, they were with each other almost every

21  day.

22  Q.   Okay.

23  A.   They were over our house a lot, too.

24  Q.   Okay.  So that summer -- specifically that summer, did

25  they spend a lot of time together based on your observations

MILLER - DIRECT - CICCOTTA

1  that summer at your home?

2  A.   Yes, I would -- you know, it's my opinion of, you know,

3  they seemed like they were good friends.

4  Q.   Okay.  So Anthony, back then, was a 14-year-old teenager.

5  Was he -- from your point of view, was he generally an

6  obedient, respectful child who followed the rules that you set

7  forth in your house?

8  A.   Yes, that's -- that's the opinion I have.  I mean,

9  Anthony -- no, him and John were respectful, respectful boys.

10  I mean, they were in our house and around our house quite

11  frequent.

12  Q.   Did you have any -- either at your home or at your

13  school, did Anthony have any -- Anthony have any disciplinary

14  issues: not obeying authority, not respecting authority?

15  A.   No, not at that time.

16  Q.   Okay.  And how about, from what you knew of John, did you

17  get the sense that he, from what you saw as a parent, that he

18  was obedient and he generally followed rules; he generally

19  tried to, you know, to do the right thing?

20  A.   He was always respectful around us.  I mean, he, no

21  ma'am, yes ma'am, thank you, you know, when we offered him

22  things to drink and eat.

23  Q.   Okay.  Before that weekend, was there ever a time where

24  either you or your wife had to set a rule that you expected

25  the boys to follow and, you know, John followed or didn't

MILLER - DIRECT - CICCOTTA

1  follow?

2  A.   I don't understand where you're going.

3  Q.   Okay.  Were there any other times before the weekend when

4  John drowned, whatever the circumstance may be, where you or

5  your wife set a rule for the boys, where John didn't obey you,

6  or John did what you didn't want him to do, before that

7  weekend?

8  A.   No.  Well, we have -- we have a pool at our house and,

9  you know, they just didn't -- whenever we told them what to

10  do, you know, at night, we didn't let them swim at our pool at

11  night.

12  Q.   Okay.  So, we heard a little bit about your pool earlier.

13  So you have -- at some point there was a pool in your

14  backyard?

15  A.   (Witness nods.)

16  Q.   Yes?

17  A.   Yes.

18  Q.   Okay.  And how deep?

19  A.   Four and-a-half foot.

20  Q.   Above ground?

21  A.   Yes.

22  Q.   Okay.  And were there times before the weekend that John

23  passed away where you observed John swimming in your backyard

24  pool?

25  A.   Yes.

MILLER – DIRECT – CICCOTTA

1   Q.   Okay.  Did you observe -- did you make any observations

2   that he had any kind of difficulty or problems swimming in

3   your pool?

4   A.   Nothing that would, you know, catch my attention.

5   Q.   Do you know before the weekend that you went down to the

6   shore at Pine Haven with the boys, did you have any other

7   information about whether John was a competent swimmer, from

8   any other source?

9   A.   No.  I mean, between my experience with him at my home

10  and we were also at the beach together, I saw no indication of

11  anything like that.

12  Q.   Okay.  So there was a point in time that weekend when you

13  got down to the shore area, actually the Saturday before the

14  Sunday that he passed away, where the family and John went

15  down to the Sea Isle City beach?

16  A.   Yes.

17  Q.   Okay.  And you were there?

18  A.   Yes.

19  Q.   Did you go into the water -- were you in the ocean at all

20  that day?

21  A.   Yes.

22  Q.   Yes?

23  A.   My daughter can't stay out of the water.

24  Q.   Okay.  So were you -- the entire time that you were at

25  the beach with the family that day, were you mostly with

MILLER - DIRECT - CICCOTTA

1   Sophia?

2   A.   Yeah.

3   Q.   Yeah?  Were you ever in the water --

4   A.   She's a little rambunctious, so she takes all the

5   attention.

6   Q.   So were you ever in the water, without Sophia but with

7   the boys, out in the water?

8   A.   My recollection, I believe they had a football, so

9   normal, normal things.  Throw the football to them and they

10  catch it in the waves, stuff like that.  Just normal play.

11  Q.   Okay.  From what you saw at the ocean, the Atlantic Ocean

12  that day, on Saturday, August 7th, 2010, did it appear that

13  John was a competent swimmer?

14  A.   Yeah, see, I didn't see him struggle at all, and he was

15  diving into the waves.  I didn't see --

16  Q.   Were there -- do you know if there were times that --

17  that particular day when he was far enough out that he would

18  actually need to swim and wouldn't be able to stand in the

19  ocean?

20  A.   Like I said, there was no indication at all.  I didn't

21  see anything that would have alarmed me that, you know, he

22  couldn't handle himself in -- in the water.

23  Q.   Okay.  All right.

24  A.   He never mentioned anything that he couldn't swim.

25  Never, you know, I never saw -- you know, not that I'm an

MILLER - DIRECT - CICCOTTA

1  expert in swimming, but, you know, my life experience shows me

2  that, you know, someone is struggling to swim they can't swim.

3  No, I didn't notice that.

4  Q.   You didn't see anything like that.  Okay.

5       Did -- were you present at any time that weekend when

6  your wife, Heather, gave clear instructions to the boys about

7  what she expected of them that weekend, what her rules were?

8  A.   Yeah.

9  Q.   Okay.  And do you remember what her rules were for that

10  weekend?

11  A.   Well, she, you know, she -- they had to be in by curfew.

12  Q.   Which was 10?

13  A.   Which was 10 o'clock for -- for the children at that age.

14  Q.   Okay.

15  A.   The other thing was, you know, swimming in the lake.

16  Q.   Okay.  She told them no swimming in the lake without you

17  guys?

18  A.   Yes.  Quite a few times.

19  Q.   All right.  And you heard that, you were present when she

20  gave them those warnings?

21  A.   Yes.

22  Q.   And they seemed to understand, right?  There didn't seem

23  to be any kind of problem with them comprehending what she was

24  saying?

25  A.   No.

MILLER – DIRECT – CICCOTTA

1  Q.  Okay.  Was –– did your wife have –– did she specifically

2  give them instructions about the swimming lake?

3  A.  Yes.

4  Q.  All right.  And she told them specifically, don't go in

5  the swimming lake?

6  A.  Yes.

7  Q.  At some point during the time before the Sunday when they

8  did go into the lake, she had warned them not to?

9  A.  Yes.

10  Q.  Okay.  Was there –– let's step back a few months to the

11  point where you became a renter at Pine Haven.  This was the

12  first summer that you, as a family, had rented a campsite at

13  Pine Haven?

14  A.  We had just purchased our brand-new camper, I think ––

15  excuse me, I think in April.  We looked around at campsites in

16  that area, and we looked at I think almost every one down

17  there.

18  Q.  Okay.  And you decided on Pine Haven?

19  A.  Yes, we did.

20  Q.  And during the search process, was there a time where you

21  actually met with Terri Jordan; as you were deciding which

22  campground to go with, which resort to pick, did you meet with

23  Mr. Jordan?

24  A.  He's the front person for the campground.

25  Q.  Okay.  He's the manager ––

MILLER - DIRECT - CICCOTTA

1  A.   He's the manager, he's the front person.

2  Q.   All right.  So you did meet with him before picking Pine

3  Haven?

4  A.   I believe we met with him twice before we decided.

5  Q.   Okay.  So -- and did he go over with you kind of the

6  general expectations of the campground, about how you guys

7  would handle yourselves while you were on-site?

8  A.   Yes, he did.

9  Q.   Okay.  Was there ever a time where he said to you that

10  the management of the campground expected that parents would

11  supervise their children under age 16, 24/7?

12  A.   In the rules, I -- rules or bylaws --

13  Q.   That's not what I'm asking you --

14  A.   -- of the campground --

15  Q.   I'm asking you first at that point whether or not --

16  A.   Did he tell us we had to watch them 24/7?  I don't

17  believe he framed it that way.

18  Q.   Okay.  All right.

19  A.   He told us that you're responsible for your children.

20  Q.   Okay.  All right.  But he never said you had to be with

21  them at all times in all locations on the campsite -- on the

22  campground?

23  A.   No.  I don't believe he worded it that way.  He just made

24  us understand that we're responsible for our children's

25  behavior.

MILLER - DIRECT - CICCOTTA

1 Q.  Okay.  All right.  As parents?

2 A.  So, which is, you know, nothing unusual.  I mean, that's

3 just the rule --

4 Q.  Sure.

5 A.  -- the law everywhere.

6 Q.  So when you were looking at the site and you were picking

7 -- trying to pick among the camping resorts available to you

8 down at the shore, was there something that kind of attracted

9 you to Pine Haven, something that made Pine Haven attractive

10 to you?

11 A.  My wife and I, repeating what I said, we looked at

12 several campgrounds, and we thought Pine Haven would be the

13 best fit for us.  We thought that, you know, it was more of a

14 family atmosphere.

15 Q.  Yeah.

16 A.  Looked structured, looked -- it looked like they were

17 investing in the property.  The owners or management, you

18 know, was investing in the campground.

19 Q.  And a kid-friendly type of environment?

20 A.  Yeah, yeah.  I mean, there was -- you know, there was

21 swing sets.  They didn't look run-down.  It looked clean.

22 Looked like, you know, looked like there was upgrades done

23 and, you know, and the -- and the fact, you know, they -- they

24 had a monthly schedule that they put out.  They had activities

25 and it was all -- seemed like it was geared towards the

*United States District Court*
*Camden, New Jersey*

MILLER - DIRECT - CICCOTTA

1   children.

2   Q.   Yeah.

3   A.   We live in the city and we were looking for a place to

4   get away.

5   Q.   Yeah.

6   A.   You know.  We'd go down the shore and get away, too.

7   Q.   So at any point, Mr. Miller, I don't want to cover ground

8   that we've covered already with your wife, but at any point,

9   Mr. Miller, before John Toribio passed away that weekend, did

10  you personally see any signs with instructions or rules from

11  the campground with respect to the swimming lake?

12  A.   There was a -- there was a sign on the far side of the

13  lake, which is -- on the side of the lake that, really,

14  there's no beach, there was a sign over there.

15  Q.   Okay.  And what did that sign -- what did that look like?

16  A.   To be -- I can't even -- I mean, it look weathered.  I

17  can't remember exactly what it said.

18  Q.   Can you -- may I?  Could you -- Tim, Mr. Miller, can you

19  step down.  Using the diagram first, have you ever seen this

20  before?

21  A.   That's the common diagram that you're given when you sign

22  up as a seasonal guest, as a -- for a renter at the Pine Haven

23  resort.

24  Q.   Okay.  So you're familiar with this kind of -- this map?

25  A.   Yes.

MILLER – DIRECT – CICCOTTA

1   Q.   All right.  So the sign you were talking about, the one

2   sign that you were talking about, can you show us on the

3   diagram, the map, where that sign was located.

4   A.   I mean, the map is not really a true indication.

5   Q.   Right.  It's not to scale.  So, can you show us --

6        MR. HERMESMANN:  If the witness could testify.  He's

7   interrupting his own witness.

8        MR. VESPER:  He's just --

9   BY MR. CICCOTTA:

10  Q.   Where, just using this first, where would you say your

11  recollection is that sign was located, using this only?

12  A.   It would be -- I guess it would be on this side.

13  Q.   Okay.

14  A.   But that's -- to be honest with you, there would be trees

15  on this side of the lake, if it was a true scale map.

16  Q.   Okay.  Sure.  Were you able to see the -- were you able

17  to see the sign?

18  A.   No.

19  Q.   Why?

20  A.   Because it was obscured by the foliage on the other side

21  of the lake.

22  Q.   Okay.  Was there one sign or more than one sign, before

23  -- again, before the boy drowned?

24  A.   What I said, I didn't notice the sign.  It was on the

25  other side of the lake.

*United States District Court*
*Camden, New Jersey*

MILLER - DIRECT - CICCOTTA

1  Q.  Okay.  If we use this, rather than using the diagram,

2  this has been used before during the trial.  Can you show us

3  where the sign --

4  A.  That would be the sign.

5  Q.  Oh, okay.  Is the sign actually shown in this photograph?

6  A.  No.

7  Q.  Well, you said that --

8  A.  Well, I think this -- that would be approximately where I

9  remember the sign being.

10  Q.  Okay.  Can you, using -- using this marker, can you draw

11  a circle around the area where you think approximately the

12  sign you're referring to was located before John passed away.

13  A.  (Witness complies.)

14  Q.  Okay.  All right.  And you don't recall any other signs

15  before he passed away other than that one?

16  A.  No.

17  Q.  Okay.  You can have a seat.

18     The sign you're referring to, the sign you're saying

19  was kind of in that general area, did it look like this?

20  A.  No.

21  Q.  Did it look like this?

22  A.  No.

23  Q.  All right.  And when I say "this," for the record, I'm

24  referring to what's already been marked as Defendant's Exhibit

25  39.

*United States District Court*
*Camden, New Jersey*

MILLER - DIRECT - CICCOTTA

1      THE COURT:  He said he couldn't read it.  What's the

2  purpose of showing him a sign when he said he couldn't read

3  it?

4      MR. CICCOTTA:  Well, I understand --

5      THE COURT:  You've spent about 10 minutes on

6  something that was -- his testimony is completely clear on.

7      MR. VESPER:  He was trying to identify --

8      THE COURT:  No, no.  You're not handling this

9  witness.  You know that and I told you that.

10     Go ahead.

11     MR. CICCOTTA:  Thank you, Your Honor.

12  BY MR. CICCOTTA:

13  Q.  Let's go to Sunday.  Let's talk about Sunday, August 8th

14  of 2010.  Your wife had explained some of the activities that

15  went on that day.  The boys spent a good part of that day up

16  front in the area where all the attractions are for children?

17  A.  Yes.  There's -- it's where the play set is and the swing

18  set, and I think the -- I'll call it a pirate ship.  It's a

19  wooden play apparatus that's, you know, in the shape of a

20  ship, it's made of wood.

21  Q.  Okay.  And where is that with respect to the lake?

22  A.  Right on the lake.

23  Q.  Like, on the beach?

24  A.  On the beach.

25  Q.  Okay.  And were there -- you know, during that summer

MILLER - DIRECT - CICCOTTA

1    when you were there, leading up to the weekend when John

2    passed away, in the later parts of the day, in the evening,

3    were there any kind of artifical lights anywhere near the

4    swimming lake?

5    A.   I believe there is one light at the very, I would call it

6    the east end of the lake.

7    Q.   Okay.  The east end, is that where the playground is?

8    A.   There -- yes, there was -- I think there was a couple --

9    they're telephone poles that had like a light on it.

10   Q.   Okay.

11   A.   Is what I -- you know, excuse me, is what I remember.

12   Q.   After dinner that evening, was there a period of time

13   where you and your daughter, Sophia, went up to the front area

14   where the boys were?

15   A.   Yes.

16   Q.   All right.  And why were you up there with Sophia?

17   A.   We were swing -- she was swinging on the swings, and

18   basically just playing, playing at the beach.

19   Q.   Okay.

20   A.   And she wanted to catch tadpoles and...

21   Q.   Okay.  So that was the playground area on the beach near

22   the -- near the lake?

23   A.   Yes.

24   Q.   Okay.  And were the boys up there with you at that time?

25   A.   Yes.

*United States District Court*
*Camden, New Jersey*

MILLER - DIRECT - CICCOTTA

1   Q.   Okay.  Were they with anyone else at that point?

2   A.   There was a group of teenagers, similar age group.

3   Q.   Okay.

4   A.   That, you know, they were -- they were up there in that

5   same area that I was playing with Sophia.

6   Q.   Okay.  Did you speak to the boys at all during the time

7   you were up there in that area with Sophia?

8   A.   Yeah.

9   Q.   What did you say to them?

10  A.   Just basically, don't do nothing stupid, you know.  They

11  -- they were with two girls that John and Anthony were --

12  there was a couple girls that were similar to their age.

13  Q.   Yeah.

14  A.   They were, you know, messing around with them.  They were

15  catching tadpoles at the lake, trying to catch frogs and, you

16  know, there -- and there was some other -- there was some

17  other teenagers, too, that I didn't really get to meet, but,

18  that was...

19  Q.   Okay.  How long do you think you and Sophia were up there

20  with them that evening?

21  A.   I was probably up there 45 minutes to an hour.

22  Q.   Okay.  And so after that 45 minutes to an hour, did you

23  go back to your campsite?

24  A.   Yes, I did.  I went up to John and Anthony and told them

25  that I was leaving, I was going back to the camper.

*United States District Court*
*Camden, New Jersey*

MILLER - DIRECT - CICCOTTA

1   Q.   Okay.  Told them not to do anything stupid?

2   A.   Told them don't go swimming in the damn lake.  Excuse my

3   language.

4   Q.   Okay.  So around what time of the -- what time of day was

5   it when you went back to your campsite?

6   A.   It was dusk.

7   Q.   Okay.

8   A.   I guess being August, I guess probably 8 o'clock, a

9   little after 8, in that area.

10   Q.   What do you mean by -- what do you mean by dusk?  When

11   you refer to dusk, what do you -- what do you mean?

12   A.   Well, it was -- it was light, but the sun wasn't -- you

13   know, I didn't -- the sun wasn't beating down on me.  The sun

14   was setting over the horizon.

15   Q.   Okay.  When you left, when you walked away from the boys,

16   where were they the last -- the last time you saw them?

17   A.   They were at the swing set by -- there's -- they were at

18   the swing set or the -- or the boat.  I think they were at --

19   they were at that pirate ship.

20   Q.   Okay.

21   A.   When I -- when I went up to them and told them that I was

22   leaving.

23   Q.   All right.  So, again, at the beach area near the lake?

24   A.   Yes.  All the things that I'm talking about are right on

25   the beach of the lake.

MILLER - DIRECT - CICCOTTA

1   Q.   Okay.  All right.  And so you left them and went back to

2   your campsite?

3   A.   Yes.

4   Q.   Okay.  And when was the next time you had heard anything

5   from the boys?

6   A.   When I was woken up.  I went -- I actually fell asleep

7   with Sophia, and I guess it was early in the morning, there

8   was a knock on the door.  I was actually -- next time I was

9   woken up, I was woken up by Terri.

10  Q.   By Mr. Jordan?

11  A.   Yes.

12  Q.   Yeah.  And what time was that around?

13  A.   Give a rough estimate, maybe 2 in the morning, I guess.

14  Q.   Okay.

15  A.   One in the morning.

16  Q.   All right.  Were you familiar, Mr. Miller, with the thing

17  that's been talked about throughout this trial, about the

18  whale that's positioned in the lake?

19  A.   Yes.

20  Q.   Okay.  Did you -- did you personally ever swim in the

21  lake yourself?

22  A.   Just -- I wouldn't -- not really.  I just -- I went

23  wading in the lake, you know, with Sophia, but, really, I

24  didn't really go swimming in the lake.

25  Q.   Okay.

MILLER – DIRECT – CICCOTTA

1  A.   Maybe once or twice.

2  Q.   Did you make any observations yourself, the summer -- the

3  summer -- that summer of 2010 up until the time that John

4  passed away, of other -- other children in the lake, swimming

5  in the lake?

6  A.   The lake is one of the focal points of the whole resort.

7  Q.   Okay.  Did you ever --

8  A.   And that's where, you know, the majority of all the

9  tenants would, you know, congregate, either at the pool or on

10  the lake, in that area.

11  Q.   And on previous occasions when you were observing -- you

12  were observing people in the lake, if you can tell and if you

13  know, did you observe times -- were there times when children

14  were swimming in the lake without parents?

15  A.   All the time.

16  Q.   Okay.  And again, that would be the period of time before

17  John passed away, that summer when you were down there on

18  previous occasions, and that weekend, up until the time he

19  died, you had seen children in the lake without parents?

20  A.   I've seen children diving off of the whale.

21  Q.   All right.  Had you -- were there times in that summer,

22  leading up to the time that John passed away, where you saw

23  children in the lake without parents in the evening hours?

24  A.   Yeah.

25  Q.   Okay.  When it was dark?

MILLER – DIRECT – CICCOTTA

1   A.   (Witness nods.)

2   Q.   Yes?

3   A.   Yes.

4   Q.   All right.  Are you familiar, Mr. Miller, with the -- any

5   type of patrols that were done around curfew time or whenever,

6   back in August of 2010, by Mr. Jordan or any of the campsite

7   management?

8   A.   There was patrols.  I would say, at best, sporadically.

9   Q.   Sporadically?

10       All right.  During that period of time when you were at

11   the lake for about 45 minutes to an hour with Sophia and the

12   boys were doing their thing that evening, before you went back

13   to your campsite, did you see anybody doing any kind of

14   patrols at that time?

15   A.   I -- you would see, during the daytime, you know, Terri

16   and some of the other faculty were visible; you know, there

17   was a presence during the daytime.  At nighttime, it was a lot

18   different.

19   Q.   Okay.

20       MR. VESPER:  It was what?

21       MR. CICCOTTA:  A lot different.

22   BY MR. CICCOTTA:

23   Q.   So are you -- you are a landscaper by trade?

24   A.   Correct.

25   Q.   Or you were.  After the incident, were you -- did you --

MILLER – DIRECT – CICCOTTA

1  have you done work for Pine Haven, actually landscaping work

2  for Pine Haven?

3  A.   Yes, I have.

4          MR. HERMESMANN:  Object as to relevance.

5          THE COURT:  What's the relevance of that?

6          MR. CICCOTTA:  It's a budgetary issue, Your Honor,

7  questions of budget.

8          THE COURT:  What is the budgetary issue?

9          MR. CICCOTTA:  Well, there is, in this case, a

10  question that was raised by Mr. Jordan himself, that -- maybe

11  we should do this at sidebar.

12          THE COURT:  All right.  I want no more questions

13  about his doing landscaping.  That has nothing to do with what

14  happened.

15  BY MR. CICCOTTA:

16  Q.   All right.  Did you, prior to the incident, the drowning

17  incident, had you ever seen John Toribio with his family, with

18  his mother, in any kind of setting?

19  A.   Excuse me.  Me personally, no.

20  Q.   Okay.  Did you have any personal knowledge of what John

21  was interested in doing, or what he maybe would have planned

22  to have done as an adult with a career?  Did you ever hear

23  anything like that?

24  A.   No.  No, I just -- they were -- my experience with John

25  and Anthony together was, you know, their interaction with

MILLER – CROSS – HERMESMANN

1   sports.  You know, we would take them -- we would take them to

2   football practice, and I would throw, you know, throw them

3   passes, probably a couple times a week.  You know, they -- we

4   would -- you know, I have a nice size yard and we would throw

5   passes in the yard.

6   Q.   Okay.  But as far as -- as far as anything that you may

7   have heard about anything that John might have wanted to do as

8   a career or -- you know, when he was an adult, what he might

9   have wanted to do as a career plan when he was older.

10  A.   It wasn't something he discussed with me.

11  Q.   Okay.

12  A.   I was more of, you know, like the father figure that, you

13  know -- they were on their best behavior around me.

14  Q.   All right.  Thank you.  That's all I have.

15          THE COURT:  Cross-examine.

16          MR. HERMESMANN:  Thank you, Your Honor.

17  (CROSS EXAMINATION OF TIMOTHY MILLER BY MR. HERMESMANN:)

18  Q.   Good afternoon, Mr. Miller.

19  A.   Good afternoon.

20  Q.   Let me just follow up on that last comment you made, they

21  were on their best behavior around you.  Based upon your

22  observations, did they view you as an authority figure?

23  A.   Yes.

24  Q.   Did they also view your wife as an authority figure?

25  A.   Yes, I -- there was nothing that I seen that would

MILLER – CROSS – HERMESMANN

**1**  indicate otherwise.

**2**  Q.   Okay.  Let me take you back to when you first -- when you

**3**  first came to Pine Haven.  You had a couple of meetings before

**4**  deciding to lease a space at Pine Haven, is that right?

**5**  A.   Correct.

**6**  Q.   And I believe you've already told us that you liked the

**7**  family atmosphere, correct?

**8**  A.   There was one -- you know, repeating myself, it was one

**9**  of the things that -- it was the pitch that was done by Pine

**10**  Haven to us.  It was what we were -- you know, it was what we

**11**  were seeking.

**12**  Q.   Okay.  And it appeared -- I think you said it appeared

**13**  structured, correct?

**14**  A.   Yes.

**15**  Q.   Clean, correct?

**16**  A.   Yes.

**17**  Q.   They had been making upgrades, correct?

**18**  A.   Yes.

**19**  Q.   Appeared to be organized, is that correct?

**20**  A.   Yes.

**21**  Q.   And when you sat down with Mr. Jordan, on one or both of

**22**  the occasions, did he go over the Pine Haven rules and

**23**  regulations with you?

**24**  A.   Yes, he did.

**25**       MR. HERMESMANN:  If I could approach, Your Honor?

MILLER - CROSS - HERMESMANN

1     THE COURT:  Yes.

2   BY MR. HERMESMANN:

3   Q.   Sir, let me show you a document we have previously marked

4   D-41.  Do you recognize that document?

5     THE COURT:  I'm sorry, you don't mean D-17.

6     MR. HERMESMANN:  I may, Your Honor.

7     THE COURT:  What?

8     MR. HERMESMANN:  It's the rules and regulations.

9     THE COURT:  It's D-17, isn't it?

10     MR. HERMESMANN:  I apologize, it is.  I have a

11   different version.

12   BY MR. HERMESMANN:

13   Q.   Do you recognize that document?

14   A.   Yes, it looks like the annual, I guess for a lack of

15   naming it properly, the annual lease, rules and regulations of

16   Pine Haven.

17   Q.   Okay.  It says in dark print at the top, Pine Haven Camp

18   Rules and Regulations, correct?

19   A.   Correct.

20   Q.   And this one, this one in particular, it has:  A seasonal

21   contract runs from October 1st, 2009, until September 30th,

22   2010.

23     Did I read that correctly?

24   A.   Yes.

25   Q.   And it's dated May 23rd, 2010?

MILLER - CROSS - HERMESMANN

1  A.   Yes.

2  Q.   And is that your signature above it?

3  A.   Yes.

4  Q.   And you understood, from both this and from what Mr.

5  Jordan explained to you, that there was parenteral

6  responsibility for the children while they were at Pine Haven,

7  is that correct?

8  A.   Yes.  I mean, it's a general rule of pretty much anything

9  you're involved with.  You're always responsible for your

10  children.

11  Q.   You didn't think for a second that this was the type of

12  campground or place that you drop your children off, and Pine

13  Haven has them and you can come pick them up at the end of the

14  day, or you can come pick them up a week later.  You didn't

15  have that impression for a second, did you?

16  A.   No.  It doesn't say Pine Haven day care.

17  Q.   And your understanding of the gist of the rules included

18  that you had to supervise your children while they were at the

19  lake, is that correct?

20  A.   Correct.

21  Q.   And he specifically told you, during one of these two

22  meetings, that you are responsible for your children while

23  they were at the lake, is that correct?

24  A.   Correct.

25  Q.   I believe you indicated earlier that you've seen -- seen

MILLER – CROSS – HERMESMANN

1  children going into the lake unsupervised, is that correct?

2  A.   There's -- on several occasions, I've witnessed that

3  happening.

4        THE COURT:  You witnessed children going into the

5  lake without their parents being in the lake?

6        THE WITNESS:  Correct.

7        THE COURT:  They could have been on the shore,

8  though.

9        THE WITNESS:  Correct.

10        THE COURT:  So when you say they were unsupervised,

11  you mean the parents weren't in the water with them.

12        THE WITNESS:  Correct.

13        THE COURT:  Okay.

14  BY MR. HERMESMANN:

15  Q.   But do you know when you saw children in the water

16  whether or not there were parents adjoining them on the beach

17  watching them?

18  A.   Not necessarily.

19  Q.   Okay.  You don't know one way or the other, would that be

20  correct?

21  A.   Yes, I do know.  I know for a fact that there was parents

22  that children swam in the lake and they weren't at the lake.

23  Q.   You also testified --

24  A.   And I'm -- I'm sure, you know, considering that

25  management knows everybody at the park, I'm sure they realized

MILLER - CROSS - HERMESMANN

1    that, too.

2    Q.   You also testified on your direct examination that you

3    saw kids going into the lake after dark, is that right?

4    A.   Yes.

5    Q.   How about -- how about any other source?  Did they go in

6    the pool after dark?

7    A.   I -- I've witnessed them in the lake after dark, and I've

8    witnessed them down at the fishing lake.

9            THE COURT:  I'm sorry, the what?

10           THE WITNESS:  The fishing -- well, it's more like a

11   stream, Your Honor, but it's a place where you fish.  I've

12   seen people in there, also.

13           THE COURT:  In, actually in the water?

14           THE WITNESS:  Yeah.  I don't -- not that it was

15   condoned.

16           THE COURT:  What?

17           THE WITNESS:  Not that it was condoned, but I've seen

18   them in there.

19   BY MR. HERMESMANN:

20   Q.   You said it was not condoned.  Is that correct?

21           THE COURT:  I think he said it was not typical.

22           THE WITNESS:  I said not that it was condoned, is

23   what I said.

24           MR. HERMESMANN:  Thank you.

25           THE COURT:  Oh, okay.

MILLER – CROSS – HERMESMANN

1   BY MR. HERMESMANN:

2   Q.   Moving forward to this particular evening, when you were

3   initially at the lake with your daughter for a period of time,

4   the boys are there while you're there, correct?

5   A.   Yes.

6   Q.   And you then decide you're going to take your daughter

7   back to the -- to the trailer, is that correct?

8   A.   Yes.

9   Q.   And I believe your testimony was, you told them, don't do

10  any --

11  A.   Don't do any swimming.

12  Q.   Okay.  You told them don't do anything stupid, and you

13  specifically said don't go swimming, correct?

14  A.   Correct.

15       THE COURT:  Counsel, we're going to have to break in

16  5 minutes, so either you finish in 5 minutes or we continue

17  tomorrow.

18       MR. HERMESMANN:  Judge, I will continue.  I will

19  probably be done within 5 minutes, but I certainly haven't had

20  nearly as much time as plaintiff's counsel did.

21       THE COURT:  No, you can -- we can go tomorrow.

22       MR. HERMESMANN:  I have no problem, I'm just telling

23  you.  Thank you.

24       THE COURT:  No, I'm not going to cut you off at the

25  end of the day.

MILLER – CROSS – HERMESMANN

1   BY MR. HERMESMANN:

2   Q.   Mr. Miller, based upon the -- both the rules and

3   regulations and the fact that you brought John down to the

4   lake, I take it you felt responsible for him while he was down

5   there, is that correct?

6   A.   Yes.

7   Q.   The beach area, you said this was one of the congregating

8   areas during the daytime for the park.  Would that be correct?

9   A.   Yes, one of the -- one of the -- you know, a lot of the

10  kids like to catch tadpoles and frogs and, you know, people

11  would walk all around the lake, even on the backside, the

12  wooded side, and it was just -- it was fun.  The kids enjoyed

13  it, you know, and...

14  Q.   And it's a nice thing to do during a hot summer day,

15  right?

16  A.   Yes.

17  Q.   And did some people -- did they sunbathe, did people

18  sunbathe, at all?

19  A.   Yes.

20  Q.   On a typical Saturday or Sunday during the course of the

21  summer, during your first summer there, how many people would

22  be either in the water or on the beach, combined?

23  A.   I would estimate maybe 30 families, at times.

24  Q.   Okay.

25  A.   Sitting, you know, at various -- various areas around the

MILLER – CROSS – HERMESMANN

1  lake.

2  Q.   Thirty families consisting of four to five people,

3  average, per family?  You weren't counting?

4  A.   Yeah, you know, I -- it was just a place -- you know,

5  like I said, it was one of the focal points of the park.

6  Q.   Okay.  And you said that throughout the course of the

7  day, you'd observe Mr. Jordan and others patrolling through

8  the area, is that right?

9  A.   Yes.  I mean, you know, Terry was always friendly with

10  our family, and always we would see him interacting with

11  everybody constantly.

12  Q.   He was engaged, is that right?

13  A.   Correct.

14  Q.   And he was all over that park, right?

15  A.   Correct.

16  Q.   And when the sun went down and it got dark at night, the

17  activities would shut down and everybody would go back to

18  their trailer homes, is that correct?

19  A.   No.

20  Q.   Would -- would you go back to yours?

21  A.   No, there was -- there was functions -- there was

22  functions at Piney's Palace, I think that's the name.  It's

23  been a couple years.

24  Q.   The activities area?

25  A.   Yes, there was -- there was activities at night.

MILLER - CROSS - HERMESMANN

1   Q.   What time -- maybe we're confusing the night.  What time

2   would the activities go to at Piney's Palace?

3   A.   Whenever they were over.

4   Q.   What type of activities?

5   A.   There was, you know, they would have stuff, movies for

6   the kids.  They would -- you know, there would be potlucks,

7   there would be bingo, you know, various activities.

8   Q.   Family-oriented activities, correct?

9   A.   Correct.

10   Q.   And I assume these family-oriented activities aren't

11   going till midnight or anything like that.

12   A.   No.

13   Q.   Is that correct?

14   A.   No.

15        MR. HERMESMANN:  That's all I have for you, sir,

16   thank you.

17        THE COURT:  Can I ask you a question?

18        THE WITNESS:  Yes.

19        THE COURT:  On that night you went back with Sophia,

20   back to your -- around 7 o'clock, 7:30, you went back with her

21   to your trailer, right?

22        THE WITNESS:  Yes.

23        THE COURT:  Is that correct?

24        THE WITNESS:  Yes, Your Honor.

25        THE COURT:  When is the next -- the first time you

**1** became aware that John was missing?

**2**          THE WITNESS:  The next time I became aware was --

**3** there was a knock at our trailer.  Anthony couldn't find John

**4** and --

**5**          THE COURT:  Well, who was knocking at your trailer?

**6**          THE WITNESS:  I think it was a couple of the

**7** teenagers, Your Honor.

**8**          THE COURT:  Yeah.  What time is this?

**9**          THE WITNESS:  I guess that was about 10.  To be

**10** honest with you, Your Honor, I --

**11**          THE COURT:  That's two hour -- two hours later after

**12** the drowning.

**13**          THE WITNESS:  Yes.  I thought he was with a girl, is

**14** what I thought.  He was very -- he was very flirtatious with a

**15** -- with a couple of the girls.

**16**          THE COURT:  But anyway, the first time --

**17**          THE WITNESS:  And that's where --

**18**          THE COURT:  -- that you became aware that he was

**19** missing was 10 o'clock.

**20**          THE WITNESS:  Yes, approximately at that time.

**21**          THE COURT:  Well, we're going to have to break, you

**22** can continue your --

**23**          MR. HERMESMANN:  I'm done, Your Honor.

**24**          THE COURT:  Well, then, we will continue with your

**25** re --

MILLER – REDIRECT – CICCOTTA

1          MR. CICCOTTA:  I just probably only have a few

2   questions if Your Honor wanted to...

