1

2                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF NEW JERSEY
3    _____
     BETANIA TORIBIO, Administratrix
4    of the Estate of JOHN JOAQUIN
     TORIBIO, Deceased; and BETANIA
5    TORIBIO, individually,
               Plaintiff              CIVIL ACTION
6         v.                          NO. 12-4975 (JEI/JS)

7    PINE HAVEN, LLC, d/b/a PINE HAVEN
     CAMPGROUND and PINE HAVEN CAMPING
8    RESORT; and DIVERSIFIED INVESTMENTS,
     INC. a/k/a DIVERSIFIED INVESTMENTS,
9    LLC a/k/a DIVERSIFIED INVESTMENT
     SERVICES LLC,
10             Defendants.
     _____
11                                    UNITED STATES COURTHOUSE
                                      ONE JOHN F. GERRY PLAZA
12                                    4TH AND COOPER STREETS
                                      CAMDEN, NEW JERSEY 08101
13                                    MAY 12, 2015

14   **B E F O R E:**       **THE HONORABLE JOSEPH E. IRENAS**
                          **UNITED STATES DISTRICT JUDGE**
15
     **A P P E A R A N C E S:**
16
     MANIACI, CICCOTTA & SCHWEIZER
17        BY:  RENO JOHN CICCOTTA, ESQUIRE
             - and -
18   WESTMORELAND, VESPER, QUATTRONE & BEERS
          BY:  TOM VESPER, ESQUIRE
19             Counsel for Plaintiff

20   LAW OFFICES OF TERKOWITZ & HERMESMANN
          BY:  PATRICK J. HERMESMANN, ESQUIRE
21             Counsel for Defendant, Diversified Investments
               Pine Haven, LLC
22

23        Certified as true and correct as required by Title 28,
     U.S.C., Section 753.
24                      /S/ Karen Friedlander, CRR, RMR

25

                    *United States District Court*
                       *Camden, New Jersey*

1    **W I T N E S S   I N D E X**

2

3    **WITNESS**                                                    **PAGE**

4    **MARIA K. BELLA**                                             1105

5    VOIR DIRE EXAMINATION OF MARIA K. BELLA BY MR.                 1106

6    HERMESMANN:

7    VOIR DIRE EXAMINATION OF MARIA K. BELLA BY MR.                 1110

8    VESPER:

9    DIRECT EXAMINATION OF MARIA K. BELLA BY MR.                    1111

10   HERMESMANN:

11   CROSS-EXAMINATION OF MARIA BELLA BY MR. VESPER:                1120

12   REDIRECT EXAMINATION OF MARIA BELLA BY MR.                     1158

13   HERMESMANN:

14   RECROSS-EXAMINATION OF MARIA BELLA BY MR. VESPER:              1161

15

16

17

18

19

20

21

22

23

24

25

1    **E X H I B I T   I N D E X**

2

3

4    **EXHIBIT NUMBER**                                              **PAGE**

5

6    PLAINTIFF EXHIBIT P-1B WAS RECEIVED IN EVIDENCE       1173

7    PLAINTIFF EXHIBIT P-6 WAS RECEIVED IN EVIDENCE        1178

8    DEFENDANT EXHIBIT D-39 WAS RECEIVED IN EVIDENCE       1178

9    PLAINTIFF EXHIBIT P-3 WAS RECEIVED IN EVIDENCE        1179

10   DEFENDANT EXHIBIT D-1 WAS RECEIVED IN EVIDENCE        1179

11   DEFENDANT EXHIBIT D-41 WAS RECEIVED IN EVIDENCE       1180

12   DEFENDANT EXHIBIT D-17 WAS RECEIVED IN EVIDENCE       1180

13   DEFENDANT EXHIBIT D-42 WAS RECEIVED IN EVIDENCE       1181

14   PLAINTIFF EXHIBITS P-17A, P-17B and P-17C WERE        1192

15   RECEIVED IN EVIDENCE

16

17

18

19

20

21

22

23

24

25

 1            (OPEN COURT, MAY 12, 2015, 8:27 a.m.)

 2            THE DEPUTY CLERK:  All rise.

 3            (JURY ENTERS; 8:30 a.m.)

 4            THE COURT:  Good morning, everybody.

 5            RESPONSE:  Good morning, Your Honor.

 6            THE COURT:  What a nice time of day this is, my

 7  favorite.

 8         Everybody, please be seated.

 9         I guess it's you.

10            MR. HERMESMANN:  Defense will call Maria Bella.

11            THE DEPUTY CLERK:  Good morning.  Please step up.

12  Please raise your right hand.

13  (**MARIA K. BELLA**, having been duly sworn as a witness,

14  testified as follows:)

15            THE DEPUTY CLERK:  Please state and spell your name

16  for the record.

17            THE WITNESS:  Maria K. Bella.  M-A-R-I-A, middle

18  initial K.  Last name B, as in butterfly, E-L-L-A.

19            THE DEPUTY CLERK:  You can be seated.

20            THE COURT:  B-E-L-L-O?

21            THE WITNESS:  A.

22            THE COURT:  B-E-L-L-A.

23            THE WITNESS:  Yes, sir.

24            THE COURT:  You may proceed, sir.

25            MR. HERMESMANN:  Thank you, Your Honor.

*United States District Court*
*Camden, New Jersey*

1   (VOIR DIRE EXAMINATION OF MARIA K. BELLA BY MR. HERMESMANN:)

2   Q.   Good morning, Ms. Bella.

3   A.   Good morning.

4   Q.   Please make sure that, one, the microphone does amplify

5   and try to speak to me this way.  If I can hear you, I'm

6   certain the jury can hear you, okay?

7   A.   Yes, sir.

8   Q.   Where did you come in from?

9   A.   From Reading, Pennsylvania.

10  Q.   And do you have a background in aquatic safety?

11  A.   Yes, I do.

12  Q.   Please take the jury through your background in aquatic

13  safety.

14  A.   This is actually my 40th year of active involvement in

15  the aquatics industry.  I started out as a swimming aide.

16  Worked my way up to lifeguard, then swimming instructor,

17  coached the swim team, of course, became the facility manager.

18  Over the years, I managed a number of different types of

19  facilities, obtained a degree in aquatic engineering, so

20  that's specific to the design, construction, operation and

21  maintenance of aquatic facilities.

22      I'm a certified pool operator instructor through the

23  National Swimming Pool Foundation and a certified aquatic

24  facility operator instructor trainer through the National

25  Recreation Parks Association.  What that means is, I teach the

BELLA - VOIR DIRE - HERMESMANN

1  teachers that teach people how to operate aquatic facilities

2  of all different sorts and sizes, catering to individuals from

3  toddlers through senior citizens.

4  Q.  Can you take us through, somewhat briefly, your

5  employment history in the aquatic safety field?

6  A.  Certainly.  I started out working for recreation

7  departments in Colorado, moved from there to Texas.  Continued

8  to work both in the public and private sector.  Another move

9  to Pennsylvania, and again continued to work in both the

10  public and private sector.

11       Tried to get out of the business a couple of times, but

12  it's like that scene in the Godfather where he says, I tried

13  to get out and they kept pulling me back in.  That's truly my

14  life in aquatics.  I've had people show up my doorstep asking

15  me to come and help them with their facility, training their

16  swimmers, teaching their children.

17  Q.  What type of aquatic facilities have you been involved

18  with over the years?

19  A.  Well, I have worked, again, in municipal settings,

20  everything from very small therapy pools, daycare centers, up

21  through very large Olympic-sized swimming pools.  As a trainer

22  of facility operators, I worked with people in institutional,

23  universities, hospitality industry, hotel, motel, campgrounds,

24  apartment complexes, you name it.  If there's a recreational

25  swimming area, I've been involved in it, both on the

BELLA - VOIR DIRE - HERMESMANN

1    operational side, the design side.  I worked in commercial

2    sales for a while, specifying equipment, reviewing designs by

3    architects and engineers and making changes to them to make

4    the facilities safer.

5    Q.   What type of training have you provided over the years to

6    facility operators of various bodies of water?

7    A.   That training would be through the National Swimming Pool

8    Foundation.  They actually have an international program that

9    requires classroom time, continuing education and then testing

10   for national certification, and all through the -- also,

11   through the National Recreation and Parks Association, they

12   have a similar program where attendees will come for either

13   their initial training or their continuing education in the

14   operating of aquatic facilities, both from safety standpoint,

15   of course, the risk management and then also cost

16   effectiveness.

17   Q.   The training that you provided to facility operators over

18   the years, did that include facility operators that operate

19   lakes?

20   A.   Yes, sir.  And again, this would be in the campground.

21   It's usually in the campground industry, where I will get

22   people in the class who operate swimming pools, hot tubs,

23   lakes, everything falls under their operational umbrella.

24        In some states, such as New Jersey, they have to be

25   certified either as a CPO, certified pool operator, or an AFO,

*United States District Court*
*Camden, New Jersey*

1  aquatic facility operator, or through the YMCA's pool program.

2  In other states, the requirement is not there for

3  certification, but they come voluntarily, again, looking at

4  safer operations and more cost effective operations.

5  Q.   And specifically, as to lakes and campgrounds, for how

6  long a time period have you been providing such training?

7  A.   The past decade.

8  Q.   Do you have any professional memberships that would be

9  relevant?

10  A.   I have a number of professional memberships.  I'd have to

11  reference my CV.  May I do so?

12  Q.   Sure.

13       THE COURT:  I don't --

14       MR. HERMESMANN:  She has it.

15       MR. VESPER:  She has her CV.  She has it.  No

16  objection.

17       THE COURT:  All right.

18       THE WITNESS:  I just need to look at the list,

19  because I forget.

20       I'm involved with ASTM International, used to be known

21  as the American Society for Testing and Materials and now it's

22  an international organization, so they've changed their name

23  slightly.

24       The Association of Pool and Spa Professionals which

25  writes all of the ANSI standards and promulgates the ANSI

BELLA – VOIR DIRE – VESPER

1  standards specific to aquatic facilities.  The National

2  Association of Amusement Ride Safety Officials, and that has

3  to do with things like water slides, large inflatable devices

4  of the sort at different types of aquatic facilities and

5  amusement parks.

6       I'm a member of the National Drowning Prevention

7  Alliance, the National Recreation and Park Association, the

8  National Swimming Pool Foundation, the Northeast Spa and Pool

9  Association, Professional Pool Operators of America and the

10  World Water Park Association.

11       MR. HERMESMANN:  Your Honor, at this time, we would

12  like to offer Ms. Bella as an expert in aquatic safety.

13       THE COURT:  Voir dire.

14       MR. VESPER:  I have no objection.  It's true, we've

15  actually lectured before, haven't we?  For ICLE, and for the

16  state park, ICLE, the Institute for Continuing Legal

17  Education.

18       THE WITNESS:  If we have, please forgive me.  I don't

19  remember faces well.  I'm so sorry.

20       MR. VESPER:  That's all right.

21  (VOIR DIRE EXAMINATION OF MARIA K. BELLA BY MR. VESPER:)

22  Q.  So aquatic safety, you would agree, for the ladies and

23  gentlemen of the jury to understand this, aquatic safety

24  includes both pools and lakes?

25  A.  It includes all recreational bodies of water, so anything

BELLA – DIRECT – HERMESMANN

1  intended for recreational swimming, sir.

2  Q.  Okay.  So any body of water, it could be a fishing lake,

3  but if people are invited to enjoy the aquatics of whatever

4  body of water it is, that's what aquatic safety encompasses.

5  You would agree?

6  A.  The areas in which I work --

7  Q.  Yes.

8  A.  -- are specifically the bodies of water intended for

9  swimming.  So if a fishing lake were not intended for

10  swimming, not advertised and inviting swimmers, then no, that

11  would be separate from what I do.

12  Q.  That falls outside of that?

13  A.  Yes, sir.

14  Q.  In fact, I don't know whether you skipped over it, but

15  you're one of the only four certified, what,

16  instructors/trainers that teach the teachers?

17  A.  Yes, sir.  In --

18  Q.  In the country?

19  A.  Yes, sir.

20          MR. VESPER:  I have no objection.

21          THE COURT:  Okay.  I'm going to permit her to testify

22  as an expert witness.  Go ahead.

23          MR. HERMESMANN:  Thank you, Your Honor.

24  (DIRECT EXAMINATION OF MARIA K. BELLA BY MR. HERMESMANN:)

25  Q.  Ms. Bella, I'm going to ask you some questions as we move

1112

BELLA – DIRECT – HERMESMANN

1   along here that may require you to give an opinion.  So please

2   ensure that any opinions you offer is to a reasonable degree

3   of probability in the field of aquatic safety.

4       Can you do that for us?

5   A.   Yes, sir.

6   Q.   At my request, did you review the matter that's before

7   the Court involving the drowning of John Toribio on

8   August 8th, 2010?

9   A.   Yes, sir, I did.

10  Q.   And briefly, tell the jury what all you reviewed relative

11  to that request.

12  A.   Again, I'm going to reference my report.  It's an

13  extensive list, so I apologize, but I'll go through this as

14  quickly as possible.

15      I reviewed the New Jersey State Police investigation

16  report dated August 8th, 2010; the New Jersey State Police

17  supplemental investigation reports dated August 24th, 2010 and

18  September 2nd, 2010; also, the New Jersey State Police

19  evidence disposal report dated January 24th, 2013.

20      I reviewed the Complaint in this matter; plaintiff's

21  initial disclosures and all attachments thereto; first set of

22  Interrogatories directed to plaintiff; answers of plaintiff to

23  the Interrogatories of the defendant; plaintiff's supplemental

24  answers.

25      First set of Interrogatories directed to the defendant

*United States District Court*
*Camden, New Jersey*

1113

BELLA - DIRECT - HERMESMANN

1  Pine Haven; answers from Pine Haven; initial disclosures by

2  Pine Haven; answers by Timothy and Heather Miller; answers by

3  Anthony Dioscon.  I apologize if I'm not saying that last name

4  correctly.

5          Third party defendants Heather Miller, Heather, also

6  known as Heather Dioscon and Timothy Miller and Anthony

7  Dioscon initial disclosures; John Toribio's school records,

8  the autopsy report; the death certificate for John.

9          I reviewed photographs from the medical examiner's

10  office; photographs of Pine Haven campground dated

11  December 6th, 2010; the transcript of the July 15th, 2013

12  deposition of Ms. Toribio; the transcript of the July 1st,

13  2013 deposition of Timothy Miller and the exhibits thereto.

14          I listened to the recorded statement taken by the

15  police of Anthony Dioscon and Michelle Wheeler following the

16  incident.  I performed a site inspection on August 2nd, 2013.

17  I also reviewed a report by Homer Staves dated July 8th, 2014,

18  and a report by Thomas Cate dated September 3rd, 2014.

19  Q.  Did you also go to the lake at some point?

20  A.  I did, sir.

21  Q.  And when was that?

22  A.  That was on October 2nd, 2013.

23  Q.  And what did your inspection of the lake reveal that

24  would be relevant to your findings?

25  A.  The location of the lake with respect to the campsite

1114

BELLA – DIRECT – HERMESMANN

 1  where the family was staying at the time of the incident, also

 2  with respect to surrounding sites, the basketball court, the

 3  swimming pool, the game room, that kind of thing in respect to

 4  the trailer park, so I could have an understanding of both

 5  where this incident occurred and what the witnesses, both

 6  Anthony and Michelle, were describing in their interviews with

 7  police immediately following the incident.

 8  Q.  What was the lighting like on August 8th, 2010 at Pine

 9  Haven campground at the time John Toribio entered the lake?

10  A.  It was light outside.

11  Q.  And what do you base that upon?

12  A.  Well, that's based on the testimony that's been given in

13  this case, the statements again that Michelle and Anthony gave

14  to the police, and also my research into sunset on the date of

15  the incident, the different lighting conditions available

16  through natural lighting.

17  Q.  And what time did the sun set on this particular evening?

18  A.  So technically, what sunset means is when the top edge of

19  the sun just drops just below the horizon so it's still light

20  outside, because the sun is --

21       THE COURT:  What time?

22       THE WITNESS:  I'm sorry.  8:03 p.m.

23  BY MR HERMESMANN:

24  Q.  What does sunset mean?

25  A.  It means that it's still light outside, because the sun

*United States District Court*
*Camden, New Jersey*

1115

BELLA – DIRECT – HERMESMANN

1   is refracting off of the atmosphere.  So we have sunset out

2   with light continuing for a period of time thereafter.

3   Q.   And how long after sunset did this incident occur?

4        When I say "this incident," at the time John Toribio

5   entered the lake?

6   A.   Based on the police report, he entered the lake at about

7   8:15 p.m., so about 12 minutes after sunset.

8   Q.   Based upon your review of everything you had spoken to

9   earlier and the sunset time, as you've just described, tell us

10  your understanding of what occurred.

11  A.   John and Michelle first entered the lake ahead of

12  Anthony.  They started going across the lake.  Anthony caught

13  up.  He and Michelle got out in front of John, moved to the

14  other edge of the lake.  John was calling for help.  Anthony

15  believed that he was playing around, informed Michelle of

16  that, continued up onto the beach.  John was, again, calling

17  for help.  They turned and looked for John and could no longer

18  see him in the lake.  They believed that he had gotten out of

19  the lake prior to them.

20  Q.   Is this lake regulated at all in the State of New Jersey

21  by any code, ordinance, statute, law, anything like that?

22  A.   It is.

23  Q.   And what is it regulated by?

24  A.   By the New Jersey State Sanitary Code Chapter 9, Public

25  Recreational Bathing.

*United States District Court*
*Camden, New Jersey*

BELLA - DIRECT - HERMESMANN

1    Q.   And what does that sanitary code hold relative to this

2    particular lake?

3    A.   I'm sorry, I don't understand your question.

4    Q.   What is the requirement under the code as to this lake?

5    What do they have to do to be in compliance with the code?

6    A.   They have to maintain a safe, clean, reasonably -- or

7    reasonably safe swimming area, which means that they have to

8    have tests, microbiological tests to ensure that the water is

9    safe to swim in.  They have to provide safety devices with

10   which rescues can be made.

11   Q.   Does the code have language in there regarding signs that

12   are required?

13   A.   It does.

14   Q.   Based upon your review of this matter, was Pine Haven in

15   compliance, that is, did they follow the code?

16   A.   They did have the required signs, yes, sir.

17   Q.   Did the code -- does the code have something called a

18   specially-exempt facility?

19   A.   Yes, sir.

20   Q.   And what is a specially-exempt facility?

21   A.   Well, based on New Jersey Code, those are facilities that

22   are not required to have supervisory personnel, such as

23   lifeguards.

24   Q.   Was Pine Haven a specially-exempt facility?

25   A.   Yes, sir.

*1117*

BELLA – DIRECT – HERMESMANN

1   Q.   And do you know why the code allows for specially-exempt

2   facilities that do not require lifeguards?

3   A.   Yes, sir.

4   Q.   What's that?

5   A.   Campgrounds, like hotels, apartment complexes,

6   condominiums, et cetera, are considered extensions of the

7   home.  They are alternative living environments.  And just

8   like you don't have to have a lifeguard if you have a pool in

9   your backyard, facilities that are extensions of the home are

10  generally exempted from having lifeguards.

11  Q.   What does the term industry standard mean?

12  A.   There is a consensus standard that has been developed

13  through the industry by the work of many people to help

14  develop the industry standard of care.  So what we expect that

15  a reasonable person would do in the same or similar

16  circumstances.

17  Q.   Is there an industry standard that requires for lakes

18  such as this, constant supervision?

19  A.   No, sir.

20  Q.   Is there an industry standard for a lake such as this,

21  that requires lifeguards?

22  A.   No, sir.

23  Q.   Is there an industry standard for a lake such as this,

24  that requires any type of patrolling?

25  A.   No, sir.

BELLA – DIRECT – HERMESMANN

1  Q.   Is there an industry standard for a lake such as this,

2  that requires any type of lighting?

3  A.   Well, it depends.

4  Q.   What does it depend upon?

5  A.   On whether or not the lake is intended -- or the bathing

6  is intended to be used after dark.

7  Q.   And what was your understanding as to whether or not this

8  particular body of water, this lake, was intended to be used

9  for bathing or swimming after dark?

10 A.   No, sir, it was not.

11 Q.   What would be the impact of having lighting on a lake

12 such as this, after dark?

13       MR. VESPER:  Your Honor, can I just object at this

14 time.  That was never offered in this expert's report.  I'm

15 not --

16       THE COURT:  Repeat the question.

17 BY MR. HERMESMANN:

18 Q.   What would be the impact of having lighting such as this

19 on a lake after dark?

20       THE COURT:  I'm going to allow that question.

21       MR. VESPER:  Even though it wasn't reported.

22       THE COURT:  Yeah, but I'm going to.

23       MR. VESPER:  Okay.

24       THE COURT:  We've had testimony on that.

25       MR. VESPER:  Very well.

*United States District Court*
*Camden, New Jersey*

BELLA – DIRECT – HERMESMANN

1    THE COURT:  Obviously, there's a dispute as to

2  whether it attracts children or repels children.

3    MR. VESPER:  I would agree, if she reported on that,

4  respectfully.

5    THE COURT:  All right.  Go ahead.

6  BY MR. HERMESMANN:

7  Q.  Ma'am, do you understand the question?

8  A.  Yes, sir.

9  Q.  Can you please answer it?

10  A.  I would say it depends.

11  Q.  On what?

12  A.  On the type of lighting, the individual's response to the

13  lighting.  To me, lighting indicates that something is open,

14  whether it's a shop or basketball courts or whatever the case

15  may be.

16    MR. VESPER:  That's her personal opinion, Your Honor.

17    THE COURT:  I'm going to allow it.

18    Go ahead.

19  BY MR. HERMESMANN:

20  Q.  Ma'am, did you have the opportunity to review the Pine

21  Haven rules and regulations that apply to the lake?

22  A.  Yes, sir.

23  Q.  And do you know, based upon your review, whether or not

24  Mr. and Mrs. Miller were aware of those regulations?

25  A.  Yes, sir.  Mr. Miller testified that he was.

BELLA – DIRECT – HERMESMANN

1    Q.   Was there anything in your review of this matter that

2    indicated that Pine Haven did not follow the industry standard

3    for water safety for a lake such as this?

4    A.   No, sir.

5         MR. HERMESMANN:  That's all I have for you.  Thank

6    you.

7         THE COURT:  Okay.  Cross-examine.

8         MR. VESPER:  Yes.

9    (CROSS-EXAMINATION OF MARIA BELLA BY MR. VESPER:)

10   Q.   Hello again.

11   A.   Hello.

12   Q.   And I do have -- I think seven areas that I want to

13   cover, so I'll try to keep you and everybody on target.

14        You would agree -- can I refer to you as Mrs. Bella or

15   would you prefer Ms.?

16   A.   Ms., please.

17   Q.   Thank you.  Ms. Bella, you would agree that once an

18   aquatic facility of any kind assumes a duty, whether it's

19   required or not, they have to perform that duty reasonably.

20   Would you agree?

21   A.   Yes, sir.

22   Q.   So even though there's no industry standard that requires

23   -- just as an example, there is no industry standard that

24   requires lights, as far as you know, anywhere around a

25   swimming facility of any type, if the owner/operator of the

BELLA - CROSS - VESPER

1  campground decides to put up lights, they have to make -- they

2  have to maintain the lights properly.  Wouldn't you agree?

3  A.  Yes, sir.

4  Q.  There may not be an industry standard, but once an

5  owner/operator of an aquatic facility decides to do something,

6  I would express it as once you decide to do a job, you've got

7  to do it right.  Would you agree?

8  A.  You must do it properly, yes, sir.

9  Q.  Now, in terms of your report, your report does not

10  address -- and you didn't testify today to the best practices

11  in the camping industry, did you?

12  A.  No, sir.

13  Q.  All right.  And again, I'm not trying to -- criticizing

14  you, I'm just saying that you're taking into account the

15  industry that you're very experienced in, which includes

16  hotels and water parks, and you've done -- and for schools,

17  you've been a consultant for schools and kids on the swim team

18  that you coached.  I should talk to you about swim teams.

19       So, that is, all these different places that have water

20  facilities where people swim, and you're addressing that

21  entire aquatic industry?

22  A.  Yes, sir.  Any place that you chose to put in, again, a

23  designated swim area, whether you put it in at a campground or

24  you put it in -- I've seem them put them in at restaurants to

25  attract patrons to the restaurant, but still, you have to

*United States District Court*
*Camden, New Jersey*

1122

BELLA — CROSS — VESPER

1  follow the standard of care for the aquatic industry --

2  Q.   Right.

3  A.   -- as well as any local or state codes that apply.

4  Q.   Right.  And within that vast aquatic industry, including

5  even restaurants, there is a subset within that industry

6  that's the camping, campground, camping resort industry, is

7  there not?

8  A.   Yes, sir.

9  Q.   Now I want to -- so turn the page, I want to ask you

10  about some of the assumptions in your report.  You have your

11  report there.

12  A.   Yes, sir.

13  Q.   And you were supplied -- and it appears on page -- I'm

14  referring now to -- yeah, Page 2 of your report.

15       Do you have that?

16  A.   Yes.

17  Q.   Okay.  And you were supplied -- and it said -- and you

18  did review the colored copies of the 18 photographs labeled by

19  the New Jersey Southern Regional medical examiner.

20       These are the autopsy photographs.

21  A.   Yes, sir.

22  Q.   And you also were supplied, I'm assuming you have them,

23  there were -- this is Item No. 21 on Page 2.

24       You were supplied 14 photographs of the Pine Haven

25  campground that were dated December 6th of 2010.

BELLA – CROSS – VESPER

1    A.   Yes, sir.

2    Q.   Did you bring those with you?

3    A.   I don't have printed-out copies of them, no, sir.

4    Q.   All right.  Well, to move things along, I ask you if you

5    recall -- oh, you know what, tab new paragraph.

6         That's what my wife likes to say.

7         I'll talk to you about the photographs in just a

8    second, but you were also supplied this diagram.  It was much

9    smaller than this, but you remember you reviewed this?

10   A.   Yes, sir.

11   Q.   And is there anything misleading or confusing to the jury

12   about this diagram, in relation to understanding the facts

13   surrendering the events that led up to the drowning incident?

14   A.   No, sir.

15   Q.   Does this help?

16   A.   Yes.

17   Q.   Okay.

18   A.   Well, it helped me, at least.

19   Q.   It helped me, too.  So back to the photographs.

20        In the -- among the -- among the -- was it 14 or 18

21   photographs that color?  Were they?

22   A.   14.

23   Q.   14.  Of the 14 photographs that were supplied to you, do

24   these look like two of them?

25   A.   Yes, sir.

BELLA - CROSS - VESPER

1  Q.   All right.  And your report very accurately reflects that

2  these two were taken on December of 2010?

3  A.   Yes, sir.

4  Q.   That's four months after the drowning incident?

5  A.   Yes, sir.

6  Q.   Now I'm assuming, but you correct me, you assumed, for

7  purposes of your report, that these two signs were up in two

8  separate locations around this lake, the swimming lake?

9  A.   Well, I reviewed not only those photographs, but I also

10  reviewed the county inspection report for this facility that

11  was done about three weeks prior to this incident.

12          THE COURT:  Answer his question.  Ask the question

13  again.

14  BY MR. VESPER:

15  Q.   Did you or did you --

16          MR. VESPER:  Thank you.

17  BY MR. VESPER:

18  Q.   Did you or did you not assume that these two photographs

19  -- did you not assume, for writing your report, that these two

20  signs were up at one location in the lake, around the lake, or

21  several?

22  A.   At two separate locations.

23  Q.   Okay.  And you assumed that these two signs, as an

24  aquatic safety expert, you would agree that not only does the

25  law require that the signs be posted, correct?

BELLA - CROSS - VESPER

1  A.  Yes, sir.

2  Q.  And the law requires just this sign or both signs?

3  A.  Both signs.

4        MR. VESPER:  So for the record, because I sometimes

5  forget, I've been holding up P-41, it's the persons under the

6  age of 16 sign, and then there's the P --

7        THE COURT:  39?

8        MR. VESPER:  39.  Thank you, Your Honor.

9  BY MR. VESPER:

10  Q.  P-39 sign that says no lifeguard on duty.

11       These two signs are required by the law, correct?

12  A.  Yes, sir.

13  Q.  And as far as the spirit of the law is concerned, you not

14  only have to post the signs, but you have to post them

15  conspicuously, don't you?

16  A.  Yes, sir.

17  Q.  All right.  Now, you assumed for the purposes of your

18  report, that these two signs were conspicuous to anyone

19  entering the swimming lake on August 8th of 2010, correct?

20  A.  Yes, sir, that they were readily available to be seen.

21  Q.  Yeah.  Or another word for readily available to be seen

22  would be, they were conspicuous to the people that were going

23  into or out of the lake, correct?

24  A.  Yes, sir.

25  Q.  Now, do you know what the testimony -- and in this case,

1   there were three 14 year olds that went into the lake at about

2   -- around 8:15, correct?

3   A.   Yes, sir.

4   Q.   Now, if you know, was Michelle Wheeler ever at the lake

5   before?  If you know?

6   A.   I don't recall.

7   Q.   Okay.  That's fine.  I mean, there's things we all

8   remember and there's things -- but what about -- well, do you

9   know whether Michelle Wheeler saw any signs anywhere around

10  the lake that day that she was there, that Sunday?

11  A.   That was not asked by the police officers who interviewed

12  her, and that is all I have from her, so I can't answer that,

13  sir.

14  Q.   All right.  Fair enough.  So you don't know what she

15  testified to in her deposition or what she testified to here

16  at trial?

17  A.   No, sir.

18  Q.   And I assume then -- do you know whether Anthony Dioscon,

19  who was the other 14 year old on August 8th, whether --

20  whether or not he saw any signs anywhere?

21  A.   Again, that was not asked by the police officers and I

22  have his witness statement.

23  Q.   Okay.  And you don't know what Mr. Dioscon testified to

24  in this trial?

25  A.   No, sir.

BELLA - CROSS - VESPER

1   Q.   So again, I'm assuming -- you don't know for a fact what

2   any -- when I say, "any" -- whether -- you don't know for a

3   fact what Michelle Wheeler or Anthony Dioscon or Mr. and

4   Mrs. Wheeler or any other witness testified about signage that

5   they either saw or didn't see around the lake, testimony in

6   this case?

7   A.   I only have Mr. Wheeler's testimony and I don't recall

8   what he testified to with regards to signage.

9   Q.   All right.  You would agree with me, that if they --

10  because signs, whatever they're made of, signs deteriorate,

11  don't they?

12  A.   Yes, sir.

13  Q.   And if a sign deteriorates and is not visible, for

14  whatever reason, because it's just worn out, weathered,

15  covered with weeds, it would, from your safety background and

16  experience, would that satisfy you as an aquatic safety expert

17  for the owner/operator's fulfillment of the state duty to post

18  a sign, if the sign was weathered as I described?

19  A.   If it was degradable and unreadable, no, sir, that would

20  not be satisfactory.

21  Q.   That would be pretty poor maintenance, wouldn't it?

22  A.   Yes, sir.

23  Q.   Oh, and before I -- the assumptions -- or things that you

24  were asked to review, you were asked to review the report of

25  an engineer, Thomas Cate?

1128

BELLA – CROSS – VESPER

 1  A.  Yes, sir.

 2  Q.  That engineer is not -- as far as you know, certainly

 3  doesn't have aquatic safety credentials like you do.  If you

 4  know.

 5  A.  I don't recall what's on his CV.

 6  Q.  You never worked with the engineer Cate before?

 7  A.  No, sir.

 8  Q.  All right.  Now, when you went for your inspection, which

 9  was -- again, was in what year?

10  A.  2013.

11  Q.  Okay.  So when you were inspecting in 2013, did you

12  notice any kind of surveillance cameras in place anywhere in

13  the park, or were you not -- you were not there to look for

14  surveillance cameras?

15  A.  I don't recall seeing any surveillance cameras.

16  Q.  Fair enough.  And you mentioned that -- let me ask you

17  one more thing about the signs.

18       The law requires that if you're the owner/operator of a

19  swimming lake, that you post a sign, but there's no

20  requirement as to how many signs, is there?

21  A.  No, sir.

22  Q.  And insofar -- you testified that your understanding of

23  the facts were that the 14 year olds were in the water and at

24  some point, at some point, as they were swimming in the swim

25  lake, John called for help, Anthony assumed that John was

BELLA - CROSS - VESPER

1  playing around, they kept swimming, and then I believe you

2  said, and then John called for help again?

3  A.  Yes, sir.

4  Q.  So with your safety -- especially aquatic safety

5  experience, and you're certainly familiar with drownings.

6  A.  Yes, sir.

7  Q.  In your mind, were you able to time -- tell the ladies

8  and gentlemen of the jury, how much time elapsed from the

9  first call for help and the second call for help?  Did you

10  time that or you didn't?

11  A.  No, sir.  I wasn't there to time that.  I can tell you --

12  Q.  Well, if you didn't do it, then I'm not going to ask you

13  to.

14       So you weren't asked to give an estimate, and I didn't

15  see it in your report, as to how long it took before John went

16  under water or how long it took for John to actually drown.

17  You were not asked to do that, were you?

18  A.  No, sir.

19  Q.  All right.  Then I won't ask you.

20       Okay.  Third topic.  You mentioned in your report on

21  Page 2, go back to Page 2.  Yeah, the last paragraph.  You

22  talk about aquatic -- it's the second sentence of your last

23  paragraph.

24       The aquatic amenities at this campground include the

25  swimming pool, kiddie pool, swimming lake and a fishing lake.

*United States District Court*
*Camden, New Jersey*

BELLA - CROSS - VESPER

1   A.   Yes, sir.

2   Q.   And those are the aquatic amenities, correct?

3   A.   Yes, sir.

4   Q.   And at this park, would you consider -- you saw the whale

5   when you went for your inspection, did you not, in the

6   swimming lake?

7   A.   Yes, sir.

8   Q.   And was the whale spouting?

9   A.   It was.

10  Q.   Now, from your experience with all kinds of different

11  aquatic facilities and restaurants and also in campgrounds,

12  would you consider that the whale is an aquatic amenity?

13  A.   It's part of the lake, yes, sir.

14  Q.   Yeah.  I mean, it's not a -- it's not a water slide and

15  it's not a diving board, but it's certainly an amenity at that

16  swimming lake, is it not?

17  A.   Yes, sir.

18  Q.   Now, as far as the whale is concerned, are you familiar

19  -- do you know there was a rule about the whale for the

20  swimmers?

21  A.   Yes, sir.

22  Q.   What was the rule?  This is -- by the way, excuse me for

23  interrupting.  But this is the campground -- this is the Pine

24  Haven Camping Resort rule.

25  A.   And I'm trying to remember the sign that was on the whale

BELLA — CROSS — VESPER

1   at the time.  I haven't looked at it for quite some time.

2   Q.   Okay.

3   A.   So I believe it was that no one was to be on the whale.

4   Q.   Okay.

5   A.   But I don't recall the specific rule.

6   Q.   That's all right.  But there was a sign that said, like,

7   stay off the whale?

8   A.   Something to that effect, yes, sir, and that would be

9   proper signage.

10  Q.   Okay.  And the sign to stay off the whale, do you know --

11  and the rule to not go on the whale, do you know whether that

12  was enforced by the -- by Pine Haven?

13  A.   I don't know.

14  Q.   Also, at --

15       THE COURT:  On the night of the drowning, did any of

16  the three stop at the whale or get on the whale?

17       THE WITNESS:  No, sir.

18       MR. VESPER:  We agree, but -- yeah, that's

19  stipulated.

20       THE COURT:  I'm asking her.

21       MR. VESPER:  All right.  It just wasn't an issue.

22       But in any event, we agree.

23  BY MR. VESPER:

24  Q.   So the -- around this swim lake, there's a beach,

25  correct?

BELLA - CROSS - VESPER

1  A.  Yes, sir.

2  Q.  And the beach is also part of the attraction of the --

3  it's one of the amenities of the swimming lake, it starts --

4  you don't go right from the road into the water, there's a

5  beach, correct?

6  A.  Yes, sir.

7  Q.  So the beach is considered part of the aquatic amenity.

8  A.  Yes, sir.

9  Q.  Of that --

10 A.  Of that aquatic amenity, yes, sir.

11 Q.  That amenity.  Right.

12     And on the beach, there's a playground.

13 A.  Yes, sir.

14 Q.  All right.  And when you were there, the playground

15 consisted of what?

16 A.  I recall swings.  I don't recall anything else.

17 Q.  All right.  So there wasn't like a merry-go-round or a

18 pirate ship when you arrived?

19 A.  I don't recall any of that, no, sir.

20 Q.  You didn't see the pirate ship?

21 A.  Again, I don't recall that.  My focus was on the lake and

22 determining the cause of this drowning.

23 Q.  All right.  I'm talking -- I'm concerned about the

24 overall operation of the swim lake.

25     So the operator of the swim lake is -- was the

1133

BELLA - CROSS - VESPER

1   playground equipment that you saw, was it close to the lake?

2   A.   Define close.  It was a far enough distance away that

3   nobody was going to, for instance, jump the swing set into the

4   lake.

5   Q.   No, I certainly agree.  But they could -- once they were

6   finished on the swings, they could certainly walk a very short

7   distance and go into the lake, couldn't they?

8   A.   They could.  I think it was something like 80 or 90 feet.

9   Q.   All right.  That much?

10  A.   I believe so.  I can refer to my notes, if you would like

11  me to.

12  Q.   Well, a photograph would be better, but if you have

13  notes, go ahead.  I'm --

14  A.   These measurements were taken from the center of the

15  swing set to the edge of the lake was 91 feet.

16  Q.   Okay.  And were there any signs about either closing

17  hours or the swimming signs anywhere near the playground that

18  you saw when you were there?

19  A.   They were, they were en route to the playground and the

20  swimming lake.

21  Q.   Over by the arcade?

22  A.   The ones that I specifically recall were on the road.  So

23  between the basketball court and the office store, as you walk

24  down towards the lake, they were along that main roadway.

25  Q.   Just so we're all sure, there's been testimony, and I'm

BELLA – CROSS – VESPER

1    going to show you the diagram which I believe is P-1 --

2             MR. CICCOTTA:  A.

3             MR. VESPER:  A, thank you.

4    BY MR. VESPER:

5    Q.   So P-1A, I'll just hold this up.  There's been testimony

6    by representatives of Pine Haven, you see where these two

7    crosses -- two sets of crosses, there's two here?

8    A.   Yes, sir.

9    Q.   And two here?

10   A.   Yes, sir.

11   Q.   Do you see those, Ms. Bella?  So which set of signs did

12   you see when you were there?

13   A.   This set here.

14   Q.   Okay.

15   A.   I may have also seen signs over here.  Again, I don't

16   recall.  My focus was predominately in this area since it was

17   my understanding that they entered the lake here and went in

18   this direction.