3          THE COURT:  We have already 50 percent more

4   transcript than you would have in a normal trial day.

5          MR. CICCOTTA:  We did well.

6          MR. VESPER:  It depends on who's testifying.

7          THE COURT:  Are you going -- if you're only talking

8   one or two minutes.

9          MR. CICCOTTA:  It really is.

10          THE COURT:  All right.

11          MR. CICCOTTA:  It really is.

12          THE COURT:  But, if not, I'm going to cut you off.

13          MR. CICCOTTA:  Okay.  It really --

14          THE COURT:  All right, go ahead.

15   (REDIRECT EXAMINATION OF TIMOTHY MILLER BY MR. CICCOTTA:)

16   Q.  Mr. Miller, you were asked some questions about the --

17   kind of the shut-down time on the evening of August 8th of

18   2010, and actually, that summer leading up to the weekend that

19   John passed away.  When -- when there would be shut-down time

20   at night, what would the park do in order to shut down the

21   swimming pool, if you made an observation of that?  What did

22   they do to shut down the swimming pool?

23   A.  It would just close the gates.

24   Q.  There was a gate.

25   A.  There was -- it was a -- you know, it was a gated pool.

*United States District Court*
*Camden, New Jersey*

MILLER – REDIRECT – CICCOTTA

1  Q.   Okay.  Close it.  Was it locked?

2  A.   I believe there was -- I believe there's a lock on it,

3  yes.  I believe there's a lock on the handle.  I don't

4  remember a padlock or --

5  Q.   Okay.  And so --

6  A.   I think they locked it, to answer your question.

7  Q.   Okay.  So at shut-down time, as far as a swimming pool

8  was concerned and the wading -- and the wading pool, there was

9  a fence around it and it was locked up, is that right?

10 A.   I believe so, yes.

11 Q.   During the time that you were there in the summer of

12 2010, leading up to the time that John passed away, did you

13 ever observe camp management actually patrolling the beach,

14 actually being on the beach and patrolling the beach at any

15 time?

16 A.   There was a road adjacent --

17 Q.   I'm not talking about the road.

18 A.   No.  Actually on the beach, I don't -- I couldn't say

19 that that was something that they did.

20 Q.   Okay.  So -- so when everything is shut down in the

21 evenings and there's a gate and a --

22       THE COURT:  You're starting to testify.

23       MR. CICCOTTA:  I'm sorry?

24       THE COURT:  You're starting to testify.

25       MR. CICCOTTA:  No, I won't, Your Honor.

MILLER – REDIRECT – CICCOTTA

1   BY MR. CICCOTTA:

2   Q.   When you had said a few moments ago that the swimming

3   pool is closed up, fenced and locked down in the evenings --

4   I'm sorry, Your Honor, you threw me there.

5           THE COURT:  A, there's no gate around the lake, is

6   there?

7           MR. CICCOTTA:  No, that wasn't -- that wasn't

8   actually where I was going.

9           THE COURT:  Right?

10          THE WITNESS:  No, Your Honor, there was not.

11          MR. CICCOTTA:  I wasn't going -- that wasn't my

12  question.

13          THE COURT:  And you didn't observe anybody patrolling

14  the beach after this so-called shut-down.

15          THE WITNESS:  No, Your Honor.

16          THE COURT:  Okay.  What's next?

17          MR. CICCOTTA:  That really wasn't my question.

18  BY MR. CICCOTTA:

19  Q.   At shut-down time, they did what they did in order to

20  lock up the pool.  So here's my question:  So were there any

21  occasions that summer when you observed children in the

22  swimming pool after shut-down time, in the swimming pool?

23  A.   I personally, no, I did not.

24  Q.   Okay.  But there were times that summer, leading up to

25  the day that John passed away, when you saw children swimming

1    in the swimming lake at night after shut-down time?

2    A.   Yes, I have.

3    Q.   And there were --

4         THE COURT:  He's already testified to that.

5         MR. CICCOTTA:  And there were occasions -- well, I'm

6    contrasting it with the swimming pool.

7    BY MR. CICCOTTA:

8    Q.   And there were -- and there were occasions that summer

9    where you saw children in the lake at night without parents?

10   A.   Yes.

11        THE COURT:  He's testified at least twice to that.

12   BY MR. CICCOTTA:

13   Q.   That was a yes?

14   A.   Yes.

15        MR. CICCOTTA:  Thank you.

16        THE COURT:  Okay.  Are you finished with this

17   witness?

18        MR. CICCOTTA:  I am.  Do you have any recross?

19        MR. HERMESMANN:  Judge, I'm glad to report, no

20   recross.

21        THE COURT:  Okay.  Thank you very much.  You don't

22   have to come back tomorrow.

23        Ladies and gentlemen, we're going to break for the day.

24   Please, don't discuss the case among yourselves.  Don't

25   discuss the case with your family, friends or loved ones,

 1   co-employees, bus drivers, space aliens, or anybody else, and

 2   do not do any research about the case.  You will learn what

 3   you need to learn here in the courtroom.  Have a very safe

 4   trip home, and I will see you tomorrow at 8:30.

 5            THE DEPUTY CLERK:  All rise.

 6            (JURY EXITS; 1:49 p.m.)

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**'** 

**'63** [1] - 437:24
**'90s** [1] - 492:5

---

**/**

---

**/S** [2] - 432:24, 432:24

---

**0**

---

**08101** [1] - 432:12

---

**1**

---

**1** [7] - 461:12, 464:23, 552:10, 645:20, 649:1, 649:13, 649:19
**10** [50] - 456:20, 467:17, 467:20, 468:1, 468:4, 468:5, 468:8, 468:18, 468:21, 472:10, 477:6, 484:1, 489:2, 491:2, 491:3, 500:15, 502:3, 521:22, 526:12, 534:21, 542:7, 542:8, 542:12, 551:23, 552:7, 557:16, 562:4, 564:2, 564:5, 573:12, 573:15, 583:25, 597:18, 599:1, 600:1, 601:11, 604:22, 607:18, 608:2, 608:4, 608:6, 608:7, 624:14, 633:12, 651:11, 658:12, 658:13, 665:5, 683:9, 683:19
**10,000** [1] - 475:18
**105** [1] - 560:8
**10:30** [1] - 601:11
**10th** [1] - 501:11
**11** [2] - 526:12, 564:25
**119.4** [1] - 444:6
**11:08** [1] - 565:9
**11:26** [1] - 565:10
**12** [1] - 452:6
**12-4975** [1] - 432:6
**125** [1] - 471:16
**14** [9] - 463:19, 505:2, 505:15, 517:14, 548:7, 548:10,

---

567:20, 642:6, 651:2
**14-year-old** [8] - 482:24, 496:11, 498:22, 498:25, 568:17, 609:14, 618:15, 654:4
**14-year-olds** [3] - 471:5, 495:14, 496:6
**15** [12] - 440:8, 440:10, 440:14, 528:7, 534:21, 536:14, 557:16, 559:25, 564:10, 614:25, 616:21, 633:12
**15,000** [1] - 439:17
**150** [1] - 437:9
**15th** [2] - 463:23, 550:25
**16** [6] - 518:2, 556:2, 581:9, 582:23, 583:1, 660:11
**16-year-old** [1] - 502:15
**18** [2] - 504:25, 624:14
**18-year-old** [1] - 618:16
**19** [1] - 624:14
**1962** [1] - 437:24
**1967** [1] - 438:3
**1970** [1] - 438:22
**1:49** [1] - 688:6
**1st** [2] - 471:16, 675:21

---

**2**

---

**2** [2] - 472:10, 669:13
**2,000** [4] - 437:11, 457:10, 457:14
**2,000-acre** [1] - 437:1
**20** [15] - 463:25, 469:15, 476:8, 482:21, 483:5, 491:3, 528:7, 551:8, 559:9, 559:11, 564:3, 564:5, 564:10, 578:17, 643:2
**200** [4] - 457:9, 607:18, 608:6, 608:7
**2009** [1] - 675:21
**2010** [40] - 450:24, 462:7, 462:13, 505:2, 505:15, 507:11, 508:20, 509:20, 515:5, 524:9, 543:4, 566:25, 567:20,

---

568:10, 580:10, 580:13, 582:3, 582:10, 583:22, 584:2, 585:6, 586:18, 594:18, 602:13, 603:6, 603:9, 607:17, 622:14, 623:1, 629:7, 653:1, 653:7, 657:12, 665:14, 670:3, 671:6, 675:22, 675:25, 684:18, 685:12
**2012** [1] - 512:2
**2013** [6] - 463:23, 471:16, 550:25, 559:25, 574:6, 645:2
**2015** [3] - 432:13, 436:3, 439:17
**23** [1] - 463:13
**23rd** [1] - 675:25
**24** [7] - 437:5, 477:22, 497:17, 498:7, 500:23, 501:7, 586:9
**24-hour** [2] - 502:8, 502:11
**24/7** [6] - 456:4, 479:8, 581:10, 581:14, 660:11, 660:16
**25** [6] - 438:6, 536:24, 537:8, 537:11, 538:8, 564:25
**28** [1] - 432:23

---

**3**

---

**30** [9] - 463:25, 536:24, 537:8, 537:11, 538:8, 551:8, 554:8, 643:2, 680:23
**30th** [1] - 675:21
**35** [1] - 540:3
**39** [1] - 664:25

---

**4**

---

**4** [1] - 604:8
**4,000** [1] - 440:15
**40** [1] - 540:3
**40-acre** [1] - 437:9
**42** [3] - 641:17, 641:18, 644:23
**436** [2] - 433:3, 433:4
**443** [1] - 433:6
**444** [1] - 433:8
**45** [5] - 555:11, 555:16, 667:21, 667:22, 671:11

---

**46** [2] - 555:11, 556:2
**462** [1] - 433:9
**494** [1] - 433:10
**4TH** [1] - 432:12

---

**5**

---

**5** [5] - 460:2, 651:11, 679:16, 679:19
**50** [13] - 438:11, 438:20, 440:7, 499:20, 500:3, 500:6, 639:3, 639:10, 646:17, 646:23, 647:1, 684:3
**500** [1] - 440:9
**500-and-some** [1] - 475:14
**501** [1] - 433:11
**504** [2] - 433:12, 433:13
**53** [1] - 575:4
**547** [1] - 433:14
**559** [1] - 433:15
**56** [1] - 560:7
**563** [1] - 433:16
**565** [1] - 433:17
**566** [1] - 433:18
**5:30** [2] - 650:18, 650:19

---

**6**

---

**6** [7] - 432:13, 436:3, 503:18, 624:21, 624:22, 625:5, 650:19
**6,000** [6] - 439:25, 440:2, 440:4, 440:5, 440:17, 454:25
**60** [5] - 530:23, 538:9, 538:10, 538:13, 540:1
**602** [1] - 433:20
**608** [1] - 433:22
**61** [1] - 575:5
**621** [1] - 433:24
**622** [1] - 433:25
**641** [1] - 435:6
**642** [1] - 434:2
**647** [1] - 434:4
**650** [2] - 434:6, 434:8
**652** [2] - 434:10, 434:11
**673** [1] - 434:12
**684** [1] - 434:14
**6:30** [3] - 628:10, 628:11, 644:4

---

**7**

---

**7** [18] - 468:4, 496:5, 496:23, 497:1, 497:2, 497:3, 503:13, 524:14, 530:10, 560:8, 580:10, 560:8, 583:22, 639:25, 640:16, 640:17, 640:24, 682:20
**70** [4] - 530:23, 538:11, 538:13, 540:1
**753** [1] - 432:23
**7:30** [7] - 524:14, 530:10, 533:20, 596:12, 608:19, 630:5, 682:20
**7:45** [1] - 608:19
**7th** [5] - 575:11, 579:19, 580:3, 580:13, 657:12

---

**8**

---

**8** [7] - 462:12, 533:20, 596:12, 622:14, 634:24, 668:8, 668:9
**8/10** [1] - 513:25
**86** [2] - 463:13, 550:18
**8:05** [1] - 459:16
**8:10** [3] - 451:14, 451:15, 459:16
**8:30** [1] - 688:4
**8:31** [2] - 436:2, 436:3
**8th** [18] - 451:14, 459:16, 462:7, 462:13, 513:25, 515:5, 516:19, 518:11, 522:9, 524:9, 582:21, 584:2, 585:6, 594:18, 623:1, 629:7, 665:13, 684:17

---

**9**

---

**9** [3] - 464:11, 587:5, 604:8
**91** [2] - 464:10, 551:20
**911** [2] - 601:20, 601:21
**98** [2] - 464:23, 552:10
**9:23** [1] - 484:4
**9:32** [1] - 491:11
**9:43** [1] - 491:12

# A

activity [2] - 485:25, 580:22
actual [2] - 575:19, 613:7
add [2] - 490:19, 512:7
addition [3] - 438:20, 446:9, 539:13
additional [2] - 445:17, 586:20
address [3] - 470:22, 483:16, 484:6
adjacent [1] - 685:16
adjoining [1] - 677:16
Administratrix [1] - 432:3
admitted [1] - 618:25
adopted [1] - 466:9
adult [13] - 460:11, 461:9, 461:16, 461:17, 483:4, 496:12, 496:14, 502:15, 545:2, 582:23, 618:16, 672:22, 673:8
adults [3] - 459:15, 630:19, 651:1
advance [1] - 447:2
adversary [1] - 618:25
afield [1] - 571:19
afloat [1] - 558:5
afternoon [15] - 461:13, 580:1, 602:12, 621:20, 622:4, 622:8, 622:9, 623:19, 642:2, 642:3, 652:7, 652:19, 652:20, 673:18, 673:19
afterwards [1] - 512:25
age [14] - 436:22, 477:6, 505:2, 505:15, 517:14, 518:1, 581:9, 582:23, 583:1, 583:11, 588:13, 660:11, 667:2, 667:12
agency [1] - 441:6
ages [3] - 583:8, 583:10, 624:13
ago [9] - 476:1, 551:3, 559:25, 564:5, 575:5, 587:20, 609:1, 621:5, 686:2
agree [21] - 458:23, 459:2, 462:25, 465:16, 465:18, 467:5, 467:7, 469:1, 471:8, 472:12,

a.m [3] - 436:2, 436:3, 484:4
a.m. [4] - 491:11, 491:12, 565:9, 565:10
a/k/a [2] - 432:8, 432:9
able [13] - 446:15, 446:18, 488:22, 529:2, 555:24, 576:20, 577:7, 625:16, 626:11, 637:5, 657:18, 663:16
absence [2] - 503:22, 503:23
absolutely [11] - 448:5, 472:2, 489:19, 575:2, 597:7, 599:3, 612:16, 612:19, 612:23, 613:11, 614:9
accept [4] - 441:10, 512:5, 512:6, 513:19
accepted [1] - 445:20
access [1] - 446:24
accompanied [6] - 461:16, 496:12, 502:15, 508:8, 524:10, 623:18
accompany [1] - 503:1
according [2] - 496:6, 499:13
accurate [1] - 645:10
accused [1] - 613:20
accusing [2] - 499:25, 500:1
achieve [1] - 611:3
Acme [2] - 587:5, 587:11
acres [4] - 437:11, 457:8, 457:9, 457:14
acted [1] - 493:18
ACTION [1] - 432:5
actions [1] - 459:9
active [3] - 437:18, 506:15, 510:7
activities [18] - 482:8, 506:3, 525:3, 525:4, 525:20, 566:14, 572:9, 585:4, 661:24, 665:14, 681:17, 681:24, 681:25, 682:2, 682:4, 682:7, 682:8, 682:10

472:15, 473:7, 475:3, 493:9, 510:6, 536:20, 603:1, 615:2, 616:25, 619:1, 634:12
agreed [2] - 557:8, 637:21
agreeing [1] - 477:1
agrees [3] - 492:16, 618:20, 619:6
agricultural [1] - 495:23
ahead [26] - 448:15, 451:23, 453:18, 454:18, 468:6, 477:15, 481:2, 481:18, 484:8, 512:14, 516:14, 525:16, 527:6, 532:25, 534:19, 553:21, 556:20, 571:7, 595:12, 600:13, 602:5, 622:6, 635:12, 637:15, 665:10, 684:14
air [1] - 523:14
alarmed [1] - 657:21
alcohol [1] - 527:4
aliens [1] - 688:1
allow [10] - 446:21, 471:7, 494:10, 506:8, 511:16, 516:14, 534:19, 569:24, 571:7, 636:14
allowed [5] - 486:8, 496:6, 496:12, 497:25, 503:20
allowing [2] - 487:23, 488:7
almost [8] - 440:9, 487:19, 488:18, 541:25, 586:9, 620:5, 653:20, 659:16
alone [4] - 440:3, 594:25, 596:15, 596:17
altogether [1] - 488:25
amenities [1] - 580:25
America [3] - 439:8, 439:15, 440:1
amount [2] - 569:24, 606:16, 606:18
analyze [1] - 440:13
AND [1] - 432:12
and-a-half [2] - 453:13, 655:19
and.. [2] - 666:20,

680:13
angle [1] - 541:15
annual [2] - 675:14, 675:15
answer [31] - 439:13, 441:2, 441:17, 441:19, 454:17, 454:20, 460:18, 460:23, 460:25, 461:17, 471:19, 472:2, 473:3, 473:21, 474:20, 484:23, 484:24, 492:1, 495:19, 506:10, 519:7, 552:13, 556:4, 560:15, 562:13, 562:22, 595:12, 608:12, 619:4, 630:14, 685:6
Answer [6] - 464:3, 464:5, 464:18, 464:20, 465:1, 472:6
answered [13] - 467:23, 473:12, 495:7, 523:22, 535:13, 542:17, 542:20, 545:19, 547:8, 591:13, 601:9, 601:10, 607:21
answering [1] - 591:15
ANTHONY [3] - 433:12, 504:12, 504:18
Anthony [64] - 463:4, 463:16, 463:22, 465:5, 465:14, 469:3, 469:21, 472:17, 498:25, 499:4, 504:7, 504:8, 517:6, 521:5, 537:21, 544:6, 547:19, 562:9, 563:16, 563:17, 566:4, 566:6, 568:9, 568:18, 568:20, 572:23, 576:9, 577:20, 581:5, 584:14, 584:16, 584:19, 584:24, 596:14, 603:15, 628:15, 628:23, 629:2, 629:23, 632:8, 635:11, 635:20, 637:1, 637:5, 637:8, 637:15, 638:3, 639:13, 643:9,

647:7, 648:12, 652:23, 653:1, 653:8, 653:9, 653:15, 654:4, 654:9, 654:13, 667:11, 667:24, 672:25, 683:3
Anthony's [2] - 464:10, 639:7
anyhow [1] - 497:10
anyway [2] - 605:8, 683:16
apologize [2] - 560:8, 675:10
apparatus [1] - 665:19
apparent [1] - 616:9
appeal [1] - 512:14
appear [3] - 493:9, 640:21, 657:12
appeared [3] - 674:12, 674:19
applicable [3] - 467:11, 467:13, 467:14
applied [3] - 465:13, 467:8, 482:11
applies [1] - 466:5
apply [4] - 466:8, 467:3, 467:7, 472:12
approach [8] - 463:9, 501:14, 510:14, 510:17, 550:12, 550:13, 558:25, 674:25
appropriate [5] - 447:23, 492:23, 493:21, 513:8, 583:21
appropriately [2] - 492:4, 493:19
approximate [4] - 449:15, 582:12, 582:17, 646:20
April [1] - 659:15
arcade [11] - 525:13, 533:11, 580:21, 588:15, 591:5, 591:6, 591:7, 591:11, 591:23, 632:25, 649:18
area [64] - 440:11, 440:12, 452:9, 452:10, 454:23, 484:14, 498:6, 509:10, 514:17, 515:9, 515:24, 517:12, 521:24, 525:8, 525:9, 525:10, 525:11, 525:20, 526:9,

530:11, 530:15, 537:24, 542:23, 549:6, 557:17, 557:21, 580:19, 580:25, 583:21, 586:17, 588:10, 593:7, 594:5, 594:12, 594:18, 598:25, 599:23, 600:9, 602:18, 606:15, 606:23, 630:7, 632:4, 632:17, 632:19, 632:21, 649:3, 656:13, 659:16, 664:11, 664:19, 665:16, 666:13, 666:21, 667:5, 667:7, 668:9, 668:23, 670:10, 680:7, 681:8, 681:24

**areas** [11] - 442:4, 451:7, 451:9, 451:11, 452:4, 484:12, 486:10, 494:24, 526:14, 680:8, 680:25

**argue** [5] - 481:11, 489:24, 489:25, 615:19

**arguing** [1] - 490:1

**argument** [2] - 618:10, 619:19

**arguments** [1] - 470:24

**arms** [2] - 558:6, 558:13

**arrangements** [1] - 447:2

**arrive** [1] - 625:9

**arrived** [4] - 528:15, 573:3, 624:20, 626:5

**artfully** [1] - 561:17

**artifical** [1] - 666:3

**artificial** [4] - 542:3, 542:22, 594:9, 639:19

**AS** [2] - 504:12, 565:19

**aside** [1] - 646:10

**asleep** [1] - 669:6

**asphalt** [4] - 531:5, 531:6, 531:8, 543:1

**assembled** [1] - 587:14

**assessment** [1] - 609:8

**associate** [1] - 560:12

**Association** [2] - 438:23, 444:5

**association** [2] - 443:3, 443:4

**assume** [8] - 458:6, 461:12, 470:10, 579:5, 603:12, 641:18, 642:15, 682:10

**assumed** [1] - 546:3

**assuming** [3] - 462:25, 482:5, 548:12

**assumption** [1] - 548:19

**Atlantic** [3] - 575:25, 577:21, 657:11

**atmosphere** [4] - 592:19, 602:25, 661:14, 674:7

**attempt** [3] - 600:8, 600:9, 613:8

**attendant** [1] - 497:17

**attention** [4] - 581:17, 608:16, 656:4, 657:5

**attorney** [4] - 474:15, 488:15, 547:22, 550:20

**Attorney's** [1] - 564:24

**attract** [1] - 459:4

**attracted** [2] - 556:16, 661:8

**attracting** [1] - 478:19

**attraction** [1] - 478:15

**attractions** [2] - 627:13, 665:16

**attractive** [1] - 661:9

**audience** [1] - 492:6

**August** [37] - 451:14, 459:16, 462:7, 462:13, 505:2, 505:15, 513:25, 515:5, 516:19, 522:9, 524:9, 568:10, 575:11, 579:19, 580:3, 580:10, 580:13, 582:21, 583:21, 584:2, 585:6, 586:16, 586:18, 588:4, 594:17, 602:13, 607:16, 622:14, 623:1, 629:7, 653:1, 653:7, 657:12, 665:13, 668:8, 671:6, 684:17

**aunt** [4] - 622:25, 625:17, 627:10, 627:21

**aunt's** [4] - 626:12, 626:20, 627:1, 627:15

**authored** [2] - 466:12, 466:15

**authority** [7] - 466:10, 548:25, 569:5, 654:14, 673:22, 673:24

**available** [7] - 439:12, 441:22, 456:4, 457:20, 467:10, 500:23, 661:7

**average** [1] - 681:3

**aware** [9] - 465:4, 471:5, 516:17, 517:7, 581:8, 604:10, 683:1, 683:2, 683:18

**axis** [5] - 537:14, 537:15, 537:16, 638:23, 638:25

---

# B

**backed** [2] - 600:21, 600:22

**background** [4] - 506:9, 507:20, 513:10, 569:25

**backside** [1] - 680:11

**backyard** [5] - 576:14, 576:21, 577:8, 655:14, 655:23

**bad** [1] - 484:25

**ball** [2] - 577:9, 577:10

**banter** [1] - 440:22

**barred** [2] - 447:6, 453:3

**barriers** [1] - 536:2

**barring** [2] - 488:25, 516:20

**base** [1] - 618:19

**based** [22] - 448:23, 449:3, 449:17, 449:18, 450:16, 451:3, 452:15, 459:4, 459:5, 462:11, 465:4, 469:1, 469:25, 470:8, 472:9, 503:2, 569:4, 588:24, 653:25, 673:21, 680:2

**basic** [1] - 450:4

**basis** [3] - 443:2, 492:9, 614:14

**basketball** [31] - 482:8, 506:13, 506:14, 525:15, 526:17, 526:18, 527:2, 527:13,

527:16, 529:5, 529:6, 530:19, 530:21, 530:25, 531:9, 532:9, 580:22, 601:16, 606:12, 628:18, 628:21, 629:19, 630:7, 631:15, 632:1, 634:20, 636:4, 640:14, 642:14, 642:18, 649:23

**baskets** [2] - 527:8, 527:9

**bathing** [8] - 532:2, 625:6, 625:8, 625:9, 643:20, 643:23, 644:1, 644:3

**beach** [47] - 459:18, 521:24, 525:14, 530:25, 531:9, 533:3, 534:11, 575:14, 575:15, 575:17, 575:19, 575:23, 576:4, 578:1, 578:24, 579:14, 579:18, 593:14, 593:16, 598:11, 607:6, 607:11, 607:13, 607:18, 607:20, 608:8, 632:20, 633:6, 656:10, 656:15, 656:25, 662:14, 665:23, 665:24, 666:18, 666:21, 668:23, 668:25, 677:16, 680:7, 680:22, 685:13, 685:14, 685:18, 686:14

**beams** [2] - 598:12, 599:5

**Bear** [3] - 442:9, 442:11, 442:12

**bear** [1] - 442:12

**beat** [1] - 488:7

**beating** [1] - 668:13

**became** [4] - 659:11, 683:1, 683:2, 683:18

**becomes** [2] - 452:11, 487:2

**bed** [2] - 456:24, 477:3

**BEEN** [2] - 504:12, 565:18

**BEERS** [1] - 432:18

**began** [3] - 539:8, 571:4, 644:11

**begin** [4] - 467:17, 467:20, 468:8,

531:10

**beginning** [2] - 493:20, 571:19

**behavior** [4] - 518:15, 660:25, 673:13, 673:21

**behind** [3] - 591:11, 637:5, 637:8

**belief** [1] - 478:10

**believes** [1] - 484:21

**below** [1] - 495:25

**benefit** [1] - 608:3

**best** [35] - 441:6, 442:24, 443:5, 443:10, 445:10, 449:18, 451:5, 451:6, 452:3, 453:23, 454:23, 456:3, 456:17, 465:21, 477:17, 478:11, 486:21, 486:23, 487:2, 487:15, 499:13, 502:2, 505:5, 505:7, 505:11, 505:13, 506:3, 544:7, 546:22, 566:11, 566:15, 661:13, 671:8, 673:13, 673:21

**BETANIA** [2] - 432:3, 432:4

**Betania** [1] - 571:1

**better** [2] - 485:1, 572:10

**Betty** [5] - 492:10, 493:3, 571:1, 571:3, 571:10

**between** [11] - 455:14, 530:20, 531:9, 553:15, 557:21, 591:22, 592:3, 606:15, 608:7, 648:11, 656:9

**beyond** [8] - 472:19, 499:16, 499:21, 543:15, 545:17, 553:7, 613:7, 616:22

**big** [9] - 437:8, 439:14, 492:1, 578:6, 592:22, 620:16, 620:17, 620:21, 646:4

**biggest** [1] - 609:13

**bikes** [1] - 583:11

**Billings** [3] - 436:20, 438:2, 438:3

**bingo** [1] - 682:7

**bit** [15] - 452:7, 467:15, 475:2,

479:5, 492:10, 522:24, 525:15, 528:20, 539:11, 560:15, 562:25, 584:5, 602:14, 630:22, 655:12

**black** [1] - 520:12

**BLM** [2] - 439:21

**block** [2] - 501:15, 564:6

**blocked** [2] - 447:23, 448:5

**blocking** [1] - 447:10

**blurt** [1] - 613:22

**board** [1] - 591:19

**Boardwalk** [5] - 585:10, 585:14, 586:7, 586:22, 595:20

**boat** [1] - 668:18

**bodies** [2] - 475:2, 477:18

**body** [6] - 454:10, 454:14, 460:12, 461:8, 478:14, 549:22

**bore** [1] - 567:25

**bother** [1] - 476:4

**bottom** [3] - 502:1, 579:2, 602:7

**boulders** [1] - 620:21

**Boy** [1] - 437:18

**boy** [8] - 463:16, 482:12, 483:7, 568:17, 599:23, 617:3, 618:16, 663:23

**boys** [77] - 469:19, 470:1, 470:5, 470:14, 550:4, 566:13, 566:14, 566:19, 566:23, 567:8, 567:20, 569:11, 570:4, 570:7, 573:3, 574:20, 577:20, 578:9, 578:25, 579:14, 580:11, 580:15, 581:4, 583:20, 584:4, 584:5, 585:5, 585:7, 585:16, 585:22, 586:21, 586:25, 594:18, 594:24, 595:2, 595:23, 596:14, 604:17, 605:7, 609:3, 609:5, 609:10, 609:14, 610:17, 610:18, 610:19, 628:2,

628:21, 629:1, 629:20, 629:21, 631:16, 631:17, 632:7, 632:14, 633:9, 633:18, 634:12, 635:7, 640:7, 642:14, 643:1, 654:9, 654:25, 655:5, 656:6, 657:7, 658:6, 665:15, 666:14, 666:24, 667:6, 668:15, 669:5, 671:12, 679:4

**boys'** [1] - 633:15

**branch** [1] - 531:6

**branch-in** [1] - 531:6

**brand** [2] - 441:21, 450:22, 659:14

**brand-new** [2] - 450:22, 659:14

**break** [11] - 483:23, 490:15, 490:17, 490:22, 490:23, 491:6, 564:23, 621:4, 679:15, 683:21, 687:23

**breakdown** [1] - 492:11

**breakfast** [1] - 477:3

**breaking** [1] - 651:4

**brief** [1] - 483:19

**briefly** [4] - 443:16, 491:16, 494:13, 641:21

**bright** [2] - 452:12, 496:5

**bring** [6] - 463:6, 472:24, 505:8, 511:12, 603:20, 617:21

**bringing** [1] - 618:22

**brochure** [1] - 590:7

**brother** [2] - 623:20, 627:21

**brought** [9] - 566:13, 569:19, 581:16, 595:23, 603:12, 604:12, 610:19, 653:12, 680:3

**brush** [3] - 588:18, 589:16, 591:11

**bucket** [1] - 554:20

**budget** [1] - 672:7

**budgetary** [2] - 672:6, 672:8

**bugging** [1] - 557:9

**build** [1] - 436:24

**building** [2] - 438:7, 438:20

**built** [2] - 437:23, 438:2

**bumps** [1] - 531:5

**buoys** [2] - 536:2, 536:7

**Bureau** [2] - 439:20, 439:21

**bus** [1] - 688:1

**bushes** [1] - 588:23

**business** [8] - 436:23, 437:15, 437:16, 443:1, 450:4, 450:6, 475:16, 500:25

**busy** [3] - 501:2, 608:13, 608:14

**but..** [1] - 463:8

**buy** [3] - 436:24, 450:6, 450:8

**BY** [203] - 432:17, 432:18, 432:20, 433:4, 433:6, 433:8, 433:9, 433:10, 433:11, 433:13, 433:14, 433:15, 433:16, 433:18, 433:20, 433:22, 433:25, 434:2, 434:4, 434:6, 434:8, 434:11, 434:12, 434:14, 436:18, 438:17, 439:6, 440:24, 441:24, 442:7, 442:14, 443:17, 444:17, 445:9, 445:25, 448:17, 449:14, 453:20, 455:2, 455:9, 456:15, 457:16, 458:22, 460:3, 461:21, 462:4, 463:15, 466:11, 468:7, 468:15, 468:25, 471:14, 473:6, 473:16, 473:23, 474:23, 476:2, 477:16, 478:1, 479:6, 479:24, 480:9, 481:4, 481:19, 483:3, 494:12, 495:13, 495:21, 496:4, 496:20, 496:25, 497:4, 497:12, 497:22, 498:14, 499:3, 499:8, 499:18, 500:2, 500:20, 501:17, 501:25, 502:19, 504:23, 505:10,

505:25, 506:16, 507:1, 507:24, 514:9, 515:2, 515:21, 516:5, 516:16, 517:5, 517:23, 519:9, 520:10, 521:4, 522:7, 522:21, 524:7, 526:4, 527:11, 528:8, 529:10, 533:2, 535:3, 535:19, 535:25, 536:21, 537:20, 538:17, 539:16, 541:13, 542:19, 543:25, 544:5, 544:24, 545:13, 546:17, 547:18, 550:2, 550:19, 555:8, 555:23, 559:3, 559:14, 560:10, 560:24, 561:18, 562:8, 562:14, 562:24, 563:14, 563:25, 566:3, 567:13, 570:3, 571:13, 571:22, 573:14, 574:11, 575:7, 575:21, 576:2, 578:23, 579:12, 589:9, 591:21, 593:1, 593:22, 595:16, 596:6, 597:13, 597:22, 598:5, 599:11, 600:7, 600:23, 602:6, 602:11, 603:8, 604:11, 606:4, 608:25, 609:20, 622:7, 628:13, 630:17, 634:11, 636:7, 636:21, 638:2, 639:2, 642:1, 643:25, 644:6, 645:24, 647:18, 648:1, 648:18, 648:25, 650:7, 650:17, 650:23, 652:18, 663:9, 665:12, 671:22, 672:15, 673:17, 675:2, 675:12, 677:14, 678:19, 679:1, 680:1, 684:15, 686:1, 686:18, 687:7, 687:12

**bylaws** [1] - 660:12

**C**

**CAMDEN** [1] - 432:12

**camera** [1] - 488:2

**cameras** [15] - 484:13, 484:17, 484:20, 484:22, 485:4, 485:5, 485:7, 485:9, 485:20, 485:23, 486:2, 486:9, 487:14, 487:22, 488:4

**Camp** [1] - 675:17

**camp** [29] - 437:18, 477:5, 482:13, 507:12, 517:7, 525:23, 525:24, 526:8, 527:17, 571:18, 571:23, 573:15, 580:2, 581:8, 581:21, 582:2, 600:24, 601:2, 604:1, 604:5, 604:10, 604:12, 609:9, 609:24, 609:25, 610:19, 626:6, 685:13

**camped** [1] - 507:15

**camper** [4] - 452:12, 581:13, 659:14, 667:25

**campers** [3] - 502:4, 594:12, 650:11

**Campground** [1] - 548:13

**CAMPGROUND** [1] - 432:7

**campground** [92] - 436:23, 436:25, 437:3, 437:15, 437:16, 441:8, 441:14, 442:19, 443:1, 443:9, 446:5, 446:16, 446:21, 446:25, 448:22, 449:24, 450:1, 450:10, 450:15, 450:18, 453:2, 454:1, 456:14, 456:17, 456:18, 456:23, 457:3, 457:5, 457:7, 461:9, 467:12, 467:13, 468:14, 474:6, 475:3, 475:10, 475:23, 475:24, 475:25, 476:7, 477:4, 477:18, 478:2, 479:2, 481:6,