19   Q.   Okay.  So -- and again, you were assuming that these two

20   signs, they would have passed when they went into the water?

21   A.   I -- again, I -- and I wasn't assuming that they would

22   have passed the signs.  At the time of my inspection, the

23   signs were readily visible at the lake.

24   Q.   Okay.  And obviously, if the signs weren't there on

25   August 8th, there's -- nobody would have seen them if they're

BELLA – CROSS – VESPER

1   not there.

2   A.   Yes, sir.

3   Q.   Now, you mentioned -- you mentioned that these signs at

4   this -- no, that's okay.  I don't want you to --

5   A.   All right.

6   Q.   This has a tendency to hit people in the head.

7        So over here, see this?  These two -- the location,

8   approximate location of the two signs, you said were also

9   either visible or accessible to people coming from the

10  basketball court.

11       So this is not to scale, but the basketball court

12  that's here is more like over here, is it not, like closer to

13  the road?  Do you see where the basketball court is, here?

14  A.   Again, and this was all based on memory --

15  Q.   Yeah.

16  A.   -- but I recall the basketball court or there being

17  courts beyond the general store when I was there.

18  Q.   Just point.

19  A.   I recall there being courts somewhere in this area at the

20  time that I was there.

21  Q.   Okay.  So as best you can recall, the basketball courts

22  were not as they're shown on P-1A, but they were closer to the

23  office?

24  A.   Yes, again, they were in this -- this general -- this

25  general area just beyond the general store.

BELLA - CROSS - VESPER

1  Q.  Okay.  And closer to the main -- this is the main road?

2  A.  I don't know that this is to scale.  The best I can do is

3  tell you --

4  Q.  Yeah.

5  A.  -- what I recall, and again, my focus was on the lake.

6  Q.  Okay.

7  A.  But I walked passed the general store, because I took a

8  measurement, again, from the center of the swing set to the

9  store, which was a hundred feet, and then continued on to the

10  basketball court.  So from here to the basketball court was

11  208 feet.

12  Q.  Oh, okay.  So you took those -- thank you very much.  You

13  took some good measurements.

14  A.  Yes, sir.

15  Q.  Now, in terms of the rule about the closing of the lake,

16  are you aware that there's testimony in this case that as of

17  7 o'clock on Sunday night, when -- when the store that we

18  just, you know, we were talking about, that store was closed

19  and the facilities in the campground on Sunday were closed at

20  7 o'clock.  As of 7 o'clock, the lake was closed.

21  A.  I don't know anything about that testimony, sir.

22  Q.  All right.  If you assume, then, that as far as -- well,

23  let me ask you this way.  Did you assume that the -- that the

24  rule of the campground was that the swim lake closed when it

25  became dark or dusk?

*United States District Court*
*Camden, New Jersey*

BELLA - CROSS - VESPER

1  A.  Yes, sir.

2  Q.  Okay.  I'm going to ask you to assume that in addition to

3  that -- that is one rule, and then there's also a rule that if

4  the campground closes, like the store, the operation of the

5  campground, if it closes earlier than dusk, then the -- then

6  the lake is not open to anyone of any age.

7       Can you assume that that's a rule?

8  A.  Yes, sir.

9  Q.  So if you assume that -- that on Sunday, August 8th,

10  after 7 o'clock, no one of any age -- forget that they were

11  14, but no one of any age is allowed to swim in that lake,

12  then who, after 7 o'clock on that Sunday, on behalf of Pine

13  Haven was going to enforce that rule, if you know?

14  A.  I don't know who was identified to do so.

15  Q.  All right.  Now, normally, when you -- you do risk

16  management and you're asked, as a -- as an aquatic safety

17  expert to come to aquatic facilities and advise people,

18  correct?

19  A.  Yes, sir.

20  Q.  All right.  Now, when you're asked by reasonable people,

21  not maybe the most cautious, not maybe the -- I don't want to

22  say -- not maybe the most careless, all right, but by

23  reasonable people, when they ask you for advice about who

24  should enforce whether it's a pool, a swimming lake, whatever

25  swimming facility there is, to enforce the rules, usually, in

BELLA – CROSS – VESPER

1   the majority of cases, don't you tell them -- or maybe it's in

2   all the cases, don't you tell the owner/operator that someone

3   has to be designated, at least one person, to enforce the

4   rule?  Let's say it's the closing rule.  Wouldn't you advise

5   them?

6   A.   Yes, sir.

7   Q.   And I'm assuming, you correct me if I'm wrong, other than

8   for this case, you were consulted for this case, obviously,

9   because you're here, but were you consulted by anyone on

10  behalf of management or Diversified Investments, Inc., the

11  owners to advise them prior to August 8th of 2010 about the

12  safe operation of their aquatic facilities?

13  A.   Not that I recall specifically.

14  Q.   All right.  I mean, if you were -- were you ever

15  contacted by Mr. Jordan, other than for this case, and prior

16  to August 8th of 2010, to give either him or his staff advice

17  about aquatic safety?

18  A.   Again, not that I recall specifically, but I have many

19  people attend my courses.

20  Q.   Sure.

21  A.   So I can't say absolutely no.  Just in case one of their

22  personnel was in one of my aquatic safety courses.

23  Q.   Okay.  It may be that somebody from Diversified

24  Industries, Inc., and even from Pine Haven came to one of your

25  classes?

*United States District Court*
*Camden, New Jersey*

1139

BELLA - CROSS - VESPER

1   A.   It's possible.

2   Q.   Right.  And you teach some wonderful classes.  That's a

3   gratuitous --

4           THE COURT:  Oh, come on.  Let's go.

5           MR. VESPER:  I'll try.  I won't withdraw that.

6           THE WITNESS:  I do my very best.

7   BY MR. VESPER:

8   Q.   Yes, you do.

9           So when you teach a class, you would teach the people

10  there from whatever facility they're from, campgrounds or

11  pools or hotels, you would teach them what you're telling us

12  here, that if you have rules, like closing rules, one person

13  should be designated in your staff to enforce those rules.

14  That's what you would teach them.

15  A.   Yes, sir.

16  Q.   All right.  And would you agree with me that if the

17  designee, let's say, the designee for enforcing the no

18  swimming after closing time rule, saw three 14 year olds

19  getting into the water, they would do something about getting

20  them out of the water, wouldn't they?

21  A.   They should, yes, sir.

22  Q.   Yes.  And have you ever seen what -- there's 14 year olds

23  and then there's 14 -- have you ever seen what these three 14

24  year olds -- well, not when they were 14.

25          Did you ever see what they looked like?

*United States District Court*
*Camden, New Jersey*

BELLA - CROSS - VESPER

1  A.   What John looked like, yes, sir.

2  Q.   He looks like he's 14, doesn't he?

3  A.   Well, that's an interesting question.

4        THE COURT:  I'm going to strike that question.

5        Ask your next question.

6  BY MR. VESPER:

7  Q.   Sorry.  There's another rule that Pine Haven has, and I'm

8  sure most of the facilities that you advise have rules about

9  underage drinking, that there shall be no underage drinking,

10 correct?

11 A.   Yes, sir.

12 Q.   Now from what you've read in this case --

13       MR. HERMESMANN:  I've got to object to this line of

14 questioning.

15       THE COURT:  Yes, there's no issue of underage

16 drinking in this case.  Why even bring it up?

17       MR. VESPER:  It has to do with the negligent

18 operation of this campground.

19       THE COURT:  There was no testimony as to there was

20 any underage drinking in this case.

21       MR. VESPER:  There was testimony.

22       THE COURT:  Not --

23       MR. VESPER:  There was testimony.

24       THE COURT:  Not for the three people involved.

25 There's no inference anywhere.

BELLA - CROSS - VESPER

1          MR. VESPER:  It's not an inference.  There was direct

2    testimony, Your Honor.

3          MR. HERMESMANN:  Your Honor, if we're going to have

4    this conversation, can we have it at sidebar?

5          MR. VESPER:  I'd like to just move along.

6          THE COURT:  I --

7    BY MR. VESPER:

8    Q.   Would you agree that any rules that have to do with the

9    safety of children should be enforced by the owner/operators

10   of the -- of any aquatic facility, wouldn't you agree?

11   A.   Within reason, yes, sir.

12   Q.   Yeah, within reason.  I'm going to talk to you -- that's

13   maybe the last point about reasonable risk analysis.

14        You do risk analysis, don't you?

15   A.   Yes, sir.

16   Q.   But you -- as far as you can think right here and now,

17   you never did a risk analysis for the Pine Haven people, did

18   you?

19   A.   Not at that site, no, sir.

20   Q.   Right.  Now, in -- on the Robson -- and Robson Forensic,

21   you've worked for, for how many years?

22   A.   11 years.

23   Q.   Okay.  And they supply forensic experts for both sides,

24   plaintiffs and defense in cases like this, correct?

25   A.   Yes, sir.

BELLA - CROSS - VESPER

1  Q.   P-38 is going to be -- this is an article that is posted

2  by Robson Forensic that -- it was attributed to you -- first,

3  let me show you before I start.

4          MR. HERMESMANN:  Could I see it, please?

5          MR. VESPER:  Yeah, sure.

6          THE COURT:  P-38?

7          MR. VESPER:  P-38, yes, Your Honor.

8  BY MR. VESPER:

9  Q.   Let me just show you this.

10          MR. HERMESMANN:  Your Honor, I'm going to have an

11  objection regarding this.  Can I be heard at sidebar?

12          THE COURT:  Can I see it?  Let's go to sidebar.

13          (SIDEBAR AS FOLLOWS:)

14          THE COURT:  Okay.

15          MR. HERMESMANN:  Objection.

16          THE COURT:  You said your objection.

17          MR. HERMESMANN:  Yes.

18          THE COURT:  That's why I'm here.

19          MR. HERMESMANN:  I understand.  The objection, as

20  you'll neither note at the beginning of this, and I haven't

21  read through the entire article because it was handed to me

22  moments ago, it applies to swimming pools.  This is not a

23  swimming pool case.  This is a lake case.  This is a case

24  that's governed by the sanitary code and there's a different

25  set of standards.  So it's clear at the beginning of this

*United States District Court*
*Camden, New Jersey*

BELLA - CROSS - VESPER

1   article that this is meant to address swimming pools.

2          MR. VESPER:  She's testified though pools are

3   included in aquatic safety.

4          THE COURT:  There's -- the question, there's a

5   difference between -- if you put a fence around a swimming

6   pool, just to state one, you have to have a fence around it.

7   You don't have to have a fence around a lake.

8          MR. VESPER:  I agree, but it's a way of enforcing the

9   rules, it's an option that was available and I don't believe

10  that the plaintiff should be limited to the minimum

11  requirements of the state.  The state --

12         THE COURT:  The first one is check barriers, ensure

13  that chain link hasn't been cut.  First one, has nothing to

14  do --

15         MR. HERMESMANN:  Nothing to do.

16         THE COURT:  Run in-service training with all staff

17  throughout the season.  Emergency skills should be practiced

18  at the environment which they will be used.  Has nothing to do

19  with this case.  Next says make certain that signage meets

20  code.  Well, everyone agrees with that.

21         MR. HERMESMANN:  It's been testified to at length by

22  this witness.

23         THE COURT:  Whether it does or not is a different

24  issue.

25         MR. HERMESMANN:  Whether it exists or not.

*1144*

BELLA - CROSS - VESPER

 1          THE COURT:  There's been conflicting testimony on

 2   that.

 3          MR. VESPER:  Right.

 4          THE COURT:  But nobody disagrees with the rule,

 5   whatever the law of signage.  It has to be complied with.  Mr.

 6   Vesper, in fact it's one of his points that --

 7          MR. VESPER:  Right.

 8          THE COURT:  -- there should be signage and that his

 9   testimony is at least that it wasn't there, or it was obscured

10   or -- check your chemical stock has nothing to do with the

11   lake.  Enlist experts for technical assistance with electrical

12   and gas powered equipment.  Nothing to do with this case.

13   Measure the length, width and depth of each pool.  Has nothing

14   to do with this case.  The other ones, visit the CDC's website

15   blah, blah, blah, slash, swimming.  View the fecal accident

16   response.  Nothing to do with this case.  No, I'm not going to

17   allow this.

18          MR. VESPER:  All right.

19          THE COURT:  I'm not going to allow this.

20          MR. VESPER:  All right.

21          THE COURT:  This -- maybe you think this will, you

22   know, somehow or -- I don't know what you're thinking it will

23   do, but it has nothing to do with this case.

24          MR. VESPER:  Okay.  Understood.  Thank you, Your

25   Honor.

 1              MR. HERMESMANN:  Thank you.

 2              (END OF SIDEBAR.)

 3   BY MR. VESPER:

 4   Q.  Besides yourself, Ms. Bella, there are other aquatic

 5   safety experts available in New Jersey?

 6   A.  Yes, sir.

 7   Q.  Right, and besides Robson Forensics, there are, you know,

 8   like, not those that are trained, which you're only one of

 9   four trained to teach the teachers, but how many would you

10   estimate are available for New Jersey, for this area?

11   A.  I know of only one other person who's been identified as

12   a testifying expert.

13   Q.  No, no, no, I'm sorry.  I didn't make my question clear.

14         Not as an expert to come into court and testify, I mean

15   as a consultant for the owners and operators.

16         If an owner/operator wants to find out or learn about

17   aquatic safety, they can attend seminars that you give,

18   correct?

19   A.  Yes, sir.

20   Q.  And those are several times a year?

21   A.  Yes, sir.

22   Q.  All right.  And they're -- and they're easily accessible

23   because they are in New Jersey, correct?

24   A.  No, sir.  The courses that I offer are primarily in

25   Pennsylvania.  I do go to Virginia at the request of the

BELLA – CROSS – VESPER

1    National Recreation and Park Association.  I do have attendees

2    come from New Jersey and other states to those courses at

3    various locations.

4    Q.  Okay.  Maybe I'm thinking of the ICLE courses in New

5    Jersey.

6         But in any event, people who own and operate aquatic

7    facilities can attend the safety seminars that are given, the

8    lectures, you have materials that are available that they can

9    obtain online or by mailing in requests, correct?

10   A.  Yes, sir.

11   Q.  And as far as –- again, I'm back to the question about if

12   you know, in this Delaware Valley area within a couple hours

13   of Pine Haven, are there safety consultants that someone from

14   Pine Haven could pick up the phone and call to come down and

15   look at the facility and give them some ideas?

16   A.  I do not know.

17   Q.  Okay.  All right.  So, I've got two more points to cover.

18        So –- but before I cover them, let me ask you about

19   facilities that –- there's no requirement for a swimming lake

20   operator, like Pine Haven Camping Resort, to have surveillance

21   cameras anywhere, correct?

22   A.  It's –-

23   Q.  There's no industry written rule or regulation.  Excuse

24   me for interrupting.  Correct?

25   A.  I'm sorry, anywhere is the problem.  I can speak again to

*United States District Court*
*Camden, New Jersey*

1147

BELLA - CROSS - VESPER

1  aquatic facilities and --

2  Q.   Right.

3  A.   -- no, there is no requirement for security cameras at

4  aquatic facilities.

5  Q.   Okay.  Would you agree, however, as a safety consultant,

6  that once you do decide to put up surveillance cameras, that

7  they should work?

8  A.   Yes, sir.

9  Q.   And why is it -- why is it important that they should

10  work?

11  A.   Well, surveillance cameras in the aquatic industry, when

12  used, are used to review operations, typically after an

13  incident or to look at ebb and flow of patrons for staffing

14  purposes.

15  Q.   Yeah, and that's a good point.  The surveillance video

16  cameras, and the video that's produced, they don't have to be

17  constantly monitored, do they?

18  A.   No, sir.

19  Q.   But you would, if there was an incident, look at the --

20  at the video to see if somebody had to be either sanctioned or

21  warned about violating rules, correct?

22  A.   Yes, sir, or if staff needed to be retrained.

23  Q.   Yeah.  So the ongoing review of the video is to include

24  the overall --

25  A.   I'm --

BELLA – CROSS – VESPER

1    Q.   -- safety of the aquatic operation, correct?

2              THE COURT:  Go ahead, you can answer.

3    BY MR. VESPER:

4    Q.   Correct?

5              THE COURT:  But that's the last question on this.

6    A.   Yes, sir.

7              THE COURT:  Was there a video camera anywhere around

8    the lake when you were there?

9              THE WITNESS:  Not to my knowledge, sir.

10             THE COURT:  Okay.

11             MR. VESPER:  There was a video camera around the

12   pool.

13             THE COURT:  Yeah, but the pool is not the lake.  The

14   accident didn't happen in the pool, it happened at the lake.

15             MR. VESPER:  I understand that.  This is --

16             THE COURT:  No, don't argue with me.

17             MR. VESPER:  I'm not.

18             THE COURT:  I'm telling you, you can't -- you're

19   implying something that is not the law.

20   BY MR. VESPER:

21   Q.   So there's no industry standard to put up a sensor light

22   anywhere on a campground or on an aquatic facility, is there?

23        A sensor light that -- when I say a "sensor," somebody

24   moves, it picks that up, it goes -- is there such a

25   requirement?

BELLA – CROSS – VESPER

1  A.   Not for an aquatic facility, no, sir.

2  Q.   Okay.  However, if, if the owner/operator of an aquatic

3  facility does decide to use motion sensor lights, you would

4  expect the lights to work, correct?

5  A.   Yes, sir.

6  Q.   And wouldn't you expect, as an aquatic safety expert,

7  that the light should be placed strategically, correct?

8  A.   Yes, sir.

9  Q.   Do you know the approximate cost for a sensor light?

10  A.   For commercial application?  No, sir.

11       THE COURT:  Did you see sensor lights around the

12  lake?

13       THE WITNESS:  No, sir.

14       MR. VESPER:  Whether she saw them or not, there's

15  testimony that they were there.  Not -- I'm sorry, not around

16  the lake, I don't want to confuse this issue.

17       THE COURT:  Yeah, I know, maybe they were somewhere

18  else, but I recall no testimony that they were around the

19  lake.

20       MR. VESPER:  Agreed.  That's agreed.

21  BY MR. VESPER:

22  Q.   Now, do you know how much was in the budget of Pine Haven

23  Camping Resort for the enforcement of the safety -- aquatic

24  safety at the campground?

25  A.   No, sir.

*United States District Court*
*Camden, New Jersey*

1150

BELLA - CROSS - VESPER

1  Q.   A risk analysis, would you agree, has, I guess, five

2  steps.  If you're a safety consultant and you're asked to come

3  to an aquatic facility, the safety expert, such as yourself,

4  Ms. Bella, you would expect that the owner/operator would know

5  the environment in which business invitees or guests of that

6  facility are going to engage in water activities.

7        You would expect the owner to know that, correct?

8  A.   I'm sorry.  You lost me on the lead in.

9        Could you restate that, please.

10 Q.   All right.  When you start out with a risk analysis of a

11 water facility, as an aquatic safety expert, do you expect

12 that the owner/operator will know how the water environment is

13 going to be used?

14 A.   That would be part of my work as a consultant to address

15 that component.  That's usually predesign in construction.

16 Q.   No, no, not construction, I'm sorry.  Excuse me for

17 interrupting, but I'm not into construction now.

18       The facility, like in this case, the swimming lake

19 already existed, correct?  It already exists.  And you come on

20 site.

21       Now, does it make a difference whether it's man-made or

22 nature-made, the swimming lake?

23 A.   It can make a difference, yes.

24 Q.   In the analysis of the risks?

25 A.   Yes, and that has to do with the equipment that would be

BELLA - CROSS - VESPER

1    used in either application.

2    Q.   Okay.  Let's focus, then, on -- it's a man-made swimming

3    lake, and when you come to analyze the risks at that man-made

4    swimming lake, you have to know and understand the usages that

5    people who are invited to swim in that man-made lake are going

6    to make or do in that lake, correct?

7    A.   Yes, or the foreseeable or anticipated usages based on

8    the demographics.

9    Q.   Right.  The second step, once you -- as an aquatic safety

10   expert, once you see how the aquatic facility is going to be

11   used, you would also evaluate how the aquatic amenities,

12   whatever they are, how the aquatic amenities are going to be

13   used, wouldn't you?

14   A.   Yes, sir.

15   Q.   Okay.  Now, once you understand that, isn't the next step

16   to try to appreciate what is reasonably -- what's reasonably

17   foreseeable risks of serious injury or death to the people

18   that use the facility or the amenities?

19   A.   Yes, sir.

20   Q.   Right.  And then the third step in the -- and this is

21   risk analysis, my interpretation of it, but you correct me if

22   I'm wrong, the next step in risk analysis is once you've

23   identified reasonably foreseeable risks of serious injury or

24   death to the users of that aquatic facility, do you try, as

25   reasonably as possible, as practical, to eliminate the risk,

BELLA - CROSS - VESPER

1  if it can be done?

2  A.   Well, there is a hierarchy.

3  Q.   Yeah.

4  A.   Elimination, yes.  If feasible.

5  Q.   If feasible?

6  A.   If it's cost effective and if it doesn't take away the

7  attractions.  Certainly, we're not going to address a drowning

8  hazard by filling in all swimming areas.

9  Q.   Certainly.

10  A.   So we will remove the hazard if possible.

11  Q.   If possible and feasible, yeah, sorry to interrupt.

12       And the second step is to either ameliorate, or the

13  other word is reduce the risk?

14  A.   Yes, sir.

15  Q.   Okay.  First step is, if you can do it feasibly, is to

16  eliminate the risk.  Third (sic) step is you try to lessen the

17  risk?

18  A.   Reduce the hazard, yes, sir.

19  Q.   And what's the third and last risk -- yeah, risk analysis

20  step?

21  A.   Well, you phrased them differently than I would.

22  Q.   Go ahead.

23  A.   We -- and this is -- this is not my rule, this is the

24  National Safety Council's hierarchy.

25       If possible, remove the hazard.  If you can't remove

BELLA - CROSS - VESPER

1  the hazard, guard against the hazard, and if you can't guard

2  against the hazard, then warn about the hazard.

3  Q.   Okay.  Now, the least effective of those methods of

4  either eliminating, reducing -- by the way, we're talking

5  about risk or hazard of serious injury or death.  So we're

6  talking about serious risks.

7  A.   Yes, sir.

8  Q.   All right.  So the least effective of the -- of the risk

9  removal or hazard removal method is to put up a sign that

10  warns people of the risk of serious injury or death, isn't it?

11  A.   Well, I would say that depends on the individual.

12  Certainly, I read signage and follow rules to the best of my

13  ability.  I can't say that everybody does, but having operated

14  aquatic facilities for many, many years, I can tell you that

15  many people do read the rules and some people don't.

16  Q.   Which is the least effective of risk removal?

17  A.   Again, it would depend on the individual.

18  Q.   All right.  If you post a sign, but the risk remains and

19  you can -- again, feasibly and reasonably remove the risk, you

20  should, shouldn't you?

21  A.   If reasonable, yes, sir.

22  Q.   Yeah.

23        THE COURT:  In a water facility, you can never remove

24  the risk of drowning.

25        THE WITNESS:  Not entirely, no, sir.

1154

BELLA - CROSS - VESPER

1          THE COURT:  Yeah, it's impossible.

2          THE WITNESS:  Correct.

3          THE COURT:  Somebody goes in the water, who knows,

4   has a cramp, has a heart attack, you can't eliminate the risk

5   of drowning, can you?

6          THE WITNESS:  No, sir, not completely, although we

7   will do our level best.

8   BY MR. VESPER:

9   Q.   And so other than, you know, filling in the lake, there

10  are ways of reducing the risk of drowning, aren't there?

11  A.   Yes, sir.

12  Q.   And is one of them patrolling the area?  Not having a

13  lifeguard, that's one way, but I'm talking about just

14  patrolling on a regular basis, regular patrol.

15  A.   Well, at the moment that the patrol is there, yes, sir.

16  Q.   Well, after a few months or seasons or years go by and

17  people know that a regular patrol is coming by, doesn't that

18  develop a culture within a facility that the area is being

19  monitored and the rules are being enforced?  Doesn't it?

20  A.   It certainly could, sir.

21  Q.   Okay.  So even with the sign, if you post the sign and it

22  is feasible to -- let me just talk about feasibility.

23          Do you know whether the -- there was a roving patrol at

24  the Pine Haven camp?

25  A.   There was, I believe, on Fridays and Saturday evenings.

BELLA - CROSS - VESPER

1   Q.   And do you know how much more it would have cost for the

2   roving patrol to have been there for the same hours or for

3   different hours -- well, let me use this.

4        From the time of closing up until 1 or 2 o'clock in the

5   morning for the entire summer between Memorial -- when I say

6   the summer, Memorial Day to Labor Day.  Do you know what the

7   cost of that would be?

8   A.   No, sir.

9   Q.   You read Mr. Miller's testimony, did you not, Tim Miller?

10  A.   Yes, sir.

11  Q.   And wasn't there -- did Pine Haven spend $15,000 for a

12  couple hundred trees that were planted?

13       THE COURT:  I'm -- don't answer that question.  I'm

14  striking it.  I'm striking the question.

15  BY MR. VESPER:

16  Q.   Would it have cost more or less than $15,000 for Pine

17  Haven to have a roving patrol?

18       THE COURT:  For what, a month, a week, a year, four

19  hours, 20 hours?

20  BY MR. VESPER:

21  Q.   Did you understand that my question has to do with the

22  season, Ms. Bella?

23       THE COURT:  24 hours a day?  12 hours a day?  Seven

24  days a week?

25       MR. VESPER:  I'll try to --

*United States District Court*
*Camden, New Jersey*

BELLA - CROSS - VESPER

 1          THE COURT:  You can't answer the question unless you

 2     give her parameters.

 3     BY MR. VESPER:

 4     Q.  I'll try to give you parameters.  I'm not trying to

 5     confuse you.  Between time of closing and 1 or 2 -- when did

 6     the -- let me back up.

 7          When did the roving patrols stop the work that were

 8     paid for by the Pine Haven people for Fridays and Saturdays?

 9     A.  I don't know, sir.

10     Q.  As an aquatic safety expert, would you have some opinion

11     as to what would be the reasonable hours for a roving patrol?

12     A.  As an aquatic safety expert, I wouldn't count on a roving

13     patrol to control activity in the swimming lake.

14     Q.  For a roving patrol, is -- and -- this is a good time to

15     ask you.  Do you know what the majority of campgrounds do, if

16     they have swimming facilities, whether they have roving

17     patrols or not, the majority?

18          THE COURT:  Well, wait a minute.  Roving patrols

19     around the swimming area.

20          MR. VESPER:  Yes.

21          THE COURT:  Not necessarily around the 80 acres or

22     hundred acres of the park.

23          MR. VESPER:  It is also around the park in this case.

24     Please, let me state the question my way.

25          THE COURT:  Yeah, but you can't --

*United States District Court*
*Camden, New Jersey*

BELLA - CROSS - VESPER

1   BY MR. VESPER:

2   Q.   Have you heard --

3        THE COURT:  You've got to specify whether you're

4   talking about going around the swimming facility or around the

5   whole property.  Because that's a big difference.

6   BY MR. VESPER:

7   Q.   Have you been -- do you know how many camping grounds

8   there are in the United States?

9   A.   No, sir.

10  Q.   And I would take it that from your background and

11  experience, you have not been to 50 percent of all the

12  campgrounds in North America, have you?

13  A.   No, sir.

14  Q.   All right.  And I would take it, then, that you do not

15  know what the majority of the campgrounds in the United

16  States, who have aquatic facilities, I'm talking about

17  campgrounds, just camping facilities, those camping facilities

18  that do have aquatic facilities for swimming, do you know what

19  the majority of those camp owners and managers and operators

20  do, as far as roving patrols?

21  A.   No, sir.

22  Q.   Do you know what -- so you don't know what the best

23  practices are in the camping industry, do you?

24  A.   With regards to roving patrols?

25  Q.   With regard to roving patrols or with regard to -- yeah,

*United States District Court*
*Camden, New Jersey*

BELLA – REDIRECT – HERMESMANN

1  with regard to roving patrols.

2  A.  No, sir.  Again, my area of expertise is aquatic safety.

3  Q.  Your practice areas are listed, and you certainly are an

4  aquatic safety expert.

5       Your practice areas do not list camping facilities, do

6  they?

7  A.  No, sir.

8            MR. VESPER:  No further questions.

9            THE COURT:  Redirect.

10  (REDIRECT EXAMINATION OF MARIA BELLA BY MR. HERMESMANN:)

11  Q.  Ms. Bella, on cross-examination, you were asked some

12  questions about reasonableness.

13       Is there anything in this matter, based upon your

14  entire review, that indicates that Pine Haven did not behave

15  reasonably or within the industry standard?

16            MR. VESPER:  Could we just ask a more specific

17  question as to what he's addressing?

18            THE COURT:  The answer is -- it's no more vague than

19  any question you asked.

20       No, I'm going to allow that question.

21            MR. VESPER:  Very well.

22            THE WITNESS:  No, sir.

23  BY MR. HERMESMANN:

24  Q.  And your background certainly includes training of people

25  who work on lakes and campgrounds, correct?

*United States District Court*
*Camden, New Jersey*

BELLA - REDIRECT - HERMESMANN

1  A.   Yes, sir.

2  Q.   And you have extensive background relative to campground

3  lakes, is that correct?

4  A.   Yes, sir.

5  Q.   You were asked questions about signs that were up.

6       Did you have the opportunity, as part of your review,

7  to look at the Cape May County Department of Health inspection

8  that took place on July 21st, 2010?

9  A.   Yes, sir.

10 Q.   And what did that inspection report reveal to you?

11 A.   That signage -- required signage, state-required safety

12 signage was present at this facility, at the swimming lake,

13 three weeks prior to this incident.

14 Q.   As to surveillance cameras, is there any requirement

15 under the industry standard of reasonableness that there be

16 such cameras at a lake, at a camp?

17 A.   No, sir.  That's an optional item.

18 Q.   And I believe that you testified earlier about the rules

19 and regulations that are in writing at camp -- at Pine Haven,

20 is that correct?

21 A.   Yes, sir.

22 Q.   And do those rules and regulations indicate on Page 3

23 that there's no swimming permitted after dark?

24 A.   Yes, sir.

25 Q.   What's your understanding as to the number of miles that

BELLA - REDIRECT - HERMESMANN

1  are located, as far as roads, throughout the Pine Haven

2  campground?

3  A.   About four-and-a-half miles, sir.

4  Q.   And as to aquatic safety, is there any industry standard

5  that requires any roving patrol of a lake at a campground?

6  A.   No, sir.

7  Q.   What's the expectation --

8        THE COURT:  Before you -- you have no personal

9  knowledge of what is done in the industry, in terms of roving

10  patrols.  You just don't know.

11        THE WITNESS:  Only specific to the aquatic

12  facilities, sir.  As far as the whole campground, no, sir.

13        THE COURT:  You are familiar with roving patrols as

14  to aquatic facilities?

15        THE WITNESS:  Yes, sir.  That's not a common practice

16  in the industry, nor is it required in this application.

17        THE COURT:  Okay.  All right.

18  BY MR. HERMESMANN:

19  Q.   Under New Jersey's Sanitary Code for a specially-exempt

20  facility, what's the expectation regarding parental

21  supervision at a lake such as this one?

22  A.   Exactly what it would be at your backyard pool.  The

23  parent is responsible for supervising their child at this type

24  of home extension.

25  Q.   And under the Pine Haven written rules and regulations,

*United States District Court*
*Camden, New Jersey*

**1**  what's the expectation regarding parental supervision?

**2**  A.   Again, the requirement is for parental supervision when

**3**  children under the age of 16 are at the swimming pool or at

**4**  the swimming lake.

**5**  Q.   Any indication that Mr. and Mrs. Miller were not aware of

**6**  that?

**7**  A.   No, sir.  Mr. Miller testified that he was aware of the

**8**  rules.

**9**      MR. HERMESMANN:  Thank you.  That's all I have.

**10**  (RECROSS-EXAMINATION OF MARIA BELLA BY MR. VESPER:)

**11**  Q.   Now, you understand Mr. Miller is no longer a party in

**12**  this case.

**13**      THE COURT:  No, no.  Stop that.

**14**  BY MR. VESPER:

**15**  Q.   Is Mr. Miller --

**16**      THE COURT:  Mr. Miller has nothing to do with this

**17**  case.

**18**      MR. VESPER:  Then why -- the questions have been

**19**  asked about Mr. Miller.

**20**      THE COURT:  Yeah, but that's relevant on -- I don't

**21**  want to say anything, but it was certainly relevant what the

**22**  Millers did or told their children.  It has nothing to do with

**23**  them having been a party, not been a party.  They are not

**24**  currently parties to this case.

**25**      MR. VESPER:  Understood.

*United States District Court*
*Camden, New Jersey*

BELLA – RECROSS – VESPER

1  BY MR. VESPER:

2  Q.  Do you -- do you understand, Ms. Bella, that -- or let me

3  phrase it this way:  Do people who go to a campground have a

4  reasonable expectation, a right to assume that the campground

5  will enforce its rules?

6  A.  That's an interesting question.

7  Q.  Can you answer it?

8  A.  I believe it would be reasonable for them to expect rules

9  to be enforced.

10  Q.  Right.  And is it reasonable for anybody that goes to a

11  campground to be required to follow their children at all

12  times, like -- let me back up.

13      Is there a difference between supervision and direct

14  supervision?

15  A.  Yes.

16  Q.  Tell the ladies and gentlemen of the jury, what's the

17  difference between supervision and direct supervision?

18  A.  Supervision means generally watching children in an area.

19  Direct supervision means specifically watching that individual

20  child in a particularly dangerous environment.

21  Q.  Right.  It means actually following -- not necessarily

22  holding on, but you're with the child when you directly

23  supervise him, you're with that child, aren't you?

24  A.  Yes, sir.

25  Q.  Now, is it reasonable to assume that -- or back up.

BELLA - RECROSS - VESPER

 1        Is it reasonable for the owner/operator of a facility

 2   to assume that at all times, at all times, that -- and under

 3   all circumstances, not just for the water facility, but that a

 4   parent is going to directly supervise their child at all

 5   times?  Is that reasonable or unreasonable?

 6        THE COURT:  For a 14 year old.

 7        MR. VESPER:  Yeah, for a 14 year old.

 8        THE WITNESS:  I wouldn't expect that, no, sir.

 9   BY MR. VESPER:

10   Q.  You wouldn't expect an owner/operator to reasonably

11   expect that either, would you, if you were advising them as a

12   safety expert, correct?

13   A.  No, sir, I would not.

14        THE COURT:  Can I ask you --

15        THE WITNESS:  Yes, sir.

16        THE COURT:  Did the Millers warn the decedent and his

17   friend, Anthony, not to go into the water when there was no

18   parent -- when there was no adult present?

19        THE WITNESS:  Yes, sir, the boys were instructed not

20   to go swimming.

21        THE COURT:  Do you know, was it just once or multiple

22   times?

23        THE WITNESS:  I don't know, but I do know that that

24   instruction was given specifically right before Mr. Miller

25   left, just a few minutes before the boys went into the lake.

BELLA - RECROSS - VESPER

1          MR. VESPER:  Any other questions, Your Honor?

2          THE COURT:  No.

3    BY MR. VESPER:

4    Q.   Now, the extensive background that you have in

5    campgrounds --

6          THE COURT:  You're supposed to -- he had a very

7    limited redirect.

8          MR. VESPER:  He asked about her background and she

9    said she had extensive -- I am, I'm trying to limit myself to

10   what she testified to.

11         THE COURT:  All right.

12   BY MR. VESPER:

13   Q.   You did testify -- well, His Honor asked you some

14   questions a little while ago about whether you knew what the

15   standards were in the campground industry.

16        You said that your expertise is in the aquatic

17   industry, correct?

18   A.   Yes, sir.

19   Q.   And as far as what is done by the majority of campgrounds

20   within the campground industry, you don't have any personal or

21   professional understanding of what that is, you just include

22   the campgrounds into the overall aquatic, correct?

23   A.   Again, as I explained earlier, it doesn't matter where

24   you put the aquatic facility.  There is an industry standard

25   of care, whether you're a campground, a restaurant, a hotel, a

*United States District Court*
*Camden, New Jersey*

BELLA – RECROSS – VESPER

1   municipal complex, that is how I'm answering the question,

2   based on the aquatic industry standard of care.

3   Q.   The aquatic industry, right.  But when I asked you on

4   cross examination about, do you know what the best practices

5   are of campgrounds that have -- that have aquatic facilities,

6   you don't know the best practices, do you?

7   A.   No, sir, I have not done a survey of campgrounds.

8   Q.   That's -- that's what I wanted to get to.  The --

9        THE COURT:  All right.  You got to it.  Now go to the

10   next question.

11   BY MR. VESPER:

12   Q.   And the --

13        MR. VESPER:  Well, I thank you very much.

14        No further questions.

15        THE COURT:  Okay.  Thank you very much.  You can step

16   down.

17        MR. HERMESMANN:  Judge, we're going to need about ten

18   minutes to set up.

19        THE COURT:  Tell me who the next witness is.

20        MR. VESPER:  The economist --

21        MR. HERMESMANN:  I thought he was asking me.

22   Dr. Rubin.

23        THE COURT:  Okay.  How much time do you need?

24        MR. HERMESMANN:  Ten, maybe 15 minutes to set up.

25        THE COURT:  All right.  The next one, this is going

1   to be presented through videotape, and, although I advise you,

2   that it has the same force and effect as if it were given in

3   person.

4        It's just about a minute or two before 10 right now,

5   why don't we go to 10:15.

6            MR. HERMESMANN:  Thank you, Your Honor.

7            MR. CICCOTTA:  Thank you, Your Honor.

8            THE DEPUTY CLERK:  All rise.

9            (JURY EXITS; 9:59 a.m.)

10           THE COURT:  Okay.  I will see you all at 10:15.

11           RESPONSE:  Thank you, Your Honor.

12           (RECESS TAKEN 10:00 a.m.)

13           THE DEPUTY CLERK:  All rise.

14           (JURY ENTERS 10:21 a.m.)

15           THE COURT:  Everyone, please be seated.

16       Ladies and gentlemen, our next witness offered by the

17  defendant is going to be presented by videotape.  It was

18  taken, I guess, late last week.

19           MR. VESPER:  Friday, Your Honor.

20           MR. HERMESMANN:  Last Friday.

21           THE COURT:  Last Friday.  And it will be just like it

22  was done in court.  Defense counsel questions the witness on

23  direct exam, cross-examination by the plaintiff, and so forth.

24       What's important for you to know is that, No. 1, we --

25  from time to time use this technique when scheduling makes it

BELLA - RECROSS - VESPER

1   difficult for a particular witness to come to court at a

2   particular time, so that's in his control when we see the

3   witness.

4        The testimony is under oath and has the same force and

5   effect as if it were given live, right from this witness stand

6   and so with that, I'll turn it over to defense counsel.

7        MR. HERMESMANN:  Thank you, Your Honor.  I'm going to

8   play Dr. Rubin on videotape.