481:7, 481:9,
481:18, 482:1,
482:2, 482:13,
485:22, 486:8,
487:1, 498:6,
500:25, 501:6,
509:6, 524:19,
527:17, 572:2,
572:8, 573:19,
573:20, 580:16,
581:22, 582:24,
584:7, 602:14,
603:19, 603:21,
607:9, 607:17,
609:22, 610:7,
623:13, 623:14,
625:3, 626:3, 629:4,
640:8, 641:1,
645:23, 659:22,
659:24, 660:6,
660:10, 660:14,
660:22, 661:18,
662:11, 676:12

**campgrounds** [74] -
436:24, 436:25,
437:23, 438:8,
438:9, 438:10,
438:19, 438:20,
438:21, 438:24,
438:25, 439:1,
439:8, 439:10,
439:15, 439:18,
439:19, 439:25,
440:3, 440:7,
440:12, 440:16,
441:1, 441:4,
441:15, 442:16,
442:21, 443:1,
443:6, 443:14,
443:23, 444:3,
444:7, 444:21,
449:19, 449:21,
451:8, 453:21,
454:24, 455:19,
455:20, 455:21,
455:24, 456:20,
459:7, 460:4,
465:20, 466:3,
467:16, 467:20,
468:8, 468:13,
468:18, 472:25,
478:10, 482:11,
485:2, 485:8,
485:10, 485:13,
486:4, 486:18,
489:2, 494:14,
494:19, 494:22,
498:5, 500:3, 500:7,
500:22, 572:12,
602:17, 661:12

**camping** [5] - 450:9,

477:9, 575:22,
640:2, 661:7

**Camping** [3] - 446:14,
451:4, 622:13

**CAMPING** [1] - 432:7

**camps** [1] - 604:6

**campsite** [11] -
626:12, 626:20,
627:1, 636:18,
659:12, 660:21,
667:23, 668:5,
669:2, 671:6, 671:13

**campsites** [3] - 437:9,
499:14, 659:15

**Canada** [3] - 439:18,
439:22, 485:8

**cannot** [1] - 466:20

**capable** [1] - 645:16

**capacities** [1] - 438:7

**Cape** [6] - 474:7,
476:18, 476:23,
476:24, 477:3,
623:13

**care** [7] - 472:18,
473:9, 618:9,
618:12, 619:16,
676:16

**career** [7] - 544:10,
544:14, 544:19,
545:3, 672:22,
673:8, 673:9

**careful** [1] - 519:3

**cargo** [3] - 529:8,
532:8, 532:11

**caring** [1] - 617:3

**cars** [1] - 599:4

**cart** [4] - 456:19,
482:15, 483:6,
640:12

**case** [50] - 438:13,
446:1, 450:17,
457:10, 459:11,
465:4, 465:13,
465:23, 466:13,
467:8, 467:14,
468:4, 469:1, 470:1,
470:21, 471:7,
474:6, 482:6,
482:12, 487:3,
492:4, 509:15,
510:10, 510:20,
510:23, 511:1,
535:7, 543:17,
544:12, 592:6,
592:7, 597:3, 597:4,
598:20, 598:22,
610:25, 611:1,
611:6, 614:4, 614:6,
614:15, 616:14,
619:13, 620:1,

620:16, 630:22,
672:9, 687:24,
687:25, 688:2

**cases** [4] - 468:1,
497:25, 620:7, 620:8

**casting** [1] - 620:19

**catch** [10] - 577:9,
631:18, 632:7,
632:13, 633:9,
656:4, 657:10,
666:20, 667:15,
680:10

**catching** [4] - 633:14,
633:21, 633:23,
667:15

**categories** [4] -
449:21, 449:25,
450:17, 450:20

**caused** [2] - 614:21,
619:10

**CCR** [1] - 432:24

**center** [2] - 519:25,
580:22

**certain** [4] - 455:14,
455:15, 474:4,
616:19

**certainly** [8] - 491:20,
492:22, 536:10,
603:20, 616:5,
617:11, 631:23,
679:19

**Certified** [1] - 432:23

**cetera** [1] - 439:21

**chained** [1] - 520:14

**change** [1] - 616:1

**changed** [1] - 587:10

**characterizations** [1]
- 653:16

**characterize** [3] -
464:1, 551:9, 560:22

**characterized** [1] -
612:20

**charge** [1] - 616:7

**charged** [1] - 613:12

**chasing** [1] - 594:1

**check** [2] - 443:8,
587:7

**chief** [1] - 446:10

**child** [9] - 460:6,
472:6, 593:15,
602:25, 608:13,
608:15, 616:7,
616:8, 654:6

**children** [64] - 459:4,
460:10, 461:8,
461:22, 471:4,
473:9, 498:4, 518:1,
518:5, 520:19,
521:7, 521:9,
567:22, 567:24,

567:25, 572:16,
573:25, 574:22,
580:17, 581:9,
581:15, 582:22,
582:25, 583:9,
583:11, 583:13,
583:16, 593:3,
593:6, 593:11,
593:18, 593:20,
594:1, 600:14,
601:16, 603:21,
603:25, 604:2,
604:13, 605:23,
630:6, 630:19,
658:13, 660:11,
660:19, 662:1,
665:16, 670:4,
670:13, 670:19,
670:20, 670:23,
676:6, 676:10,
676:12, 676:18,
676:22, 677:1,
677:4, 677:15,
677:22, 686:21,
686:25, 687:9

**children's** [1] - 660:24

**chipmunks** [1] -
442:13

**choice** [2] - 448:1,
572:7

**choose** [3] - 487:16,
488:1, 572:8

**chose** [4] - 571:17,
571:23, 571:25,
602:22

**Ciccotta** [2] - 612:17,
621:16

**CICCOTTA** [249] -
432:16, 432:17,
433:13, 433:15,
433:19, 433:23,
434:1, 434:5, 434:9,
434:11, 434:15,
504:7, 504:9,
504:20, 504:22,
504:23, 505:9,
505:10, 505:25,
506:16, 507:1,
507:23, 507:24,
510:9, 510:20,
510:24, 511:2,
511:4, 511:10,
511:22, 512:3,
512:7, 512:13,
512:15, 512:24,
513:6, 513:10,
513:16, 513:22,
514:1, 514:5, 514:8,
514:9, 515:2,
515:21, 516:5,

516:16, 517:5,
517:19, 517:23,
519:9, 520:9,
520:10, 521:4,
522:7, 522:11,
522:21, 523:22,
524:6, 524:7, 526:4,
527:7, 527:11,
528:8, 529:10,
533:1, 533:2,
534:20, 535:2,
535:3, 535:11,
535:15, 535:18,
535:19, 535:25,
536:9, 536:18,
536:20, 536:21,
537:19, 537:20,
538:17, 539:16,
541:13, 542:15,
542:18, 542:19,
543:25, 544:4,
544:5, 544:8,
544:13, 544:18,
544:21, 544:23,
544:24, 545:13,
545:21, 546:17,
547:10, 547:12,
547:15, 558:24,
559:2, 559:3,
559:14, 560:7,
560:10, 560:23,
560:24, 561:17,
561:18, 561:25,
562:3, 562:6, 562:8,
562:14, 562:23,
562:24, 563:4,
563:12, 563:14,
563:22, 564:17,
565:4, 565:7,
565:14, 565:25,
566:2, 566:3,
567:13, 570:1,
570:3, 571:13,
571:20, 571:22,
573:14, 574:8,
574:10, 574:11,
575:3, 575:7,
575:21, 576:2,
578:23, 579:12,
589:8, 589:9,
591:21, 593:1,
593:22, 595:9,
595:11, 595:14,
595:16, 596:6,
597:5, 597:13,
597:22, 598:3,
598:5, 598:23,
599:3, 599:11,
599:19, 599:22,
600:2, 600:5, 600:7,
600:23, 601:9,

602:6, 602:9,
608:25, 609:20,
611:2, 611:5, 611:8,
611:12, 611:15,
612:1, 613:1,
613:25, 616:3,
616:23, 616:25,
617:6, 617:11,
617:13, 617:15,
617:18, 617:23,
618:2, 618:24,
619:12, 621:3,
621:6, 621:17,
622:4, 622:7,
628:13, 630:15,
630:17, 634:11,
636:7, 636:21,
638:2, 639:2,
647:18, 647:24,
648:1, 648:18,
648:24, 648:25,
650:7, 650:23,
651:10, 651:19,
651:23, 652:15,
652:17, 652:18,
663:9, 665:4,
665:11, 665:12,
671:21, 671:22,
672:6, 672:9,
672:15, 684:1,
684:5, 684:9,
684:11, 684:13,
684:15, 685:23,
685:25, 686:1,
686:7, 686:11,
686:17, 686:18,
687:5, 687:7,
687:12, 687:15,
687:18
**circle** [2] - 627:1,
664:11
**circled** [4] - 590:16,
590:17, 636:10,
636:16
**circuit** [2] - 489:3,
620:23
**circular** [1] - 537:1
**circumstance** [1] -
655:4
**circumstances** [1] -
516:21
**city** [3] - 579:8,
579:10, 662:3
**City** [4] - 483:1, 578:2,
585:15, 656:15
**City's** [1] - 575:23
**CIVIL** [1] - 432:5
**civil** [2] - 462:13,
462:18
**claim** [2] - 545:18,

613:6
**claims** [2] - 511:17,
512:10
**clarification** [1] -
468:1
**clarify** [1] - 468:3
**class** [1] - 567:17
**classes** [2] - 567:18,
567:19
**clean** [2] - 603:1,
661:21, 674:15
**clear** [13] - 447:21,
453:9, 462:25,
467:10, 476:23,
485:21, 485:22,
493:10, 499:7,
537:21, 572:22,
658:6, 665:6
**clearing** [2] - 533:4,
533:5
**clearly** [2] - 616:7,
618:1
**CLERK** [23] - 436:1,
436:8, 436:14,
484:3, 491:10,
491:13, 494:7,
504:10, 504:14,
504:17, 504:19,
565:1, 565:11,
565:16, 565:20,
565:24, 621:20,
621:24, 622:3,
652:6, 652:11,
652:14, 688:5
**clients** [1] - 440:9
**close** [12] - 456:19,
468:3, 468:4,
468:21, 506:19,
520:2, 522:4, 547:6,
557:19, 653:18,
684:23, 685:1
**closed** [2] - 459:25,
686:3
**closely** [1] - 589:5
**closer** [1] - 505:8
**closes** [3] - 467:19,
467:24, 468:19
**closing** [7] - 470:24,
533:6, 533:10,
533:11, 615:15,
640:21
**clothes** [2] - 625:9,
625:10
**clouds** [1] - 462:23
**club** [1] - 450:8
**co** [5] - 492:11,
612:14, 614:3,
620:4, 688:1
**co-counsel** [4] -
492:11, 612:14,

614:3, 620:4
**co-employees** [1] -
688:1
**coast** [1] - 575:25
**code** [11] - 444:6,
444:8, 465:19,
466:5, 466:8,
473:24, 494:22,
502:21, 503:2,
510:22
**codes** [4] - 438:23,
441:3, 444:6, 494:14
**coincidental** [1] -
642:15
**college** [3] - 437:19,
437:20, 437:22
**combined** [1] - 680:22
**coming** [9] - 457:25,
478:19, 492:21,
548:5, 587:4,
591:20, 620:21,
621:11, 635:17
**comment** [5] - 452:15,
452:17, 491:18,
492:8, 673:20
**commit** [1] - 490:10
**commitment** [1] -
477:9
**committee** [1] -
438:23
**common** [3] - 450:12,
494:24, 662:21
**companies** [1] -
441:21
**company** [4] - 438:5,
438:8, 439:14
**company-owned** [1] -
438:8
**comparative** [1] -
510:25
**compare** [1] - 538:12
**compared** [1] - 475:8
**competent** [2] - 656:7,
657:13
**competition** [1] -
440:13
**complete** [1] - 442:18
**completely** [4] -
471:12, 544:20,
597:2, 665:6
**complies** [4] - 627:3,
646:5, 646:9, 664:13
**comprehending** [1] -
658:23
**computer** [2] - 463:7,
566:21
**conceding** [1] - 511:2
**conceived** [1] -
569:19
**concentrate** [1] -

450:19
**concern** [4] - 491:17,
574:1, 605:17,
605:18
**concerned** [6] - 537:4,
568:9, 571:11,
574:4, 574:17, 685:8
**concluded** [1] - 617:7
**concur** [2] - 462:21,
548:25
**condition** [8] - 535:11,
613:23, 614:6,
615:5, 615:10,
615:11, 616:4,
617:18
**conditions** [7] -
541:23, 559:17,
559:18, 559:23,
598:25, 635:1,
639:14
**condoned** [4] -
678:15, 678:17,
678:20, 678:22
**conduct** [3] - 488:13,
492:18, 493:12
**conducted** [2] - 446:8,
492:3
**configurations** [1] -
489:2
**confuse** [3] - 486:16,
487:15, 488:6
**confusing** [5] -
486:14, 486:15,
486:16, 486:17,
682:1
**congregate** [2] -
526:9, 670:9
**congregating** [1] -
680:7
**consensus** [1] -
478:18
**consequence** [1] -
465:15
**consequently** [1] -
439:11
**consideration** [1] -
483:19
**considered** [2] -
609:13, 612:11
**considering** [2] -
490:23, 677:24
**consistent** [4] -
516:24, 540:15,
615:13, 616:18
**consisting** [1] - 681:2
**constantly** [1] -
681:11
**construction** [7] -
438:24, 441:3,
444:2, 444:7, 444:8,

466:3, 494:19
**consultant** [2] -
436:23, 440:8
**consulting** [1] - 445:4
**contain** [1] - 494:23
**contemplating** [1] -
530:6
**context** [2] - 453:5,
495:9
**continually** [1] -
614:14
**continue** [7] - 491:7,
494:3, 514:7,
679:16, 679:18,
683:22, 683:24
**continues** [1] - 551:20
**continuing** [1] -
535:22
**continuous** [1] - 492:9
**continuously** [1] -
573:6
**contract** [1] - 675:21
**contractor** [1] -
437:23
**contradicts** [1] - 465:5
**contrasting** [1] -
687:6
**contributed** [1] -
615:16
**convenience** [1] -
580:21
**conventions** [1] -
479:3
**conversation** [6] -
530:4, 577:16,
629:20, 648:6,
648:11, 648:14
**convey** [1] - 494:18
**cook** [1] - 580:8
**cooler** [1] - 579:21
**COOPER** [1] - 432:12
**copy** [1] - 463:7
**corner** [1] - 606:13
**Corporation** [1] -
438:3
**correct** [197] - 432:23,
442:2, 443:20,
443:21, 443:24,
444:3, 444:19,
444:22, 444:24,
445:12, 450:22,
461:24, 463:4,
463:17, 463:19,
465:11, 465:23,
466:13, 466:17,
466:20, 466:21,
466:22, 466:23,
466:24, 466:25,
467:18, 467:19,
467:21, 468:9,

469:4, 469:11,
470:5, 470:9,
470:14, 470:19,
471:17, 471:24,
472:3, 472:14,
473:25, 474:1,
474:2, 474:3, 474:4,
474:5, 474:8,
474:25, 475:4,
475:8, 475:19,
475:23, 476:6,
477:19, 478:4,
478:7, 478:12,
478:13, 478:21,
478:23, 480:1,
480:2, 481:20,
481:22, 482:21,
496:8, 496:10,
499:5, 501:18,
502:6, 502:9,
502:10, 502:12,
502:21, 502:22,
503:2, 503:3, 503:5,
503:6, 503:9,
503:10, 503:16,
503:24, 536:9,
548:8, 548:15,
548:19, 548:22,
549:3, 549:6,
549:10, 549:13,
550:4, 550:7,
550:10, 551:16,
552:8, 552:19,
552:24, 553:2,
553:8, 553:17,
553:19, 553:22,
553:25, 554:3,
554:6, 554:9,
554:12, 555:1,
555:3, 556:21,
556:24, 557:17,
557:22, 557:24,
567:12, 567:21,
572:6, 572:17,
572:24, 587:23,
602:18, 602:23,
602:24, 603:10,
603:17, 603:18,
604:14, 604:17,
604:18, 604:20,
604:21, 604:22,
604:23, 605:9,
605:15, 605:19,
605:21, 606:8,
606:9, 606:15,
606:22, 607:1,
607:4, 607:7,
608:19, 608:21,
641:15, 642:7,
642:9, 643:1,
644:17, 644:20,

645:5, 646:12,
646:18, 647:7,
647:9, 647:10,
647:11, 647:13,
647:15, 652:25,
653:5, 671:24,
674:5, 674:7,
674:13, 674:15,
674:17, 674:19,
675:18, 675:19,
676:7, 676:19,
676:20, 676:23,
676:24, 677:1,
677:6, 677:9,
677:12, 677:20,
678:20, 679:4,
679:7, 679:13,
679:14, 680:5,
680:8, 681:13,
681:15, 681:18,
682:8, 682:9,
682:13, 682:23
**corrected** [2] - 496:24,
497:21
**correctly** [8] - 464:8,
464:21, 465:2,
551:18, 552:4,
552:14, 556:10,
675:23
**corrects** [1] - 444:12
**costume** [1] - 442:13
**counsel** [16] - 447:3,
447:6, 463:12,
484:9, 491:14,
492:11, 493:8,
494:13, 565:13,
612:14, 612:22,
613:9, 614:3, 620:4,
679:15, 679:20
**Counsel** [2] - 432:19,
432:21
**count** [1] - 607:22
**counted** [3] - 607:12,
607:21, 608:13
**counting** [1] - 681:2
**country** [2] - 450:8,
478:11
**County** [1] - 474:7
**couple** [15] - 437:21,
478:3, 481:17,
506:4, 529:15,
534:9, 552:25,
626:2, 666:8,
667:12, 673:3,
674:3, 681:23,
683:6, 683:15
**course** [13] - 469:9,
482:23, 491:21,
566:1, 587:1,
587:13, 603:22,

605:1, 607:3,
617:10, 638:12,
680:20, 681:6
**COURT** [544] - 432:2,
436:3, 436:4,
438:15, 439:3,
440:21, 441:17,
441:19, 442:3,
442:11, 443:15,
444:16, 445:1,
445:3, 445:8,
445:15, 445:18,
445:21, 446:18,
446:23, 447:2,
447:5, 447:9,
447:15, 447:21,
448:1, 448:3, 448:8,
448:14, 449:12,
451:14, 451:17,
451:19, 451:23,
452:1, 452:5,
452:13, 452:21,
452:24, 453:7,
453:9, 453:13,
453:16, 453:18,
454:3, 454:8,
454:10, 454:13,
454:17, 454:20,
455:8, 456:6, 456:9,
456:11, 456:25,
457:4, 457:8,
457:11, 457:14,
458:20, 459:11,
459:16, 459:20,
459:23, 460:10,
460:16, 460:18,
460:20, 460:23,
460:25, 461:2,
461:6, 461:8,
461:12, 461:17,
461:20, 463:11,
466:4, 466:7,
467:25, 468:6,
468:11, 468:22,
468:24, 470:24,
471:4, 471:11,
472:21, 473:1,
473:3, 473:12,
473:15, 473:21,
474:20, 475:24,
476:10, 476:12,
476:15, 476:19,
476:22, 477:2,
477:5, 477:9,
477:12, 477:15,
477:22, 477:24,
478:24, 479:19,
479:21, 479:23,
480:5, 480:7,
480:14, 480:17,
480:20, 480:24,

481:2, 481:11,
482:23, 483:1,
483:12, 483:20,
483:22, 483:23,
483:25, 484:5,
484:8, 484:15,
484:21, 485:4,
485:6, 485:14,
485:16, 485:21,
486:11, 486:15,
486:20, 486:23,
487:1, 487:5, 487:8,
487:12, 487:25,
488:3, 488:24,
489:9, 489:14,
489:17, 489:21,
489:23, 490:1,
490:3, 490:6, 490:9,
490:13, 490:16,
490:19, 490:25,
491:2, 491:6, 491:9,
491:10, 491:13,
491:14, 491:21,
492:1, 492:14,
492:25, 493:5,
493:8, 493:15,
494:3, 494:6, 494:7,
494:9, 495:3, 495:7,
495:11, 495:19,
495:24, 496:2,
496:14, 496:17,
496:23, 497:2,
497:9, 497:20,
498:11, 498:13,
499:1, 499:6,
499:24, 500:10,
500:13, 500:15,
501:10, 501:13,
501:15, 501:21,
502:18, 503:12,
503:18, 503:22,
503:25, 504:3,
504:6, 504:8,
504:10, 504:14,
504:17, 504:19,
504:21, 505:7,
505:22, 506:8,
506:24, 507:21,
510:2, 510:6,
510:12, 510:15,
510:18, 510:23,
510:25, 511:3,
511:7, 511:16,
511:24, 512:5,
512:9, 512:14,
512:19, 512:25,
513:12, 513:19,
513:24, 514:2,
514:7, 514:21,
514:24, 515:19,
516:1, 516:4,

516:14, 516:18,
516:23, 517:2,
517:16, 517:20,
519:7, 520:8, 522:4,
522:9, 522:12,
522:15, 522:18,
523:20, 523:23,
524:2, 524:5, 526:1,
527:6, 527:8, 528:5,
529:6, 529:8,
532:18, 532:21,
532:25, 534:19,
535:1, 535:7,
535:13, 535:17,
535:24, 536:5,
536:13, 536:17,
536:19, 537:10,
537:12, 537:14,
538:9, 538:11,
538:14, 539:13,
541:9, 542:6, 542:8,
542:12, 542:17,
543:18, 543:22,
544:3, 544:11,
544:16, 544:22,
545:7, 545:10,
545:20, 545:23,
546:1, 546:4, 546:7,
546:9, 546:11,
546:13, 546:16,
547:6, 547:11,
547:14, 547:16,
549:16, 549:18,
549:21, 549:24,
550:1, 550:13,
550:15, 555:4,
555:6, 555:21,
559:1, 559:11,
559:13, 560:9,
560:21, 561:15,
561:23, 562:1,
562:4, 562:12,
562:20, 563:3,
563:5, 563:9,
563:24, 564:18,
564:21, 564:23,
565:1, 565:3, 565:5,
565:8, 565:11,
565:13, 565:16,
565:20, 565:24,
566:1, 567:11,
569:24, 571:7,
571:19, 573:12,
574:7, 574:9, 575:1,
575:4, 575:17,
575:25, 578:18,
578:20, 579:5,
579:8, 592:24,
593:13, 593:20,
595:12, 596:3,
597:3, 597:8,

597:10, 597:12,
597:17, 597:19,
598:1, 598:20,
599:1, 599:4, 599:7,
599:10, 599:16,
599:21, 599:25,
600:4, 600:6,
600:13, 600:20,
601:6, 601:11,
601:14, 601:18,
601:21, 601:23,
601:25, 602:2,
602:5, 602:10,
603:6, 604:1, 604:5,
606:1, 609:17,
610:25, 611:3,
611:6, 611:9,
611:13, 611:17,
611:19, 611:24,
612:2, 612:4, 612:8,
612:10, 612:22,
613:12, 613:16,
613:24, 614:4,
614:10, 614:17,
614:23, 615:2,
615:4, 615:7, 615:9,
615:14, 615:22,
616:6, 616:17,
616:24, 617:1,
617:10, 617:12,
617:14, 617:17,
617:20, 617:24,
618:3, 618:10,
618:20, 619:4,
619:13, 619:18,
619:21, 619:23,
619:25, 620:7,
620:11, 620:16,
620:23, 621:5,
621:8, 621:13,
621:19, 622:6,
622:8, 628:11,
630:14, 634:9,
635:14, 635:17,
636:13, 636:18,
637:18, 637:21,
637:24, 638:1,
638:23, 638:25,
641:9, 641:13,
641:16, 641:18,
641:20, 641:24,
643:23, 644:3,
645:19, 645:22,
647:21, 647:25,
648:16, 648:22,
650:6, 650:16,
651:8, 651:13,
651:18, 651:25,
652:2, 652:16,
665:1, 665:5, 665:8,
672:5, 672:8,

672:12, 673:15,
675:1, 675:5, 675:7,
675:9, 677:4, 677:7,
677:10, 677:13,
678:9, 678:13,
678:16, 678:21,
678:25, 679:15,
679:21, 679:24,
682:17, 682:19,
682:23, 682:25,
683:5, 683:8,
683:11, 683:16,
683:18, 683:21,
683:24, 684:3,
684:7, 684:10,
684:12, 684:14,
685:22, 685:24,
686:5, 686:9,
686:13, 686:16,
687:4, 687:11,
687:16, 687:21
**court** [12] - 491:12,
492:22, 525:15,
526:17, 527:2,
530:19, 530:21,
565:10, 580:22,
601:16, 606:12,
630:7
**Court** [5] - 441:10,
492:23, 613:9,
615:20, 618:7
**COURTHOUSE** [1] -
432:11
**courtroom** [6] - 494:8,
509:17, 565:2,
565:12, 578:15,
688:3
**courts** [17] - 526:18,
527:13, 527:16,
530:25, 531:9,
628:18, 628:21,
629:19, 630:4,
631:15, 632:1,
634:20, 636:4,
640:14, 642:14,
642:19, 649:23
**cousin** [7] - 529:15,
529:19, 529:22,
556:23, 627:21,
627:22, 628:25
**cousin's** [1] - 626:8
**cousins** [5] - 624:5,
624:7, 624:10,
624:11, 642:9
**cover** [5] - 448:14,
452:21, 562:6,
652:21, 662:7
**covered** [4] - 511:12,
589:16, 652:21,
662:8

**coves** [1] - 543:14
**cream** [1] - 558:17
**Creek** [1] - 506:13
**critical** [2] - 493:16,
493:17
**cross** [15] - 448:14,
452:21, 472:21,
488:10, 488:17,
490:7, 496:21,
499:11, 501:21,
537:24, 547:7,
547:16, 602:10,
641:10, 673:15
**CROSS** [12] - 433:6,
433:9, 433:14,
433:20, 434:2,
434:12, 443:17,
462:4, 547:18,
602:11, 642:1,
673:17
**cross-examination**
[3] - 452:21, 488:10,
496:21
**CROSS-
EXAMINATION** [2] -
433:9, 462:4
**cross-examine** [6] -
488:17, 501:21,
547:16, 602:10,
641:10, 673:15
**cross-examining** [1] -
490:7
**crosses** [1] - 591:9
**crowded** [1] - 586:17
**CRR** [1] - 432:24
**crying** [1] - 493:10
**curfew** [9] - 518:17,
526:10, 573:9,
573:12, 583:21,
604:22, 610:14,
658:11, 671:5
**custody** [2] - 472:18,
473:9
**customer** [2] - 443:8,
457:19
**cut** [4] - 613:19,
615:23, 679:24,
684:12

**D**

**D-17** [2] - 675:5, 675:9
**D-41** [1] - 675:4
**D-42** [3] - 435:6,
641:18, 641:25
**D-I-O-C-S-O-N** [1] -
504:18
**d/b/a** [1] - 432:7
**dad** [2] - 463:25,

464:12
**daily** [1] - 450:19
**damages** [2] - 544:13,
599:15
**damn** [1] - 668:2
**danger** [1] - 609:13
**dangerous** [5] -
613:23, 614:6,
615:4, 615:9, 615:11
**dangers** [2] - 609:8,
609:9
**dark** [45] - 449:6,
451:15, 452:10,
458:8, 458:11,
458:13, 459:3,
459:9, 459:12,
464:2, 464:4, 464:5,
464:6, 464:7,
465:11, 477:24,
482:1, 523:14,
541:25, 542:9,
542:13, 542:16,
550:10, 551:10,
551:12, 551:13,
551:15, 552:6,
560:12, 594:5,
597:16, 598:14,
599:2, 599:25,
600:1, 636:6,
647:19, 648:2,
670:25, 675:17,
678:3, 678:6, 678:7,
681:16
**dark-to** [1] - 458:11
**dark-to-dawn** [1] -
458:11
**darker** [2] - 627:4,
647:22
**data** [1] - 439:12
**date** [1] - 513:2
**dated** [1] - 675:25
**dates** [1] - 576:25
**daughter** [10] - 568:1,
571:24, 578:3,
578:4, 592:23,
606:25, 656:23,
666:13, 679:3, 679:6
**dawn** [4] - 458:8,
458:11, 459:3,
477:23
**dawn-to-dark** [1] -
458:8
**day-dusk** [1] - 454:1
**daycare** [2] - 604:4,
604:5
**days** [12] - 455:15,
475:25, 481:17,
482:13, 483:8,
493:11, 509:2,
512:20, 512:21,

512:22, 542:22,
626:2
**daytime** [5] - 523:11,
583:14, 671:15,
671:17, 680:8
**deal** [1] - 621:13
**dealt** [1] - 489:19
**death** [2] - 613:6,
613:8
**debated** [2] - 478:17,
478:24
**Deceased** [1] - 432:4
**decedent's** [1] - 544:9
**decide** [4] - 486:19,
486:25, 634:2, 679:6
**decided** [6] - 531:12,
634:4, 637:14,
638:8, 659:18, 660:4
**decides** [3] - 454:1,
486:8, 487:1
**deciding** [4] - 592:17,
602:13, 659:21,
674:4
**decision** [2] - 586:20,
634:21
**decorum** [1] - 492:24
**deem** [1] - 491:7
**deep** [5] - 478:3,
534:14, 536:14,
576:16, 655:18
**deeper** [1] - 557:12
**Defendant** [1] -
432:21
**DEFENDANT** [2] -
435:6, 641:25
**Defendant's** [3] -
644:23, 645:20,
664:24
**Defendants** [1] -
432:10
**defense** [3] - 488:15,
620:19, 648:19
**Defense** [3] - 649:1,
649:13, 649:18
**defense's** [1] - 510:20
**defense-oriented** [1] -
620:19
**defined** [1] - 439:10
**definitely** [4] - 442:25,
449:22, 547:3,
584:12
**degrading** [2] - 487:4,
487:5
**deliver** [1] - 604:2
**denied** [2] - 619:22,
619:23
**dep** [1] - 550:16
**Department** [2] -
441:5, 474:7
**depicting** [1] - 632:17

**deposition** [23] - 446:11, 451:19, 463:3, 463:23, 469:2, 469:15, 469:18, 469:21, 470:8, 471:15, 480:12, 480:22, 512:1, 520:4, 536:10, 550:18, 550:21, 559:24, 560:19, 569:7, 574:5, 641:23, 645:1

**depositions** [2] - 446:3, 482:7

**depth** [1] - 616:21

**DEPUTY** [23] - 436:1, 436:8, 436:14, 484:3, 491:10, 491:13, 494:7, 504:10, 504:14, 504:17, 504:19, 565:1, 565:11, 565:16, 565:20, 565:24, 621:20, 621:24, 622:3, 652:6, 652:11, 652:14, 688:5

**describe** [14] - 520:11, 531:3, 532:16, 534:7, 534:13, 538:23, 566:10, 568:18, 569:8, 592:11, 599:22, 630:25, 635:9, 641:21

**described** [5] - 569:7, 581:1, 591:8, 591:24, 636:25

**describing** [2] - 535:4, 542:25

**description** [2] - 497:7, 497:24

**deserve** [1] - 620:25

**desk** [2] - 557:20, 557:22

**detail** [1] - 566:18

**details** [1] - 523:2

**detecting** [1] - 561:21

**detection** [2] - 561:12, 562:16

**detector** [2] - 454:1, 561:13

**detectors** [1] - 562:2

**deter** [2] - 483:8, 498:3

**deterred** [1] - 482:14

**deterrent** [5] - 457:23, 459:8, 480:1, 482:10, 498:8

**deters** [1] - 478:18

**develop** [1] - 487:23

**developed** [1] - 443:6

**diagonal** [1] - 633:10

**diagonally** [1] - 649:24

**diagram** [8] - 632:1, 641:22, 644:25, 645:4, 662:19, 662:21, 663:3, 664:1

**died** [2] - 589:19, 670:19

**difference** [2] - 475:21, 503:15

**different** [23] - 436:22, 438:7, 449:21, 449:24, 451:4, 460:21, 460:24, 475:3, 475:6, 485:6, 492:7, 510:8, 511:9, 561:3, 610:12, 618:11, 618:12, 619:18, 623:14, 642:6, 671:18, 671:21, 675:11

**difficult** [3] - 589:16, 594:11

**difficulties** [1] - 579:3

**difficulty** [1] - 656:2

**dilapidating** [1] - 588:18

**dimension** [2] - 537:12, 537:22

**dimensions** [1] - 536:23

**dinner** [15] - 524:15, 524:18, 524:22, 525:19, 526:13, 526:16, 579:23, 580:2, 580:10, 580:14, 587:14, 594:17, 594:22, 594:23, 666:12

**dinnertime** [1] - 587:10

**DIOCSON** [1] - 565:23

**DIOSCON** [18] - 433:12, 433:13, 433:14, 433:15, 433:16, 433:17, 433:18, 433:20, 433:22, 504:12, 504:23, 547:18, 559:3, 563:25, 565:18, 566:3, 602:11, 608:25

**Dioscon** [29] - 463:4, 463:16, 465:14, 469:3, 469:21, 498:25, 499:1, 499:4, 504:7, 504:8,

504:24, 507:7, 514:10, 515:7, 516:6, 517:6, 518:18, 519:4, 536:22, 541:22, 546:22, 559:4, 560:25, 563:15, 564:19, 565:15, 565:22, 566:4, 628:15