9        THE COURT:  First name?

10       MR. HERMESMANN:  Jeffrey.  If anyone has --

11       (Videotape played.)

12       THE COURT:  Excuse me, could you stop the tape for a

13  minute?  I have to take a slight break, so we will resume,

14  have the jury go out, I'll be back about ten minutes.

15       (RECESS TAKEN; 11:34 a.m.)

16       THE DEPUTY CLERK:  All rise.

17       (JURY EXITS 11:34 a.m.)

18       THE DEPUTY CLERK:  All rise.

19       (JURY ENTERS; 11:46 a.m.)

20       THE COURT:  Everyone please be seated.  My apologies

21  for the unexpected break.

22       Okay.  The videographer can continue.

23       (Videotape played.)

24       THE COURT:  Okay.  Thank you very much.

25       Counsel, do you have another witness?

*United States District Court*
*Camden, New Jersey*

BELLA - RECROSS - VESPER

1     MR. HERMESMANN:  I do not, Your Honor.  Other than

2  the submission of documents.

3     THE COURT:  Yeah, well, we're going to go out,

4  because I think both sides have documents that are going to go

5  in.

6     MR. CICCOTTA:  Yes, sir.

7     MR. HERMESMANN:  Other than that.

8     THE COURT:  They have been identified but they

9  haven't been marked yet.

10     MR. HERMESMANN:  We have three.

11     THE COURT:  We will go through both sides.

12     MR. VESPER:  All right, but there are some

13  photographs that haven't been yet identified but will be

14  identified.  That's it.

15     THE COURT:  Haven't been identified by whom?

16     MR. VESPER:  Well, if we need to, we can do this

17  outside the presence of the jury.  We don't have a photograph

18  of John.  We intended to do that, but we were rushing.  We

19  don't have a photograph of John.

20     THE COURT:  Do you have one here right now?

21     MR. VESPER:  Yes, yes, Your Honor.

22     No, I don't have them here at my fingertips, if we can

23  do that, it's not necessary.

24     THE COURT:  Okay.  Well, you have no problem of

25  putting a photograph of John in.

1       MR. HERMESMANN:  I'd like to see the photograph

2   before I --

3       THE COURT:  Well, obviously, but I'm going on the

4   assumption that we're talking about a photograph of a 14 year

5   old boy.

6       MR. VESPER:  Right, not the ones in the envelope.

7       THE COURT:  No, no, I understand.  But you rest then?

8       MR. HERMESMANN:  Subject to my documents.

9       THE COURT:  Subject to --

10      MR. HERMESMANN:  I rest.

11      THE COURT:  -- for both sides, we are going to do.

12      Now, do you have any rebuttal?

13      MR. VESPER:  I did, but you already ruled on that.

14      THE COURT:  What?

15      MR. VESPER:  I would, but Your Honor has already

16  ruled on that issue.

17      THE COURT:  Okay.  All right.  Now, just so the jury

18  knows what the order of march is, I plan tomorrow morning to

19  start closings.  Okay?  And the closings, of course, of

20  defense, we reversed the order of the openings and the defense

21  goes first and the plaintiff gives the second closing

22  argument.

23      I'm then going to read the charge to the jury, which I

24  know how long that's going to take.  That one, I can figure

25  out.  It's probably about 35, 40 minutes.  But, obviously, I

1  can't quite predict the length of the closings.  I will -- so

2  I really don't know whether the jury will start deliberating

3  tomorrow or whether, between the closings and the charge, we

4  use up most of the day and the jury will go out Thursday

5  morning.  I just don't know.

6          But -- so it looks like you will get the case for

7  deliberation, again, at either the end of the day tomorrow or

8  starting Thursday and we will sit Friday.  When I say "sit",

9  you will be deliberating on Friday, okay?  And you will do it

10 back there.

11         So I think I'm going to send the jury home now, because

12 we do have things to do, charge conference and things like

13 that.

14             MR. HERMESMANN:  Your Honor, no need for them to

15 remain, Your Honor.

16             THE COURT:  What?

17             MR. HERMESMANN:  I said it's certainly from our

18 perspective, no need for the jury to remain.

19             THE COURT:  Yeah, but I don't think they have to

20 remain here.

21         So again, my profound thanks to the jury and I will see

22 you tomorrow morning to start the closing arguments at 8:30.

23 Again, have a safe trip home, and --

24             THE JURY:  Don't talk, don't talk.

25             THE COURT:  Do not discuss the case with your family,

BELLA - RECROSS - VESPER

1  friends, loved ones, co-employees, space aliens, I can't

2  forget them, bus drivers, and don't do any manual research or

3  electronic research on this case.  You've got a lot to digest

4  that you've already heard in here, and so have a very safe

5  trip home.  Go home with my thanks.  Come in tomorrow morning

6  with my thanks, and I'll see you then.

7         THE DEPUTY CLERK:  All rise.

8         (JURY EXITS; 12:07 p.m.)

9         THE COURT:  Okay, everyone be seated please.

10        My plan is to start the charge conference as soon as

11  it's convenient for you folks.  If you'd like a little break,

12  you know, that's fine with me, whatever, to go through it.

13        I did receive this morning -- well, it was in one

14  package, but it was really two different items, in a way.

15  There was some original charges requested by Mr. Vesper and

16  then he copied, what I think is right from the charge book.

17        MR. VESPER:  And they now have a website, but you're

18  right.

19        THE COURT:  They got it in a website.  Most of which

20  is in my charge, so it's not --

21        MR. VESPER:  I didn't -- I may have missed it.  I

22  don't think that the voluntarily assumed duty charge was in.

23        THE COURT:  No, that's in -- you have that, but you

24  have it in the part that you originally drafted.

25        MR. VESPER:  I did?

BELLA - RECROSS - VESPER

1      THE COURT:  Yes.

2      MR. VESPER:  We did, but I --

3      THE COURT:  You definitely did, in the first two

4   pages and you had it twice, I think there were two charges

5   that went to that.  But I'm sorry, you attached from the

6   website most of which looks like I have, word for word, so I'm

7   not sure what's at issue there.

8      And so, do you want 15 minutes to just --

9      MR. VESPER:  I'd like to offer -- counsel has really

10  been -- I have to give compliments to Mr. Ciccotta, because he

11  did all that work, along with my partner Rudy.  But we have

12  the comparative negligence ultimate outcome charge, 7.31, if I

13  could --

14     THE COURT:  Well, I have it in the charge, so...

15     MR. HERMESMANN:  Judge, isn't the issue right now

16  what time we are coming back?

17     MR. VESPER:  Yes.

18     MR. HERMESMANN:  Can we get into this later?  I would

19  really like 12:45 if that's possible.

20     THE COURT:  Yes, first of all, there is a comparative

21  negligence charge, it's already in there.  But we will go

22  back, and the one that I have in there, is right from the

23  book.  I mean, you know, it's nothing, I -- I'm not a big fan

24  of creativity in charges.  I go for the tried and true, and,

25  you know, it's been used a hundred times before.

United States District Court
Camden, New Jersey

BELLA - RECROSS - VESPER

1       So let's do -- could we do exhibits right now?  Can we

2   get --

3           MR. VESPER:  No, we need a few minutes on the

4   exhibits, I apologize, because we -- I can't find the

5   photographs, but I will find them.  It's just I can't --

6           THE COURT:  Well, can we do all the other ones and

7   then when the photos come, we will mark that one in.  We have

8   about eight or nine here.  I just want to go through them.

9           Well, for instance, P-18, which is that big diagram of

10  the campground -- no, I'm sorry, P-1B, P-1B, it's that big

11  schematic.

12          MR. VESPER:  Right.

13          THE COURT:  Not to scale.  Are you offering it in

14  evidence?

15          MR. VESPER:  Yes.

16          THE COURT:  Any objection?

17          MR. HERMESMANN:  Same objection as before, Your

18  Honor, just regarding scale.

19          THE COURT:  Well, I'm -- I think that, given the

20  testimony, which made it clear where things were out of scale,

21  I think it's a useful diagram and I'm going to let it in.

22  Okay.

23  (PLAINTIFF EXHIBIT P-1B WAS RECEIVED IN EVIDENCE)

24          THE COURT:  The next was the photo of the whale

25  fountain.  That's P-6.  Are you offering P-6?

*United States District Court*
*Camden, New Jersey*

BELLA – RECROSS – VESPER

1          MR. VESPER:  Yes, Your Honor.

2          MR. HERMESMANN:  I am objecting.

3          THE COURT:  I'm going to allow it in.

4          MR. HERMESMANN:  Judge, what's the relevance of this

5     whale?  I mean, the kids -- all the kids have testified --

6          THE COURT:  Shows the lake.  Hey, look.  As Tennyson

7     said, the Assyrian came down like the wolf in the fold.

8          If he tries to make an argument that isn't supported by

9     the evidence about the whale, he's going to regret the day he

10    did it.

11         MR. CICCOTTA:  Your Honor, may I say --

12         THE COURT:  On the other hand --

13         MR. CICCOTTA:  Your Honor, may I say, I think we may

14    be forgetting there was very clear testimony from Anthony

15    Dioscon that John, the deceased, was very interested and very

16    drawn to that whale.

17         THE COURT:  That night, nobody stopped at the whale.

18    The two people who went didn't stop at the whale, there was no

19    discussion when they went in.

20         MR. VESPER:  We agree.  Nobody stopped at the whale

21    but it was John's -- here's what you're cutting off.  You're

22    cutting off the right of the plaintiff to explain that John

23    intended to swim to the whale.  There's no doubt -- I agree

24    with what you just said.  What you just said is perfectly

25    correct in -- but it has to be put in context.  Nobody swam to

*United States District Court*
*Camden, New Jersey*

BELLA - RECROSS - VESPER

1  the whale.  However, John had expressed an interest to swim to

2  the whale, which -- come on, it's --

3      THE COURT:  What does that got to do with what

4  happened that night, with whether -- what does that have to do

5  with whether there were adequate -- well, I will, if all

6  you're going to say is -- you'll say it expressed an interest

7  in swimming to whale.

8      MR. VESPER:  That's it.

9      THE COURT:  But if you get into what's clearly

10  attractiveness, I'm not going to allow it.  This case is not

11  an attractive nuisance case.

12      MR. VESPER:  You told me in chambers and I think also

13  on the record, never put those two words together, never in

14  this case, attractive and nuisance.  I haven't done that.

15      THE COURT:  No, you haven't.  I agree.  And I'm not

16  arguing with you on that.

17      MR. HERMESMANN:  He certainly described it as an

18  attraction.

19      MR. VESPER:  I did not.

20      MR. HERMESMANN:  He hasn't utilized the word

21  nuisance.

22      MR. VESPER:  She said amenity.  Emphatically she said

23  --

24      MR. HERMESMANN:  I would appreciate when I speak, if

25  I could just finish my sentence and I will certainly give the

BELLA – RECROSS – VESPER

1  same courtesy to Mr. Vesper.

2          MR. VESPER:  I apologize.

3          MR. HERMESMANN:  The word "attraction" has been used,

4  I'm going to estimate five times.

5          THE COURT:  Okay.

6          MR. HERMESMANN:  And the record will bear it out.

7          THE COURT:  If there's -- there's nothing in this

8  case, that in my view that suggests that the presence of the

9  whale increased the risk of drowning, but -- so that's fodder

10 for you when you close this.

11         MR. HERMESMANN:  Well, I don't get to go after him.

12         THE COURT:  No, no, I will let you.  If he tries to

13 make it -- what -- even if he doesn't use the words attractive

14 nuisance, if he tries to tie the risk of drowning to that

15 whale, I'll give you a rebuttal.

16         MR. HERMESMANN:  Thank you, Your Honor.

17         MR. VESPER:  I believe --

18         THE COURT:  I'm telling you, that's not in this case.

19 It really isn't.

20         MR. VESPER:  And I respectfully disagree, but I'll

21 follow the Court's -- I'm going to follow the Court's order

22 despite the fact that I believe that there is enough evidence

23 for any reasonable person to conclude that if you have an

24 amenity, as the aquatic expert said, you have a water amenity

25 and within that amenity, you have an amenity, and that other

BELLA - RECROSS - VESPER

 1   amenity is this whale.

 2          THE COURT:  But that has nothing to do with the

 3   drowning.  If anything, the presence of that little thing in

 4   the center reduces the risk of drowning because that's the

 5   place that you could stop in the middle of your swim.

 6          MR. VESPER:  In the middle of the 15-foot lake,

 7   that's in the deepest part of the lake.

 8          THE COURT:  Yeah, but if you were going across the

 9   lake, as the two kids did in this case, and suddenly you were

10   floundering, you would have a place to grab onto.

11          MR. VESPER:  Your Honor has already ruled.  I'll

12   follow Your Honor's ruling, despite my --

13          THE COURT:  Okay.  I'm going to let the picture --

14   I'm going to let the picture in.

15          MR. VESPER:  I know that.  I'm just saying, I'm going

16   to follow your ruling but I've made my exception to your

17   ruling.

18          THE COURT:  Okay.

19          MR. VESPER:  I'm only going to refer to it as the

20   amenity that the aquatic expert said was there.

21          THE COURT:  We will have to get three circuit judges

22   who are swimmers and they'll -- we will see what they say.

23          MR. VESPER:  I would prefer three circuit judges who

24   not only swim, but have children.

25          THE COURT:  Oh, well, some of them definitely do.

BELLA - RECROSS - VESPER

1           MR. VESPER:  I'm sure.

2           THE COURT:  I could tell you that.

3   (PLAINTIFF EXHIBIT P-6 WAS RECEIVED IN EVIDENCE)

4           THE COURT:  Okay.  The photos of D-39, now that would

5   be defense exhibit.  Are you offering that?

6           MR. HERMESMANN:  I am.  That's the blowup of the --

7           MR. VESPER:  No objection.

8           THE COURT:  Okay.  That will be in evidence.

9   (DEFENDANT EXHIBIT D-39 WAS RECEIVED IN EVIDENCE)

10          THE COURT:  P-3.  I just have the words pre-2010.

11      What is P-3?

12          MR. VESPER:  We don't know.

13          THE DEPUTY CLERK:  I have it down as a brochure.

14          MR. VESPER:  Oh, that's the -- thank you very much.

15  The brochure of the Pine Haven.

16          THE COURT:  Is it like a small version of the big

17  blowup?

18          MR. VESPER:  It's a small version, yes.  It's the

19  color --

20          THE COURT:  It includes, at least, that drawing in

21  miniature.

22          MR. VESPER:  It does, it includes that drawing in

23  miniature.

24          THE COURT:  Okay.  Are you offering it -- I assume

25  you're offering it.

*United States District Court*
*Camden, New Jersey*

BELLA - RECROSS - VESPER

1      MR. VESPER:  Yes, Your Honor.

2      THE COURT:  Any objection?

3      MR. HERMESMANN:  I would just like to see it, Your

4  Honor.  I think it's more than just that blowup.

5      THE COURT:  It is, I said it has that, and it has

6  other text in it.  We should have it.

7      MR. VESPER:  Here it is.  No, you don't have it.  We

8  found it.  It wasn't in evidence.

9      MR. HERMESMANN:  I don't think it was utilized, Your

10 Honor, so I'm not sure of the relevance of it.

11     THE COURT:  Well, it shows what they saw, you know,

12 when they were going through the process of selecting a

13 campground.  I'm going to allow it.

14 (PLAINTIFF EXHIBIT P-3 WAS RECEIVED IN EVIDENCE)

15     THE COURT:  D-1 is the photo of the lake.  It's a

16 defense exhibit.

17     MR. HERMESMANN:  We are moving that into evidence.

18     THE COURT:  Any objection?

19     MR. VESPER:  No objection.

20     THE COURT:  Okay.  D-1 in evidence.

21 (DEFENDANT EXHIBIT D-1 WAS RECEIVED IN EVIDENCE)

22     THE COURT:  Now, the next one is the -- it's an

23 inspection certificate, I think that's the word, it was D-40,

24 and it was by the Cape May County Department of Health, I

25 believe.

BELLA - RECROSS - VESPER

1            MR. HERMESMANN:  It's already in evidence.

2            MR. VESPER:  Over my objection, but you ruled.

3            THE COURT:  You're right, it is in evidence.  I even

4    have it here in evidence.  See, I do have that.

5        Okay.  Next one is D-41 which is a signage photo.

6            MR. HERMESMANN:  We are moving that into evidence.

7            MR. VESPER:  No objection.

8            THE COURT:  Okay.

9    (DEFENDANT EXHIBIT D-41 WAS RECEIVED IN EVIDENCE)

10           THE COURT:  Can I please have the -- that's D-41.

11       The next is D-17, which I think is what I have right

12   here, it's the Pine Haven rules and regulations and it was

13   marked originally Jordan 8 or something like that, but I think

14   we gave it the number of D-17.

15           MR. HERMESMANN:  And do you have all three pages,

16   Your Honor?

17           THE COURT:  I have here one -- come on, two, three.

18           MR. HERMESMANN:  We're moving that into evidence.

19           MR. VESPER:  No objection.

20           THE COURT:  Okay.  Pine Haven rules and regs in

21   evidence.

22   (DEFENDANT EXHIBIT D-17 WAS RECEIVED IN EVIDENCE)

23           THE COURT:  The next -- this is funny, I have P-5,

24   which would be you, Mr. Vesper, Page 1 of the Pine Haven

25   brochure.  Is that duplicative of what's already there?  You

BELLA - RECROSS - VESPER

1  marked it.

2          MR. CICCOTTA:  It may be a duplicate.

3          MR. VESPER:  That's probably a duplicate.

4          THE COURT:  So I don't have to.

5          MR. CICCOTTA:  We won't need that.

6          MR. VESPER:  We won't need that.

7          MR. CICCOTTA:  Now that you have the full brochure

8  admitted, we won't need that.

9          THE COURT:  Yeah.  Now, I have another P-3, brochure

10  for Pine Haven, and we also have it already in evidence as --

11  oh, P-3 is here twice, so we don't need it a second time.

12  It's in once.

13          MR. VESPER:  Right.

14          THE COURT:  Okay.  Okay.  The diagram by Ms. Wheeler,

15  I have as D-42.

16          MR. VESPER:  No objection.

17          THE COURT:  Okay.  You're offering it, I assume,

18  Counsel?  Counsel?

19          MR. HERMESMANN:  Yes, Your Honor, I am.

20          THE COURT:  Okay.  Then D-42 is in evidence.

21  (DEFENDANT EXHIBIT D-42 WAS RECEIVED IN EVIDENCE)

22          THE COURT:  And the last one was a Pine Haven video.

23          MR. VESPER:  That was P something.

24          THE COURT:  It's -- it is P something, yes.  It was

25  P-36, actually.

*United States District Court*
*Camden, New Jersey*

BELLA – RECROSS – VESPER

**1**          MR. VESPER:  There was no sound, because the way it

**2**     was explained to me, prior to her testimony, was that she had

**3**     seen what was on the video, as it developed, she saw pictures,

**4**     but not the actual video.  But now that the jury has seen the

**5**     pictures that are in the actual video, but not listened to it,

**6**     perhaps -- unless the sound could be taken out, we shouldn't

**7**     even admit it into evidence.

**8**          THE COURT:  Well, I don't know -- if you're not

**9**     moving it, I have no problem -- if that finishes the -- he's

**10**    not moving it, so...

**11**         MR. HERMESMANN:  In fact, Your Honor, I'd like this

**12**    jury instructed -- a curative instruction that they should

**13**    ignore whatever they saw on that video.  The offer of proof,

**14**    if I could, the offer of proof was that this witness was going

**15**    to get on the stand and testify that she reviewed this video

**16**    before she ever went to the campground.  That was the offer of

**17**    proof.

**18**         I represented to the Court that it was then made in

**19**    2013.  The witness then gets on the stand, the question is,

**20**    have you ever looked at the website?  She said, yes.  I

**21**    objected as to foundation when the plaintiff then moves to

**22**    show the video.  The foundation was never met and this jury

**23**    ought to hear that.

**24**         MR. VESPER:  I believe the foundation was met in this

**25**    regard:  We believed from what she was telling us, and it was

*United States District Court*
*Camden, New Jersey*

BELLA - RECROSS - VESPER

 1  coming in in dribs and drabs that she saw the pictures on the

 2  video.  She was referring to the website.

 3      Now, the fact that we showed a moving picture of the

 4  pictures that she saw, does that -- did that prejudice the

 5  defense at all?  You haven't heard one word that anything they

 6  saw in any way prejudiced that.  And here's why, because the

 7  moving pictures were the same things that she saw on the

 8  two-dimensional thing.

 9      THE COURT:  Save your oxygen.  The -- I'm going to

10  let it in, but what --

11      MR. VESPER:  No, no, he didn't move it in.

12      MR. HERMESMANN:  I didn't move it in.

13      THE COURT:  Then he's not moving it in.

14      MR. HERMESMANN:  No, he wants a curative instruction.

15  It never should have been shown.

16      MR. VESPER:  Well, that was very succinct.  Did I

17  respond to --

18      THE COURT:  Okay, No. 1, I'm not putting it in

19  evidence because he's not moving it into evidence.  That's

20  simple.

21      MR. VESPER:  Right.

22      THE COURT:  As to a curative instruction, I didn't

23  see anything in that movie that would prejudice the jury, and

24  I'm not going to give a curative instruction, and I think that

25  would serve only to confuse the jury rather than elucidate.

**1**        MR. HERMESMANN:  The plaintiffs, through counsel,

**2**  they think it's important to show the video.  What the reason

**3**  is, I don't know.  That's not for me to get inside their mind

**4**  to do so.

**5**        THE COURT:  Well, he can't refer to it.  He hasn't

**6**  moved it into evidence, so he can't refer to it, it's not in

**7**  evidence.

**8**        MR. VESPER:  Right, I'm not going to refer to it.

**9**        THE COURT:  He can't refer to it, he can't.  And I

**10**  did see -- I was here when it was played.  I think I was.

**11**  Have I been on the bench most of the time?

**12**        MR. CICCOTTA:  You've been here, Judge.

**13**        MR. VESPER:  You've been here most of the time.

**14**        THE COURT:  Judge Wiener -- I tell you, Judge Wiener,

**15**  he used to go off the bench.  He'd let the case go on, he'd be

**16**  trying a case and he went off the bench to do something else.

**17**  Charlie.

**18**        But I'm not going to give a curative instruction.

**19**  Look, if you can point to something to me that you think is

**20**  prejudicial, I may reconsider.  But right now, from my own

**21**  memory, I don't see anything that would confuse the jury or be

**22**  unfair.  That covers everything that so far we have.  Yes --

**23**  except for photos.

**24**        MR. VESPER:  Right.

**25**        THE COURT:  And as I say, so long as we have a plain,

BELLA – RECROSS – VESPER

1  ordinary, I mean, not prejudicial photo of any kind, I think

2  the jury is entitled to have a sense of what he looked like.

3           MR. VESPER:  There's two sets of photographs.

4           THE COURT:  Do you have them?

5           MR. VESPER:  Yes.

6           THE COURT:  Oh, you found them.

7           MR. VESPER:  Oh, no, we didn't.  But here's the two

8  sets.

9           THE COURT:  Why do we need sets?

10           MR. VESPER:  There's one set of John, there's three

11  photos.  John at a birthday party, John showing his hand, in

12  part, and John with, I think, with his mom, and that's --

13  that's the three photos.

14           THE COURT:  Well, I have to see those.

15           MR. VESPER:  I know you do, and so does Counsel.

16  Counsel has to see them.  Then there's another set -- well,

17  these are that in the envelope.

18           THE COURT:  Well, that's the autopsy.

19           MR. VESPER:  P-35 that you said you would rule on,

20  and three of the experts that testified relied on them.

21           THE COURT:  I'm not going to admit the autopsy

22  photos, not a chance, but...

23           MR. VESPER:  I'm not going to show them, but

24  shouldn't the jury have the chance --

25           THE COURT:  That doesn't help them on any issue in

*United States District Court*
*Camden, New Jersey*

1    this case.  All it does is inflame them.

2         MR. HERMESMANN:  There's a difference between

3    reviewing them and relying on them.  None of the experts

4    indicated that they relied upon those photographs to reach

5    their opinions.

6         THE COURT:  I will -- though I do want to rule on the

7    other photos, but -- when will we have those?

8         MR. VESPER:  If you just -- if I may have a moment,

9    Your Honor.

10        There's one -- this was taken only about a month prior.

11   This is a birthday photograph.

12        THE COURT:  Can I see it?

13        MR. VESPER:  This has got -- it's got the holes in

14   it.  Where is the original?  We would like to find the

15   photographs that have no holes punched in them.

16        THE COURT:  Well, I'll substitute them should you

17   find them.

18        MR. VESPER:  Right.  But that's the closest in time

19   that we have to --

20        THE COURT:  Who is the --

21        MR. VESPER:  -- death.

22        THE COURT:  Who is the young lady in the picture?

23        MR. VESPER:  That's his sister.

24        THE COURT:  That's his sister?

25        MR. VESPER:  Who has testified, Odalie.

BELLA - RECROSS - VESPER

1            THE COURT:  Yeah.  Do you have any others?

2            MR. VESPER:  Right.  And the other two, one --

3            THE COURT:  Have you shown them to counsel?

4            MR. HERMESMANN:  I haven't seen them.

5            MR. VESPER:  Sorry.

6            THE COURT:  Here's the birthday party.  Here's --

7            MR. HERMESMANN:  I might have seen them at some

8     point.

9            MR. CICCOTTA:  These were referenced in the pretrial

10    order.  These were referenced in the trial exhibits that

11    Mr. Hermesmann and I --

12           MR. HERMESMANN:  I'm not saying I've never, ever seen

13    these photographs.

14           MR. VESPER:  I know, I know.

15           MR. HERMESMANN:  I'm not saying I haven't seen them

16    in this context that they're being offered.

17           THE COURT:  You guys could argue on who should march

18    in a one-man parade.

19           MR. HERMESMANN:  I vote for Mr. Vesper.

20           MR. VESPER:  Hey, I have to follow the general's

21    orders once the -- and the judge.  Everybody here outranks me.

22           THE COURT:  Actually, I think the warrant officer is

23    the coolest rank of all.

24           MR. VESPER:  Here's the finger.

25           THE COURT:  And this one is his mother?  The woman

United States District Court
Camden, New Jersey

BELLA - RECROSS - VESPER

1  he's hugging?

2          MR. CICCOTTA:  No, that's an aunt.

3          THE COURT:  And what's the other one?

4          MR. VESPER:  Well, and then the final photograph has

5  been marked P-17.  This shows the fingers and his mom, or the

6  side of his mom.

7          MR. HERMESMANN:  Are these the fingers?

8          MR. VESPER:  Yeah.  These are the fingers that --

9          MR. HERMESMANN:  Truth is, I have an objection to all

10  three, but I will wait until we're done.

11          THE COURT:  Can I see it?  I haven't seen it.

12          MR. VESPER:  Sure.

13          THE COURT:  All right.  Counsel, would you like to

14  see them?  Would you like to have them in your hands?

15          MR. HERMESMANN:  I would.

16          THE COURT:  Okay.  I'm going to call them, by the

17  way, 17A, 17B and 17C.

18          MR. HERMESMANN:  Your Honor, I concur that the

19  plaintiff is permitted to put in a picture of the plaintiff so

20  this jury has an idea of who -- what John Toribio looked like,

21  the individual we've been talking about for the last week and

22  a half.

23      I do not concur that he should be permitted to put in a

24  photograph of himself being hugged by his sister, another by

25  an unknown aunt, and to the extent that the third photograph

*United States District Court*
*Camden, New Jersey*

BELLA - RECROSS - VESPER

1   is meant to show his hand, my suggestion would be that we crop

2   out the other individual, whoever she may be, and then allow

3   it to go in in that fashion.

4        MR. VESPER:  Since when is a plaintiff limited to one

5   photograph?  I never heard that rule before.  I've seen

6   scrapbooks come in, not that that would happen here, but

7   here's the point:  One photograph shows him --

8        THE COURT:  Don't argue that point.  There is no --

9   there is no one photo rule that I'm aware of.

10       MR. VESPER:  Right.  So we have a photograph of him

11  --

12       THE COURT:  Don't argue that point.

13       MR. VESPER:  All right.  We have a photograph that

14  shows him very close in time to his death.  We have another

15  photograph that shows some scale, him, and they've already met

16  Odalie, and now we have a photograph that now the defense

17  wants cropped?  Why, because it shows his mom?  That doesn't

18  prejudice anybody.  This photograph shows the hand that

19  Dr. Manion made such a big issue about that contributed to his

20  drowning.  There it is.  His hand is in the photograph and you

21  could see the deformity is two shortened fingers.

22       THE COURT:  How does it relate to the duties and

23  obligations of the --

24       MR. VESPER:  It doesn't relate to the --

25       THE COURT:  -- Pine Haven that --

1    MR. VESPER:  It relates to what they've heard.  The

2  jury heard their expert.  I didn't make it an issue, their

3  expert, Dr. Manion said, that the deformed hand contributed to

4  the drowning.  I want, in my summation, to show the jury how

5  ridiculous that Doctor was.  Look at the hand.

6    MR. HERMESMANN:  Actually, plaintiff did make an

7  issue because it did not come out on his direct examination,

8  it came out during his cross-examination.

9    MR. VESPER:  That is not true.  That is absolutely --

10  and I'm not saying that he said that intentionally.  That is

11  totally incorrect.  It came out in his direct.  Otherwise, I

12  was not going to deal with it in cross.  I dealt with it in

13  cross, if you remember, and then he wouldn't answer even your

14  question.

15    I mean, I said to him, are you -- you're telling me the

16  deformity contributed to drowning?  Yes.  How big was the

17  deformity?  I don't know.  I mean...

18    MR. HERMESMANN:  Your Honor, if I could.  I didn't

19  object to the picture of the hand.

20    MR. VESPER:  Oh, good.

21    MR. HERMESMANN:  I objected to the mother being part

22  of the paragraph.

23    MR. VESPER:  Right.

24    MR. HERMESMANN:  That's the basis for the objection.

25    MR. VESPER:  If one could take the mother out of the

BELLA - RECROSS - VESPER

1   photograph, that's -- and there's a reason for that?

2            THE COURT:  Anything else?

3            MR. HERMESMANN:  I guess my question is, what's the

4   reason of having the mother in the photograph?  That's

5   probably the more poignant question.

6            MR. VESPER:  Yeah, that's his mother, she's the

7   plaintiff, and again, this goes to -- is this too cumulative,

8   a third photograph?  I urge the Court to see that we've been

9   reasonable in our selection.

10            THE COURT:  You know, one thing I've learned over

11   many years, 50, being a lawyer, every piece of evidence can

12   favor both sides, depending on how it's spun, okay?  To the

13   extent that it's shown that he was a very well-behaved boy

14   with his mother, you know, did what she wanted, if you can't

15   figure out how that's a negative factor for the plaintiff,

16   you're not as smart as I think you are.

17            And you want that out?

18            MR. VESPER:  No.  I want it --

19            THE COURT:  You want it in, I mean?

20            MR. VESPER:  In, yes.

21            THE COURT:  All right.  I'm going to leave it in.

22            MR. VESPER:  Thank you.

23            THE COURT:  I'm going to admit all three of them.

24   Let's have them, 17A -- let me take these until you get the

25   better ones.

BELLA - RECROSS - VESPER

**1**         MR. VESPER:  Right.

**2**         THE COURT:  Let me have those until --

**3**         MR. VESPER:  Thank you, Your Honor.

**4** (PLAINTIFF EXHIBITS P-17A, P-17B and P-17C WERE RECEIVED IN

**5** EVIDENCE)

**6**         THE COURT:  And as I say, if you can get ones without

**7** holes, you know, or something in the sides, I will --

**8**         MR. VESPER:  Then we have -- because I have to show

**9** counsel, but I can't find them, we have aerials of the camp,

**10** showing the camp looking -- an aerial view looking down

**11** showing the entire camp and an aerial close-up of the lake --

**12**         THE COURT:  When was that done?  I never heard about

**13** that one.

**14**         MR. VESPER:  No, we didn't mark them.  But I would

**15** like to have them marked and represent to the Court, we can

**16** certainly link them up, but they show more of the --

**17**         THE COURT:  Can I see it?

**18**         MR. VESPER:  Sure.  This is the close-up.  I can't

**19** find the one of a distance, distance shot.

**20**         This was premarked P -- yeah, here they are, we found

**21** them.  It's P-8A, B and C, just to show scale.

**22**         THE COURT:  Can I see them?

**23**         MR. VESPER:  Yes.  Can we have that other photo back,

**24** please.

**25**         This, I think, both -- yeah, I think both.  I think all

1193

BELLA − RECROSS − VESPER

1  three photographs would help the jury to better understand the

2  scale, which the diagram does a pretty good job, but now, if

3  they really want to see what a hundred feet looks like for the

4  -- for the width of the shore line or the distance to the

5  basketball court, it's -- it orients them and it brings them

6  into clear --

7          THE COURT:  And you think this helps you?

8          MR. VESPER:  Yes.

9          THE COURT:  Something that emphasizes how small the

10 lake is helps you?

11         MR. VESPER:  Yes, Your Honor.

12         THE COURT:  I guess -- what do I -- what do I know.

13 Show it to -- show this one to -- well, show all three of them

14 to counsel.

15         MR. VESPER:  Right.  Because if you recall, in the

16 beginning, not now, because it's already in, there was a big

17 issue made about the scale of the diagram.  It's not an issue

18 anymore, but just in case somebody on the jury wants to see,

19 it's for scale, here's for scale.

20         MR. HERMESMANN:  The objection is as to foundation.

21 I mean, if we're going to take a document that no witness has

22 referred to, there's been no reference to it and I haven't had

23 a chance to counter it, some of it, actually, I just picked

24 out a real quick one that's not accurate as to how the camp

25 was in 2008, so -- or 2010.

*United States District Court*
*Camden, New Jersey*

BELLA – RECROSS – VESPER

 1        THE COURT:  '10.

 2        MR. HERMESMANN:  From a foundational perspective, I

 3   believe it's improper.

 4        THE COURT:  You may find this strange, I think I'm

 5   helping Mr. Vesper.  I'm not going to admit those.  I have to

 6   -- how can I explain to the jury that I need testifying as to

 7   what those things show and what they represent, when they were

 8   made.  You say they're to scale, maybe they are to scale, I

 9   don't know, but I don't see -- I see a minuscule probative

10   value and I see no witness that could -- the only thing it

11   does show to me is how small the lake is, but that's -- I call

12   it the lake, the swimming lake.

13        All right?

14        MR. CICCOTTA:  If Your Honor --

15        THE COURT:  That's taking care of the evidence.

16        P -- do you have numbers on those, by the way?

17        MR. VESPER:  We did.  It was P-8A, P-8B, P-8C and

18   there is -- my co-counsel reminded me, there was a chart that

19   Professor Tinari redid.

20        THE COURT:  Well, he can rely on things not in

21   evidence.  An expert doesn't have to -- he's not limited to

22   relying on things in evidence.  You know that.

23        MR. VESPER:  We would ask that the -- Professor

24   Tinari's chart, with the four columns, this has to be marked,

25   but we would ask that this go into evidence.

*United States District Court*
*Camden, New Jersey*

BELLA - RECROSS - VESPER

1        MR. HERMESMANN:  I would object.  I believe it can

2   be --

3        THE COURT:  Yeah, I never heard of a chart prepared

4   by a witness -- you know, you can, when you're doing your

5   closing, you know, create a chart and you can write numbers

6   down that you think -- you can say, for this category, it's

7   this.

8        MR. CICCOTTA:  That's our intention.

9        THE COURT:  It might well duplicate most of that, if

10  not all of that.

11       MR. CICCOTTA:  That's what --

12       THE COURT:  That's different, that's not evidence.

13       MR. CICCOTTA:  And that's exactly, Your Honor, what

14  we've done.

15       THE COURT:  But everybody does it.

16       MR. VESPER:  Yes.

17       THE COURT:  I mean, when we have damage cases, it's

18  very common, you put the elements and you write each one.

19  Now, one little thing I'm going to point out to you, normally,

20  in the standard charge, funeral expenses are compensable.

21       MR. VESPER:  We're not introducing that.

22       THE COURT:  I know.  That was my point.  Is it -- I

23  heard no testimony as to -- as to funeral expenses.  So I just

24  want you to know I'm taking that out of the charge.

25       MR. VESPER:  Thank you, Your Honor.

*United States District Court*
*Camden, New Jersey*

1     THE COURT:  Okay.  Now, when do you want to have the

2  charging conference?  I'm free till 3 o'clock and then I have

3  to give somebody more months in jail than you care to

4  consider.

5     MR. HERMESMANN:  I'm requesting 1:15, Your Honor.

6     THE COURT:  Is that okay with you?

7     MR. VESPER:  Yes, Your Honor.

8     THE COURT:  Okay.  Then we will meet in my chambers.

9     By the way, did you get a copy of what he gave you?

10     MR. HERMESMANN:  I did.

11     THE COURT:  Okay.

12     MR. HERMESMANN:  Well, assuming we got the same

13  thing.

14     THE COURT:  Well, I'm assuming he did.

15     MR. HERMESMANN:  I didn't review your copy.

16     MR. VESPER:  Come on, Joe.

17     THE COURT:  Hope springs eternal.  So I am hoping

18  that's the case.

19     MR. HERMESMANN:  I'm certain we got the same thing.

20     THE COURT:  All right.  To orient you to one thing,

21  though, just so you're not shocked by it, I believe that *Green*

22  *v. Bittner* does allow the deduction of the costs.  In other

23  words, it didn't reverse the old law.  All it did was create a

24  whole new category of compensable.  Because as the Court

25  actually said, you know, people were resorting to various

BELLA – RECROSS – VESPER

1  fictions to give damages, and they thought by creating this

2  new category of damages, there would be recovery, but it could

3  be recovered by plaintiffs, consistent.

4       On the other hand, I want to alert you to one thing

5  here, that -- and it goes -- kind of goes Mr. Vesper's way.

6  In the *Green v. Bittner* case, and many cases, you have a

7  family, let's say, a husband and wife.  They're both claimants

8  under the Death Act, they're both claiming a piece of the pie

9  and they both contribute to the upbringing.  In that case,

10 reducing the damage by that cost of finishing the upbringing

11 of the child to age 18 or age 21 makes some sense.

12      This case, and I'm going to allow argument on it, is a

13 little different.  We have the boy's natural father, who is

14 married, who has -- his own wife, and we have Mrs. Toribio's

15 current husband, and so far as I can tell, there's testimony,

16 and even that all three contributed, to some degree, to his

17 costs.  But it wouldn't be fair to deduct anything that either

18 of the men, either the natural father or the stepfather

19 contributed, because they're not claimants against the fund.

20 They're not seeking part of the fund, only the mother.

21      The father, who might have, has waived it and the other

22 one, I don't think under any circumstances would have had a

23 claim.