**Dioscon's** [5] - 463:13, 465:5, 550:17, 652:23, 652:24

**Dioscon-Miller** [1] - 565:22

**DIOSCON-MILLER** [8] - 433:17, 433:18, 433:20, 433:22, 565:18, 566:3, 602:11, 608:25

**dire** [1] - 443:15

**DIRE** [4] - 433:4, 433:6, 436:18, 443:17

**direct** [12] - 465:9, 468:16, 468:17, 472:19, 472:22, 488:9, 602:15, 613:10, 617:22, 618:21, 618:24, 678:2

**DIRECT** [12] - 433:4, 433:8, 433:13, 433:18, 433:25, 434:11, 436:18, 444:17, 504:23, 566:3, 622:7, 652:18

**directly** [1] - 643:9

**directory** [2] - 439:14, 439:17

**dirt** [1] - 531:7

**dis** [1] - 488:11

**disagree** [7] - 459:2, 489:18, 535:16, 612:23, 615:8, 617:16, 617:17

**disagreement** [1] - 452:8

**disappeared** [1] - 616:8

**disciplinary** [1] - 654:13

**discipline** [1] - 568:14

**discounted** [1] - 488:12

**discovered** [2] - 510:4, 511:10

**discovery** [1] - 536:7

**discuss** [2] - 687:24,

687:25

**discussed** [4] - 479:1, 577:11, 604:17, 673:10

**discussing** [1] - 571:9

**discussion** [2] - 536:6, 637:18

**discussions** [1] - 554:25

**disgrace** [1] - 488:19

**displayed** [2] - 510:11, 511:14

**dispute** [7] - 544:3, 561:23, 599:25, 614:18, 614:23, 616:11, 617:20

**disputed** [4] - 616:12, 616:13, 616:15, 617:22

**disputes** [1] - 599:1

**disqualified** [1] - 477:11

**disrespect** [1] - 489:8

**distance** [8] - 530:20, 537:6, 538:7, 538:14, 538:18, 538:19, 538:20, 616:19

**distraught** [4] - 616:8, 617:2, 617:3, 618:1

**DISTRICT** [3] - 432:2, 432:2, 432:14

**Diversified** [1] - 432:21

**DIVERSIFIED** [3] - 432:8, 432:8, 432:9

**diving** [2] - 657:15, 670:20

**document** [6] - 474:18, 474:24, 590:5, 675:3, 675:4, 675:13

**documentation** [3] - 474:10, 581:19, 589:22

**documents** [1] - 581:13

**dollar** [1] - 587:5

**dollars** [1] - 620:17

**done** [14] - 440:9, 447:7, 475:17, 493:17, 493:18, 562:21, 626:25, 661:22, 671:5, 672:1, 672:22, 674:9, 679:19, 683:23

**door** [9] - 483:17, 484:10, 484:14, 484:15, 484:16,

486:7, 487:11, 487:12, 669:8

**doors** [1] - 484:15

**down** [103] - 437:2, 477:2, 480:3, 506:1, 506:13, 506:14, 507:25, 508:23, 518:9, 518:10, 518:11, 518:14, 529:16, 529:17, 533:6, 533:10, 533:12, 533:13, 534:11, 536:14, 537:16, 548:12, 549:8, 549:14, 549:20, 550:22, 556:2, 556:12, 558:13, 559:21, 564:21, 566:13, 566:19, 569:11, 569:20, 570:4, 570:8, 570:16, 572:20, 572:22, 575:9, 577:17, 579:18, 582:15, 585:11, 585:16, 586:9, 586:10, 587:25, 590:12, 591:20, 597:8, 603:1, 603:10, 604:13, 604:16, 606:21, 614:25, 626:1, 626:2, 626:17, 627:6, 631:18, 631:19, 631:25, 633:22, 635:3, 639:16, 640:3, 640:22, 646:2, 648:3, 648:4, 648:20, 653:12, 656:5, 656:13, 656:15, 659:16, 661:8, 661:21, 662:6, 662:19, 668:13, 670:17, 674:21, 678:8, 680:3, 680:4, 681:16, 681:17, 684:17, 684:19, 684:20, 684:22, 685:7, 685:20, 686:3, 686:14, 686:19, 686:22, 687:1

**dozen** [3] - 574:14, 605:4, 605:6

**dozens** [1] - 574:15

**draw** [3] - 537:23, 645:4, 664:10

**dreamers** [1] - 545:4

**dress** [2] - 528:25, 529:6
**drew** [1] - 641:22
**drink** [1] - 654:22
**drinking** [6] - 526:23, 527:1, 527:3, 527:13, 527:16, 527:22
**drive** [6] - 457:18, 519:24, 590:22, 590:23, 592:21, 610:7
**Drive** [1] - 632:4
**driven** [2] - 476:18, 476:19
**drivers** [1] - 688:1
**driving** [3] - 457:12, 483:6, 640:11
**drop** [29] - 534:10, 534:14, 534:16, 534:21, 534:22, 535:4, 535:8, 535:20, 535:23, 536:1, 536:11, 552:21, 552:23, 553:5, 613:22, 614:11, 614:14, 614:18, 615:6, 616:10, 616:20, 618:11, 618:14, 619:1, 619:3, 619:6, 619:10, 676:12
**drop-off** [15] - 536:11, 613:22, 614:11, 614:14, 614:18, 615:6, 616:10, 616:20, 618:11, 618:14, 619:1, 619:3, 619:6, 619:10
**dropped** [2] - 532:8, 600:19
**drops** [4] - 534:11, 534:14, 536:6, 536:14
**drove** [1] - 598:11
**drowned** [11] - 515:16, 523:3, 542:21, 563:16, 563:17, 584:20, 592:2, 622:14, 636:20, 655:4, 663:23
**drowning** [31] - 445:6, 462:8, 462:10, 462:14, 465:6, 465:16, 472:12, 496:22, 505:1, 511:10, 512:17, 512:20, 517:11, 518:10, 543:16,

577:20, 581:18, 581:23, 582:25, 588:12, 589:12, 593:25, 594:21, 597:2, 601:5, 614:22, 615:17, 618:4, 619:10, 672:16, 683:12
**due** [2] - 570:20, 617:6
**DULY** [2] - 504:12, 565:18
**duly** [4] - 436:10, 436:12, 621:22, 652:9
**duration** [1] - 573:7
**during** [51] - 437:18, 437:19, 437:22, 475:15, 488:10, 494:25, 500:7, 509:2, 509:5, 520:17, 523:11, 525:21, 525:22, 544:25, 546:22, 583:14, 584:4, 587:1, 587:11, 587:13, 587:24, 593:2, 593:24, 605:21, 607:3, 610:8, 610:9, 610:18, 630:18, 631:10, 639:18, 639:25, 640:5, 650:8, 659:7, 659:20, 664:2, 665:25, 667:6, 671:10, 671:15, 671:17, 676:21, 680:8, 680:14, 680:20, 680:21, 685:11
**dusk** [6] - 449:6, 454:1, 458:6, 459:3, 477:23, 502:4, 668:6, 668:10, 668:11
**duty** [9] - 472:14, 475:20, 487:21, 487:22, 496:22, 497:1, 497:5, 497:17, 498:20

---

# E

**Eagles** [1] - 492:5
**early** [3] - 575:14, 586:18, 669:7
**Earth** [1] - 448:22
**east** [2] - 666:6, 666:7
**eat** [2] - 587:4, 654:22
**eating** [1] - 558:17

echo [1] - 493:8
**edge** [1] - 528:5
**effect** [2] - 581:19, 643:6
**eight** [3] - 516:19, 568:7, 568:8
**eighth** [5] - 505:17, 505:18, 505:20, 505:23, 567:15
**either** [26] - 445:11, 450:13, 455:22, 461:13, 481:24, 518:13, 522:10, 534:3, 542:21, 563:15, 563:19, 572:18, 573:2, 577:12, 589:18, 596:14, 603:21, 606:1, 629:1, 633:14, 633:18, 654:12, 654:24, 670:9, 679:16, 680:22
**electrical** [2] - 437:22, 444:6
**electrician** [2] - 437:20, 437:21
**elects** [1] - 485:23
**elicit** [2] - 616:4, 616:10
**elsewhere** [1] - 575:18
**emotion** [1] - 492:13
**emotional** [1] - 492:11
**emphasizing** [1] - 617:2
**employee** [3] - 456:14, 497:5, 497:6
**employees** [3] - 475:20, 502:4, 688:1
**employees'** [1] - 455:11
**enabled** [1] - 529:4
**end** [16] - 505:13, 514:6, 536:5, 537:15, 541:17, 557:12, 604:2, 621:2, 635:23, 638:21, 666:6, 666:7, 676:13, 679:25
**endless** [1] - 614:17
**enforce** [1] - 461:25
**engaged** [2] - 506:4, 681:12
**engender** [7] - 598:21, 601:6, 612:14, 613:9, 613:21, 617:8, 617:25
**engendering** [1] -

613:10
**enjoyed** [1] - 680:12
**enter** [5] - 515:17, 533:18, 538:6, 638:8, 643:2
**entered** [19] - 494:8, 516:21, 519:21, 532:13, 532:16, 534:1, 538:20, 538:23, 539:23, 553:4, 554:9, 559:5, 562:17, 565:12, 635:10, 645:17, 646:1, 646:3, 650:10
**entering** [3] - 516:9, 516:20, 519:22
**ENTERS** [1] - 436:2
**entire** [13] - 446:15, 457:2, 457:4, 457:7, 500:23, 501:7, 509:20, 510:20, 510:23, 559:8, 590:18, 640:5, 656:24
**entirely** [1] - 508:2
**entrance** [2] - 446:16, 645:23
**entry** [4] - 497:10, 539:24, 637:2, 645:7
**environment** [1] - 661:19
**envision** [1] - 537:14
**episodes** [1] - 579:13
**equipped** [1] - 618:5
**equivalent** [1] - 439:22
**ESQUIRE** [3] - 432:17, 432:18, 432:20
**essentially** [1] - 559:5
**establish** [1] - 618:8
**established** [2] - 454:8, 566:6
**Estate** [1] - 432:4
**estimate** [15] - 508:4, 518:22, 521:18, 537:6, 538:6, 555:24, 574:12, 578:11, 582:12, 582:17, 638:3, 638:13, 638:17, 669:13, 680:23
**et** [1] - 439:21
**evaluate** [1] - 510:13
**evening** [25] - 475:11, 497:3, 503:18, 516:19, 523:11, 524:10, 524:16, 524:18, 549:13, 581:4, 581:6, 583:17, 585:10,

594:17, 597:23, 608:18, 628:11, 640:1, 666:2, 666:12, 667:20, 670:23, 671:12, 679:2, 684:17
**evenings** [6] - 525:6, 562:16, 562:17, 594:10, 685:21, 686:3
**event** [2] - 568:21, 579:22
**events** [1] - 584:3
**everywhere** [2] - 457:21, 661:5
**evidence** [1] - 447:23
**exact** [3] - 576:25, 582:14, 612:24
**exactly** [3] - 572:19, 633:22, 662:17
**exam** [1] - 504:20
**examination** [10] - 452:21, 465:9, 468:16, 468:17, 488:10, 496:21, 602:15, 618:21, 678:2
**EXAMINATION** [42] - 433:4, 433:6, 433:8, 433:9, 433:10, 433:11, 433:13, 433:14, 433:15, 433:16, 433:18, 433:20, 433:22, 433:25, 434:2, 434:4, 434:6, 434:8, 434:11, 434:12, 434:16, 434:18, 443:17, 444:17, 462:4, 494:12, 501:17, 504:23, 547:18, 559:3, 563:25, 566:3, 602:11, 608:25, 622:7, 642:1, 647:18, 650:17, 650:23, 652:18, 673:17, 684:15
**examine** [6] - 488:17, 501:21, 547:16, 602:10, 641:10, 673:15
**examined** [1] - 436:13
**examining** [1] - 490:7
**example** [2] - 484:25, 485:1
**except** [1] - 503:23
**exception** [1] - 467:1
**excessively** [1] - 489:10

exchanging [1] - 571:8

excuse [12] - 451:21, 477:14, 538:25, 543:19, 548:16, 549:17, 563:18, 637:18, 659:15, 666:11, 668:2, 672:19

excused [4] - 504:5, 564:22, 611:21, 651:9

exercise [1] - 487:22

EXHIBIT [3] - 435:4, 435:6, 641:25

exhibit [5] - 641:11, 648:19, 649:1, 649:22, 649:23

Exhibit [6] - 644:23, 645:20, 649:1, 649:13, 649:18, 664:24

exhibits [1] - 641:13

exit [4] - 541:15, 541:20, 645:7

exited [5] - 541:23, 543:10, 565:2, 639:13, 645:18

EXITS [2] - 484:4, 688:6

expand [1] - 591:17

expect [2] - 535:20, 615:12

expectation [1] - 605:21

expectations [2] - 528:22, 660:6

expected [5] - 518:15, 573:4, 654:24, 658:7, 660:10

expects [1] - 443:8

experience [12] - 439:7, 449:19, 455:19, 459:4, 459:5, 492:22, 495:16, 498:5, 575:5, 656:9, 658:1, 672:24

experienced [4] - 532:17, 534:7, 535:20, 536:1

expert [17] - 438:19, 441:10, 443:14, 445:20, 469:10, 487:17, 488:22, 488:24, 489:5, 614:10, 614:16, 614:21, 615:16, 616:15, 618:5, 619:15, 658:1

expertise [2] - 460:20, 487:13

experts [1] - 619:14

explain [1] - 477:7

explained [2] - 665:14, 676:5

express [2] - 519:1, 522:22

expressed [2] - 466:19, 519:5

expression [1] - 558:3

extra [1] - 451:8

## F

face [2] - 570:13

face-to-face [1] - 570:13

facilities [5] - 455:20, 455:21, 485:10, 625:12, 625:22

facing [1] - 609:14

fact [16] - 439:13, 465:4, 470:19, 483:12, 487:20, 494:18, 494:21, 556:16, 612:18, 616:11, 617:21, 618:20, 661:23, 677:21, 680:3

factor [3] - 572:7, 592:18, 613:6

facts [6] - 450:16, 451:3, 465:13, 482:11, 506:9, 544:3

factual [1] - 617:16

faculty [1] - 671:16

fair [1] - 503:12

fairness [1] - 503:12

faith [3] - 620:1, 620:2, 620:3

fall [1] - 450:17

familiar [9] - 449:3, 449:5, 462:18, 509:8, 549:6, 594:4, 662:24, 669:16, 671:4

familiarize [2] - 509:5, 588:9

families [3] - 604:13, 680:23, 681:2

family [56] - 436:25, 439:11, 446:4, 491:17, 491:19, 492:12, 492:18, 493:3, 506:2, 506:19, 507:11, 507:15, 507:25, 515:8, 516:7, 517:25, 518:9, 518:11, 524:15, 529:24, 561:1, 569:13, 572:9, 572:14, 572:15, 575:12, 576:3, 584:3, 585:4, 587:14, 592:17, 602:25, 603:20, 604:12, 624:3, 627:10, 628:4, 629:15, 630:10, 630:18, 631:7, 640:6, 644:4, 656:14, 656:25, 659:12, 661:14, 672:17, 674:7, 681:3, 681:10, 682:8, 682:10, 687:25

family's [2] - 524:22, 626:2

family-oriented [2] - 682:8, 682:10

far [43] - 437:16, 453:23, 453:24, 470:6, 475:20, 482:20, 492:25, 509:14, 521:18, 528:5, 528:25, 530:21, 537:4, 537:5, 538:6, 539:23, 540:2, 540:12, 548:24, 557:14, 563:2, 567:5, 568:9, 571:19, 577:23, 578:11, 578:20, 579:1, 609:8, 614:10, 616:17, 619:6, 633:11, 653:19, 657:17, 662:12, 673:6, 685:7

fashion [1] - 615:16

father [1] - 673:12

favor [1] - 616:1

fear [1] - 574:2

feared [2] - 609:5, 609:10

feasibility [2] - 440:10, 440:11

feature [4] - 521:14, 521:15, 523:10, 530:24

features [1] - 632:20

fee [1] - 450:7

feet [40] - 476:8, 478:3, 521:22, 528:7, 530:23, 534:10, 534:22, 536:14, 536:24, 537:8, 537:11, 538:1, 538:3, 538:8, 538:9, 538:10, 538:11, 538:13, 540:2, 540:3, 552:25, 557:16, 576:17, 576:20, 577:6, 578:6, 578:13, 578:17, 614:19, 614:24, 614:25, 616:19, 616:20, 616:21, 633:12

fell [1] - 669:6

felt [7] - 470:19, 471:25, 472:6, 489:4, 613:22, 680:4

fence [1] - 685:9

fenced [1] - 686:3

few [15] - 441:9, 544:8, 563:1, 571:20, 582:4, 587:20, 609:1, 636:23, 639:6, 642:5, 658:18, 659:10, 684:1, 686:2

field [5] - 445:4, 537:18, 638:20, 638:21, 639:1

fight [1] - 489:21

figure [4] - 440:14, 673:12, 673:22, 673:24

filled [1] - 627:11

filter [1] - 520:14

final [3] - 458:5, 499:9, 552:10

fine [5] - 452:22, 479:22, 523:8, 621:6, 626:19

finish [3] - 444:11, 562:12, 679:16

finished [3] - 490:18, 505:22, 687:16

finishes [1] - 562:13

Fire [2] - 438:22, 444:5

first [59] - 436:12, 437:23, 437:25, 438:1, 438:2, 449:2, 449:20, 481:1, 484:9, 485:19, 498:16, 498:22, 514:24, 515:4, 519:21, 519:23, 520:5, 526:15, 529:16, 529:17, 531:12, 531:22, 533:25, 534:14, 537:22, 539:23, 549:21, 557:9, 569:18, 575:5, 582:2, 582:8, 582:15, 586:4, 592:21, 596:22, 605:11, 626:5, 626:6, 628:8, 628:15, 629:20, 635:4, 641:12, 642:11, 644:18, 644:20, 650:20, 659:12, 660:15, 662:19, 663:10, 674:2, 674:3, 680:21, 682:25, 683:16

fish [2] - 511:9, 678:11

fishing [2] - 678:8, 678:10

fit [1] - 661:13

five [16] - 464:15, 483:24, 541:6, 541:7, 541:8, 541:14, 551:23, 552:7, 564:2, 583:11, 587:19, 600:18, 614:19, 614:24, 616:19, 681:2

flashlights [1] - 636:9

flirtatious [1] - 683:14

float [1] - 520:15

floating [3] - 534:23, 558:8, 558:9

Florida [5] - 555:3, 555:5, 556:7, 556:8, 556:13

flyer [3] - 440:19, 590:6, 590:7

focal [2] - 670:6, 681:5

focus [1] - 575:10

foliage [2] - 511:12, 663:20

folks [2] - 492:21, 627:23

follow [13] - 443:6, 443:7, 451:5, 461:22, 492:15, 495:16, 497:13, 568:10, 574:22, 574:24, 654:25, 655:1, 673:20

followed [5] - 569:2, 583:24, 654:6, 654:18, 654:25

following [6] - 462:21, 502:23, 510:5, 515:3, 554:17, 570:21

**follows** [4] - 436:11, 436:13, 621:23, 652:10
**FOLLOWS** [2] - 504:13, 565:19
**foot** [1] - 655:19
**football** [11] - 506:13, 507:2, 537:18, 566:21, 578:22, 638:20, 638:21, 639:1, 657:8, 657:9, 673:2
**FOR** [3] - 432:2, 435:6, 641:25
**forbidden** [1] - 547:7
**Forest** [1] - 439:20
**forest** [1] - 606:18
**form** [4] - 493:23, 527:12, 561:9, 591:4
**former** [1] - 492:5
**forming** [1] - 469:11
**forth** [4] - 478:17, 587:7, 610:12, 654:7
**forward** [7] - 464:10, 464:23, 555:20, 558:6, 637:1, 637:8, 679:2
**four** [18] - 440:17, 453:13, 508:7, 509:3, 511:14, 534:10, 549:9, 564:5, 576:17, 576:19, 576:20, 577:6, 614:19, 616:20, 616:21, 639:6, 655:19, 681:2
**framed** [1] - 660:17
**franch** [1] - 441:18
**franchise** [3] - 441:20, 442:19, 442:25
**franchisee** [2] - 451:7, 454:23
**franchisees** [2] - 438:9, 441:23
**frankly** [1] - 617:23
**frequent** [2] - 440:19, 654:11
**frequent-flyer** [1] - 440:19
**frequently** [1] - 610:8
**Friday** [12] - 481:6, 481:20, 481:25, 512:21, 512:22, 518:12, 570:22, 572:19, 572:21, 575:8, 575:9
**Fridays** [1] - 472:11
**Friedlander** [1] - 432:24
**friend** [7] - 498:25,

508:13, 544:7, 623:20, 627:21, 628:4, 629:24
**friend's** [1] - 623:21
**friendly** [8] - 572:14, 572:16, 592:18, 592:19, 602:25, 661:19, 681:9
**friends** [17] - 505:5, 505:11, 505:12, 505:13, 506:3, 546:22, 564:13, 566:7, 566:11, 566:15, 568:21, 584:7, 584:8, 653:15, 653:18, 654:3, 687:25
**friendship** [2] - 566:10, 653:17
**frogs** [2] - 667:15, 680:10
**front** [21] - 493:10, 497:6, 525:10, 525:11, 527:23, 580:16, 580:18, 580:20, 580:24, 583:21, 588:19, 588:20, 592:3, 594:18, 594:24, 620:5, 659:24, 660:1, 665:16, 666:13
**full** [5] - 436:14, 456:13, 495:1, 498:7, 594:13
**full-time** [1] - 456:13
**fun** [1] - 680:12
**functions** [2] - 681:21, 681:22
**funny** [1] - 569:8
**future** [1] - 490:9

## G

**game** [3] - 591:6, 632:23, 649:18
**games** [1] - 566:21
**gate** [7] - 446:20, 476:3, 497:17, 498:1, 684:24, 685:21, 686:5
**gated** [1] - 684:25
**gates** [2] - 519:22, 684:23
**geared** [1] - 661:25
**gee** [1] - 457:17
**general** [10] - 442:22, 446:10, 449:25, 451:6, 509:9,

586:17, 626:19, 660:6, 664:19, 676:8
**generally** [9] - 482:10, 568:10, 568:22, 632:4, 634:25, 654:5, 654:18
**generous** [1] - 489:10
**gentleman** [3] - 550:22, 640:21, 640:24
**gentlemen** [1] - 687:23
**genuine** [1] - 493:24
**geographic** [2] - 638:14
**geometric** [1] - 537:2
**GERRY** [1] - 432:11
**gestures** [1] - 491:23
**girl** [2] - 498:22, 683:13
**Girl** [1] - 477:5
**girls** [19] - 529:12, 529:14, 530:2, 530:17, 530:18, 556:9, 584:11, 584:12, 584:14, 584:22, 584:24, 585:9, 632:8, 667:11, 667:12, 683:15
**gist** [1] - 676:17
**given** [3] - 507:5, 581:13, 662:21
**Glacier** [2] - 437:4, 437:5
**glad** [1] - 687:19
**golf** [5] - 456:19, 482:15, 483:6, 580:23, 640:12
**golfing** [1] - 580:22
**Google** [1] - 448:21
**government** [1] - 439:19
**governmental** [1] - 441:6
**grade** [9] - 505:12, 505:13, 505:17, 505:18, 505:20, 505:22, 567:14, 567:15, 575:6
**graduated** [1] - 437:21
**great** [6] - 476:24, 477:1, 487:17, 487:18, 566:18
**green** [1] - 554:20
**grew** [4] - 555:17, 555:25, 556:3, 556:5
**grist** [3] - 513:20, 514:2, 514:4
**ground** [5] - 475:18,

562:6, 652:21, 655:20, 662:7
**grounds** [4] - 488:25, 489:6, 503:14
**group** [6] - 492:2, 526:22, 572:25, 573:1, 667:2
**grouping** [1] - 492:19
**grown** [1] - 438:5
**guard** [1] - 497:25
**guardhouse** [3] - 497:7, 497:8, 497:14
**guess** [23] - 490:7, 502:13, 510:9, 520:13, 525:17, 531:15, 531:19, 533:5, 537:17, 545:24, 564:5, 589:5, 600:18, 607:24, 610:12, 637:15, 663:12, 668:8, 669:7, 669:13, 675:14, 683:9
**guessed** [1] - 607:25
**guessing** [2] - 531:14, 538:8
**guest** [6] - 475:15, 475:18, 622:19, 622:22, 622:23, 662:22
**guests** [5] - 475:10, 475:16, 475:18, 650:12
**guidance** [2] - 443:22, 443:23
**guidelines** [1] - 441:12
**guitar** [1] - 546:5
**guy** [1] - 620:9
**guys** [2] - 658:17, 660:6

## H

**half** [8] - 439:18, 453:13, 551:3, 567:7, 594:14, 639:1, 652:3, 655:19
**halfway** [2] - 540:24, 553:17
**hall** [1] - 525:16
**hand** [6] - 436:9, 504:11, 565:17, 621:21, 650:4, 652:8
**handle** [3] - 657:22, 660:7, 685:3
**handling** [1] - 665:8
**hang** [6] - 506:12,

526:15, 584:6, 585:8, 585:24, 585:25
**hanging** [2] - 564:12, 564:13
**happy** [1] - 595:20
**hard** [1] - 463:7
**Haven** [96] - 432:21, 446:14, 450:17, 450:18, 451:4, 451:11, 470:4, 472:9, 472:16, 473:8, 473:9, 499:12, 502:14, 506:2, 507:13, 507:15, 507:25, 508:5, 509:3, 514:12, 514:16, 515:8, 515:13, 517:24, 518:10, 524:9, 548:13, 548:17, 549:24, 566:13, 566:20, 568:4, 569:12, 569:20, 570:16, 571:17, 571:23, 571:25, 572:5, 572:8, 573:3, 574:2, 577:17, 580:18, 582:9, 582:18, 584:15, 584:19, 587:21, 589:22, 589:23, 590:19, 591:5, 602:23, 605:22, 622:13, 622:19, 623:2, 623:5, 623:9, 623:19, 624:3, 624:20, 625:5, 625:13, 625:19, 626:6, 626:22, 627:8, 632:4, 642:12, 650:8, 650:10, 650:11, 653:12, 656:6, 659:11, 659:13, 659:18, 660:3, 661:9, 661:12, 662:22, 672:1, 672:2, 674:3, 674:4, 674:10, 674:22, 675:16, 675:17, 676:6, 676:13, 676:16
**HAVEN** [3] - 432:7, 432:7
**HAVING** [2] - 504:12, 565:18
**head** [5] - 469:9, 490:21, 557:17,

584:10, 620:24
**heading** [1] - 505:23
**Health** [2] - 441:5,
474:7
**hear** [14] - 460:19,
491:24, 493:13,
495:9, 515:19,
539:14, 544:22,
555:4, 558:9,
558:11, 594:25,
613:3, 648:15,
672:22
**heard** [33] - 447:17,
448:11, 449:9,
449:17, 451:12,
455:12, 455:16,
487:9, 493:5,
509:14, 510:12,
516:7, 521:14,
525:10, 534:24,
535:6, 536:3,
536:12, 536:16,
558:3, 560:22,
568:1, 594:19,
594:24, 605:16,
635:12, 635:14,
655:12, 658:19,
669:4, 673:7
**hearing** [4] - 446:9,
453:6, 479:14, 488:5
**hearsay** [2] - 571:6,
596:2
**Heather** [9] - 507:7,
518:8, 565:4,
565:15, 565:22,
652:22, 653:8, 658:6
**HEATHER** [3] -
433:17, 565:18,
565:23
**held** [1] - 570:20
**help** [6] - 618:12,
618:13, 635:13,
635:15, 636:5,
648:22
**helping** [2] - 436:24,
438:21
**HERMESMANN** [193] -
432:20, 432:20,
433:7, 433:9,
433:11, 433:14,
433:16, 433:21,
434:3, 434:7,
434:13, 443:16,
443:18, 444:14,
447:14, 447:16,
447:19, 448:6,
448:9, 449:11,
452:14, 452:19,
452:22, 452:25,
454:16, 459:6,

462:3, 462:4, 463:9,
463:12, 463:15,
466:11, 468:7,
468:15, 468:23,
468:25, 470:22,
471:14, 473:4,
473:6, 473:16,
473:23, 474:17,
474:23, 476:2,
477:16, 478:1,
479:6, 479:20,
479:22, 479:24,
480:6, 480:9,
480:16, 480:18,
480:22, 480:25,
481:4, 481:14,
481:19, 483:3,
483:14, 487:9,
490:20, 491:5,
491:16, 491:22,
492:20, 495:2,
495:6, 495:18,
499:16, 499:21,
500:9, 500:14,
501:14, 501:16,
501:17, 501:25,
502:19, 503:11,
504:2, 506:6,
507:18, 510:1,
510:3, 511:6,
511:20, 512:1,
512:12, 512:18,
513:1, 513:7,
513:15, 513:17,
515:18, 516:11,
520:6, 521:1,
523:24, 525:25,
527:5, 534:17,
534:24, 535:5,
535:9, 535:22,
536:3, 536:12,
536:16, 543:15,
545:20, 545:17,
547:4, 547:17,
547:18, 550:2,
550:12, 550:14,
550:17, 550:19,
555:5, 555:8,
555:22, 555:23,
558:19, 560:5,
562:11, 562:19,
563:25, 564:15,
569:21, 571:5,
591:13, 591:16,
595:7, 595:10,
596:2, 597:1, 597:7,
598:18, 599:14,
600:12, 601:3,
601:8, 602:11,
603:7, 603:8,
604:11, 606:4,

608:23, 609:16,
611:18, 612:23,
613:2, 614:13,
614:21, 616:13,
619:2, 619:9,
636:11, 641:11,
641:15, 641:17,
641:19, 641:22,
642:1, 643:25,
644:6, 645:20,
645:24, 650:17,
650:22, 663:6,
672:4, 673:16,
673:17, 674:25,
675:2, 675:6, 675:8,
675:10, 675:12,
677:14, 678:19,
678:24, 679:1,
679:18, 679:22,
680:1, 682:15,
683:23, 687:19
**Hermesmann** [7] -
559:22, 560:3,
562:25, 609:1,
610:16, 648:5,
648:20
**Hermesmann's** [1] -
560:12
**hesitant** [1] - 571:14
**hide** [1] - 452:10
**hiding** [1] - 543:13
**high** [3] - 521:20,
598:12, 599:5
**himself** [7] - 452:16,
511:12, 519:4,
641:4, 653:9,
657:22, 672:10
**hits** [1] - 534:22
**hmm** [8] - 459:19,
481:23, 533:24,
537:25, 551:17,
553:3, 555:13,
560:16
**hobbies** [4] - 544:10,
544:11, 544:16,
544:18
**hold** [1] - 451:14
**holiday** [2] - 450:21,
610:2
**holidays** [3] - 455:15,
499:12, 500:24
**home** [21] - 440:20,
477:7, 506:11,
518:17, 566:23,
567:5, 567:6,
568:15, 573:9,
576:11, 586:2,
594:25, 604:9,
606:24, 653:2,
653:6, 654:1,

654:12, 656:9, 688:4
**Homer** [2] - 436:7,
436:16
**HOMER** [12] - 433:3,
433:4, 433:6, 433:8,
433:9, 436:10,
436:12, 436:16,
436:18, 443:17,
444:17, 462:4
**homes** [1] - 681:18
**honest** [3] - 607:12,
663:14, 683:10
**Honor** [121] - 436:6,
440:23, 443:13,
444:15, 445:13,
445:24, 447:14,
447:25, 448:4,
448:12, 448:16,
451:21, 452:8,
452:14, 456:8,
458:5, 461:1, 462:3,
463:10, 468:23,
482:25, 486:22,
487:7, 488:16,
489:12, 491:16,
494:5, 494:11,
499:22, 501:14,
503:11, 504:7,
504:20, 507:18,
507:23, 510:9,
510:20, 514:5,
514:8, 515:3,
516:11, 518:7,
520:6, 520:9, 521:1,
532:7, 533:1,
534:20, 535:2,
535:5, 535:11,
535:15, 535:22,
536:3, 536:12,
536:16, 537:23,
540:1, 540:6,
542:15, 544:9,
545:17, 545:21,
547:12, 547:17,
550:12, 558:24,
562:3, 562:7, 563:4,
563:13, 564:17,
565:14, 565:25,
570:1, 571:21,
589:8, 591:13,
595:15, 598:18,
599:14, 599:19,
600:12, 601:3,
612:6, 612:12,
614:1, 614:2, 616:3,
616:23, 617:6,
617:7, 617:13,
617:16, 618:18,
621:1, 621:3, 621:6,
622:5, 641:12,

641:19, 648:24,
650:4, 651:11,
652:4, 665:11,
672:6, 673:16,
674:25, 675:6,
678:11, 682:24,
683:7, 683:10,
683:23, 684:2,
685:25, 686:4,
686:10, 686:15
**Honor's** [1] - 489:7
**HONORABLE** [1] -
432:14
**hook** [1] - 590:23
**hoped** [1] - 482:16
**horizon** [2] - 495:25,
668:14
**horse** [2] - 488:7,
539:12
**horseshoes** [1] -
525:15
**hot** [4] - 586:15,
607:10, 629:9,
680:14
**hour** [7] - 502:3,
594:2, 652:3,
667:21, 667:22,
671:11, 683:11
**hours** [17] - 455:15,
477:22, 497:17,
498:7, 499:11,
500:23, 501:7,
583:14, 583:17,
586:9, 597:19,
597:20, 598:1,
600:1, 617:5,
670:23, 683:11
**house** [6] - 604:6,
653:23, 654:7,
654:10, 655:8
**houses** [1] - 567:8
**huge** [2] - 519:25,
520:2
**hundred** [6] - 457:8,
537:17, 537:24,
538:1, 538:3
**hundreds** [2] - 445:3
**hung** [1] - 580:17
**husband** [16] - 566:12,
571:18, 572:23,
574:20, 574:22,
578:3, 580:8, 581:5,
585:5, 585:22,
595:1, 602:13,
603:10, 604:20,
605:18, 608:19
**hyper** [1] - 574:17
**hyper-concerned** [1] -
574:17

# I

**ice** [1] - 558:17
**idea** [20] - 451:16, 451:17, 462:9, 462:15, 462:17, 473:19, 475:12, 479:7, 481:16, 498:1, 511:7, 519:1, 531:13, 569:19, 570:4, 572:13, 576:23, 626:19, 634:5, 634:9
**IDENTIFICATION** [2] - 435:7, 641:25
**identified** [2] - 489:1, 591:4
**identify** [1] - 665:7
**idiots** [1] - 620:6
**illegal** [1] - 482:17
**illuminated** [2] - 561:8, 598:8
**illumination** [2] - 543:4, 594:9
**imagine** [1] - 586:16
**immaterial** [1] - 475:14
**immediately** [1] - 643:14
**impeaching** [1] - 574:7
**implication** [2] - 619:11
**imply** [2] - 447:9, 618:3
**important** [1] - 510:16
**impression** [6] - 472:16, 472:20, 472:23, 473:8, 592:19, 676:15
**impressions** [2] - 472:24, 473:5
**improper** [5] - 516:13, 544:20, 612:15, 612:17, 619:11
**in-between** [1] - 553:15
**inappropriate** [2] - 492:18, 493:12
**INC** [1] - 432:8
**inch** [1] - 615:25
**incident** [23] - 474:8, 480:4, 481:6, 481:22, 505:1, 505:14, 511:8, 511:17, 512:2, 524:1, 524:2, 526:7, 548:7, 550:9, 554:17, 570:15,