24      Well, I hope you follow what I'm saying, that it's one

25 thing --

BELLA - RECROSS - VESPER

 1          MR. VESPER:  Yeah.

 2          THE COURT:  -- to argue for a deduction when the

 3  people who are claimants to the fund are the ones paying the

 4  money out.

 5          But when I have two people, and even the father has

 6  said, somebody that was giving -- was paying money, there was

 7  numbers somewhere, was paying money for -- and certainly,

 8  there's every indication that his current stepfather, in other

 9  words, his mother's current husband is also contributing.

10  He's a working man.  He's contributing to the support of the

11  family, and neither one of those two are claiming the fund.

12          And I'm going to allow argument on that.  I mean, while

13  I think Mr. Vesper is wrong to say that *Green v. Bittner*

14  changed the old rule, because I think actually the reverse, I

15  think it affirmed the old rule.  But, this particular case is

16  very unique, in that we have two people who both have been

17  identified, has provided some support for the child, neither

18  of whom is a claimant to the fund, the would-be fund, the

19  damage claim.  And I think that's significant.

20          Now, one thing that -- and I'm going to let -- each

21  side can argue that, as they want.  I mean, Mr. Vesper can

22  argue it and defense counsel can argue it.  So that's fine.

23          But I notice that -- now *Green v. Bittner*, what, is 30

24  years old now, something like that?

25          MR. HERMESMANN:  30, 35 years.

*United States District Court*
*Camden, New Jersey*

BELLA – RECROSS – VESPER

1    THE COURT:  30 years –– what?

2    MR. HERMESMANN:  35 years old.

3    THE COURT:  35, 1980?

4    MR. HERMESMANN:  1985 case.

5    THE COURT:  *Green v. Bittner* is 35 years old and the
6  standard, let's call it the book charge in the New Jersey
7  standard charges doesn't charge one way or the other as to the
8  deductibility.  Just doesn't charge it, and I'm not going to
9  charge it.

10    I'm going to let it be argued, I'm going to let it be
11  argued and I've indicated to you the kind of wrinkle that
12  there is here, or wrinkles.  But I'm not going to charge it.
13  I'm not going to add a charge that 300 times has never been
14  given, to my knowledge.  So I think the jury can figure it out
15  and we'll go from there.

16    So I just wanted to put that on the record before you
17  came in here, because that's been a big issue, in a sense
18  throughout the case, and I disagree, again, with Mr. Vesper on
19  one point, but I also disagree with the expert, which suggests
20  that somehow or another the cost of upbringing is
21  automatically deductible when two of the three people
22  providing it are not –– are not claiming to the fund.  I sound
23  like an estate lawyer, the fund.

24    That's what my old partners at Woodruff English, they
25  like the fund, because they thought they would get their hands

BELLA – RECROSS – VESPER

1    on it and usually did.  At one point, a Chancery Judge in

2    Newark came in for a fee application.  The Judge looked up and

3    said, are you a residuary beneficiary of this estate?

4    So...but you all know what I mean.  Okay.  I will see you at

5    1:15.

6              MR. VESPER:  Thank you, Your Honor.

7              MR. HERMESMANN:  Yes, Your Honor.

8              (RECESS; 12:46 p.m.)

9              THE DEPUTY CLERK:  All rise.

10             (OPEN COURT; 3:37 p.m.)

11             THE COURT:  Okay.  Everybody, it's about 25 of 4 on

12   Monday.  For like the last two hours or so, we have been

13   having a charge conference --

14             MR. VESPER:  Massive two and a half.

15             THE COURT:  Two and a half.  We won't quibble among

16   friends.

17             MR. VESPER:  None of that was pointed out to me.  I

18   said we all thank you for the time and patience.

19             THE COURT:  Two and a half hours going over the

20   charge and the verdict sheet.  I had marked as C-1, I think,

21   and C-2, that is Court 1 and Court 2, the original version

22   that I distributed to the parties prior to the charge

23   conference, and we've since gone over that.

24             What I'm going to do now is, I'm going to go through

25   both the jury charge and the -- and set forth what I believe

BELLA – RECROSS – VESPER

1    we have agreed to, but to make sure we're all on the same

2    page, and then if either party has objections in the sense

3    that they think there are things I should have included or

4    should not have included that they want to object to, they can

5    put their objections on the record, and for whatever it's

6    worth, after I give the charge, I'm going to call you to

7    sidebar and ask, does anybody object.

8         Now, you can say, just incorporate all the objections I

9    made in the past.  However, if in hearing it, there's a new

10   objection that occurs to you that you didn't think of now, I

11   won't bar you –– I won't claim that you didn't have an

12   opportunity, because I believe when you hear it orally, there

13   may be something about the charge that you object to that you

14   didn't think of now, so don't worry if you –– that by not

15   saying anything now, you're like permanently waiving, because

16   I do give you another chance to object.

17        In other words, my object is to not to get you to waive

18   things.  I think the Circuit should be made busy, and I think

19   it's good for them and –– okay?

20        Now, let's start with the charge.  I have nothing on

21   Page 1, nothing on Page 2, nothing on Page 3, nothing on

22   Page 4, nothing on Page 5, nothing on Page 6.

23        Now, on Page 7, where it says:  Questions are not

24   evidence, we're going to add the word, on the very first line

25   of Paragraph 5, the words, "or the Court" after "counsel."

*United States District Court*
*Camden, New Jersey*

BELLA – RECROSS – VESPER

1    Do you see that?

2         MR. VESPER:  Yes, Your Honor.

3         MR. HERMESMANN:  Yes, Your Honor.

4         THE COURT:  Okay.  All right.  And I think both sides

5    agree to that.

6         Nothing on 8, nothing on 9, nothing on 10, nothing on

7    11, Page 11, nothing on Page 12, nothing -- no.

8         On Page 13, we're changing, to get the right names.

9    I'm taking out Kucsma, Duval, Thomas Cate.  Those three, I'm

10   taking out, because they didn't testify.

11        MR. CICCOTTA:  Yes, Your Honor.

12        THE COURT:  Okay.  So I'm going to cross those names

13   out.

14        MR. VESPER:  I have one -- do I make my objections

15   now or are you simply -- you're going to run through and then

16   we get up.

17        THE COURT:  Yes, just make a note for yourself.

18        MR. VESPER:  I will.  Thank you, Your Honor.

19        THE COURT:  Okay.  Now, on Page 14, there's a fair

20   number of changes.  First of all, in the first section, which

21   is 13.  Three lines from the bottom of 13, where it says,

22   "with regard to their operation or maintain," you have that?

23        MR. VESPER:  No.  Where is it?

24        THE COURT:  Three lines from the bottom, sentence

25   begins:  Defendants deny any negligence with respect to the.

*United States District Court*
*Camden, New Jersey*

BELLA - RECROSS - VESPER

1          MR. VESPER:  Oh, yes, I have it.

2          THE COURT:  Operation or maintenance, and after -- on

3     the second line, after the word, "standards."

4          Do you see that?

5          MR. VESPER:  Yes, Your Honor.

6          THE COURT:  Relating to lighting, signage, time of

7     use or employee patrols, and that -- so forth.  Okay?

8          MR. VESPER:  And my sole objection to that, it should

9     read, should -- did not breach any industry standards to

10    include.  I don't want them to be limited just to that,

11    because there's been other comments and testimony --

12         THE COURT:  All right.  I don't mind putting -- I'm

13    going to do that, "to include."  That's okay.

14         MR. VESPER:  Why don't we just say:  To include but

15    not be limited to.  Because we criticized this entire

16    operation of this lake as being almost nonexistent.

17         THE COURT:  Well, that's something he would want.

18    You don't mind that.

19         MR. HERMESMANN:  I don't mind.

20         THE COURT:  No, I'm talking --

21         MR. VESPER:  Excuse me, I'm making that request.

22         THE COURT:  What?

23         MR. HERMESMANN:  I don't mind that language, as just

24    suggested by Mr. Vesper.  The language that he just suggested,

25    which I think is pretty much the same as you've just indicated

*United States District Court*
*Camden, New Jersey*

BELLA – RECROSS – VESPER

 1  is fine.

 2          THE COURT:  What, "to include?"  I'm sorry.

 3          MR. HERMESMANN:  To include but not limited to.

 4          THE COURT:  You don't mind.

 5          MR. HERMESMANN:  No.

 6          THE COURT:  I didn't think so.

 7          MR. VESPER:  Right.

 8          THE COURT:  All right.  And now, in the next

 9  paragraph, which is 14, I have the following changes:  In the

10  one, two, three, fourth line down, after the word, "who," have

11  the phrase, "have been invited upon," or "have the right to be

12  on the premises."

13          See that?

14          MR. HERMESMANN:  I do.

15          THE COURT:  Okay.  And then after the word,

16  "premises," which is Line 4, I have a new sentence which reads

17  as follows:  "A person who enters the premises to purchase

18  goods or services from the owner or operator is deemed to have

19  been invited on to the property."

20          MR. HERMESMANN:  And I believe that is language that

21  would be more appropriate for a premises liability case as to

22  this case.

23          THE COURT:  Okay.  Well, you can say –– that's –– you

24  objected, but I'm going to add that.

25          MR. HERMESMANN:  Thank you.

*United States District Court*
*Camden, New Jersey*

BELLA - RECROSS - VESPER

1      THE COURT:  I think we have that -- still have the

2  concept of a business invitee.  Okay.

3      Believe it or not, I have nothing on Page 15.  In 16,

4  we changed -- in B, second paragraph, second line of B, we

5  changed the word, "the" to "a."

6      MR. HERMESMANN:  No objection.

7      THE COURT:  And I think that was Mr. Vesper's

8  suggestion.

9      MR. VESPER:  Yes, Your Honor.

10      THE COURT:  Okay.  That's the only change I have on

11  Page 16.

12      On Page 17, there will be a new paragraph between 15

13  and 16.  I'm trying to figure out where that is now.  Have I

14  lost it already?

15      Oh, it's a sanitary code language.

16      MR. VESPER:  Right, the sanitary.

17      THE COURT:  Why don't I have my copy?  Oh, I have it,

18  I do have it.  Okay.

19      Basically, we took out -- we took -- well, I'll just

20  read it:  The defendant, Pine Haven Campground, is a private

21  camping resort.  As such, it is subject to Chapter 9 of the

22  New Jersey State Sanitary Code entitled:  Public Recreational

23  Bathing.  Pine Haven is not required by the statute to have

24  lifeguards or first aid personnel in and around the man-made

25  swimming lake.  They are required, under the statute, to post

*United States District Court*
*Camden, New Jersey*

BELLA – RECROSS – VESPER

1   signs that state no lifeguard on duty.  Persons under the age

2   of 16 must be accompanied by an adult and no swimming alone.

3   In this case, Pine Haven alleges that it complied with the

4   requirements of the New Jersey Sanitary Code, and appropriate

5   signs were displayed at the lake.  Plaintiff alleges that Pine

6   Haven did not display appropriate signs at the lake and

7   negligently failed to manage its facilities and enforce its

8   own safety rules and regulations.  Whether in compliance with

9   the sanitary code -- with the New Jersey Sanitary Code by Pine

10  Haven amounts to reasonable care in the operation of the

11  swimming lake, must be determined by the jury based on all the

12  evidence.  You may, but are not required to consider that

13  compliance with the sanitary code amounts to reasonable care.

14          I hear dead -- deadly silence.

15          MR. HERMESMANN:  No objection from the defense.

16          THE COURT:  Any objection?

17          MR. VESPER:  No, Your Honor.

18          THE COURT:  Okay.  I thought you all had agreed to

19  this already.  Okay.  Let me attach this so I don't lose it.

20          Again, that's going to be what is 15 -- what is

21  currently 15 and 16.  Okay.

22          Nothing else on Page 17.  I have nothing on 18.

23          On 19:  1, survivorship is going to be divided into A

24  and B.

25          Do we have 1.7, Sanhita?

*United States District Court*
*Camden, New Jersey*

1      Oh, no, that's the charge.  That's what you're going to

2 get me.

3           MR. VESPER:  Yes, Your Honor.

4           THE COURT:  Okay.  Well, we're going to change the A.

5 We're going to change, "pain, comma, suffering, fear and

6 anxiety," there's only two.  Adding "fear and anxiety," and

7 then we're going to add that charge that's required in rule --

8 I think it's 1.7 B.

9           MR. VESPER:  1.71B.

10          THE COURT:  1B is in the New Jersey rules.  I'm

11 hoping you guys, before you leave here today, will get me

12 that.

13          MR. HERMESMANN:  My objection to adding "fear and

14 anxiety" in the --

15          THE COURT:  I know.

16          MR. HERMESMANN:  I just want to put it on the record.

17          THE COURT:  I know.

18          MR. HERMESMANN:  Fear and anxiety are a subset of

19 pain and suffering.  It's just more of the same.

20          THE COURT:  I understand.  Don't agree with you, but

21 I understand, which is something.  Okay.

22          On Page 20, I have -- in the very first, where it says,

23 "what is reasonable."  Do you see that?

24          At the very bottom, the paragraph on the bottom, "what

25 is reasonable."  Do you see that?

BELLA - RECROSS - VESPER

 1          MR. HERMESMANN:  "What is recoverable?"

 2          THE COURT:  "What is recoverable," of course.

 3      The last two words of the first line, I'm taking out.

 4          MR. VESPER:  Where?

 5          THE COURT:  Okay.  In A, I'm taking out the words,

 6  "with regard to the decedent's earnings," and replacing it

 7  with, "in determining the amount of moneys the decedent would

 8  have contributed to his mother," and then pick up with, "you

 9  should consider."  Okay?

10          MR. HERMESMANN:  No objection, Your Honor.

11          THE COURT:  That's Page 20.

12      Page 21 on Line 2, we're taking out the, "her," where

13  it says his/her.  Right?

14          MR. HERMESMANN:  I'm not sure where you are, Judge.

15          THE COURT:  Second line of Page 21.

16          MR. HERMESMANN:  Yes, correct.

17          THE COURT:  Very -- the end of Line 2.  I have no

18  other changes on 21.

19          MR. VESPER:  We had an objection to that on 21, but I

20  was going to go over --

21          THE COURT:  Okay.  Well, you do, I'll give your

22  objection later.

23          MR. VESPER:  Okay.  Thank you.

24          THE COURT:  Okay.  On 22, we may get objections here,

25  in the second full -- the second paragraph, Line 4, starting

*United States District Court*
*Camden, New Jersey*

BELLA - RECROSS - VESPER

1  with the sentence that begins on Line 4 with the word,

2  "companionship."

3          MR. VESPER:  Yes.

4          THE COURT:  Companionship in this sense, however,

5  will not include true nursing services unless you find that

6  the decedent had or was likely to have special training.

7          No testimony about specialized nursing training, and

8  I'm taking that out.

9          Nothing else on 22.  23, I have nothing.  24, I have

10  nothing.  25, I have nothing.  26, I'm taking out, "funeral

11  expenses," which begins at the very bottom of 26 and goes over

12  to the top of Page 27.  Okay?

13          MR. VESPER:  Yes, Your Honor.

14          THE COURT:  And on duty to deliberate, I have -- what

15  insert is that?  Oh, that's where -- that's the part where I'm

16  going to explain to the jury the verdict sheet, okay?  And I

17  think that's it.

18          So now I'm going to start.

19          Oh, yes.  What do you want?  Do you want to elect the

20  foreperson or do you want to choose Juror No. 1?

21          MR. VESPER:  Yeah, I would just go with No. 1 is

22  No. 1.

23          THE COURT:  Is that okay with you?

24          MR. HERMESMANN:  That sounds fine, Your Honor.

25          THE COURT:  Okay, then, you know, we have the same as

*United States District Court*
*Camden, New Jersey*

BELLA – RECROSS – VESPER

1    the other one.  We will clean that up.  Okay.

2         Now, I'm going to start with Mr. Vesper.

3         MR. VESPER:  Your Honor, just to go very quickly, we

4    appreciate --

5         THE COURT:  These are the things you object to.

6         MR. VESPER:  Yes.  We went through two-and-a-half

7    hours of this, and I would go first to Page 13.

8         I requested that some language be put in about net

9    opinion because I believe -- except, I believe, of all the

10   experts, Doctor -- or Professor Rubin and Dr. Manion gave net

11   baseless opinions, but Your Honor overruled me on that.

12        No. 14 --

13        THE COURT:  Page 14?

14        MR. VESPER:  Yes, excuse me, Page 14, I requested the

15   instruction on duty that can be voluntarily assumed, which is

16   5:5.10 -- 5 point something.

17        THE COURT:  Yeah, you gave me -- you actually gave it

18   to me.

19        MR. VESPER:  Of the model.

20        MR. CICCOTTA:  5.10C.

21        MR. VESPER:  5.10C and.

22        THE COURT:  You gave me two alternates, in fact on

23   requested --

24        MR. VESPER:  Yes.  And that was overruled, but I do

25   believe that there were several duties undertaken by Pine

*United States District Court*
*Camden, New Jersey*

BELLA – RECROSS – VESPER

1  Haven, not the least of which is the roving patrols, among

2  other things.

3       Then page -- but you overruled that.  Page 15 -- well,

4  if you didn't put it on Page 14, you certainly weren't going

5  to put the duty voluntarily assumed --

6            THE COURT:  On 15.

7            MR. VESPER:  -- on Page 15.  Then page going -- I

8  objected on Page 17, where you're adding, "New Jersey State

9  Sanitary Code," because I don't think the sanitary code is any

10 part of what is their responsibility, other than it's a

11 minimum requirement.  But Your Honor decided you would --

12           THE COURT:  Well, I mean, I agreed with you that

13 standing by itself --

14           MR. VESPER:  Right.

15           THE COURT:  -- was a problem, only because the jury

16 might conclude, well, they complied with the code, therefore

17 that's okay.

18           MR. VESPER:  Right.

19           THE COURT:  That's why I insisted on adding the

20 language that -- it may or may not be reasonable care.  But I

21 have your objection.

22           MR. VESPER:  Thank you.  And then -- well, we asked

23 for on Page 19, fear, anxiety and --

24           THE COURT:  Distress.

25           MR. VESPER:  -- and distress.

BELLA - RECROSS - VESPER

1          THE COURT:  I gave you, "fear, anxiety," but not

2    distress.

3          MR. VESPER:  Two out of three, but I still think this

4    is a serious enough matter where a drowning death as with the

5    torturous death by fire, when somebody drowns and they're in

6    distress, they -- it's a completely different emotion than --

7    I'm not talking now about the physical pain of it, I'm talking

8    about the sense of dread and distress.  Well, dread is more

9    like fear.

10         THE COURT:  Yeah, that's what I was --

11         MR. VESPER:  Anyway, I thought there was a

12   distinction, Your Honor didn't agree.  Moving right along.

13   Did I miss something?

14        On Page 21, my co-counsel wants to add --

15         THE COURT:  Page 21?

16         MR. VESPER:  Page 21.  We had requested -- my

17   co-counsel and I, that additional language to the wrongful

18   death charge 5.40C be added, which we drafted last night and

19   that was part of my special jury instructions, that was

20   actually just one sentence, but that Your Honor overruled.  Is

21   that it?

22         MR. CICCOTTA:  Yes.

23         MR. VESPER:  And I believe -- yeah, we're going to

24   talk about the verdict sheet later.  That's when we --

25         THE COURT:  Yes, we will go right to the verdict

BELLA – RECROSS – VESPER

1   sheet after.

2        MR. VESPER:  Do you want me to go to the verdict

3   sheet now?

4        THE COURT:  No, no.  I'll go through it first, and

5   then --

6        MR. HERMESMANN:  Your Honor, briefly, on Section 13,

7   which was Page 14 --

8        THE COURT:  Page 14?

9        MR. HERMESMANN:  My request in chambers, which I'll

10  repeat here to make a fully balanced charge would be that it

11  read on the second paragraph, under Section 13:  Defendants

12  deny any negligence with regard to the operation and

13  maintenance of the swimming lake where John Toribio drowned,

14  stating that the industry standard for swimming lakes does not

15  require illumination of the lake.  Patrolling is not required

16  and that neither of these issues were a cause of the accident.

17  Defendants also assert that proper signs were in place, and --

18  and then pick up from there.

19       Moving forward to Page 21.  And the section is:  What

20  is coverable, at the end of Section A, we requested that we

21  include the language:  Ultimately, you must determine what

22  amount of money he reasonably would have provided to Betania

23  Toribio.  Your Honor did put in language at the beginning of

24  that which adequately addressed our concern.

25       Other than that, I have no additional comment.

BELLA - RECROSS - VESPER

1      THE COURT:  All right.  If you'll now turn to the

2  verdict sheet.  Okay?

3      I'll tell you what I think we've agreed to, and then

4  you can give me yours.  Okay.

5      In Paragraph 1, I call it Question 1, we're going to

6  separate the question about negligence and the question about

7  proximate cause.  It's going to be two questions.

8      I'm sorry, are you okay?  You with me?

9      MR. HERMESMANN:  No, I'm fine, I'm listening.

10      THE COURT:  No, I saw you go under the table, I was

11  wondering what was going on.

12      MR. VESPER:  We had -- neither of us had any

13  objection to that.

14      THE COURT:  I know, that's why I didn't think so.

15      So 1 becomes 1 and 2, basically.  3 and 4 is the same

16  concept, except, of course, the different party with a burden

17  of proof, but the concept is the same, negligence on the one

18  hand and proximate cause on the other.  Okay?  That will be 3

19  and 4.  Okay?

20      MR. VESPER:  Yes, Your Honor.

21      MR. HERMESMANN:  Yes, Your Honor, I'm sorry.

22      THE COURT:  5, I have no changes, except the number

23  is going to be -- instead of 3, it's 5.

24      MR. VESPER:  Right.

25      THE COURT:  6, I've added the word, "conscious" and

BELLA - RECROSS - VESPER

 1  pain and suffering, fear and anxiety.

 2      MR. HERMESMANN:  And the defense position is that it

 3  should just be pain and suffering.  Those other --

 4      THE COURT:  Right.

 5      MR. HERMESMANN:  -- descriptors.

 6      THE COURT:  Right.  And his position, to make -- the

 7  other side, is it should include distress.

 8      MR. VESPER:  Right.

 9      MR. HERMESMANN:  Those other wordings are just

10  subsets of pain and suffering.

11      Your Honor, if I could, going back to what's now

12  Question No. 5 --

13      THE COURT:  Yes.

14      MR. HERMESMANN:  The jury will need an instruction at

15  the end of that question, that they should only proceed to the

16  next question if they find the defendant's 50 percent or more

17  at fault.

18      MR. VESPER:  May I suggest?  I don't think they need

19  that for this reason.  Even if, even if, their numbers are,

20  let's assume unfavorable.

21      THE COURT:  It's 55/45.  55 for the plaintiff and 45

22  for the defendant.

23      MR. HERMESMANN:  Let's assume -- then there is no

24  recovery for the plaintiff.

25      MR. VESPER:  Respectfully, I think they should

BELLA - RECROSS - VESPER

1   proceed to give us a number for this reason:  I believe the

2   cases say, I can't cite right now to a case, but the cases say

3   that in some situations, it's up to the trial Judge that the

4   jury can proceed to evaluate a claim, even though technically,

5   Your Honor is going to mold the verdict and come up with a

6   zero.  If their percentage is 51 percent comparative against

7   John, why shouldn't they proceed to give us the value of the

8   damages, even though John is never going to collect them, if,

9   perhaps, that would assist the Third Circuit or who's ever

10  going to review this.

11       MR. HERMESMANN:  Judge, I've never seen a situation

12  where a jury reaches a verdict on liability, and then for some

13  unknown reason, which I've never even heard the argument made,

14  would then proceed on to damages.

15       If they reach a verdict in favor of the defense, they

16  need to be instructed at the end of that questioning, cease

17  your deliberations, you're done.

18       THE COURT:  I agree with the defendant on that one, I

19  really do.

20       MR. VESPER:  All right.

21       THE COURT:  I'm going to add:  If you find more than

22  50 percent.  All right.

23       Now, on 6, I have fear and anxiety and conscious, and

24  we've already argued that, so we don't have to argue it again.

25       Okay.  7, I'm adding -- I'm only -- on 7, I'm going to

BELLA – RECROSS – VESPER

1    make, which is now 5, it becomes 7, there's only going to be

2    an A and B, C and D go out, but I'm going to add to both A and

3    B the words at the end, "and in the future."  Okay?

4         MR. VESPER:  So A and B is going to be -- A is going

5    to be financial contributions to date and in the future, and

6    then B is going to be the other one?

7         THE COURT:  Yep.

8         MR. VESPER:  All right.  Very well, Your Honor.

9         THE COURT:  Okay.

10        MR. HERMESMANN:  And the defense position, Your

11   Honor, as stated in chambers, is that all damages under the

12   Wrongful Death Act should be on a single line and not broken

13   down, that the breakdown that's required by law is one for

14   Survivors Act, one for the wrongful death statute and that's

15   been done.  This is just a further breakdown, which is not

16   required and necessary.

17        THE COURT:  I'm going to overrule that.  I'm going to

18   do it the way I'm doing it here.

19        MR. VESPER:  Yeah, and I think the case law supports

20   what Your Honor is doing.

21        THE COURT:  Doesn't make a difference.  That's what

22   I'm ruling.

23        MR. VESPER:  It's case-specific, yes.

24        THE COURT:  I'm ruling.

25        Okay.  That's what I have.

*United States District Court*
*Camden, New Jersey*

BELLA - RECROSS - VESPER

1          Now, I'm going to back to chambers -- Mr. Vesper, I
2     don't want to cut you off.  Is there anything else you object
3     to here?
4          MR. VESPER:  No, Your Honor, thank you.
5          THE COURT:  I would appreciate if you could work on
6     that 1.71(b) charge.
7          MR. VESPER:  He's writing it out.  My co-counsel is
8     writing it out as we speak.
9          MR. CICCOTTA:  We'll do that right now.
10         THE COURT:  By the way, he said he thought you could
11    reach agreement.
12         MR. CICCOTTA:  Believe it or not.
13         THE COURT:  What can I say?  So -- okay.  And I
14    emphasize, you get here -- I don't know what kind of --
15         MR. VESPER:  I beat you this morning.
16         THE COURT:  What?
17         MR. VESPER:  It's the only time in history that I
18    think -- your court attendant would bear me out, I actually
19    beat you in this morning.  I have a witness.
20         THE COURT:  How do you know you beat me in?  Did he
21    squeal?
22         THE DEPUTY CLERK:  I think because he was knocking on
23    the door looking for you and you weren't here.
24         THE COURT:  I was pretty early today.
25         MR. VESPER:  You were, you were on my heels.

*United States District Court*
*Camden, New Jersey*

BELLA – RECROSS – VESPER

1          THE COURT:  Yeah, I was pretty early, but -- I try to

2    leave the house between 6:30 and quarter of 7, and it takes

3    about an hour to get here.  Okay.

4          MR. VESPER:  Thank you, Your Honor.

5          THE COURT:  Go to work.  I'll be inside and you can

6    barge in and give me your language.

7          MR. VESPER:  Thank you, Your Honor.  See you

8    tomorrow.

9          (4:06 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$15,000** [2] - 1155:11, 1155:16

## '

## /

**/S** [1] - 1102:24

## 0

**08101** [1] - 1102:12

## 1

**1** [15] - 1155:4, 1156:5, 1166:24, 1180:24, 1183:18, 1200:21, 1201:21, 1206:23, 1209:20, 1209:21, 1209:22, 1214:5, 1214:15
**1.7** [2] - 1206:25, 1207:8
**1.71(b** [1] - 1218:6
**1.71B** [1] - 1207:9
**10** [2] - 1166:4, 1202:6
**10:00** [1] - 1166:12
**10:15** [2] - 1166:5, 1166:10
**10:21** [1] - 1166:14
**11** [3] - 1141:22, 1202:7
**1105** [1] - 1103:4
**1106** [1] - 1103:5
**1110** [1] - 1103:7
**1111** [1] - 1103:9
**1120** [1] - 1103:11
**1158** [1] - 1103:12
**1161** [1] - 1103:14
**1173** [1] - 1104:6
**1178** [2] - 1104:7, 1104:8
**1179** [2] - 1104:9, 1104:10
**1180** [2] - 1104:11, 1104:12
**1181** [1] - 1104:13
**1192** [1] - 1104:14
**11:34** [2] - 1167:15, 1167:17
**11:46** [1] - 1167:19

**12** [5] - 1102:13, 1105:1, 1115:7, 1155:23, 1202:7
**12-4975** [1] - 1102:6
**12:07** [1] - 1171:8
**12:45** [1] - 1172:19
**12:46** [1] - 1200:8
**13** [6] - 1202:8, 1202:21, 1210:7, 1213:6, 1213:11
**14** [26] - 1122:24, 1123:20, 1123:22, 1123:23, 1126:1, 1126:19, 1128:23, 1137:11, 1139:18, 1139:22, 1139:23, 1139:24, 1140:2, 1163:6, 1163:7, 1169:4, 1202:19, 1204:9, 1210:12, 1210:13, 1210:14, 1211:4, 1213:7, 1213:8
**15** [9] - 1165:24, 1172:8, 1205:3, 1205:12, 1206:20, 1206:21, 1211:3, 1211:6, 1211:7
**15-foot** [1] - 1177:6
**15th** [1] - 1113:11
**16** [7] - 1125:6, 1161:3, 1205:3, 1205:11, 1205:13, 1206:2, 1206:21
**17** [3] - 1205:12, 1206:22, 1211:8
**17A** [1] - 1188:17, 1191:24
**17B** [1] - 1188:17
**17C** [1] - 1188:17
**18** [4] - 1122:18, 1123:20, 1197:11, 1206:22
**19** [2] - 1206:23, 1211:23
**1980** [1] - 1199:3
**1985** [1] - 1199:4
**1:15** [2] - 1196:5, 1200:5
**1B** [1] - 1207:10
**1st** [1] - 1113:12

## 2

**2** [11] - 1122:14, 1122:23, 1129:21, 1155:4, 1156:5, 1200:21, 1201:21, 1208:12, 1208:17,

1214:15
**20** [3] - 1155:19, 1207:22, 1208:11
**2008** [1] - 1193:25
**2010** [13] - 1112:8, 1112:16, 1112:17, 1112:18, 1113:11, 1114:8, 1122:25, 1124:2, 1125:19, 1138:11, 1138:16, 1159:8, 1193:25
**2013** [8] - 1112:19, 1113:11, 1113:13, 1113:16, 1113:22, 1128:10, 1128:11, 1182:19
**2014** [2] - 1113:17, 1113:18
**2015** [2] - 1102:13, 1105:1
**208** [1] - 1136:11
**21** [10] - 1122:23, 1197:11, 1208:12, 1208:15, 1208:18, 1208:19, 1212:14, 1212:15, 1212:16, 1213:19
**21st** [1] - 1159:8
**22** [2] - 1208:24, 1209:9
**23** [1] - 1209:9
**24** [2] - 1155:23, 1209:9
**24th** [2] - 1112:17, 1112:19
**25** [2] - 1200:11, 1209:10
**26** [2] - 1209:10, 1209:11
**27** [1] - 1209:12
**28** [1] - 1102:23
**2nd** [3] - 1112:18, 1113:16, 1113:22

## 3

**3** [6] - 1159:22, 1196:2, 1201:21, 1214:15, 1214:18, 1214:23
**30** [3] - 1198:23, 1198:25, 1199:1
**300** [1] - 1199:13
**35** [5] - 1169:25, 1198:25, 1199:2, 1199:3, 1199:9
**39** [2] - 1125:7, 1125:8
**3:37** [1] - 1200:10
**3rd** [1] - 1113:18

## 4

**4** [7] - 1200:11, 1201:22, 1204:16, 1208:25, 1209:1, 1214:15, 1214:19
**40** [1] - 1169:25
**40th** [1] - 1106:14
**45** [1] - 1215:21
**4:06** [1] - 1219:9
**4TH** [1] - 1102:12

## 5

**5** [7] - 1201:22, 1201:25, 1210:16, 1214:22, 1214:23, 1215:12, 1217:1
**5.10C** [2] - 1210:20, 1210:21
**5.40C** [1] - 1212:18
**50** [4] - 1157:11, 1191:11, 1215:16, 1216:22
**51** [1] - 1216:6
**55** [1] - 1215:21
**55/45** [1] - 1215:21
**5:5.10** [1] - 1210:16

## 6

**6** [3] - 1201:22, 1214:25, 1216:23
**6:30** [1] - 1219:2
**6th** [2] - 1113:11, 1122:25

## 7

**7** [10] - 1136:17, 1136:20, 1137:10, 1137:12, 1201:23, 1216:25, 1217:1, 1219:2
**7.31** [1] - 1172:12
**753** [1] - 1102:23

## 8

**8** [2] - 1180:13, 1202:6
**80** [2] - 1133:8, 1156:21
**8:03** [1] - 1114:22
**8:15** [2] - 1115:7, 1126:2
**8:27** [1] - 1105:1

**8:30** [2] - 1105:3, 1170:22
**8th** [10] - 1112:8, 1112:16, 1113:17, 1114:8, 1125:19, 1126:19, 1134:25, 1137:9, 1138:11, 1138:16

## 9

**9** [3] - 1115:24, 1202:6, 1205:21
**90** [1] - 1133:8
**91** [1] - 1133:15
**9:59** [1] - 1166:9

## A

**a.m** [8] - 1105:1, 1105:3, 1166:9, 1166:12, 1166:14, 1167:15, 1167:17, 1167:19
**a/k/a** [2] - 1102:8, 1102:9
**ability** [1] - 1153:13
**able** [1] - 1129:7
**absolutely** [2] - 1138:21, 1190:9
**accessible** [2] - 1135:9, 1145:22
**accident** [3] - 1144:15, 1148:14, 1213:16
**accompanied** [1] - 1206:2
**account** [1] - 1121:14
**accurate** [1] - 1193:24
**accurately** [1] - 1124:1
**acres** [2] - 1156:21, 1156:22
**Act** [3] - 1197:8, 1217:12, 1217:14
**ACTION** [1] - 1102:5
**active** [1] - 1106:14
**activities** [1] - 1150:6
**activity** [1] - 1156:13
**actual** [2] - 1182:4, 1182:5
**add** [7] - 1199:13, 1201:24, 1204:24, 1207:7, 1212:14, 1216:21, 1217:2
**added** [2] - 1212:18, 1214:25
**adding** [5] - 1207:6, 1207:13, 1211:8,

1211:19, 1216:25
**addition** [1] - 1137:2
**additional** [2] -
1212:17, 1213:25
**address** [4] - 1121:10,
1143:1, 1150:14,
1152:7
**addressed** [1] -
1213:24
**addressing** [2] -
1121:20, 1158:17
**adequate** [1] - 1175:5
**adequately** [1] -
1213:24
**Administratrix** [1] -
1102:3
**admit** [4] - 1182:7,
1185:21, 1191:23,
1194:5
**admitted** [1] - 1181:8
**adult** [2] - 1163:18,
1206:2
**advertised** [1] -
1111:10
**advice** [2] - 1137:23,
1138:16
**advise** [5] - 1137:17,
1138:4, 1138:11,
1140:8, 1166:1
**advising** [1] - 1163:11
**aerial** [2] - 1192:10,
1192:11
**aerials** [1] - 1192:9
**affirmed** [1] - 1198:15
**AFO** [1] - 1108:25
**age** [8] - 1125:6,
1137:6, 1137:10,
1137:11, 1161:3,
1197:11, 1206:1
**ago** [2] - 1142:22,
1164:14
**agree** [26] - 1110:22,
1111:5, 1119:3,
1120:14, 1120:17,
1120:20, 1121:2,
1121:7, 1124:24,
1127:9, 1131:18,
1131:22, 1133:5,
1139:16, 1141:8,
1141:10, 1143:8,
1147:5, 1150:1,
1174:20, 1174:23,
1175:15, 1202:5,
1207:20, 1212:12,
1216:18
**agreed** [6] - 1149:20,
1201:1, 1206:18,
1211:12, 1214:3
**agreement** [1] -
1218:11

**agrees** [1] - 1143:20
**ahead** [7] - 1111:22,
1115:11, 1119:5,
1119:18, 1133:13,
1148:2, 1152:22
**aid** [1] - 1205:24
**aide** [1] - 1106:15
**alert** [1] - 1197:4
**aliens** [1] - 1171:1
**alleges** [2] - 1206:3,
1206:5
**Alliance** [1] - 1110:7
**allow** [12] - 1118:20,
1119:17, 1144:17,
1144:19, 1158:20,
1174:3, 1175:10,
1179:13, 1189:2,
1196:22, 1197:12,
1198:12
**allowed** [1] - 1137:11
**allows** [1] - 1117:2
**almost** [1] - 1203:16
**alone** [1] - 1206:2
**alternates** [1] -
1210:22
**alternative** [1] -
1117:7
**ameliorate** [1] -
1152:12
**amenities** [6] -
1129:24, 1130:2,
1132:3, 1151:11,
1151:12, 1151:18
**amenity** [12] -
1130:12, 1130:15,
1132:7, 1132:10,
1132:11, 1175:22,
1176:24, 1176:25,
1177:1, 1177:20
**America** [2] - 1110:9,
1157:12
**American** [1] -
1109:21
**amount** [2] - 1208:7,
1213:22
**amounts** [2] -
1206:10, 1206:13
**amplify** [1] - 1106:4
**Amusement** [1] -
1110:2
**amusement** [1] -
1110:5
**analysis** [9] - 1141:13,
1141:14, 1141:17,
1150:1, 1150:10,
1150:24, 1151:21,
1151:22, 1152:19
**analyze** [1] - 1151:3
**AND** [1] - 1102:12
**ANSI** [2] - 1109:25

**answer** [9] - 1119:9,
1124:12, 1126:12,
1148:2, 1155:13,
1156:1, 1158:18,
1162:7, 1190:13
**answering** [1] -
1165:1
**answers** [5] -
1112:22, 1112:24,
1113:1, 1113:2
**Anthony** [13] - 1113:3,
1113:6, 1113:15,
1114:6, 1114:13,
1115:12, 1115:14,
1126:18, 1127:3,
1128:25, 1163:17,
1174:14
**anticipated** [1] -
1151:7
**anxiety** [8] - 1207:6,
1207:14, 1207:18,
1211:23, 1212:1,
1215:1, 1216:23
**anyway** [1] - 1212:11
**apartment** [2] -
1107:24, 1117:5
**apologies** [1] -
1167:20
**apologize** [4] -
1112:13, 1113:3,
1173:4, 1176:2
**application** [4] -
1149:10, 1151:1,
1160:16, 1200:2
**applies** [1] - 1142:22
**apply** [2] - 1119:21,
1122:3
**appreciate** [4] -
1151:16, 1175:24,
1210:4, 1218:5
**appropriate** [3] -
1204:21, 1206:4,
1206:6
**approximate** [2] -
1135:8, 1149:9
**aquatic** [77] - 1106:10,
1106:12, 1106:19,
1106:21, 1106:23,
1107:1, 1107:5,
1107:17, 1108:14,
1109:1, 1110:1,
1110:4, 1110:12,
1110:22, 1110:23,
1111:4, 1112:3,
1120:18, 1121:5,
1121:21, 1122:1,
1122:4, 1124:24,
1127:16, 1128:3,
1129:4, 1129:22,
1129:24, 1130:2,