575:13, 581:16, 582:4, 607:10, 671:25, 672:16, 672:17
**include** [1] - 624:4
**included** [2] - 442:5, 676:17
**including** [5] - 438:7, 446:4, 456:1, 457:7, 509:21
**incorporate** [1] - 586:8
**incorrect** [1] - 475:19
**indeed** [1] - 619:21
**independent** [1] - 586:8
**indicate** [5] - 444:1, 469:6, 470:16, 517:13, 674:1
**indicated** [8] - 444:1, 470:18, 471:16, 474:24, 475:22, 517:7, 555:24, 676:25
**indicates** [1] - 472:16
**indicating** [1] - 626:24
**indication** [4] - 487:13, 656:10, 657:20, 663:4
**individuality** [1] - 450:1
**individually** [1] - 432:5
**industry** [6] - 439:9, 443:4, 478:18, 478:20, 479:2, 502:3
**information** [2] - 449:4, 656:7
**informed** [1] - 627:11
**inground** [1] - 454:13
**inquiring** [1] - 548:13
**inquiry** [1] - 475:13
**inside** [2] - 469:9, 527:19
**insist** [1] - 536:3
**insisting** [1] - 535:5
**inspect** [1] - 447:3
**inspected** [3] - 474:6, 474:14, 474:16
**inspection** [2] - 448:24, 474:24
**inspections** [1] - 451:8
**inspects** [1] - 441:13
**install** [2] - 486:19, 487:21
**instance** [1] - 491:18
**instruct** [2] - 491:25, 612:13

**instructed** [2] - 492:11, 492:23
**instructing** [1] - 650:11
**instruction** [3] - 605:14, 615:20, 615:22
**instructions** [8] - 495:17, 568:11, 569:2, 573:4, 629:16, 658:6, 659:2, 662:10
**instrument** [5] - 546:1, 546:2, 546:4, 546:9, 546:11
**intention** [1] - 576:3
**interact** [2] - 522:12, 522:18
**interacted** [1] - 520:23
**interacting** [7] - 521:7, 521:10, 546:23, 547:2, 568:20, 640:6, 681:10
**interaction** [1] - 672:25
**interest** [3] - 519:5, 522:22, 641:5
**interested** [5] - 519:10, 519:14, 556:23, 584:23, 672:21
**interesting** [1] - 439:9
**interests** [3] - 544:10, 544:14, 544:19
**Internet** [1] - 572:4
**interrupt** [1] - 439:24
**interrupting** [1] - 663:7
**introducing** [1] - 571:9
**investigated** [1] - 445:5
**investigation** [1] - 445:5
**investing** [2] - 661:17, 661:18
**INVESTMENT** [1] - 432:9
**Investments** [1] - 432:21
**INVESTMENTS** [2] - 432:8, 432:8
**invited** [1] - 454:15
**involved** [5] - 437:12, 438:24, 445:5, 527:12, 676:9
**involving** [1] - 585:4
**IRENAS** [1] - 432:14
**irrational** [1] - 617:4
**irrelevant** [8] - 510:5,

512:11, 512:12, 513:18, 543:16, 597:2, 597:7, 601:7
**IRS** [3] - 456:5, 456:6, 456:12
**ish** [1] - 587:19
**island** [2] - 575:19, 575:20
**Isle** [9] - 575:15, 575:16, 575:20, 575:22, 578:1, 579:10, 579:18, 580:14, 656:15
**issue** [22] - 439:17, 471:4, 486:14, 486:15, 488:6, 489:23, 511:3, 511:4, 512:8, 512:9, 513:12, 534:25, 535:7, 536:4, 614:7, 614:8, 617:19, 617:22, 619:10, 621:14, 672:6, 672:8
**issues** [5] - 444:11, 444:13, 534:4, 577:15, 654:14
**items** [1] - 587:6

# J

**jealous** [1] - 556:20
**JEI/JS** [1] - 432:6
**Jellystone** [7] - 441:22, 442:9, 442:15, 454:22, 467:1, 467:3
**Jersey** [9] - 448:23, 465:19, 466:7, 473:24, 494:22, 502:20, 602:18, 604:6, 615:5
**JERSEY** [2] - 432:2, 432:12
**JOAQUIN** [1] - 432:4
**job** [2] - 497:7, 497:24
**jobs** [1] - 445:4
**John** [143] - 463:17, 464:13, 464:16, 469:2, 471:23, 472:17, 480:3, 481:25, 498:16, 498:17, 498:18, 498:20, 505:4, 505:11, 505:15, 506:2, 506:3, 506:19, 507:4, 508:6, 508:9, 509:4, 509:21, 509:24, 514:11, 515:12, 515:16, 515:22,

517:25, 518:15, 519:4, 521:6, 522:22, 523:3, 524:8, 524:23, 526:15, 527:9, 528:10, 529:17, 530:16, 531:14, 531:16, 531:23, 534:2, 539:2, 539:7, 539:10, 540:5, 541:4, 542:21, 543:11, 544:6, 544:25, 545:14, 546:23, 548:10, 550:6, 551:21, 551:24, 553:7, 553:11, 555:16, 556:2, 556:5, 557:5, 557:6, 557:19, 558:17, 559:8, 559:16, 566:6, 568:20, 568:22, 569:5, 569:9, 570:6, 572:23, 576:7, 577:20, 578:11, 578:25, 581:4, 582:19, 584:20, 587:22, 588:12, 589:19, 592:2, 593:2, 596:22, 598:7, 598:25, 599:12, 600:9, 602:7, 622:14, 622:16, 628:15, 629:23, 632:7, 635:12, 635:17, 635:18, 635:24, 637:2, 637:5, 637:8, 641:4, 643:9, 647:8, 648:11, 653:11, 654:9, 654:16, 654:25, 655:4, 655:5, 655:6, 655:22, 655:23, 656:7, 656:14, 657:13, 662:9, 664:12, 666:1, 667:11, 667:24, 670:3, 670:17, 670:22, 672:17, 672:20, 672:24, 673:7, 680:3, 683:1, 683:3, 684:19, 685:12, 686:25
**JOHN** [3] - 432:4, 432:11, 432:17
**John's** [8] - 526:7, 554:25, 567:6, 569:13, 570:23, 588:12, 590:10, 593:7

**jokester** [1] - 540:18
**joking** [2] - 553:24, 554:5
**Jordan** [21] - 446:10, 470:8, 509:15, 509:17, 510:10, 511:12, 563:15, 563:19, 563:20, 581:21, 609:25, 610:7, 659:21, 659:23, 669:10, 671:6, 672:10, 674:21, 676:5, 681:7
**JOSEPH** [1] - 432:14
**journey** [1] - 450:21
**Jude** [1] - 508:13
**Judge** [9] - 452:22, 477:11, 477:14, 480:18, 513:2, 571:5, 595:7, 679:18, 687:19
**judge** [11] - 487:9, 489:24, 490:1, 490:20, 497:13, 499:21, 501:20, 544:20, 569:21, 597:1
**JUDGE** [1] - 432:14
**Julia** [6] - 623:22, 623:23, 629:25, 632:9, 632:10, 634:14
**July** [2] - 437:7, 471:15
**jump** [1] - 520:24
**jumped** [1] - 483:2
**jurisdiction** [1] - 466:10
**jury** [40] - 438:13, 438:18, 449:5, 468:22, 474:21, 476:16, 483:17, 484:1, 486:16, 486:17, 487:15, 488:6, 488:11, 488:19, 489:8, 493:10, 494:6, 494:8, 495:9, 501:11, 501:22, 506:2, 510:12, 525:8, 536:13, 565:2, 565:12, 589:10, 608:3, 611:4, 611:11, 612:7, 612:13, 612:17, 613:12, 617:9, 618:2, 620:5, 646:2, 646:10
**JURY** [3] - 436:2, 484:4, 688:6

**jury's** [1] - 501:15

### K

**K-O-L-M-A-N** [1] - 623:25
**karaoke** [1] - 525:17
**Karen** [2] - 432:24, 483:21
**keep** [7] - 505:6, 535:1, 555:21, 599:18, 613:9, 618:17, 651:21
**keeping** [3] - 558:6, 558:11, 616:1
**kept** [4] - 543:12, 557:9, 605:1, 635:23
**kettle** [1] - 511:9
**kicked** [1] - 479:4
**kid** [5] - 457:25, 482:24, 592:19, 615:17, 661:19
**kid-friendly** [1] - 661:19
**kids** [15] - 459:11, 459:17, 520:20, 526:22, 526:25, 527:22, 533:18, 592:23, 604:7, 607:4, 678:3, 680:10, 680:12, 682:6
**kill** [2] - 476:14, 476:15
**kind** [76] - 437:17, 442:1, 443:5, 444:21, 489:3, 492:13, 506:3, 509:5, 509:9, 511:1, 513:13, 519:23, 520:4, 521:19, 521:24, 522:8, 530:24, 531:3, 533:5, 534:11, 536:2, 537:1, 537:3, 540:5, 540:8, 540:18, 541:15, 542:22, 545:2, 545:16, 561:12, 561:21, 566:17, 581:12, 581:13, 588:9, 590:7, 592:8, 594:9, 594:14, 595:17, 598:21, 609:25, 617:4, 626:10, 627:10, 627:12, 627:13, 629:8, 629:9, 630:22, 630:23, 632:3, 633:22,

633:23, 634:25, 636:23, 637:9, 638:14, 638:16, 639:14, 639:19, 650:9, 650:24, 651:4, 656:2, 658:23, 660:5, 661:8, 662:24, 664:19, 666:3, 671:13, 672:18, 684:17
**kinds** [3] - 499:25, 566:18, 618:12
**knock** [2] - 669:8, 683:3
**knocking** [1] - 683:5
**knowing** [5] - 469:5, 473:11, 473:13, 497:24, 562:18
**knowledge** [6] - 441:6, 452:11, 465:21, 510:4, 576:6, 672:20
**known** [4] - 498:20, 511:21, 529:15, 529:19
**knows** [7] - 457:19, 511:25, 536:14, 565:5, 595:9, 615:10, 677:25
**KOA** [12] - 437:23, 437:25, 438:3, 438:6, 438:7, 441:22, 442:3, 450:20, 451:7, 454:22, 467:1, 467:3
**Kolman** [1] - 623:23

### L

**labeled** [1] - 626:22
**lack** [1] - 675:14
**ladies** [3] - 596:18, 596:19, 687:23
**lake** [341] - 455:5, 458:24, 459:21, 461:13, 464:13, 464:17, 464:19, 464:25, 466:16, 475:3, 475:8, 478:6, 480:3, 480:8, 480:10, 481:8, 481:17, 496:6, 496:12, 497:10, 497:19, 497:20, 500:16, 509:9, 509:16, 509:22, 509:25, 514:12, 514:18, 514:22, 514:25, 515:4,

515:5, 515:9, 515:14, 515:17, 515:24, 516:25, 517:8, 517:12, 517:14, 517:17, 518:2, 518:5, 518:14, 519:5, 519:11, 519:15, 520:1, 520:15, 520:17, 520:18, 520:22, 520:23, 521:10, 523:9, 524:9, 525:2, 525:9, 525:12, 525:14, 525:21, 525:23, 526:17, 527:23, 527:25, 528:1, 530:3, 530:6, 530:15, 530:21, 530:22, 531:1, 531:10, 531:12, 531:13, 531:18, 531:22, 532:4, 532:5, 532:13, 532:14, 532:16, 532:19, 532:23, 533:17, 533:18, 534:1, 534:2, 534:4, 534:7, 536:22, 536:23, 537:1, 537:5, 537:7, 538:5, 538:6, 538:21, 538:24, 539:1, 539:2, 539:23, 539:24, 541:5, 541:16, 541:20, 541:23, 542:3, 542:6, 542:23, 543:4, 543:7, 543:10, 549:5, 549:6, 549:12, 549:16, 550:4, 550:7, 550:10, 551:22, 551:25, 552:2, 552:7, 552:11, 552:19, 554:9, 554:14, 559:5, 559:8, 561:1, 561:2, 561:4, 561:7, 561:13, 561:19, 561:21, 562:9, 562:10, 562:15, 562:17, 562:18, 563:16, 563:17, 563:20, 574:2, 580:21, 581:2, 585:8, 588:10, 588:13, 588:25, 589:1, 589:2, 589:11, 589:12, 589:18, 591:3,

591:5, 591:7, 591:19, 591:23, 592:3, 592:4, 592:7, 592:8, 592:20, 593:4, 593:6, 593:11, 594:1, 594:4, 594:10, 594:12, 594:13, 595:2, 595:4, 595:8, 595:18, 597:6, 597:8, 597:11, 597:14, 597:17, 597:25, 598:6, 598:8, 598:10, 598:11, 598:16, 600:3, 600:4, 600:8, 600:16, 600:17, 600:25, 601:12, 602:3, 602:7, 604:19, 606:2, 606:10, 606:16, 607:1, 607:4, 609:23, 613:19, 613:23, 614:6, 614:7, 614:8, 614:9, 615:12, 616:5, 616:9, 618:9, 619:17, 625:23, 625:25, 626:21, 626:23, 627:2, 627:18, 627:23, 627:24, 628:4, 628:8, 628:20, 629:14, 629:16, 629:17, 630:10, 630:11, 630:19, 630:23, 631:6, 631:12, 631:18, 632:7, 632:13, 632:20, 632:21, 633:15, 635:4, 635:10, 635:24, 636:16, 637:2, 637:9, 637:14, 637:22, 638:4, 638:9, 638:13, 639:13, 639:19, 639:20, 640:1, 640:2, 640:6, 641:2, 641:5, 645:14, 645:16, 645:17, 645:18, 646:1, 646:3, 646:15, 646:25, 647:4, 647:19, 648:2, 650:13, 650:25, 651:1, 658:15, 658:16, 659:2, 659:5, 659:8, 662:11, 662:13, 663:15, 663:21,

663:25, 665:21,
665:22, 666:4,
666:6, 666:22,
667:15, 668:2,
668:23, 668:25,
669:18, 669:21,
669:23, 669:24,
670:4, 670:5, 670:6,
670:10, 670:12,
670:14, 670:19,
670:23, 671:11,
676:19, 676:23,
677:1, 677:5,
677:22, 678:3,
678:7, 678:8, 679:3,
680:4, 680:11,
681:1, 686:5, 687:1,
687:9

**lakes** [7] - 442:17,
445:11, 453:22,
454:2, 454:7,
465:20, 485:14

**Land** [1] - 439:21

**land** [2] - 535:12,
617:19

**landscaper** [1] -
671:23

**landscaping** [2] -
672:1, 672:13

**language** [4] - 474:4,
503:4, 503:7, 668:3

**laptop** [1] - 555:19

**large** [4] - 437:1,
444:23, 526:22,
592:15

**last** [15] - 440:8,
440:10, 440:14,
520:24, 521:1,
553:11, 598:25,
599:13, 599:23,
600:9, 600:15,
600:16, 668:16,
673:20

**late** [2] - 575:10, 580:1

**laugh** [1] - 491:19

**laughing** [2] - 491:23,
493:9

**Laughter** [1] - 477:13

**laughter** [1] - 491:24

**law** [7] - 461:19,
487:18, 487:19,
487:20, 496:18,
503:4, 661:5

**LAW** [1] - 432:20

**lawful** [2] - 513:13,
516:24

**lawyer** [1] - 615:25

**lay** [1] - 518:14

**layout** [1] - 448:20

**lead** [2] - 449:12,

507:18

**leading** [20] - 449:11,
454:3, 458:20,
459:6, 513:3, 513:5,
513:11, 515:18,
520:7, 520:8,
525:25, 526:2,
569:22, 590:10,
593:24, 666:1,
670:22, 684:18,
685:12, 686:24

**leap** [1] - 617:7

**leaped** [1] - 633:23

**learn** [2] - 688:2,
688:3

**learned** [2] - 510:7,
596:22

**lease** [3] - 446:22,
674:4, 675:15

**least** [7] - 465:13,
469:15, 537:22,
552:6, 574:14,
618:4, 687:11

**leave** [13] - 497:8,
497:25, 530:11,
532:11, 563:12,
570:16, 573:19,
573:20, 586:4,
586:5, 603:21,
603:25, 604:7

**leaves** [5] - 463:25,
464:1, 551:8, 551:9,
551:16

**leaving** [7] - 498:3,
570:10, 570:14,
570:20, 573:6,
667:25, 668:22

**LEE** [3] - 433:17,
565:18, 565:23

**Lee** [1] - 565:22

**left** [19] - 460:2,
464:12, 469:19,
525:13, 526:24,
530:15, 551:21,
554:13, 570:13,
570:17, 570:21,
570:23, 572:21,
575:22, 594:24,
650:11, 668:15,
669:1

**legal** [2] - 462:20,
618:10

**legally** [2] - 459:22,
503:16

**legs** [2] - 558:5,
558:12

**length** [7] - 536:25,
537:5, 537:23,
553:2, 604:17,
638:17, 638:18

**less** [4] - 567:7, 608:6,
646:17, 646:23

**letting** [1] - 489:10

**level** [1] - 466:9

**liability** [3] - 488:22,
599:15, 601:4

**life** [3] - 555:17, 564:7,
658:1

**Life** [3] - 439:14,
441:13, 451:8

**lifeguard** [4] - 460:11,
461:6, 461:14, 579:6

**lifeguards** [2] -
579:11, 606:1

**light** [44] - 449:7,
451:15, 451:20,
451:25, 452:4,
462:21, 463:1,
464:1, 464:3,
464:16, 464:25,
465:6, 465:14,
478:3, 478:6,
478:11, 478:18,
495:25, 496:5,
498:7, 541:24,
542:12, 551:10,
551:11, 551:24,
552:8, 552:11,
560:12, 561:13,
561:16, 594:16,
606:16, 606:18,
608:21, 614:8,
635:1, 635:2,
639:16, 647:13,
647:15, 666:5,
666:9, 668:12

**lighted** [2] - 477:18,
477:22

**lighting** [29] - 449:7,
453:23, 454:23,
454:25, 458:5,
465:20, 466:16,
478:14, 479:10,
479:15, 484:11,
489:19, 494:23,
494:25, 502:12,
541:23, 542:22,
559:17, 559:18,
559:23, 561:12,
594:9, 597:15,
598:7, 600:2,
634:25, 639:14,
639:19

**lights** [41] - 449:3,
449:6, 449:8, 451:2,
451:4, 451:6, 451:9,
451:11, 453:3,
453:4, 453:10,
453:11, 453:14,
453:25, 454:1,

454:2, 458:7, 458:8,
458:16, 458:18,
458:24, 459:2,
459:8, 465:10,
465:15, 484:18,
498:3, 542:3, 543:7,
561:8, 561:15,
561:19, 561:21,
562:9, 562:15,
562:16, 594:13,
599:8, 636:9, 666:3

**limit** [2] - 500:21,
513:22

**limited** [5] - 472:21,
501:3, 523:25,
544:21, 569:24

**limits** [1] - 636:13

**line** [9] - 471:12,
547:7, 552:10,
556:2, 560:5, 560:8,
595:13, 612:14,
613:9

**Line** [3] - 463:13,
464:11, 464:23

**lines** [2] - 533:3,
550:16

**listen** [4] - 483:4,
491:19, 492:8, 620:5

**listened** [2] - 547:3,
569:1

**listening** [1] - 620:22

**lists** [1] - 439:17

**lit** [3] - 452:9, 478:16,
479:8

**litigation** [2] - 446:23,
510:8

**live** [7] - 436:20,
556:3, 556:6, 556:8,
567:2, 662:3

**lived** [2] - 506:19,
606:8

**lives** [1] - 456:4

**living** [5] - 436:21,
456:14, 506:17,
566:25, 653:2

**LLC** [4] - 432:7, 432:9,
432:9, 432:21

**local** [1] - 466:9

**located** [6] - 453:3,
476:5, 602:7, 663:3,
663:11, 664:12

**location** [7] - 449:15,
451:3, 462:14,
567:3, 623:12,
624:25, 633:19

**locations** [2] - 449:10,
660:21

**lock** [3] - 685:2, 685:3,
686:20

**locked** [4] - 685:1,

685:6, 685:9, 686:3

**long-term** [1] - 586:1

**long-ways** [2] - 537:4,
537:7

**look** [22] - 489:4,
492:2, 514:17,
534:3, 540:11,
543:4, 547:1,
555:11, 564:5,
589:5, 619:13,
620:7, 636:1, 636:3,
636:6, 645:14,
661:21, 662:15,
662:16, 664:19,
664:21

**looked** [21] - 448:21,
540:5, 543:19,
590:9, 592:12,
594:4, 594:6,
602:17, 627:12,
640:7, 659:15,
659:16, 661:11,
661:16, 661:21,
661:22

**looking** [9] - 459:9,
459:12, 459:14,
543:12, 592:22,
631:22, 631:24,
661:6, 662:3

**looks** [2] - 640:11,
675:14

**loses** [1] - 498:7

**losing** [2] - 620:2,
620:3

**love** [3] - 476:23,
489:3, 556:14

**loved** [4] - 547:3,
547:8, 592:23,
687:25

**lunch** [1] - 587:4

**lyricist** [4] - 545:22,
545:23, 545:24,
546:3

**lyrics** [5] - 545:6,
545:14, 546:3,
546:18, 555:19

---

**M**

**M-I-L-L-E-R** [2] -
565:23, 652:13

**ma'am** [4] - 602:12,
608:23, 654:21

**main** [7] - 525:16,
531:2, 531:5,
542:24, 545:4,
545:11, 572:7

**maintenance** [2] -
446:11, 446:17

**majority** [28] - 439:10, 453:22, 454:6, 454:24, 455:18, 455:20, 455:24, 460:4, 472:25, 484:20, 485:1, 485:8, 485:11, 485:12, 486:1, 486:4, 486:9, 486:11, 486:12, 486:13, 486:18, 486:23, 486:25, 488:1, 500:22, 670:8

**malicious** [1] - 493:22

**man** [4] - 568:23, 569:5, 640:19, 653:11

**management** [24] - 459:24, 460:1, 460:5, 462:1, 496:15, 496:19, 503:14, 503:23, 525:23, 526:8, 527:17, 581:22, 600:25, 601:2, 609:22, 609:25, 640:2, 640:8, 641:1, 660:10, 661:17, 671:7, 677:25, 685:13

**Management** [1] - 439:21

**manager** [5] - 446:10, 496:19, 563:20, 659:25, 660:1

**managers** [2] - 440:15, 443:2

**MANIACI** [1] - 432:16

**manual** [1] - 442:19

**manuals** [2] - 442:5, 449:23

**map** [9] - 589:24, 626:10, 626:12, 631:22, 649:4, 662:24, 663:3, 663:4, 663:15

**maritime** [1] - 495:23

**mark** [2] - 626:25, 641:11

**marked** [5] - 591:6, 591:9, 644:22, 664:24, 675:3

**MARKED** [2] - 435:6, 641:25

**marker** [1] - 664:10

**marketed** [1] - 572:14

**marketing** [2] - 572:15, 590:6

**marks** [1] - 591:22

**Marlita** [1] - 653:8

**materials** [2] - 446:2, 590:6

**matter** [2] - 478:9, 513:17

**maximum** [1] - 584:21

**MAY** [1] - 432:13

**McDonald's** [1] - 587:6

**mean** [55] - 446:18, 446:19, 452:11, 453:14, 453:23, 454:10, 454:13, 455:4, 457:8, 458:11, 471:2, 477:10, 477:24, 480:5, 481:10, 481:16, 482:24, 490:9, 493:22, 510:4, 513:20, 517:6, 536:25, 537:13, 539:4, 539:12, 543:6, 557:25, 558:1, 558:8, 576:25, 603:6, 624:10, 626:18, 633:2, 636:18, 641:13, 653:19, 653:20, 654:8, 654:10, 654:20, 656:9, 661:2, 661:20, 662:16, 663:4, 668:10, 668:11, 675:5, 676:8, 677:11, 681:9

**mean..** [1] - 448:25

**meaning** [5] - 517:1, 606:18, 625:2

**meant** [1] - 546:3

**measure** [1] - 578:14

**medium** [1] - 444:23

**meet** [7] - 526:19, 526:21, 530:2, 628:17, 659:22, 660:2, 667:17

**meeting** [2] - 628:20, 642:14

**meetings** [5] - 443:3, 479:4, 674:3, 676:22

**member** [4] - 438:22, 443:19, 516:7, 527:17

**members** [9] - 441:22, 482:20, 491:17, 491:19, 492:12, 627:10, 628:4, 629:15, 631:7

**membership** [3] - 437:12, 450:8, 450:9

**Memorial** [5] - 582:14,

**memorial** [1] - 582:15

**memory** [4] - 480:19, 480:21, 556:12, 556:14

**mention** [7] - 468:20, 502:8, 502:11, 614:11, 630:21, 630:22, 647:8

**mentioned** [18] - 441:13, 442:20, 443:19, 488:3, 488:4, 496:9, 521:16, 523:4, 526:14, 528:13, 529:11, 544:6, 552:21, 553:1, 561:1, 609:21, 614:1, 657:24

**merits** [1] - 598:22

**message** [2] - 488:11, 612:17

**messing** [3] - 540:13, 635:20, 667:14

**met** [22] - 470:7, 529:12, 529:14, 529:16, 529:18, 529:19, 554:8, 569:15, 575:5, 584:14, 584:24, 622:16, 628:2, 628:14, 628:23, 629:1, 629:2, 629:3, 629:20, 653:14, 659:21, 660:4

**mic** [1] - 505:8

**Michelle** [27] - 464:19, 522:11, 522:12, 529:11, 529:17, 530:16, 531:25, 532:1, 534:2, 539:2, 539:9, 540:21, 541:18, 543:10, 552:2, 553:21, 554:2, 554:8, 554:19, 556:17, 557:1, 557:4, 559:8, 596:20, 612:1, 621:17, 622:1

**MICHELLE** [13] - 433:24, 433:25, 434:2, 434:4, 434:6, 434:8, 621:22, 622:1, 622:7, 642:1, 647:18, 650:17, 650:23

**Michelle's** [3] - 529:19, 529:22, 556:23

**microphone** [2] - 520:2, 622:10

**middle** [4] - 452:19, 452:20, 460:12, 461:18

**midnight** [1] - 682:11

**might** [21] - 445:16, 455:4, 455:5, 478:3, 478:9, 478:15, 508:2, 544:9, 544:14, 545:2, 558:10, 574:12, 576:23, 579:25, 589:25, 616:15, 616:20, 673:7, 673:8

**mile** [2] - 567:7, 615:25

**miles** [4] - 437:5, 440:19, 453:13, 457:14

**mill** [3] - 513:20, 514:2, 514:4

**Miller** [34] - 469:14, 469:18, 470:7, 470:9, 470:16, 471:21, 482:21, 507:7, 507:9, 518:8, 524:11, 528:14, 565:4, 565:15, 565:22, 566:4, 578:4, 581:8, 589:21, 593:23, 609:2, 651:22, 651:23, 651:24, 652:12, 652:19, 662:7, 662:9, 662:18, 669:16, 671:4, 673:18, 680:2, 684:16

**MILLER** [16] - 433:17, 433:18, 433:20, 433:22, 434:10, 434:11, 434:12, 434:14, 565:18, 566:3, 602:11, 608:25, 652:9, 652:18, 673:17, 684:15

**Miller's** [3] - 470:8, 471:15, 471:17

**Millers** [4] - 446:6, 446:7, 472:17, 473:8

**minds** [1] - 584:6

**mine** [2] - 589:25, 634:7

**miniature** [1] - 580:23

**minute** [2] - 460:6, 523:2

**minutes** [41] - 463:25, 464:15, 483:24,

**microphone** ... (second column continues)

**484:1, 491:3, 541:6,** 541:7, 541:14, 542:7, 542:9, 542:12, 551:8, 551:23, 552:7, 554:9, 559:9, 559:11, 564:2, 564:3, 564:5, 564:10, 587:20, 634:1, 638:5, 639:6, 643:2, 647:5, 647:21, 647:22, 647:25, 651:11, 665:5, 667:21, 667:22, 671:11, 679:16, 679:19, 684:8

**mischievous** [1] - 459:8

**misheard** [1] - 564:3

**mispronouncing** [1] - 652:23

**misrepresenting** [2] - 485:17, 489:19

**missing** [4] - 596:23, 598:7, 683:1, 683:19

**misstating** [1] - 479:18

**mist** [1] - 522:3

**mistake** [1] - 499:19

**mistrial** [2] - 488:20, 612:12

**mom** [19] - 439:11, 472:4, 507:7, 507:11, 508:16, 508:24, 516:8, 518:8, 518:14, 518:23, 546:24, 547:3, 547:8, 566:9, 577:12, 577:17, 627:21, 636:17, 636:19

**mom-and-pop** [1] - 439:11

**moment** [2] - 448:11, 478:14

**moments** [2] - 609:1, 686:2

**Monday** [4] - 476:12, 476:13, 586:4, 586:6

**Montana** [5] - 436:20, 437:1, 437:3, 437:5, 438:2

**monthly** [2] - 450:13, 661:24

**months** [3] - 577:1, 582:4, 659:10

**moon** [2] - 594:13, 594:14

**morning** [18] - 436:4,

436:6, 436:8,
436:19, 462:5,
462:6, 472:10,
547:19, 547:20,
565:16, 566:4,
584:4, 586:4, 586:6,
652:19, 669:7,
669:13, 669:15

**most** [25] - 443:6,
450:12, 456:20,
458:8, 462:23,
467:16, 467:20,
468:1, 468:8,
468:13, 468:18,
468:21, 478:18,
494:24, 497:25,
500:6, 502:3, 525:2,
525:4, 584:17,
603:16, 608:10,
609:5, 609:11

**mostly** [1] - 656:25

**mother** [16] - 469:22,
482:22, 483:1,
483:4, 491:19,
492:15, 548:21,
550:3, 550:6, 556:3,
569:15, 570:7,
570:13, 576:8,
605:17, 672:18

**motion** [24] - 449:8,
452:15, 454:1,
458:7, 458:8,
458:13, 458:16,
465:10, 465:14,
477:12, 540:6,
540:8, 561:12,
561:13, 561:21,
562:2, 562:10,
562:16, 611:22,
612:4, 612:13,
619:12, 619:22,
619:23

**motions** [4] - 540:23,
541:2, 541:5, 541:15

**mountain** [1] - 535:4

**mountains** [1] - 437:6

**move** [8] - 464:10,
464:23, 555:3,
555:5, 555:20,
556:12, 558:5,
617:15

**moved** [3] - 438:2,
511:24, 637:8

**movies** [1] - 682:5

**moving** [10] - 488:20,
551:20, 556:2,
558:6, 558:12,
612:11, 621:8,
631:3, 631:5, 679:2

**MR** [648] - 433:4,

433:6, 433:8, 433:9,
433:10, 433:11,
433:13, 433:14,
433:15, 433:16,
433:18, 433:20,
433:22, 433:25,
434:2, 434:4, 434:6,
434:8, 434:11,
434:12, 434:14,
436:7, 436:18,
438:17, 439:6,
440:23, 440:24,
441:24, 442:7,
442:14, 443:13,
443:16, 443:17,
444:14, 444:17,
445:9, 445:13,
445:16, 445:19,
445:23, 445:25,
447:14, 447:16,
447:18, 447:19,
447:20, 447:24,
448:6, 448:9,
448:13, 448:16,
448:17, 449:11,
449:13, 449:14,
451:21, 452:14,
452:18, 452:19,
452:22, 452:25,
453:5, 453:8,
453:12, 453:15,
453:17, 453:19,
453:20, 454:5,
454:9, 454:12,
454:14, 454:16,
454:19, 454:21,
455:2, 455:9,
456:15, 457:16,
458:21, 458:22,
459:6, 460:3, 461:1,
461:21, 462:2,
462:3, 462:4, 463:9,
463:12, 463:14,
463:15, 466:11,
467:23, 468:3,
468:7, 468:10,
468:12, 468:15,
468:23, 468:25,
470:20, 470:22,
471:8, 471:13,
471:14, 472:19,
472:23, 473:2,
473:4, 473:5, 473:6,
473:10, 473:14,
473:16, 473:20,
473:23, 474:16,
474:17, 474:19,
474:23, 476:2,
476:17, 476:20,
476:25, 477:16,
478:1, 479:6,

479:17, 479:20,
479:22, 479:24,
480:6, 480:9,
480:16, 480:18,
480:22, 480:25,
481:3, 481:4,
481:14, 481:19,
482:25, 483:3,
483:14, 483:16,
483:24, 484:6,
484:9, 484:16,
484:24, 485:5,
485:7, 485:15,
485:18, 486:1,
486:6, 486:14,
486:17, 486:21,
486:25, 487:3,
487:7, 487:9,
487:18, 488:1,
488:9, 489:7,
489:12, 489:16,
489:18, 489:22,
489:25, 490:2,
490:4, 490:7,
490:12, 490:15,
490:17, 490:20,
490:24, 491:1,
491:4, 491:5, 491:8,
491:16, 491:22,
491:24, 492:10,
492:20, 493:2,
493:7, 493:13,
494:2, 494:5,
494:11, 494:12,
495:2, 495:5, 495:6,
495:9, 495:12,
495:13, 495:18,
495:21, 496:1,
496:3, 496:4,
496:20, 496:24,
496:25, 497:3,
497:4, 497:12,
497:21, 497:22,
498:12, 498:14,
499:2, 499:3, 499:8,
499:16, 499:17,
499:18, 499:21,
499:22, 500:1,
500:2, 500:9,
500:11, 500:14,
500:19, 500:20,
501:9, 501:12,
501:14, 501:16,
501:17, 501:25,
502:19, 503:11,
504:1, 504:2, 504:7,
504:9, 504:20,
504:22, 504:23,
505:9, 505:10,
505:25, 506:6,
506:16, 507:1,

507:18, 507:23,
507:24, 510:1,
510:3, 510:9,
510:14, 510:16,
510:20, 510:24,
511:2, 511:4, 511:6,
511:10, 511:20,
511:22, 512:1,
512:3, 512:7,
512:12, 512:13,
512:15, 512:18,
512:24, 513:1,
513:6, 513:7,
513:10, 513:15,
513:16, 513:17,
513:22, 514:1,
514:5, 514:8, 514:9,
515:2, 515:18,
515:21, 516:5,
516:11, 516:16,
517:5, 517:19,
517:23, 519:9,
520:6, 520:9,
520:10, 521:1,
521:4, 522:7,
522:11, 522:21,
523:22, 523:24,
524:6, 524:7,
525:25, 526:4,
527:5, 527:7,
527:11, 528:8,
529:10, 533:1,
533:2, 534:17,
534:20, 534:24,
535:2, 535:3, 535:5,
535:9, 535:11,
535:15, 535:18,
535:19, 535:22,
535:25, 536:3,
536:9, 536:12,
536:16, 536:18,
536:20, 536:21,
537:19, 537:20,
538:17, 539:16,
541:13, 542:15,
542:18, 542:19,
543:15, 543:25,
544:4, 544:5, 544:8,
544:13, 544:18,
544:20, 544:21,
544:23, 544:24,
545:13, 545:17,
545:21, 546:17,
547:4, 547:10,
547:12, 547:15,
547:17, 547:18,
550:2, 550:12,
550:14, 550:17,
550:19, 555:5,
555:8, 555:22,
555:23, 558:19,