1130:11, 1130:12,
1132:7, 1132:10,
1137:16, 1137:17,
1138:12, 1138:17,
1138:22, 1141:10,
1143:3, 1145:4,
1145:17, 1146:6,
1147:1, 1147:4,
1147:11, 1148:1,
1148:22, 1149:1,
1149:2, 1149:6,
1149:23, 1150:3,
1150:11, 1151:9,
1151:10, 1151:11,
1151:12, 1151:24,
1153:14, 1156:10,
1156:12, 1157:16,
1157:18, 1158:2,
1158:4, 1160:4,
1160:11, 1160:14,
1164:16, 1164:22,
1164:24, 1165:2,
1165:3, 1165:5,
1176:24, 1177:20
**aquatics** [3] -
1106:15, 1107:14,
1111:3
**arcade** [1] - 1133:21
**architects** [1] - 1108:3
**area** [13] - 1107:25,
1116:7, 1121:23,
1134:16, 1135:19,
1135:25, 1145:10,
1146:12, 1154:12,
1154:18, 1156:19,
1158:2, 1162:18
**areas** [5] - 1111:6,
1120:12, 1152:8,
1158:3, 1158:5
**argue** [4] - 1148:16,
1187:17, 1189:8,
1189:12, 1198:2,
1198:21, 1198:22,
1216:24
**argued** [3] - 1199:10,
1199:11, 1216:24
**arguing** [1] - 1175:16
**argument** [5] -
1169:22, 1174:8,
1197:12, 1198:12,
1216:13
**arguments** [1] -
1170:22
**arrived** [1] - 1132:18
**article** [3] - 1142:1,
1142:21, 1143:1
**AS** [1] - 1142:13
**assert** [1] - 1213:17
**assist** [1] - 1216:9
**assistance** [1] -

1144:11
**Association** [8] -
1106:25, 1108:11,
1109:24, 1110:2,
1110:7, 1110:9,
1110:10, 1146:1
**assume** [15] -
1124:18, 1124:19,
1126:18, 1136:22,
1136:23, 1137:2,
1137:7, 1137:9,
1162:4, 1162:25,
1163:2, 1178:24,
1181:17, 1215:20,
1215:23
**assumed** [7] - 1124:6,
1124:23, 1125:17,
1128:25, 1171:22,
1210:15, 1211:5
**assumes** [1] - 1120:18
**assuming** [8] -
1122:22, 1124:6,
1127:1, 1134:19,
1134:21, 1138:7,
1196:12, 1196:14
**assumption** [1] -
1169:4
**assumptions** [2] -
1122:10, 1127:23
**Assyrian** [1] - 1174:7
**ASTM** [1] - 1109:20
**atmosphere** [1] -
1115:1
**attach** [1] - 1206:19
**attached** [1] - 1172:5
**attachments** [1] -
1112:21
**attack** [1] - 1154:4
**attend** [3] - 1138:19,
1145:17, 1146:7
**attendant** [1] -
1218:18
**attendees** [2] -
1108:12, 1146:1
**attract** [1] - 1121:25
**attraction** [3] - 1132:2,
1175:18, 1176:3
**attractions** [1] -
1152:7
**attractive** [3] -
1175:11, 1175:14,
1176:13
**attractiveness** [1] -
1175:10
**attracts** [1] - 1119:2
**attributed** [1] - 1142:2
**August** [11] - 1112:8,
1112:16, 1112:17,
1113:16, 1114:8,
1125:19, 1126:19,

1134:25, 1137:9, 1138:11, 1138:16
**aunt** [2] - 1188:2, 1188:25
**automatically** [1] - 1199:21
**autopsy** [4] - 1113:8, 1122:20, 1185:18, 1185:21
**available** [7] - 1114:15, 1125:20, 1125:21, 1143:9, 1145:5, 1145:10, 1146:8
**aware** [5] - 1119:24, 1136:16, 1161:5, 1161:7, 1189:9

**B**

**B-E-L-L-A** [1] - 1105:22
**background** [8] - 1106:10, 1106:12, 1127:15, 1157:10, 1158:24, 1159:2, 1164:4, 1164:8
**backyard** [2] - 1117:9, 1160:22
**balanced** [1] - 1213:10
**bar** [1] - 1201:11
**barge** [1] - 1219:6
**barriers** [1] - 1143:12
**base** [1] - 1114:11
**based** [11] - 1114:12, 1115:6, 1115:8, 1116:14, 1116:21, 1119:23, 1135:14, 1151:7, 1158:13, 1165:2, 1206:11
**baseless** [1] - 1210:11
**basis** [2] - 1154:14, 1190:24
**basketball** [11] - 1114:2, 1119:14, 1133:23, 1135:10, 1135:11, 1135:13, 1135:16, 1135:21, 1136:10, 1193:5
**bathing** [2] - 1118:5, 1118:9
**Bathing** [1] - 1115:25, 1205:23
**beach** [6] - 1115:16, 1131:24, 1132:2, 1132:5, 1132:7, 1132:12
**bear** [2] - 1176:6,

1218:18
**beat** [3] - 1218:15, 1218:19, 1218:20
**became** [2] - 1106:17, 1136:25
**becomes** [2] - 1214:15, 1217:1
**BEERS** [1] - 1102:18
**beginning** [4] - 1142:20, 1142:25, 1193:16, 1213:23
**begins** [3] - 1202:25, 1209:1, 1209:11
**behalf** [2] - 1137:12, 1138:10
**behave** [1] - 1158:14
**behaved** [1] - 1191:13
**Bella** [13] - 1105:10, 1105:17, 1106:2, 1110:12, 1111:25, 1120:14, 1120:17, 1134:11, 1145:4, 1150:4, 1155:22, 1158:11, 1162:2
**BELLA** [14] - 1103:4, 1103:5, 1103:7, 1103:9, 1103:11, 1103:12, 1103:14, 1105:13, 1106:1, 1110:21, 1111:24, 1120:9, 1158:10, 1161:10
**BELLO** [1] - 1105:20
**below** [1] - 1114:19
**bench** [3] - 1184:11, 1184:15, 1184:16
**beneficiary** [1] - 1200:3
**best** [9] - 1121:10, 1135:21, 1136:2, 1139:6, 1153:12, 1154:7, 1157:22, 1165:4, 1165:6
**Betania** [1] - 1213:22
**BETANIA** [2] - 1102:3, 1102:4
**better** [3] - 1133:12, 1191:25, 1193:1
**between** [10] - 1133:23, 1143:5, 1155:5, 1156:5, 1162:13, 1162:17, 1170:3, 1186:2, 1205:12, 1219:2
**beyond** [2] - 1135:17, 1135:25
**big** [9] - 1157:5, 1172:23, 1173:9, 1173:10, 1178:16, 1189:19, 1190:16,

1193:16, 1199:17
**birthday** [3] - 1185:11, 1186:11, 1187:6
**Bittner** [5] - 1196:22, 1197:6, 1198:13, 1198:23, 1199:5
**blah** [3] - 1144:15
**blowup** [3] - 1178:6, 1178:17, 1179:4
**board** [1] - 1130:15
**bodies** [3] - 1108:6, 1110:25, 1111:8
**body** [3] - 1111:2, 1111:4, 1118:8
**book** [3] - 1171:16, 1172:23, 1199:6
**bottom** [5] - 1202:21, 1202:24, 1207:24, 1209:11
**boy** [2] - 1169:5, 1191:13
**boy's** [1] - 1197:13
**boys** [2] - 1163:19, 1163:25
**breach** [1] - 1203:9
**break** [3] - 1167:13, 1167:21, 1171:11
**breakdown** [2] - 1217:13, 1217:15
**briefly** [3] - 1107:4, 1112:10, 1213:6
**bring** [2] - 1123:2, 1140:16
**brings** [1] - 1193:5
**brochure** [5] - 1178:13, 1178:15, 1180:25, 1181:7, 1181:9
**broken** [1] - 1217:12
**budget** [1] - 1149:22
**burden** [1] - 1214:16
**bus** [1] - 1171:2
**business** [3] - 1107:11, 1150:5, 1205:2
**busy** [1] - 1201:18
**but..** [1] - 1185:22
**butterfly** [1] - 1105:18
**BY** [46] - 1102:17, 1102:18, 1102:20, 1103:5, 1103:7, 1103:9, 1103:11, 1103:12, 1103:14, 1106:1, 1110:21, 1111:24, 1114:23, 1118:17, 1119:6, 1119:19, 1120:9, 1124:14, 1124:17, 1125:9, 1131:23, 1134:4, 1139:7,

1140:6, 1141:7, 1142:8, 1145:3, 1143:8, 1148:20, 1149:21, 1154:8, 1155:15, 1155:20, 1156:3, 1157:1, 1157:6, 1158:10, 1158:23, 1160:18, 1161:10, 1161:14, 1162:1, 1163:9, 1164:3, 1164:12, 1165:11

**C**

**C-1** [1] - 1200:20
**C-2** [1] - 1200:21
**CAMDEN** [1] - 1102:12
**camera** [2] - 1148:7, 1148:11
**cameras** [10] - 1128:12, 1128:14, 1128:15, 1146:21, 1147:3, 1147:6, 1147:11, 1147:16, 1159:14, 1159:16
**camp** [8] - 1154:24, 1157:19, 1159:16, 1159:19, 1192:9, 1192:10, 1192:11, 1193:24
**CAMPGROUND** [1] - 1102:7
**campground** [30] - 1108:20, 1108:21, 1113:10, 1114:9, 1121:1, 1121:23, 1122:6, 1122:25, 1129:24, 1130:23, 1136:19, 1136:24, 1137:4, 1137:5, 1140:18, 1148:22, 1149:24, 1159:2, 1160:2, 1160:5, 1160:12, 1162:3, 1162:4, 1162:11, 1164:15, 1164:20, 1164:25, 1173:10, 1179:13, 1182:16
**Campground** [1] - 1205:20
**campgrounds** [15] - 1107:23, 1109:5, 1117:5, 1130:11, 1139:10, 1156:15, 1157:12, 1157:15, 1157:17, 1158:25, 1164:5, 1164:19, 1164:22, 1165:5,

1165:7
**Camping** [3] - 1130:24, 1146:20, 1149:23
**camping** [9] - 1121:11, 1122:6, 1157:7, 1157:17, 1157:23, 1158:5, 1205:21
**CAMPING** [1] - 1102:7
**campsite** [1] - 1113:25
**Cape** [2] - 1159:7, 1179:24
**care** [9] - 1117:14, 1122:1, 1164:25, 1165:2, 1194:15, 1196:3, 1206:10, 1206:13, 1211:20
**careless** [1] - 1137:22
**case** [51] - 1114:13, 1119:14, 1125:25, 1127:6, 1136:16, 1138:8, 1138:15, 1138:21, 1140:12, 1140:16, 1140:20, 1142:23, 1143:19, 1144:12, 1144:14, 1144:16, 1144:23, 1150:18, 1156:23, 1161:12, 1161:17, 1161:24, 1170:6, 1170:25, 1171:3, 1175:10, 1175:11, 1175:14, 1176:8, 1176:18, 1177:9, 1184:15, 1184:16, 1186:1, 1193:18, 1196:18, 1197:6, 1197:9, 1197:12, 1198:15, 1199:4, 1199:18, 1204:21, 1204:22, 1206:3, 1216:2, 1217:19, 1217:23
**case-specific** [1] - 1217:23
**cases** [7] - 1138:1, 1138:2, 1141:24, 1195:17, 1197:6, 1216:2
**Cate** [4] - 1113:18, 1127:25, 1128:6, 1202:9
**category** [3] - 1195:6, 1196:24, 1197:2
**catering** [1] - 1107:2
**caught** [1] - 1115:12
**cautious** [1] - 1137:21
**CDC's** [1] - 1144:14

**cease** [1] - 1216:16
**center** [3] - 1133:14,
1136:8, 1177:4
**centers** [1] - 1107:20
**certain** [3] - 1106:6,
1143:19, 1196:19
**certainly** [19] - 1107:6,
1128:2, 1129:5,
1130:15, 1133:5,
1133:6, 1152:7,
1152:9, 1153:12,
1154:20, 1158:3,
1158:24, 1161:21,
1170:17, 1175:17,
1175:25, 1192:16,
1198:7, 1211:4
**certificate** [2] -
1113:8, 1179:23
**certification** [2] -
1108:10, 1109:3
**certified** [5] - 1106:22,
1106:23, 1108:25,
1111:15
**Certified** [1] - 1102:23
**cetera** [1] - 1117:6
**chain** [1] - 1143:13
**chambers** [5] -
1175:12, 1196:8,
1213:9, 1217:11,
1218:1
**chance** [4] - 1185:22,
1185:24, 1193:23,
1201:16
**Chancery** [1] - 1200:1
**change** [3] - 1205:10,
1207:4, 1207:5
**changed** [4] -
1109:22, 1198:14,
1205:4, 1205:5
**changes** [5] - 1108:3,
1202:20, 1204:9,
1208:18, 1214:22
**changing** [1] - 1202:8
**Chapter** [2] - 1115:24,
1205:21
**charge** [30] - 1169:23,
1170:3, 1170:12,
1171:10, 1171:16,
1171:20, 1171:22,
1172:12, 1172:14,
1172:21, 1195:20,
1195:24, 1199:6,
1199:7, 1199:8,
1199:9, 1199:12,
1199:13, 1200:13,
1200:20, 1200:22,
1200:25, 1201:6,
1201:13, 1201:20,
1207:1, 1207:7,
1212:18, 1213:10,

1218:6
**charges** [4] - 1171:15,
1172:4, 1172:24,
1199:7
**charging** [1] - 1196:2
**Charlie** [1] - 1184:17
**chart** [4] - 1194:18,
1194:24, 1195:3,
1195:5
**check** [2] - 1143:12,
1144:10
**chemical** [1] - 1144:10
**child** [7] - 1160:23,
1162:20, 1162:22,
1162:23, 1163:4,
1197:11, 1198:17
**children** [9] - 1107:16,
1119:2, 1141:9,
1161:3, 1161:22,
1162:11, 1162:18,
1177:24
**choose** [1] - 1209:20
**chose** [1] - 1121:22
**Ciccotta** [1] - 1172:10
**CICCOTTA** [22] -
1102:16, 1102:17,
1134:2, 1166:7,
1168:6, 1174:11,
1174:13, 1181:2,
1181:5, 1181:7,
1184:12, 1187:9,
1188:2, 1194:14,
1195:8, 1195:11,
1195:13, 1202:11,
1210:20, 1212:22,
1218:9, 1218:12
**circuit** [2] - 1177:21,
1177:23
**Circuit** [2] - 1201:18,
1216:9
**circumstances** [3] -
1117:16, 1163:3,
1197:22
**cite** [1] - 1216:2
**citizens** [1] - 1107:3
**CIVIL** [1] - 1102:5
**claim** [4] - 1197:23,
1198:19, 1201:11,
1216:4
**claimant** [1] - 1198:18
**claimants** [3] -
1197:7, 1197:19,
1198:3
**claiming** [3] - 1197:8,
1198:11, 1199:22
**class** [2] - 1108:22,
1139:9
**classes** [2] - 1138:25,
1139:2
**classroom** [1] -

1108:9
**clean** [2] - 1116:6,
1210:1
**clear** [5] - 1142:25,
1145:13, 1173:20,
1174:14, 1193:6
**clearly** [1] - 1175:9
**CLERK** [12] - 1105:2,
1105:11, 1105:15,
1105:19, 1166:8,
1166:13, 1167:16,
1167:18, 1171:7,
1178:13, 1200:9,
1218:22
**close** [6] - 1133:1,
1133:2, 1176:10,
1189:14, 1192:11,
1192:18
**close-up** [2] -
1192:11, 1192:18
**closed** [4] - 1136:18,
1136:19, 1136:20,
1136:24
**closer** [3] - 1135:12,
1135:22, 1136:1
**closes** [2] - 1137:4,
1137:5
**closest** [1] - 1186:18
**closing** [10] - 1133:16,
1136:15, 1138:4,
1139:12, 1139:18,
1155:4, 1156:5,
1169:21, 1170:22,
1195:5
**closings** [4] -
1169:19, 1170:1,
1170:3
**co** [5] - 1171:1,
1194:18, 1212:14,
1212:17, 1218:7
**co-counsel** [4] -
1194:18, 1212:14,
1212:17, 1218:7
**co-employees** [1] -
1171:1
**coached** [2] -
1106:17, 1121:18
**code** [16] - 1115:21,
1116:1, 1116:4,
1116:5, 1116:11,
1116:15, 1116:17,
1117:1, 1142:24,
1143:20, 1205:15,
1206:9, 1206:13,
1211:9, 1211:16
**Code** [7] - 1115:24,
1116:21, 1160:19,
1205:22, 1206:4,
1206:9, 1211:9
**codes** [1] - 1122:3

**collect** [1] - 1216:8
**color** [2] - 1123:21,
1178:19
**Colorado** [1] - 1107:7
**colored** [1] - 1122:18
**columns** [1] - 1194:24
**coming** [4] - 1135:9,
1154:17, 1172:16,
1183:1
**comma** [1] - 1207:5
**comment** [1] -
1213:25
**comments** [1] -
1203:11
**commercial** [2] -
1108:1, 1149:10
**common** [2] -
1160:15, 1195:18
**companionship** [1] -
1209:2, 1209:4
**comparative** [3] -
1172:12, 1172:20,
1216:6
**compensable** [2] -
1195:20, 1196:24
**Complaint** [1] -
1112:20
**completely** [2] -
1154:6, 1212:6
**complex** [1] - 1165:1
**complexes** [2] -
1107:24, 1117:5
**compliance** [4] -
1116:5, 1116:15,
1206:8, 1206:13
**complied** [3] - 1144:5,
1206:3, 1211:16
**compliments** [1] -
1172:10
**component** [1] -
1150:15
**concept** [3] - 1205:2,
1214:16, 1214:17
**concern** [1] - 1213:24
**concerned** [3] -
1125:13, 1130:18,
1132:23
**conclude** [2] -
1176:23, 1211:16
**concur** [2] - 1188:18,
1188:23
**conditions** [1] -
1114:15
**condominiums** [1] -
1117:6
**conference** [5] -
1170:12, 1171:10,
1196:2, 1200:13,
1200:23
**conflicting** [1] -

1144:1
**confuse** [4] - 1149:16,
1156:5, 1183:25,
1184:21
**confusing** [1] -
1123:11
**conscious** [2] -
1214:25, 1216:23
**consensus** [1] -
1117:12
**consider** [5] - 1130:4,
1130:12, 1196:4,
1206:12, 1208:9
**considered** [2] -
1117:6, 1132:7
**consisted** [1] -
1132:15
**consistent** [1] -
1197:3
**conspicuous** [2] -
1125:18, 1125:22
**conspicuously** [1] -
1125:15
**constant** [1] - 1117:18
**constantly** [1] -
1147:17
**construction** [4] -
1106:20, 1150:15,
1150:16, 1150:17
**consultant** [5] -
1121:17, 1145:15,
1147:5, 1150:2,
1150:14
**consultants** [1] -
1146:13
**consulted** [2] -
1138:8, 1138:9
**contacted** [1] -
1138:15
**context** [2] - 1174:25,
1187:16
**continue** [1] - 1167:22
**continued** [4] -
1107:7, 1107:9,
1115:16, 1136:9
**Continuing** [1] -
1110:16
**continuing** [3] -
1108:9, 1108:13,
1115:2
**contribute** [1] -
1197:9
**contributed** [6] -
1189:19, 1190:3,
1190:16, 1197:16,
1197:19, 1208:8
**contributing** [2] -
1198:9, 1198:10
**contributions** [1] -
1217:5

**control** [2] - 1156:13, 1167:2
**convenient** [1] - 1171:11
**conversation** [1] - 1141:4
**coolest** [1] - 1187:23
**COOPER** [1] - 1102:12
**copied** [1] - 1171:16
**copies** [2] - 1122:18, 1123:3
**copy** [3] - 1196:9, 1196:15, 1205:17
**correct** [37] - 1102:23, 1124:6, 1124:25, 1125:11, 1125:19, 1125:23, 1126:2, 1130:2, 1131:25, 1132:5, 1137:18, 1138:7, 1140:10, 1141:24, 1145:18, 1145:23, 1146:9, 1146:21, 1146:24, 1147:21, 1148:1, 1148:4, 1149:4, 1149:7, 1150:7, 1150:19, 1151:6, 1151:21, 1154:2, 1158:25, 1159:3, 1159:20, 1163:12, 1164:17, 1164:22, 1174:25, 1208:16
**correctly** [1] - 1113:4
**cost** [9] - 1108:15, 1109:4, 1149:9, 1152:6, 1155:1, 1155:7, 1155:16, 1197:10, 1199:20
**costs** [2] - 1196:22, 1197:17
**Council's** [1] - 1152:24
**Counsel** [4] - 1102:19, 1102:21, 1181:18, 1185:15
**counsel** [17] - 1166:22, 1167:6, 1167:25, 1172:9, 1181:18, 1184:1, 1185:16, 1187:3, 1188:13, 1192:9, 1193:14, 1194:18, 1198:22, 1201:25, 1212:14, 1212:17, 1218:7
**count** [1] - 1156:12
**counter** [1] - 1193:23
**country** [1] - 1111:18
**County** [2] - 1159:7,
1179:24
**county** [1] - 1124:10
**couple** [3] - 1107:11, 1146:12, 1155:12
**course** [5] - 1106:17, 1108:15, 1169:19, 1208:2, 1214:16
**courses** [5] - 1138:19, 1138:22, 1145:24, 1146:2, 1146:4
**COURT** [315] - 1102:2, 1105:1, 1105:4, 1105:6, 1105:20, 1105:22, 1105:24, 1109:13, 1109:17, 1110:13, 1111:21, 1114:21, 1118:16, 1118:20, 1118:22, 1118:24, 1119:1, 1119:5, 1119:17, 1120:7, 1124:12, 1125:7, 1131:15, 1131:20, 1139:4, 1140:4, 1140:15, 1140:19, 1140:22, 1140:24, 1141:6, 1142:6, 1142:12, 1142:14, 1142:16, 1142:18, 1143:4, 1143:12, 1143:16, 1143:23, 1144:1, 1144:4, 1144:8, 1144:19, 1144:21, 1148:2, 1148:5, 1148:7, 1148:10, 1148:13, 1148:16, 1148:18, 1149:11, 1149:17, 1153:23, 1154:1, 1154:3, 1155:13, 1155:18, 1155:23, 1156:1, 1156:18, 1156:21, 1156:25, 1157:3, 1158:9, 1158:18, 1160:8, 1160:13, 1160:17, 1161:13, 1161:16, 1161:20, 1163:6, 1163:14, 1163:16, 1163:21, 1164:2, 1164:6, 1164:11, 1165:9, 1165:15, 1165:19, 1165:23, 1165:25, 1166:10, 1166:15, 1166:21, 1167:9, 1167:12, 1167:20, 1167:24, 1168:3, 1168:8, 1168:11, 1168:15, 1168:20, 1168:24, 1169:3,
1169:7, 1169:9, 1169:11, 1169:14, 1169:17, 1170:16, 1170:19, 1170:25, 1171:9, 1171:19, 1171:23, 1172:1, 1172:3, 1172:14, 1172:20, 1173:6, 1173:13, 1173:16, 1173:19, 1173:24, 1174:3, 1174:6, 1174:12, 1174:17, 1175:3, 1175:9, 1175:15, 1176:5, 1176:7, 1176:12, 1176:18, 1177:2, 1177:8, 1177:13, 1177:18, 1177:21, 1177:25, 1178:2, 1178:4, 1178:8, 1178:10, 1178:16, 1178:20, 1178:24, 1179:2, 1179:5, 1179:11, 1179:15, 1179:18, 1179:20, 1179:22, 1180:3, 1180:8, 1180:10, 1180:17, 1180:20, 1180:23, 1181:4, 1181:9, 1181:14, 1181:17, 1181:20, 1181:22, 1181:24, 1182:8, 1183:9, 1183:13, 1183:18, 1183:22, 1184:5, 1184:9, 1184:14, 1184:25, 1185:4, 1185:6, 1185:9, 1185:14, 1185:18, 1185:21, 1185:25, 1186:6, 1186:12, 1186:16, 1186:20, 1186:22, 1186:24, 1187:1, 1187:3, 1187:6, 1187:17, 1187:22, 1187:25, 1188:3, 1188:11, 1188:13, 1188:16, 1189:8, 1189:12, 1189:22, 1189:25, 1191:2, 1191:10, 1191:19, 1191:21, 1191:23, 1192:2, 1192:6, 1192:12, 1192:17, 1192:22, 1193:7, 1193:9, 1193:12, 1194:1, 1194:4, 1194:15, 1194:20, 1195:3, 1195:9, 1195:12, 1195:15, 1195:17,
1195:22, 1196:1, 1196:6, 1196:8, 1196:11, 1196:14, 1196:17, 1196:20, 1198:2, 1199:1, 1199:3, 1199:5, 1200:10, 1200:11, 1200:15, 1200:19, 1202:4, 1202:12, 1202:17, 1202:19, 1202:24, 1203:2, 1203:6, 1203:12, 1203:17, 1203:20, 1203:22, 1204:2, 1204:4, 1204:6, 1204:8, 1204:15, 1204:23, 1205:1, 1205:7, 1205:10, 1205:17, 1206:16, 1206:18, 1207:4, 1207:10, 1207:15, 1207:17, 1207:20, 1208:2, 1208:5, 1208:11, 1208:15, 1208:17, 1208:21, 1208:24, 1209:4, 1209:14, 1209:23, 1209:25, 1210:5, 1210:13, 1210:17, 1210:22, 1211:6, 1211:12, 1211:15, 1211:19, 1211:24, 1212:1, 1212:10, 1212:15, 1212:25, 1213:4, 1213:8, 1214:1, 1214:10, 1214:14, 1214:22, 1214:25, 1215:4, 1215:6, 1215:13, 1215:21, 1216:18, 1216:21, 1217:7, 1217:9, 1217:17, 1217:21, 1217:24, 1218:5, 1218:10, 1218:13, 1218:16, 1218:20, 1218:24, 1219:1, 1219:5
**Court** [8] - 1112:7, 1182:18, 1191:8, 1192:15, 1196:24, 1200:21, 1201:25
**court** [13] - 1114:2, 1133:23, 1135:10, 1135:11, 1135:13, 1135:16, 1136:10, 1145:14, 1166:22, 1167:1, 1193:5, 1218:18
**Court's** [2] - 1176:21
**courtesy** [1] - 1176:1
**COURTHOUSE** [1] - 1102:11
**courts** [4] - 1119:14, 1135:17, 1135:19, 1135:21
**cover** [3] - 1120:13, 1146:17, 1146:18
**coverable** [1] - 1213:20
**covered** [1] - 1127:15
**covers** [1] - 1184:22
**CPO** [1] - 1108:25
**cramp** [1] - 1154:4
**create** [2] - 1195:5, 1196:23
**creating** [1] - 1197:1
**creativity** [1] - 1172:24
**credentials** [1] - 1128:3
**criticized** [1] - 1203:15
**criticizing** [1] - 1121:13
**crop** [1] - 1189:1
**cropped** [1] - 1189:17
**CROSS** [2] - 1103:11, 1120:9
**cross** [8] - 1120:7, 1158:11, 1165:4, 1166:23, 1190:8, 1190:12, 1190:13, 1202:12
**cross-examination** [3] - 1158:11, 1166:23, 1190:8
**CROSS-EXAMINATION** [2] - 1103:11, 1120:9
**cross-examine** [1] - 1120:7
**crosses** [2] - 1134:7
**CRR** [1] - 1102:24
**culture** [1] - 1154:18
**cumulative** [1] - 1191:7
**curative** [5] - 1182:12, 1183:14, 1183:22, 1183:24, 1184:18
**current** [3] - 1197:15, 1198:8, 1198:9
**cut** [2] - 1143:13, 1218:2
**cutting** [2] - 1174:21, 1174:22
**CV** [3] - 1109:11, 1109:15, 1128:5

# D

**D-1** [4] - 1104:10, 1179:15, 1179:20, 1179:21
**D-17** [4] - 1104:12, 1180:11, 1180:14, 1180:22
**D-39** [3] - 1104:8, 1178:4, 1178:9
**D-40** [1] - 1179:23
**D-41** [4] - 1104:11, 1180:5, 1180:9, 1180:10
**D-42** [4] - 1104:13, 1181:15, 1181:20, 1181:21
**d/b/a** [1] - 1102:7
**damage** [3] - 1195:17, 1197:10, 1198:19
**damages** [5] - 1197:1, 1197:2, 1216:8, 1216:14, 1217:11
**dangerous** [1] - 1162:20
**dark** [6] - 1118:6, 1118:9, 1118:12, 1118:19, 1136:25, 1159:23
**date** [2] - 1114:14, 1217:5
**dated** [7] - 1112:16, 1112:17, 1112:19, 1113:10, 1113:17, 1113:18, 1122:25
**daycare** [1] - 1107:20
**days** [1] - 1155:24
**dead** [1] - 1206:14
**deadly** [1] - 1206:14
**deal** [1] - 1190:12
**dealt** [1] - 1190:12
**death** [11] - 1113:8, 1151:17, 1151:24, 1153:5, 1153:10, 1186:21, 1189:14, 1212:4, 1212:5, 1212:18, 1217:14
**Death** [2] - 1197:8, 1217:12
**decade** [1] - 1109:7
**Deceased** [1] - 1102:4
**deceased** [1] - 1174:15
**decedent** [3] - 1163:16, 1208:7, 1209:6
**decedent's** [1] - 1208:6
**December** [3] -

1113:11, 1122:25, 1124:2
**decide** [3] - 1121:6, 1147:6, 1149:3
**decided** [1] - 1211:11
**decides** [2] - 1121:1, 1121:5
**deduct** [1] - 1197:17
**deductibility** [1] - 1199:8
**deductible** [2] - 1199:21
**deduction** [2] - 1196:22, 1198:2
**deemed** [1] - 1204:18
**deepest** [1] - 1177:7
**defendant** [6] - 1112:23, 1112:25, 1166:17, 1205:20, 1215:22, 1216:18
**Defendant** [1] - 1102:21
**DEFENDANT** [10] - 1104:8, 1104:10, 1104:11, 1104:12, 1104:13, 1178:9, 1179:21, 1180:9, 1180:22, 1181:21
**defendant's** [1] - 1215:16
**Defendants** [1] - 1102:10
**defendants** [4] - 1113:5, 1202:25, 1213:11, 1213:17
**defense** [15] - 1105:10, 1141:24, 1166:22, 1167:6, 1169:20, 1178:5, 1179:16, 1183:5, 1189:16, 1198:22, 1206:15, 1215:2, 1216:15, 1217:10
**define** [1] - 1133:2
**definitely** [2] - 1172:3, 1177:25
**deformed** [1] - 1190:3
**deformity** [3] - 1189:21, 1190:16, 1190:17
**degradable** [1] - 1127:19
**degree** [3] - 1106:19, 1112:2, 1197:16
**Delaware** [1] - 1146:12
**deliberate** [1] - 1209:14
**deliberating** [2] - 1170:2, 1170:9

**deliberation** [1] - 1170:7
**deliberations** [1] - 1216:17
**demographics** [1] - 1151:8
**deny** [2] - 1202:25, 1213:12
**Department** [2] - 1159:7, 1179:24
**departments** [1] - 1107:7
**deposition** [3] - 1113:12, 1113:13, 1126:15
**depth** [1] - 1144:13
**DEPUTY** [12] - 1105:2, 1105:11, 1105:15, 1105:19, 1166:8, 1166:13, 1167:16, 1167:18, 1171:7, 1178:13, 1200:9, 1218:22
**described** [3] - 1115:9, 1127:18, 1175:17
**describing** [1] - 1114:6
**descriptors** [1] - 1215:5
**design** [2] - 1106:20, 1108:1
**designated** [3] - 1121:23, 1138:3, 1139:13
**designee** [2] - 1139:17
**designs** [1] - 1108:2
**despite** [2] - 1176:22, 1177:12
**deteriorate** [1] - 1127:10
**deteriorates** [1] - 1127:13
**determine** [1] - 1213:21
**determined** [1] - 1206:11
**determining** [2] - 1132:22, 1208:7
**develop** [2] - 1117:14, 1154:18
**developed** [2] - 1117:12, 1182:3
**devices** [2] - 1110:3, 1116:9
**diagram** [8] - 1123:8, 1123:12, 1134:1, 1173:9, 1173:21, 1181:14, 1193:2,

1193:17
**difference** [8] - 1143:5, 1150:21, 1150:23, 1157:5, 1162:13, 1162:17, 1186:2, 1217:21
**different** [14] - 1106:18, 1107:2, 1110:4, 1114:15, 1121:19, 1130:10, 1142:24, 1143:23, 1155:3, 1171:14, 1195:12, 1197:13, 1212:6, 1214:16
**differently** [1] - 1152:21
**difficult** [1] - 1167:1
**digest** [1] - 1171:3
**dimensional** [1] - 1183:8
**Dioscon** [8] - 1113:3, 1113:6, 1113:7, 1113:15, 1126:18, 1126:23, 1127:3, 1174:15
**dire** [1] - 1110:13
**DIRE** [4] - 1103:5, 1103:7, 1106:1, 1110:21
**direct** [7] - 1141:1, 1162:13, 1162:17, 1162:19, 1166:23, 1190:7, 1190:11
**DIRECT** [2] - 1103:9, 1111:24
**directed** [2] - 1112:22, 1112:25
**direction** [1] - 1134:18
**directly** [2] - 1162:22, 1163:4
**disagree** [3] - 1176:20, 1199:18, 1199:19
**disagrees** [1] - 1144:4
**disclosures** [3] - 1112:21, 1113:1, 1113:7
**discuss** [1] - 1170:25
**discussion** [1] - 1174:19
**display** [1] - 1206:6
**displayed** [1] - 1206:5
**disposal** [1] - 1112:19
**dispute** [1] - 1119:1
**distance** [5] - 1133:2, 1133:7, 1192:19, 1193:4
**distinction** [1] - 1212:12
**distress** [6] - 1211:24,

1211:25, 1212:2, 1212:6, 1212:8, 1215:7
**distributed** [1] - 1200:22
**DISTRICT** [3] - 1102:2, 1102:2, 1102:14
**Diversified** [3] - 1102:21, 1138:10, 1138:23
**DIVERSIFIED** [3] - 1102:8, 1102:8, 1102:9
**divided** [1] - 1206:23
**diving** [1] - 1130:15
**Doctor** [2] - 1190:5, 1210:10
**document** [1] - 1193:21
**documents** [3] - 1168:2, 1168:4, 1169:8
**done** [13] - 1121:16, 1124:11, 1152:1, 1160:9, 1164:19, 1165:7, 1166:22, 1175:14, 1188:10, 1192:12, 1195:14, 1216:17, 1217:15
**door** [1] - 1218:23
**doorstep** [1] - 1107:14
**doubt** [1] - 1174:23
**down** [9] - 1133:24, 1146:14, 1165:16, 1174:7, 1178:13, 1192:10, 1195:6, 1204:10, 1217:13
**Dr** [5] - 1165:22, 1167:8, 1189:19, 1190:3, 1210:10
**drabs** [1] - 1183:1
**drafted** [2] - 1171:24, 1212:18
**drawing** [2] - 1178:20, 1178:22
**drawn** [1] - 1174:16
**dread** [2] - 1212:8
**dribs** [1] - 1183:1
**drinking** [4] - 1140:9, 1140:16, 1140:20
**drivers** [1] - 1171:2
**drops** [1] - 1114:19
**drown** [1] - 1129:16
**drowned** [1] - 1213:13
**drowning** [17] - 1112:7, 1123:13, 1124:4, 1131:15, 1132:22, 1152:7, 1153:24, 1154:5,

1154:10, 1176:9,
1176:14, 1177:3,
1177:4, 1189:20,
1190:4, 1190:16,
1212:4
**Drowning** [1] - 1110:6
**drownings** [1] -
1129:5
**drowns** [1] - 1212:5
**duly** [1] - 1105:13
**duplicate** [3] - 1181:2,
1181:3, 1195:9
**duplicative** [1] -
1180:25
**during** [1] - 1190:8
**dusk** [2] - 1136:25,
1137:5
**duties** [2] - 1189:22,
1210:25
**duty** [9] - 1120:18,
1120:19, 1125:10,
1127:17, 1171:22,
1206:1, 1209:14,
1210:15, 1211:5
**Duval** [1] - 1202:9

---

## E

**E-L-L-A** [1] - 1105:18
**early** [2] - 1218:24,
1219:1
**earnings** [1] - 1208:6
**easily** [1] - 1145:22
**ebb** [1] - 1147:13
**economist** [1] -
1165:20
**edge** [3] - 1114:18,
1115:14, 1133:15
**education** [2] -
1108:9, 1108:13
**Education** [1] -
1110:17
**effect** [3] - 1131:8,
1166:2, 1167:5
**effective** [5] - 1109:4,
1152:6, 1153:3,
1153:8, 1153:16
**effectiveness** [1] -
1108:16
**eight** [1] - 1173:8
**either** [15] - 1108:12,
1108:25, 1127:5,
1133:16, 1135:9,
1138:16, 1147:20,
1151:1, 1152:12,
1153:4, 1163:11,
1170:7, 1197:17,
1197:18, 1201:2
**elapsed** [1] - 1129:8

**elect** [1] - 1209:19
**electrical** [1] -
1144:11
**electronic** [1] - 1171:3
**elements** [1] -
1195:18
**eliminate** [3] -
1151:25, 1152:16,
1154:4
**eliminating** [1] -
1153:4
**elimination** [1] -
1152:4
**elucidate** [1] -
1183:25
**emergency** [1] -
1143:17
**emotion** [1] - 1212:6
**emphasize** [1] -
1218:14
**emphasizes** [1] -
1193:9
**emphatically** [1] -
1175:22
**employee** [1] - 1203:7
**employees** [1] -
1171:1
**employment** [1] -
1107:5
**en** [1] - 1133:19
**encompasses** [1] -
1111:4
**END** [1] - 1145:2
**end** [6] - 1170:7,
1208:17, 1213:20,
1215:15, 1216:16,
1217:3
**enforce** [7] - 1137:13,
1137:24, 1137:25,
1138:3, 1139:13,
1162:5, 1206:7
**enforced** [4] -
1131:12, 1141:9,
1154:19, 1162:9
**enforcement** [1] -
1149:23
**enforcing** [2] -
1139:17, 1143:8
**engage** [1] - 1150:6
**engineer** [3] -
1127:25, 1128:2,
1128:6
**engineering** [1] -
1106:19
**engineers** [1] - 1108:3
**English** [1] - 1199:24
**enjoy** [1] - 1111:3
**enlist** [1] - 1144:11
**ensure** [3] - 1112:2,
1116:8, 1143:12