558:22, 558:24,
559:2, 559:3,
559:14, 560:5,
560:7, 560:10,
560:23, 560:24,
561:17, 561:18,
561:25, 562:3,
562:6, 562:8,
562:11, 562:14,
562:19, 562:23,
562:24, 563:4,
563:12, 563:14,
563:22, 563:25,
564:15, 564:17,
565:4, 565:7,
565:14, 565:25,
566:2, 566:3,
567:13, 569:21,
570:1, 570:3, 571:5,
571:13, 571:20,
571:22, 573:14,
574:8, 574:10,
574:11, 575:3,
575:7, 575:21,
576:2, 578:23,
579:12, 589:8,
589:9, 591:13,
591:15, 591:16,
591:21, 593:1,
593:22, 595:7,
595:9, 595:10,
595:11, 595:14,
595:16, 596:2,
596:6, 597:1, 597:5,
597:7, 597:13,
597:22, 598:3,
598:5, 598:18,
598:23, 599:3,
599:11, 599:14,
599:19, 599:22,
600:2, 600:5, 600:7,
600:12, 600:23,
601:3, 601:8, 601:9,
602:6, 602:9,
602:11, 603:7,
603:8, 604:11,
606:4, 608:23,
608:25, 609:16,
609:19, 609:20,
611:2, 611:5, 611:8,
611:12, 611:15,
611:18, 611:22,
611:25, 612:1,
612:3, 612:6,
612:11, 612:23,
613:1, 613:2,
613:14, 613:18,
613:25, 614:2,
614:5, 614:12,
614:13, 614:21,
615:1, 615:3, 615:6,

615:8, 615:12, 615:19, 616:3, 616:13, 616:23, 616:25, 617:6, 617:11, 617:13, 617:15, 617:18, 617:23, 618:2, 618:7, 618:15, 618:24, 618:25, 619:2, 619:8, 619:9, 619:12, 619:15, 619:20, 619:22, 619:24, 620:2, 620:10, 620:14, 620:18, 621:1, 621:3, 621:6, 621:9, 621:17, 622:4, 622:7, 628:13, 630:15, 630:17, 634:11, 636:7, 636:11, 636:21, 638:2, 639:2, 641:11, 641:15, 641:17, 641:19, 641:22, 642:1, 643:25, 644:6, 645:20, 645:24, 647:18, 647:24, 648:1, 648:18, 648:24, 648:25, 650:7, 650:17, 650:22, 650:23, 651:10, 651:14, 651:19, 651:20, 651:23, 651:24, 652:1, 652:4, 652:15, 652:17, 652:18, 663:6, 663:8, 663:9, 665:4, 665:7, 665:11, 665:12, 671:20, 671:21, 671:22, 672:4, 672:6, 672:9, 672:15, 673:16, 673:17, 674:25, 675:2, 675:6, 675:8, 675:10, 675:12, 677:14, 678:19, 678:24, 679:1, 679:18, 679:22, 680:1, 682:15, 683:23, 684:1, 684:5, 684:6, 684:9, 684:11, 684:13, 684:15, 685:23, 685:25, 686:1, 686:7, 686:11, 686:17, 686:18, 687:5, 687:7, 687:12, 687:15, 687:18, 687:19

**MS** [6] - 433:18, 433:20, 433:22, 566:3, 602:11, 608:25
**multiple** [2] - 602:17, 604:25
**music** [3] - 545:5, 545:14, 545:23
**musician** [2] - 545:8, 546:14
**must** [3] - 492:17, 502:15, 531:19

**N**

**name** [13] - 436:15, 436:16, 499:13, 504:15, 504:16, 522:10, 529:22, 565:21, 590:1, 621:24, 623:21, 652:11, 681:22
**names** [1] - 624:13
**naming** [1] - 675:15
**nap** [1] - 595:19
**narrow** [1] - 489:6
**nation** [1] - 482:11
**National** [4] - 437:6, 438:22, 439:20, 444:5
**national** [4] - 443:3, 444:5, 446:9, 494:18
**nationwide** [1] - 466:4
**natural** [4] - 541:23, 559:18, 594:16, 635:1
**nature** [3] - 442:25, 466:17, 544:19
**nautical** [4] - 462:16, 462:18, 495:22, 495:23
**near** [39] - 440:13, 464:7, 509:22, 509:25, 515:14, 520:19, 527:18, 542:3, 550:10, 551:15, 552:6, 561:13, 563:17, 573:25, 581:1, 588:13, 588:15, 588:25, 589:1, 589:2, 589:12, 589:18, 591:2, 594:9, 595:2, 600:25, 629:16, 632:4, 633:15, 637:2, 639:20, 641:2, 641:5, 650:12, 666:3,

666:21, 666:22, 668:23
**nearby** [1] - 506:19
**nearly** [1] - 679:20
**neath** [1] - 643:18
**necessarily** [4] - 451:10, 456:25, 500:16, 677:18
**need** [17] - 440:22, 448:24, 461:17, 474:22, 483:16, 483:24, 491:20, 513:5, 552:18, 579:1, 590:25, 598:13, 619:15, 641:11, 651:15, 657:18, 688:3
**needed** [1] - 511:12
**negligence** [1] - 511:1
**nervous** [1] - 571:16
**never** [28] - 448:11, 475:22, 476:3, 476:6, 476:7, 488:3, 488:4, 515:25, 536:6, 543:22, 544:1, 548:20, 549:12, 549:14, 549:19, 558:3, 581:12, 591:20, 594:3, 605:7, 607:12, 607:21, 608:13, 627:7, 657:24, 657:25, 660:20
**NEW** [2] - 432:2, 432:12
**new** [3] - 450:22, 499:6, 659:14
**New** [8] - 448:23, 465:19, 466:7, 473:24, 483:1, 494:22, 502:20, 615:5
**news** [3] - 447:19, 448:6, 448:8
**next** [50] - 453:7, 455:8, 455:10, 464:19, 473:15, 473:22, 474:21, 479:23, 480:14, 490:13, 504:6, 513:1, 531:24, 535:24, 536:15, 536:17, 539:6, 545:20, 546:16, 547:9, 547:11, 552:2, 553:6, 565:3, 565:14, 594:19, 594:23, 596:13, 600:6, 602:5,

609:18, 611:22, 611:24, 611:25, 612:1, 621:4, 621:17, 621:18, 627:16, 651:15, 651:16, 651:21, 669:4, 669:8, 682:25, 683:2, 686:16
**NFPA** [7] - 443:19, 444:18, 466:2, 466:3, 466:16, 494:14, 494:22
**nice** [4] - 462:25, 556:9, 673:4, 680:14
**nicknamed** [1] - 592:13
**nicole** [1] - 624:17
**Nicole** [6] - 529:24, 624:15, 624:16, 628:25, 629:23, 632:10
**niece** [1] - 653:8
**night** [46] - 439:16, 452:9, 452:12, 457:13, 495:1, 496:5, 502:5, 524:8, 524:24, 525:19, 529:17, 543:3, 543:5, 561:4, 561:7, 561:20, 570:22, 575:10, 580:15, 586:2, 586:3, 586:21, 586:22, 586:23, 593:17, 593:20, 594:6, 594:21, 595:5, 610:5, 610:13, 610:16, 625:5, 640:25, 655:10, 655:11, 681:16, 681:25, 682:1, 682:19, 684:20, 687:1, 687:9
**nighttime** [3] - 543:8, 594:5, 671:17
**Nikki** [5] - 529:23, 529:24, 530:18, 556:23, 624:14
**nineteen** [1] - 622:12
**NO** [1] - 432:6
**nobody** [6] - 472:14, 473:7, 599:1, 601:17, 617:21, 647:7
**noise** [2] - 491:23, 493:10
**non** [2] - 441:23, 513:5
**non-franchisees** [1] -

441:23
**non-leading** [1] - 513:5
**none** [1] - 561:24
**noon** [1] - 452:6
**normal** [4] - 657:9, 657:10, 684:4
**normally** [1] - 456:20
**north** [1] - 537:16
**North** [4] - 439:8, 439:15, 440:1, 604:6
**north-south** [1] - 537:16
**Northeast** [3] - 506:21, 653:4, 653:7
**nothing** [22] - 456:6, 472:15, 491:23, 521:2, 521:3, 524:1, 569:23, 598:22, 599:14, 602:9, 611:15, 611:18, 612:19, 613:14, 616:5, 651:7, 656:4, 661:2, 667:10, 672:13, 673:25
**notice** [11] - 519:24, 533:8, 542:2, 561:20, 576:20, 629:15, 630:10, 639:19, 639:22, 658:3, 663:24
**noticed** [1] - 553:19
**notified** [1] - 598:6
**November** [1] - 645:1
**nowhere** [6] - 464:7, 489:15, 550:10, 551:15, 552:6
**number** [5] - 449:19, 514:11, 608:10, 641:16, 645:19
**NUMBER** [1] - 435:4
**numerous** [2] - 438:7, 498:5

**O**

**o'clock** [30] - 456:20, 456:22, 460:2, 461:12, 462:12, 467:17, 467:20, 468:1, 468:4, 468:5, 468:9, 468:18, 468:21, 496:5, 496:23, 497:1, 516:19, 533:20, 573:12, 587:19, 597:18, 599:1, 600:1, 601:11, 604:22, 650:19,

**658**:13, 668:8, 682:20, 683:19

**o'clock-ish** [1] - 587:19

**obedient** [3] - 568:23, 654:6, 654:18

**obey** [2] - 461:19, 655:5

**obeyed** [1] - 489:7

**obeying** [1] - 654:14

**object** [11] - 451:21, 470:20, 472:19, 473:10, 473:20, 479:17, 488:14, 506:6, 562:20, 569:21, 672:4

**objection** [43] - 444:14, 449:11, 452:14, 453:5, 454:16, 459:6, 468:10, 471:11, 481:3, 493:2, 495:2, 495:6, 495:18, 499:16, 500:14, 507:22, 510:1, 510:2, 510:7, 511:7, 513:15, 515:18, 516:11, 521:1, 527:5, 534:17, 543:15, 547:4, 562:11, 562:19, 562:21, 571:5, 595:7, 597:1, 598:19, 600:12, 601:3, 609:16, 611:13, 614:14, 636:11

**objectionable** [1] - 488:19

**obligations** [1] - 570:21

**obscured** [1] - 663:20

**observation** [4] - 540:12, 581:14, 594:8, 684:21

**observations** [13] - 523:13, 568:22, 569:4, 577:5, 577:7, 581:25, 583:8, 588:24, 597:5, 653:25, 656:1, 670:2, 673:22

**observe** [14] - 518:4, 539:3, 566:14, 566:18, 577:24, 578:9, 609:24, 631:10, 631:11, 656:1, 670:13, 681:7, 685:13, 686:13

**observed** [7] - 532:22, 576:9, 598:24, 600:3, 600:4, 655:23, 686:21

**observing** [3] - 492:8, 670:11, 670:12

**obviously** [1] - 593:18

**occasion** [5] - 523:16, 605:7, 623:3, 623:5, 627:8

**occasionally** [2] - 583:18, 610:2

**occasions** [32] - 469:15, 514:11, 514:15, 514:16, 515:7, 515:10, 517:24, 521:9, 523:9, 560:25, 561:3, 561:6, 561:11, 561:14, 561:20, 582:24, 582:25, 583:10, 588:3, 588:9, 593:10, 605:25, 609:23, 609:24, 653:14, 670:11, 670:18, 674:22, 677:2, 686:21, 687:5, 687:8

**occur** [1] - 462:10

**occurred** [12] - 465:7, 470:7, 481:22, 512:2, 521:2, 548:7, 550:9, 553:5, 575:13, 603:5, 607:10, 645:14

**occurs** [1] - 603:9

**ocean** [22] - 576:4, 576:9, 577:13, 577:19, 577:24, 578:5, 578:6, 578:7, 578:9, 578:12, 579:2, 579:5, 579:15, 579:17, 579:18, 615:5, 615:17, 625:2, 656:19, 657:11, 657:19

**Ocean** [3] - 577:21, 585:15, 657:11

**October** [4] - 463:23, 550:25, 559:25, 675:21

**Odalie** [2] - 570:24, 571:1

**OF** [44] - 432:2, 432:20, 433:4, 433:6, 433:8, 433:9, 433:10, 433:11, 433:13, 433:14,

433:15, 433:16, 433:18, 433:20, 433:22, 433:25, 434:2, 434:4, 434:6, 434:8, 434:11, 434:12, 434:14, 436:18, 443:17, 444:17, 462:4, 494:12, 501:17, 504:23, 547:18, 559:3, 563:25, 566:3, 602:11, 608:25, 622:7, 642:1, 647:18, 650:17, 650:23, 652:18, 673:17, 684:15

**offer** [1] - 443:13

**offered** [2] - 606:7, 654:21

**offers** [1] - 471:19

**office** [4] - 456:19, 559:24, 574:6, 610:20

**Office** [1] - 564:24

**OFFICES** [1] - 432:20

**often** [5] - 514:23, 518:4, 518:22, 583:3, 583:4

**old** [11] - 463:19, 504:24, 508:21, 548:7, 554:13, 562:6, 583:11, 588:18, 603:12, 622:11, 642:6

**older** [1] - 673:9

**on-site** [1] - 660:7

**once** [9] - 453:25, 465:11, 474:20, 486:8, 488:4, 534:22, 604:24, 670:1

**one** [97] - 437:10, 437:23, 438:1, 438:2, 442:8, 445:1, 449:22, 450:6, 450:7, 451:19, 452:1, 456:20, 457:18, 475:15, 475:18, 487:1, 487:3, 488:21, 488:24, 489:1, 492:2, 496:22, 497:1, 497:5, 498:17, 508:13, 511:11, 511:23, 534:3, 549:14, 549:19, 557:11, 570:20, 571:9, 571:24, 572:1,

572:3, 572:25, 575:10, 583:18, 584:13, 584:24, 586:20, 586:22, 589:11, 589:15, 590:6, 590:16, 591:23, 591:24, 593:17, 593:19, 596:19, 599:5, 600:5, 601:15, 603:24, 609:4, 614:10, 616:6, 617:23, 620:17, 621:5, 624:9, 635:7, 641:13, 641:14, 642:21, 642:23, 643:5, 644:16, 644:19, 648:20, 651:14, 659:16, 663:1, 663:22, 664:15, 666:5, 669:15, 670:6, 674:8, 674:21, 675:20, 676:21, 677:19, 680:7, 680:9, 681:5, 684:8

**ONE** [1] - 432:11

**ones** [3] - 438:1, 442:22, 687:25

**ongoing** [1] - 598:18

**OPEN** [1] - 436:3

**open** [20] - 437:13, 439:16, 441:14, 443:4, 450:12, 450:18, 475:15, 475:16, 479:3, 484:10, 484:15, 484:16, 486:7, 487:11, 491:12, 500:24, 501:8, 519:20, 565:10, 573:25

**open-to-the-public** [1] - 450:18

**opened** [4] - 483:17, 484:10, 484:14, 487:12

**operate** [2] - 436:24, 441:7

**operating** [6] - 438:8, 438:10, 438:21, 439:1, 441:21, 442:19

**operation** [9] - 440:25, 442:16, 442:18, 442:21, 443:14, 444:20, 449:23, 618:9, 619:16

**operational** [1] - 499:11

**operations** [6] - 439:11, 441:7, 442:3, 444:7, 445:11, 494:20

**opinion** [9] - 449:2, 452:1, 453:1, 454:6, 455:10, 471:1, 487:17, 654:2, 654:8

**opinions** [4] - 449:2, 449:3, 466:19, 469:11

**opportunities** [1] - 625:12

**opportunity** [12] - 463:3, 490:21, 509:4, 514:17, 515:9, 546:23, 547:21, 561:2, 566:14, 568:25, 588:9

**opposed** [1] - 572:8

**opposite** [1] - 606:14

**order** [3] - 595:20, 684:20, 686:19

**ordered** [1] - 575:6

**ordinance** [1] - 465:18

**organization** [1] - 442:15

**organizations** [4] - 441:4, 441:11, 442:1

**organized** [4] - 437:16, 572:10, 603:1, 674:19

**oriented** [5] - 620:8, 620:12, 620:19, 682:8, 682:10

**other..** [1] - 438:9

**otherwise** [4] - 598:4, 619:7, 623:11, 674:1

**ought** [1] - 619:25

**ourselves** [1] - 571:9

**outside** [4] - 437:4, 527:20, 612:2, 651:16

**oval** [7] - 537:3, 537:4, 537:14, 537:23, 541:17, 638:16, 645:4

**oval-shaped** [1] - 537:3

**over-neath** [1] - 643:18

**overall** [1] - 448:20

**overheard** [1] - 648:11

**overlooking** [2] - 487:19, 487:20

**overnight** [2] - 450:14, 603:21

**overrule** [1] - 527:6

**overruled** [1] - 468:11

**overruling** [3] - 471:11, 507:21, 507:22
**own** [5] - 436:25, 450:1, 450:7, 581:25, 663:7
**owned** [3] - 438:8, 439:11, 439:19
**owner** [2] - 492:5, 496:19
**owners** [3] - 440:15, 443:1, 661:17

## P

**p.m** [7] - 451:15, 459:16, 502:3, 597:18, 624:22, 639:25, 688:6
**pack** [1] - 579:21
**padlock** [1] - 685:4
**Page** [4] - 463:13, 464:10, 464:23, 471:16
**page** [10] - 502:2, 550:16, 550:18, 551:20, 552:10, 555:11, 555:16, 560:7, 560:8
**PAGE** [2] - 433:2, 435:4
**paid** [1] - 579:11
**Palace** [2] - 681:22, 682:2
**pants** [1] - 529:8
**parent** [9] - 471:22, 503:15, 503:19, 516:10, 573:24, 581:10, 609:9, 654:17
**parental** [2] - 470:5, 495:16
**parenteral** [1] - 676:5
**parents** [38] - 459:17, 460:5, 461:22, 469:12, 469:14, 477:7, 495:15, 514:12, 517:8, 517:14, 517:16, 517:17, 518:2, 518:5, 521:11, 521:12, 583:1, 583:13, 583:16, 593:7, 593:14, 593:16, 603:22, 607:6, 623:16, 623:20, 633:15, 633:19, 660:10, 661:1, 670:14,

670:19, 670:23, 677:5, 677:11, 677:16, 677:21, 687:9
**park** [31] - 437:2, 437:9, 450:8, 455:4, 455:5, 462:1, 467:3, 467:7, 482:9, 482:15, 483:7, 494:19, 494:25, 502:2, 502:4, 516:8, 525:11, 526:24, 561:7, 583:2, 583:9, 609:15, 632:22, 633:1, 633:2, 651:4, 677:25, 680:8, 681:5, 681:14, 684:20
**Park** [4] - 437:4, 437:6, 439:20, 442:9
**parks** [6] - 494:22, 494:24, 495:16, 502:3
**part** [7] - 446:23, 452:11, 510:24, 551:5, 616:14, 640:8, 665:15
**particular** [16] - 465:16, 472:11, 474:6, 475:10, 491:17, 523:10, 549:13, 561:16, 574:1, 578:25, 604:16, 612:25, 632:1, 657:17, 675:20, 679:2
**partner** [1] - 437:1
**parts** [2] - 520:15, 666:2
**partway** [1] - 447:1
**party** [3] - 470:21, 610:24, 611:6
**passed** [29] - 464:14, 474:24, 508:6, 509:4, 509:21, 509:24, 510:4, 514:11, 515:13, 515:16, 515:22, 521:6, 524:8, 551:22, 582:19, 587:22, 593:2, 655:23, 656:14, 662:9, 664:12, 664:15, 666:2, 670:4, 670:17, 670:22, 684:19, 685:12, 686:25
**passes** [3] - 506:12, 673:3, 673:5
**passing** [3] - 526:8,

588:12, 593:8
**past** [1] - 476:3
**PATRICK** [1] - 432:20
**patrol** [9] - 455:11, 455:14, 468:18, 479:25, 482:10, 499:12, 502:4, 502:8, 502:11
**patrolled** [1] - 579:8
**patrolling** [4] - 681:7, 685:13, 685:14, 686:13
**patrols** [20] - 455:22, 455:23, 467:15, 467:16, 467:17, 467:20, 468:8, 472:10, 498:15, 498:18, 499:10, 500:11, 500:12, 500:16, 610:1, 610:2, 610:13, 671:5, 671:8, 671:14
**paying** [1] - 608:16
**people** [64] - 436:24, 438:21, 446:5, 446:17, 446:21, 448:10, 450:6, 450:8, 450:14, 452:8, 454:14, 455:1, 455:3, 457:12, 457:24, 459:9, 471:3, 473:19, 476:8, 478:15, 478:18, 478:19, 478:20, 478:24, 482:8, 492:6, 498:6, 498:8, 498:19, 498:20, 503:8, 520:24, 526:9, 527:19, 593:14, 601:12, 601:25, 607:11, 607:13, 607:14, 607:15, 607:18, 607:19, 607:21, 608:7, 608:10, 608:13, 608:14, 608:16, 614:19, 619:8, 620:11, 624:3, 630:11, 630:14, 631:12, 670:12, 678:12, 680:10, 680:17, 680:21, 681:2
**per** [2] - 441:15, 681:3
**percent** [4] - 499:20, 500:3, 500:6, 684:3
**perception** [2] - 493:1, 556:16
**perhaps** [1] - 544:10

**perimeter** [1] - 600:15
**period** [16] - 462:22, 463:1, 526:10, 628:14, 631:10, 637:9, 638:6, 639:25, 640:5, 644:10, 650:8, 666:12, 670:16, 671:10, 679:3
**permit** [3] - 445:22, 456:11, 511:22
**permitted** [1] - 545:18
**person** [9] - 492:8, 503:14, 503:23, 529:16, 532:14, 618:22, 620:6, 659:24, 660:1
**personal** [1] - 672:20
**personality** [1] - 540:16
**personally** [16] - 484:19, 508:5, 515:4, 518:1, 533:25, 534:6, 540:13, 544:1, 582:18, 594:3, 595:22, 662:10, 669:20, 672:19, 686:23
**personnel** [1] - 496:15
**perspective** [5] - 573:22, 578:24, 649:2, 649:17, 649:21
**pertaining** [1] - 494:23
**perturbed** [1] - 595:19
**phenomenon** [1] - 558:11
**Philadelphia** [6] - 506:17, 506:21, 566:25, 576:14, 653:4, 653:7
**Philly** [1] - 586:3
**phone** [1] - 636:9
**photo** [4] - 648:19, 649:5, 649:8, 649:11
**photograph** [4] - 649:1, 649:2, 649:25, 664:5
**phrase** [1] - 453:25
**phrased** [1] - 520:4
**physical** [1] - 460:15
**physically** [2] - 476:5, 598:15
**pick** [7] - 587:5, 604:2, 604:8, 659:22, 661:7, 676:13, 676:14
**picked** [1] - 476:15
**picking** [3] - 572:2,

660:2, 661:6
**picture** [1] - 645:16
**pictures** [1] - 448:22
**Pine** [96] - 432:21, 446:14, 450:17, 450:18, 451:4, 451:10, 470:4, 472:9, 472:16, 473:7, 473:9, 499:12, 502:14, 506:2, 507:13, 507:15, 507:25, 508:5, 509:3, 514:12, 514:16, 515:8, 515:13, 517:24, 518:10, 524:8, 548:12, 548:17, 549:24, 566:13, 566:20, 568:4, 569:12, 569:20, 570:16, 571:17, 571:23, 571:25, 572:5, 572:8, 573:3, 574:2, 577:17, 580:18, 582:9, 582:18, 584:15, 584:19, 587:21, 589:22, 589:23, 590:19, 591:5, 602:22, 605:22, 622:13, 622:19, 623:2, 623:5, 623:9, 623:18, 624:3, 624:20, 625:5, 625:13, 625:19, 626:5, 626:22, 627:7, 632:4, 642:11, 650:8, 650:10, 650:11, 653:12, 656:6, 659:11, 659:13, 659:18, 660:2, 661:9, 661:12, 662:22, 672:1, 672:2, 674:3, 674:4, 674:9, 674:22, 675:16, 675:17, 676:6, 676:12, 676:16
**pine** [2] - 606:21, 606:23
**PINE** [3] - 432:7, 432:7
**Piney's** [2] - 681:22, 682:2
**pirate** [2] - 665:18, 668:19
**pitch** [1] - 674:9
**place** [18] - 442:15, 455:1, 455:3, 459:9,

459:12, 459:14,
470:4, 472:10,
476:24, 477:1,
485:24, 487:13,
571:17, 572:14,
662:3, 676:12,
678:11, 681:4
**places** [3] - 462:23,
477:3, 607:15
**plaintiff** [3] - 620:8,
620:12, 620:18
**Plaintiff** [2] - 432:5,
432:19
**plaintiff's** [1] - 679:20
**plaintiff-oriented** [2] -
620:8, 620:12
**plan** [7] - 450:6,
585:12, 585:13,
585:21, 586:21,
586:22, 673:9
**planned** [5] - 584:3,
586:10, 586:11,
625:18, 672:21
**planning** [6] - 569:16,
569:17, 570:19,
585:16, 586:2
**plans** [8] - 450:4,
524:23, 544:10,
544:14, 544:19,
545:3, 584:5, 586:1
**platform** [1] - 520:12
**play** [14] - 506:12,
506:14, 507:2,
507:4, 522:16,
546:1, 546:2, 546:9,
574:20, 595:21,
633:3, 657:10,
665:17, 665:19
**played** [4] - 540:20,
546:4, 546:11,
653:19
**playful** [1] - 569:7
**playground** [18] -
525:13, 527:23,
527:24, 528:1,
528:6, 528:9,
528:19, 530:21,
595:21, 595:23,
633:3, 633:5, 633:8,
649:3, 649:6, 666:7,
666:21
**playing** [12] - 482:8,
520:19, 539:4,
539:12, 566:21,
587:8, 601:16,
636:1, 666:18, 667:5
**PLAZA** [1] - 432:11
**pleasantries** [1] -
571:8
**plowing** [1] - 499:7

**podium** [1] - 528:4
**poetry** [2] - 546:20,
555:19
**point** [83] - 444:18,
447:25, 448:4,
451:22, 457:18,
457:25, 463:24,
488:8, 488:9, 489:5,
490:5, 495:24,
496:1, 497:10,
503:22, 507:21,
507:22, 509:14,
510:10, 511:20,
513:1, 516:25,
518:7, 518:13,
524:10, 525:22,
528:13, 529:12,
530:11, 531:18,
532:4, 533:21,
534:2, 538:5,
538:20, 539:24,
540:4, 540:22,
541:22, 541:24,
543:11, 551:7,
553:7, 554:11,
557:11, 557:19,
559:4, 566:9, 596:7,
601:8, 602:3,
614:16, 616:23,
617:20, 618:4,
619:12, 625:18,
628:1, 628:3,
628:19, 630:2,
631:16, 634:3,
634:14, 634:23,
636:25, 637:2,
643:5, 643:17,
643:21, 644:13,
645:7, 645:8, 654:5,
655:13, 656:12,
659:7, 659:11,
660:15, 662:7,
662:8, 667:1
**pointed** [1] - 540:1
**pointer** [2] - 648:22,
648:23
**pointing** [4] - 528:2,
528:4, 632:3
**points** [3] - 451:8,
670:6, 681:5
**poles** [1] - 666:9
**Police** [1] - 554:17
**pond** [2] - 479:8,
625:22
**pool** [43] - 454:13,
457:25, 458:1,
459:20, 461:14,
475:3, 475:8,
497:18, 497:20,
519:17, 519:19,

519:20, 525:15,
576:10, 576:13,
576:16, 576:21,
576:24, 577:8,
580:22, 585:8,
604:19, 606:2,
607:14, 625:22,
655:8, 655:10,
655:12, 655:13,
655:24, 656:3,
670:9, 678:6,
684:21, 684:22,
684:25, 685:7,
685:8, 686:3,
686:20, 686:22,
687:6
**pools** [8] - 442:17,
445:11, 453:22,
454:2, 454:7,
454:10, 454:12,
486:4
**pop** [1] - 439:11
**portion** [2] - 464:8,
464:21
**position** [6] - 460:5,
503:13, 507:4,
507:5, 558:12
**positioned** [3] -
527:24, 592:8,
669:18
**positioning** [2] -
449:6, 449:7
**possibilities** [1] -
616:6
**possible** [1] - 584:16
**possibly** [5] - 487:11,
521:22, 544:12,
563:5, 613:20
**post** [1] - 597:2
**posted** [1] - 459:25
**potential** [2] - 544:14,
544:19
**potentially** [1] -
609:14
**potlucks** [1] - 682:6
**practice** [5] - 472:9,
472:11, 487:2,
502:2, 673:2
**practices** [19] -
442:24, 443:5,
443:10, 445:10,
449:18, 451:5,
451:6, 452:3,
453:21, 453:23,
454:24, 456:3,
456:17, 477:17,
478:11, 486:21,
486:23, 487:16,
499:13
**practicing** [1] - 507:6

**prank** [1] - 636:1
**precise** [1] - 481:12
**predict** [1] - 562:22
**prejudiced** [1] -
488:21
**prejudicial** [1] - 471:9
**premark** [1] - 641:14
**premise** [2] - 459:25,
460:1, 496:19
**prepared** [2] - 528:24,
644:25
**presence** [12] -
455:11, 456:23,
457:19, 457:23,
458:3, 460:15,
483:17, 496:14,
525:23, 581:14,
612:7, 671:17
**present** [5] - 460:1,
501:7, 517:17,
550:6, 565:6,
604:20, 658:5,
658:19
**presented** [1] - 501:19
**presenting** [1] -
501:22
**presently** [1] - 504:24
**president** [1] - 438:4
**pretty** [4] - 586:17,
587:21, 644:8, 676:8
**prevailed** [1] - 477:6
**previous** [23] - 506:4,
523:9, 529:20,
542:1, 542:21,
560:25, 561:3,
561:6, 561:20,
582:24, 582:25,
584:14, 584:25,
588:3, 588:8,
588:24, 623:2,
623:5, 627:8, 629:5,
653:14, 670:11,
670:18
**previously** [1] - 675:3
**primarily** [3] - 436:22,
440:8, 444:4
**primary** [1] - 436:23
**print** [1] - 675:17
**private** [3] - 439:25,
440:2, 450:3
**problem** [8] - 553:12,
568:14, 619:9,
621:9, 621:10,
621:15, 658:23,
679:22
**problems** [4] - 534:4,
579:13, 579:16,
656:2
**proceed** [5] - 453:15,
453:17, 493:24,

621:7, 637:5
**proceeded** [2] - 540:4,
637:1
**proceedings** [1] -
610:23
**process** [3] - 620:3,
659:20
**Professor** [3] -
651:16, 651:18,
651:20
**prohibited** [1] - 516:9
**prohibition** [1] -
517:13
**prominently** [2] -
510:11, 511:14
**promoted** [1] - 450:22
**promptly** [1] - 564:25
**proof** [1] - 611:10
**proper** [5] - 468:2,
471:12, 492:16,
613:11, 616:16
**properly** [1] - 675:15
**property** [5] - 450:7,
456:4, 500:17,
500:23, 661:17
**proposed** [1] - 531:17
**proprietary** [1] - 467:2
**Protection** [2] -
438:23, 444:5
**prove** [1] - 611:3
**provide** [8] - 441:15,
441:21, 443:22,
454:25, 474:15,
494:25, 590:5
**provincial** [1] - 439:22
**proximity** [1] - 581:1
**public** [9] - 437:13,
439:16, 441:14,
450:12, 450:18,
451:7, 451:9,
451:11, 452:4
**publish** [3] - 441:12,
442:1, 442:16
**published** [1] - 443:10
**publishes** [1] - 439:14
**purchased** [1] -
659:14
**purpose** [5] - 616:9,
617:8, 617:24,
618:8, 665:2
**purposes** [1] - 617:25
**pushing** [2] - 547:6,
595:13
**put** [24] - 444:18,
452:22, 454:1,
486:9, 489:11,
493:20, 493:22,
494:14, 494:17,
495:8, 495:10,
502:5, 503:4, 503:7,

503:8, 514:25,
516:18, 598:12,
599:4, 619:6, 645:7,
646:4, 646:8, 661:24

## Q

qualification [1] -
454:5
qualifications [5] -
438:16, 438:19,
439:4, 440:21,
444:15
qualified [4] - 451:10,
452:16, 453:1,
488:18
quarter [1] - 596:12
QUATTRONE [1] -
432:18
questioning [3] -
451:22, 471:12,
535:1
questions [37] - 441:9,
445:16, 447:17,
488:14, 488:15,
490:10, 501:9,
501:12, 504:1,
504:2, 509:16,
513:2, 513:4,
513:13, 513:22,
535:23, 544:9,
547:22, 548:4,
550:21, 552:16,
558:20, 558:22,
559:23, 563:1,
571:20, 574:9,
600:5, 608:24,
610:16, 613:4,
613:10, 672:7,
672:12, 684:2,
684:16
quick [2] - 441:2,
621:12
quickest [1] - 439:13
quickly [1] - 484:7
quiet [2] - 492:24,
502:3
quite [7] - 479:5,
519:10, 570:19,
595:19, 630:21,
654:10, 658:18

## R

raise [6] - 436:9,
499:24, 504:11,
565:17, 621:21,
652:8
raised [4] - 499:22,

518:7, 672:10
rambunctious [1] -
657:4
range [3] - 607:19,
607:23, 608:4
rapper [3] - 554:25,
555:18, 555:25
rare [2] - 458:15,
458:17
rate [1] - 441:14
rather [4] - 450:19,
478:19, 520:8, 664:1
re [2] - 481:15, 683:25
re-asking [1] - 481:15
reached [1] - 540:25
read [22] - 446:3,
446:11, 451:24,
463:3, 463:19,
464:8, 464:21,
465:2, 465:21,
469:10, 471:17,
495:5, 503:8, 551:5,
551:18, 552:4,
552:14, 556:10,
665:1, 665:2, 675:23
reading [2] - 495:3,
502:1
ready [2] - 651:17,
651:21
realize [1] - 591:3
realized [3] - 522:25,
541:11, 677:25
really [25] - 437:17,
443:8, 448:25,
491:23, 519:13,
524:1, 537:13,
539:11, 556:14,
570:19, 588:17,
608:16, 613:6,
620:1, 621:8,
662:13, 663:4,
667:17, 669:22,
669:23, 684:24,
684:9, 684:11,
684:18, 686:17
reason [13] - 469:25,
482:12, 483:6,
483:8, 488:17,
519:16, 586:5,
595:17, 595:18,
609:4, 618:18,
620:4, 637:4
reasonable [1] -
619:16
reasonably [1] -
487:23
reasons [1] - 449:22
rec [1] - 507:2
recent [1] - 452:15
Recess [2] - 491:11,