**entered** [5] - 1114:9,
1115:5, 1115:6,
1115:11, 1134:17
**entering** [1] - 1125:19
**enters** [1] - 1204:17
**ENTERS** [3] - 1105:3,
1166:14, 1167:19
**entire** [6] - 1121:21,
1142:21, 1155:5,
1158:14, 1192:11,
1203:15
**entirely** [1] - 1153:25
**entitled** [2] - 1185:2,
1205:22
**envelope** [2] - 1169:6,
1185:17
**environment** [4] -
1143:18, 1150:5,
1150:12, 1162:20
**environments** [1] -
1117:7
**equipment** [4] -
1108:2, 1133:1,
1144:12, 1150:25
**especially** [1] - 1129:4
**ESQUIRE** [3] -
1102:17, 1102:18,
1102:20
**estate** [2] - 1199:23,
1200:3
**Estate** [1] - 1102:4
**estimate** [3] -
1129:14, 1145:10,
1176:4
**et** [1] - 1117:6
**eternal** [1] - 1196:17
**evaluate** [2] - 1151:11,
1216:4
**evening** [1] - 1114:17
**evenings** [1] -
1154:25
**event** [2] - 1131:22,
1146:6
**events** [1] - 1123:13
**EVIDENCE** [18] -
1104:6, 1104:7,
1104:8, 1104:9,
1104:10, 1104:11,
1104:12, 1104:13,
1173:23, 1178:3,
1178:9, 1179:14,
1179:21, 1180:9,
1180:22, 1181:21,
1192:5
**evidence** [29] -
1112:19, 1173:14,
1174:9, 1176:22,
1178:8, 1179:8,
1179:17, 1179:20,
1180:1, 1180:3,

1180:4, 1180:6,
1180:18, 1180:21,
1181:10, 1181:20,
1182:7, 1183:19,
1184:6, 1184:7,
1191:11, 1194:15,
1194:21, 1194:22,
1194:25, 1195:12,
1201:24, 1206:12
**exactly** [2] - 1160:22,
1195:13
**exam** [1] - 1166:23
**EXAMINATION** [12] -
1103:5, 1103:7,
1103:9, 1103:11,
1103:12, 1103:14,
1106:1, 1110:21,
1111:24, 1120:9,
1158:10, 1161:10
**examination** [5] -
1158:11, 1165:4,
1166:23, 1190:7,
1190:8
**examine** [1] - 1120:7
**examiner** [1] -
1122:19
**examiner's** [1] -
1113:9
**example** [1] - 1120:23
**except** [4] - 1184:23,
1210:9, 1214:16,
1214:22
**exception** [1] -
1177:16
**excuse** [5] - 1130:22,
1146:23, 1150:16,
1167:12, 1210:14
**Excuse** [1] - 1203:21
**exempt** [5] - 1116:18,
1116:20, 1116:24,
1117:1, 1160:19
**exempted** [1] -
1117:10
**EXHIBIT** [17] - 1104:4,
1104:6, 1104:7,
1104:8, 1104:9,
1104:10, 1104:11,
1104:12, 1104:13,
1173:3, 1178:3,
1178:9, 1179:14,
1179:21, 1180:9,
1180:22, 1181:21
**exhibit** [2] - 1178:5,
1179:16
**exhibits** [4] - 1113:13,
1173:1, 1173:4,
1187:10
**EXHIBITS** [2] -
1104:14, 1192:4
**existed** [1] - 1150:19

**exists** [2] - 1143:25,
1150:19
**EXITS** [3] - 1166:9,
1167:17, 1171:8
**expect** [10] - 1117:14,
1149:4, 1149:6,
1150:4, 1150:7,
1150:11, 1162:8,
1163:8, 1163:10,
1163:11
**expectation** [4] -
1160:7, 1160:20,
1161:1, 1162:4
**expenses** [3] -
1195:20, 1195:23,
1209:11
**experience** [4] -
1127:16, 1129:5,
1130:10, 1157:11
**experienced** [1] -
1121:15
**expert** [21] - 1110:12,
1111:22, 1124:24,
1127:16, 1137:17,
1145:12, 1145:14,
1149:6, 1150:3,
1150:11, 1151:10,
1156:10, 1156:12,
1158:4, 1163:12,
1176:24, 1177:20,
1190:2, 1190:3,
1194:21, 1199:19
**expert's** [1] - 1118:14
**expertise** [2] - 1158:2,
1164:16
**experts** [6] - 1141:23,
1144:11, 1145:5,
1185:20, 1186:3,
1210:10
**explain** [3] - 1174:22,
1194:6, 1209:16
**explained** [2] -
1164:23, 1182:2
**express** [1] - 1121:6
**expressed** [2] -
1175:1, 1175:6
**extension** [1] -
1160:24
**extensions** [2] -
1117:6, 1117:9
**extensive** [4] -
1112:13, 1159:2,
1164:4, 1164:9
**extent** [2] - 1188:25,
1191:13

---

## F

**faces** [1] - 1110:19

**facilities** [32] - 1106:19, 1106:21, 1107:1, 1107:17, 1108:4, 1108:14, 1110:1, 1110:4, 1116:21, 1117:2, 1117:9, 1121:20, 1130:11, 1136:19, 1137:17, 1138:12, 1140:8, 1146:7, 1146:19, 1147:1, 1147:4, 1153:14, 1156:16, 1157:16, 1157:17, 1157:18, 1158:5, 1160:12, 1160:14, 1165:5, 1206:7

**facility** [37] - 1106:17, 1106:24, 1107:15, 1107:22, 1108:6, 1108:17, 1108:18, 1109:1, 1116:18, 1116:20, 1116:24, 1120:18, 1120:25, 1121:5, 1124:10, 1137:25, 1139:10, 1141:10, 1146:15, 1148:22, 1149:1, 1149:3, 1150:3, 1150:6, 1150:11, 1150:18, 1151:10, 1151:18, 1151:24, 1153:23, 1154:18, 1157:4, 1159:12, 1160:20, 1163:1, 1163:3, 1164:24

**fact** [8] - 1111:14, 1127:1, 1127:3, 1144:6, 1176:22, 1182:11, 1183:3, 1210:22

**factor** [1] - 1191:15

**facts** [2] - 1123:12, 1128:23

**failed** [1] - 1206:7

**fair** [4] - 1126:14, 1128:16, 1197:17, 1202:19

**falls** [2] - 1108:23, 1111:12

**familiar** [3] - 1129:5, 1130:18, 1160:13

**family** [4] - 1114:1, 1170:25, 1197:7, 1198:11

**fan** [1] - 1172:23

**far** [14] - 1120:24, 1125:13, 1128:2, 1130:18, 1133:2, 1136:22, 1141:16,

1146:11, 1157:20, 1160:1, 1160:12, 1164:19, 1184:22, 1197:15

**fashion** [1] - 1189:3

**father** [4] - 1197:13, 1197:18, 1197:21, 1198:5

**fault** [1] - 1215:17

**favor** [2] - 1191:12, 1216:15

**favorite** [1] - 1105:7

**fear** [9] - 1207:5, 1207:6, 1207:13, 1207:18, 1211:23, 1212:1, 1212:9, 1215:1, 1216:23

**feasibility** [1] - 1154:22

**feasible** [4] - 1152:4, 1152:5, 1152:11, 1154:22

**feasibly** [2] - 1152:15, 1153:19

**fecal** [1] - 1144:15

**fee** [1] - 1200:2

**feet** [5] - 1133:8, 1133:15, 1136:9, 1136:11, 1193:3

**fence** [3] - 1143:5, 1143:6, 1143:7

**few** [3] - 1154:16, 1163:25, 1173:3

**fictions** [1] - 1197:1

**field** [2] - 1107:5, 1112:3

**figure** [4] - 1169:24, 1191:15, 1199:14, 1205:13

**filling** [2] - 1152:8, 1154:9

**final** [1] - 1188:4

**financial** [1] - 1187:20

**findings** [1] - 1113:24

**fine** [6] - 1126:7, 1171:12, 1198:22, 1204:1, 1209:24, 1214:9

**finger** [1] - 1187:24

**fingers** [4] - 1188:5, 1188:7, 1188:8, 1189:21

**fingertips** [1] - 1168:22

**finish** [1] - 1175:25

**finished** [1] - 1133:6

**finishes** [1] - 1182:9

**finishing** [1] - 1197:10

**fire** [1] - 1212:5

**first** [20] - 1112:21,

1112:25, 1115:11, 1129:9, 1142:2, 1143:12, 1143:13, 1152:15, 1167:9, 1169:21, 1172:3, 1172:20, 1201:24, 1202:20, 1205:24, 1207:22, 1208:3, 1210:7, 1213:4

**fishing** [3] - 1111:2, 1111:9, 1129:25

**five** [2] - 1150:1, 1176:4

**floundering** [1] - 1177:10

**flow** [1] - 1147:13

**focus** [4] - 1132:21, 1134:16, 1136:5, 1151:2

**fodder** [1] - 1176:9

**fold** [1] - 1174:7

**folks** [1] - 1171:11

**follow** [11] - 1116:15, 1120:2, 1122:1, 1153:12, 1162:11, 1176:21, 1177:12, 1177:16, 1187:20, 1197:24

**following** [4] - 1113:15, 1114:7, 1162:21, 1204:9

**follows** [2] - 1105:14, 1204:17

**FOLLOWS** [1] - 1142:13

**FOR** [1] - 1102:2

**force** [2] - 1166:2, 1167:4

**Forensic** [2] - 1141:20, 1142:2

**forensic** [1] - 1141:23

**Forensics** [1] - 1145:7

**foreperson** [1] - 1209:20

**foreseeable** [3] - 1151:7, 1151:17, 1151:23

**forget** [4] - 1109:19, 1125:5, 1137:10, 1171:2

**forgetting** [1] - 1174:14

**forgive** [1] - 1110:18

**forth** [3] - 1166:23, 1200:25, 1203:7

**forward** [1] - 1213:19

**foundation** [4] - 1182:21, 1182:22, 1182:24, 1193:20

**Foundation** [3] -

1106:23, 1108:8, 1110:8

**foundational** [1] - 1194:2

**fountain** [1] - 1173:25

**four** [6] - 1111:15, 1124:4, 1145:9, 1155:18, 1160:3, 1194:24

**four-and-a-half** [1] - 1160:3

**fourth** [1] - 1204:10

**free** [1] - 1196:2

**Friday** [5] - 1166:19, 1166:20, 1166:21, 1170:8, 1170:9

**Fridays** [2] - 1154:25, 1156:8

**Friedlander** [1] - 1102:24

**friend** [1] - 1163:17

**friends** [2] - 1171:1, 1200:16

**front** [1] - 1115:13

**fulfillment** [1] - 1127:17

**full** [2] - 1181:7, 1208:25

**fully** [1] - 1213:10

**fund** [9] - 1197:19, 1197:20, 1198:3, 1198:11, 1198:18, 1199:22, 1199:23, 1199:25

**funeral** [3] - 1195:20, 1195:23, 1209:10

**funny** [1] - 1180:23

**future** [2] - 1217:3, 1217:5

**G**

**game** [1] - 1114:3

**gas** [1] - 1144:12

**general** [5] - 1135:17, 1135:24, 1135:25, 1136:7

**general's** [1] - 1187:20

**generally** [2] - 1117:10, 1162:18

**gentlemen** [4] - 1110:23, 1129:8, 1162:16, 1166:16

**GERRY** [1] - 1102:11

**given** [7] - 1114:12, 1146:7, 1163:24, 1166:2, 1167:5, 1173:19, 1199:14

**Godfather** [1] - 1107:12

**goods** [1] - 1204:18

**governed** [1] - 1142:24

**grab** [1] - 1177:10

**gratuitous** [1] - 1139:3

**Green** [5] - 1196:21, 1197:6, 1198:13, 1198:23, 1199:5

**grounds** [1] - 1157:7

**guard** [2] - 1153:1

**guess** [5] - 1105:9, 1150:1, 1166:18, 1191:3, 1193:12

**guests** [1] - 1150:5

**guys** [2] - 1187:17, 1207:11

**H**

**half** [6] - 1160:3, 1188:22, 1200:14, 1200:15, 1200:19, 1210:6

**hand** [11] - 1105:12, 1174:12, 1185:11, 1189:1, 1189:18, 1189:20, 1190:3, 1190:5, 1190:19, 1197:4, 1214:18

**handed** [1] - 1142:21

**hands** [2] - 1188:14, 1199:25

**HAVEN** [3] - 1102:7, 1102:7

**Haven** [43] - 1102:21, 1113:1, 1113:2, 1113:10, 1114:9, 1116:14, 1116:24, 1119:21, 1120:2, 1122:24, 1130:24, 1131:12, 1134:6, 1137:13, 1138:24, 1140:7, 1141:17, 1146:13, 1146:14, 1146:20, 1149:22, 1154:24, 1155:11, 1155:17, 1156:8, 1158:14, 1159:19, 1160:1, 1160:25, 1178:15, 1180:12, 1180:20, 1180:24, 1181:10, 1181:22, 1189:25, 1205:20, 1205:23, 1206:3, 1206:6, 1206:10, 1211:1

**hazard** [10] - 1152:8, 1152:10, 1152:18, 1152:25, 1153:1, 1153:2, 1153:5, 1153:9

**head** [1] - 1135:6

**Health** [2] - 1159:7, 1179:24

**hear** [5] - 1106:5, 1106:6, 1182:23, 1201:12, 1206:14

**heard** [11] - 1142:11, 1157:2, 1171:4, 1183:5, 1189:5, 1190:1, 1190:2, 1192:12, 1195:3, 1195:23, 1216:13

**hearing** [1] - 1201:9

**heart** [1] - 1154:4

**Heather** [4] - 1113:2, 1113:5, 1113:6

**heels** [1] - 1218:25

**hello** [2] - 1120:10, 1120:11

**help** [11] - 1107:15, 1115:14, 1115:17, 1117:13, 1123:15, 1128:25, 1129:2, 1129:9, 1185:25, 1193:1

**helped** [2] - 1123:18, 1123:19

**helping** [1] - 1194:5

**helps** [2] - 1193:7, 1193:10

**Hermesmann** [1] - 1187:11

**HERMESMANN** [128] - 1102:20, 1102:20, 1103:6, 1103:10, 1103:13, 1105:10, 1105:25, 1106:1, 1109:14, 1110:11, 1111:23, 1111:24, 1114:23, 1118:17, 1119:6, 1119:19, 1120:5, 1140:13, 1141:3, 1142:4, 1142:10, 1142:15, 1142:17, 1142:19, 1143:15, 1143:21, 1143:25, 1145:1, 1158:10, 1158:23, 1160:18, 1161:9, 1165:17, 1165:21, 1165:24, 1166:6, 1166:20, 1167:7, 1167:10, 1168:1, 1168:7, 1168:10, 1169:1, 1169:8,

1169:10, 1170:14, 1170:17, 1172:15, 1172:18, 1173:17, 1174:2, 1174:4, 1175:17, 1175:20, 1175:24, 1176:3, 1176:6, 1176:11, 1176:16, 1178:6, 1179:3, 1179:9, 1179:17, 1180:1, 1180:6, 1180:15, 1180:18, 1181:19, 1182:11, 1183:12, 1183:14, 1184:1, 1186:2, 1187:4, 1187:7, 1187:12, 1187:15, 1187:19, 1188:7, 1188:9, 1188:15, 1188:18, 1190:6, 1190:18, 1190:21, 1190:24, 1191:3, 1193:20, 1194:2, 1195:1, 1196:5, 1196:10, 1196:12, 1196:15, 1196:19, 1198:25, 1199:2, 1199:4, 1200:7, 1202:3, 1203:19, 1203:23, 1204:3, 1204:5, 1204:14, 1204:20, 1204:25, 1205:6, 1206:15, 1207:13, 1207:16, 1207:18, 1208:1, 1208:10, 1208:14, 1208:16, 1209:24, 1213:6, 1213:9, 1214:9, 1214:21, 1215:2, 1215:5, 1215:9, 1215:14, 1215:23, 1216:11, 1217:10

**hierarchy** [2] - 1152:2, 1152:24

**himself** [1] - 1188:24

**his/her** [1] - 1208:13

**history** [2] - 1107:5, 1218:17

**hit** [1] - 1135:6

**hold** [2] - 1116:1, 1134:5

**holding** [2] - 1125:5, 1162:22

**holes** [3] - 1186:13, 1186:15, 1192:7

**home** [7] - 1117:7, 1117:9, 1160:24, 1170:11, 1170:23, 1171:5

**Homer** [1] - 1113:17

**Honor** [76] - 1105:5, 1105:25, 1110:11, 1111:23, 1118:13, 1119:16, 1125:8, 1141:2, 1141:3, 1142:7, 1142:10, 1144:25, 1164:1, 1164:13, 1166:6, 1166:7, 1166:11, 1166:19, 1167:7, 1168:1, 1168:21, 1169:15, 1170:14, 1170:15, 1173:18, 1174:1, 1174:11, 1174:13, 1176:16, 1177:11, 1179:1, 1179:4, 1179:10, 1180:16, 1181:19, 1182:11, 1186:9, 1188:18, 1190:18, 1192:3, 1193:11, 1194:14, 1195:13, 1195:25, 1196:5, 1196:7, 1200:6, 1200:7, 1202:2, 1202:3, 1202:11, 1202:18, 1203:5, 1205:9, 1206:17, 1207:3, 1208:10, 1209:13, 1209:24, 1210:3, 1210:11, 1211:11, 1212:12, 1212:20, 1213:6, 1213:23, 1214:20, 1214:21, 1215:11, 1216:5, 1217:8, 1217:11, 1217:20, 1218:4, 1219:4, 1219:7

**Honor's** [1] - 1177:12

**HONORABLE** [1] - 1102:14

**hope** [2] - 1196:17, 1197:24

**hoping** [2] - 1196:17, 1207:11

**horizon** [1] - 1114:19

**hospitality** [1] - 1107:23

**hot** [1] - 1108:22

**hotel** [2] - 1107:23, 1164:25

**hotels** [3] - 1117:5, 1121:16, 1139:11

**hour** [1] - 1219:3

**hours** [12] - 1133:17, 1146:12, 1155:2, 1155:3, 1155:19, 1155:23, 1156:11, 1200:12, 1200:19,

1210:7

**house** [1] - 1219:2

**hugged** [1] - 1188:24

**hugging** [1] - 1188:1

**hundred** [5] - 1136:9, 1155:12, 1156:22, 1172:25, 1193:3

**husband** [1] - 1197:7, 1197:15, 1198:9

**I**

**ICLE** [3] - 1110:15, 1110:16, 1146:4

**idea** [1] - 1188:20

**ideas** [1] - 1146:15

**identified** [8] - 1137:14, 1145:11, 1151:23, 1168:8, 1168:13, 1168:14, 1168:15, 1198:17

**ignore** [1] - 1182:13

**illumination** [1] - 1213:15

**immediately** [1] - 1114:7

**impact** [2] - 1118:11, 1118:18

**implying** [1] - 1148:19

**important** [3] - 1147:9, 1166:24, 1184:2

**impossible** [1] - 1154:1

**improper** [1] - 1194:3

**IN** [18] - 1104:6, 1104:7, 1104:8, 1104:9, 1104:10, 1104:11, 1104:12, 1104:13, 1104:15, 1173:23, 1178:3, 1178:9, 1179:14, 1179:21, 1180:9, 1180:22, 1181:21, 1192:4

**in-service** [1] - 1143:16

**Inc** [2] - 1138:10, 1138:24

**INC** [1] - 1102:8

**incident** [13] - 1113:16, 1114:1, 1114:5, 1114:7, 1114:15, 1115:3, 1115:4, 1123:13, 1124:4, 1124:11, 1147:13, 1147:19, 1159:13

**include** [12] - 1108:18,

1129:24, 1147:23, 1164:21, 1203:10, 1203:13, 1203:14, 1204:2, 1204:3, 1209:5, 1213:21, 1215:7

**included** [3] - 1143:3, 1201:3, 1201:4

**includes** [6] - 1110:24, 1110:25, 1121:15, 1158:24, 1178:20, 1178:22

**including** [1] - 1122:4

**incorporate** [1] - 1201:8

**incorrect** [1] - 1190:11

**increased** [1] - 1176:9

**indicate** [1] - 1159:22

**indicated** [4] - 1120:2, 1186:4, 1199:11, 1203:25

**indicates** [2] - 1119:13, 1158:14

**indication** [2] - 1161:5, 1198:8

**individual** [5] - 1153:11, 1153:17, 1162:19, 1188:21, 1189:2

**individual's** [1] - 1119:12

**individually** [1] - 1102:5

**individuals** [1] - 1107:2

**Industries** [1] - 1138:24

**industry** [38] - 1106:15, 1107:23, 1108:21, 1117:11, 1117:13, 1117:14, 1117:17, 1117:20, 1117:23, 1118:1, 1120:2, 1120:22, 1120:23, 1121:4, 1121:11, 1121:15, 1121:21, 1122:1, 1122:4, 1122:5, 1122:6, 1146:23, 1147:11, 1148:21, 1157:23, 1158:15, 1159:15, 1160:4, 1160:9, 1160:16, 1164:15, 1164:17, 1164:20, 1164:24, 1165:2, 1165:3, 1203:9, 1213:14

**inference** [2] - 1140:25, 1141:1

**inflame** [1] - 1186:1

**inflatable** [1] - 1110:3
**informed** [1] - 1115:15
**initial** [5] - 1105:18,
1108:13, 1112:21,
1113:1, 1113:7
**injury** [4] - 1151:17,
1151:23, 1153:5,
1153:10
**insert** [1] - 1209:15
**inside** [2] - 1184:3,
1219:5
**insisted** [1] - 1211:19
**insofar** [1] - 1128:22
**inspecting** [1] -
1128:11
**inspection** [9] -
1113:16, 1113:23,
1124:10, 1128:8,
1130:5, 1134:22,
1159:7, 1159:10,
1179:23
**instance** [2] - 1133:3,
1173:9
**instead** [1] - 1214:23
**Institute** [1] - 1110:16
**institutional** [1] -
1107:22
**instructed** [3] -
1163:19, 1182:12,
1216:16
**instruction** [8] -
1163:24, 1182:12,
1183:14, 1183:22,
1183:24, 1184:18,
1210:15, 1215:14
**instructions** [1] -
1212:19
**instructor** [3] -
1106:16, 1106:22,
1106:24
**instructors/trainers**
[1] - 1111:16
**intended** [8] - 1111:1,
1111:8, 1111:9,
1118:5, 1118:6,
1118:8, 1168:18,
1174:23
**intention** [1] - 1195:8
**intentionally** [1] -
1190:10
**interest** [2] - 1175:1,
1175:6
**interested** [1] -
1174:15
**interesting** [2] -
1140:3, 1162:6
**international** [2] -
1108:8, 1109:22
**International** [1] -
1109:20

**interpretation** [1] -
1151:21
**Interrogatories** [3] -
1112:22, 1112:23,
1112:25
**interrupt** [1] - 1152:11
**interrupting** [3] -
1130:23, 1146:24,
1150:17
**interviewed** [1] -
1126:11
**interviews** [1] -
1114:6
**introducing** [1] -
1195:21
**investigation** [2] -
1112:15, 1112:17
**INVESTMENT** [1] -
1102:9
**Investments** [2] -
1102:21, 1138:10
**INVESTMENTS** [2] -
1102:8, 1102:8
**invited** [4] - 1111:3,
1151:5, 1204:11,
1204:19
**invitee** [1] - 1205:2
**invitees** [1] - 1150:5
**inviting** [1] - 1111:10
**involved** [4] - 1107:17,
1107:25, 1109:20,
1140:24
**involvement** [1] -
1106:14
**involving** [1] - 1112:7
**IRENAS** [1] - 1102:14
**issue** [14] - 1131:21,
1140:15, 1143:24,
1149:16, 1169:16,
1172:7, 1172:15,
1185:25, 1189:19,
1190:2, 1190:7,
1193:17, 1199:17
**issues** [1] - 1213:16
**Item** [1] - 1122:23
**item** [1] - 1159:17
**items** [1] - 1171:14
**itself** [1] - 1211:13

**J**

**jail** [1] - 1196:3
**January** [1] - 1112:19
**Jeffrey** [1] - 1167:10
**JEI/JS** [1] - 1102:6
**Jersey** [19] - 1108:24,
1112:15, 1112:16,
1112:18, 1115:20,
1115:24, 1116:21,

1122:19, 1145:5,
1145:10, 1145:23,
1146:2, 1146:5,
1199:6, 1205:22,
1206:4, 1206:9,
1207:10, 1211:8
**JERSEY** [2] - 1102:2,
1102:12
**Jersey's** [1] - 1160:19
**JOAQUIN** [1] - 1102:4
**job** [2] - 1121:6,
1193:2
**Joe** [1] - 1196:16
**John** [30] - 1112:7,
1113:7, 1113:8,
1114:9, 1115:4,
1115:11, 1115:13,
1115:14, 1115:16,
1115:17, 1128:25,
1129:2, 1129:15,
1129:16, 1140:1,
1168:18, 1168:19,
1168:25, 1174:15,
1174:22, 1175:1,
1185:10, 1185:11,
1185:12, 1188:20,
1213:13, 1216:7,
1216:8
**JOHN** [3] - 1102:4,
1102:11, 1102:17
**John's** [1] - 1174:21
**Jordan** [2] - 1138:15,
1180:13
**JOSEPH** [1] - 1102:14
**Judge** [11] - 1165:17,
1172:15, 1174:4,
1184:12, 1184:14,
1200:1, 1200:2,
1208:14, 1216:3,
1216:11
**judge** [1] - 1187:21
**JUDGE** [1] - 1102:14
**judges** [2] - 1177:21,
1177:23
**July** [4] - 1113:11,
1113:12, 1113:17,
1159:8
**jump** [1] - 1133:3
**Juror** [1] - 1209:20
**JURY** [7] - 1105:3,
1166:9, 1166:14,
1167:17, 1167:19,
1170:24, 1171:8
**jury** [39] - 1106:6,
1106:12, 1110:23,
1112:10, 1123:11,
1129:8, 1162:16,
1167:14, 1168:17,
1169:17, 1169:23,
1170:2, 1170:4,

1170:11, 1170:18,
1170:21, 1182:4,
1182:12, 1182:22,
1183:23, 1183:25,
1184:21, 1185:2,
1185:24, 1188:20,
1190:2, 1190:4,
1193:1, 1193:18,
1194:6, 1199:14,
1200:25, 1206:11,
1209:16, 1211:15,
1212:19, 1215:14,
1216:4, 1216:12

**K**

**Karen** [1] - 1102:24
**keep** [1] - 1120:13
**kept** [2] - 1107:13,
1129:1
**kiddie** [1] - 1129:25
**kids** [4] - 1121:17,
1174:5, 1177:9
**kind** [7] - 1114:3,
1120:18, 1128:12,
1185:1, 1197:5,
1199:11, 1218:14
**kinds** [1] - 1130:10
**knocking** [1] -
1218:22
**knowledge** [3] -
1148:9, 1160:9,
1199:14
**known** [2] - 1109:20,
1113:6
**knows** [2] - 1154:3,
1169:18
**Kucsma** [1] - 1202:9

**L**

**labeled** [1] - 1122:18
**Labor** [1] - 1155:6
**ladies** [4] - 1110:22,
1129:7, 1162:16,
1166:16
**lady** [1] - 1186:22
**lake** [103] - 1111:2,
1111:9, 1113:19,
1113:23, 1113:25,
1114:9, 1115:5,
1115:6, 1115:11,
1115:12, 1115:14,
1115:18, 1115:19,
1115:20, 1116:2,
1116:4, 1117:20,
1117:23, 1118:1,
1118:5, 1118:8,
1118:11, 1118:19,

1119:21, 1120:3,
1124:8, 1124:20,
1125:19, 1125:23,
1126:1, 1126:4,
1126:10, 1127:5,
1128:19, 1128:25,
1129:25, 1130:6,
1130:13, 1130:16,
1131:24, 1132:3,
1132:21, 1132:24,
1132:25, 1133:1,
1133:4, 1133:7,
1133:15, 1133:20,
1133:24, 1134:17,
1134:23, 1136:5,
1136:15, 1136:20,
1136:24, 1137:6,
1137:11, 1137:24,
1142:23, 1143:7,
1144:11, 1146:19,
1148:8, 1148:13,
1148:14, 1149:12,
1149:16, 1149:19,
1150:18, 1150:22,
1151:3, 1151:4,
1151:5, 1151:6,
1154:9, 1156:13,
1159:12, 1159:16,
1160:5, 1160:21,
1161:4, 1163:25,
1174:6, 1177:6,
1177:7, 1177:9,
1179:15, 1192:11,
1193:10, 1194:11,
1194:12, 1203:16,
1205:25, 1206:5,
1206:6, 1206:11,
1213:13, 1213:15
**lakes** [8] - 1108:19,
1108:23, 1109:5,
1110:24, 1117:17,
1158:25, 1159:3,
1213:14
**language** [11] -
1116:11, 1203:23,
1203:24, 1204:20,
1205:15, 1210:8,
1211:20, 1212:17,
1213:21, 1213:23,
1219:6
**large** [2] - 1107:21,
1110:3
**last** [15] - 1105:18,
1113:3, 1129:21,
1129:22, 1141:13,
1148:5, 1152:19,
1166:18, 1166:20,
1166:21, 1181:22,
1188:21, 1200:12,
1208:3, 1212:18

**late** [1] - 1166:18
**LAW** [1] - 1102:20
**law** [11] - 1115:21, 1124:25, 1125:2, 1125:11, 1125:13, 1128:18, 1144:5, 1148:19, 1196:23, 1217:13, 1217:19
**lawyer** [2] - 1191:11, 1199:23
**lead** [1] - 1150:8
**learn** [1] - 1145:16
**learned** [1] - 1191:10
**least** [8] - 1123:18, 1138:3, 1144:9, 1153:3, 1153:8, 1153:16, 1178:20, 1211:1
**leave** [3] - 1191:21, 1207:11, 1219:2
**lectured** [1] - 1110:15
**lectures** [1] - 1146:8
**led** [1] - 1123:13
**left** [1] - 1163:25
**Legal** [1] - 1110:16
**length** [3] - 1143:21, 1144:13, 1170:1
**less** [1] - 1155:16
**lessen** [1] - 1152:16
**level** [1] - 1154:7
**liability** [2] - 1204:21, 1216:12
**life** [1] - 1107:14
**lifeguard** [5] - 1106:16, 1117:8, 1125:10, 1154:13, 1206:1
**lifeguards** [5] - 1116:23, 1117:2, 1117:10, 1117:21, 1205:24
**light** [8] - 1114:10, 1114:19, 1114:25, 1115:2, 1148:21, 1148:23, 1149:7, 1149:9
**lighting** [10] - 1114:8, 1114:15, 1114:16, 1118:2, 1118:11, 1118:18, 1119:12, 1119:13, 1203:6
**lights** [6] - 1120:24, 1121:1, 1121:2, 1149:3, 1149:4, 1149:11
**likely** [1] - 1209:6
**limit** [1] - 1164:9
**limited** [7] - 1143:10, 1164:7, 1189:4, 1194:21, 1203:10,

1203:15, 1204:3
**Line** [5] - 1204:16, 1208:12, 1208:17, 1208:25, 1209:1
**line** [9] - 1140:13, 1193:4, 1201:24, 1203:3, 1204:10, 1205:4, 1208:3, 1208:15, 1217:12
**lines** [2] - 1202:21, 1202:24
**link** [2] - 1143:13, 1172:16
**list** [3] - 1109:18, 1112:13, 1158:5
**listed** [1] - 1158:3
**listened** [2] - 1113:14, 1182:5
**listening** [1] - 1214:9
**live** [1] - 1167:5
**living** [1] - 1117:7
**LLC** [4] - 1102:7, 1102:9, 1102:9, 1102:21
**local** [1] - 1122:3
**located** [1] - 1160:1
**location** [4] - 1113:25, 1124:20, 1135:7, 1135:8
**locations** [3] - 1124:8, 1124:22, 1146:3
**Look** [1] - 1190:5
**look** [9] - 1109:18, 1123:24, 1128:13, 1146:15, 1147:13, 1147:19, 1159:7, 1174:6, 1184:19
**looked** [8] - 1115:17, 1131:1, 1139:25, 1140:1, 1182:20, 1185:2, 1188:20, 1200:2
**looking** [4] - 1109:3, 1192:10, 1218:23
**looks** [4] - 1140:2, 1170:6, 1172:6, 1193:3
**lose** [1] - 1206:19
**lost** [2] - 1150:8, 1205:14
**loved** [1] - 1171:1

**M**

**ma'am** [2] - 1119:7, 1119:20
**mailing** [1] - 1146:9
**main** [3] - 1133:24, 1136:1

**maintain** [3] - 1116:6, 1121:2, 1202:22
**maintenance** [4] - 1106:21, 1127:21, 1203:2, 1213:13
**majority** [6] - 1138:1, 1156:15, 1156:17, 1157:15, 1157:19, 1164:19
**man** [7] - 1150:21, 1151:2, 1151:3, 1151:5, 1187:18, 1198:10, 1205:24
**man-made** [5] - 1150:21, 1151:2, 1151:3, 1151:5, 1205:24
**manage** [1] - 1206:7
**managed** [1] - 1106:18
**management** [3] - 1108:15, 1137:16, 1138:10
**manager** [1] - 1106:17
**managers** [1] - 1157:19
**MANIACI** [1] - 1102:16
**Manion** [3] - 1189:19, 1190:3, 1210:10
**manual** [1] - 1171:2
**march** [2] - 1169:18, 1187:17
**Maria** [2] - 1105:10, 1105:17
**MARIA** [15] - 1103:4, 1103:5, 1103:7, 1103:9, 1103:11, 1103:12, 1103:14, 1105:13, 1105:17, 1106:1, 1110:21, 1111:24, 1120:9, 1158:10, 1161:10
**mark** [2] - 1173:7, 1192:14
**marked** [7] - 1168:9, 1180:13, 1181:1, 1188:5, 1192:15, 1194:24, 1200:20
**married** [1] - 1197:14
**massive** [1] - 1200:14
**materials** [1] - 1146:8
**Materials** [1] - 1109:21
**matter** [7] - 1112:6, 1112:20, 1116:14, 1120:1, 1158:13, 1164:23, 1212:4
**MAY** [2] - 1102:13, 1105:1
**mean** [17] - 1114:24,

1117:11, 1126:7, 1130:14, 1138:14, 1145:14, 1172:23, 1174:5, 1185:1, 1190:15, 1191:19, 1193:21, 1195:17, 1198:12, 1198:21, 1200:4, 1211:12
**mean..** [1] - 1190:17
**means** [7] - 1106:25, 1114:18, 1114:25, 1116:7, 1162:18, 1162:19, 1162:21
**meant** [2] - 1143:1, 1189:1
**measure** [1] - 1144:13
**measurement** [1] - 1136:8
**measurements** [2] - 1133:14, 1136:13
**medical** [2] - 1113:9, 1122:19
**meet** [1] - 1196:8
**meets** [1] - 1143:19
**member** [1] - 1110:6
**memberships** [2] - 1109:8, 1109:10
**Memorial** [2] - 1155:5, 1155:6
**memory** [2] - 1135:14, 1184:21
**men** [1] - 1197:18
**mentioned** [4] - 1128:16, 1129:20, 1135:3
**merry** [1] - 1132:17
**merry-go-round** [1] - 1132:17
**met** [3] - 1182:22, 1182:24, 1189:15
**method** [1] - 1153:9
**methods** [1] - 1153:3
**Michelle** [9] - 1113:15, 1114:6, 1114:13, 1115:11, 1115:13, 1115:15, 1126:4, 1126:9, 1127:3
**microbiological** [1] - 1116:8
**microphone** [1] - 1106:4
**middle** [3] - 1105:17, 1177:5, 1177:6
**might** [4] - 1187:7, 1195:9, 1197:21, 1211:16
**miles** [2] - 1159:25, 1160:3
**Miller** [14] - 1113:2, 1113:5, 1113:6,

1113:13, 1119:24, 1119:25, 1155:9, 1161:5, 1161:7, 1161:11, 1161:15, 1161:16, 1161:19, 1163:24
**Miller's** [1] - 1155:9
**Millers** [2] - 1161:22, 1163:16
**mind** [7] - 1129:7, 1184:3, 1203:12, 1203:18, 1203:19, 1203:23, 1204:4
**miniature** [2] - 1178:21, 1178:23
**minimum** [2] - 1143:10, 1211:11
**minuscule** [1] - 1194:9
**minute** [3] - 1156:18, 1166:4, 1167:13
**minutes** [8] - 1115:7, 1163:25, 1165:18, 1165:24, 1167:14, 1169:25, 1172:8, 1173:3
**misleading** [1] - 1123:11
**miss** [1] - 1212:13
**missed** [1] - 1171:21
**model** [1] - 1210:19
**mold** [1] - 1216:5
**mom** [4] - 1185:12, 1188:5, 1188:6, 1189:17
**moment** [2] - 1154:15, 1186:8
**moments** [1] - 1142:22
**Monday** [1] - 1200:12
**money** [4] - 1198:4, 1198:6, 1198:7, 1213:22
**moneys** [1] - 1208:7
**monitored** [2] - 1147:17, 1154:19
**month** [2] - 1155:18, 1186:10
**months** [3] - 1124:4, 1154:16, 1196:3
**morning** [13] - 1105:4, 1105:5, 1105:11, 1106:2, 1106:3, 1155:5, 1169:18, 1170:5, 1170:22, 1171:5, 1171:13, 1218:15, 1218:19
**most** [9] - 1137:21, 1137:22, 1140:8, 1170:4, 1171:19,