565:9
recite [1] - 545:6
Reclamation [1] -
439:21
recognize [4] -
644:23, 645:12,
675:4, 675:13
recollection [8] -
481:5, 557:1,
603:15, 629:8,
642:18, 647:4,
657:8, 663:11
recommended [1] -
539:7
record [9] - 436:15,
452:23, 452:25,
473:17, 476:25,
504:15, 565:21,
621:25, 664:23
recorded [1] - 554:16
RECROSS [6] -
433:11, 433:16,
434:6, 501:17,
563:25, 650:17
recross [5] - 501:13,
563:24, 650:16,
687:18, 687:20
rectangular [1] -
537:1
redirect [13] - 490:24,
490:25, 491:7,
491:8, 491:9,
493:25, 494:4,
494:10, 499:6,
562:4, 563:6,
617:21, 618:22
REDIRECT [12] -
433:10, 433:15,
433:22, 434:4,
434:8, 434:14,
494:12, 559:3,
608:25, 647:18,
650:23, 684:15
refer [5] - 463:12,
550:15, 591:2,
626:11, 668:11
reference [2] - 466:15,
560:5
referencing [1] -
494:14
referred [1] - 649:3
referring [8] - 444:4,
465:10, 621:10,
626:10, 649:4,
664:12, 664:18,
664:24
refresh [5] - 480:16,
480:18, 480:20,
480:22, 556:12
refreshed [1] - 556:14

refuse [1] - 490:10
regard [1] - 527:25
regarding [7] -
447:17, 466:2,
467:16, 502:14,
510:22, 547:22,
606:7
regardless [1] -
496:11
regional [1] - 443:3
regular [3] - 443:2,
498:19, 561:19
regularly [2] - 562:9,
562:15
Regulations [1] -
675:18
regulations [8] -
503:8, 548:14,
548:18, 548:24,
674:23, 675:8,
675:15, 680:3
relate [1] - 448:13
relates [3] - 444:9,
444:11, 465:19
relating [1] - 612:4
relation [2] - 539:22,
633:8
relationship [3] -
505:4, 547:1, 569:12
relative [11] - 443:22,
443:23, 444:2,
452:15, 466:12,
475:13, 475:17,
492:23, 513:1,
614:14, 624:10
relevance [10] -
454:16, 470:21,
470:23, 506:6,
527:5, 534:18,
569:22, 571:5,
672:4, 672:5
relevancy [1] - 636:11
relevant [6] - 471:6,
471:9, 471:10,
486:20, 486:21,
599:19
rely [1] - 469:11
remain [1] - 541:5
remains [2] - 462:21,
463:1
remedial [2] - 512:8,
512:9
remember [43] -
460:14, 473:4,
479:9, 480:12,
482:6, 492:4,
502:15, 529:22,
534:23, 535:4,
550:20, 554:19,
564:8, 575:12,

589:11, 589:15,
592:9, 613:14,
613:17, 624:19,
625:4, 626:16,
628:6, 629:11,
631:2, 632:19,
632:22, 635:4,
640:11, 640:15,
640:23, 642:20,
643:16, 643:19,
643:22, 644:18,
646:22, 658:9,
662:17, 664:9,
666:11, 685:4
remembrance [1] -
545:11
remotely [1] - 597:4
rendered [1] - 488:3
RENO [1] - 432:17
rent [3] - 450:14,
477:2, 571:18
rental [6] - 507:12,
508:1, 582:8,
622:21, 622:22,
622:23
rentals [5] - 450:13,
450:14, 450:19
rented [2] - 582:2,
659:12
renter [6] - 581:13,
589:23, 590:19,
622:24, 659:11,
662:22
renting [2] - 529:25,
593:25
repeat [2] - 510:12,
580:12
repeated [1] - 609:2
repeatedly [3] -
469:22, 495:15,
609:3
repeating [3] - 605:2,
661:11, 674:8
rephrase [2] - 461:4,
486:6
rephrased [1] - 481:9
reply [1] - 643:12
report [20] - 448:11,
466:12, 466:13,
466:15, 471:17,
488:3, 488:25,
489:4, 489:15,
489:19, 494:15,
494:17, 495:3,
495:8, 495:10,
501:18, 502:6,
502:8, 502:11,
687:19
REPORTER [1] -
483:22

reporters [1] - 483:21
represented [1] -
618:7
Republicans [1] -
484:25
reputable [1] - 441:11
request [3] - 490:22,
612:21, 645:1
require [5] - 454:22,
460:11, 460:15,
497:8, 621:16
required [6] - 432:23,
443:7, 465:20,
470:4, 496:18, 503:4
requirement [3] -
441:7, 502:21,
510:21
requirements [3] -
441:5, 466:16, 475:6
requires [4] - 451:7,
474:2, 474:4, 483:18
rescue [2] - 599:6,
599:7
research [3] - 572:2,
572:3, 688:2
researched [1] -
465:23
researching [1] -
572:13
resided [1] - 653:6
resistance [1] -
643:14
resistant [1] - 571:14
resort [20] - 450:21,
516:9, 517:7,
519:21, 519:22,
519:24, 571:23,
575:17, 575:22,
581:9, 592:18,
594:1, 609:9, 626:7,
626:11, 627:12,
640:2, 659:22,
662:23, 670:6
RESORT [1] - 432:8
Resort [3] - 446:14,
451:4, 622:13
resorts [1] - 661:7
respect [14] - 451:2,
458:18, 488:16,
499:9, 499:10,
582:22, 590:21,
591:7, 617:6, 627:2,
649:18, 649:23,
662:11, 665:21
respected [1] - 569:5
respectful [7] - 547:5,
568:22, 569:8,
654:6, 654:9, 654:20
respectfully [5] -
484:9, 535:15,

612:16, 615:8,
618:18
respecting [1] -
654:14
respond [1] - 499:17
RESPONSE [2] -
436:6, 493:14
responsibility [8] -
470:14, 470:17,
471:9, 471:25,
497:18, 497:23,
610:17, 676:6
responsible [7] -
470:19, 472:6,
660:19, 660:24,
676:9, 676:22, 680:4
rest [3] - 500:8,
515:19, 640:25
result [1] - 443:5
resume [2] - 564:25,
647:3
retired [1] - 502:5
return [1] - 583:20
returned [1] - 596:11
review [5] - 449:4,
469:1, 469:10,
470:1, 470:8
reviewed [7] - 446:1,
451:3, 465:5, 469:6,
472:16, 473:17,
473:25
ride [1] - 587:4
rides [1] - 456:18
riding [2] - 578:21,
583:11
rise [8] - 436:1, 484:3,
491:10, 491:13,
494:7, 565:1,
565:11, 688:5
RMR [2] - 432:24,
432:24
road [17] - 531:2,
531:3, 531:5, 531:8,
542:4, 542:24,
542:25, 543:1,
592:3, 606:16,
632:4, 642:19,
642:24, 685:16,
685:17
roads [1] - 531:6
roadways [1] - 453:14
roaming [1] - 468:13
Robert [1] - 432:24
rocks [1] - 531:7
role [1] - 574:19
room [7] - 538:9,
538:15, 553:2,
553:10, 591:6,
632:23, 649:18
ropes [1] - 536:2,

536:8
rough [1] - 669:13
roughly [3] - 579:25,
634:22, 641:20
Route [1] - 587:5
rove [1] - 499:12
roving [17] - 455:11,
455:14, 455:22,
467:15, 467:16,
467:17, 468:8,
479:25, 482:10,
489:20, 498:15,
499:9, 499:12,
500:11, 500:12,
500:16
rowhomes [1] -
506:21
rule [18] - 465:19,
496:9, 502:14,
516:7, 516:8,
516:17, 516:20,
519:2, 582:22,
583:24, 650:10,
651:4, 654:24,
655:5, 661:3, 676:8
ruled [2] - 456:5,
456:10
Rules [1] - 675:18
rules [42] - 438:25,
461:23, 461:25,
467:16, 470:4,
470:15, 494:23,
496:7, 502:24,
503:7, 516:24,
517:3, 517:7,
518:14, 548:14,
548:18, 548:20,
548:24, 573:4,
573:6, 573:8,
573:10, 574:23,
581:8, 581:9, 592:4,
604:17, 604:19,
629:16, 650:24,
654:6, 654:18,
658:7, 658:9,
660:12, 662:10,
674:22, 675:8,
675:15, 676:17,
680:2
ruling [5] - 472:25,
487:12, 489:7,
511:17, 513:19
rulings [1] - 512:6
run [4] - 438:9,
506:14, 603:1,
661:21
run-down [1] - 661:21
running [2] - 583:12,
583:18
runs [2] - 579:9,

675:21
RV [8] - 494:19,
494:22, 494:24,
495:16, 502:2,
590:22

—————————

## S

S-T-A-V-E-S [1] -
436:17
safe [1] - 688:3
safety [3] - 443:23,
444:11, 444:13
sales [2] - 437:12,
450:6
sandy [1] - 534:9
sanitary [4] - 441:5,
473:24, 502:21,
510:21
sanitary-type [1] -
441:5
sat [2] - 446:7, 674:21
satisfaction [1] -
510:21
Saturday [18] -
481:25, 512:22,
575:11, 575:13,
575:14, 577:19,
579:18, 580:2,
580:10, 580:13,
580:15, 581:4,
581:5, 583:21,
656:13, 657:12,
680:20
Saturdays [1] - 472:11
saw [81] - 448:23,
449:10, 469:2,
474:10, 511:17,
512:3, 512:4,
512:10, 512:13,
512:15, 512:18,
512:20, 513:16,
513:17, 513:23,
513:24, 514:3,
527:15, 530:18,
534:1, 540:5,
540:22, 541:1,
541:4, 541:14,
547:2, 553:7,
553:11, 553:24,
561:7, 561:15,
561:19, 563:1,
563:3, 563:6,
568:20, 570:13,
576:24, 578:12,
581:16, 583:9,
587:4, 587:6, 587:7,
587:9, 587:11,
587:13, 588:14,
589:1, 589:2,

589:23, 591:2,
591:20, 591:24,
592:11, 593:11,
593:20, 595:22,
597:6, 599:23,
602:22, 609:22,
630:25, 631:1,
635:13, 640:22,
640:24, 640:25,
642:15, 654:17,
656:10, 657:11,
657:25, 668:16,
670:22, 677:15,
678:3, 686:25, 687:9
scale [5] - 591:3,
631:23, 638:13,
663:5, 663:15
Scarpa [9] - 446:10,
509:15, 509:17,
510:11, 563:15,
563:20, 581:21,
609:25, 610:10
schedule [1] - 661:24
scheduling [3] -
621:9, 621:10,
621:15
school [7] - 437:17,
483:1, 506:11,
506:24, 567:11,
568:15, 654:13
SCHWEIZER [1] -
432:16
scold [1] - 620:4
scolded [1] - 614:2
scope [2] - 499:16,
499:21
Scout [2] - 437:18,
477:5
Scouts [1] - 437:18
se [1] - 441:15
Sea [9] - 575:15,
575:16, 575:20,
575:22, 578:1,
579:10, 579:18,
580:14, 656:15
search [3] - 601:18,
636:11, 659:20
searched [1] - 600:15
season [5] - 475:15,
500:23, 501:8,
582:8, 582:9
seasonal [5] - 450:13,
450:19, 508:1,
662:22, 675:20
seasons [1] - 582:6
seat [3] - 633:13,
647:3, 664:17
seated [7] - 436:5,
494:9, 504:19,
565:13, 565:24,

622:3, 652:14
**second** [11] - 450:7, 477:6, 488:8, 488:9, 502:1, 582:1, 590:12, 628:3, 648:21, 676:11, 676:15
**seconds** [1] - 636:23
**secretary** [1] - 438:4
**Section** [1] - 432:23
**sector** [1] - 450:3
**security** [5] - 446:20, 497:6, 497:25, 498:1, 501:3
**see** [103] - 445:23, 463:20, 474:12, 476:4, 476:14, 491:14, 492:18, 492:19, 497:14, 509:21, 511:19, 513:4, 513:5, 513:8, 513:23, 515:9, 515:10, 515:13, 515:23, 516:2, 517:11, 518:1, 519:23, 520:19, 520:21, 520:22, 521:6, 521:9, 523:16, 525:23, 526:8, 527:15, 533:3, 536:1, 539:10, 542:22, 543:10, 543:22, 546:23, 555:12, 561:2, 561:11, 561:15, 563:15, 564:24, 571:21, 583:16, 583:18, 586:25, 587:1, 587:3, 588:13, 589:16, 589:18, 591:7, 591:23, 592:1, 592:2, 592:21, 592:22, 593:10, 593:12, 593:15, 593:25, 594:11, 594:12, 596:3, 596:4, 597:10, 598:12, 601:2, 608:11, 610:3, 631:25, 633:14, 633:18, 636:4, 640:7, 640:10, 640:13, 640:19, 641:1, 646:2, 646:10, 649:10, 649:16, 650:9, 650:24, 653:20, 657:14, 657:15, 657:21,

658:4, 662:10, 663:16, 663:17, 671:13, 671:15, 681:10, 688:4
**seeing** [3] - 455:19, 606:7, 624:11
**seeking** [1] - 674:11
**seem** [5] - 492:3, 579:3, 637:4, 653:17, 658:22
**semi** [1] - 617:4
**semi-irrational** [1] - 617:4
**send** [1] - 483:25
**sending** [2] - 571:14, 612:16
**sensation** [1] - 521:25
**sense** [18] - 489:4, 492:7, 492:14, 493:23, 506:3, 516:6, 516:12, 525:8, 530:8, 530:20, 534:13, 544:18, 654:17
**sensitive** [1] - 449:7
**sensor** [1] - 449:8
**sent** [1] - 488:11
**separate** [1] - 520:15
**separated** [1] - 637:7
**separates** [1] - 530:25
**September** [2] - 505:19, 675:21
**seriously** [1] - 488:21
**served** [1] - 438:22
**Service** [2] - 439:20
**SERVICES** [1] - 432:9
**sessions** [1] - 479:2
**set** [10] - 462:8, 509:9, 524:23, 654:6, 654:24, 655:5, 665:17, 665:18, 668:17, 668:18
**set-up** [1] - 509:9
**sets** [1] - 661:21
**setting** [3] - 438:25, 668:14, 672:18
**setup** [1] - 627:11
**seven** [2] - 456:22, 630:5
**seventh** [3] - 505:13, 505:22, 567:14
**several** [4] - 498:13, 653:15, 661:12, 677:2
**Shamu** [1] - 592:13
**shape** [8] - 527:12, 536:25, 537:2, 561:8, 591:4, 638:14, 638:15, 665:19

**shaped** [1] - 537:3
**shared** [1] - 605:18
**Sharp** [1] - 624:17
**shine** [1] - 599:8
**ship** [3] - 665:18, 665:20, 668:19
**shoot** [2] - 527:8, 527:9
**shoots** [1] - 520:13
**shop** [1] - 632:25
**shore** [20] - 522:4, 522:5, 522:15, 532:12, 569:12, 569:20, 570:5, 570:8, 570:11, 571:15, 586:17, 602:18, 615:5, 626:2, 633:22, 656:6, 656:13, 661:8, 662:6, 677:7
**shoreline** [3] - 631:20, 632:12, 632:13
**short** [6] - 537:15, 621:3, 638:6, 638:25, 644:10
**shorts** [6] - 529:5, 529:6, 532:8, 532:9, 532:11, 643:18
**shot** [1] - 592:16
**shoulders** [1] - 620:24
**show** [18] - 474:13, 492:13, 511:13, 555:19, 590:12, 619:15, 619:16, 626:12, 644:22, 645:4, 649:22, 649:25, 663:2, 663:5, 664:2, 675:3
**showers** [1] - 579:22
**showing** [4] - 645:17, 648:20, 649:4, 665:2
**shown** [4] - 649:2, 649:5, 649:8, 664:5
**shows** [2] - 649:13, 658:1
**shred** [1] - 536:7
**shut** [13] - 533:12, 533:13, 681:17, 684:17, 684:19, 684:20, 684:22, 685:7, 685:20, 686:14, 686:19, 686:22, 687:1
**shut-down** [7] - 684:17, 684:19, 685:7, 686:14, 686:19, 686:22, 687:1
**shutting** [1] - 640:3
**siblings** [1] - 583:12

**side** [18] - 439:1, 522:19, 541:9, 541:11, 606:13, 606:14, 637:24, 638:10, 639:13, 642:19, 642:24, 662:12, 662:13, 663:12, 663:15, 663:20, 663:25, 680:12
**sidebar** [10] - 510:19, 514:6, 534:24, 535:6, 536:4, 611:12, 612:8, 612:9, 621:2, 672:11
**sign** [52] - 459:25, 461:15, 503:1, 503:2, 503:5, 511:11, 511:13, 511:14, 511:23, 513:6, 513:7, 552:18, 588:14, 588:17, 588:18, 589:1, 589:2, 589:4, 589:7, 589:10, 589:11, 589:13, 589:15, 589:16, 591:2, 591:7, 591:16, 591:18, 591:23, 591:24, 606:7, 662:12, 662:14, 662:15, 662:21, 663:1, 663:2, 663:3, 663:11, 663:17, 663:22, 663:24, 664:3, 664:4, 664:5, 664:9, 664:12, 664:18, 665:2
**signage** [6] - 474:2, 474:4, 509:25, 510:22, 517:12, 581:12
**signature** [1] - 676:2
**significant** [3] - 452:5, 510:24, 510:25
**signs** [32] - 509:15, 509:22, 510:11, 511:5, 511:14, 511:19, 511:24, 512:3, 512:4, 512:13, 512:16, 512:18, 513:7, 515:10, 515:13, 515:23, 515:25, 552:16, 563:1, 563:2, 563:3, 563:6, 563:10, 588:13, 589:18, 592:2, 592:3, 629:15,

650:9, 662:10, 664:14
**similar** [3] - 489:2, 667:2, 667:12
**simple** [1] - 450:7
**single** [8] - 466:20, 466:23, 466:25, 487:10, 507:19, 518:6, 520:7, 603:10
**singular** [1] - 510:21
**sister** [10] - 508:18, 508:24, 524:11, 528:16, 530:13, 554:13, 570:12, 570:24, 577:12, 577:16
**sit** [1] - 627:5
**site** [18] - 448:9, 448:10, 450:14, 507:12, 571:18, 573:15, 580:2, 582:2, 590:11, 590:13, 590:18, 590:21, 610:19, 626:19, 660:7, 661:6
**sites** [3] - 475:14, 602:20, 602:22
**sits** [1] - 531:8
**sitting** [6] - 550:12, 607:6, 607:11, 612:2, 631:1, 680:25
**situation** [1] - 618:1
**six** [6] - 534:10, 577:1, 600:18, 614:19, 614:24, 616:19
**sixth** [2] - 505:12, 575:6
**size** [4] - 537:18, 638:18, 638:20, 673:4
**slap** [1] - 620:23
**sleeping** [1] - 623:9
**sliding** [1] - 591:19
**slight** [1] - 533:22
**slightly** [3] - 509:7, 514:19, 549:6
**small** [1] - 444:23
**smaller** [2] - 589:24, 626:15
**smartest** [1] - 620:6
**smoking** [1] - 526:23
**snowmobiling** [1] - 437:7
**so-called** [1] - 686:14
**so..** [1] - 452:6
**someone** [6] - 519:21, 560:3, 613:3, 615:10, 622:22, 658:2
**sometime** [2] - 510:5,

586:3

**sometimes** [5] - 521:11, 521:13, 607:13, 607:14, 615:24

**somewhat** [1] - 522:14

**somewhere** [8] - 482:15, 483:7, 553:15, 581:1, 592:8, 608:7, 608:20, 650:1

**son** [7] - 566:4, 568:9, 571:15, 594:25, 603:15, 613:22, 652:22

**song** [1] - 545:7

**soon** [1] - 490:22

**Sophia** [28] - 508:20, 508:24, 524:11, 528:16, 568:1, 568:2, 571:24, 572:23, 578:4, 592:24, 595:6, 595:18, 595:23, 596:8, 596:11, 653:9, 653:10, 657:1, 657:6, 666:13, 666:16, 667:5, 667:7, 667:19, 669:7, 669:23, 671:11, 682:19

**sorry** [24] - 439:24, 449:20, 519:18, 520:9, 523:23, 526:5, 532:25, 537:10, 537:21, 555:4, 560:7, 560:8, 580:12, 589:21, 607:16, 631:24, 634:9, 635:14, 675:5, 678:9, 685:23, 686:4

**sort** [3] - 463:21, 520:14, 628:20

**sound** [2] - 488:24, 551:2

**source** [3] - 460:20, 656:8, 678:5

**south** [1] - 537:16

**space** [2] - 674:4, 688:1

**speaking** [1] - 633:19

**specific** [5] - 482:6, 494:23, 518:19, 580:19, 626:18

**specifically** [1] - 442:17, 442:18, 494:21, 653:24,

659:1, 659:4, 676:21, 679:13

**specify** [1] - 470:15

**speed** [1] - 531:5

**Spell** [1] - 504:16

**spell** [5] - 436:14, 504:14, 565:20, 621:24, 652:11

**spend** [4] - 439:16, 566:23, 604:8, 653:25

**spending** [1] - 584:23

**spent** [7] - 438:6, 440:20, 544:25, 559:8, 559:15, 665:5, 665:15

**spigot** [1] - 520:13

**splash** [1] - 455:5

**splashing** [7] - 539:4, 539:5, 539:10, 539:14, 539:17, 540:10, 635:12

**spoken** [2] - 569:15, 570:12

**sporadically** [2] - 671:8, 671:9

**sports** [2] - 653:19, 673:1

**spot** [1] - 600:16

**spout** [2] - 524:3, 592:15

**spouting** [4] - 521:25, 523:10, 523:14, 523:16

**spouts** [1] - 521:16

**spring** [2] - 577:4, 582:9

**square** [2] - 457:14, 606:14

**staff** [12] - 457:20, 468:13, 482:20, 500:22, 501:7, 525:23, 526:8, 527:17, 548:14, 548:17, 609:24, 610:10

**stage** [3] - 569:16, 569:17, 610:23

**stake** [1] - 543:16

**stand** [7] - 492:21, 496:24, 497:21, 579:2, 619:5, 646:10, 657:18

**standard** [6] - 442:1, 443:5, 466:25, 467:8, 467:10, 467:11

**standards** [13] - 440:25, 441:12, 441:15, 441:21,

442:3, 442:16, 442:21, 442:23, 444:2, 444:20, 467:1, 472:24, 494:18

**standing** [3] - 534:22, 644:13, 644:15

**standpoint** [1] - 462:20

**stands** [1] - 553:13

**start** [6] - 438:6, 439:7, 468:18, 511:8, 621:13, 651:15

**started** [12] - 437:17, 451:2, 508:3, 539:20, 541:10, 582:8, 593:25, 600:17, 635:11, 636:20, 644:20, 652:2

**starting** [7] - 464:4, 464:5, 533:18, 551:12, 551:13, 685:22, 685:24

**starts** [2] - 618:22, 644:16

**state** [8] - 436:14, 441:4, 441:6, 496:18, 504:14, 565:20, 621:24, 652:11

**State** [3] - 465:19, 494:21, 554:17

**statement** [3] - 486:3, 535:16, 554:16

**STATES** [3] - 432:2, 432:11, 432:14

**States** [12] - 439:19, 440:3, 440:4, 440:5, 441:12, 449:24, 455:24, 456:5, 485:8, 494:25, 500:4, 500:7

**states** [1] - 439:23

**stationary** [4] - 520:16, 558:12, 590:22, 631:3

**statistics** [1] - 449:23

**status** [1] - 611:14

**statute** [1] - 465:18

**STAVES** [15] - 433:3, 433:4, 433:6, 433:8, 433:9, 433:10, 433:11, 436:10, 436:12, 436:18, 443:17, 444:17, 462:4, 494:12, 501:17

**Staves** [12] - 436:7,

436:16, 436:19, 443:13, 445:14, 446:1, 460:4, 462:5, 465:4, 483:15, 491:18, 494:1

**stay** [12] - 450:14, 477:4, 506:14, 558:5, 573:9, 573:15, 573:18, 586:20, 586:22, 609:3, 656:23

**staying** [6] - 518:19, 623:11, 623:12, 623:13, 623:14, 625:3

**step** [19] - 436:8, 463:25, 464:12, 504:11, 553:6, 564:21, 565:16, 590:12, 590:13, 621:20, 626:17, 630:9, 631:25, 636:23, 648:20, 652:7, 652:22, 659:10, 662:19

**step-dad** [2] - 463:25, 464:12

**step-son** [1] - 652:22

**stepdad** [11] - 507:9, 507:12, 508:16, 508:24, 516:8, 517:16, 528:14, 528:18, 530:11, 551:8, 551:21

**stepfather** [6] - 469:22, 524:11, 548:22, 551:16, 554:12, 652:24

**stepped** [1] - 534:6

**steps** [2] - 534:9, 600:18

**stick** [3] - 440:21, 506:9, 578:14

**still** [31] - 437:6, 464:3, 464:7, 464:16, 464:25, 475:16, 495:25, 507:5, 530:17, 534:11, 546:13, 551:11, 551:15, 551:24, 552:8, 552:11, 560:13, 567:2, 586:10, 586:22, 591:15, 608:21, 634:15, 635:2, 639:16, 647:13, 647:15, 652:3

**stint** [1] - 437:22

**stomach** [1] - 558:10

**stones** [2] - 620:20

**stop** [9] - 447:12, 490:2, 490:7, 522:12, 522:16, 536:5, 599:17, 636:22

**stopped** [2] - 475:25, 587:6

**store** [12] - 467:19, 467:24, 468:19, 525:16, 527:19, 533:11, 580:21, 587:5, 606:13, 606:14, 640:14, 640:22

**stores** [1] - 468:21

**story** [2] - 510:8, 618:12

**straggler** [1] - 583:18

**straight** [1] - 522:19

**strategic** [1] - 486:10

**stream** [3] - 455:5, 478:2, 678:11

**STREETS** [1] - 432:12

**strike** [6] - 533:25, 554:11, 577:23, 582:1, 624:2, 648:16

**strongly** [2] - 459:8, 485:23

**struck** [1] - 530:4

**structured** [3] - 572:9, 661:16, 674:13

**struggle** [1] - 657:14

**struggling** [2] - 553:19, 658:2

**studies** [1] - 440:10

**study** [1] - 440:11

**stuff** [8] - 442:6, 465:21, 482:7, 499:7, 635:21, 642:4, 657:10, 682:5

**stupid** [4] - 518:17, 667:10, 668:1, 679:12

**sub** [1] - 485:10

**sub-universe** [1] - 485:10

**subject** [4] - 478:17, 479:4, 536:19, 618:21

**subpoena** [1] - 610:20

**subpoenaed** [1] - 610:21

**subsequent** [1] - 512:8

**subset** [1] - 485:9

**substance** [3] - 507:20, 513:3, 513:11

**sudden** [2] - 615:6,

616:20
**sufficient** [2] - 491:7, 619:16
**suggest** [1] - 447:5
**suggested** [4] - 476:20, 512:16, 557:1, 569:18
**suggesting** [3] - 447:24, 476:17, 598:3
**suggestion** [2] - 643:6, 644:7
**suggests** [1] - 473:18
**suit** [8] - 532:2, 625:6, 625:9, 643:21, 643:23, 644:1, 644:3
**summer** [45] - 500:7, 507:11, 507:16, 508:1, 508:3, 508:20, 509:20, 529:25, 542:2, 543:3, 567:20, 577:3, 582:3, 584:15, 588:25, 590:9, 590:10, 592:1, 593:2, 593:24, 603:4, 604:7, 607:10, 607:17, 609:23, 653:24, 654:1, 659:12, 665:25, 670:2, 670:3, 670:17, 670:21, 680:14, 680:21, 684:18, 685:11, 686:21, 686:24, 687:8
**summers** [2] - 437:19, 582:5
**sun** [15] - 462:8, 464:7, 495:24, 496:11, 541:24, 551:15, 559:21, 635:3, 639:16, 648:3, 648:4, 668:12, 668:13, 681:16
**sunbathe** [2] - 680:17, 680:18
**Sunday** [25] - 475:11, 481:6, 481:22, 513:25, 514:22, 518:11, 570:15, 584:2, 584:4, 584:23, 585:5, 586:3, 586:23, 586:25, 594:17, 594:20, 594:21, 640:1, 656:14, 659:7, 665:13,

680:20
**sundown** [8] - 533:7, 533:14, 533:15, 533:22, 533:23, 542:10, 550:11, 559:5
**sunlight** [3] - 533:21, 533:22, 560:13
**sunny** [1] - 607:16
**sunset** [3] - 462:21, 463:1, 495:23
**supervise** [9] - 470:15, 471:23, 471:25, 472:3, 502:24, 605:23, 610:17, 660:11, 676:18
**supervised** [6] - 460:10, 496:14, 502:17, 502:18, 581:10, 582:23
**supervising** [2] - 503:19, 516:10
**supervision** [12] - 460:12, 460:15, 460:21, 460:24, 461:9, 461:10, 461:18, 470:5, 470:15, 471:6, 581:15, 609:10
**support** [1] - 482:3
**supported** [3] - 575:1, 614:15, 616:14
**supports** [1] - 466:20
**supposed** [11] - 457:24, 458:1, 461:11, 461:22, 461:25, 471:6, 498:9, 501:19, 552:18, 582:23, 618:22
**surf** [1] - 578:18
**surface** [1] - 615:13
**surveillance** [17] - 484:13, 484:17, 484:19, 484:22, 485:2, 485:4, 485:5, 485:6, 485:9, 485:20, 485:23, 486:2, 486:9, 487:10, 487:21, 488:2, 488:4
**sustain** [3] - 510:6, 562:20, 611:13
**swam** [10] - 522:14, 522:24, 541:9, 541:11, 541:15, 638:9, 643:18, 644:18, 646:20, 677:22

**swim** [37] - 454:15, 458:24, 478:16, 503:17, 503:20, 514:21, 514:23, 519:15, 520:20, 520:21, 539:8, 539:19, 554:19, 554:23, 564:11, 576:7, 576:8, 576:21, 577:6, 577:7, 577:9, 577:12, 578:7, 579:1, 615:10, 625:16, 631:7, 637:13, 637:14, 637:21, 655:10, 657:18, 657:24, 658:2, 669:20
**swimmer** [4] - 519:13, 578:6, 656:7, 657:13
**swimming** [124] - 442:4, 454:2, 454:7, 454:10, 454:12, 454:23, 455:1, 455:3, 455:20, 455:21, 460:1, 461:14, 469:13, 482:17, 484:12, 485:10, 485:15, 486:4, 509:9, 509:22, 509:25, 514:18, 515:5, 515:14, 517:8, 517:12, 517:13, 517:17, 517:21, 518:2, 518:5, 519:5, 519:11, 519:14, 522:23, 528:23, 529:1, 531:21, 534:23, 539:5, 539:7, 539:9, 539:20, 549:13, 549:14, 549:19, 553:7, 553:11, 557:25, 564:12, 574:2, 576:4, 576:9, 576:10, 576:24, 577:15, 578:9, 578:12, 579:14, 581:2, 591:4, 591:5, 593:3, 593:6, 593:15, 593:18, 593:20, 606:2, 615:12, 615:17, 624:24, 625:12, 625:19, 625:21, 625:24, 626:22, 627:2, 627:17, 627:20, 627:24, 629:12, 629:14, 631:12, 634:4,

635:11, 635:23, 641:5, 643:6, 644:7, 644:11, 644:16, 644:20, 646:14, 646:18, 648:6, 648:12, 655:23, 656:2, 658:1, 658:15, 658:16, 659:2, 659:5, 662:11, 666:4, 668:2, 669:24, 670:4, 670:14, 679:11, 679:13, 684:21, 684:22, 685:7, 686:2, 686:22, 686:25, 687:1, 687:6
**swing** [5] - 661:21, 665:17, 666:17, 668:17, 668:18
**swinging** [2] - 530:5, 666:17
**swings** [3] - 530:5, 557:3, 666:17
**switch** [4] - 458:8, 483:20, 483:21, 483:25
**sworn** [4] - 436:10, 436:12, 621:22, 652:9
**SWORN** [2] - 504:12, 565:18
**sympathetic** [1] - 621:15
**sympathy** [13] - 598:21, 601:6, 612:14, 612:19, 613:5, 613:9, 613:10, 613:21, 616:5, 617:8, 617:15, 618:1, 618:18

---

**T**

**T's** [1] - 626:25
**tadpoles** [10] - 631:18, 631:19, 632:7, 632:14, 633:9, 633:14, 633:21, 666:20, 667:15, 680:10
**Tate** [1] - 432:24
**teacher** [1] - 483:2
**technically** [1] - 462:20
**teenager** [2] - 451:25, 654:4
**teenagers** [4] - 451:20, 662:1,

667:17, 683:7
**teens** [2] - 518:1, 630:6
**telephone** [1] - 666:9
**ten** [2] - 464:15, 634:1
**tenants** [1] - 670:9
**tend** [1] - 443:6
**TERKOWITZ** [1] - 432:20
**term** [1] - 586:1
**terms** [5] - 442:20, 488:11, 536:22, 543:4, 560:12
**Terri** [3] - 659:21, 669:9, 671:15
**Terry** [1] - 681:9
**TESTIFIED** [2] - 504:12, 565:18
**testified** [45] - 436:10, 436:13, 452:16, 453:1, 453:2, 465:9, 465:14, 466:2, 468:16, 470:11, 470:13, 470:19, 477:17, 478:10, 483:12, 489:6, 496:17, 496:21, 497:1, 498:11, 509:18, 511:6, 511:15, 514:10, 535:9, 539:1, 547:21, 549:8, 559:4, 564:1, 564:2, 602:14, 605:4, 609:17, 613:24, 618:13, 618:16, 621:23, 642:5, 647:12, 652:10, 677:23, 678:2, 687:4, 687:11
**testifies** [1] - 493:3
**testify** [17] - 445:15, 445:22, 469:15, 469:21, 470:25, 479:13, 479:15, 479:21, 511:5, 511:16, 511:19, 512:10, 610:21, 612:1, 663:6, 685:22, 685:24
**testifying** [6] - 453:4, 471:2, 479:9, 520:6, 610:20, 684:6
**testimonies** [1] - 446:8
**testimony** [58] - 439:4, 446:9, 446:11, 449:4, 449:9, 451:19, 451:24, 453:10, 455:12,