1172:6, 1184:11, 1184:13, 1195:9

**motel** [1] - 1107:23

**mother** [8] - 1187:25, 1190:21, 1190:25, 1191:4, 1191:6, 1191:14, 1197:20, 1208:8

**mother's** [1] - 1198:9

**motion** [1] - 1149:3

**move** [6] - 1107:8, 1111:25, 1123:4, 1141:5, 1183:11, 1183:12

**moved** [3] - 1107:7, 1115:13, 1184:6

**moves** [2] - 1148:24, 1182:21

**movie** [1] - 1183:23

**moving** [11] - 1179:17, 1180:6, 1180:18, 1182:9, 1182:10, 1183:3, 1183:7, 1183:13, 1183:19, 1212:12, 1213:19

**MR** [391] - 1103:5, 1103:7, 1103:9, 1103:11, 1103:12, 1103:14, 1105:10, 1105:25, 1106:1, 1109:14, 1109:15, 1110:11, 1110:14, 1110:20, 1110:21, 1111:20, 1111:23, 1111:24, 1114:23, 1118:13, 1118:17, 1118:21, 1118:23, 1118:25, 1119:3, 1119:6, 1119:16, 1119:19, 1120:5, 1120:8, 1120:9, 1124:14, 1124:16, 1124:17, 1125:4, 1125:8, 1125:9, 1131:18, 1131:21, 1131:23, 1134:2, 1134:3, 1134:4, 1139:5, 1139:7, 1140:6, 1140:13, 1140:17, 1140:21, 1140:23, 1141:1, 1141:3, 1141:5, 1141:7, 1142:4, 1142:5, 1142:7, 1142:8, 1142:10, 1142:15, 1142:17, 1142:19, 1143:2, 1143:8, 1143:15, 1143:21, 1143:25, 1144:3, 1144:7,

1144:18, 1144:20, 1144:24, 1145:1, 1145:3, 1148:3, 1148:11, 1148:15, 1148:17, 1148:20, 1149:14, 1149:20, 1149:21, 1154:8, 1155:15, 1155:20, 1155:25, 1156:3, 1156:20, 1156:23, 1157:1, 1157:6, 1158:8, 1158:10, 1158:16, 1158:21, 1158:23, 1160:18, 1161:9, 1161:10, 1161:14, 1161:18, 1161:25, 1162:1, 1163:7, 1163:9, 1164:1, 1164:3, 1164:8, 1164:12, 1165:11, 1165:13, 1165:17, 1165:20, 1165:21, 1165:24, 1166:6, 1166:7, 1166:19, 1166:20, 1167:7, 1167:10, 1168:1, 1168:6, 1168:7, 1168:10, 1168:12, 1168:16, 1168:21, 1169:1, 1169:6, 1169:8, 1169:10, 1169:13, 1169:15, 1170:14, 1170:17, 1171:17, 1171:21, 1171:25, 1172:2, 1172:9, 1172:15, 1172:17, 1172:18, 1173:3, 1173:12, 1173:15, 1173:17, 1174:1, 1174:2, 1174:4, 1174:11, 1174:13, 1174:20, 1175:8, 1175:12, 1175:17, 1175:19, 1175:20, 1175:22, 1175:24, 1176:2, 1176:3, 1176:6, 1176:11, 1176:16, 1176:17, 1176:20, 1177:6, 1177:11, 1177:15, 1177:19, 1177:23, 1178:1, 1178:6, 1178:7, 1178:12, 1178:14, 1178:18, 1178:22, 1179:1, 1179:3, 1179:7, 1179:9, 1179:17, 1179:19, 1180:1, 1180:2, 1180:6, 1180:7, 1180:15,

1180:18, 1180:19, 1181:2, 1181:3, 1181:5, 1181:6, 1181:7, 1181:13, 1181:16, 1181:19, 1181:23, 1182:1, 1182:11, 1182:24, 1183:11, 1183:12, 1183:14, 1183:16, 1183:21, 1184:1, 1184:8, 1184:12, 1184:13, 1184:24, 1185:3, 1185:5, 1185:7, 1185:10, 1185:15, 1185:19, 1185:23, 1186:2, 1186:8, 1186:13, 1186:18, 1186:21, 1186:23, 1186:25, 1187:2, 1187:4, 1187:5, 1187:7, 1187:9, 1187:12, 1187:14, 1187:15, 1187:19, 1187:20, 1187:24, 1188:2, 1188:4, 1188:7, 1188:8, 1188:9, 1188:12, 1188:15, 1188:18, 1189:4, 1189:10, 1189:13, 1189:24, 1190:1, 1190:6, 1190:9, 1190:18, 1190:20, 1190:21, 1190:23, 1190:24, 1190:25, 1191:3, 1191:6, 1191:18, 1191:20, 1191:22, 1192:1, 1192:3, 1192:8, 1192:14, 1192:18, 1192:23, 1193:8, 1193:11, 1193:15, 1193:20, 1194:2, 1194:14, 1194:17, 1194:23, 1195:1, 1195:8, 1195:11, 1195:13, 1195:16, 1195:21, 1195:25, 1196:5, 1196:7, 1196:10, 1196:12, 1196:15, 1196:16, 1196:19, 1198:1, 1198:25, 1199:2, 1199:4, 1200:6, 1200:7, 1200:14, 1200:17, 1202:2, 1202:3, 1202:11, 1202:14, 1202:18, 1202:23, 1203:1, 1203:5, 1203:8, 1203:14, 1203:19,

1203:21, 1203:23, 1204:3, 1204:5, 1204:7, 1204:14, 1204:20, 1204:25, 1205:6, 1205:9, 1205:16, 1206:15, 1206:17, 1207:3, 1207:9, 1207:13, 1207:16, 1207:18, 1208:1, 1208:4, 1208:10, 1208:14, 1208:16, 1208:19, 1208:23, 1209:3, 1209:13, 1209:21, 1209:24, 1210:3, 1210:6, 1210:14, 1210:19, 1210:20, 1210:21, 1210:24, 1211:7, 1211:14, 1211:18, 1211:22, 1211:25, 1212:3, 1212:11, 1212:16, 1212:22, 1212:23, 1213:2, 1213:6, 1213:9, 1214:9, 1214:12, 1214:20, 1214:21, 1214:24, 1215:2, 1215:5, 1215:8, 1215:9, 1215:14, 1215:18, 1215:23, 1215:25, 1216:11, 1216:20, 1217:4, 1217:8, 1217:10, 1217:19, 1217:23, 1218:4, 1218:7, 1218:9, 1218:12, 1218:15, 1218:17, 1218:25, 1219:4, 1219:7

**multiple** [1] - 1163:21

**municipal** [2] - 1107:19, 1165:1

**must** [4] - 1121:8, 1206:2, 1206:11, 1213:21

**N**

**name** [6] - 1105:15, 1105:18, 1107:24, 1109:22, 1113:3, 1167:9

**names** [2] - 1202:8, 1202:12

**National** [10] - 1106:23, 1106:24, 1108:7, 1108:11, 1110:1, 1110:6, 1110:7, 1110:8, 1146:1, 1152:24

**national** [1] - 1108:10

**natural** [3] - 1114:16, 1197:13, 1197:18

**nature** [1] - 1150:22

**nature-made** [1] - 1150:22

**near** [1] - 1133:17

**necessarily** [2] - 1156:21, 1162:21

**necessary** [2] - 1168:23, 1217:16

**need** [16] - 1109:18, 1165:17, 1165:23, 1168:16, 1170:14, 1170:18, 1173:3, 1181:5, 1181:6, 1181:8, 1181:11, 1185:9, 1194:6, 1215:14, 1215:18, 1216:16

**needed** [1] - 1147:22

**negative** [1] - 1191:15

**negligence** [6] - 1172:12, 1172:21, 1202:25, 1213:12, 1214:6, 1214:17

**negligent** [1] - 1140:17

**negligently** [1] - 1206:7

**net** [2] - 1210:8, 1210:10

**never** [16] - 1118:14, 1128:6, 1141:17, 1153:23, 1175:13, 1182:22, 1183:15, 1187:12, 1189:5, 1192:12, 1195:3, 1199:13, 1216:8, 1216:11, 1216:13

**new** [6] - 1123:5, 1196:24, 1197:2, 1201:9, 1204:16, 1205:12

**NEW** [2] - 1102:2, 1102:12

**New** [20] - 1108:24, 1112:15, 1112:16, 1112:18, 1115:20, 1115:24, 1116:21, 1122:19, 1145:5, 1145:10, 1145:23, 1146:2, 1146:4, 1160:19, 1199:6, 1205:22, 1206:4, 1206:9, 1207:10, 1211:8

**Newark** [1] - 1200:2

**next** [15] - 1140:5, 1143:19, 1151:15,

1151:22, 1165:10, 1165:19, 1165:25, 1166:16, 1173:24, 1179:22, 1180:5, 1180:11, 1180:23, 1204:8, 1215:16
**nice** [1] - 1105:6
**night** [5] - 1131:15, 1136:17, 1174:17, 1175:4, 1212:18
**nine** [1] - 1173:8
**NO** [1] - 1102:6
**nobody** [6] - 1133:3, 1134:25, 1144:4, 1174:17, 1174:20, 1174:25
**none** [2] - 1186:3, 1200:17
**nonexistent** [1] - 1203:16
**normally** [2] - 1137:15, 1195:19
**North** [1] - 1157:12
**Northeast** [1] - 1110:8
**note** [2] - 1142:20, 1202:17
**notes** [2] - 1133:10, 1133:13
**nothing** [32] - 1143:13, 1143:15, 1143:18, 1144:10, 1144:12, 1144:13, 1144:16, 1144:23, 1161:16, 1161:22, 1172:23, 1176:7, 1177:2, 1201:20, 1201:21, 1201:22, 1202:6, 1202:7, 1205:3, 1206:22, 1209:9, 1209:10
**notice** [2] - 1128:12, 1198:23
**nuisance** [4] - 1175:11, 1175:14, 1175:21, 1176:14
**NUMBER** [1] - 1104:4
**number** [7] - 1106:18, 1109:10, 1159:25, 1180:14, 1202:20, 1214:22, 1216:1
**numbers** [4] - 1194:16, 1195:5, 1198:7, 1215:19
**nursing** [2] - 1209:5, 1209:7

# O

**o'clock** [7] - 1136:17,

1136:20, 1137:10, 1137:12, 1155:4, 1196:2
**oath** [1] - 1167:4
**object** [11] - 1118:13, 1140:13, 1190:19, 1195:1, 1201:4, 1201:7, 1201:13, 1201:16, 1201:17, 1210:5, 1218:2
**objected** [4] - 1182:21, 1190:21, 1204:24, 1211:8
**objecting** [1] - 1174:2
**objection** [31] - 1109:16, 1110:14, 1111:20, 1142:11, 1142:15, 1142:16, 1142:19, 1173:16, 1173:17, 1178:7, 1179:2, 1179:18, 1179:19, 1180:2, 1180:7, 1180:19, 1181:16, 1188:9, 1190:24, 1193:20, 1201:10, 1203:8, 1205:6, 1206:15, 1206:16, 1207:13, 1208:10, 1208:19, 1208:22, 1211:21, 1214:13
**objections** [5] - 1201:2, 1201:5, 1201:8, 1202:14, 1208:24
**obligations** [1] - 1189:23
**obscured** [1] - 1144:9
**obtain** [1] - 1146:9
**obtained** [1] - 1106:19
**obviously** [5] - 1119:1, 1134:24, 1138:8, 1169:3, 1169:25
**occur** [1] - 1115:3
**occurred** [2] - 1114:5, 1115:10
**occurs** [1] - 1201:10
**October** [1] - 1113:22
**Odalie** [2] - 1186:25, 1189:16
**OF** [15] - 1102:2, 1102:20, 1103:5, 1103:7, 1103:9, 1103:11, 1103:12, 1103:14, 1106:1, 1110:21, 1111:24, 1120:9, 1145:2, 1158:10, 1161:10
**offer** [7] - 1110:12,

1112:2, 1145:24, 1172:9, 1182:13, 1182:14, 1182:16
**offered** [3] - 1118:14, 1166:16, 1187:16
**offering** [6] - 1173:13, 1173:25, 1178:5, 1178:24, 1178:25, 1181:17
**office** [3] - 1113:10, 1133:23, 1135:23
**officer** [1] - 1187:22
**officers** [2] - 1126:11, 1126:21
**OFFICES** [1] - 1102:20
**Officials** [1] - 1110:2
**old** [11] - 1126:19, 1163:6, 1163:7, 1169:5, 1196:23, 1198:14, 1198:15, 1198:24, 1199:2, 1199:5, 1199:24
**olds** [5] - 1126:1, 1128:23, 1139:18, 1139:22, 1139:24
**Olympic** [1] - 1107:21
**Olympic-sized** [1] - 1107:21
**once** [12] - 1120:17, 1121:4, 1121:6, 1133:5, 1147:6, 1151:9, 1151:10, 1151:15, 1151:22, 1163:21, 1181:12, 1187:21
**one** [69] - 1106:4, 1111:15, 1124:20, 1128:17, 1131:3, 1132:3, 1137:3, 1137:10, 1137:11, 1138:3, 1138:21, 1138:22, 1138:24, 1139:12, 1143:6, 1143:12, 1143:13, 1144:6, 1145:8, 1145:11, 1154:12, 1154:13, 1160:21, 1165:25, 1168:20, 1169:24, 1171:13, 1172:22, 1173:7, 1179:22, 1180:5, 1180:17, 1181:22, 1183:5, 1185:10, 1186:10, 1187:2, 1187:18, 1187:25, 1188:3, 1189:4, 1189:7, 1189:9, 1190:25, 1191:10, 1192:13, 1192:19,

1193:13, 1193:24, 1195:18, 1195:19, 1196:20, 1197:4, 1197:22, 1197:24, 1198:11, 1198:20, 1199:7, 1199:19, 1200:1, 1202:14, 1204:10, 1210:1, 1212:20, 1214:17, 1216:18, 1217:6, 1217:13, 1217:14
**ONE** [1] - 1102:11
**one-man** [1] - 1187:18
**ones** [8] - 1133:22, 1144:14, 1169:6, 1171:1, 1173:6, 1191:25, 1192:6, 1198:3
**ongoing** [1] - 1147:23
**online** [1] - 1146:9
**open** [2] - 1119:13, 1137:6
**OPEN** [2] - 1105:1, 1200:10
**openings** [1] - 1169:20
**operate** [4] - 1107:1, 1108:18, 1108:22, 1146:6
**operated** [1] - 1153:13
**operating** [1] - 1108:14
**operation** [11] - 1106:20, 1132:24, 1137:4, 1138:12, 1140:18, 1148:1, 1202:22, 1203:2, 1203:16, 1206:10, 1213:12
**operational** [2] - 1108:1, 1108:23
**operations** [3] - 1109:4, 1147:12
**operator** [7] - 1106:22, 1106:24, 1108:25, 1109:1, 1132:25, 1146:20, 1204:18
**operators** [6] - 1107:22, 1108:6, 1108:17, 1108:18, 1145:15, 1157:19
**Operators** [1] - 1110:9
**opinion** [4] - 1112:1, 1119:16, 1156:10, 1210:9
**opinions** [3] - 1112:2, 1186:5, 1210:11
**opportunity** [3] - 1119:20, 1159:6,

1201:12
**option** [1] - 1143:9
**optional** [1] - 1159:17
**orally** [1] - 1201:12
**order** [4] - 1169:18, 1169:20, 1176:21, 1187:10
**orders** [1] - 1187:21
**ordinance** [1] - 1115:21
**ordinary** [1] - 1185:1
**organization** [1] - 1109:22
**orient** [1] - 1196:20
**orients** [1] - 1193:5
**original** [3] - 1171:15, 1186:14, 1200:21
**originally** [2] - 1171:24, 1180:13
**otherwise** [1] - 1190:11
**ought** [1] - 1182:23
**outcome** [1] - 1172:12
**outranks** [1] - 1187:21
**outside** [5] - 1111:12, 1114:10, 1114:20, 1114:25, 1168:17
**overall** [3] - 1132:24, 1147:24, 1164:22
**overrule** [1] - 1217:17
**overruled** [4] - 1210:11, 1210:24, 1211:3, 1212:20
**own** [4] - 1146:6, 1184:20, 1197:14, 1206:8
**owner** [2] - 1150:7, 1204:18
**owner/operator** [10] - 1120:25, 1121:5, 1128:18, 1138:2, 1145:16, 1149:2, 1150:4, 1150:12, 1163:1, 1163:10
**owner/operator's** [1] - 1127:17
**owner/operators** [1] - 1141:9
**owners** [3] - 1138:11, 1145:15, 1157:19
**oxygen** [1] - 1183:9

# P

**P-1** [1] - 1134:1
**P-17** [1] - 1188:5
**P-17A** [1] - 1104:14, 1192:4
**P-17B** [2] - 1104:14,

1192:4
**P-17C** [2] - 1104:14, 1192:4
**P-18** [1] - 1173:9
**P-1A** [2] - 1134:5, 1135:22
**P-1B** [4] - 1104:6, 1173:10, 1173:23
**P-3** [6] - 1104:9, 1178:10, 1178:11, 1179:14, 1181:9, 1181:11
**P-35** [1] - 1185:19
**P-36** [1] - 1181:25
**P-38** [3] - 1142:1, 1142:6, 1142:7
**P-39** [1] - 1125:10
**P-41** [1] - 1125:5
**P-5** [1] - 1180:23
**P-6** [4] - 1104:7, 1173:25, 1178:3
**P-8A** [2] - 1192:21, 1194:17
**P-8B** [1] - 1194:17
**P-8C** [1] - 1194:17
**p.m** [6] - 1114:22, 1115:7, 1171:8, 1200:8, 1200:10, 1219:9
**package** [1] - 1171:14
**PAGE** [2] - 1103:3, 1104:4
**page** [6] - 1122:9, 1122:13, 1201:2, 1211:3, 1211:7, 1212:16
**Page** [39] - 1122:14, 1122:23, 1129:21, 1159:22, 1180:24, 1201:21, 1201:22, 1201:23, 1202:7, 1202:8, 1202:19, 1205:3, 1205:11, 1205:12, 1206:22, 1207:22, 1208:11, 1208:12, 1208:15, 1209:12, 1210:7, 1210:13, 1210:14, 1211:3, 1211:4, 1211:7, 1211:8, 1211:23, 1212:14, 1212:15, 1213:7, 1213:8, 1213:19
**pages** [2] - 1172:4, 1180:15
**paid** [1] - 1156:8
**pain** [6] - 1207:5, 1207:19, 1212:7, 1215:1, 1215:3, 1215:10

**parade** [1] - 1187:18
**paragraph** [10] - 1123:5, 1129:21, 1129:23, 1190:22, 1204:9, 1205:4, 1205:12, 1207:24, 1208:25, 1213:11
**Paragraph** [2] - 1201:25, 1214:5
**parameters** [2] - 1156:2, 1156:4
**parent** [3] - 1160:23, 1163:4, 1163:18
**parental** [3] - 1160:20, 1161:1, 1161:2
**Park** [3] - 1110:7, 1110:10, 1146:1
**park** [6] - 1110:16, 1114:4, 1128:13, 1130:4, 1156:22, 1156:23
**Parks** [2] - 1106:25, 1108:11
**parks** [2] - 1110:5, 1121:16
**part** [13] - 1130:13, 1132:2, 1132:7, 1150:14, 1159:6, 1171:24, 1177:7, 1185:12, 1190:21, 1197:20, 1209:15, 1211:10, 1212:19
**particular** [6] - 1114:17, 1116:2, 1118:8, 1167:1, 1167:2, 1198:15
**particularly** [1] - 1162:20
**parties** [2] - 1161:24, 1200:22
**partner** [1] - 1172:11
**partners** [1] - 1199:24
**party** [8] - 1113:5, 1161:11, 1161:23, 1185:11, 1187:6, 1201:2, 1214:16
**passed** [3] - 1134:20, 1134:22, 1136:7
**past** [2] - 1109:7, 1201:9
**patience** [1] - 1200:18
**PATRICK** [1] - 1102:20
**patrol** [10] - 1154:14, 1154:15, 1154:17, 1154:23, 1155:2, 1155:17, 1156:11, 1156:13, 1156:14, 1160:5
**patrolling** [4] -

1117:24, 1154:12, 1154:14, 1213:15
**patrols** [11] - 1156:7, 1156:17, 1156:18, 1157:20, 1157:24, 1157:25, 1158:1, 1160:10, 1160:13, 1203:7, 1211:1
**patrons** [2] - 1121:25, 1147:13
**paying** [3] - 1198:3, 1198:6, 1198:7
**Pennsylvania** [3] - 1106:9, 1107:9, 1145:25
**people** [33] - 1107:1, 1107:14, 1107:22, 1108:22, 1111:3, 1117:13, 1121:20, 1125:22, 1135:6, 1135:9, 1137:17, 1137:20, 1137:23, 1138:19, 1139:9, 1140:24, 1141:17, 1146:6, 1151:5, 1151:17, 1153:10, 1153:15, 1154:17, 1156:8, 1158:24, 1162:3, 1174:18, 1196:25, 1198:3, 1198:5, 1198:16, 1199:21
**percent** [2] - 1157:11, 1215:16, 1216:6, 1216:22
**percentage** [1] - 1216:6
**perfectly** [1] - 1174:24
**perform** [1] - 1120:19
**performed** [1] - 1113:16
**perhaps** [2] - 1182:6, 1216:9
**period** [2] - 1109:6, 1115:2
**permanently** [1] - 1201:15
**permit** [1] - 1111:21
**permitted** [3] - 1159:23, 1188:19, 1188:23
**person** [7] - 1117:15, 1138:3, 1139:12, 1145:11, 1166:3, 1176:23, 1204:17
**personal** [3] - 1119:16, 1160:8, 1164:20
**personnel** [3] - 1116:22, 1138:22,

1205:24
**persons** [2] - 1125:5, 1206:1
**perspective** [2] - 1170:18, 1194:2
**phone** [1] - 1146:14
**photo** [6] - 1173:24, 1179:15, 1180:5, 1185:1, 1189:9, 1192:23
**photograph** [21] - 1133:12, 1168:17, 1168:19, 1168:25, 1169:1, 1169:4, 1186:11, 1188:4, 1188:24, 1188:25, 1189:5, 1189:7, 1189:10, 1189:13, 1189:15, 1189:16, 1189:18, 1189:20, 1191:1, 1191:4, 1191:8
**photographs** [18] - 1113:9, 1113:10, 1122:18, 1122:20, 1122:24, 1123:7, 1123:19, 1123:21, 1123:23, 1124:9, 1124:18, 1168:13, 1173:5, 1185:3, 1186:4, 1186:15, 1187:13, 1193:1
**photos** [7] - 1173:7, 1178:4, 1184:23, 1185:11, 1185:13, 1185:22, 1186:7
**phrase** [2] - 1162:3, 1204:11
**phrased** [1] - 1152:21
**physical** [1] - 1212:7
**pick** [3] - 1146:14, 1208:8, 1213:18
**picked** [1] - 1193:23
**picks** [1] - 1148:24
**picture** [6] - 1177:13, 1177:14, 1183:3, 1186:22, 1188:19, 1190:19
**pictures** [5] - 1182:3, 1182:5, 1183:1, 1183:4, 1183:7
**pie** [1] - 1197:8
**piece** [2] - 1191:11, 1197:8
**Pine** [43] - 1102:21, 1113:1, 1113:2, 1113:10, 1114:8, 1116:14, 1116:24, 1119:20, 1120:2, 1122:24, 1130:23,

1131:12, 1134:6, 1137:12, 1138:24, 1140:7, 1141:17, 1146:13, 1146:14, 1146:20, 1149:22, 1154:24, 1155:11, 1155:16, 1156:8, 1158:14, 1159:19, 1160:1, 1160:25, 1178:15, 1180:12, 1180:20, 1180:24, 1181:10, 1181:22, 1189:25, 1205:20, 1205:23, 1206:3, 1206:5, 1206:9, 1210:25
**PINE** [3] - 1102:7, 1102:7
**pirate** [2] - 1132:18, 1132:20
**place** [6] - 1121:22, 1128:12, 1159:8, 1177:5, 1177:10, 1213:17
**placed** [1] - 1149:7
**places** [1] - 1121:19
**plain** [1] - 1184:25
**plaintiff** [16] - 1112:22, 1143:10, 1166:23, 1169:21, 1174:22, 1182:21, 1188:19, 1189:4, 1190:6, 1191:7, 1191:15, 1206:5, 1215:21, 1215:24
**Plaintiff** [2] - 1102:5, 1102:19
**PLAINTIFF** [8] - 1104:6, 1104:7, 1104:9, 1104:14, 1173:23, 1178:3, 1179:14, 1192:4
**plaintiff's** [2] - 1112:20, 1112:23
**plaintiffs** [3] - 1141:24, 1184:1, 1197:3
**plan** [2] - 1169:18, 1171:10
**planted** [1] - 1155:12
**play** [1] - 1167:8
**played** [3] - 1167:11, 1167:23, 1184:10
**playground** [5] - 1132:12, 1132:14, 1133:1, 1133:17, 1133:19
**playing** [2] - 1115:15, 1129:1
**PLAZA** [1] - 1102:11

**poignant** [1] - 1191:5
**point** [16] - 1113:19, 1128:24, 1135:18, 1141:13, 1147:15, 1184:19, 1187:8, 1189:7, 1189:8, 1189:12, 1195:19, 1195:22, 1199:19, 1200:1, 1210:16
**pointed** [1] - 1200:17
**points** [2] - 1144:6, 1146:17
**Police** [3] - 1112:15, 1112:16, 1112:18
**police** [6] - 1113:15, 1114:7, 1114:14, 1115:6, 1126:11, 1126:21
**pool** [16] - 1106:22, 1108:25, 1109:1, 1114:3, 1117:8, 1129:25, 1137:24, 1142:23, 1143:6, 1144:13, 1148:12, 1148:13, 1148:14, 1160:22, 1161:3
**Pool** [6] - 1106:23, 1108:7, 1109:24, 1110:8, 1110:9
**pools** [8] - 1107:20, 1107:21, 1108:22, 1110:24, 1139:11, 1142:22, 1143:1, 1143:2
**poor** [1] - 1127:21
**position** [3] - 1215:2, 1215:6, 1217:10
**possible** [7] - 1112:14, 1139:1, 1151:25, 1152:10, 1152:11, 1152:25, 1172:19
**post** [7] - 1125:14, 1127:17, 1128:19, 1153:18, 1154:21, 1205:25
**posted** [2] - 1124:25, 1142:1
**powered** [1] - 1144:12
**practical** [1] - 1151:25
**practice** [3] - 1158:3, 1158:5, 1160:15
**practiced** [1] - 1143:17
**practices** [4] - 1121:10, 1157:23, 1165:4, 1165:6
**pre-2010** [1] - 1178:10
**predesign** [1] - 1150:15

**predict** [1] - 1170:1
**predominately** [1] - 1134:16
**prefer** [2] - 1120:15, 1177:23
**prejudice** [3] - 1183:4, 1183:23, 1189:18
**prejudiced** [1] - 1183:6
**prejudicial** [2] - 1184:20, 1185:1
**premarked** [1] - 1192:20
**premises** [4] - 1204:12, 1204:16, 1204:17, 1204:21
**prepared** [1] - 1195:3
**presence** [3] - 1168:17, 1176:8, 1177:3
**present** [2] - 1159:12, 1163:18
**presented** [2] - 1166:1, 1166:17
**pretrial** [1] - 1187:9
**pretty** [5] - 1127:21, 1193:2, 1203:25, 1218:24, 1219:1
**Prevention** [1] - 1110:6
**primarily** [1] - 1145:24
**printed** [1] - 1123:3
**printed-out** [1] - 1123:3
**private** [3] - 1107:8, 1107:10, 1205:20
**probability** [1] - 1112:3
**probative** [1] - 1194:9
**problem** [4] - 1146:25, 1168:24, 1182:9, 1211:15
**proceed** [6] - 1105:24, 1215:15, 1216:1, 1216:4, 1216:7, 1216:14
**process** [1] - 1179:12
**produced** [1] - 1147:16
**Professional** [1] - 1110:9
**professional** [3] - 1109:8, 1109:10, 1164:21
**Professionals** [1] - 1109:24
**Professor** [3] - 1194:19, 1194:23, 1210:10
**profound** [1] -

1170:21
**program** [3] - 1108:8, 1108:12, 1109:1
**promulgates** [1] - 1109:25
**proof** [4] - 1182:13, 1182:14, 1182:17, 1214:17
**proper** [2] - 1131:9, 1213:17
**properly** [2] - 1121:2, 1121:8
**property** [2] - 1157:5, 1204:19
**provide** [1] - 1116:9
**provided** [4] - 1108:5, 1108:17, 1198:17, 1213:22
**providing** [2] - 1109:6, 1199:22
**proximate** [2] - 1214:7, 1214:18
**Public** [1] - 1115:24
**public** [3] - 1107:8, 1107:10, 1205:22
**pulling** [1] - 1107:13
**punched** [1] - 1186:15
**purchase** [1] - 1204:17
**purposes** [3] - 1124:7, 1125:17, 1147:14
**put** [22] - 1121:1, 1121:22, 1121:23, 1121:24, 1143:5, 1147:6, 1148:21, 1153:9, 1164:24, 1174:25, 1175:13, 1188:19, 1188:23, 1195:18, 1199:16, 1201:5, 1207:16, 1210:8, 1211:4, 1211:5, 1213:23
**putting** [3] - 1168:25, 1183:18, 1203:12

**Q**

**quarter** [1] - 1219:2
**QUATTRONE** [1] - 1102:18
**questioning** [2] - 1140:14, 1216:16
**questions** [11] - 1111:25, 1158:8, 1158:12, 1159:5, 1161:18, 1164:1, 1164:14, 1165:14, 1166:22, 1201:23, 1214:7

**quibble** [1] - 1200:15
**quick** [1] - 1193:24
**quickly** [2] - 1112:14, 1210:3
**quite** [2] - 1131:1, 1170:1

**R**

**raise** [1] - 1105:12
**rank** [1] - 1187:23
**rather** [1] - 1183:25
**reach** [3] - 1186:4, 1216:15, 1218:11
**reaches** [1] - 1216:12
**read** [9] - 1140:12, 1142:21, 1153:12, 1153:15, 1155:9, 1169:23, 1203:9, 1205:20, 1213:11
**readily** [3] - 1125:20, 1125:21, 1134:23
**Reading** [1] - 1106:9
**reads** [1] - 1204:16
**real** [1] - 1193:24
**really** [7] - 1170:2, 1171:14, 1172:9, 1172:19, 1176:19, 1193:3, 1216:19
**reason** [9] - 1127:14, 1141:11, 1141:12, 1184:2, 1191:1, 1191:4, 1215:19, 1216:1, 1216:13
**reasonable** [20] - 1112:2, 1117:15, 1137:20, 1137:23, 1141:13, 1153:21, 1156:11, 1162:4, 1162:8, 1162:10, 1162:25, 1163:1, 1163:5, 1176:23, 1191:9, 1206:10, 1206:13, 1207:23, 1207:25, 1211:20
**reasonableness** [2] - 1158:12, 1159:15
**reasonably** [11] - 1116:6, 1116:7, 1120:19, 1151:16, 1151:23, 1151:25, 1153:19, 1158:15, 1163:10, 1213:22
**rebuttal** [2] - 1169:12, 1176:15
**receive** [1] - 1171:13
**RECEIVED** [18] - 1104:6, 1104:7, 1104:8, 1104:9,

1104:10, 1104:11, 1104:12, 1104:13, 1104:15, 1173:23, 1178:3, 1178:9, 1179:14, 1179:21, 1180:9, 1180:22, 1181:21, 1192:4
**RECESS** [3] - 1166:12, 1167:15, 1200:8
**reconsider** [1] - 1184:20
**record** [7] - 1105:16, 1125:4, 1175:13, 1176:6, 1199:16, 1201:5, 1207:16
**recorded** [1] - 1113:14
**records** [1] - 1113:7
**recoverable** [1] - 1208:1, 1208:2
**recovered** [1] - 1197:3
**recovery** [2] - 1197:2, 1215:24
**Recreation** [4] - 1106:25, 1108:11, 1110:7, 1146:1
**recreation** [1] - 1107:6
**recreational** [3] - 1107:24, 1110:25, 1111:1
**Recreational** [2] - 1115:25, 1205:22
**RECROSS** [2] - 1103:14, 1161:10
**RECROSS-EXAMINATION** [2] - 1103:14, 1161:10
**redid** [1] - 1194:19
**redirect** [2] - 1158:9, 1164:7
**REDIRECT** [2] - 1103:12, 1158:10
**reduce** [2] - 1152:13, 1152:18
**reduces** [1] - 1177:4
**reducing** [3] - 1153:4, 1154:10, 1197:10
**refer** [7] - 1120:14, 1133:10, 1177:19, 1184:5, 1184:6, 1184:8, 1184:9
**reference** [3] - 1109:11, 1112:12, 1193:22
**referenced** [2] - 1187:9, 1187:10
**referred** [1] - 1193:22
**referring** [2] - 1122:14, 1183:2
**reflects** [1] - 1124:1

**refracting** [1] - 1115:1
**regard** [7] - 1157:25, 1158:1, 1182:25, 1202:22, 1208:6, 1213:12
**regarding** [5] - 1116:11, 1142:11, 1160:20, 1161:1, 1173:18
**regards** [2] - 1127:8, 1157:24
**Regional** [1] - 1122:19
**regret** [1] - 1174:9
**regs** [1] - 1180:20
**regular** [3] - 1154:14, 1154:17
**regulated** [2] - 1115:20, 1115:23
**regulation** [1] - 1146:23
**regulations** [7] - 1119:21, 1119:24, 1159:19, 1159:22, 1160:25, 1180:12, 1206:8
**relate** [2] - 1189:22, 1189:24
**relates** [1] - 1190:1
**relating** [1] - 1203:6
**relation** [1] - 1123:12
**relative** [3] - 1112:10, 1116:1, 1159:2
**relevance** [2] - 1174:4, 1179:10
**relevant** [4] - 1109:9, 1113:24, 1161:20, 1161:21
**relied** [2] - 1185:20, 1186:4
**rely** [1] - 1194:20
**relying** [2] - 1186:3, 1194:22
**remain** [3] - 1170:15, 1170:18, 1170:20
**remains** [1] - 1153:18
**remember** [5] - 1110:19, 1123:9, 1126:8, 1130:25, 1190:13
**reminded** [1] - 1194:18
**removal** [3] - 1153:9, 1153:16
**remove** [5] - 1152:10, 1152:25, 1153:19, 1153:23
**RENO** [1] - 1102:17
**repeat** [2] - 1118:16, 1213:10
**repels** [1] - 1119:2

**replacing** [1] - 1208:6
**report** [22] - 1112:12, 1112:16, 1112:19, 1113:8, 1113:17, 1113:18, 1115:6, 1118:14, 1121:9, 1122:10, 1122:11, 1122:14, 1124:1, 1124:7, 1124:10, 1124:19, 1125:18, 1127:24, 1129:15, 1129:20, 1159:10
**reported** [2] - 1118:21, 1119:3
**reports** [1] - 1112:17
**represent** [2] - 1192:15, 1194:7
**representatives** [1] - 1134:6
**represented** [1] - 1182:18
**request** [5] - 1112:6, 1112:11, 1145:25, 1203:21, 1213:9
**requested** [6] - 1171:15, 1210:8, 1210:14, 1210:23, 1212:16, 1213:20
**requesting** [1] - 1196:5
**requests** [1] - 1146:9
**require** [4] - 1112:1, 1117:2, 1124:25, 1213:15
**required** [17] - 1102:23, 1116:12, 1116:16, 1116:22, 1120:19, 1125:11, 1159:11, 1160:16, 1162:11, 1205:23, 1205:25, 1206:12, 1207:7, 1213:15, 1217:13, 1217:16
**requirement** [9] - 1109:2, 1116:4, 1128:20, 1146:19, 1147:3, 1148:25, 1159:14, 1161:2, 1211:11
**requirements** [2] - 1143:11, 1206:4
**requires** [10] - 1108:9, 1117:17, 1117:21, 1117:24, 1118:2, 1120:22, 1120:24, 1125:2, 1128:18, 1160:5
**rescues** [1] - 1116:10
**research** [3] - 1114:14, 1171:2,

1171:3
**residuary** [1] - 1200:3
**Resort** [3] - 1130:24, 1146:20, 1149:23
**resort** [2] - 1122:6, 1205:21
**RESORT** [1] - 1102:8
**resorting** [1] - 1196:25
**respect** [4] - 1113:25, 1114:2, 1114:3, 1202:25
**respectfully** [1] - 1119:4, 1176:20, 1215:25
**respond** [1] - 1183:17
**RESPONSE** [2] - 1105:5, 1166:11
**response** [2] - 1119:12, 1144:16
**responsibility** [1] - 1211:10
**responsible** [1] - 1160:23
**rest** [2] - 1169:7, 1169:10
**restate** [1] - 1150:9
**restaurant** [2] - 1121:25, 1164:25
**restaurants** [3] - 1121:24, 1122:5, 1130:11
**resume** [1] - 1167:13
**retrained** [1] - 1147:22
**reveal** [2] - 1113:23, 1159:10
**reverse** [2] - 1196:23, 1198:14
**reversed** [1] - 1169:20
**review** [15] - 1112:6, 1115:8, 1116:14, 1119:20, 1119:23, 1120:1, 1122:18, 1127:24, 1147:12, 1147:23, 1158:14, 1159:6, 1196:15, 1216:10
**reviewed** [9] - 1112:10, 1112:15, 1112:20, 1113:9, 1113:17, 1123:9, 1124:9, 1124:10, 1182:15
**reviewing** [2] - 1108:2, 1186:3
**Ride** [1] - 1110:2
**ridiculous** [1] - 1190:5
**rise** [7] - 1105:2, 1166:8, 1166:13, 1167:16, 1167:18,

1171:7, 1200:9
**risk** [27] - 1108:15, 1137:15, 1141:13, 1141:14, 1141:17, 1150:1, 1150:10, 1151:21, 1151:22, 1151:25, 1152:13, 1152:16, 1152:17, 1152:19, 1153:5, 1153:8, 1153:10, 1153:16, 1153:18, 1153:19, 1153:24, 1154:4, 1154:10, 1176:9, 1176:14, 1177:4
**risks** [5] - 1150:24, 1151:3, 1151:17, 1151:23, 1153:6
**RMR** [1] - 1102:24
**road** [4] - 1132:4, 1133:22, 1135:13, 1136:1
**roads** [1] - 1160:1
**roadway** [1] - 1133:24
**Robson** [4] - 1141:20, 1142:2, 1145:7
**room** [1] - 1114:3
**round** [1] - 1132:17
**route** [1] - 1133:19
**roving** [16] - 1154:23, 1155:2, 1155:17, 1156:7, 1156:11, 1156:12, 1156:14, 1156:16, 1157:20, 1157:24, 1157:25, 1158:1, 1160:5, 1160:9, 1160:13, 1211:1
**Roving** [1] - 1156:18
**Rubin** [3] - 1165:22, 1167:8, 1210:10
**Rudy** [1] - 1172:11
**rule** [25] - 1130:19, 1130:22, 1130:24, 1131:5, 1131:11, 1136:15, 1136:24, 1137:3, 1137:7, 1137:13, 1138:4, 1139:18, 1140:7, 1144:4, 1146:23, 1152:23, 1185:19, 1186:6, 1189:5, 1189:9, 1198:14, 1198:15, 1207:7
**ruled** [4] - 1169:13, 1169:16, 1177:11, 1180:2
**rules** [22] - 1119:21, 1137:25, 1139:12, 1139:13, 1140:8,