456:11, 458:19,
459:13, 462:11,
463:13, 464:10,
465:6, 469:6,
469:10, 479:17,
479:18, 482:3,
482:7, 484:12,
485:11, 487:4,
487:5, 487:6,
487:14, 489:14,
489:16, 503:25,
509:14, 510:10,
510:13, 512:1,
521:15, 536:7,
536:10, 538:19,
542:15, 543:15,
560:19, 562:1,
575:9, 592:6, 592:7,
606:7, 612:5, 613:7,
614:16, 614:17,
616:15, 627:7,
639:5, 645:25,
665:6, 679:9

**Texas** [2] - 437:2,
437:10

**textbook** [2] - 466:20,
478:23

**thanked** [1] - 489:12

**THE** [769] - 432:2,
432:14, 436:1,
436:4, 436:8,
436:14, 436:16,
438:15, 439:3,
440:21, 441:17,
441:18, 441:19,
441:20, 442:3,
442:5, 442:11,
442:12, 443:15,
444:16, 445:1,
445:2, 445:3, 445:7,
445:8, 445:15,
445:18, 445:21,
446:18, 446:20,
446:23, 446:25,
447:2, 447:4, 447:5,
447:8, 447:9,
447:11, 447:15,
447:21, 447:25,
448:1, 448:2, 448:3,
448:4, 448:8,
448:14, 449:12,
451:14, 451:16,
451:17, 451:18,
451:19, 451:23,
451:24, 452:1,
452:3, 452:5, 452:7,
452:13, 452:21,
452:24, 453:7,
453:9, 453:13,
453:16, 453:18,
454:3, 454:8,

454:10, 454:13,
454:17, 454:20,
454:22, 455:8,
456:6, 456:8, 456:9,
456:10, 456:11,
456:13, 456:25,
457:2, 457:4, 457:6,
457:8, 457:10,
457:11, 457:12,
457:14, 457:15,
458:20, 459:7,
459:11, 459:14,
459:16, 459:19,
459:20, 459:22,
459:23, 459:24,
460:10, 460:14,
460:16, 460:17,
460:18, 460:19,
460:20, 460:21,
460:23, 460:24,
460:25, 461:2,
461:4, 461:6, 461:7,
461:8, 461:11,
461:12, 461:15,
461:17, 461:19,
461:20, 463:11,
466:4, 466:6, 466:7,
466:8, 467:25,
468:6, 468:11,
468:13, 468:22,
468:24, 470:24,
471:2, 471:4,
471:11, 472:21,
473:1, 473:3,
473:11, 473:12,
473:15, 473:21,
474:20, 475:24,
475:25, 476:10,
476:11, 476:12,
476:13, 476:15,
476:19, 476:21,
476:22, 477:2,
477:4, 477:5, 477:8,
477:9, 477:10,
477:12, 477:14,
477:15, 477:22,
477:23, 477:24,
477:25, 478:24,
479:1, 479:19,
479:21, 479:23,
480:5, 480:7, 480:8,
480:14, 480:17,
480:20, 480:24,
481:2, 481:11,
481:12, 481:16,
482:23, 482:24,
483:1, 483:12,
483:20, 483:23,
483:25, 484:3,
484:5, 484:8,
484:15, 484:21,

485:4, 485:6,
485:14, 485:16,
485:17, 485:19,
485:21, 485:22,
486:3, 486:11,
486:15, 486:20,
486:23, 487:1,
487:5, 487:8,
487:12, 487:25,
488:3, 488:24,
489:9, 489:14,
489:17, 489:21,
489:23, 490:1,
490:3, 490:6, 490:9,
490:13, 490:16,
490:19, 490:25,
491:2, 491:6, 491:9,
491:10, 491:13,
491:14, 491:21,
492:1, 492:14,
492:25, 493:5,
493:8, 493:15,
494:3, 494:6, 494:7,
494:9, 495:3, 495:7,
495:11, 495:19,
495:20, 495:24,
496:2, 496:14,
496:16, 496:17,
496:18, 496:23,
497:2, 497:9,
497:11, 497:20,
498:11, 498:13,
499:1, 499:6,
499:24, 500:10,
500:13, 500:15,
501:10, 501:13,
501:15, 501:21,
501:23, 502:18,
503:12, 503:16,
503:18, 503:21,
503:22, 503:24,
503:25, 504:3,
504:4, 504:6, 504:8,
504:10, 504:14,
504:16, 504:17,
504:18, 504:19,
504:21, 505:7,
505:22, 505:24,
506:7, 506:8,
506:11, 506:24,
506:25, 507:21,
510:2, 510:6,
510:12, 510:15,
510:18, 510:23,
510:25, 511:3,
511:7, 511:16,
511:24, 512:5,
512:9, 512:14,
512:19, 512:25,
513:12, 513:19,
513:24, 514:2,

514:7, 514:21,
514:23, 514:24,
515:1, 515:19,
516:1, 516:3, 516:4,
516:14, 516:15,
516:18, 516:22,
516:23, 517:1,
517:2, 517:4,
517:16, 517:18,
517:20, 517:21,
519:7, 519:8, 520:8,
522:4, 522:6, 522:9,
522:12, 522:14,
522:15, 522:17,
522:18, 522:20,
523:20, 523:21,
523:23, 524:2,
524:4, 524:5, 526:1,
526:3, 527:6, 527:8,
527:10, 528:5,
528:7, 529:6, 529:7,
529:8, 529:9,
532:18, 532:20,
532:21, 532:24,
532:25, 534:19,
534:21, 535:1,
535:7, 535:13,
535:17, 535:24,
536:5, 536:13,
536:17, 536:19,
537:10, 537:11,
537:12, 537:13,
537:14, 537:17,
538:9, 538:10,
538:11, 538:13,
538:14, 538:16,
539:13, 539:15,
541:9, 541:10,
542:6, 542:7, 542:8,
542:10, 542:12,
542:14, 542:17,
543:18, 543:21,
543:22, 543:24,
544:3, 544:11,
544:16, 544:22,
545:7, 545:9,
545:10, 545:11,
545:20, 545:23,
545:24, 546:1,
546:2, 546:4, 546:6,
546:7, 546:8, 546:9,
546:10, 546:11,
546:12, 546:13,
546:15, 546:16,
547:5, 547:6,
547:11, 547:14,
547:16, 549:16,
549:17, 549:18,
549:19, 549:21,
549:23, 549:24,
549:25, 550:1,

550:13, 550:15,
555:4, 555:6, 555:7,
555:21, 558:21,
559:1, 559:11,
559:12, 559:13,
560:9, 560:21,
561:15, 561:23,
562:1, 562:4,
562:12, 562:20,
563:3, 563:5, 563:8,
563:9, 563:11,
563:24, 564:16,
564:18, 564:20,
564:21, 564:23,
565:1, 565:3, 565:5,
565:8, 565:11,
565:13, 565:16,
565:20, 565:22,
565:24, 566:1,
567:11, 567:12,
569:24, 571:7,
571:8, 571:19,
573:12, 573:13,
574:7, 574:9, 575:1,
575:2, 575:4,
575:17, 575:19,
575:25, 576:1,
578:16, 578:19,
578:20, 578:21,
579:5, 579:7, 579:8,
579:10, 591:18,
592:24, 592:25,
593:13, 593:17,
593:20, 593:21,
595:12, 596:3,
596:4, 597:3, 597:8,
597:9, 597:10,
597:11, 597:12,
597:17, 597:18,
597:19, 597:21,
598:1, 598:20,
599:1, 599:4, 599:6,
599:7, 599:9,
599:10, 599:16,
599:21, 599:25,
600:4, 600:6,
600:13, 600:14,
600:20, 600:22,
601:6, 601:11,
601:13, 601:14,
601:15, 601:18,
601:20, 601:21,
601:22, 601:23,
601:24, 601:25,
602:1, 602:2, 602:4,
602:5, 602:10,
603:6, 604:1, 604:4,
604:5, 604:10,
606:1, 606:3,
609:17, 610:25,
611:3, 611:6, 611:9,

611:13, 611:17,
611:19, 611:20,
611:24, 612:2,
612:4, 612:8,
612:10, 612:22,
613:12, 613:16,
613:24, 614:4,
614:10, 614:17,
614:23, 615:2,
615:4, 615:7, 615:9,
615:14, 615:22,
616:6, 616:17,
616:24, 617:1,
617:10, 617:12,
617:14, 617:17,
617:20, 617:24,
618:3, 618:10,
618:20, 619:4,
619:13, 619:18,
619:21, 619:23,
619:25, 620:7,
620:11, 620:16,
620:23, 621:5,
621:8, 621:13,
621:19, 621:20,
621:24, 622:1,
622:3, 622:6, 628:8,
628:10, 628:11,
628:12, 630:14,
630:16, 634:9,
634:10, 635:14,
635:16, 635:17,
635:18, 636:13,
636:16, 636:18,
636:19, 637:18,
637:20, 637:21,
637:23, 637:24,
637:25, 638:1,
638:23, 638:24,
638:25, 639:1,
641:9, 641:13,
641:16, 641:18,
641:20, 641:24,
643:23, 643:24,
644:3, 644:5,
645:19, 645:21,
645:22, 645:23,
647:21, 647:23,
647:25, 648:16,
648:22, 650:5,
650:6, 650:16,
651:8, 651:13,
651:18, 651:25,
652:2, 652:6,
652:11, 652:12,
652:14, 652:16,
665:1, 665:5, 665:8,
672:5, 672:8,
672:12, 673:15,
675:1, 675:5, 675:7,
675:9, 677:4, 677:6,

677:7, 677:9,
677:10, 677:12,
677:13, 678:9,
678:10, 678:13,
678:14, 678:16,
678:17, 678:21,
678:22, 678:25,
679:15, 679:21,
679:24, 682:17,
682:18, 682:19,
682:22, 682:23,
682:24, 682:25,
683:2, 683:5, 683:6,
683:8, 683:9,
683:11, 683:13,
683:16, 683:17,
683:18, 683:20,
683:21, 683:24,
684:3, 684:7,
684:10, 684:12,
684:14, 685:22,
685:24, 686:5,
686:9, 686:10,
686:13, 686:15,
686:16, 687:4,
687:11, 687:16,
687:21, 688:5
**themselves** [1] -
492:3
**theory** [1] - 614:15
**thereafter** [1] - 586:3
**therefore** [1] - 503:14
**they've** [5] - 492:25,
493:17, 510:25
**thick** [1] - 439:14
**thinking** [1] - 599:17
**thinks** [2] - 487:16,
619:4
**third** [3] - 450:12,
502:2, 532:13
**thirty** [1] - 681:2
**thousand** [3] - 440:17,
475:16, 475:18
**three** [44] - 449:25,
450:4, 450:17,
450:20, 474:7,
474:22, 482:13,
483:7, 508:7,
508:21, 509:3,
512:22, 518:25,
522:9, 531:17,
532:18, 532:21,
532:22, 541:6,
541:7, 541:8,
541:14, 549:9,
549:10, 554:13,
568:4, 572:1,
584:17, 584:20,
596:18, 603:12,
603:16, 616:21,

635:9, 637:21,
638:5, 639:6,
644:16, 644:19,
647:5, 647:21,
647:25, 648:6
**three-year-old** [2] -
554:13, 603:12
**threw** [1] - 686:4
**throughout** [7] -
494:25, 558:17,
583:2, 583:7, 605:1,
669:17, 681:6
**throw** [5] - 577:9,
657:9, 673:2, 673:4
**throwing** [2] - 578:22,
620:20
**Thursday** [3] - 518:12,
572:18, 575:8
**Tim** [18] - 507:9,
524:11, 528:14,
566:13, 572:23,
574:20, 578:4,
595:1, 595:4, 595:8,
595:17, 595:25,
596:7, 604:20,
608:19, 651:23,
651:25, 662:18
**Timothy** [1] - 652:12
**TIMOTHY** [9] - 434:10,
434:11, 434:12,
434:14, 652:9,
652:12, 652:18,
673:17, 684:15
**Tinari** [3] - 651:16,
651:18, 651:21
**Title** [1] - 432:23
**to..** [1] - 684:2
**today** [8] - 463:6,
466:19, 489:16,
492:12, 505:1,
536:10, 548:5,
610:20
**toe** [1] - 514:25
**together** [19] - 505:17,
506:5, 507:2, 532:5,
547:2, 557:14,
557:24, 566:15,
566:23, 567:18,
585:5, 604:13,
637:10, 644:8,
644:11, 653:19,
653:25, 656:10,
672:25
**TOM** [1] - 432:18
**Tom's** [1] - 619:12
**Tommy** [1] - 624:14
**tomorrow** [6] -
621:11, 621:14,
679:17, 679:21,
687:22, 688:4

**took** [10] - 530:13,
534:9, 564:11,
569:11, 572:19,
574:5, 595:18,
595:21, 639:5, 645:1
**Tookany** [1] - 506:13
**top** [5] - 584:10,
592:16, 594:12,
631:1, 675:17
**TORIBIO** [3] - 432:3,
432:4, 432:5
**Toribio** [14] - 463:17,
469:2, 480:3,
492:21, 505:4,
567:6, 571:1,
622:14, 622:17,
628:15, 653:11,
662:9, 672:17
**total** [5] - 439:8,
547:14, 559:9,
646:21, 647:5
**totally** [1] - 489:18
**tough** [1] - 627:4
**tougher** [1] - 492:20
**towards** [7] - 525:2,
539:7, 540:24,
541:11, 578:15,
661:25
**town** [1] - 437:5
**trade** [1] - 671:23
**Trailer** [3] - 439:14,
441:13, 451:8
**trailer** [17] - 524:20,
524:21, 524:22,
580:5, 580:8,
580:14, 583:25,
587:16, 596:7,
596:11, 626:8,
627:15, 679:7,
681:18, 682:21,
683:3, 683:5
**training** [3] - 438:8,
442:5, 545:16
**trajectory** [2] - 521:19,
522:8
**trans** [1] - 506:12
**transcript** [6] - 463:3,
470:9, 471:15,
471:17, 480:23,
684:4
**transcripts** [1] - 469:2
**transferred** [1] - 489:8
**trashed** [1] - 488:23
**travesty** [1] - 489:1
**treading** [7] - 557:12,
557:14, 557:24,
558:1, 558:15,
644:14
**treatise** [2] - 466:23,
478:20

**trees** [5] - 606:16,
606:17, 606:21,
606:23, 663:14
**tremendously** [1] -
438:5
**trial** [4] - 641:14,
664:2, 669:17, 684:4
**trickery** [1] - 493:23
**tried** [4] - 620:7,
620:8, 620:16,
654:19
**trip** [9] - 568:5,
569:19, 571:4,
572:19, 584:14,
587:11, 623:8,
623:10, 688:4
**trips** [1] - 584:25
**trouble** [2] - 501:24,
615:14
**truck** [1] - 598:11
**true** [8] - 432:23,
486:5, 496:7, 609:6,
611:8, 620:12,
663:4, 663:15
**try** [11] - 480:18,
501:16, 505:7,
560:21, 598:15,
615:15, 615:24,
618:8, 619:13,
652:2, 652:21
**trying** [23] - 454:5,
461:1, 461:2,
480:16, 481:12,
520:20, 547:7,
564:6, 598:21,
607:16, 608:3,
611:3, 612:14,
613:2, 613:5,
613:20, 615:23,
616:4, 616:10,
619:13, 661:7,
665:7, 667:15
**tub** [1] - 554:20
**tuba** [1] - 546:5
**turn** [2] - 466:20,
621:16
**turned** [9] - 522:25,
524:3, 539:10,
540:22, 541:1,
600:20, 635:13,
635:18
**twice** [3] - 660:4,
670:1, 687:11
**twilight** [4] - 462:13,
462:16, 462:18,
462:19
**two** [46] - 441:18,
441:20, 441:25,
449:2, 475:25,
484:6, 493:11,

512:2, 512:11, 512:21, 513:14, 513:16, 513:18, 514:3, 518:25, 549:9, 563:9, 566:19, 567:25, 574:14, 574:15, 577:1, 584:19, 591:22, 597:20, 598:1, 599:25, 600:5, 603:16, 605:4, 605:6, 616:6, 617:5, 617:25, 619:8, 624:12, 635:7, 643:1, 647:5, 647:21, 667:11, 676:21, 683:11, 684:8

**type** [16] - 441:5, 449:6, 465:15, 478:6, 478:9, 561:12, 561:13, 561:16, 561:21, 562:16, 592:15, 592:18, 661:19, 671:5, 676:11, 682:4

**typical** [4] - 568:17, 580:7, 678:21, 680:20

**typically** [2] - 608:7, 610:13

---

# U

**U.S** [2] - 439:18, 564:24

**U.S.C** [1] - 432:23

**uh-hmm** [1] - 555:13

**ultimately** [1] - 643:18

**um-hmm** [5] - 533:24, 537:25, 551:17, 553:3, 560:16

**umbrellas** [1] - 579:21

**uncertain** [1] - 488:11

**uncle** [2] - 622:25, 625:17

**under** [8] - 516:20, 518:1, 529:6, 581:9, 582:22, 583:1, 609:10, 660:11

**underneath** [2] - 625:9, 625:10

**understandable** [2] - 493:20, 493:21

**understood** [5] - 468:23, 471:22, 603:19, 605:14, 676:4

**undisputed** [1] - 562:1

United [12] - 439:19, 440:3, 440:4, 440:5, 441:12, 449:24, 455:24, 456:5, 485:8, 494:25, 500:4, 500:7

**UNITED** [3] - 432:2, 432:11, 432:14

**universe** [2] - 485:3, 485:10

**unlawful** [1] - 513:13

**unless** [4] - 446:21, 460:1, 496:12, 594:12

**unring** [1] - 488:21

**unsupervised** [4] - 583:1, 583:9, 677:1, 677:10

**unusual** [2] - 547:9, 661:2

**up** [142] - 436:8, 454:1, 464:7, 471:19, 478:11, 478:14, 478:16, 484:1, 484:2, 484:11, 489:14, 497:6, 497:13, 499:7, 504:11, 505:6, 507:21, 509:9, 509:14, 509:20, 510:10, 512:14, 514:12, 515:3, 520:14, 521:20, 523:25, 525:10, 525:11, 525:20, 525:21, 525:22, 526:13, 528:14, 528:19, 529:12, 530:4, 531:13, 531:20, 533:8, 537:16, 551:15, 555:17, 555:21, 555:25, 556:3, 556:5, 565:17, 569:19, 569:22, 570:4, 570:20, 575:14, 580:16, 580:20, 580:24, 581:4, 582:21, 583:20, 584:6, 587:5, 590:10, 590:23, 593:3, 593:24, 594:18, 594:24, 595:2, 595:4, 595:6, 595:8, 595:17, 595:18, 595:19, 595:21, 595:23, 597:6, 597:14, 597:25, 598:6, 599:16,

599:23, 600:21, 600:22, 600:24, 603:4, 603:9, 604:2, 604:8, 606:25, 609:23, 614:8, 618:4, 619:14, 621:20, 628:2, 631:8, 631:12, 632:5, 634:20, 636:3, 645:25, 651:13, 652:7, 662:22, 665:15, 666:1, 666:13, 666:16, 666:24, 667:4, 667:7, 667:19, 667:21, 667:24, 668:21, 669:6, 669:9, 670:3, 670:18, 670:22, 673:20, 676:13, 676:14, 684:18, 685:9, 685:12, 686:3, 686:20, 686:24

**upgrades** [2] - 661:22, 674:17

**uses** [1] - 486:12

**utilities** [1] - 590:25

**utilizing** [2] - 553:10, 645:16

---

# V

**various** [6] - 441:4, 446:4, 602:20, 680:25, 682:7

**vehicles** [4] - 599:8, 601:19, 601:23

**version** [3] - 589:24, 626:15, 675:11

**Vesper** [3] - 494:10, 512:6, 609:18

**VESPER** [200] - 432:18, 432:18, 433:5, 433:8, 433:10, 436:7, 436:18, 438:17, 439:6, 440:23, 440:24, 441:24, 442:7, 442:14, 443:13, 444:17, 445:9, 445:13, 445:16, 445:19, 445:23, 445:25, 447:18, 447:20, 447:24, 448:13, 448:16, 448:17, 449:13, 449:14, 451:21, 452:18, 453:5, 453:8,

453:12, 453:15, 453:17, 453:19, 453:20, 454:5, 454:9, 454:12, 454:14, 454:19, 454:21, 455:2, 455:9, 456:15, 457:16, 458:21, 458:22, 460:3, 461:1, 461:21, 462:2, 463:14, 467:23, 468:3, 468:10, 468:12, 470:20, 471:8, 471:13, 472:19, 472:23, 473:2, 473:5, 473:10, 473:14, 473:20, 474:16, 474:19, 476:17, 476:20, 476:25, 479:17, 481:3, 482:25, 483:16, 483:24, 484:6, 484:9, 484:16, 484:24, 485:5, 485:7, 485:15, 485:18, 486:1, 486:6, 486:14, 486:17, 486:21, 486:25, 487:3, 487:7, 487:18, 488:1, 488:9, 489:7, 489:12, 489:16, 489:18, 489:22, 489:25, 490:2, 490:4, 490:7, 490:12, 490:15, 490:17, 490:24, 491:1, 491:4, 491:8, 491:24, 492:10, 493:2, 493:7, 493:13, 494:2, 494:5, 494:11, 494:12, 495:5, 495:9, 495:12, 495:13, 495:21, 496:1, 496:3, 496:4, 496:20, 496:24, 496:25, 497:3, 497:4, 497:12, 497:21, 497:22, 498:12, 498:14, 499:2, 499:3, 499:8, 499:17, 499:18, 499:22, 500:1, 500:2, 500:11, 500:19, 500:20, 501:9, 501:12, 504:1, 510:14, 510:16, 558:22,

591:15, 609:19, 611:22, 611:25, 612:3, 612:6, 612:11, 613:14, 613:18, 614:2, 614:5, 614:12, 615:1, 615:3, 615:6, 615:8, 615:12, 615:19, 618:7, 618:15, 618:25, 619:8, 619:15, 619:20, 619:22, 619:24, 620:2, 620:10, 620:14, 620:18, 621:1, 621:9, 651:14, 651:20, 651:24, 652:1, 652:4, 663:8, 665:7, 671:20, 684:6

**vetoed** [4] - 585:17, 585:20, 585:21, 586:21

**vicinity** [1] - 596:12

**view** [8] - 497:9, 497:11, 501:15, 519:21, 566:9, 654:5, 673:22, 673:24

**viewed** [1] - 602:25

**violating** [1] - 517:3

**virtually** [1] - 501:6

**visible** [2] - 456:23, 671:16

**visit** [8] - 440:12, 512:23, 529:20, 602:20, 623:2, 623:6, 623:18, 629:5

**visited** [3] - 440:7, 454:25, 572:4

**visiting** [5] - 624:3, 624:4, 624:7, 640:6, 642:9

**visits** [11] - 459:7, 508:8, 508:9, 508:12, 508:15, 508:23, 509:2, 509:5, 509:9, 521:6

**voice** [2] - 505:6, 555:21

**VOIR** [4] - 433:4, 433:6, 436:18, 443:17

**voir** [1] - 443:15

---

# W

**W-H-E-E-L-E-R** [1] - 622:2

**wading** [3] - 669:23, 685:8

**walk** [11] - 446:15, 506:7, 506:11, 534:15, 567:8, 600:17, 606:19, 606:20, 607:18, 617:4, 680:11

**walked** [7] - 446:25, 476:8, 531:20, 534:8, 589:5, 613:19, 668:15

**walking** [2] - 530:6, 609:15

**walks** [2] - 456:18, 506:13

**wall** [5] - 488:16, 538:12, 553:1, 553:4, 564:11

**wants** [2] - 443:8, 564:24

**warn** [3] - 573:23, 573:24, 610:17

**warned** [1] - 659:8

**warning** [4] - 573:22, 574:20, 609:3, 614:7

**warnings** [6] - 518:8, 518:19, 574:3, 609:2, 615:3, 658:20

**WAS** [2] - 435:6, 641:25

**was..** [1] - 667:18

**watch** [3] - 470:14, 590:13, 660:16

**watching** [3] - 608:13, 608:15, 677:17

**water** [112] - 454:11, 454:14, 455:4, 455:25, 456:1, 456:18, 457:1, 457:7, 460:12, 461:8, 469:3, 469:7, 469:16, 469:19, 469:23, 470:2, 475:2, 477:18, 478:9, 478:15, 482:14, 482:19, 483:5, 483:9, 495:15, 514:25, 515:23, 516:9, 516:20, 518:19, 518:20, 518:24, 520:13, 521:16, 521:24, 522:10, 523:14, 523:17, 528:21, 529:2, 533:9, 534:23, 539:19, 540:9, 541:12, 542:11, 549:22, 552:23, 556:19, 557:2, 557:4, 557:5, 557:6,

557:12, 557:14, 557:24, 558:1, 558:7, 558:15, 559:16, 559:17, 559:19, 564:1, 564:3, 564:4, 564:9, 564:13, 573:9, 573:16, 573:22, 573:23, 573:25, 574:4, 574:13, 574:17, 574:20, 574:21, 592:16, 593:15, 596:3, 596:5, 597:20, 598:12, 605:17, 608:11, 609:3, 609:4, 609:5, 609:6, 609:11, 633:18, 634:6, 634:17, 634:22, 643:2, 644:8, 644:11, 644:13, 644:14, 656:19, 656:23, 657:3, 657:6, 657:7, 657:22, 677:11, 677:15, 678:13, 680:22

**water's** [1] - 528:5

**waterfall** [2] - 592:15, 592:22

**waves** [6] - 578:18, 578:19, 578:20, 578:21, 657:10, 657:15

**ways** [2] - 537:4, 537:7

**wearing** [6] - 528:25, 529:4, 532:1, 625:6, 625:8, 644:1

**weather** [7] - 462:23, 586:12, 586:13, 629:8, 629:10, 629:12

**weather-wise** [1] - 629:10

**weathered** [1] - 662:16

**website** [2] - 448:18, 448:21

**weeds** [1] - 588:21

**week** [3] - 500:8, 673:3, 676:14

**weekdays** [2] - 500:24, 588:6

**weekend** [60] - 501:1, 506:1, 508:6, 509:4, 509:21, 512:21, 515:12, 515:13, 517:25, 518:9, 518:16, 519:4,

520:18, 521:6, 523:4, 523:10, 568:21, 569:11, 569:16, 571:10, 573:5, 573:7, 576:24, 582:14, 582:19, 582:20, 582:21, 584:20, 585:11, 586:1, 586:12, 586:18, 587:21, 587:22, 587:25, 592:2, 603:10, 604:16, 605:1, 605:22, 607:10, 609:9, 610:18, 653:12, 654:23, 655:3, 655:7, 655:22, 656:5, 656:12, 658:5, 658:7, 658:10, 662:9, 666:1, 670:18, 684:18

**weekends** [11] - 499:11, 500:8, 500:21, 500:24, 501:3, 587:25, 588:4, 588:5, 603:11, 610:1, 610:2

**weeks** [2] - 474:7, 529:15

**Western** [1] - 437:1

**WESTMORELAND** [1] - 432:18

**wet** [1] - 578:6

**whale** [49] - 497:14, 519:25, 520:3, 520:11, 520:19, 520:21, 520:22, 521:7, 521:10, 521:14, 521:15, 521:25, 522:13, 522:16, 522:22, 523:4, 523:10, 523:13, 523:16, 524:3, 539:7, 539:18, 539:19, 539:22, 540:24, 541:1, 554:23, 592:8, 592:9, 592:12, 592:18, 593:3, 593:7, 593:11, 630:22, 630:23, 631:1, 631:8, 631:13, 641:5, 641:6, 647:8, 648:7, 648:12, 649:10, 649:14, 669:18, 670:20

**whatnot** [1] - 525:18

**whatsoever** [6] - 543:7, 553:12, 588:13, 613:7, 613:15, 629:15

**Wheeler** [11] - 529:11, 554:2, 554:8, 556:17, 596:20, 612:1, 621:18, 622:1, 622:4, 622:8, 641:22

**WHEELER** [12] - 433:24, 433:25, 434:2, 434:4, 434:6, 434:8, 621:22, 622:7, 642:1, 647:18, 650:17, 650:23

**white** [1] - 520:12

**Whitefish** [1] - 437:5

**whole** [7] - 492:3, 500:17, 541:19, 609:23, 626:11, 636:10, 670:6

**width** [6] - 538:14, 538:21, 638:9, 639:7, 646:14, 646:25

**widthwise** [2] - 537:9, 538:5

**wife** [13] - 477:2, 477:5, 575:5, 652:22, 653:8, 654:24, 655:5, 658:6, 659:1, 661:11, 662:8, 665:14, 673:24

**wind** [1] - 585:11

**wise** [1] - 629:10

**withdraw** [1] - 563:22

**witness** [48] - 436:10, 449:12, 454:4, 463:9, 487:24, 488:12, 488:13, 488:17, 489:11, 489:13, 490:8, 491:9, 493:25, 504:5, 504:6, 511:4, 511:13, 513:2, 550:13, 558:25, 564:22, 565:3, 598:24, 599:22, 610:20, 611:21, 611:23, 611:24, 611:25, 616:4, 619:5, 619:7, 621:4, 621:11, 621:13, 621:18, 621:22, 651:14, 651:15, 651:16, 651:21, 652:9, 655:15,

663:6, 663:7, 665:9, 671:1, 687:17

**WITNESS** [216] - 433:2, 436:16, 441:18, 441:20, 442:5, 442:12, 445:2, 445:7, 446:20, 446:25, 447:4, 447:8, 447:11, 447:25, 448:2, 448:4, 451:16, 451:18, 451:24, 452:3, 452:7, 454:22, 456:8, 456:10, 456:13, 457:2, 457:6, 457:10, 457:17, 457:15, 459:7, 459:14, 459:19, 459:22, 459:24, 460:14, 460:17, 460:19, 460:21, 460:24, 461:4, 461:7, 461:11, 461:15, 461:19, 466:6, 466:8, 468:13, 471:2, 473:11, 475:25, 476:11, 476:13, 476:21, 477:4, 477:8, 477:10, 477:14, 477:23, 477:25, 479:1, 480:8, 481:12, 481:16, 482:24, 485:17, 485:19, 485:22, 486:3, 495:20, 496:16, 496:18, 497:11, 501:23, 503:16, 503:21, 503:24, 504:4, 504:16, 504:18, 505:24, 506:7, 506:11, 506:25, 514:23, 515:1, 516:3, 516:15, 516:22, 517:1, 517:4, 517:18, 517:21, 519:8, 522:6, 522:14, 522:17, 522:20, 523:21, 524:4, 526:3, 527:10, 528:7, 529:7, 529:9, 532:20, 532:24, 534:21, 537:11, 537:13, 537:17, 538:10, 538:13, 538:16, 539:15, 541:10, 542:7,

542:10, 542:14,
543:21, 543:24,
545:9, 545:11,
545:24, 546:2,
546:6, 546:8,
546:10, 546:12,
546:15, 547:5,
549:17, 549:19,
549:23, 549:25,
555:7, 558:21,
559:12, 563:8,
563:11, 564:16,
564:20, 565:22,
567:12, 571:8,
573:13, 575:2,
575:19, 576:1,
578:19, 578:21,
579:7, 579:10,
591:18, 592:25,
593:17, 593:21,
596:4, 597:9,
597:11, 597:18,
597:21, 599:6,
599:9, 600:14,
600:22, 601:13,
601:15, 601:20,
601:22, 601:24,
602:1, 602:4, 604:4,
604:10, 606:3,
611:20, 622:1,
628:10, 628:12,
630:16, 634:10,
635:16, 635:18,
636:16, 636:19,
637:20, 637:23,
637:25, 638:24,
639:1, 643:24,
644:5, 645:21,
645:23, 647:23,
650:5, 652:12,
677:6, 677:9,
677:12, 678:10,
678:14, 678:17,
678:22, 682:18,
682:22, 682:24,
683:2, 683:6, 683:9,
683:13, 683:17,
683:20, 686:10,
686:15
**Witness** [4] - 627:3,
646:5, 646:9, 664:13
**witnessed** [5] - 594:3,
677:2, 677:4, 678:7,
678:8
**witnesses** [9] - 446:4,
490:8, 490:10,
511:18, 562:5,
613:5, 616:17,
621:15
**woke** [1] - 595:18

**woken** [3] - 669:6,
669:9
**woman** [1] - 616:7
**women** [1] - 556:15
**wood** [2] - 631:1,
665:20
**wooded** [2] - 633:3,
680:12
**wooden** [1] - 665:19
**woods** [2] - 511:11,
525:14
**word** [4] - 502:24,
503:1, 513:6, 635:15
**worded** [1] - 660:23
**wording** [2] - 589:3,
589:4
**words** [4] - 539:14,
549:5, 575:1, 643:6
**wore** [1] - 644:3
**workshops** [1] - 479:1
**worn** [1] - 589:15
**worse** [1] - 620:20
**would've** [1] - 482:16
**wound** [1] - 489:14
**write** [7] - 444:6,
444:8, 545:6,
545:14, 546:18,
546:20, 555:19
**writer** [2] - 545:7,
545:23
**writes** [2] - 438:23,
444:5
**writing** [2] - 545:5,
566:22
**written** [12] - 440:25,
441:3, 441:7,
442:21, 442:23,
444:20, 449:23,
466:8, 467:11,
497:7, 650:10,
650:25
**wrongful** [1] - 613:6

# X

**X's** [1] - 626:25

# Y

**yard** [2] - 673:4, 673:5
**yards** [6] - 537:18,
538:3, 639:3,
639:10, 646:17,
646:20
**year** [9] - 439:15,
508:3, 520:24,
521:2, 551:2,
554:13, 566:19,
577:1, 603:12

**years** [29] - 437:21,
438:6, 438:11,
438:20, 440:7,
440:8, 440:10,
440:14, 463:19,
505:2, 505:15,
506:4, 508:21,
512:2, 512:11,
513:14, 513:16,
513:18, 514:3,
548:7, 559:25,
564:5, 575:4, 575:5,
577:2, 583:11,
642:6, 681:23
**Yellowstone** [1] -
442:10
**yesterday** [14] - 446:7,
446:8, 449:9,
451:12, 453:6,
460:14, 476:10,
479:9, 479:14,
484:12, 484:24,
485:1, 509:17,
521:15
**Yogi** [4] - 442:9,
442:11, 442:12,
442:15
**York** [1] - 483:1
**young** [8] - 463:16,
482:8, 568:23,
569:5, 583:13,
583:16, 596:18,
653:11
**younger** [7] - 508:18,
508:24, 624:4,
624:7, 624:9, 624:10
**yourself** [19] - 509:5,
518:1, 518:4,
519:10, 520:19,
534:1, 534:3, 534:6,
538:24, 558:6,
558:11, 573:3,
574:1, 577:7,
582:18, 588:10,
598:15, 669:21,
670:2
**yourselves** [2] -
660:7, 687:24

# Z

**zero** [1] - 465:15
**zone** [2] - 638:21