1141:8, 1143:9, 1147:21, 1153:12, 1153:15, 1154:19, 1159:18, 1159:22, 1160:25, 1161:8, 1162:5, 1162:8, 1180:12, 1180:20, 1206:8, 1207:10
**ruling** [5] - 1177:12, 1177:16, 1177:17, 1217:22, 1217:24
**run** [2] - 1143:16, 1202:15
**rushing** [1] - 1168:18

**S**

**safe** [6] - 1116:6, 1116:7, 1116:9, 1138:12, 1170:23, 1171:4
**safer** [2] - 1108:4, 1109:4
**safety** [43] - 1106:10, 1106:13, 1107:5, 1108:14, 1110:12, 1110:22, 1110:23, 1111:4, 1112:3, 1116:9, 1120:3, 1124:24, 1127:15, 1127:16, 1128:3, 1129:4, 1137:16, 1138:17, 1138:22, 1141:9, 1143:3, 1145:5, 1145:17, 1146:7, 1146:13, 1147:5, 1148:1, 1149:6, 1149:23, 1149:24, 1150:2, 1150:3, 1150:11, 1151:9, 1156:10, 1156:12, 1158:2, 1158:4, 1159:11, 1160:4, 1163:12, 1206:8
**Safety** [2] - 1110:2, 1152:24
**sales** [1] - 1108:2
**sanctioned** [1] - 1147:20
**Sanhita** [1] - 1206:25
**Sanitary** [6] - 1115:24, 1160:19, 1205:22, 1206:4, 1206:9, 1211:9
**sanitary** [7] - 1116:1, 1142:24, 1205:15, 1205:16, 1206:9, 1206:13, 1211:9
**satisfactory** [1] -

1127:20

**satisfy** [1] - 1127:16
**Saturday** [1] - 1154:25
**Saturdays** [1] - 1156:8
**save** [1] - 1183:9
**saw** [16] - 1126:9, 1126:20, 1127:5, 1130:4, 1133:1, 1133:18, 1139:18, 1149:14, 1179:11, 1182:3, 1182:13, 1183:1, 1183:4, 1183:6, 1183:7, 1214:10
**scale** [13] - 1135:11, 1136:2, 1173:13, 1173:18, 1173:20, 1189:15, 1192:21, 1193:2, 1193:17, 1193:19, 1194:8
**scene** [1] - 1107:12
**scheduling** [1] - 1166:25
**schematic** [1] - 1173:11
**school** [1] - 1113:7
**schools** [2] - 1121:16, 1121:17
**SCHWEIZER** [1] - 1102:16
**scrapbooks** [1] - 1189:6
**season** [2] - 1143:17, 1155:22
**seasons** [1] - 1154:16
**seated** [5] - 1105:8, 1105:19, 1166:15, 1167:20, 1171:9
**second** [13] - 1123:8, 1129:9, 1129:22, 1151:9, 1152:12, 1169:21, 1181:11, 1203:3, 1205:4, 1208:25, 1213:11
**Second** [1] - 1208:15
**section** [2] - 1202:20, 1213:19
**Section** [4] - 1102:23, 1213:6, 1213:11, 1213:20
**sector** [2] - 1107:8, 1107:10
**security** [1] - 1147:3
**see** [47] - 1115:18, 1127:5, 1129:15, 1132:20, 1134:6, 1134:11, 1134:12, 1135:7, 1135:13, 1139:25, 1142:4, 1142:12, 1147:20,

1149:11, 1151:10, 1166:10, 1167:2, 1169:1, 1170:21, 1171:6, 1177:22, 1179:3, 1180:4, 1183:23, 1184:10, 1184:21, 1185:14, 1185:16, 1186:12, 1188:11, 1188:14, 1189:21, 1191:8, 1192:17, 1192:22, 1193:3, 1193:18, 1194:9, 1194:10, 1200:4, 1202:1, 1203:4, 1204:13, 1207:23, 1207:25, 1219:7
**seeing** [1] - 1128:15
**seeking** [1] - 1197:20
**seem** [1] - 1121:24
**selecting** [1] - 1179:12
**selection** [1] - 1191:9
**seminars** [2] - 1145:17, 1146:7
**send** [1] - 1170:11
**senior** [1] - 1107:3
**sense** [6] - 1185:2, 1197:11, 1199:17, 1201:2, 1209:4, 1212:8
**sensor** [6] - 1148:21, 1148:23, 1149:3, 1149:9, 1149:11
**sentence** [6] - 1129:22, 1175:25, 1202:24, 1204:16, 1209:1, 1212:20
**separate** [4] - 1111:11, 1124:8, 1124:22, 1214:6
**September** [2] - 1112:18, 1113:18
**serious** [6] - 1151:17, 1151:23, 1153:5, 1153:6, 1153:10, 1212:4
**serve** [1] - 1183:25
**service** [1] - 1143:16
**SERVICES** [1] - 1102:9
**services** [2] - 1204:18, 1209:5
**set** [14] - 1112:21, 1112:25, 1114:17, 1133:3, 1133:15, 1134:11, 1134:13, 1136:8, 1142:25, 1165:18, 1165:24, 1185:10, 1185:16,

1200:25
**sets** [4] - 1134:7, 1185:3, 1185:8, 1185:9
**settings** [1] - 1107:19
**seven** [2] - 1120:12, 1155:23
**several** [3] - 1124:21, 1145:20, 1210:25
**shall** [1] - 1140:9
**sheet** [6] - 1200:20, 1209:16, 1212:24, 1213:1, 1213:3, 1214:2
**ship** [2] - 1132:18, 1132:20
**shocked** [1] - 1196:21
**shop** [1] - 1119:14
**shore** [1] - 1193:4
**short** [1] - 1133:6
**shortened** [1] - 1189:21
**shot** [1] - 1192:19
**show** [17] - 1107:14, 1134:1, 1142:3, 1142:9, 1182:22, 1184:2, 1185:23, 1189:1, 1190:4, 1192:8, 1192:16, 1192:21, 1193:13, 1194:7, 1194:11
**showed** [1] - 1183:3
**showing** [3] - 1185:11, 1192:10, 1192:11
**shown** [4] - 1135:22, 1183:15, 1187:3, 1191:13
**shows** [8] - 1174:6, 1179:11, 1188:5, 1189:7, 1189:14, 1189:15, 1189:17, 1189:18
**sic** [1] - 1152:16
**side** [5] - 1108:1, 1188:6, 1198:21, 1215:7
**SIDEBAR** [2] - 1142:13, 1145:2
**sidebar** [4] - 1141:4, 1142:11, 1142:12, 1201:7
**sides** [7] - 1141:23, 1168:4, 1168:11, 1169:11, 1191:12, 1192:7, 1202:4
**sign** [14] - 1125:2, 1125:6, 1125:10, 1127:13, 1127:18, 1128:19, 1130:25,

1131:6, 1131:10, 1153:9, 1153:18, 1154:21
**signage** [12] - 1127:4, 1127:8, 1131:9, 1143:19, 1144:5, 1144:8, 1153:12, 1159:11, 1159:12, 1180:5, 1203:6
**significant** [1] - 1198:19
**signs** [32] - 1116:11, 1116:16, 1124:7, 1124:20, 1124:23, 1124:25, 1125:2, 1125:3, 1125:11, 1125:14, 1125:18, 1126:9, 1126:20, 1127:10, 1128:17, 1128:20, 1133:16, 1133:17, 1134:11, 1134:15, 1134:20, 1134:22, 1134:23, 1134:24, 1135:3, 1135:8, 1159:5, 1206:1, 1206:5, 1206:6, 1213:17
**silence** [1] - 1206:14
**similar** [2] - 1108:12, 1117:15
**simple** [1] - 1183:20
**simply** [1] - 1202:15
**single** [1] - 1217:12
**sister** [3] - 1186:23, 1186:24, 1188:24
**sit** [2] - 1170:8
**site** [3] - 1113:16, 1141:19, 1150:20
**sites** [1] - 1114:2
**situation** [1] - 1216:11
**situations** [1] - 1216:3
**sized** [1] - 1107:21
**sizes** [1] - 1107:2
**skills** [1] - 1143:17
**skipped** [1] - 1111:14
**slash** [1] - 1144:15
**slide** [1] - 1130:14
**slides** [1] - 1110:3
**slight** [1] - 1167:13
**slightly** [1] - 1109:23
**small** [5] - 1107:20, 1178:16, 1178:18, 1193:9, 1194:11
**smaller** [1] - 1123:9
**smart** [1] - 1191:16
**so..** [2] - 1172:14, 1182:10
**so...but** [1] - 1200:4
**Society** [1] - 1109:21
**sole** [1] - 1203:8

**someone** [2] - 1138:2, 1146:13
**sometimes** [1] - 1125:4
**somewhat** [1] - 1107:4
**somewhere** [3] - 1135:19, 1149:17, 1198:7
**soon** [1] - 1171:10
**sorry** [16] - 1110:19, 1114:22, 1116:3, 1140:7, 1145:13, 1146:25, 1149:15, 1150:8, 1150:16, 1152:11, 1172:5, 1173:10, 1187:5, 1204:2, 1214:8, 1214:21
**sort** [1] - 1110:4
**sorts** [1] - 1107:2
**sound** [3] - 1182:1, 1182:6, 1199:22
**sounds** [1] - 1209:24
**Southern** [1] - 1122:19
**Spa** [2] - 1109:24, 1110:8
**space** [1] - 1171:1
**special** [2] - 1209:6, 1212:19
**specialized** [1] - 1209:7
**specially** [5] - 1116:18, 1116:20, 1116:24, 1117:1, 1160:19
**specially-exempt** [5] - 1116:18, 1116:20, 1116:24, 1117:1, 1160:19
**specific** [6] - 1106:20, 1110:1, 1131:5, 1158:16, 1160:11, 1217:23
**specifically** [7] - 1109:5, 1111:8, 1133:22, 1138:13, 1138:18, 1162:19, 1163:24
**specify** [1] - 1157:3
**specifying** [1] - 1108:2
**spell** [1] - 1105:15
**spend** [1] - 1155:11
**spirit** [1] - 1125:13
**spoken** [1] - 1115:8
**spouting** [1] - 1130:8
**springs** [1] - 1196:17
**spun** [1] - 1191:12

squeal [1] - 1218:21
staff [4] - 1138:16, 1139:13, 1143:16, 1147:22
staffing [1] - 1147:13
stand [3] - 1167:5, 1182:15, 1182:19
standard [22] - 1117:11, 1117:12, 1117:14, 1117:17, 1117:20, 1117:23, 1118:1, 1120:2, 1120:22, 1120:23, 1121:4, 1122:1, 1148:21, 1158:15, 1159:15, 1160:4, 1164:24, 1165:2, 1195:20, 1199:6, 1199:7, 1213:14
standards [6] - 1109:25, 1110:1, 1142:25, 1164:15, 1203:3, 1203:9
standing [1] - 1211:13
standpoint [1] - 1108:14
start [9] - 1142:3, 1150:10, 1169:19, 1170:2, 1170:22, 1171:10, 1201:20, 1209:18, 1210:2
started [3] - 1106:15, 1107:6, 1115:12
starting [2] - 1170:8, 1208:25
starts [1] - 1132:3
State [7] - 1112:15, 1112:16, 1112:18, 1115:20, 1115:24, 1205:22, 1211:8
state [10] - 1105:15, 1110:16, 1122:3, 1127:17, 1143:6, 1143:11, 1156:24, 1159:11, 1206:1
state-required [1] - 1159:11
statement [2] - 1113:14, 1126:22
statements [1] - 1114:13
States [2] - 1157:8, 1157:16
STATES [3] - 1102:2, 1102:11, 1102:14
states [3] - 1108:24, 1109:2, 1146:2
stating [1] - 1213:14
statute [4] - 1115:21, 1205:23, 1205:25,

1217:14
Staves [1] - 1113:17
stay [2] - 1131:7, 1131:10
staying [1] - 1114:1
step [10] - 1105:11, 1151:9, 1151:15, 1151:20, 1151:22, 1152:12, 1152:15, 1152:16, 1152:20, 1165:15
stepfather [2] - 1197:18, 1198:8
steps [1] - 1150:2
still [5] - 1114:19, 1114:25, 1121:25, 1205:1, 1212:3
stipulated [1] - 1131:19
stock [1] - 1144:10
stop [6] - 1131:16, 1156:7, 1161:13, 1167:12, 1174:18, 1177:5
stopped [2] - 1174:17, 1174:20
store [8] - 1133:23, 1135:17, 1135:25, 1136:7, 1136:9, 1136:17, 1136:18, 1165:15
strange [1] - 1194:4
strategically [1] - 1149:7
STREETS [1] - 1102:12
strike [1] - 1140:4
striking [2] - 1155:14
subject [3] - 1169:8, 1169:9, 1205:21
submission [1] - 1168:2
subset [2] - 1122:5, 1207:18
subsets [1] - 1215:10
substitute [1] - 1186:16
succinct [1] - 1183:16
suddenly [1] - 1177:9
suffering [5] - 1207:5, 1207:19, 1215:1, 1215:3, 1215:10
suggest [1] - 1215:18
suggested [1] - 1203:24
suggestion [2] - 1189:1, 1205:8
suggests [2] - 1176:8, 1199:19
summation [1] -

1190:4
summer [2] - 1155:5, 1155:6
sun [4] - 1114:17, 1114:19, 1114:20, 1114:25
Sunday [5] - 1126:10, 1136:17, 1136:19, 1137:9, 1137:12
sunset [7] - 1114:14, 1114:18, 1114:24, 1115:1, 1115:3, 1115:7, 1115:9
supervise [2] - 1162:23, 1163:4
supervising [1] - 1160:23
supervision [10] - 1117:18, 1160:21, 1161:1, 1161:2, 1162:13, 1162:14, 1162:17, 1162:18, 1162:19
supervisory [1] - 1116:22
supplemental [2] - 1112:17, 1112:23
supplied [6] - 1122:13, 1122:17, 1122:22, 1122:24, 1123:8, 1123:23
supply [1] - 1141:23
support [2] - 1198:10, 1198:17
supported [1] - 1174:8
supports [1] - 1217:19
supposed [1] - 1164:6
surrendering [1] - 1123:13
surrounding [1] - 1114:2
surveillance [8] - 1128:12, 1128:14, 1128:15, 1146:20, 1147:6, 1147:11, 1147:15, 1159:14
survey [1] - 1165:7
Survivors [1] - 1217:14
survivorship [1] - 1206:23
swam [1] - 1174:25
swim [17] - 1106:17, 1116:9, 1121:17, 1121:18, 1121:20, 1121:23, 1128:24, 1131:24, 1132:24, 1132:25, 1136:24, 1137:11, 1151:5,

1174:23, 1175:1, 1177:5, 1177:24
swimmers [4] - 1107:16, 1111:10, 1130:20, 1177:22
swimming [55] - 1106:15, 1106:16, 1107:21, 1107:25, 1108:22, 1111:1, 1111:9, 1111:10, 1114:3, 1116:7, 1118:9, 1120:25, 1124:8, 1125:19, 1128:19, 1128:24, 1129:1, 1129:25, 1130:6, 1130:16, 1132:3, 1133:17, 1133:20, 1137:24, 1137:25, 1139:18, 1142:22, 1142:23, 1143:1, 1143:5, 1144:15, 1146:19, 1150:18, 1150:22, 1151:2, 1151:4, 1152:8, 1156:13, 1156:16, 1156:19, 1157:4, 1157:18, 1159:12, 1159:23, 1161:3, 1161:4, 1163:20, 1175:7, 1194:12, 1205:25, 1206:2, 1206:11, 1213:13, 1213:14
Swimming [3] - 1106:23, 1108:7, 1110:8
swing [3] - 1133:3, 1133:15, 1136:8
swings [2] - 1132:16, 1133:6
sworn [1] - 1105:13

— T —

tab [1] - 1123:5
table [1] - 1214:10
TAKEN [2] - 1166:12, 1167:15
tape [1] - 1167:12
target [1] - 1120:13
teach [9] - 1106:25, 1107:1, 1111:16, 1139:2, 1139:9, 1139:11, 1139:14, 1145:9
teachers [3] - 1107:1, 1111:16, 1145:9
teaching [1] - 1107:16
team [2] - 1106:17, 1121:17

teams [1] - 1121:18
technical [1] - 1144:11
technically [2] - 1114:18, 1216:4
technique [1] - 1166:25
ten [1] - 1165:17, 1165:24, 1167:14
tendency [1] - 1135:6
Tennyson [1] - 1174:6
TERKOWITZ [1] - 1102:20
term [1] - 1117:11
terms [3] - 1121:9, 1136:15, 1160:9
testified [16] - 1105:14, 1119:25, 1126:15, 1126:23, 1127:4, 1127:8, 1128:22, 1143:2, 1143:21, 1159:18, 1161:7, 1164:10, 1174:5, 1185:20, 1186:25
testify [6] - 1111:21, 1121:10, 1145:14, 1164:13, 1182:15, 1202:10
testifying [2] - 1145:12, 1194:6
testimony [26] - 1114:12, 1118:24, 1125:25, 1127:5, 1127:7, 1133:25, 1134:5, 1136:16, 1136:21, 1140:19, 1140:21, 1140:23, 1141:2, 1144:1, 1144:9, 1149:15, 1149:18, 1155:9, 1167:4, 1173:20, 1174:14, 1182:2, 1195:23, 1197:15, 1203:11, 1209:7
testing [1] - 1108:9
Testing [1] - 1109:21
tests [2] - 1116:8
Texas [1] - 1107:7
text [1] - 1179:6
THE [347] - 1102:2, 1102:14, 1105:2, 1105:4, 1105:6, 1105:11, 1105:15, 1105:17, 1105:19, 1105:20, 1105:21, 1105:22, 1105:23, 1105:24, 1109:13, 1109:17, 1109:18, 1110:13, 1110:18,

1111:21, 1114:21, 1114:22, 1118:16, 1118:20, 1118:22, 1118:24, 1119:1, 1119:5, 1119:17, 1120:7, 1124:12, 1125:7, 1131:15, 1131:17, 1131:20, 1139:4, 1139:6, 1140:4, 1140:15, 1140:19, 1140:22, 1140:24, 1141:6, 1142:6, 1142:12, 1142:14, 1142:16, 1142:18, 1143:4, 1143:12, 1143:16, 1143:23, 1144:1, 1144:4, 1144:8, 1144:19, 1144:21, 1148:2, 1148:5, 1148:7, 1148:9, 1148:10, 1148:13, 1148:16, 1148:18, 1149:11, 1149:13, 1149:17, 1153:23, 1153:25, 1154:1, 1154:2, 1154:3, 1154:6, 1155:13, 1155:18, 1155:23, 1156:1, 1156:18, 1156:21, 1156:25, 1157:3, 1158:9, 1158:18, 1158:22, 1160:8, 1160:11, 1160:13, 1160:15, 1160:17, 1161:13, 1161:16, 1161:20, 1163:6, 1163:8, 1163:14, 1163:15, 1163:16, 1163:19, 1163:21, 1163:23, 1164:2, 1164:6, 1164:11, 1165:9, 1165:15, 1165:19, 1165:23, 1165:25, 1166:8, 1166:10, 1166:13, 1166:15, 1166:21, 1167:9, 1167:12, 1167:16, 1167:18, 1167:20, 1167:24, 1168:3, 1168:8, 1168:11, 1168:15, 1168:20, 1168:24, 1169:3, 1169:7, 1169:9, 1169:11, 1169:14, 1169:17, 1170:16, 1170:19, 1170:24, 1170:25, 1171:7, 1171:9, 1171:19, 1171:23, 1172:1,

1172:3, 1172:14, 1172:20, 1173:6, 1173:13, 1173:16, 1173:19, 1173:24, 1174:3, 1174:6, 1174:12, 1174:17, 1175:3, 1175:9, 1175:15, 1176:5, 1176:7, 1176:12, 1176:18, 1177:2, 1177:8, 1177:13, 1177:18, 1177:21, 1177:25, 1178:2, 1178:4, 1178:8, 1178:10, 1178:13, 1178:16, 1178:20, 1178:24, 1179:2, 1179:5, 1179:11, 1179:15, 1179:18, 1179:20, 1179:22, 1180:3, 1180:8, 1180:10, 1180:17, 1180:20, 1180:23, 1181:4, 1181:9, 1181:14, 1181:17, 1181:20, 1181:22, 1181:24, 1182:8, 1183:9, 1183:13, 1183:18, 1183:22, 1184:5, 1184:9, 1184:14, 1184:25, 1185:4, 1185:6, 1185:9, 1185:14, 1185:18, 1185:21, 1185:25, 1186:6, 1186:12, 1186:16, 1186:20, 1186:22, 1186:24, 1187:1, 1187:3, 1187:6, 1187:17, 1187:22, 1187:25, 1188:3, 1188:11, 1188:13, 1188:16, 1189:8, 1189:12, 1189:22, 1189:25, 1191:2, 1191:10, 1191:19, 1191:21, 1191:23, 1192:2, 1192:6, 1192:12, 1192:17, 1192:22, 1193:7, 1193:9, 1193:12, 1194:1, 1194:4, 1194:15, 1194:20, 1195:3, 1195:9, 1195:12, 1195:15, 1195:17, 1195:22, 1196:1, 1196:6, 1196:8, 1196:11, 1196:14, 1196:17, 1196:20, 1198:2, 1199:1, 1199:3,

1199:5, 1200:9, 1200:11, 1200:15, 1200:19, 1202:4, 1202:12, 1202:17, 1202:19, 1202:24, 1203:2, 1203:6, 1203:12, 1203:17, 1203:20, 1203:22, 1204:2, 1204:4, 1204:6, 1204:8, 1204:15, 1204:23, 1205:1, 1205:7, 1205:10, 1205:17, 1206:16, 1206:18, 1207:4, 1207:10, 1207:15, 1207:17, 1207:20, 1208:2, 1208:5, 1208:11, 1208:15, 1208:17, 1208:21, 1208:24, 1209:4, 1209:14, 1209:23, 1209:25, 1210:5, 1210:13, 1210:17, 1210:22, 1211:6, 1211:12, 1211:15, 1211:19, 1211:24, 1212:1, 1212:10, 1212:15, 1212:25, 1213:4, 1213:8, 1214:1, 1214:10, 1214:14, 1214:22, 1214:25, 1215:4, 1215:6, 1215:13, 1215:21, 1216:18, 1216:21, 1217:7, 1217:9, 1217:17, 1217:21, 1217:24, 1218:5, 1218:10, 1218:13, 1218:16, 1218:20, 1218:22, 1218:24, 1219:1, 1219:5

**therapy** [1] - 1107:20
**thereafter** [1] - 1115:2
**therefore** [1] - 1211:16
**thereto** [2] - 1112:21, 1113:13
**they've** [3] - 1109:22, 1189:15, 1190:1
**thinking** [2] - 1144:22, 1146:4
**Third** [1] - 1216:9
**third** [7] - 1113:5, 1129:20, 1151:20, 1152:16, 1152:19, 1188:25, 1191:8
**Thomas** [3] - 1113:18, 1127:25, 1202:9
**three** [26] - 1124:11,

1126:1, 1131:16, 1139:18, 1139:23, 1140:24, 1159:13, 1168:10, 1177:21, 1177:23, 1180:15, 1180:17, 1185:10, 1185:13, 1185:20, 1188:10, 1191:23, 1193:1, 1193:13, 1197:16, 1199:21, 1202:9, 1202:21, 1202:24, 1204:10, 1212:3
**throughout** [3] - 1143:17, 1160:1, 1199:18
**Thursday** [2] - 1170:4, 1170:8
**tie** [1] - 1176:14
**Tim** [1] - 1155:9
**Timothy** [3] - 1113:2, 1113:6, 1113:13
**Tinari** [1] - 1194:19
**Tinari's** [1] - 1194:24
**Title** [1] - 1102:23
**today** [3] - 1121:10, 1207:11, 1218:24
**toddlers** [1] - 1107:3
**together** [1] - 1175:13
**TOM** [1] - 1102:18
**tomorrow** [6] - 1169:18, 1170:3, 1170:7, 1170:22, 1171:5, 1219:8
**took** [8] - 1129:15, 1129:16, 1136:7, 1136:12, 1136:13, 1159:8, 1205:19
**top** [2] - 1114:18, 1209:12
**topic** [1] - 1129:20
**Toribio** [7] - 1112:7, 1113:12, 1114:9, 1115:4, 1188:20, 1213:13, 1213:23
**TORIBIO** [3] - 1102:3, 1102:4, 1102:5
**Toribio's** [2] - 1113:7, 1197:14
**torturous** [1] - 1212:5
**totally** [1] - 1190:11
**towards** [1] - 1133:24
**trailer** [1] - 1114:4
**trained** [2] - 1145:8, 1145:9
**trainer** [2] - 1106:24, 1107:21
**training** [10] - 1107:15, 1108:5, 1108:7, 1108:13,

1108:17, 1109:6, 1143:16, 1158:24, 1209:6, 1209:7
**transcript** [2] - 1113:11, 1113:12
**trees** [1] - 1155:12
**trial** [4] - 1126:16, 1126:24, 1187:10, 1216:3
**tried** [3] - 1107:11, 1107:12, 1172:24
**tries** [3] - 1174:8, 1176:12, 1176:14
**trip** [2] - 1170:23, 1171:5
**true** [5] - 1102:23, 1110:14, 1172:24, 1190:9, 1209:5
**truly** [1] - 1107:13
**truth** [1] - 1188:9
**try** [9] - 1106:5, 1120:13, 1139:5, 1151:16, 1151:24, 1152:16, 1155:25, 1156:4, 1219:1
**trying** [6] - 1121:13, 1130:25, 1156:4, 1164:9, 1184:16, 1205:13
**tubs** [1] - 1108:22
**turn** [3] - 1122:9, 1167:6, 1214:1
**turned** [1] - 1115:17
**twice** [2] - 1172:4, 1181:11
**two** [46] - 1123:24, 1124:2, 1124:7, 1124:18, 1124:19, 1124:22, 1124:23, 1125:11, 1125:18, 1134:6, 1134:7, 1134:9, 1134:19, 1135:7, 1135:8, 1146:17, 1166:4, 1171:14, 1172:3, 1172:4, 1174:18, 1175:13, 1177:9, 1180:17, 1183:8, 1185:3, 1185:7, 1187:2, 1189:21, 1198:5, 1198:11, 1198:16, 1199:21, 1200:12, 1200:14, 1200:15, 1200:19, 1204:10, 1207:6, 1208:3, 1210:6, 1210:22, 1212:3, 1214:7
**two-and-a-half** [1] - 1210:6

**two-dimensional** [1] - 1183:8
**type** [7] - 1107:17, 1108:5, 1117:24, 1118:2, 1119:12, 1120:25, 1160:23
**types** [2] - 1106:18, 1110:4
**typically** [1] - 1147:12

## U

**U.S.C** [1] - 1102:23
**ultimate** [1] - 1172:12
**ultimately** [1] - 1213:21
**umbrella** [1] - 1108:23
**under** [17] - 1108:23, 1116:4, 1125:5, 1129:16, 1159:15, 1160:19, 1160:25, 1161:3, 1163:2, 1167:4, 1197:8, 1197:22, 1205:25, 1206:1, 1213:11, 1214:10, 1217:11
**underage** [4] - 1140:9, 1140:15, 1140:20
**understood** [2] - 1144:24, 1161:25
**undertaken** [1] - 1210:25
**unexpected** [1] - 1167:21
**unfair** [1] - 1184:22
**unfavorable** [1] - 1215:20
**unique** [1] - 1198:16
**UNITED** [3] - 1102:2, 1102:11, 1102:14
**United** [2] - 1157:8, 1157:15
**universities** [1] - 1107:23
**unknown** [2] - 1188:25, 1216:13
**unless** [3] - 1156:1, 1182:6, 1209:5
**unreadable** [1] - 1127:19
**unreasonable** [1] - 1163:5
**up** [36] - 1105:11, 1106:16, 1107:14, 1107:20, 1115:13, 1115:16, 1121:1, 1123:13, 1124:7, 1124:20, 1125:5, 1134:5, 1140:16,

1146:14, 1147:6, 1148:21, 1148:24, 1153:9, 1155:4, 1156:6, 1159:5, 1162:12, 1162:25, 1165:18, 1165:24, 1170:4, 1192:11, 1192:16, 1192:18, 1200:2, 1202:16, 1208:8, 1210:1, 1213:18, 1216:3, 1216:5
**upbringing** [1] - 1197:9, 1197:10, 1199:20
**urge** [1] - 1191:8
**usages** [2] - 1151:4, 1151:7
**useful** [1] - 1173:21
**users** [1] - 1151:24
**utilized** [2] - 1175:20, 1179:9

## V

**vague** [1] - 1158:18
**Valley** [1] - 1146:12
**value** [2] - 1194:10, 1216:7
**various** [3] - 1108:6, 1146:3, 1196:25
**vast** [1] - 1122:4
**verdict** [9] - 1200:20, 1209:16, 1212:24, 1212:25, 1213:2, 1214:2, 1216:5, 1216:12, 1216:15
**version** [3] - 1178:16, 1178:18, 1200:21
**Vesper** [12] - 1144:6, 1171:15, 1176:1, 1180:24, 1187:19, 1194:5, 1198:13, 1198:21, 1199:18, 1203:24, 1210:2, 1218:1
**VESPER** [247] - 1102:18, 1102:18, 1103:8, 1103:11, 1103:14, 1109:15, 1110:14, 1110:20, 1110:21, 1111:20, 1118:13, 1118:21, 1118:23, 1118:25, 1119:3, 1119:16, 1120:8, 1120:9, 1124:14, 1124:16, 1124:17, 1125:4, 1125:8, 1125:9, 1131:18, 1131:21,

1131:23, 1134:3, 1134:4, 1139:5, 1139:7, 1140:6, 1140:17, 1140:21, 1140:23, 1141:1, 1141:5, 1141:7, 1142:5, 1142:7, 1142:8, 1143:2, 1143:8, 1144:3, 1144:7, 1144:18, 1144:20, 1144:24, 1145:3, 1148:3, 1148:11, 1148:15, 1148:17, 1148:20, 1149:14, 1149:20, 1149:21, 1154:8, 1155:15, 1155:20, 1155:25, 1156:3, 1156:20, 1156:23, 1157:1, 1157:6, 1158:8, 1158:16, 1158:21, 1161:10, 1161:14, 1161:18, 1161:25, 1162:1, 1163:7, 1163:9, 1164:1, 1164:3, 1164:8, 1164:12, 1165:11, 1165:13, 1165:20, 1166:19, 1168:12, 1168:16, 1168:21, 1169:6, 1169:13, 1169:15, 1171:17, 1171:21, 1171:25, 1172:2, 1172:9, 1172:17, 1173:3, 1173:12, 1173:15, 1174:1, 1174:20, 1175:8, 1175:12, 1175:19, 1175:22, 1176:2, 1176:17, 1176:20, 1177:6, 1177:11, 1177:15, 1177:19, 1177:23, 1178:1, 1178:7, 1178:12, 1178:14, 1178:18, 1178:22, 1179:1, 1179:7, 1179:19, 1180:2, 1180:7, 1180:19, 1181:3, 1181:6, 1181:13, 1181:16, 1181:23, 1182:1, 1182:24, 1183:11, 1183:16, 1183:21, 1184:8, 1184:13, 1184:24, 1185:3, 1185:5, 1185:7, 1185:10, 1185:15, 1185:19, 1185:23, 1186:8, 1186:13, 1186:18,

1186:21, 1186:23, 1186:25, 1187:2, 1187:5, 1187:14, 1187:20, 1187:24, 1188:4, 1188:8, 1188:12, 1189:4, 1189:10, 1189:13, 1189:24, 1190:1, 1190:9, 1190:20, 1190:23, 1190:25, 1191:6, 1191:18, 1191:20, 1191:22, 1192:1, 1192:3, 1192:8, 1192:14, 1192:18, 1192:23, 1193:8, 1193:11, 1193:15, 1194:17, 1194:23, 1195:16, 1195:21, 1195:25, 1196:7, 1196:16, 1198:1, 1200:6, 1200:14, 1200:17, 1200:22, 1202:14, 1202:18, 1202:23, 1203:1, 1203:5, 1203:8, 1203:14, 1203:21, 1204:7, 1205:9, 1205:16, 1206:17, 1207:3, 1207:9, 1208:4, 1208:19, 1208:23, 1209:3, 1209:13, 1209:21, 1210:3, 1210:6, 1210:14, 1210:19, 1210:21, 1210:24, 1211:7, 1211:14, 1211:18, 1211:22, 1211:25, 1212:3, 1212:11, 1212:16, 1212:23, 1213:2, 1214:12, 1214:20, 1214:24, 1215:8, 1215:18, 1215:25, 1216:20, 1217:4, 1217:8, 1217:19, 1217:23, 1218:4, 1218:7, 1218:15, 1218:17, 1218:25, 1219:4, 1219:7
**Vesper's** [2] - 1197:5, 1205:7
**video** [15] - 1147:15, 1147:16, 1147:20, 1147:23, 1148:7, 1148:11, 1181:22, 1182:3, 1182:4, 1182:5, 1182:13, 1182:15, 1182:22, 1183:2, 1184:2
**videographer** [1] -

1167:22
**videotape** [3] - 1166:1, 1166:17, 1167:8
**Videotape** [2] - 1167:11, 1167:23
**view** [3] - 1144:15, 1176:8, 1192:10
**violating** [1] - 1147:21
**Virginia** [1] - 1145:25
**visible** [3] - 1127:13, 1134:23, 1135:9
**visit** [1] - 1144:14
**VOIR** [4] - 1103:5, 1103:7, 1106:1, 1110:21
**voir** [1] - 1110:13
**voluntarily** [4] - 1109:3, 1171:22, 1210:15, 1211:5
**vote** [1] - 1187:19

## W

**wait** [2] - 1156:18, 1188:10
**waive** [1] - 1201:17
**waived** [1] - 1197:21
**waiving** [1] - 1201:15
**walk** [2] - 1133:6, 1133:23
**walked** [1] - 1136:7
**wants** [5] - 1145:16, 1183:14, 1189:17, 1193:18, 1212:14
**warn** [2] - 1153:2, 1163:16
**warned** [1] - 1147:21
**warns** [1] - 1153:10
**warrant** [1] - 1187:22
**WAS** [16] - 1104:6, 1104:7, 1104:8, 1104:9, 1104:10, 1104:11, 1104:12, 1104:13, 1173:23, 1178:3, 1178:9, 1179:14, 1179:21, 1180:9, 1180:22, 1181:21
**watching** [2] - 1162:18, 1162:19
**water** [26] - 1108:6, 1110:3, 1110:25, 1111:2, 1111:4, 1111:8, 1116:8, 1118:8, 1120:3, 1121:16, 1121:19, 1128:23, 1129:16, 1130:14, 1132:4,

1134:20, 1139:19, 1139:20, 1150:6, 1150:11, 1150:12, 1153:23, 1154:3, 1163:3, 1163:17, 1176:24

**Water** [1] - 1110:10

**ways** [1] - 1154:10

**weathered** [2] - 1127:14, 1127:18

**website** [6] - 1144:14, 1171:17, 1171:19, 1172:6, 1182:20, 1183:2

**weeds** [1] - 1127:15

**week** [4] - 1155:18, 1155:24, 1166:18, 1188:21

**weeks** [2] - 1124:11, 1159:13

**well-behaved** [1] - 1191:13

**WERE** [2] - 1104:14, 1192:4

**WESTMORELAND** [1] - 1102:18

**whale** [26] - 1130:4, 1130:8, 1130:12, 1130:18, 1130:19, 1130:25, 1131:3, 1131:7, 1131:10, 1131:11, 1131:16, 1173:24, 1174:5, 1174:9, 1174:16, 1174:17, 1174:18, 1174:20, 1174:23, 1175:1, 1175:2, 1175:7, 1176:9, 1176:15, 1177:1

**Wheeler** [6] - 1113:15, 1126:4, 1126:9, 1127:3, 1127:4, 1181:14

**Wheeler's** [1] - 1127:7

**whole** [3] - 1157:5, 1160:12, 1196:24

**width** [2] - 1144:13, 1193:4

**Wiener** [2] - 1184:14

**wife** [3] - 1123:6, 1197:7, 1197:14

**withdraw** [1] - 1139:5

**WITNESS** [21] - 1103:3, 1105:17, 1105:21, 1105:23, 1109:18, 1110:18, 1114:22, 1131:17, 1139:6, 1148:9, 1149:13, 1153:25, 1154:2, 1154:6,

1158:22, 1160:11, 1160:15, 1163:8, 1163:15, 1163:19, 1163:23

**witness** [18] - 1105:13, 1111:22, 1126:22, 1127:4, 1143:22, 1165:19, 1166:16, 1166:22, 1167:1, 1167:3, 1167:5, 1167:25, 1182:14, 1182:19, 1193:21, 1194:10, 1195:4, 1218:19

**witnesses** [1] - 1114:5

**wolf** [1] - 1174:7

**woman** [1] - 1187:25

**wonderful** [1] - 1139:2

**wondering** [1] - 1214:11

**Woodruff** [1] - 1199:24

**word** [15] - 1125:21, 1152:13, 1172:6, 1175:20, 1176:3, 1179:23, 1183:5, 1201:24, 1203:3, 1204:10, 1204:15, 1205:5, 1209:1, 1214:25

**wordings** [1] - 1215:9

**words** [10] - 1175:13, 1176:13, 1178:10, 1196:23, 1198:9, 1201:17, 1201:25, 1208:3, 1208:5, 1217:3

**World** [1] - 1110:10

**worn** [1] - 1127:14

**worry** [1] - 1201:14

**worth** [1] - 1201:6

**would-be** [1] - 1198:18

**wrinkle** [1] - 1199:11

**wrinkles** [1] - 1199:12

**write** [2] - 1195:5, 1195:18

**writes** [1] - 1109:25

**writing** [4] - 1124:19, 1159:19, 1218:7, 1218:8

**written** [2] - 1146:23, 1160:25

**wrongful** [2] - 1212:17, 1217:14

**Wrongful** [1] - 1217:12

## Y

**year** [13] - 1106:14, 1126:1, 1126:19, 1128:9, 1128:23, 1139:18, 1139:22, 1139:24, 1145:20, 1155:18, 1163:6, 1163:7, 1169:4

**years** [14] - 1106:18, 1107:18, 1108:5, 1108:18, 1141:21, 1141:22, 1153:14, 1154:16, 1191:11, 1198:24, 1198:25, 1199:1, 1199:2, 1199:5

**YMCA's** [1] - 1109:1

**young** [1] - 1186:22

**yourself** [3] - 1145:4, 1150:3, 1202:17

## Z

**zero** [1] - 1216:6